IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
CASE No. 8:11 CR 197 T 24 MAP


UNITED STATES OF AMERICA


        Plaintiff,

v.                         July 11, 2011
                               9:00 a.m.

MICHAEL JIMENEZ, JOHANA
MELENDEZ SANTIAGO, and
MARIE MASON


        Defendant.

_____/


TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:    ROBERT O'NEILL
                        Assistant U.S. Attorney
                        U.S. Attorney's Office
                        400 North Tampa Street
                        Suite 3200
                        Tampa, FL 33602


For the Defendant:    DAVID WEISBROD
Michael Jimenez       Law Office of David T. Weisbrod
                        Suite 1111, 412 E Madison St
                        Tampa, FL 33602

```
For the Defendant:     JEFFREY G. BROWN
Johana Melendez        Brown & Doherty, PA
Santiago               Suite 120, 450 Carillon Pkwy
                       St. Petersburg, FL 33716


For the Defendant:     MATTHEW P. FARMER
Marie Mason            Farmer & Fitzgerald, PA
                       708 E Jackson St , [!ADDRESS-B3]
                       Tampa, FL 33602



Reported By:           Sandra K. Provenzano, RPR
                       Official Court Reporter
                       U.S. District Court
                       801 North Florida Avenue
                       Tampa, FL 33602
                       (813) 301-5699

STENOGRAPHICALLY REPORTED
COMPUTER-AIDED TRANSCRIPTION
```

INDEX

| WITNESS: | PAGE: |
|---|---|
| **BARTHOLOMEW BANKS** | 65 |
| DIRECT EXAMINATION | 65 |
| BY MR. O'NEILL: | |
| CROSS-EXAMINATION | 71 |
| BY MR. WEISBROD: | |
| **MARECIA BELL** | 72 |
| DIRECT EXAMINATION | 73 |
| BY MR. O'NEILL: | |
| CROSS-EXAMINATION | 89 |
| BY MR. FARMER: | |

* * * * *

EXHIBITS:                    IDENTIFIED:

| EXHIBITS: | RECEIVED: |
|---|---|
| 10 | 76 |
| 32 | 93 |

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1              P R O C E E D I N G

2    (JURY SELECTION HAVING CONCLUDED; PROCEEDING CONTINUES AS

3                    FOLLOWS:)

4              THE COURT:  Okay.  I have just a couple of

5    questions, and then we'll recess.  Do all the defense

6    attorneys intend to make opening statements?

7              MR. WEISBROD:  Yes, Your Honor.  And we did

8    with the Court's permission alter the order a little bit.

9    Mr. Brown would go first, followed by myself, and then

10   Mr. Farmer.

11             THE COURT:  Okay.  And, Mr. O'Neill,

12   obviously it's going to be later on this afternoon, but

13   can you tell me what witnesses you anticipate calling

14   this afternoon.

15             MR. O'NEILL:  Yes, Your Honor.  I was hoping

16   to start with Mr. Banks, which goes -- going

17   alphabetical.  Just kidding.  But the next one would have

18   been Bell.  So they're listed one and three in the

19   government's witness list.  I thought we wouldn't get

20   past that, Judge.

21             MR. WEISBROD:  Actually, with Miss Bell,

22   Mr. Farmer was going to take the first cross-examination

23   of Miss Bell.

24             THE COURT:  Okay.  Who will be the first --

25   will you do Banks first?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
 1              MR. WEISBROD:  Yes.

 2              THE COURT:  Okay.  All right.  I'll ask that

 3     you be back at 2:15.

 4              Mr. Brown, if you're not back, I understand

 5     you'll be in front of Judge Whittemore.  And if we have

 6     some time, we'll take up the issue.  2:15.  We're in

 7     recess.  Thank you.

 8              Let me ask your paralegal to stick around

 9     for just a minute.  We have a laptop problem apparently.

10     We need to work out how we're going to connect.

11              THE PARALEGAL:  We're just trying to figure

12     out if there's another cord for the back row.

13              THE COURT:  Don't leave.

14     (THEREUPON, THE LUNCHEON RECESS WAS TAKEN, AND THEN THE

15              PROCEEDINGS CONTINUED AS FOLLOWS:)

16              COURT SECURITY OFFICER:  All rise.

17              THE COURT:  Mr. Brown is not back yet.  Do

18     we have the laptop hooked up so it works?  You okay?

19              THE PARALEGAL:  Yes.

20              THE COURT:  All right.  And we may have a

21     few minutes so, Mr. Weisbrod, why don't you take me

22     through the exhibit and tell me your concern.

23              MR. WEISBROD:  Sure.  Your Honor, it's about

24     a 55-minute taped interview of Mr. Jimenez by a member of

25     Hillsborough County Compliance Services, is what they
```

1  call themselves, an investigator by the name of Sheehan.

2        And during the course of the interview there

3  are several portions of which Mr. Sheehan, at least in my

4  view, editorializes about the answers he's getting

5  saying, you're acting confused, you're being defensive.

6        I have a list for the Court and the

7  approximate times on the disk that the incidents occur.

8  And I think the government may agree with a couple of the

9  instances that I've highlighted, maybe not with some of

10  the others.

11        For instance, he's asked -- Mr. Jimenez is

12  asked, well, what about the -- what the other people are

13  saying?  Are they lying?  That type of question which we

14  think is completely inappropriate.  There's a recent 11th

15  Circuit case on that type of question being asked in

16  court.

17        And so quite frankly, and unfortunately I

18  suppose for the Court, the only way to really get a feel

19  for it is to listen to the tape -- or listen to the disk

20  and at the times that I've sort of outlined on -- on the

21  sheet here the comments the investigator makes.

22        THE COURT:  Okay.  Do you have that list?

23        MR. WEISBROD:  I do have a list for the

24  Court, and I also have the disk that the government

25  provided me.

1          THE COURT:  I think I might have the disk.

2          Mr. O'Neill, I have the disk, too, don't I?

3          MR. O'NEILL:  Yes, Your Honor.

4          THE COURT:  I'm good.  Okay.

5          MR. WEISBROD:  Back the tape in all the

6     instances, and then we can save the Court time.

7          THE COURT:  Well, I have two questions,

8     Mr. O'Neill.  Mr. Weisbrod said there may be some that

9     you agree to.  Maybe you should tell me what those are

10    and how -- if I agree on any of this, how you're going to

11    fix the recording.

12         MR. O'NEILL:  Yes, Your Honor.  Mr. Weisbrod

13    brought this to my attention today.  And as I told him,

14    it would have been a lot better if I had gotten it

15    earlier because some of these redactions, if the Court

16    were to favor it -- first of all, I don't have the

17    technological ability.  I presume someone would.  But

18    some are for like for ten seconds and the like.

19         But the reason I mention the time frames, in

20    listening to the disk myself -- and Mr. Weisbrod does not

21    have this on it, but I looks to me like the first four

22    minutes and 23 seconds are pretty much irrelevant as

23    well.  I have no objection putting them in if

24    Mr. Weisbrod wants them in.

25         But I think in listening to it, Your Honor,

1    nothing really relevant to this starts for the first four

2    minutes and 23 seconds.  And I put the times down just

3    for the Court's edification.

4              And then from --

5              THE COURT:  What do you mean you put the

6    times down where?

7              MR. O'NEILL:  I'm recounting them to you.  I

8    put them on a note to myself in case the Court wanted to

9    speed up the 55 minutes --

10             THE COURT:  Okay.  What -- tell what --

11             MR. O'NEILL:  Yes, Judge.

12             THE COURT:  -- starts that.

13             MR. O'NEILL:  From the time it starts till

14   four minutes and 23 seconds the investigator is asking

15   about what appears to be an unrelated matter.

16             THE COURT:  Okay.  Does that involve any of

17   these times that Mr. Weisbrod has on here?

18             MR. O'NEILL:  No, Your Honor.

19             MR. WEISBROD:  It does not, Your Honor.  But

20   it does involve asking Mr. Jimenez questions pertaining

21   to the performance of another employee by the name of

22   Dawn Dasher.  And the only reason I left that on the tape

23   is because they listed Miss Dasher as a witness, and so I

24   think then it should be played for the jury that she was

25   being investigated by compliance services also.

1            THE COURT:  Is Miss Dasher going to be a

2    witness?

3            MR. O'NEILL:  Yes, Your Honor.

4            THE COURT:  Okay.  All right.  Well, putting

5    that aside for just a moment, could I ask -- that can

6    be -- should I agree with that, that could be

7    accomplished fairly easy.  But tell me about the rest of

8    these.

9            MR. O'NEILL:  Yes, Your Honor.  And then if

10   we could go all the way to the end, Mr. Weisbrod's

11   projected final excision is 49 minutes, 54 seconds, Your

12   Honor, to 51:42.

13           In listening to the tapes again prior to

14   hearing Mr. Weisbrod's complaint about this -- these

15   portions, I thought 49:46 is probably an appropriate

16   place for the tape to end because then it does go into,

17   as Mr. Weisbrod's saying, a lot of give and go that I

18   don't think adds anything.  It seems that they're just

19   going over old territory.

20           THE COURT:  Okay.  So that would mean that

21   that last 49:54 to 51:42 you have no objection to?

22           MR. O'NEILL:  That's correct, Your Honor.

23           As to the other ones, I have not listened to

24   the tape in light of Mr. Weisbrod's complaints, so I

25   don't know, for instance, just to take the first one at

1    random, those -- from 22:12 to 23, what's --  I fully

2    think he's put it 100 percent accurate here.  I don't

3    mean to disparage Mr. Weisbrod.  I guarantee that's

4    accurate.

5              It's just what we can do about that at this

6    stage in cutting it out.  And obviously I'll do whatever

7    the Court says.

8              THE COURT:  Now, the witness that you're

9    going to use to present this evidence you would suggest

10   that he's going to be the first witness tomorrow?

11             MR. O'NEILL:  Oh, no, Your Honor, no, no.

12   Perhaps as early as tomorrow, but definitely not today.

13             THE COURT:  Okay.  All right.  That's

14   helpful because the first time I would be able to listen

15   to this would be this afternoon or this evening.

16             MR. O'NEILL:  Yes, Your Honor.

17             THE COURT:  Okay.  Well, I've got it.  I'll

18   listen to it.  And I've got the list.

19             Is -- do my exhibits have a transcript of

20   this as well or just the tape?

21             MR. O'NEILL:  No, Your Honor.  Just the --

22   in English and very audible.

23             THE COURT:  Okay.

24             MR. O'NEILL:  Your Honor, I could possibly

25   do one thing if the Court would prefer.  At the break I

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    could ask someone to go over to the office and see if we

2    could excise -- if we have the technological ability to

3    excise these and then I can look at it tonight.

4            And if I just agree with Mr. Weisbrod, it

5    would save the Court's time of going through it.  If we

6    can do it like that.

7            THE COURT:  Well, I'll go through it anyway.

8    I mean, it's not a lot.  But I can go through it anyway.

9    But that would be helpful because, you know, then it

10   comes down to, I guess, whether -- how we do this,

11   whether it comes in or it all comes in or it doesn't come

12   in or what.  So it would be helpful to know if this could

13   be accomplished.

14           MR. O'NEILL:  Yes, Your Honor.  Mr. Weisbrod

15   obviously was very specific in what he's asking to be

16   excised, so if it's possible, I don't see anything in

17   there that would be that -- although, for instance, like

18   the third notation -- and maybe Mr. Weisbrod can tell

19   us -- at 26:21, he asked him to clarify a question

20   because he's being confused.

21           And probably there should be a starting and

22   end time for that and the next one, otherwise, it would

23   be impossible to just take the one second out.

24           MR. WEISBROD:  I'm sure we can work out the

25   end time on that, Your Honor.  It probably was only a

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    short bit, which is why I left it at the single time.

2            THE COURT:  Okay.  Mr. O'Neill, what you've

3    given me in your instructions are just the standard

4    preliminary instructions, aren't they?

5            MR. O'NEILL:  Yes, Your Honor.

6            THE COURT:  David, would you tell the jury

7    it's going to be about 15 more minutes.

8            COURT SECURITY OFFICER:  Yes, Your Honor.

9            THE COURT:  Apparently it's going to be

10   about 15 more minutes, so I'm just going to leave the

11   Bench and come in.  Let me know as soon as Mr. Brown gets

12   here unless there's something else you think we need to

13   discuss.

14           Okay.

15           COURT SECURITY OFFICER:  All rise.

16   (THEREUPON, A RECESS WAS TAKEN, AND THEN THE PROCEEDINGS

17                 CONTINUED AS FOLLOWS:)

18           THE COURT:  Okay.  Would you bring the jury

19   in.

20           COURT SECURITY OFFICER:  Yes, Your Honor.

21           MR. BROWN:  Thank you, Your Honor.

22           COURT SECURITY OFFICER:  All rise, please,

23   for the jury.

24       (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

25           COURT SECURITY OFFICER:  Thank you, ladies

1    and gentlemen.  Please be seated.

2              THE COURT:  Ladies and gentlemen, I'm sorry

3    for the delay.  We'll try to be conscious of your time

4    and hopefully it will not happen again.  Let me tell you

5    a little bit about this afternoon, and then I'll start

6    with the preliminary instructions.

7              I am in just a minute going to give you some

8    preliminary instructions and those will be oral.  I'm

9    going to read them to you.

10             At the end of the trial you'll have a set of

11   written jury instructions, and I'll give each of you a

12   copy.  And it will set out the elements of each of the

13   crimes alleged in the Indictment so that you will know

14   exactly what it takes in order for the government to

15   prove beyond a reasonable doubt if they can the

16   defendants are guilty of the crimes.  But in the

17   beginning here the instructions I'm going to give you are

18   oral.

19             After I have done that, we will start with

20   the opening statements by the attorneys.  After they have

21   made their opening statement, we'll start with the

22   evidentiary portion of the trial.

23             I anticipate, as I said earlier, we'll

24   recess sometime around 5 o'clock.  Tomorrow you will

25   return, and we will continue with the evidentiary portion

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    of the trial.  We'll start in the morning at 9 o'clock

2    and again we'll probably work till 5 o'clock.  And that

3    will be the schedule that we follow for the remainder of

4    the week.

5              In just a few minutes after I have been over

6    the preliminary instructions and read the Indictment to

7    you, I will hand out pads and pencils and you can take

8    notes if you wish to do that during the course of the

9    trial.

10             We have also prepared for your use a seating

11   chart.  It has your name on it so that if you want to

12   remember who's seated next to you in the jury box you can

13   look at your seating chart.

14             It also has the government's table and who

15   is seated at that table, the defense table and who is

16   seated at that table.  So this is strictly for your

17   convenience to help you in case you want to look at which

18   attorney is speaking or who he represents or even look at

19   who your fellow juror is.

20             All right.  You have been selected and

21   before lunch you were sworn as the jury to try this case.

22   And I'm going to explain to you some basic principles

23   about a criminal trial and your duty as jurors.  And

24   these are, as I said, preliminary instructions.  And at

25   the end of the trial you'll get more detailed

1    instructions.

2         It will be your duty as jurors to decide

3    what happened so you can determine whether the defendants

4    are guilty or not guilty of the crimes charged in the

5    Indictment.

6         At the end of the trial I will explain the

7    law that you must follow to reach your verdict, and you

8    must follow that law as I explain it to you even if you

9    don't agree with the law.

10        You must decide this case solely on the

11   evidence presented here in this courtroom.  And evidence

12   can come in many forms.  It can be testimony about what

13   someone saw or smelled or heard or it can be an exhibit

14   that's admitted into evidence.  And sometimes it can even

15   be someone's opinion.

16        Some evidence proves a fact indirectly, such

17   as a witness who saw wet grass outside and people walking

18   into the courtroom carrying wet umbrellas.  Indirect

19   evidence, sometimes called circumstantial evidence, is

20   simply a chain of circumstances that proves a fact.  And

21   as far as the law is concerned it makes no difference

22   whether evidence is either direct evidence or

23   circumstantial evidence.

24        And you may choose to believe or disbelieve

25   either kind and should give every piece of evidence

1    whatever weight you think it deserves.

2              Now, there are certain things that are not

3    evidence, and I probably need you to know that as well.

4    So these things are not evidence and you should not

5    consider them.  First, the statements and the arguments

6    of the lawyers, that's not evidence.  In their opening

7    statements and closing arguments the lawyers will discuss

8    the case, but what they say, their remarks, is not

9    evidence.

10             Questions by the lawyers or objections --

11   evidentiary objections by the lawyers are not evidence.

12   Only the witnesses' answers are evidence.

13             You should not think that something is true

14   just because a lawyer's question suggests that it's true.

15   For instance, if a lawyer asks the question, you saw the

16   defendant hit his sister, didn't you, that question is

17   not evidence whatsoever of what the witness saw or what

18   the witness did unless the witness agrees to it.

19             There are rules of evidence that control

20   what can be received into evidence.  And when a lawyer

21   asks a question or offers an exhibit, and a lawyer on the

22   other side thinks it's not permitted by the rules of

23   evidence, then that lawyer may object.  If I overrule the

24   objection, then the question may be answered or the

25   exhibit received.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          But if I sustain the objection, then the
2   question cannot be answered and the exhibit cannot be
3   received.  Whenever I sustain an objection to a question,
4   you must ignore the question and try not to guess what
5   the answer would have been had the witness been allowed
6   to answer the question.
7          Sometimes I could order that evidence be
8   stricken from the record and that you disregard or ignore
9   that evidence.  And that means that when you're deciding
10  the case, you must not consider that evidence.
11         Some evidence is admitted only for a limited
12  purpose.  And when I instruct you that an item of
13  evidence has been admitted for a limited purpose, then
14  you must consider it only for that limited purpose and no
15  other.
16         In reaching your verdict you may have to
17  decide what evidence to believe and what evidence not do
18  believe.  You may believe everything a witness says or
19  part of it, or none of it.
20         And in considering the testimony of any
21  witness, you may take into account the opportunity and
22  the ability of the witness to see or hear or know the
23  things testified about, the witness' memory, the witness'
24  manner while testifying, the witness' interest in the
25  outcome of the case, and any bias or prejudice, whether

1    other evidence has contradicted the witness' testimony,

2    the reasonableness of the witness' testimony in light of

3    all of the evidence and any other factors that bear on

4    believability.  And I will give you some additional

5    guidelines for determining credibility at the close of

6    the case.

7          As you know, because we've discussed it

8    several times, this is a criminal case.  And there are

9    some basic rules about a criminal case that you should

10    keep in mind.

11          First, the defendants are presumed innocent

12    until or if proven guilty.  The Indictment against the

13    defendant -- or defendants in this case brought by the

14    government is only an accusation, nothing more.  It is

15    not proof of guilt or anything else.  And the defendants

16    start out with a clean slate.

17          Second, the burden of proof is on the

18    government until the very end of the case.  The

19    defendants have no burden to prove their innocence or to

20    present any evidence or even to testify.  And since the

21    defendants have the right to remain silent and may choose

22    whether to testify, you cannot legally put any weight on

23    a defendant's choice not to testify.  It's simply not

24    evidence.

25          Third, the government must prove the

1       defendant's guilt beyond a reasonable doubt.  And I will

2       give you a further instruction on this later.  But bear

3       in mind that the level of proof required is high.

4               Our law requires jurors to follow certain

5       instructions regarding their personal conduct in order to

6       insure a just and fair trial, and I'm now going to talk a

7       little bit about those instructions.

8               You should not talk either among yourselves

9       or with anyone else about anything related to this case.

10      You may tell people with whom you live and your employer

11      that you're a juror and you may give them information

12      about when you will be required to be in court, but you

13      shouldn't discuss the case with them.

14              Do not at any time during the trial request,

15      accept, agree to accept or discuss with any person any

16      type of payment or benefit in return for supplying

17      information about the trial.  You must promptly tell me

18      about any incident you know of involving an attempt by

19      any person to improperly influence you or any member of

20      the jury.

21              You should not visit the premises or the

22      places that are charged or described in the evidence and

23      you must not use the Internet maps or Google Earth or any

24      other information or device to search for a view of any

25      location discussed in the testimony.

1          You should not read, watch or listen to any

2     accounts or discussions related to the case which may be

3     in the newspapers, on television, radio, the Internet or

4     any other news media.

5          And you should not attempt to research any

6     fact, issue or law related to this case whether by

7     discussing it with others, going to the library, looking

8     it up on the Internet or by any other means.

9          We are in an age of electronic communication

10    and research, so I want to emphasize that when I say

11    don't talk about the case with anyone, that means also

12    don't talk about it over the Internet with anyone, don't

13    e-mail anybody about it, don't Twitter about it, don't

14    text about it, don't chat about it, don't blog about it.

15    Don't put it on your social networking site should you

16    have one such as Facebook saying I am serving on this

17    jury.  Simply do not do that.

18         You must not provide any information about

19    the case to anyone by any means whatsoever, and that

20    includes posting information about the case or what

21    you're doing in the case on any device or Internet site.

22         You must also not use Google to research.

23    And I'm sure that most of you are familiar with Google

24    and what I mean by that, but -- and by research I mean

25    anything about the case, anything about the defendants,

1 anything about the witnesses, anything about the lawyers.

2          Our law does not permit jurors to talk with

3 anyone about the case or permit anyone to talk to them

4 about the case because only jurors are authorized to

5 render a verdict.  And you have been selected because

6 you've been found to be fair and only you have promised

7 to be fair and no one else.

8          So our law does not permit jurors to talk

9 among themselves about the case until I tell you at the

10 close of the trial and you begin your deliberations that

11 you can discuss the case.

12          And the law does not permit you to visit the

13 scenes or go to the places that are described in the

14 evidence.  And that makes sense because we have no idea

15 whether the places described are the same now as they

16 were when the events occurred.

17          Finally, the law requires that you not read

18 or listen to any news accounts of the case and that you

19 not attempt to research any fact, issue or law related to

20 the case.  And that's because your decision needs to be

21 based on what you hear in this courtroom.

22          Often the law uses words and phrases in a

23 special way, so it's important that any definitions you

24 hear come from me and not from any other sources.  It

25 wouldn't be fair to anyone associated with this case that

1  you base your decision based on what you read in a

2  newspaper or perhaps here on television should there be

3  something in the newspaper or on television about the

4  case.

5         The rules are designed to help guarantee a

6  fair trial, and I trust that you all understand the

7  importance of following the rules.

8         Now, I have mentioned that you can take

9  notes.  And in just a few minutes we'll hand out pads and

10  pens and you can take notes about this case.  You'll keep

11  those notes with you here in the courtroom.  And every

12  day when you recess I'll tell you to lay the notepad face

13  down.  And at the close of the trial you can take your

14  notepads back to the jury room and they can be used by

15  you in your deliberations.

16         Although the defendants are being tried

17  together, you must separate consideration of each

18  defendant.  You're going to be given a verdict form for

19  each defendant, so you're are going to have to make a

20  decision as to each defendant.

21         In doing so you must determine what evidence

22  in the case applies to a particular defendant.  And you

23  should disregard any evidence admitted solely against

24  some defendants but perhaps not against others.  And the

25  fact that you may find one of the defendants guilty or

1   not guilty doesn't control your verdict as to the other

2   defendants.

3           Now, I mentioned that if you were selected

4   on the jury I would read to you the Indictment.  I just

5   summarized it before.  I'm going to read to you at this

6   time.  It's about ten pages long, so it will take me a

7   few minutes.  I'm going to read it aloud because it tells

8   you exactly what the accusations are.

9           Keep in mind that this is simply a charging

10  document.  It's not evidence.  It's not proof of guilt.

11  It's the allegations brought by the grand jury and by the

12  government.  You will have a copy of the Indictment back

13  in the jury room to aid you during your deliberations.

14  So even though I am reading it to you and even though I

15  had mentioned it earlier and the attorneys may mention

16  it, it's going to be hard for you to remember everything

17  in the Indictment.  So keep in mind I'll send it back to

18  you to the jury room.

19          All right.  The Indictment reads as follows:

20  "The grand jury charges in Count I at times material to

21  this Indictment the Department of Health and Human

22  Services, herein after called HHS, is the principal

23  agency of the United States Government for protecting the

24  health of all Americans and providing essential human

25  services, especially for those who are least able to help

1    themselves.

2            "HHS works closely with state and local

3    government and many HHS funded services are provided at

4    the local level by state or county agencies or through

5    private sector grantees.

6            "The Administration for Children and

7    Families, hereinafter called the ACF, is a federal agency

8    under HHS which funds state, territory, local and tribal

9    organizations in order to provide family assistance,

10   child support, child care, Head Start, child welfare and

11   other programs relating to children and families.

12           "Actual services are provided by state,

13   county, city and tribal governments and private local

14   agencies.  ACF assists these organizations through

15   funding, policy directions and information services.  ACF

16   is a principal operating division of HHS.  The

17   Administration is headed by the Assistant Secretary for

18   Children and Families, who reports directly to the

19   Secretary of HHS.

20           "The office of Head Start, herein HS,

21   advises the Assistant Secretary for Children and Families

22   on issues regarding the Head Start program, including

23   Early Head Start, hereinafter referring to as EHS.

24           "Head Start develops legislative and

25   budgetary proposals, identifies areas for research,

1    demonstration and developmental activities, presents

2    operational planning objectives and initiatives related

3    to Head Start to the Assistant Secretary for Children and

4    Family Services and oversees the progress of approved

5    activities.

6          "Head Start is a national program launched

7    in 1965 that currently promotes school readiness by

8    enhancing the social and cognitive development of

9    children through the provision of educational, health,

10    nutritional, social and other services to enroll children

11    and families -- enrolled children and families.

12          "The program provides grants to local public

13    and private nonprofit and for profit agencies to provide

14    comprehensive child development services to economically

15    disadvantaged children and families with a special focus

16    on helping preschoolers developing the early reading and

17    math skills they need to be successful in school.

18          "In physical year 1995 the Early Head Start

19    program was established to serve people from birth to

20    three years of age in growth and development issues.

21          "Head Start programs promotes school

22    readiness by enhancing social and other services to

23    enroll children and families.  They engage parents in

24    their children's learning and help them in making

25    progress toward their educational, literacy and

1    employment goals.  Significant emphasis is placed on the

2    involvement of parents in the administration of the local

3    Head Start program.

4            "For more than 45 years Hillsborough County

5    Head Start/Early Head Start has been set up to prepare

6    more than 60,000 low income children for school by

7    providing early childhood and prenatal education, family

8    medical, dental, mental health and social services and

9    two-thirds of the United States Department of Agriculture

10    required daily nutritional needs.

11            "Hillsborough County Head Start/Early Head

12    Start division is one of the largest grantees for Head

13    Start in the southeastern United States serving

14    approximate 3,474 children and families from

15    approximately 19 centers located throughout the county.

16            "Michael Jimenez was the deputy director of

17    physical and administrative services for Hillsborough

18    County Head Start/Early Head Start.

19            "Marie Mason was the deputy director of

20    program services for Hillsborough County Head Start/Early

21    Head Start.

22            "The alleged conspiracy.  From at least in

23    or about April of 2010 and continuing through in or about

24    November of 2010, the exact dates being unknown to the

25    grand jury, Michael Jimenez, Johana Melendez Santiago and

1    Marie Mason, the defendants herein, did knowingly and

2    willfully combine, conspire, confederate and agree with

3    each other and with others both known and unknown to the

4    grand jury to, A, defraud the United States for the

5    purpose of impeding, impairing, obstructing and defeating

6    the lawful government functions of HHS in the operation

7    of the Hillsborough County Head Start/Early Head Start

8    program in a manner that was honest, fair and free from

9    deceit, craft, trickery, corruption and dishonesty.

10          "And, B, commit an offense against the

11   United States, that is being an agent of an organization

12   and of a state and local government and any agency

13   thereof which received federal assistance in excess of

14   $10,000 in a one-year period to obtain by fraud and

15   otherwise without authority knowingly convert to the use

16   of any person other than the rightful owner and

17   intentionally misapply property that is valued at $5,000

18   and more and is owned by and is under the care, custody

19   and control of such organization, government and agency,

20   in violation of Title 18 United States Code, Section

21   666(a)(1)(A).

22          "Manner and means of the conspiracy.  It was

23   part of the conspiracy that the defendant, Johana

24   Melendez Santiago, would and did author a children's book

25   entitled Travel Boy Helps Sebastian.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1              "It was further part of the conspiracy that

2     the defendant, Johana Melendez Santiago, would and did

3     attempt to sell her book to Hillsborough County Head

4     Start/Early Head Start knowing that Defendant Michael

5     Jimenez, her spouse, was the Head Start deputy director

6     of physical services.

7              "It was further part of the conspiracy that

8     the defendant, Michael Jimenez, would and did assist

9     Defendant Johana Melendez Santiago, his spouse, in

10    selling her books to Hillsborough County Head Start/Early

11    Head Start:

12             "It was further part of the conspiracy that

13    Defendant Michael Jimenez would and did enlist the

14    assistance of Marie Mason so that Hillsborough County

15    Head Start/Early Head Start would purchase the books,

16    Travel Boy Helps Sebastian, from Defendant Johana

17    Melendez Santiago.

18             "It was further part of the conspiracy that

19    the conspirators would and did keep the total price of

20    the purchase of the books, under $10,000, so that the

21    process of purchasing the books would not have to go

22    through a bid process.

23             "It was further part of the conspiracy that

24    the conspirators would and did perform acts and make

25    statements to hide and conceal and cause to be hidden and

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    concealed the purpose of the conspiracy and the acts

2    committed in furtherance thereof.

3            "Overt acts.  In furtherance of and to

4    effect the object of the conspiracy and to accomplish its

5    purpose and objectives the following overt acts, among

6    others, were committed by one or more conspirators in the

7    Middle District of Florida.

8            "On or about April 15th, 2010, Defendant

9    Johana Melendez Santiago sent an e-mail to Defendant

10   Michael Jimenez concerning book order.  Defendant Johana

11   Melendez Santiago stated therein, here's a letter of

12   presentation of my book in case they need justification.

13   Also, you can tell them that I am a product of the Head

14   Start system.

15           "Two, on or about April 21st, 2010,

16   Defendant Michael Jimenez sent an e-mail to IN, a

17   Hillsborough -- I'm sorry, a Head Start services

18   specialist.  Defendant Michael Jimenez stated, here's the

19   presentation.  I'll have the quotes sent immediately.

20           "Three, on or about April 21st, 2010,

21   Defendant Johana Melendez Santiago sent an e-mail to IN,

22   a Head Start services specialist.  Defendant Johana

23   Melendez Santiago stated, in order to send you a quote I

24   need to know the number of books you need.  I have -- I

25   can have the quote ready for you by Thursday afternoon.

1    Please let me know that and the company name and address

2    to whom the order will be shipped to.

3            "Four, on or about April 22nd, 2010, the

4    Defendant Johana Melendez Santiago sent an e-mail to IN,

5    a Head Start services specialist services.  Defendant

6    Johana Melendez Santiago stated, quote, Here are the

7    quotes for 800, 1,000 and 1,300 copies of the soft cover

8    books.  You can get the highest discount (30 percent if

9    you get 1,300 copies).  Let me know if I can help with

10   anything else, close quote.

11           "Five, on or about April 27, 2010, Defendant

12   Johana Melendez Santiago sent an e-mail to IN, a Head

13   Start services specialist.  Defendant Johana Melendez

14   Santiago stated, quote, Just following up with the book

15   order.  I wanted to know if you decided on a book amount.

16   Let me know if there's anything else I can provide to

17   help with the decision.  Don't hesitate to contact me,

18   close quote.

19           "Six, on or about May 3rd, 2010, the

20   defendants caused IN, a Head Start services specialist,

21   to send an e-mail.  IN stated, we will be placing the

22   orders for the books today.  However, the quotes have

23   expired.  I was informed today that we need to -- we need

24   the quotes amount to be under $10,000.  Could you please

25   supply the three quotes again, close quote.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          "Seven, on or about May 3rd, 2010, Defendant

2    Marie Mason on behalf of Hillsborough County Head

3    Start/Early Head Start signed a merchandise request form

4    for 750 copies of Travel Boy Helps Sebastian for a total

5    purchase price of $9,000.

6          "Eight, on or about June 2nd, 2010,

7    Defendant Johana Melendez Santiago caused an invoice to

8    be prepared by Xlibris -- and that's spelled

9    X-L-I-B-R-I-S -- for 750 copies of Travel Boy Helps

10   Sebastian to be sent to Defendant Johana Melendez

11   Santiago.

12         "Nine, on or about June the 24th, 2010, the

13   conspirators caused a check in the amount of $9,000 to be

14   issued by the Hillsborough County Board of County

15   Commissioners to Defendant Johana Melendez Santiago, all

16   in violation of Title 18 United States Code, Section 371.

17         "Count II.  One.  The allegations contained

18   in the introduction of Count I, Paragraphs 1 through 7,

19   and in the manner and means, Paragraphs 9 through 14 and

20   incorporated here -- are incorporated herein by this

21   reference."

22         And Count I was what I just read to you.

23         "Two, on or about June the 24th, 2010, in

24   the Middle District of Florida and elsewhere Michael

25   Jimenez, Johana Melendez Santiago, Marie Mason, the

1    defendants herein, being an agent of an organization and

2    of a state and local government and any agency thereof

3    which received federal assistance in excess of $10,000 in

4    a one-year period did obtain by fraud and intentionally

5    misapplied property that is valued at $5,000 and more and

6    is owned by and is under the care, custody and control of

7    such organization, government and agency, all in

8    violation of Title 18 United States Code, Section

9    666(a)(1)(A)(i) and (ii) and (2).

10            "Count III.  Introduction.  Number one.  The

11   allegations contained in the introduction of Count I,

12   Paragraphs 1 through 7, are incorporated herein by this

13   reference.

14            "The scheme.  Two, from on or about

15   April 2010 and continuing through in or about November

16   2010 in Hillsborough County in the Middle District of

17   Florida and elsewhere, Michael Jimenez, Johana Melendez

18   Santiago and Marie Mason, the defendants herein, did

19   knowingly and willfully devise and intend to devise a

20   scheme, an artifice to defraud and for obtaining money by

21   means of materially false and fraudulent pretenses,

22   representations and promises and for depriving the

23   citizens of Hillsborough County and the Hillsborough

24   County Head Start/Early Head Start programs of the

25   intangible right of honest services.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          "Manner and means.  The manner and means of

2     the scheme and artifice to defraud is set forth in Part C

3     of Count I" -- which I've previously read to you -- "and

4     is hereby realleged and incorporated as if fully set

5     forth in this paragraph.

6          "D, execution of the scheme.  On or about

7     June the 28th, 2010, in Hillsborough County in the Middle

8     District of Florida and elsewhere Michael Jimenez, Johana

9     Melendez Santiago and Marie Mason, defendants herein, for

10    the purpose of executing the above described scheme and

11    artifice to defraud and for obtaining money by means of

12    materially false and fraudulent pretenses,

13    representations and promises did knowingly cause to be

14    delivered by the United States Postal Service according

15    to the direction thereon and at the place at which the

16    defendants directed it to be delivered a check in the

17    amount of $9,000 dated June 24th, 2010, and made payable

18    to Defendant Johana Melendez Santiago, in violation of

19    United States Code, Section 1341, 1346 and 2."

20         Now, I've read the Indictment to you, but I

21    remind you again it is simply a charging document.  It is

22    an accusation, and the burden is on the government to

23    prove the alleges that are alleged in the Indictment.

24    The Indictment itself is not proof of the anything.

25         Now, in just a few minutes the attorneys are

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    going to make an opening statement.  And first the

2    government will make an opening statement and then the

3    defendants will each have an opportunity, their

4    attorneys, if they wish to make an opening statement.

5          Opening statements aren't evidence, let me

6    remind you, and certainly they're not argument.  Most of

7    the time they are simply an outline of what the attorneys

8    believe the evidence will be in the case, what will be

9    presented.

10         After you've heard the opening statements

11   then the government will present its witnesses.  The

12   government will call the witnesses.  Defense counsel may

13   cross-examine the witnesses if they wish to do that.

14         After the government has called all of its

15   witnesses and introduced any evidence they wish to

16   introduce the defendants if they wish may present

17   witnesses or present evidence.  And if they do that then

18   the government is entitled to cross-examine.

19         After you've heard all the evidence the

20   attorneys will make a closing or final argument in which

21   they have an opportunity to revisit the evidence with you

22   and argue their cases.  I then will instruct you in the

23   law that applies to the case and then you'll go back to

24   the jury room to deliberate.  So that is essentially the

25   schedule for the trial.  And I've previously told the

1    schedule for the afternoon.

2          Miss Vizza or Mr. Adkins, could you hand out

3    the legal pads.

4          I'm going to ask when you get your legal pad

5    if you will write your name on the first page, and that

6    identifies that pad as belonging to you.  You also have a

7    seating chart so make sure you take a seating chart.

8                    (PAUSE IN PROCEEDING.)

9          THE COURT:  Again, I would suggest that you

10   put your name on the first page.  That identifies the pad

11   as belonging to you.  And it'll be on your chair when you

12   come into the courtroom each morning or come back from

13   any recess.  Do any of you have any questions before we

14   begin?  All right.

15         Then, Mr. O'Neill, you may make an opening

16   statement on behalf of the United States.

17         MR. O'NEILL:  Thank you, Your Honor.

18         May it please the Court, Judge Bucklew,

19   counsel.

20         Ladies and gentlemen of the jury, good

21   afternoon.  As her Honor stated this is the opening

22   statement phase of the trial.  And I have the privilege

23   and honor of addressing you first since I represent the

24   United States.

25         I want to mention that this is a very

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1      straightforward case but a very serious one.  We will

2      move as expeditiously as possible and I fully expect that

3      this will be a short trial, but that in no way minimizes

4      the seriousness of it.

5              There are three defendants and three counts.

6      Her Honor has saved me the necessity of reading the

7      Indictment, so I won't.  But the three counts are

8      conspiracy is Count I.  Count II is fraud during a

9      federal program.  And Count III is honest services mail

10     fraud.

11             And you'll hear a lot about the law at the

12     end from her Honor.  And that is not my bailiwick to

13     intrude upon her province and talk about the law.  Merely

14     for opening statement we speak about the facts and what

15     the case is about.

16             You're going to hear now during the next few

17     days the evidence in this case.  Evidence comes

18     essentially in three forms.  We talk about evidence all

19     the time, but let me explain just basically what it is.

20     It will come in three forms.  First, testimonial

21     evidence.  And that will be when the witness takes the

22     witness stand.

23             And in this courtroom the witness looks

24     right at you so it's very good that you can see the

25     witness and you'll be able to judge the credibility of

1    that witness and be able to observe their demeanor.  And

2    as her Honor had stated, does that person seem to be

3    telling the truth or not.  And you'll have complete

4    opportunity to do that.

5            In the court system that we have hearsay as

6    a whole is inadmissible.  By that, if someone says

7    something outside of a courtroom it doesn't matter.  It

8    must be in the courtroom.  And that allows the jury to

9    determine their credibility and assess their

10   believability.

11           A second major sort of classification of

12   evidence is documentary evidence.  And I fully expect

13   that you're are going to see some documentary evidence in

14   this case, specifically some e-mails and the book itself

15   and things like that.  Some cases have a ton of

16   documentary evidence.  Some have none.  In this case we

17   have a few, but not very many so it will not be that

18   cumbersome to present.  Because, as I said, we're going

19   to try to present it as quickly as possible.

20           What does this case center on?  It centers

21   on the Hillsborough County Head Start/Early Head Start

22   program.  And you heard from the Indictment that her

23   Honor read there was a whole bunch of information about

24   Head Start.

25           And you're going to hear from witnesses.  I

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    fully expect the first witness is going to be an

2    individual by the name of Bartholomew Banks.  Mr. Banks

3    is a long-term county employee.  And he will explain

4    about Head Start and basically how Head Start is set up.

5            It is set up to help those youth that are

6    economically disadvantaged, and it's a program that does

7    help them both in their care early on in life and then

8    through the preschool years and that's why it was set up.

9            And you heard from the Indictment Head Start

10   became a program first and then it gradually morphed or

11   transformed also with Early Head Start.

12           And you'll hear that this program, as I

13   said, is designed to help those economically

14   disadvantaged youth.  And much of the money that goes

15   into it comes from the federal government, and it comes

16   from the Department of Health and Human Services.

17           And we will also have someone down because

18   we need to explain how that money goes forward because

19   it's a jurisdictional prerequisite for Count II that more

20   than $10,000 a year comes to Hillsborough County and to

21   the Head Start program.  And you'll hear that obviously

22   there's a lot more money than that.  But that's something

23   you will hear as we go along.

24           And then you will hear about -- that would

25   be just more than generalities about the program.  But

1    specifically you're going to hear from the coworkers,

2    those people that work with the defendant, Michael

3    Jimenez, the defendant, Marie Mason, and then who were

4    involved in the purchase of the book from the defendant,

5    Johana Melendez Santiago.

6            And what -- some of the people you'll here

7    is a person by the name of Marecia Bell.  Miss Bell was a

8    nurse employed there.  And she was approached by

9    Miss Mason and told, hey, look into purchasing this book.

10    See if this book is appropriate.

11            You'll also hear that the section she was in

12    usually didn't purchase these type of items.  They were

13    more for the physical needs of the children.  And they

14    would purchase diapers and thing like that.  It was a

15    separate educational section that handled the purchase of

16    books and the like.

17            Miss Bell will testify, I fully expect, that

18    she was busy, did not handle it right away.  And was

19    approached several times by Miss Mason about the book and

20    whether they could purchase it and start the purchasing

21    process.

22            She was also approached by the defendant,

23    Michael Jimenez.  At the time Miss Bell did not know that

24    the defendant, Michael Jimenez, was married to the

25    defendant, Johana Melendez Santiago.  She subsequently

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   learned that in a conversation with another individual,

2   Idalin Navejar.

3           Now, Miss Navejar, you'll see, is the person

4   in the Indictment listed as IN, just for your

5   edification.  When we draft an Indictment other than the

6   defendants we do not name people for their own privacy

7   interests, but at the time of trial of course you can.

8           And those two women who worked on this

9   project, Miss Bell went to Miss Navejar and showed her

10  the book and thought it was inappropriate for the age

11  bracket for which it was designed.

12          Miss Navejar noticed a photograph on the

13  book.  And we will enter the book in evidence, and you

14  will see it.  And there's a picture of the defendant,

15  Johana Melendez Santiago, on the book.

16          Miss Navejar, who had worked there much

17  longer, immediately realized it was the defendant, Johana

18  Melendez Santiago, and brought that to the attention of

19  Marecia Bell.

20          Marecia Bell told both Miss Mason and

21  Mr. Jimenez the book was not appropriate and did not want

22  to order it.  She was told nonetheless to order it.

23          And you will start seeing there's a series

24  of e-mails, e-mails between the defendant, Johana

25  Melendez Santiago, and they begin between her and her

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    husband, Michael Jimenez.  Some of them are listed in the

2    Indictment and there for your perusal.

3              You will, I fully expect, get to see those

4    e-mails.  And the first e-mail says, look, this is the

5    presentation, and let them know that I'm also a product

6    of the Head Start program.

7              He then takes that e-mail and forwards it

8    over to it this woman, Idalin Navejar, and the purpose of

9    that is to get her working on this project.

10             Now, at this time he is an employee of the

11   Head Start program of Hillsborough County.  As such he's

12   under certain ethical prescriptions not to engage in self

13   dealing, which is clearly what he's doing here because

14   his wife is going to sell the book, that money is going

15   to go back to the Jimenez household.

16             He continues to do that.  Miss Mason

17   continues to get in.  And then you'll see the e-mails

18   between the defendant, Johana Melendez Santiago and

19   Miss Navejar in which he's asking how many books do you

20   want.  You'll get the biggest -- you may recall from Her

21   Honor reading this -- you get the biggest reduction if

22   you buy the 1,300 books.

23             The problem with that, you're also going to

24   learn, is a debt ceiling.  If you order anything within

25   Hillsborough County and it's above $10,000 it would have

1    to go outside the division and go for bidding.

2            So there then becomes an instance in which

3    Marie Mason tells them keep it under $10,000.  And that

4    allowed them to do it locally.

5            And so the book you'll hear and see through

6    the e-mails and the like, the book is ultimately

7    purchased in the amount of 750 issues so that it is only

8    purchased for $9,000 and hence below the $10,000 debt

9    figure.

10           You will hear that Miss Melendez Santiago

11   had affixed three quotes to the book, which was something

12   that was important in the way they did this.  And the

13   three quotes come from -- and I can't pronounce it much

14   better than Her Honor.  It's either Xlibris or Xlibris

15   because it is an X in front of libris.

16           That's one.  And that's sort of a vanity

17   publishing in which you present your book and they give

18   it back to you.  Amazon and the author herself, those

19   were the three quotes.

20           So the books come in, they're purchased by

21   Hillsborough County.  Miss Melendez Santiago receives a

22   check for $9,000.

23           And it is thereafter that another employee,

24   Dawn Dasher, receives word of this and files a complaint

25   and goes -- Hillsborough County has a sort of office of

1    professional responsibility.  And they do an internal

2    investigation.  And you will hear in that

3    investigation -- an investigator will be here to testify,

4    Robert Sheehan.  And he will explain that he looked into

5    this matter and took statements from some of the

6    individuals of which he could.

7            You'll also hear from some of the other

8    women that worked within the Head Start program who were

9    responsible for the payment of the $9,000 to the

10   defendant, Melendez Santiago.

11           And as part of the payment there's a

12   procedure in place, as there would be in any agency and

13   there is in Hillsborough County Head Start, that someone

14   has to verify that the quote is proper and then that the

15   goods are received.  And that after the goods are

16   received that a voucher is issued and payment is made.

17           And you will see the person who is

18   responsible within that for the payment to the defendant,

19   Johana Melendez Santiago, was her husband, the defendant,

20   Michael Jimenez.

21           That in a nutshell is it, ladies and

22   gentlemen.  It is not a very long case.  From the e-mails

23   it's a very short period of time.  It talks about one

24   book which was purchased by Hillsborough County Head

25   Start which was authored by the defendant, Johana

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Melendez Santiago, and which was authorized through a

2    process and put forth by the defendant, Michael Jimenez,

3    and the defendant, Marie Mason.

4         The government will put on its evidence.

5    When you listen to the evidence, I ask you to do so using

6    your common sense and your good judgment.  Listen to it.

7    Keep an open mind.  We brought forth a jury that was fair

8    and impartial.  All sides believe that's exactly what we

9    received, so I ask you keep an open mind.  Listen to the

10   evidence.  And you cannot factor in sympathy or

11   prejudice.

12        And, again, at the end of the case I will

13   have an opportunity to speak to you.  And rather than

14   tell you what I expect to the evidence to be I will have

15   that opportunity then to tell you what the evidence

16   actually has shown.  Thank you very much for your

17   attention.

18        THE COURT:  Before, Mr. Brown, we start let

19   me ask the jurors on the top row, especially Miss Giffen,

20   can you see okay?

21        THE JUROR:  I can't see over (indicating).

22        THE COURT:  Okay.  Why don't -- and I'm not

23   normally in this courtroom, so why don't I ask the top

24   row just move down a seat and maybe that will help you.

25   I noticed you craning your neck.  Maybe that will be

better.

All right. Mr. Brown on behalf of Johana
Melendez Santiago.

MR. BROWN: It's about a book, about this
book. About a children's book called Travel Boy Helps
Sebastian. It's a book that's written in English and in
Spanish.

It's a book about germs. It's a book about
disease. It's a book that was written with love and
passion to indicate.

It's a book that was sold to Head Start.
750 of these books were sold to Head Start for $9,000 at
a cost to the county of about $12 a book, a net profit to
not Mr. Jimenez but Mrs. Melendez Santiago. They are
husband and wife. But a profit to her $2,700.

That's why everybody is here. That's why
you're here. That's why they're here. We're talking
about 750 children's books being sold to Head Start and
this women picks $2,700.

You know, I talked to you in the beginning
of this trial about criminal intent. They have to prove
that she did this because she intended to commit a crime.
And I'm here to tell you, members of the jury, that's not
what they're going to prove.

In fact, I'll even tell you what I'll prove,

1    and I don't have a burden to prove anything.  I'm going

2    to prove to you that this woman wrote this book out of

3    passion and a love to educate, and she sold it to the

4    county for the very same reason.

5            You know, people don't always do something

6    for money.  Sometimes we do things for passion.  Whether

7    it's quilting, whether it's shopping, whether it's

8    travelling or cooking.  Sometimes we just don't do it for

9    the money.

10           And you're going to be able to hear all the

11   reasons why she didn't do this for the money.  If she's

12   doing this for the money you'll hear that she could have

13   sold these books for $25 apiece and maximized her profit.

14   You would hear that she didn't have to give them a

15   discount and not charge them for shipping.

16           Two things I want to talk to you about in

17   this trial.  And I hope at the end of this trial you'll

18   say, gees, if this lawyer will stop talking to me about

19   these two things, it's education and passion.

20           Education.  She grew up poor in Puerto Rico.

21   She's a product of the Head Start organization.  You'll

22   hear in one of the e-mails when she says to the Head

23   Start here's some information about why this is such a

24   good idea.  You'll here her say in an e-mail or write

25   that she's a product of Head Start.

1          Well, what does that mean?  It means that at

2   five years old she was taken to a Head Start class and

3   they're the ones who first introduced her to a dentist.

4   She grew up poor in Puerto Rico, but Head Start already

5   had an impact in her life.  So was it any wonder that she

6   has a passion to give back?

7          You will hear that she does become educated.

8   She gets her degree in the University of Puerto Rico.

9   She gets a Master in microbiology and I believe it is

10  zoology -- medical zoology.

11         She goes on to gets besides the Master's

12  more graduate degrees.  She comes here, she works part of

13  the time at St. Leo where she's an educator, a teacher of

14  biology.  And she ends up eventually being a biology

15  teacher or instructor for Hillsborough Community College.

16         So you'll hear that education is very

17  important to her and you'll also hear that she's

18  passionate.  You will find out that before this ever

19  started we'll introduce articles that were written about

20  her and the things she was doing for migrant families,

21  for preschool, for after school, not just for Head Start.

22         You'll also find out that while she was

23  going to Head Start she sent her students there in 2007

24  and in 2009.  And they went to Head Start to teach.  And

25  you'll see through certain pictures that we can

1    introduce -- I don't know if this is working -- that she

2    spoke and talked about hygiene.  And that in the

3    classroom they were using way before she wrote this book

4    a predecessor of this book, books to teach about germs.

5         And you'll find out that this was something

6    that became for the her.  So why did she write this book?

7    For money?  She wrote this book because she found out it

8    was a great way to educate.  It was a great way to teach.

9         So prior to her selling this book she is

10   affiliated with Head Start.  She's sending her students

11   there to teach with a book simply sort of like this.  She

12   goes to teach there as well.  And you're going to find

13   out that at least in 2007 and as late as 2009 -- but this

14   is 2007 she's introduced by her husband to everybody at

15   Head Start because she's talking about bloodborne

16   pathogens, what are they and how to avoid them, Johana

17   Melendez.

18        You're are going to find out that everybody

19   at Head Start knew she was married to him.  Everybody

20   knew that.

21        She had lectured there to them.  She's been

22   involved with Head Start.  She has been teaching there.

23   She's been teaching a form of this book prior to her

24   selling the book.  There's no question that she is

25   intimately familiar with Head Start.  She's a part of

1    Head Start.

2          So when the idea comes that she can help

3    educate these children, help them understand about germs,

4    help them understand and them find the passion for

5    science, why not sell them the book.

6          You're going to find out that this book,

7    Sebastian, is her second child.  She has three boys.  The

8    second boy is Sebastian.  But the first boy, Michael,

9    actually wrote a book about Travel Boy Goes to Hawaii.

10         And when she's sharing this with her child

11   who I think around -- was around nine or eight at that

12   point, she thought what a great idea to help educate

13   children.

14         Here is her young son writing a book for

15   school called Travel Boy Goes To Hawaii.  So she came up

16   with that idea -- she actually dedicates the book to him

17   and her other two boys -- about a boy that is sick called

18   Sebastian.  And Travel Boy is his friend who somehow was

19   able to invent a way to go inside Sebastian and deliver

20   antibiotics and help him understand that he was suffering

21   from a cold or a flu and he's gotten healthy.

22         When she is selling the book to Head Start,

23   you're not going to hear that there's anything that's

24   nefarious about it.  You're going to see it's all in

25   e-mails.  Head Start asks her for quotes.  She doesn't

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    come up with a number of quotes.  They ask her for those

2    three quotes.  She gives them the price for the book.

3    They find the other two quotes through I believe it is

4    Amazon and the publisher.

5         And you'll see, though, that this is such a

6    passion for her that not only does she sell them the book

7    but she attaches with them -- with an e-mail an activity

8    sheet.  These are the things that she's written up for

9    them to do with the book.  And she says in an e-mail that

10   she will follow up -- I hope the books have been well

11   accepted by the parents.  Will the teachers receive

12   copies of the books too.  I've attached activity sheets

13   to go with the book.

14        And she goes on to explain what they are and

15   how they meet the standards in Florida.  And as I prepare

16   more activities to do with children I will be e-mailing

17   them to you and you can pass them along to the teachers

18   if they get a copy of the book.  Well, this is the

19   activity sheet, and it even talks about doing certain --

20   addressing certain core things, learning objectives or

21   outcomes.

22        And even using, for instance, clay in the

23   book to help the children.  Why is she attaching this for

24   free?  Why is she sending a follow-up to them with the

25   book to tell them how she's willing to go there to help

1  further educate these children?  Two things, right,
2  education and passion.

3          Members of the jury, the government may talk
4  to you about kickbacks or bribery.  There's no kickbacks
5  here.  There's no bribery.  As I said in the beginning,
6  this is a case about somebody that is passionate about
7  education and is passionate about teaching children that
8  wrote a book and sold it to Head Start.

9          And she wrote the book at a great discount
10  not because she's trying to make money because it shows
11  you that she doesn't have a criminal intent when she did
12  this.  She's simply trying to get this very book to the
13  very classrooms that she and her students have been so
14  that people and children become educated.

15          Members of the jury, at the end of this
16  trial I'm going to ask you to return a verdict on behalf
17  of Miss Melendez Santiago.  I'm going to ask you to
18  return that verdict not just because they've not proven
19  this case beyond a reasonable doubt and not just because
20  it's going to go become quite obvious that there's no
21  criminal intent on her part.

22          I'm going to ask you to deliver that verdict
23  because you recognize that she is passionate about what
24  she does.  And she is educated and she loves the
25  education.

1          And you're going to recognize that that goes

2     to prove that she didn't have any criminal intent to do

3     anything criminal, but ask you to return a not guilty

4     verdict and let her walk out of this courtroom.

5          THE COURT:  Mr. Weisbrod on behalf of

6     Michael Jimenez.

7          MR. WEISBROD:  Thank you, Your Honor.

8          May it please the Court, counsel,

9     government, defense counsel.

10          Ladies and gentlemen, good afternoon.

11     Michael Jimenez used to be the deputy fiscal director at

12     Head Start.  But when he worked at Head Start it wasn't

13     just for himself.  It was actually a family affair.  And

14     you've already gotten some of that information, but it is

15     important to go over it a little bit more with you again.

16          He has a talented wife, a smart wife, and he

17     knows that she has knowledge that can help this

18     particular program.

19          And so in 2007 when Mr. Brown put up that

20     document showing who was present at a preservice it's

21     important that you understand the evidence will show that

22     that meeting is mandatory for all the staff and

23     administrators at Head Start.  They will all be there

24     because of the importance of the information being passed

25     along because they are then going to pass it along again

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    to the children and the parents in the program.

2            And Michael Jimenez knew that his wife could

3    assist and he was more than proud to present her at that

4    preservice meeting.

5            But it doesn't stop there because the

6    following year his wife is again involved with Head

7    Start.  She has her students, as you saw in the book that

8    Mr. Brown put you up, attending certain of the Head Start

9    centers, making sure that the kids are learning about

10   germs and cleaning their hands.

11           It wasn't a one and done I'll bring my wife

12   to this preservice and then they'll never hear from us

13   again.  No, it was a continuation.

14           And a continuation again into 2009 when

15   again Mr. Jimenez him made sure his wife was available to

16   go to Head Start to go to another mandatory preservice to

17   address again all the staff and all the administrator's.

18           And you'll learn at that particular

19   preservice that she mentioned -- as she has a slide in

20   the presentation she made she mentioned, hey, I'm writing

21   a book and it's going to be on this topic and it's going

22   to be very helpful.

23           Now, there's two things you should

24   understand that the evidence will demonstrate up to this

25   point in time.  Nobody is complaining about Michael

1    Jimenez' wife volunteering and contributing her time,

2    energy and expertise to Head Start at all of these

3    events.  And no one is complaining to her at the 2009

4    preservice about saying, hey, I've got a book that's

5    going to help you all out.  Not a word.  Not a moment of

6    dispute about her availability to do those thing for Head

7    Start.

8           So when the book is ready, when it's

9    published, Michael Jimenez thinks it can help Head Start

10   and the people that are served by Head Start, and so he

11   does the rational and normal thing.  He let's those folks

12   at Head Start that are in charge of that sort of thing

13   know about it.  Not Michael Jimenez' decision to purchase

14   the book.  Someone else makes that decision.

15          And he's proud of it.  Why shouldn't he be?

16   His wife has contributed to Head Start through all these

17   years.  This book is a valuable addition to the

18   curriculum.  He's not ashamed of it.  He doesn't slink

19   around, he doesn't hide.

20          You heard the government, for instance, talk

21   a little bit about the $10,000 rule.  I'm going to tell

22   you a little bit about what the evidence is going to show

23   about a $10,000 rule because Michael Jimenez is the

24   deputy director of fiscal, money guy, one of the money

25   guys.  It's not a Michael Jimenez rule for $10,000 but

1    it's a rule that because he was a deputy director of

2    fiscal that he made sure that everybody in Head Start

3    knew about.

4           Whose rule is it?  It's the county's rule.

5    County has procurement rules.  And let me tell you the

6    county procurement manual is thicker than you'd ever want

7    to see.  But it has very specialized rules.

8           And it's called a small purchase.  And if

9    it's under $10,000 there are certain things that do not

10   have to be done such as sending it out for competitive

11   bidding.  But there are still certain things that do need

12   to be done, such as obtaining three different quotes,

13   which was done here.

14          Now, what's going to amaze you with the idea

15   that he was somehow trying to get this under $10,000 to

16   keep it quiet is that the first series of bids that come

17   in include numbers above $10,000.  So supposedly Michael

18   Jimenez is engaging in this illegal conspiracy with his

19   wife and he's supposed to know about this $10,000 rule.

20   We know he does because he trains people on it.  And yet

21   the bids that come in, some of them are above $10,000.

22   That's some of the evidence that you'll see.

23          There's also going to be evidence about

24   statements that Michael Jimenez made when the compliance

25   services people came a calling when they wanted to talk

1    to him.  It's a long statement.  They talk about a lot of

2    things.  A couple of them have to do with disclosure

3    statements that are filed.

4            You'll find out that Mr. Jimenez has filed

5    some but not filed others because, believe it or not, in

6    the three-year span of time at the county, there are

7    three different disclosure statements that apparently you

8    have to fill out.  And a couple were and one wasn't.

9            You'll here Michael Jimenez on that tape

10   before intent ever became an issue.  We started talk

11   about intent in this case.  Before he ever knew about an

12   Indictment, the spirited defense on the tape of this

13   interview.  You'll hear him say it was never my intent to

14   cheat Head Start, that I thought there was a benefit

15   greater to Head Start.

16           It didn't matter that it was my wife that

17   wrote the book.  Head Start was getting a valuable piece

18   of educational material.

19           And the evidence will show that he was right

20   in that assessment.  And you'll be able to make that

21   assessment on your own when you see all the evidence and

22   when you hear that the book was distributed to Head

23   Start.

24           You won't hear anything about Hillsborough

25   County trying to recall the books.  You'll hear that they

1    went out and payment was made.

2           And let's talk about payment because there's

3    another rule about payment that you'll hear, the

4    so-called receiver business.  Well, after Head Start has

5    ordered something such as 750 books, and they're

6    delivered, they get a bill -- in this case from Mr.

7    Jimenez' wife.  Pay the $9,000 that we agreed to pay.  I

8    have sent you the item.

9           Well, the county requires at that point that

10   a document be completed called a receiver form.  And

11   you'll hear that there's an accounting clerk in fiscal

12   that creates this form, and the particular clerk in this

13   case, a Miss Edman, has to verify -- not approve the

14   purchase, not approve the payment, but verify that what

15   the county is about to pay for the county has in fact

16   received.  And you'll hear that that is done.

17          And you will hear further that ordinarily

18   the next person up the ladder would be the second person

19   to sign that receiver form.  But that person wasn't

20   available, and so Michael Jimenez signed it.

21          He's not approving payment.  He's not

22   authorizing the purchase of the book.  He's telling the

23   county this is what we agreed to pay for these items that

24   we have received.  And he doesn't do it just in this

25   instance.  He does it periodically during the course of

1    his employment when he worked at Head Start because when

2    another level of employee isn't present he can do that,

3    and that's what he did.

4            So what is all of this evidence going to

5    ultimately show?  What's it going to demonstrate what

6    Michael Jimenez' intent was?  Well, I can tell you my

7    suggestion is you're not going to see any intent on

8    Michael Jimenez to deceive the county, to steal money

9    from the county or the federal government, to cheat them

10   out of $9,000, and you're not going to see any agreement

11   that he entered into with his wife or Marie Mason or

12   anyone else to do anything of the type.

13           Look forward to talking with you at the end

14   of case.  Thank you.

15           Thank you, Your Honor.

16           THE COURT:  Mr. Farmer on behalf of

17   Miss Mason.

18           MR. FARMER:  Thank you, Your Honor.

19           May it please the Court, counsel, counsel

20   for the defense.

21           It is my great honor, and in fact a real

22   great pleasure to have a chance to represent Marie Mason

23   in this case.  Marie has devoted her life to the social

24   services caring about others.

25           In 1993 her first professional job after

1    working in the psychiatry department at USF was to work

2    in an organization called the Children's Home here in

3    Tampa.  She worked her way up the Children's Home, and

4    left in 2006 after attaining a supervisory job there and

5    joined the Head Start program here at Hillsborough

6    County.

7              At that point she became a deputy director.

8    Part of those duties is to supervise five supervisors who

9    in turn supervised about 60 to 65 employees at Head

10   Start.  She is an upper level manager in the Head Start

11   program.

12             The only person above her at Head Start here

13   in Hillsborough County is a gentleman named Louis Finney.

14   So she's the second level in the organization.

15             Timing and date and chronology is going to

16   be very important to Mrs. Marie's case -- Miss Mason's

17   case the next week.  It's going to be very important to

18   listen hard about when dates happened, when dates claimed

19   to have occurred, when incidents are claimed to have

20   occurred and the timing of all this.

21             One example.  You heard a little bit about

22   e-mails in this case.  There are about 25 to 27 e-mails

23   that you'll see in evidence in this case.  A couple are

24   e-mail strings so I don't know if you count them

25   separately or not.  But there's about 27 different

1    messages.

2            Miss Mason appears on one e-mail of those

3    27, and she is -- her name appears as a CC about six

4    weeks after this book is approved within the system.

5            The evidence is going to show, for instance,

6    through the e-mails that Marie Mason's involvement in

7    this story is absolutely minimal.  I think if we tally up

8    from all the evidence and all the witnesses the amount of

9    minutes that this book crossed Marie Mason's life it'll

10   be less than four minutes.

11           We will know that the book entered

12   Miss Mason's life the week of April 19th, 2010.  We think

13   either the 19th, which is a Monday, the 20th, which is a

14   Tuesday or the 21st, which is a Wednesday.  And the

15   reason I know that we have dates on the e-mails.  And

16   you'll see all this chronology.

17           One of those three days Miss Mason was asked

18   by Mr. Jimenez to take a look at this book, Travel Boy

19   Helps Sebastian, and see if it was something that could

20   aid the parents and children in the program.

21   Miss Mason's first response is -- to herself at least is

22   I'll be happy to do that, but I supervise 65 people.  I'm

23   going to provide this to someone who has some expertise

24   in this area, which is trapping the germs.

25           This book you'll see is all about avoiding

1   the problem of spreading germs.  These are little kids in

2   Head Start.  We're talking about handwashing and how you

3   get sick and how it's important to take care of your

4   body, keep your hands clean, et cetera.

5           And Miss Mason's first instincts was I don't

6   know if this is a good book or not.  I mean I can't tell,

7   you know -- the old saw you can't tell a book by its

8   cover.  I'm going to give it to somebody who might give

9   be able to give me some input.  And she thought of

10  Nurse Bell, Marecia bell.

11          And on that same day, whether it was the

12  19th, the 20th or the 21st, Miss Mason brings this to one

13  of the 65 people she supervises, Marecia Bell, and asked

14  when you have a chance could you take a look at the book

15  and I'd like to know your input on the book.

16          The week of April 19th goes by.  That's

17  April 19th through 23rd.  The week of April 26th goes by.

18  That's April 26th through 30th.  Why is that important?

19  You'll hear the evidence that Miss Mason was out on a

20  professional seminar in Greensboro, North Carolina.  She

21  left on April 23rd.  She's out of the office on the

22  Friday of that first week and out the entire next week.

23          She has no communications with Marecia Bell,

24  no communications with Michael Jimenez, no communications

25  back at the office whatsoever at least about this book.

1          Miss Mason comes back on May 3rd.  That is a

2    Monday.  We know that for sure because we have e-mails

3    that give us dates on all these important mileposts in

4    this case.  That is -- well, let me back up.

5          The first confrontation or encounter with

6    Nurse Bell lasted a minute or two minutes.  Nurse Bell,

7    could you take a look at the book.  Great.  Let me know

8    what you think.

9          May 3rd is the second encounter with this

10   book.  Mr. Jimenez when Miss Mason arrives back at the

11   office out of being gone for the last six working days

12   says, what do you -- what do you know about the book?

13   What have you heard?  What do you think about the book?

14         Miss Mason says to Mr. Jimenez, I don't

15   know.  I gave it to Nurse Bell to take a look at.  Let me

16   see what she wants to do, what she thought about the

17   book.

18         Miss Mason goes back to Nurse Bell.  This is

19   only the second time ever that Miss Mason has any

20   encounters with Travel Boy Helps Sebastian in any

21   capacity.  Miss Mason has another minute, two-minute

22   conversation with Nurse Bell.

23         Remember, Miss Mason is gone for the last

24   six business days.  She asks Nurse Bell, are we going

25   forward with the book.  Nurse Bell says, yes, we're going

1    forward.

2           From that point on the book is ordered from

3    Nurse Bell and Nurse Bell's assistant, Idalin Navejar.

4           Miss Mason's job at that point becomes

5    administrative, namely her job is to make sure that for

6    purchase that this Head Start program makes that there

7    are three bids that are -- that staff has located and has

8    chosen the most inexpensive bid.

9           There's paperwork showing a bid from Amazon,

10   a bid from a place called Reading for Little Scientists

11   and a place -- a bid from Xlibris, which I think comes

12   from the term ex, E-X, libris, which means my book.

13   That's the publishing company.

14          And Miss Mason at that point becomes --

15   becomes purely administrative.  Did we get the three

16   bids?  Yeah, they look like they're here.  Was the

17   cheapest one found?  Yep.  Looks like we're going to go

18   ahead.  And signs the document, puts it in her outbox.

19   The document goes to Mr. Finney, the one and only boss

20   above Miss Mason, and the book was approved by Mr. Finney

21   and then goes to fiscal where the book is approved and

22   ultimately purchased.

23          Now, the only other time that this book

24   crosses Miss Mason's path as she's working as a deputy

25   director is sometime in June she believes but is not sure

1    that the books ended up when they were delivered to the

2    office delivered to her office for a day or two where

3    they remained in a box.  She's not even sure of that.

4    But thinks that they may have arrived at her office

5    first.

6                She never even sees the book after that

7    initial contact on April 19th, 20th or 21st.  Never does

8    any sort of, you know, analysis of the book.  She defers

9    that to Nurse Bell.

10                And, as I said, the last final connection

11    with the book is she's copied on an e-mail that you see.

12    I think it's June 22nd.  She's copied with an e-mail in

13    which the author of the book, Miss Melendez Santiago,

14    offers to provide a worksheet with the learning

15    educational materials that go along with the book.

16    Miss Mason is simply CC'd on that.

17                Miss Mason for this alleged crime received

18    nothing, not a dime, not a handshake, not a free lunch,

19    nothing.  She's not guilty.

20                THE COURT:  Mr. O'Neill, you may call your

21    first witness.

22                MR. O'NEILL:  Thank you, Your Honor.  The

23    government would call Bartholomew Banks.

24                THE COURT:  Mr. Banks, if you will come

25    forward to be sworn, please.

1           And, Miss Vizza, would you swear him in.

2           COURTROOM DEPUTY CLERK:  Please raise your

3    right hand.

4           Do you solemnly swear or affirm under

5    penalty of perjury that the testimony you shall give in

6    this cause shall be the truth, the whole truth, and

7    nothing but the truth, so help you God?

8           THE WITNESS:  I do.

9                   **BARTHOLOMEW BANKS,**

10   a witness, having been duly sworn to tell the truth, the

11   whole truth and nothing but the truth, was examined and

12   testified as follows:

13          COURTROOM DEPUTY CLERK:  Please be seated.

14          Please state your full name and spell the

15   last for the record.

16          THE WITNESS:  Bartholomew Banks, B-A-N-K-S.

17          THE COURT:  Mr. O'Neill.

18          MR. O'NEILL:  Thank you, Your Honor.

19                  <u>DIRECT EXAMINATION</u>

20   BY MR. O'NEILL:

21   Q.    Mr. Banks, I'm going to ask you a series of

22   questions.  I'd ask you to speak in a loud and clear

23   voice so that everyone can hear you.

24          Sir, how are you currently employed?

25   A.    I'm employed by the Hillsborough County Board of

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    County Commissioners as the interim director for the

2    Department of Family and Aging Services.

3    Q.      How long have you been the interim director for

4    Family and Aging Services?

5    A.      Since April 21st of this year.  About two and a

6    half months.

7    Q.      Could you briefly explain to the ladies and

8    gentlemen of the jury what is the Family and Aging

9    Services component of Hillsborough County?

10   A.      Hillsborough County is a subdivision of the State

11   of Florida that is led by a board of county

12   commissioners, seven of which are elected by the

13   community.  And they appoint a professional county

14   administrator who handles the day-to-day operation of the

15   county pursuant to the policies that they establish.

16          Under the county administrator there are four

17   individuals that give leadership to the 24 departments of

18   Hillsborough County, of which the Department of Family

19   and Aging Services is one of them.  And the division of

20   Head Start is one of the divisions that operate within

21   that department.

22   Q.      Okay.  So currently then as interim director of

23   Family and Aging Services you also oversea Head Start?

24   A.      That is correct.  The Department of Family and

25   Aging Services has four divisions.  The Division of Aging

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

        Services, Division of Children's Services, Division of
        Health and Social Services and the Division of Aging
        Services.
        Q.      Okay.  And I guess the Head Start program falls
        within the Division of Children's Services?
        A.      It's a separate division from Children's
        Services.  It's a division within itself.
        Q.      Okay.  Now, Mr. Banks, would you be able to tell
        us what is the Head Start program here in Hillsborough
        County?  What is it?  What does it do?
        A.      The Head Start program is a federally funded
        program that is providing assistance to low income
        families to assist the children of those families to
        become school ready as well as to provide wraparound
        services to help to family become self sufficient and
        provide health care such as immunization, mental health
        and dental services.
        Q.      And does it target economically disadvantaged --
        A.      That is correct, low income families.
        Q.      Now, you mentioned it was federally funded.  Can
        you just in broad strokes explain how the federal funding
        works for the program.
        A.      The Board of County Commissioners is a grantee --
        has been the grantee since 1965.  The funds flow from the
        federal government to the Board of County Commissioners.

1    The Board of County Commissioners appropriate the funds

2    to the Department of Family and Aging services, the

3    Division of Health -- Division of Head Start in order to

4    provide the services to the citizens of the community.

5    Q.      And when you say Hillsborough County is the

6    grantee under this and Hillsborough County Head Start, to

7    your knowledge, do they receive an excess of $10,000 a

8    year?

9    A.      Yes, they do.

10   Q.      Now, Mr. Banks, let me go further back into your

11   background.  You've been interim director for several

12   months.

13   A.      Yes.

14   Q.      Prior to that period of time what was your

15   occupation?

16   A.      Prior to that period of time immediately I was

17   the director for the Division of Aging Services.

18   Q.      And how long did you do that, sir?

19   A.      About three years.

20   Q.      How long have you been a county employee?

21   A.      I've been a county employee for 35 years.

22   Q.      Now, to your knowledge, are all Head Start

23   employees here in Hillsborough County county employees?

24   A.      Yes, to my knowledge, they are.

25   Q.      And is it a -- since it is a component -- well,

1    let me withdraw that.

2          Since Head Start is part of Hillsborough County,

3    the employees work for Hillsborough County?

4    A.    That is correct.

5    Q.    Who pays their paycheck?

6    A.    The Board of County Commissioners through the

7    Clerk of the Court.

8    Q.    So they are paid by the county?

9    A.    Yes.

10   Q.    Now, Mr. Banks, just can you give us a little bit

11   of your background, what you do.  You've talked a little

12   about your occupation.  Are you from Tampa?

13   A.    Yes.  I'm originally from Pensacola, but have

14   been in Tampa since 1973.

15   Q.    And since '73 you've been a county employee?

16   A.    Since '75.  Graduated from University of South

17   Florida actually '76 -- January of '76.

18   Q.    And did you receive your undergraduate degree

19   from the University of South Florida?

20   A.    I received an undergraduate degree in accounting

21   from the University of South Florida.

22   Q.    And did you receive any other advanced degrees?

23   A.    I have a Master's of Biblical Studies from the

24   Dallas Theological Seminary.

25   Q.    And when did you receive that, sir?

1    A.    1997 I believe it was.

2    Q.    Okay.  And just so it's clear, do you also have a

3    ministry?

4    A.    Yes.  I'm the pastor of the St. John Progressive

5    Mission and Baptist Church here in Tampa, Florida.

6    Q.    And how long have you been doing that?

7    A.    I've been pastor for 20 years.

8    Q.    Mr. Banks, do you know how many employees are in

9    the Head Start program here in Hillsborough County

10   approximately?

11   A.    Approximately 288 FTE.

12   Q.    And that last term you used?

13   A.    FTE is full term equivalent.

14   Q.    Okay.  Thank you very much.

15         Is that -- I know it's not exactly the same, but

16   is it equivalent to say a body?

17   A.    It's equivalent to a full-time body.  Could be

18   some part-time positions included in that number, which

19   would take the bodies up a little higher.

20   Q.    And do you know the approximate budget for the

21   Head Start program here in Hillsborough County?

22   A.    Approximately $36 million annually.

23   Q.    Thank you, sir.

24         MR. O'NEILL:  I have no further questions,

25   Your Honor.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
 1                    THE COURT:  All right.  Mr. Weisbrod.

 2                    MR. WEISBROD:  Yes, Your Honor, briefly,

 3      thank you.

 4                         CROSS-EXAMINATION

 5      BY MR. WEISBROD:

 6      Q.      Good afternoon, sir.

 7      A.      Good afternoon.

 8      Q.      The 36 million, is that just federal money or

 9      does that include the county contribution?

10      A.      It includes the 25 percent match from the

11      Hillsborough County Board of County Commissioners.

12      Q.      So when if say the federal government were to

13      make a $28 million grant, the county is required to

14      contribute another 7 million on top of that; is that

15      correct?

16      A.      Whatever the 25 percent would be.

17      Q.      So the overall -- I don't want to get too

18      confusing.  But the overall percentage of the Head Start

19      budget is 80 percent federal and 20 percent county?

20      A.      Approximately, yes, sir.

21      Q.      Thank you.

22                    MR. WEISBROD:  Nothing further, Your Honor.

23                    THE COURT:  Mr. Brown.

24                    MR. BROWN:  No questions, Your Honor.

25                    THE COURT:  All right.  Mr. Farmer.
```

1          MR. FARMER:  No questions.

2          THE COURT:  Any redirect, Mr. O'Neill?

3          MR. O'NEILL:  No, Your Honor.

4          THE COURT:  You may step down.  Thank you,

5     sir.

6          THE WITNESS:  Thank you.

7          THE COURT:  You may call your next witness,

8     Mr. O'Neill.

9          MR. O'NEILL:  Yes, Your Honor.  The

10    government calls Marecia Bell.

11         THE COURT:  Miss Bell, if you'll come

12    forward, please, to be sworn.

13         And, Miss Vizza, would you swear her in.

14         COURTROOM DEPUTY CLERK:  Do you solemnly

15    swear or affirm under the penalty of perjury that the

16    testimony you shall give in this cause shall be the

17    truth, the whole truth, and nothing but the truth, so

18    help you God?

19         THE WITNESS:  I swear.

20              **MARECIA BELL,**

21    a witness, having been duly sworn to tell the truth, the

22    whole truth and nothing but the truth, was examined and

23    testified as follows:

24         COURTROOM DEPUTY CLERK:  Please be seated.

25         State your full name and spell the last for

1      the record.

2                    THE WITNESS:  Marecia Shenette Bell,

3      B-E-L-L.

4                    COURTROOM DEPUTY CLERK:  Thank you.

5                    MR. O'NEILL:  May I inquire, Your Honor?

6                    THE COURT:  Yes.

7                    MR. O'NEILL:  Thank you.

8                         DIRECT EXAMINATION

9      BY MR. O'NEILL:

10     Q.      Good afternoon, Miss Bell.

11     A.      Hi.

12     Q.      Miss Bell, I'm going to ask you a series of

13     questions.  I'd ask you to speak in a loud voice so

14     everyone can hear you.

15     A.      Okay.

16     Q.      Ma'am, are you currently employed?

17     A.      Yes, I am.

18     Q.      And how are you employed?

19     A.      I'm employed through the State of Florida as a

20     registered nurse.

21     Q.      And how -- in your current capacity what's your

22     job title?

23     A.      I am a registered nurse specialist.

24     Q.      And how long have you been employed as such?

25     A.      I have been employed as a registered nurse

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    specialist for over two years now.

2    Q.    Miss Bell, would you please give us your

3    educational background so the ladies and gentlemen of the

4    jury know what that is.

5    A.    I am a professional registered nurse licensed by

6    the State of Florida Board of Nursing.  I attended

7    Hillsborough Community College.  I also attended the

8    University of South Florida.  And I am currently licensed

9    as a registered nurse.

10    Q.    And when did you get your -- your license to be a

11    registered nurse?

12    A.    I got my license to be a registered nurse in year

13    2000 -- year 2000.

14    Q.    And would you give us a history of your

15    occupation as a registered nurse from 2000 to the

16    present.

17    A.    Some of my job duties and skills include

18    correctional nursing in a jail and prison setting,

19    emergency room certified as a pediatric emergency room

20    nurse, adult emergency room, children's services, drug

21    and alcohol detox, labor and delivery, hospice, just a

22    variety of nursing.

23    Q.    Okay.  Let me direct your attention to

24    approximately November of 2009.  And I'd ask you, did you

25    take a job during that time frame?

1    A.    Yes, I did.

2    Q.    And where did you take a job?

3    A.    Hillsborough County Head Start.

4    Q.    And in what capacity were you employed at

5    Hillsborough County Head Start?

6    A.    As a registered nurse.

7    Q.    What were to be your duties and responsibilities

8    there?  What did you do while you were working at Head

9    Start?

10   A.    Most of the duties included educating the staff

11   as well as the families of the children of Head Start

12   that would range from age of six to five years old.  Also

13   I worked closely with the Head Start staff as far as

14   educating them on health issues in regards to care for

15   the children in the classroom and outside of the

16   classroom.

17   Q.    Miss Bell, were you assigned to a specific

18   section within Head Start?

19   A.    The health and nutrition section.

20   Q.    Okay.  And as -- as a general matter, what did

21   the people in the health and nutrition section do?

22   A.    Again, we provided education to the families as

23   well as the staff in regards to the children's health

24   from ages six weeks to five years old, anywhere from

25   recertifying and certifying the staff in basic CPR,

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    giving out health plans to the children, to the staff

2    members and the families of the children that had

3    healthcare needs and that were going to be taking

4    medications inside the program.

5    Q.    And you did your function as an RN?

6    A.    Correct --

7         MR. O'NEILL:  Now, with the permission of

8    the Court I would approach the witness, Your Honor?

9         THE COURT:  Yes, you may.

10   BY MR. O'NEILL:

11   Q.    Miss Bell, let me show you what has previously

12   been marked for identification purposes as Government's

13   Exhibit 10.  And I ask you, ma'am, would you please look

14   at that and tell me if you've seen that before.

15   A.    Yes, I have.

16   Q.    And when did you first see that?

17   A.    When it was handed to me by Marie Mason and

18   Michael Jimenez.

19        MR. O'NEILL:  Your Honor, I move into

20   evidence Government's Exhibit 10.

21        THE COURT:  Any objections?

22        MR. WEISBROD:  No, Your Honor.

23        THE COURT:  All right.  I'll receive into

24   evidence Government's Exhibit 10.

25        (EXHIBIT 10 ADMITTED INTO EVIDENCE.)

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  BY MR. O'NEILL:

2  Q.     And with permission of the Court I would just

3  leave it in front of you, Miss Bell, if you need to look

4  at for any particular reason.

5         Miss Bell, you said it was handed to you by

6  Miss Mason.  Do you recall that incident?  Can you tell

7  us what happened?

8  A.     I can just remember sitting at my desk and --

9  Q.     I'm sorry, Miss Bell.  I can't hear you.

10 A.     I can remember sitting at my desk and Miss Mason

11 and Mr. Jimenez brought the book over and asked me to

12 take a look at it to see if I would consider ordering it

13 for the children in the program.

14 Q.     Prior to that time had you ever ordered a book

15 for a Head Start?

16 A.     No, not for the children in the program.

17 Q.     When -- you said it was Miss Mason and

18 Mr. Jimenez came to see you?

19 A.     Yes, I did.

20 Q.     Now, as a necessary matter for the Court do you

21 see Miss Mason and Mr. Jimenez in the courtroom today?

22 A.     Yes.

23 Q.     And will you please identify for the record what

24 they're wearing.

25 A.     Miss Mason has the white shirt on.  Mr. Jimenez

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    is sitting here in the front with the suit on.

2    Q.      Thank you.

3            MR. O'NEILL:  Indicating the defendants,

4    Your Honor --

5            THE COURT:  The record should so reflect.

6            MR. O'NEILL:  -- Jimenez and Mason.

7    BY MR. O'NEILL:

8    Q.      And after they asked you to look at the book to

9    order it, what, if anything, did you do?

10   A.      I looked at the book to see if I, you know,

11   thought it was appropriate like they asked me to do so.

12   Q.      Now, did you do so immediately or did it take you

13   awhile?

14   A.      It took me some time.

15   Q.      Did you have an occasion to review the book to

16   see whether it was appropriate?

17   A.      Yes, I did.

18   Q.      And what was your opinion on the appropriateness

19   of that book?

20   A.      I didn't think it was appropriate.

21   Q.      And why is that?

22   A.      Well, it was some of the pictures in the book

23   that I thought were just too mature for the children in

24   the program.

25   Q.      And what -- what was the market again that this

1     book was designed for?  For what children, their ages?

2     A.     The children in the Head Start program were six

3     weeks to five years old.

4     Q.     Now, Miss Bell, when you looked at that and felt

5     it was inappropriate, did you talk to anybody else about

6     the book?

7     A.     Yes, I did.

8     Q.     Who did you speak to?

9     A.     I spoke to three of the mental health caseworkers

10    and I also spoke with one other person that I worked

11    closely with, Miss Ida Navejar.

12    Q.     Is that Idalin Navejar?

13    A.     Yes, sir.

14    Q.     Okay.  Now, you cannot tell us what she ever says

15    to you --

16    A.     Yes, sir.

17    Q.     -- because of hearsay rules.  But did you -- what

18    did you say to her?

19    A.     I asked her to take a look at the book and tell

20    me what was her opinion on it.

21    Q.     Did she notice -- did she point out anything

22    about the book to you that you did not know?

23            MR. WEISBROD:  Objection, Your Honor.  It's

24    hearsay.

25            THE COURT:  Sustained.  It's pointing out.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    It's essentially the same thing.

2              MR. O'NEILL:  May I continue, Your Honor?

3              THE COURT:  Yes.

4    BY MR. O'NEILL:

5    Q.      Miss Bell, you looked at the book and brought it

6    to Miss Navejar's attention?

7    A.      Correct.

8    Q.      As a result of any conversations you had with

9    her, what did you do?  In other words, just to get us

10   through this, without telling us what she said what was

11   the next step you took in relation to the book?

12   A.      I felt like the book shouldn't be ordered.

13   Q.      Did you tell anyone that?

14   A.      Yes, I did.

15   Q.      Who did you tell that to?

16   A.      Well, once I found out some --

17             MR. WEISBROD:  Objection, Your Honor.  She's

18   finding out information that's been provided to her by a

19   third party.  It's hearsay.

20             THE COURT:  Okay.  The question is who did

21   you tell.

22             THE WITNESS:  My direct supervisor, Ron

23   Knight.

24   BY MR. O'NEILL:

25   Q.      And after him, did you tell anyone else that you

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   did not believed it should be purchased?

2   A.      Yes, I did tell Marie Mason and Mike Jimenez that

3   I didn't feel like the book was appropriate.

4   Q.      And what did they say each to you, first

5   Miss Mason and then Mr. Jimenez?

6   A.      Mr. Jimenez didn't -- I don't recall him saying

7   anything to me.  Miss Mason said to order the book.

8   Q.      Did she say why?

9   A.      She just said order the book.

10  Q.      And did you in fact order the book?

11  A.      I did not order the book myself.  I didn't have

12  rights to order the book.

13  Q.      And what do you mean by that, ma'am?

14  A.      You have to have certain privileges to be able to

15  process an order through Head Start, and I didn't have

16  those privileges.

17  Q.      Do you know if it was referred to someone else

18  for ordering?

19  A.      Idalin Navejar is was who it was referred to to

20  go ahead and order.

21  Q.      Again, without telling us what Miss Navejar said

22  to you, did you have conversations with Miss Navejar?

23  A.      Yes, I did.

24  Q.      Now, during this period of time were you

25  receiving e-mails relative to this matter from

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Miss Navejar?

2    A.       Yes, I was.

3             MR. O'NEILL:  Let me with permission of the

4    Court approach the witness, Your Honor?

5             THE COURT:  You may.

6    BY MR. O'NEILL:

7    Q.       Miss Bell, let me show you what's been marked as

8    Government's Exhibit 2 for purposes of identification

9    only and ask you if you recognize that, ma'am.

10   A.       I don't recall the letter, but the picture at the

11   bottom with the lady and the dog looks familiar.

12   Q.       Okay.  And how about the e-mail itself, the

13   message?

14   A.       This e-mail wasn't sent directly to me.  It was

15   just shown to me on someone else's computer.

16   Q.       Okay.  That's fair.

17            Miss Bell, if you put that aside for a second, I

18   want to address your attention --  this is -- this is the

19   book that we spoke about, Travel Boy Helps Sebastian.

20   A.       Correct.

21   Q.       Miss Bell, I direct your attention to the back

22   cover.  There is a picture of the author.  And let me

23   just read it for the record.  It says, "Johana Melendez

24   Santiago, M.S., born and raised in Puerto Rico, now

25   teaches undergraduate microbiology at the Hillsborough

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   Community College and serves as a research specialist in

2   the flow cytometry core facility at H. Lee Moffit Cancer

3   Center, Tampa, Florida.

4       "With a Master's degree in medical microbiology

5   she has been actively involved in microbiology education.

6   She enjoys helping students of all ages understand the

7   fascinating world of microbes and actively seeks for

8   opportunities to visit public schools and serve as a

9   mentor for undergraduate students.  As a mother of three

10  boys, reading to her children is one of her hobbies."

11      Do you see that on the monitor, ma'am?

12  A.   Yes.

13  Q.   When you first received this book from

14  Miss Mason, did you know who Johana Melendez Santiago

15  was?

16  A.   No.

17  Q.   Have you ever seen her before?

18  A.   No.

19  Q.   Had you have heard her name?

20  A.   No.

21  Q.   Miss Bell, at a certain point in time were you

22  involved when the books were actually delivered?

23  A.   Yes, I was.

24  Q.   And what, if anything, did you do in relation to

25  the delivery of the books?

1    A.    I assisted with getting the books out of the car.

2    Q.    And who helped you on that?

3    A.    Idalin Navejar is who I helped.

4    Q.    You helped Idalin as opposed to her helping you?

5    A.    Correct.

6    Q.    Okay.  After that, did you have any conversations

7    with Miss Melendez Santiago, the author of the book?

8    A.    Yes, I did.

9    Q.    And when did you have conversations with her?

10   A.    I can't remember exactly when it was.

11   Q.    Was it after the delivery of the books?

12   A.    It was after the delivery of the books.

13   Q.    What, if anything did she say to you?  That

14   you're allowed to state.

15   A.    She said something to the fact that there was

16   some other type of book or something to go with that

17   book, a purchase or something of that nature.  I just

18   remember it was some other book that went with that book.

19   Q.    And do you recall anything more about that?

20   A.    I told her that I wouldn't be the one to

21   authorize any purchase of the books.  That she would need

22   to speak with either Mr. Jimenez and then I redirected

23   her back to Idalin Navejar.

24   Q.    Were you uncomfortable?

25   A.    Very uncomfortable.

1    Q.    Why was that?

2    A.    Because I had already been told who the author of

3    the book was.

4          MR. WEISBROD:  Objection, Your Honor.  This

5    is again the same hearsay.  That's the third time now.

6          THE COURT:  I'm going to overrule.  She's

7    just stating why she's uncomfortable.  She's not talking

8    about content of the conversation.  Overruled.

9          MR. WEISBROD:  602, source of knowledge,

10   Your Honor.

11         THE COURT:  Overruled.

12         You may answer the question.

13   BY MR. O'NEILL:

14   Q.    You may answer that Miss Bell.

15   A.    I was uncomfortable because I was told who the

16   author of the book was before the purchase of the book.

17   And I was told that it was --

18         THE COURT:  All right.  Now that's --

19   that's sufficient.

20         THE WITNESS:  Yes, ma'am.

21         MR. O'NEILL:  Thank you.

22   BY MR. O'NEILL:

23   Q.    Miss Bell, while you were at Head Start did you

24   receive any awards or accolades from your fellow

25   employees?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    A.       Yes.

2    Q.       What was that?

3    A.       One of them I was employee of the year within

4    nine months of being employed there.

5    Q.       How long did you actually work at Head Start?

6    A.       One year.

7    Q.       And did there come a time when you left?

8    A.       Yes.  I resigned.

9    Q.       Why did you resign?

10             MR. WEISBROD:  Relevance, Your Honor.

11             THE COURT:  Overruled.

12             Why did you resign?

13             THE WITNESS:  I felt very uncomfortable and

14   I felt like my license was in jeopardy at the Head Start

15   program because it was too many kids being admitted into

16   the program that I felt like medically and health wise

17   they were not stable enough to be in that program.

18   BY MR. O'NEILL:

19   Q.       And do you recall the day that you resigned?  I

20   don't mean the date so much.

21   A.       November of 2010.

22   Q.       And do you have a memory of that date?

23   A.       Yes.  The exact date I don't remember, but yes.

24   Q.       Were you contacted by anybody from Hillsborough

25   County on the very date that you resigned?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   A.      Yes.

2   Q.      Who were you contacted by?  Do you recall his

3   name?

4   A.      He said he was an inspector or investigator for

5   Head Start.  I cannot remember his name.

6   Q.      Did you actually meet with this individual

7   regardless of what his name was?

8   A.      Yes, I did.

9   Q.      Were you interviewed by this individual?

10  A.      Yes, I was.

11  Q.      And where did that interview take place?

12  A.      It took place at the main children's services

13  building over off of Lake Magdalene.

14  Q.      And was that the very day that you had resigned

15  from Head Start?

16  A.      That was the same day.

17  Q.      Thank you, Miss Bell.

18          One further area I want to go into.  Are you

19  divorced, ma'am?

20  A.      I'm remarried.

21  Q.      Okay.  Were you single for a period of time?

22  A.      Yes, I was.

23  Q.      And are you familiar with -- well, let me put it

24  this way.  Do you have two children?

25  A.      I have four sons.

1    Q.    Okay.  And two from one particular individual?

2    A.    Correct.

3    Q.    At some point in time did that individual have

4    business with the Head Start program?

5    A.    Yes, he did.

6    Q.    Was that before you met him that it started?

7    A.    No.

8    Q.    Okay.  When did that start?

9    A.    This was -- we did the health fairs for Head

10   Start -- had to be in March.

11   Q.    Of what year, ma'am?

12   A.    2010.

13   Q.    He started getting business with Head Start?

14   A.    I don't know when he started getting business.

15   He stated to me he was already getting business by

16   Hillsborough County because he's an active Hillsborough

17   County employee.

18            MR. WEISBROD:  Hearsay.

19            THE COURT:  All right.  I'll sustain the

20   objection whatever he said and I'll ask the jury to

21   disregard it.

22   BY MR. O'NEILL:

23   Q.    Let me try to ask it this way perhaps, Miss Bell,

24   to get around the hearsay rules.

25            MR. WEISBROD:  Your Honor, that's sort of

1    editorializing.

2              THE COURT:  I'll sustain the objection.

3    Don't try to get around the hearsay rules.

4              MR. O'NEILL:  Sorry, Your Honor.  I didn't

5    mean it that way.  To comport with the law.

6    BY MR. O'NEILL:

7    Q.    Miss Bell, did you have a relationship with this

8    man when you were working at Head Start?

9    A.    No, I did not.

10   Q.    Okay.  Were you aware that he had -- well, let me

11   withdraw that.

12             You had no knowledge at that time -- let me

13   withdraw it one more time.

14             Let me leave it at that.  I raised the

15   point.

16             MR. O'NEILL:  Thank you, Your Honor.

17             Thank you, Miss Bell.

18             THE COURT:  All right.  Mr. Farmer?

19             MR. FARMER:  Yes, Your Honor, thank you.

20                      CROSS-EXAMINATION

21   BY MR. FARMER:

22   Q.    Good afternoon.

23   A.    Good afternoon.

24   Q.    So if I can understand, you are saying that you

25   and Mr. Gregory Louis, Senior, were not aware of each

1     other's connection with Head Start when he was acting as

2     a vendor for Head Start?

3     A.     No, I did not say that.

4            MR. O'NEILL: Hearsay. The issue.

5            THE COURT: Well, overruled. I'm going to

6     overrule the objection. We're all skirting around this.

7     We might as well go ahead.

8            Go ahead.

9            THE WITNESS: Okay. If I may, I'm trying to

10    answer your question. Gregory Louis, Senior, and I have

11    two children together, one age 19, one age 17. We split

12    up when I was three months pregnant with the 17-year old.

13           We do not have a relationship. He works for

14    Hillsborough County Fire Rescue as a fireman and he has

15    since I was pregnant with the 17-year old.

16           I'm aware of his employment. He was aware

17    of my employment with Hillsborough County. Okay? Does

18    that answer the question? I don't know.

19    BY MR. FARMER:

20    Q.     Thank you. I appreciate it.

21           He also has a business called A Bouncing Good

22    Time Inflatables; isn't that right?

23    A.     Okay.

24    Q.     Well, I'm not asking you if it's okay. I'm

25    asking is it right.

1          Am I right?

2    A.    That information, yes, I'm aware of that, yes.

3    Q.    And one of your sons works for your ex-husband at

4    A Bouncing Good Time Inflatables; right?

5    A.    No.  They don't work for him.

6    Q.    They work with him?

7    A.    They work with their dad as a father and son.

8    Q.    And that's wonderful.  I don't fault that at all.

9    A.    Okay.

10   Q.    But do you know how your son is paid by your

11   ex-husband?

12   A.    No.  It's -- it's -- as far as I'm concerned, I

13   don't see any money being exchanged.  It's more to keep

14   him out of trouble, keep his mind idle.

15   Q.    And does that son live with you?

16   A.    Yes, he does.

17   Q.    All right.  And you are aware that on five

18   different occasions when you were still working for

19   Hillsborough County Head Start that Gregory --  Gregory

20   Louis, Senior, provided services for five different happy

21   family events at the Head Start program; right?

22   A.    I'm aware of two of them.

23          MR. O'NEILL:  I'm going to object for the

24   same basis, Your Honor, that they objected when I was

25   trying to bring that out.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          THE COURT:  It is.  And, you know, I'm not

2    sure I quite understand this.  If you want to bring it

3    out and, Mr. O'Neill, you objected -- or Mr. Weisbrod

4    objected to Mr. O'Neill asking questions about it.  So --

5          MR. FARMER:  I didn't adopt the objection.

6          THE COURT:  All right.  Mr. O'Neill, I'll

7    let you redirect on --

8          MR. O'NEILL:  Thank you, Your Honor.

9          THE COURT: -- the questions.

10          Go ahead.

11    BY MR. FARMER:

12    Q.     Isn't it true that on five different occasions A

13    Bouncing Good Time Inflatables provided services to Head

14    Start?

15    A.     I'm aware of two.

16    Q.     All right.  At one point did you thank an

17    employee at Hillsborough County Head Start for having

18    approved a check that went to your husband?

19    A.     No.  That's not my husband.

20    Q.     Or your ex-husband?

21    A.     He's not my ex-husband.  We've never been

22    married.

23    Q.     I'm sorry.

24          Mr. Louis?

25    A.     No, I did not.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    All right.

2          MR. FARMER:  May I approach then with what's

3    been marked as Defendant's Exhibit No. 32?  May I

4    approach, Your Honor?

5          THE COURT:  You may.

6    BY MR. FARMER:

7    Q.    If I could direct your attention to the fourth

8    page of this document.

9    A.    Yes, sir.

10   Q.    All right.  Could you look at a copy of the

11   signature on that document.

12   A.    Uh-huh.

13   Q.    All right.  Is that you, Marecia Bell?

14   A.    That is me.

15   Q.    Is that your handwriting?

16   A.    That's my handwriting.

17         MR. FARMER:  Your Honor, at this time

18   defense would offer Defense Exhibit No. 32.

19         MR. O'NEILL:  Even though it's out of order

20   no objection, Your Honor, at all.  Maybe it'll speed

21   things up.

22         THE COURT:  I'll receive into evidence 32 --

23   Defendants' 32.

24         (EXHIBIT 32 ADMITTED INTO EVIDENCE.)

25         MR. FARMER:  May I publish, Your Honor?

1           THE COURT:  You may.

2   BY MR. FARMER:

3   Q.      Let's take a look at your sticky notes.  Is that

4   your sticky note?

5   A.      That is my sticky note.

6   Q.      And miss Linda is Linda Edman?

7   A.      Correct.

8   Q.      At she works in fiscal --

9   A.      Yes.

10  Q.      -- at Head Start?

11  A.      Correct.

12  Q.      And that's your phone number?

13  A.      That was my Head Start cell phone number.

14  Q.      And this is a merchandise request form that's

15  made out to A Bouncing Good Time?

16  A.      Correct.

17  Q.      So in essence you would agree with me that you're

18  thanking someone at Head Start who works in fiscal for

19  approving a payment of $770 to your -- to the father of

20  your sons?

21  A.      I don't recall putting that sticky note on that.

22  I recall always giving her a sticky note on my cell phone

23  bills that she would give me from Head Start in taking

24  care of those.  I do not recall putting a thank you

25  sticky note on a merchandise request form.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1     Q.      Okay.  Do you -- do you dispute writing thank you

2 notes to Miss Linda Edman?

3     A.      No, I do not.

4     Q.      Okay.  And are you saying that someone

5 deliberately put your sticky note on this document?

6     A.      I'm not saying that.  I'm saying I did not put it

7 on there.

8     Q.      Well, isn't it true that you're --  well, who are

9 you insinuating did put the sticky note there?

10     A.      I'm not insinuating anyone put it on there.  I

11 don't know who put it on there.  I'm telling you I did

12 not put it on there.

13     Q.      Is it just a coincidence that the sticky note

14 thank you results -- or regards a business owned by

15 Mr. Louis?  Is that a coincidence?

16     A.      I'm not stating that it's a coincidence.  I'm

17 stating that I did not put that on that merchandise

18 request form.

19     Q.      And you're sure of that?

20     A.      I did not put that sticky note on that

21 merchandise request form.

22     Q.      You said you wrote sticky notes and you put them

23 on your cell phone records?

24     A.      I put them on several things, cell phone records.

25 Uhm, Avon books that Miss Linda Edman sells at work, just

1    different things.

2    Q.    And is Miss Linda Edman someone who you know

3    well?

4    A.    Not that I know her well.  I just met her at Head

5    Start.

6    Q.    Would she be someone who would take a sticky note

7    from a different document and place it on this document?

8    A.    I'm not sure.  I don't know her that well to say

9    that.

10    Q.    In your experience, would that be out of

11    character for her?

12    A.    I can't say that either.  I didn't know her long

13    enough to say that.

14    Q.    As of April of 2010 you were working at Head

15    Start for about five months; is that right?

16    A.    I was working there until November of 2010.

17    Q.    Understand.

18    But as of April 2010 --

19    A.    Uh-huh.

20    Q.    -- you were working at Head Start for about five

21    months; is that right?

22    A.    November to April.

23    Q.    Okay.  So you're going to have to maybe give me a

24    yes or no first.

25    A.    November, December, that's about six months.

1    Q.    Okay.  November to April is six months?

2    A.    That's what it sounds like.  November, December,

3    January, February, March, April.  About six months.

4    Q.    And you're currently working at Zephyrhills

5    Correctional Institute?

6    A.    Correct.

7    Q.    And were you working at Zephyrhills Correctional

8    at the time you were employed at Head Start?

9    A.    No, I was not.

10   Q.    All right.  I thought you said you were working

11   at Zephyrhills for the last two years.

12   A.    No.  I said I've been in corrections for that

13   long.  I've been in corrections for over ten years as an

14   independent contractor, so I have been back and forth.

15   Q.    All right.  You haven't been there the last two

16   years continuously?

17   A.    No, I have not.

18   Q.    All right.  Now, when you were approached with

19   Miss Marie Mason with this book, Travel Boy Helps

20   Sebastian, what month was that?

21   A.    I don't recall.

22   Q.    Do you remember if it was the spring --

23   A.    I don't recall.

24   Q.    -- of 2010?

25   A.    I don't recall what month it was.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    Okay.  You were at Head Start for a full year;
2    right?
3    A.    Correct.
4    Q.    All right.  Could you tell us if it was in the
5    first half of the time you were at Head Start?
6    A.    Honestly, I don't remember.  I did a lot of work
7    during that time.  I don't remember when it was.
8    Q.    Well, I think I know the answer to this, but you
9    don't remember the day of the week?
10   A.    No.
11   Q.    And do you remember who was with Miss Mason, if
12   anyone, when Miss Mason brought you this book?
13   A.    Mr. Jimenez.
14   Q.    Mr. Jimenez was with her that first meeting; is
15   that right?
16   A.    The first time the book was brought to me.
17   Q.    And Miss Mason asked you whether or not in your
18   opinion the book was age appropriate.  Was that the
19   question she had for you?
20   A.    I don't know if she said age appropriate.  I just
21   remember her saying something about being appropriate for
22   the kids in our program.
23   Q.    All right.  She asked you to take a look at the
24   book to determine that?
25   A.    Yes.

1  Q.     And you didn't do that immediately, did you?

2  A.     No, I didn't.

3  Q.     All right.  Let me ask generally how many times

4  have you read this book?

5  A.     I haven't read the book completely at all.

6  Q.     All right.  How many times have you looked at

7  every page?

8  A.     I can't remember how many times I looked at it.

9  I looked at it a few times.

10  Q.     Did you look at every page a few times?

11  A.     I looked at every page in there.

12  Q.     Okay.  How many times did you look at every page?

13  A.     I don't recall.

14  Q.     More than one?

15  A.     I'm sure it was more than once.

16  Q.     Okay.  If I can understand you correctly, you

17  said that you've looked at every page more than once, but

18  you've never read it all the way through?

19  A.     No, I didn't read it all the way through.

20  Q.     When you were looking at every page, what were

21  you doing?

22  A.     Looking at the pictures.

23  Q.     Okay.  And did Miss Mason tell you to give her an

24  opinion about whether the pictures were appropriate?

25  A.     No.  I don't remember her being direct about

1     asking about pictures, no.

2     Q.     Okay.  She's not only your boss, but she was --

3     is your boss's boss; is that right?

4     A.     Correct.

5     Q.     Okay.  Your immediate boss is Mr. Knight.  And

6     then his boss is Miss Mason; is that right?

7     A.     Correct.

8     Q.     And so when she asked you to help her out with

9     something, you obviously would take it seriously; right?

10    A.     Yes.

11    Q.     You'd want to comply with her essential request;

12    right?

13    A.     Yes.

14    Q.     Okay.  It's important to listen to your boss's

15    boss; right?

16    A.     When it's right, yes.

17    Q.     Did she tell you to -- to read every page of the

18    book?

19    A.     She didn't give me any directions on exactly what

20    she wanted me to do with the book.

21    Q.     Now, you know from looking at the cover of the

22    book it was about trapping the germs; is that right?

23    A.     Yes.

24    Q.     Okay.  And you've testified earlier this

25    afternoon that you said the problem you had specifically

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1     was with the pictures of the book; is that right?

2     A.     Correct.

3     Q.     Okay. And then you were more specific and you

4     said you thought the pictures in the book were too

5     mature.

6     A.     Correct.

7     Q.     Okay. Those were the general problem and the

8     specific problem; is that right?

9     A.     That was the problem that I saw with the book.

10     Q.     And -- and that was because when you looked

11     through every page of this book once or twice what you

12     really were focusing on was the pictures?

13     A.     Correct. I was focusing more on the pictures

14     than the book.

15     Q.     All right. And when you told -- you said at one

16     point later on you told Miss Mason specifically

17     personally that you did not think the book was

18     appropriate; is that right?

19     A.     Yes.

20     Q.     All right. And did you tell her this book isn't

21     appropriate because of the pictures?

22     A.     No. We didn't go into details why.

23     Q.     All right. And did you tell her this book is

24     inappropriate because the pictures were too mature?

25     A.     No. We didn't go into details.

1    Q.    Okay.  The book's right in front of you.

2    A.    No, it's not.

3    Q.    Oh, I'm sorry.

4    A.    That's all right.

5          MR. FARMER:  May I approach with Exhibit 10?

6    Your Honor, since the book is in evidence may we publish

7    the whole book to the jury by having individual copies?

8          THE COURT:  All right.  Mr. O'Neill, do you

9    have any objection in our handing out copies of the

10   books?

11         MR. O'NEILL:  No, Your Honor.

12         THE COURT:  All right.  Mr. Adkins, where

13   are you?

14         COURT SECURITY OFFICER:  Right here, Your

15   Honor.

16   BY MR. FARMER:

17   Q.    Miss Bell, could we take a look -- would you

18   page -- as those books are being distributed, could you

19   take a look at -- could you look at Page 5.  And it's

20   just a photograph -- I mean an illustration; right?

21   A.    Yes.

22   Q.    Okay.  Was that -- was that the illustration that

23   you thought was a bad illustration because it was too

24   mature?

25   A.    No.

1   Q.      Okay.  Let's go to the next illustration, No. 7.

2   Was -- was that the book -- I think everyone has got one.

3   Was that the illustration that you thought was

4   inappropriate because it was too mature?

5   A.      No.

6   Q.      Let's go to Page 9.  Was that the illustration

7   that you thought was inappropriate because it was too

8   mature?

9   A.      No.

10  Q.      How about Page 11?  Was that the specific

11  illustration that you thought was inappropriate because

12  you thought it was too mature?

13  A.      No.

14  Q.      I bet you know my next question.  How about Page

15  13?

16  A.      No.

17  Q.      All right.  How about Page 15?

18  A.      No.

19  Q.      Page 17?

20  A.      No.

21  Q.      Page 19?

22  A.      Page 19 was kind of question about coming out of

23  the door.  But it just raised some questions, and not to

24  elementary age or a pre-elementary age kid.  So that one

25  was in between and on the fence.  It wasn't so much that

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    it was inappropriate; it was just a bit mature.

2    Q.    Okay.  Well, you said that your problem was the

3    pictures were -- were inappropriate because they were too

4    mature for the children.

5    A.    We're getting to the inappropriate pictures

6    further to the back.

7    Q.    Okay.  Well, I want to be sure that we don't

8    leave any illustrations out.  Okay?

9    A.    That's fine.

10   Q.    All right.  Tell me what is it about a young man

11   who's wearing a baseball cap that says TB for Travel Boy

12   who seems to be either going into a door or exiting a

13   door?  What is inappropriate about that illustration

14   because it's too mature?

15   A.    I didn't say it was inappropriate.  This one here

16   was a bit mature for the age group of the kids.  And

17   that's just my opinion on that when you look at this book

18   for a six-week to five-year old kid.

19         It just doesn't catch their attention as to what

20   the book is saying that it needs to do to teach them

21   about the germs in this picture.  So it's not that it's

22   inappropriate.  I just felt like it was too mature on --

23   on that particular picture.

24   Q.    This illustration was too mature?

25   A.    Correct.  That's my opinion.

1   Q.      In your opinion?

2   A.      Correct.

3   Q.      For -- for young children being read books by

4   their parents?

5   A.      It wasn't to be read by their parents.  It's the

6   books to be looked at by the kids in the classroom to

7   associate them looking at the picture and knowing exactly

8   what to do about germs.

9   Q.      Well, certainly we have to read the book as a

10  whole; right?

11  A.      Understood.

12  Q.      Okay.  I just want to try to understand which of

13  these illustrations in this book were, as you said,

14  inappropriate because they're too mature.

15  A.      Okay.

16  Q.      Because that's the only reason you articulated as

17  forming an opinion that this book was inappropriate;

18  correct?

19  A.      Correct.  That I was asked to do.

20  Q.      All right.  But that's the -- well, you were

21  asked to determine if it was appropriate; right?

22  A.      Correct.

23  Q.      And the only reason you articulated so far that

24  it was inappropriate was because these pictures are too

25  mature?

1   A.      And some of them are inappropriate.

2   Q.      And some are inappropriate?

3   A.      Correct.

4   Q.      Okay.  Let's talk about the photo -- I mean the

5   illustration on Page 21.  Was that one that you thought

6   was too mature?

7   A.      No.

8   Q.      Okay.  How about Page 23?

9   A.      That one I thought was a bit mature for the

10  younger kids, again, looking at the picture to put

11  something into their mouth.  And if they can even tell

12  that that was a tonsil, if that was a tongue, if that was

13  their mouth.  So, again, I thought it was a bit mature.

14  Q.      Well, okay.  You know that this book included in

15  this part a discussion about Sebastian's mouth; right?

16  A.      Correct.

17  Q.      I feel like a book critic here.

18          But so a picture or an illustration of a boy's

19  mouth showing a tongue and tonsils was inappropriate to

20  accompany a story about tongues and tonsils?

21  A.      It was inappropriate for kids ages six weeks to

22  five years old.  You and I as adults know that that's a

23  tonsil.  A kid six weeks to five years old doesn't know

24  that.  So, again, that was just my opinion.  I felt like

25  this picture was -- was a bit mature.

1    Q.      How about the illustration on Page 25, was that

2    too mature?

3    A.      I think that one was too mature.

4    Q.      You did or did not?

5    A.      They did sad faces, you know, from the teachers.

6    Q.      So you did or did not believe it was too mature?

7    A.      I'm looking at each individual picture with you

8    as I went through the book already.  And then I base my

9    opinion on the entire book when I looked through all the

10   pictures.

11   Q.      All right.  I'm asking about illustration Page

12   25.  Too mature or not?

13   A.      Not.

14   Q.      All right.  Page 27, too mature or not?

15   A.      Not.

16   Q.      Page 29, too mature or not?

17   A.      Not.

18   Q.      Page 31, too mature or not?

19   A.      Too mature.

20   Q.      Why is a picture of a thermometer with

21   102 degrees Fahrenheit --

22   A.      Again --

23   Q.      -- with an exclamation mark too mature for a

24   parent to read to a child?

25   A.      The picture itself, once looking at the picture

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  and as an adult knowing that that's a thermometer, what

2  we use for the children are in their ear tympanic

3  thermometers, which is not this size at all.  And the

4  thermometers that we do use to put under this tongue is

5  not this picture anymore, so I felt like this picture was

6  a bit immature.

7  Q.      It was mature because it was the wrong type of

8  thermometer?

9  A.      It was a bit mature because the kids are not

10 aware of this type of thermometer that's being used on

11 that age group of kids.

12 Q.      Are you saying that this type of old school

13 thermometer isn't used in 2010 for any purposes on a

14 child?

15 A.      That's not what I'm saying at all.

16 Q.      I didn't think it was.

17 A.      Okay.

18 Q.      You would agree with me that this kind of

19 thermometer is used for little kids all the time even

20 now?

21 A.      No, I'm not going to say that it's being used all

22 the time.

23 Q.      It's commonly used like any other --

24 A.      It's not commonly used in this date.  It's not.

25 Q.      Is it used ever?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    A.      It's used.

2    Q.      Okay.  What is too mature about this thermometer?

3    A.      We looked at the thermometer and we looked at the

4    picture.  I looked at the picture myself and I just felt

5    like it was too mature.  It was the color.  It was red.

6    It was -- to me it was signifying when we give the

7    children something red and we paint something that it

8    would be hot, not to touch, you know.  So as an adult, as

9    a nurse I felt like this picture was a bit mature.

10   Q.      Well, isn't the short of the point of the

11   illustration in the page next to it about having a fever

12   that is being too hot?

13   A.      The children wouldn't understand that.  That's

14   too mature.  They don't know what 102 means.

15   Q.      I just want you to understand.  You know that a

16   six-month old child isn't going to be reading this book

17   by himself or herself; right?

18   A.      I understand that.

19   Q.      There's going to be a parent reading the book.

20   A.      Yes.

21   Q.      You understand that?

22   A.      Yes, I do.

23   Q.      Okay.  So you understand that we're not going to

24   reach into the cradle and give the infant this book.

25   We're going to have parents reading these books to the

1  kids; right?

2  A.    I would hope so.

3  Q.    Okay.  And a parent could -- could explain that

4  this means that when you have germs in your body, you

5  could get a fever of 102 degrees; right?

6  A.    That's understood.

7  Q.    All right.  Now, the illustration on Page 33 --

8  we're almost done -- was that in your opinion too mature?

9  A.    A bit mature.

10 Q.    What was -- what was mature -- too mature about a

11 picture of --

12 A.    Of a germ.

13 Q.    -- of Mac , yeah?

14 A.    The germ is smiling as if he's doing something

15 good.  Germs are taught to be bad for you, not good.

16 He's smiling.

17 Q.    Let's see.  Is that a kind of -- do you

18 understand the difference between like a smile that's --

19 A.    And a smirk.

20 Q.    Yeah.  Kind of a smile that's --

21 A.    Yeah, definitely.

22 Q.    Would that be kind of a mischievous smile?

23 A.    Mischievous?

24 Q.    Yeah.

25 A.    Pretty mature for a six-week to a five-year old.

1    Q.    Actually, if we look at the accompanying text we

2    realize that this isn't a germ; this is a strong cell

3    that's happy because he's destroying the cell.

4    A.    Okay.

5    Q.    I mean destroying the germ; right?

6    A.    Uh-huh.

7    Q.    So actually I was wrong.  That's -- that's kind

8    of a self satisfied smile of this cell named Mac who just

9    destroyed a germ.

10    A.    Okay.

11    Q.    So with my clearer understanding of both pages,

12    would you agree with me that this is not too mature?

13    A.    Now I think it's very so too much mature.

14    Q.    Oh, it makes it even too --

15    A.    Yes, it makes it even more mature.

16    Q.    Okay.  Just because the kids wouldn't be able to

17    understand that Mac -- let's take a look at this text.

18    Mac is a strong cell in someone's body that is supposed

19    to destroy germs that make people sick.  Scientists call

20    it a macrophage.  Is that -- the text and the picture,

21    does that make it too mature?

22    A.    It makes it too mature for the kids in that age

23    group, and that's my opinion.

24    Q.    Okay.  And just so we know that this is an

25    educational book, let's go to the -- Page 46 because I

1    don't know if I'm even pronouncing the word correctly.

2    But you see here that the author of the book provides a

3    phonetic pronunciation of the word "macrophage,"

4    "streptococcus" to boot.  Did you notice that when you

5    looked at the pictures in the book?

6    A.    I didn't look at it in detail.  I have some

7    information about the definitions of the book -- of the

8    words in the book, and that's why I felt like, again,

9    that was part of my reason for saying the book was too

10   mature for the kids in that age group.

11   Q.    Well, again, are you saying that the book is

12   inappropriate for a teacher or parent -- as we see here

13   in the glossary, for a teacher or parent to convey these

14   messages to a child?

15   A.    That's not what I was asked.  I was asked to look

16   at it for the kids in the program.  I wasn't asked about

17   the parents or the teachers in the program.

18   Q.    Well, didn't you read Page 46?

19   A.    I didn't read the book in detail.  I pretty much

20   paid attention to the pictures because, again, I was

21   asked about the kids.

22   Q.    All right.  So is this all a big

23   misunderstanding?  You thought you were looking at this

24   book to see if it was appropriate for a six-month old

25   kid, and you didn't understand it was for the parents?

1   A.      No, it wasn't.  It wasn't specific for a

2   six-month old kid.

3   Q.      Well, that's the age you keep using?

4   A.      No.  I said six weeks to five years old.

5           MR. O'NEILL:  Objection, Your Honor.

6           THE COURT:  I'll sustain the objection.

7   That's not what she said, Mr. Farmer.

8           MR. FARMER:  I'm sorry.  I added too much

9   time.

10  BY MR. FARMER:

11  Q.      Six weeks.  Is the misunderstanding that you

12  thought that a six-week old child would be reading this,

13  and you didn't realize that it was for the teachers and

14  parents to read to the child?

15  A.      No.

16  Q.      Is that why you thought all this was too mature?

17  A.      No.  I know that a five-year old and a six-week

18  old and a six-month old cannot read this book.  However,

19  the books were to be purchased for the children and to be

20  put in a classroom for the program.  The pictures that

21  were there that I looked at and gave my opinion on were,

22  again, too mature and some of them were inappropriate,

23  and that was my opinion on this book.

24  Q.      All right.  How about Page 35?  Is that one of

25  the illustrations that's too mature?

1    A.    Yes.  And inappropriate.

2    Q.    All right.  Why?

3    A.    Again, just looking at the picture itself, I just

4    came to the conclusion that it was inappropriate just

5    looking at the picture itself.

6    Q.    But why?  Why is this picture of Buddy

7    inappropriate?

8    A.    Well, we're teaching about the germs and all in

9    the book.  What does the police officer have to do with

10   teaching them to wash their hands and keep the germs off

11   of their hands and things?  Again, that was just my

12   opinion.  I looked at the picture and I felt like the

13   picture was not appropriate.

14   Q.    Well, Miss Mason asked you to look at the book,

15   not just pictures; right?

16   A.    Okay.  Yes.

17   Q.    Is that right?

18   A.    She asked me to look at the book.

19   Q.    Okay.  Could you look at the facing page of this

20   illustration, Page 34.

21   A.    Uh-huh.

22   Q.    Doesn't this explain that this is a picture of

23   Buddy, who's a little soldier who traps microbes?

24   Doesn't that sort of put the illustration in context?

25   A.    No.  This is a police officer.  I mean that's

1    what I'm looking at.  And it's not a soldier.

2    Q.    Okay.  So your quibble is Buddy should have been

3    dressed more clearly as a soldier, not a police officer?

4    A.    I don't know how Buddy should have been dressed,

5    but Buddy was inappropriate for ages six weeks to five

6    years old based on my opinion.

7    Q.    Even when a parent or teacher is reading a book?

8    A.    Even when a parent or a teacher is reading a

9    book.  My concern was the kids looking at the book just

10   like they would look at a picture and see someone washing

11   their hands under the sink and they would get up and look

12   at that picture and go to the sink and they would do the

13   same thing.

14        So when they look at Buddy, what would they do?

15   That was -- that was the question in my mind when I was

16   looking at these pictures.

17   Q.    Okay.  So you never really read any of the text;

18   right?

19   A.    I never really read the text of the book.

20   Q.    Did Miss Mason say, I want you to give me an

21   opinion about the illustrations.  I want you to disregard

22   the writing in this book completely?

23   A.    No, she did not say that.

24   Q.    Don't you think now she wanted you to read the

25   book, the words, and look at the pictures and then form

1    an opinion?

2              MR. O'NEILL:  Objection, Your Honor.

3              THE WITNESS:  I don't know what she wants.

4              THE COURT:  Yeah.  That question has been

5    asked numerous times.  In addition, I'm not sure how she

6    would know what Miss Mason wanted other than what she

7    said.

8    BY MR. FARMER:

9    Q.    The illustration on 37, mature or not?

10   A.    Not.

11   Q.    And 39 you see a combination of two illustrations

12   we've seen before.  Too mature or not?

13   A.    Too mature.

14   Q.    Why?

15   A.    Again, the microphage, he was just too mature for

16   the kids.

17   Q.    Why?

18   A.    The age group.  The relativeness with their

19   thinking and the definition of exactly what this picture

20   is supposed to define for them.  It's too mature.

21   Q.    How do you know what this picture is supposed to

22   define if you haven't read the book?

23   A.    Again, just my opinion.  I was asked to give my

24   opinion if I thought it was appropriate, and that's what

25   I did.

1    Q.    How about the illustration on Page 41?

2    A.    Too mature.

3    Q.    Why?

4    A.    Same pictures.

5    Q.    Well, you didn't have a problem with the

6    submarine, so that's not too mature, is it?

7    A.    I didn't say the submarine was too mature.

8    Q.    Okay.  So what -- what else about this

9    illustration is too mature?

10   A.    The same two pictures are there, the microphage

11   and Buddy are still there.  Once I looked the pictures

12   over I came up with the same conclusion that I felt like

13   it was too mature.

14   Q.    Okay.  How about Page 43?

15   A.    Submarine, nothing mature about -- too mature

16   about that.

17   Q.    And how about Page 45?

18   A.    Two little boys and a soccer ball.  Nothing too

19   mature about that.

20   Q.    So about how many pictures did you have a problem

21   with, you thought they were too mature?

22   A.    I didn't count them.

23   Q.    Okay.

24   A.    I didn't count them.  I just summed it up.  Once

25   I summed it up, I felt like the book was too mature for

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    the kids and some of the pictures were inappropriate.

2    Q.    Based on your opinion that five of these

3    illustrations -- I think I counted correctly -- may have

4    been too mature and not having read the book, you formed

5    an opinion that this book was inappropriate?

6    A.    Yes, I did.

7    Q.    Now, when you were given --

8          THE COURT:  Mr. Farmer, are you about to

9    start something else or are you still going to stick to

10   the book?

11         MR. FARMER:  I'm just going to stick with

12   the book.

13         THE COURT:  Okay.

14         MR. FARMER:  Maybe five minutes.

15         THE COURT:  All right.  Then I'll let you

16   finish.

17         MR. FARMER:  Okay.  Usually it's the other

18   way around.  I want to stop.  But I'll just -- I'm almost

19   done.

20   BY MR. FARMER:

21   Q.    When you first received the book, right, you put

22   it aside for a while; right?

23   A.    Right.

24   Q.    How long did you put it aside?  How many days?

25   A.    I don't recall.  I don't recall exactly how many

1    days.

2    Q.    Just generally how many days?

3    A.    I can't give you general.  I don't remember.

4    Q.    Was it more than a week?

5    A.    I do not remember.

6    Q.    You said you did so because -- well, you did so

7    because you were working on bringing HS and EHS into

8    compliance for a pending review.  That's the reason you

9    put the book aside?

10    A.    I don't remember.  I was just very busy.

11    Q.    Okay.  And was it the time you were doing an EHS

12    and HS --

13    A.    I don't -- I've always done Early Head Start and

14    Head Start.

15    Q.    Do you remember making a statement in April of

16    this year that indicated that you put the book aside for

17    the time being without looking at it initially because

18    you were working on bringing EHS and HS into compliance

19    for a pending review?  Do you remember making that

20    statement three months ago?

21    A.    I do not recall when if I made that statement.  I

22    may have.  But I was working on a daily basis to bring

23    Head Start and Early Head Start into compliance.

24    Q.    Okay.  I'm just interested in the relationship

25    between that job and why and for how long you put the

1    book aside.

2    A.      I don't recall.

3    Q.      All right.  And you described that you had one

4    discussion with Miss Mason when she gave you the book;

5    right?

6    A.      No.  I had several discussions.  I don't remember

7    how many, but --

8    Q.      Okay.  How many -- how many discussions did you

9    have with Miss Mason about --

10   A.      I don't recall.

11   Q.      Well, okay.  Was it more than two?

12   A.      It was more than two.

13   Q.      More than how many?

14   A.      It was more than two.  I can remember that.

15   Q.      Okay.  And these discussions, they took place

16   over a course of weeks?

17   A.      I can't remember how long.

18   Q.      Did you three months ago talk with two agents and

19   tell them that you had multiple discussions over a period

20   of weeks about this book with Miss Mason?

21   A.      I don't remember.  I know I had a period of

22   discussions over a short and long period of time.

23   Q.      Okay.  Tell me what the long period of time was.

24   A.      The time that I was there up until the books

25   arrived and we had the books delivered to the center.

1  Q.     Before the books were ordered, how many times did

2  you discuss the books?

3  A.     I don't recall.

4  Q.     Do you know when the books were ordered, what

5  date?

6  A.     No.

7  Q.     What month?

8  A.     No.

9  Q.     All right.  Do you know how much time separated

10  the point where Miss Mason asked you to look at the book

11  and the point where she tells you to go ahead and order

12  the book?

13  A.     No.

14  Q.     Any idea how much time separated the two?

15  A.     I don't recall, I didn't order the books.  I

16  couldn't order the books.  I don't recall.

17  Q.     Okay.  When -- when the decision was made, you

18  described an occasion when Miss Mason and you discussed

19  the book and to go forward with the book; right?

20  A.     Correct.

21  Q.     Okay.  That day, going back the first day you see

22  this book, how much time separated the two?

23  A.     I don't recall.

24  Q.     More than a month?

25  A.     I don't recall.

1  Q.    Have no idea?

2  A.    I have no idea.

3  Q.    A day?

4        MR. O'NEILL:  Objection, Your Honor.

5        THE WITNESS:  I do not recall.

6        THE COURT:  I think she does not recall.

7        MR. FARMER:  And, Your Honor, that's all I

8  have.  Thank you.

9        THE COURT:  I'm going to ask you to step

10 down, but you're going to need to come back tomorrow.

11       THE WITNESS:  Yes, ma'am.

12       THE COURT:  Please don't discuss your

13 testimony over the evening hours with anyone, attorneys,

14 witnesses, anyone at all.  Just don't discuss your

15 testimony.

16       THE WITNESS:  Yes, ma'am.

17       THE COURT:  And we're going to start at

18 9 o'clock.

19       THE WITNESS:  Yes, ma'am.

20       THE COURT:  But you can step down.

21       Now, as far as the jury is concerned, I'm

22 going to ask you to leave your pads face down on your

23 chairs, the book, the seating chart, everything leave

24 here in the courtroom.  Nobody is going to bother it.

25 Leave them face down on your chairs.  We will start in

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    the morning at 9 o'clock.

2            Let me just remind you not to discuss the

3    case with anyone, not to do any kind of research about

4    the case, simply come back just as you are this evening.

5    Should there be anything in the news media, and I don't

6    know that there will be, but please don't read it, please

7    don't listen to it.

8            You need to make a decision based on what

9    you hear in the courtroom.  And we will start in the

10   morning promptly at 9 o'clock.  Thank you.

11           COURT SECURITY OFFICER:  All rise, please,

12   for the jury.

13       (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

14           THE COURT:  Okay.  If you'd have a seat for

15   just a minute.

16           Mr. Farmer, again, I'm assuming you're

17   joining in objections unless you tell me otherwise.

18           MR. FARMER:  Oh, yes.

19           THE COURT:  All right.  And, Mr. O'Neill,

20   did you have an opportunity to have someone check into

21   whether or not that's going to be an easy fix or not an

22   easy fix?

23           MR. O'NEILL:  No, Your Honor.  I was here.

24           THE COURT:  Okay.  All right.  Can you tell

25   me about your witnesses tomorrow after this witness

1    leaves the stand.

2              MR. O'NEILL:  Yes, Your Honor.  I think

3    after Miss Bell probably Idalin Navejar, Nolen Estes

4    coming in, Linda Edman, Carol Tedder, Louis Finney.  And

5    that's something we'd have to address, Your Honor.

6              THE COURT:  Mr. Finney?

7              MR. O'NEILL:  Yes, Your Honor.

8              THE COURT:  Okay.  Is it something we need

9    to address this evening or tomorrow before he testifies?

10              MR. O'NEILL:  I think tomorrow is fine, Your

11    Honor.  I turned over Jencks.  He exercised his Fifth

12    Amendment right to the grand jury.

13              THE COURT:  Okay.

14              MR. O'NEILL:  We may have to take it out of

15    the presence of the jury.

16              THE COURT:  All right.

17              MR. O'NEILL:  And then Dawn Dasher,

18    Mr. Sheehan.  That should be it.

19              THE COURT:  Okay.  Mr. Weisbrod.

20              MR. WEISBROD:  Does the government know

21    whether or not Mr. Finney has counsel?

22              MR. O'NEILL:  Do not.

23              MR. WEISBROD:  Have counsel at the time of

24    the grand jury appearance?

25              MR. O'NEILL:  Did not.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          MR. WEISBROD:  He may need --

2          MR. O'NEILL:  Well, I'm sorry.  He might

3     have, but he didn't indicate to us that he did.

4          MR. WEISBROD:  Based on that, he may need

5     counsel, Your Honor.

6          THE COURT:  Okay.  Well, I'll just have to

7     see what happens.  I don't know what to do about it

8     today.

9          All right.  Thank you.  We're in recess

10    until 9 o'clock tomorrow morning.

11               (PROCEEDING ADJOURNED.)

12

13          I CERTIFY that the foregoing is a true and

14    accurate transcription of my stenographic notes.

15    Dated:  11/04/2011.

16

17               ___s/ Sandra K. Provenzano_____
                    SANDRA K. PROVENZANO, RPR
18                  Official Court Reporter

19

20

21

22

23

24

25


SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER