IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
CASE No. 8:11 CR 197 T 24 MAP


UNITED STATES OF AMERICA


        Plaintiff,

v.                            July 12, 2011
                                9:00 a.m.

MICHAEL JIMENEZ, JOHANA
MELENDEZ SANTIAGO, and
MARIE MASON


        Defendant.

_____/


TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:    ROBERT O'NEILL
                        Assistant U.S. Attorney
                        U.S. Attorney's Office
                        400 North Tampa Street
                        Suite 3200
                        Tampa, FL 33602


For the Defendant:    DAVID WEISBROD
Michael Jimenez       Law Office of David T. Weisbrod
                        Suite 1111, 412 E Madison St
                        Tampa, FL 33602

```
       For the Defendant:      JEFFREY G. BROWN
       Johana Melendez         Brown & Doherty, PA
       Santiago                Suite 120, 450 Carillon Pkwy
                               St. Petersburg, FL 33716


       For the Defendant:      MATTHEW P. FARMER
       Marie Mason             Farmer & Fitzgerald, PA
                               708 E Jackson St.
                               Tampa, FL 33602



       Reported By:            Sandra K. Provenzano, RPR
                               Official Court Reporter
                               U.S. District Court
                               801 North Florida Avenue
                               Tampa, FL 33602
                               (813) 301-5699

       STENOGRAPHICALLY REPORTED
       COMPUTER-AIDED TRANSCRIPTION
```

## INDEX

WITNESS:                                          PAGE:

**MARCEIA BELL**
     DIRECT EXAMINATION                             20
BY MR. WEISBROD
     CROSS-EXAMINATION                              37
BY MR. BROWN
     REDIRECT EXAMINATION                           47
BY MR. O'NEILL
**IDALIN NAVEJAR**                                  51
     DIRECT EXAMINATION                             51
BY MR. O'NEILL
     CROSS-EXAMINATION                              88
BY MR. WEISBROD
     CROSS-EXAMINATION                             103
BY MR. BROWN
     CROSS-EXAMINATION                             118
BY MR. FARMER:
     REDIRECT EXAMINATION                          139
BY MR. O'NEILL
**NOLAN ESTES**                                    151
     DIRECT EXAMINATION                            151
BY MR. O'NEILL
     CROSS-EXAMINATION                             162
BY MR. WEISBROD
     CROSS-EXAMINATION                             166
BY MR. BROWN
     REDIRECT EXAMINATION                          172
BY MR. O'NEILL
**LINDA EDMAN**                                    174
     DIRECT EXAMINATION                            174
BY MR. O'NEILL
     VOIR DIRE EXAMINATION                         178
BY MR. WEISBROD
     DIRECT EXAMINATION                            180
BY MR. O'NEILL
     VOIR DIRE EXAMINATION                         190
BY MR. WEISBROD
     DIRECT EXAMINATION                            193
BY MR. O'NEILL
     DIRECT EXAMINATION                            196
BY MR. WEISBROD
     CROSS-EXAMINATION                             205
BY MR. FARMER
     REDIRECT EXAMINATION                          211
BY MR. O'NEILL
     RECROSS-EXAMINATION                           214

BY MR. WEISBROD
**CAROL TEDDER**                                    215
     DIRECT EXAMINATION                            216
BY MR. O'NEILL
     CROSS-EXAMINATION                             233
BY MR. WEISBROD
     CROSS-EXAMINATION                             246
BY MR. FARMER
     REDIRECT EXAMINATION                          252
BY MR. O'NEILL
**DAWN DASHER**                                     257
     DIRECT EXAMINATION                            257
BY MR. O'NEILL:
     CROSS-EXAMINATION                             266
BY MR. WEISBROD
     CROSS-EXAMINATION                             274
BY MR. BROWN
     CROSS-EXAMINATION                             281
BY MR. FARMER:
     REDIRECT EXAMINATION                          283
BY MR. O'NEILL

* * * * *

EXHIBITS:                    IDENTIFIED:




EXHIBITS:                    RECEIVED:

     2                       59
     3                       64
     4                       67
     5                       71
     6                       74
     7                       75
     8                       78
     1                       81
     8                       106
     2 THROUGH 27            123
     9                       155
     37                      168
     12                      186

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

| | |
|---|---|
| 13 | 189 |
| 15 | 193 |
| 21 | 225 |
| 22 | 229 |
| 14 | 278 |

```
 1              P R O C E E D I N G
 2         COURT SECURITY OFFICER:  All rise.
 3         THE COURT:  Good morning.
 4              It was brought to my attention because --
 5    well, actually I looked at it is how it was brought to my
 6    attention -- there were news stories in both the Tribune
 7    and in the Times.  So when I bring the jury in I will
 8    just verify hopefully that no one has read anything that
 9    was in the newspaper.
10              Secondly, Mr. O'Neil, I took the DVD home or
11    the audio recording home and could not open it on either
12    of my computers.  So I gave it to my law clerk to see if
13    she could open it on hers.
14         MR. O'NEILL:  That happened to me originally
15    too, Your Honor.  I think you need a special program
16    sometimes to run these things.  At the conclusion last
17    night I talked to one of our admin people.  I was able to
18    get them in.  And they were giving it to somebody this
19    morning who has those capabilities.  And I did speak with
20    someone from our Orlando office who thought we do have
21    those capabilities.
22              I told Mr. Weisbrod this morning.  He very
23    graciously added a couple minutes here.  The problem his
24    whatever is run is going to be run by the minutes he gave
25    me yesterday.  So what I plan to say is if -- they were
```

1    going to bring that this morning.  Perhaps at a break

2    Mr. Weisbrod could then go through it and see whether

3    that's sufficient.

4                  THE COURT:  Okay.

5                  MR. WEISBROD:  What I've done is just added

6    a few seconds to the entries that were single times.

7    I've completed out how long it was.  I have an updated

8    copy.

9                  THE COURT:  All right.

10                 MR. WEISBROD:  It's called a DSS player.

11   Uh, if you have a DSS player you're able to download it.

12   And that's how I was able to get into it also.

13                 THE COURT:  All right.

14                 MR. WEISBROD:  So I don't think

15   technologically it should be an issue to get these

16   precise redactions done.

17                 THE COURT:  Okay.  Good.  Second question

18   that I had, Mr. Finney I believe it is --

19                 MR. O'NEILL:  Yes, Your Honor.

20                 THE COURT:  -- when you anticipate calling

21   him?  When would you estimate he would be called?

22                 MR. O'NEILL:  Maybe late today or tomorrow,

23   Your Honor.

24                 THE COURT:  Okay.  Certainly not this

25   morning?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

         1          MR. O'NEILL:  No, ma'am.

         2          THE COURT:  All right.  Thank you.

         3          Anything else we need to take up?  Yes.

         4          MR. WEISBROD:  I know that Mr. Farmer

         5   desired to ask a few more questions, and so I just didn't

         6   know whether or not we were going to start with him.

         7          THE COURT:  Yes.

         8          MR. FARMER:  That was while I was standing,

         9   Your Honor.  I know I told you I was done yesterday, but

        10   I just had three or four follow-ups.

        11          THE COURT:  That's fine.

        12          MR. FARMER:  Thanks.

        13          THE COURT:  All right.  Good morning.

        14          THE WITNESS:  Good morning.

        15          THE COURT:  I didn't mean to ignore you.

        16          THE WITNESS:  No.  You said good morning.

        17   I'm fine, yes, ma'am.

        18          THE COURT:  All right.  Could you bring the

        19   jury in.

        20          COURT SECURITY OFFICER:  Yes, Your Honor.

        21              (PAUSE IN PROCEEDING.)

        22          COURT SECURITY OFFICER:  All rise, please,

        23   for the jury.

        24     (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

        25          COURT SECURITY OFFICER:  Thank you, ladies

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    and gentlemen.  Please be seated.

2              THE COURT:  Good morning.

3              MEMBERS OF THE JURY:  Good morning.

4              THE COURT:  Ladies and gentlemen, let me

5    ask -- and this is a question I will to ask every morning

6    during the trial so I'm not insinuating anything might

7    have happened by asking the questions.  But did anything

8    happen over the evening hours that any of you feel might

9    affect your ability to serve fairly on this jury?  All

10   right.

11             It's been brought to my attention that there

12   may have been some news coverage of this case.  Did any

13   of you read anything, listen to anything about the case

14   over the evening hours?  Okay.  Good.

15             Please again let me just tell you don't read

16   anything should their be an article in the newspapers,

17   don't listen to anything, don't read anything over the

18   Internet because it is important that you make the

19   decision based on what you hear in this courtroom.

20             Anything else before we begin this morning?

21   Okay.

22             You will recall when we recessed yesterday

23   afternoon Miss Bell was on the stand, and Mr. Farmer has

24   indicated to me he has a few more questions.

25             Mr. Farmer.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
 1                         MARECIA BELL,
 2     a witness, having been previously sworn to tell the
 3     truth, the whole truth and nothing but the truth, was
 4     examined and testified as follows:
 5     BY MR. FARMER:
 6     Q.     Good morning, ma'am.
 7     A.     Good morning.
 8            THE COURT:  And -- I'm sorry.  Miss Bell, I
 9     won't swear you in again because we swore you in
10     yesterday, but I will remind you you're under oath.
11            THE WITNESS:  Yes, ma'am.
12            THE COURT:  Mr. Farmer.
13            MR. FARMER:  Thank you, Your Honor.
14     BY MR. FARMER:
15     Q.     Ma'am, you worked at the Head Start program in
16     the fall of 2010; is that right?  You were still there?
17     A.     Yes, sir.
18     Q.     And that would be during a period in August
19     approximately where new families would be enrolling in
20     the program, enrolling their children?
21     A.     Correct, sir.  They're enrolling all year long.
22     Q.     Well, isn't there sort of an entering group every
23     fall sort of like the school year is designed, that is
24     school begins in the fall.  And does Head Start have the
25     same program or plan?
```

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  A.     They actually enter every day.  They can come

2  into the program.  It's a year round program.  It's not a

3  start and stop program like regular school.

4  Q.     In August is there typically a greater group of

5  children and parents entering the program?

6  A.     Yes.

7  Q.     Okay.  And isn't it true when you were there for

8  one fall period that approximately 750 new families

9  joined the program?

10 A.     I don't know how many new families joined the

11 program.

12 Q.     Well, did you write a letter to the parents of

13 the new families, the new children that were coming into

14 the program in August?

15 A.     I revised a letter that was given to me that was

16 already previously written.  But, again, that was for the

17 entire program.

18 Q.     And wasn't it -- that letter addressed to the new

19 parents, the new families in the program?

20 A.     Not to the new parents.  It was to all the

21 parents in the program, period.

22 Q.     And how many parents would that be?

23 A.     I'm not sure.  I know it was over a thousand.

24 Q.     And of that group of a thousand, how many -- do

25 you recall how many were new in August of 2010?

1    A.    I don't recall how many was new.

2    Q.    Now, I don't think I clarified this yesterday,

3    but could you describe what Mr. Louis' business called A

4    Bouncing Good Time Inflatables, what that provided?

5    A.    I can't describe what his business is.  I can

6    just tell you what I know of what he brought out for Head

7    Start because I don't know what he does with his

8    business.  I don't know the inside details.

9    Q.    Okay.  Well, tell us what he brought out.

10   A.    I just know that it's the jumping bouncers that

11   the kids jump in.

12   Q.    Like those big bouncy houses?

13   A.    Correct, the big bouncers that the kids jump in,

14   uh-huh.

15   Q.    Is that why he calls it A Bouncing Good Time?

16   A.    I don't know why he called it that.

17   Q.    And were those kinds of I guess toys used as part

18   of Head Start's program to provide services like

19   vaccinations and health screenings at playgrounds and

20   parks and community centers?

21   A.    We call them health fairs.  We had two health

22   fairs, yes.

23   Q.    Okay.  So the bouncy balloons would come out to

24   the health fairs?

25   A.    Correct.

1    Q.      And your -- and Mr. Williams (sic) was paid by

2    Head Start for providing those services?

3    A.      I don't know for sure if he was paid by them but

4    that was the way it was set up is what I was told.

5    Q.      And let me ask you a question about the initial

6    conversation you had with Miss Mason about this book,

7    Travel Boy.  Now, isn't it true that Miss Mason asked you

8    to take a look at the book for your health perspective;

9    isn't that right?

10    A.      I don't remember her being direct about my health

11    perspective, you know.

12    Q.      All right.  Now, let me ask you, April 4th, 2011,

13    a little more than three months ago, you had a

14    conversation with Agent Williams and Agent Bledsoe; is

15    that right?

16    A.      I don't remember the exact date, but I've had a

17    few conversations with the two FBI agents, yes, sir.

18    Q.      And when you talked with them, you, uhm, knew it

19    was important to tell the truth; right?

20    A.      Correct.

21    Q.      And isn't it true that when you talked with them

22    in April that you told them that you were given a book by

23    Miss Mason for you to review from a health perspective?

24    Isn't that what you told the two law enforcement agents

25    about three months ago?

1    A.    I didn't tell them that it was just Miss Mason.

2    The book was brought to me by -- when I first seen it, by

3    Miss Mason and Mr. Jimenez together.  And exactly what I

4    said to them I do not recall.  But I can tell you that I

5    was given the book by Miss Mason and Mr. Jimenez and

6    asked if I would review the book to see if it was

7    appropriate for our kids in the Head Start program.

8    Q.    And isn't it also true that three months ago you

9    told them, that is the law enforcement agents,

10   specifically that the purpose of your review was from a

11   health perspective; isn't that right?

12   A.    I don't recall.

13        MR. FARMER:  Your Honor, may I approach for

14   purposes of refreshing her recollection?

15        THE COURT:  Yes.

16        MR. FARMER:  Thank you.

17   BY MR. FARMER:

18   Q.    If you look at, ma'am, the first sentence of the

19   paragraph entitled Book Order Purchase.

20   A.    Yes.

21   Q.    Just read it to yourself.  Have you had a chance

22   to do that?

23   A.    Yes, sir.

24   Q.    Does that, ma'am, refresh your recollection that

25   on April 4th or whatever date you remember talking with

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    law enforcement agents you told them that Miss Mason

2    approached you to look at the book from a health

3    perspective?

4    A.    That's what it says.  Again, I just know that I

5    was told to look at the book to see if it was appropriate

6    for the kids.

7    Q.    So let me ask this:  You are the one person at

8    Head Start who --  whose area is health specifically,

9    isn't that right?

10   A.    Yes, sir, health and nutrition.

11   Q.    All right.  And are you the only RN -- or were

12   you the only RN at Head Start?

13   A.    No, sir.

14   Q.    Okay.  Were you the -- the most senior RN at Head

15   Start?

16   A.    Yes, I was.

17   Q.    Okay.  So you would be the one at Head Start

18   whose responsibilities would include health; is that

19   right?

20   A.    Correct.

21   Q.    And you know Dawn Dasher, a woman who also worked

22   at Head Start; correct?

23   A.    Yes, sir.

24   Q.    Now, it's true that her department had nothing to

25   do with health; isn't that right?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   A.      No, sir, that's not right.

2   Q.      Well, she was part of the education wing of Head

3   Start; isn't that right?

4   A.      Yes, sir.

5   Q.      All right.  And Dawn Dasher had nothing to do

6   with providing nursing services to any of the young

7   children at Head Start; isn't that right?

8   A.      Not nursing services.

9   Q.      Or -- or any medical services whatsoever?

10  A.      Everyone at Head Start was responsible for health

11  services to the entire program.

12  Q.      Well, is Dawn Dasher a nurse?

13  A.      Not to my knowledge.

14  Q.      All right.  Did she provide any health services

15  whatsoever, to your knowledge, to any one -- any of the

16  children at Head Start?

17  A.      I'm not sure.

18  Q.      What was her title?

19  A.      She was a deputy director.

20  Q.      And how well do you know her?

21  A.      Just from Head Start.

22  Q.      Did you ever have a conversation with her or did

23  you ever observe Dawn Dasher providing any health

24  services to any of the young children at Head Start?

25          MR. O'NEILL:  Objection, Your Honor, asked

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    three times.

2                    THE COURT:  Sustained.

3                    Ask another question.

4    BY MR. FARMER:

5    Q.      Now, you testified yesterday that you informed

6    Miss Mason and Mr. Jimenez together that you believed the

7    book was inappropriate.

8    A.      Correct.

9    Q.      Okay.  Now, did they respond, either one of them?

10   Did they respond to your opinion that it was

11   inappropriate, as you say?

12   A.      Yes.  It was several responses.

13   Q.      Okay.  And did they ask you why you felt it was

14   inappropriate?

15   A.      No, I don't recall being asked why I felt it was

16   inappropriate.

17   Q.      Well, does it -- wouldn't that surprise you that

18   they didn't ask you why?

19   A.      Not -- not really.

20   Q.      And when you told someone that this book was

21   inappropriate, what was the response?

22   A.      What do you mean by told someone?  I'm trying to

23   figure out who you're talking about, then I can respond

24   better.

25   Q.      Sure.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1           You testified that you told Miss Mason that the

2    book was inappropriate; is that right?

3    A.      Yes, sir.

4    Q.      And how many times did you do that?

5    A.      I can't recall how many times I said that.

6    Q.      Was it more than once?

7    A.      I would say it was more than once.

8    Q.      More than twice?

9    A.      I don't -- I don't exactly know how many times --

10   how many times I was asked.  I was given the same -- I

11   told the same response.

12   Q.      All right.  And was it more than five times?

13   A.      I'm not sure.

14   Q.      All right.  You just don't know how many times

15   you had the conversation with Miss Mason?

16   A.      No, I can't recall how many times I had that

17   conversation.

18   Q.      And whatever the number of times was, Miss Mason

19   never asked you in response why do you think this book is

20   inappropriate?

21   A.      I don't recall Miss Mason asking me why I felt

22   like the book was inappropriate.

23   Q.      And do you recall on any of these occasions what

24   Miss Mason said to you in response to your opinion?

25   A.      I know at some point she said just order the

1    book.

2    Q.    All right.  How many times did she say that?

3    A.    I don't -- I can't recall how many times she said

4    that.

5    Q.    Did she say that each and every time you told her

6    the book was inappropriate?

7    A.    I can't say that.

8         THE COURT:  She said she can't recall.  Ask

9    another question.

10   BY MR. FARMER:

11   Q.    And did you order the book?

12   A.    I did not order the book.  I did not have

13   authority to order anything.

14   Q.    What did you do in response to Miss Mason's

15   comment?

16   A.    I just let Miss Idalin Navejar know that she said

17   go ahead and order the book.

18   Q.    Other than Miss Mason saying order the book, do

19   you recall Miss Mason saying anything else in response to

20   you saying the book is inappropriate at any time?

21   A.    I can't recall right at this time.

22   Q.    Thank you, ma'am.

23        MR. FARMER:  Thank you, Your Honor.

24        THE COURT:  Mr. Weisbrod.

25        MR. WEISBROD:  Thank you, Your Honor.

<u>DIRECT EXAMINATION</u>

BY MR. WEISBROD:

Q.      Good morning, ma'am.

A.      Good morning, sir.

Q.      When we talk about ordering a book, what Miss Navejar had to do at that point was prepare a merchandise request form; is that correct?

A.      Yes.

Q.      And then that would have to be signed off by in this case Miss Mason; correct?

A.      Yes.  But it entails some other things too.

Q.      All right.  And then you're aware because you've received training from the fiscal people that there can be purchases under $10,000 made by people in Miss Mason's position?

A.      I wasn't there long enough to receive enough training where I can definitely say I knew the policies and procedures of the ordering process.  No, I can't say that.

Q.      Well, you did receive training one time by a woman named Naomi Brooks, did you not?

A.      Yes, we did receive some training.

Q.      Any Naomi Brooks was from fiscal, and she was sent around to explain the county ordering procedures, was she not?

1  A.     I'm not sure what she was sent around to do.

2  Q.     Well, you know that you had a meeting with her,

3  right, because you told us?

4  A.     I did not have a meeting with her.  I attended

5  some of the training that they provided.

6  Q.     So she was attempting to provide training

7  regarding the purchasing rules, but you don't recall the

8  content of that training.  Is that fair to say?

9  A.     Correct, sir.

10  Q.     All right.  Now, let me clear up a little bit

11  because I didn't quite understand yesterday the very

12  beginning of your testimony about the licensing,

13  education and your training.  Okay?

14  A.     Yes, sir.

15  Q.     All right.  I believe you said that you have been

16  licensed as a registered nurse with the State of Florida

17  since 2000.

18  A.     About 2000.  I graduated in 1988.

19  Q.     Uh-huh.  You graduated from where in --

20  A.     High school in 1988.  And I went on to school.

21  And I've been licensed about that long, about 2000, 2001,

22  correct.

23  Q.     All right.  So between 1988 when you finished

24  high school until about 2000, that 12-year period, is

25  that --

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    A.      Uh-huh.

2    Q.      -- when your education took place?

3    A.      About that time.

4    Q.      All right.  Fair enough.

5            And was that a four-year degree or a two-year

6    degree?

7    A.      Two-year degree.

8    Q.      And that allowed you then to get an Associate's

9    degree in nursing?

10   A.      Correct.

11   Q.      And that makes you eligible to apply for and

12   receive a RN certificate from the State of Florida;

13   right?

14   A.      Correct.

15   Q.      You have to pass a test?

16   A.      Correct.

17   Q.      Okay.  Now, what was your first job after getting

18   licensed by the State of Florida as a registered nurse?

19   A.      Tampa General Hospital.

20   Q.      Okay.  And that was around 2000, 2001?

21   A.      No.  I started working at Tampa General Hospital

22   in 2002 because I was at the V.A. hospital prior to.

23   Q.      When you were at the V.A. hospital was that at

24   all as an RN?

25   A.      Not as an RN

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    Okay.  So then in 2002 at Tampa General as an RN?

2    A.    Correct.

3    Q.    And then the next job after that, please.

4    A.    I can't remember exactly what my time line was.

5    I did a lot of agency work for different companies.

6    Q.    Well, when you say you did "agency work for

7    different companies," is that while you are employed at

8    Tampa General --

9    A.    Yes.

10   Q.    -- or after?

11   A.    No.  While I was employed at the same time.

12   Q.    Okay.  So from Tampa General you did take another

13   job somewhere else at some point; right?

14   A.    Yes, sir.

15   Q.    Okay.  Can you tell us where that was.

16   A.    I can't recall.

17   Q.    You have no idea what year it was?

18   A.    I'm just stating to you I don't remember exact --

19   Q.    I'm not going to hold you to April 1st, 2005.

20   A.    Uh-huh.

21   Q.    Just an approximation.  Sometime between 2002

22   when you started Tampa General and 2009 when you started

23   Head Start, there was some other jobs, were there not?

24   A.    Yes, sir, yes, sir, definitely.

25   Q.    All right.  You definitely remember there were

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    other jobs?

2    A.       Yes.

3    Q.       Can you please tell us where those other jobs

4    were.

5    A.       I worked for United Healthcare at some point.  I

6    worked for --

7    Q.       Excuse me.  Let me stop you just for a second.

8             What is United Healthcare, please?

9    A.       United Healthcare is an insurance group.

10   Q.       Was that a full-time job?

11   A.       Full-time.

12   Q.       All right.  Next place where you worked?

13   A.       I don't know if I worked there right after Tampa

14   General.  I also worked for Baycare Home Care.  I've also

15   worked for Acts Drug and Alcohol Detox.  I worked for

16   Bayfront Medical Center labor and delivery.  I've worked

17   for Brandon emergency room.  I worked for Florida

18   Department of Corrections.

19   Q.       When you worked -- right now you're working for

20   the Florida Department of Corrections; right?

21   A.       Correct.  I've always worked for them.

22   Q.       All right.  And so you fill in with them during

23   the course of when you had had these other jobs?

24   A.       Correct, agency, uh-huh.

25   Q.       Okay.  So you're allowed to when you're working

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    now to work these other jobs?

2    A.      Correct.

3    Q.      All right.  Now, in 2010 I think you told us in

4    November you left Head Start because you believe in part

5    your license might have been in jeopardy.

6    A.      I felt like my license would be put in jeopardy,

7    correct.

8    Q.      Now, there's never been as a result of your work

9    with Head Start any formal notification to you in any

10   way, shape or form that your license is in jeopardy with

11   the State of Florida; correct?

12   A.      Correct, sir.

13   Q.      And as a matter of fact, after you resigned in

14   November of 2010 you went back to work for Head Start,

15   did you not?

16   A.      I haven't gone back to work for Head Start.

17   Q.      Okay.  Did you ever work again after November 13,

18   2010?

19   A.      I have not worked for Head Start since I resigned

20   from them in November of 2010.

21   Q.      Okay.  Now, when you resigned in November of 2010

22   you had other issues -- other issues had come up while

23   you were employed at Head Start; is that correct?

24   A.      What specific issues?

25   Q.      Well, you had made a complaint regarding the kids

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    attending Head Start classes when you felt they might

2    have been too sick to attend; right?

3    A.    That was prior to my resignation.

4    Q.    I understand.

5          This was an issue that important to you; right?

6    A.    Correct.

7    Q.    As a matter of fact, important enough that you

8    went to a David Rogoff to complain; right?

9    A.    After I went to my direct supervisor, my

10   department supervisor and my director, correct.

11   Q.    Who was your direct supervisor?

12   A.    Ron Knight.

13   Q.    Okay.  And then who was above Mr. Knight?

14   A.    Marie Mason.

15   Q.    And then who was above Miss Mason?

16   A.    Louis Finney.

17   Q.    And then who was above that?

18   A.    Dave Rogoff.

19   Q.    You went to those four people?

20   A.    Correct.

21   Q.    And you did not get, it's fair to say,

22   satisfaction regarding your complaint about the kids

23   being in these various class; right?

24   A.    I wasn't looking for satisfaction.  I was just

25   looking for the fairness to be done among the kids that

1    were being brought into the program.

2    Q.      But it's sufficient to say that your position was

3    not accepted by any of the four people you brought the

4    issue to; right?

5    A.      I would not say that.  I wouldn't say that they

6    didn't accept my position, no, sir.

7    Q.      They didn't do anything about it, did they?

8    A.      I wouldn't say that they didn't do anything about

9    it.  I'll just say that the kids were still being

10   admitted into the program.

11   Q.      The kids were being admitted into the program

12   despite the conditions that you thought should have

13   prevented them from being in the program; right?

14   A.      Correct, sir.

15   Q.      So the four levels of objection that you made did

16   not result in your position being accepted; right?

17   A.      I wouldn't say that.

18   Q.      Okay.  Now, you also had a complaint about the

19   dental unit, did you not?

20   A.      No, I didn't have a complaint about the dental

21   unit.

22   Q.      You had an issue about $60,000 of the dental

23   budget, did you not?

24   A.      No, I didn't have an issue with it.  It was

25   brought to my attention by someone else.

1   Q.      Okay.  And then what did you do with it?

2   A.      I couldn't do anything with it.

3   Q.      Did you make a complaint to somebody?  Did you

4   bring the issue up?

5   A.      I discussed it, but I didn't make a complaint

6   about it.

7   Q.      Who did you discuss it with?

8   A.      One of the young ladies who brought it to my

9   attention that worked in fiscal.

10  Q.      Okay.  And then as a result of that you went to

11  Mr. Finney, did you not?

12  A.      Not about the dental.

13  Q.      You remember that same interview that Mr. Farmer

14  asked you about with the law enforcement officers in

15  early May -- in early April of this year?

16  A.      Yes.

17  Q.      Do you remember telling them that you brought the

18  $60,000 question to Finney but he summarily cut you off?

19  A.      We were in a group meeting, not he and I alone.

20  Q.      Did you bring the issue up in a meeting in which

21  Finney you off about the 60,000?

22  A.      I did not bring the issue up.  The issue was

23  brought up.  The budget was being told in the meeting,

24  and I asked when we did the roundtable what happened to

25  the monies that were there prior to because I worked with

1    dental as well.

2    Q.    You asked what happened to the $60,000?

3    A.    I don't know specifically what amount, but I did

4    ask.

5              MR. WEISBROD:  May I approach, Your Honor?

6              THE COURT:  You may.

7              Mr. O'Neill.

8              MR. O'NEILL:  I don't know what the purpose

9    of approaching would --

10             MR. WEISBROD:  To refresh.

11             THE COURT:  She doesn't -- hasn't indicated

12   she needs her recollection refreshed.

13             MR. WEISBROD:  Well, it was just on the

14   $60,000 to try and refresh her recollection as to her

15   bringing that exact amount up.

16             THE COURT:  The exact amount?

17             MR. WEISBROD:  Yes, ma'am.

18             THE COURT:  All right.

19   BY MR. WEISBROD:

20   Q.    I'm going to ask you to look at the third

21   paragraph, the sentence I'm pointing out to you.  Let me

22   know when you finish reading that sentence, please.

23   A.    I'm done, sir.

24   Q.    Okay.  Does that refresh your recollection that

25   you specifically asked Director Finney where did the

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   $60,000 go?

2   A.      I didn't directly ask because I don't know the

3   amount of the budget.  As I stated, I was in a meeting

4   with the budget being discussed and I asked the question

5   about the dental money.  The exact amount I cannot say.

6   And, yes, I was cut off and told that that's not a

7   question for me to ask.  It was for my supervisor.

8   Q.      And you also complained about the fact that

9   Finney would cut you off.  That he was, in your words, a

10  bully; right?

11  A.      No, sir I did not say -- complain about it.  I

12  had a discussion about it.

13  Q.      Did you characterize -- or you did characterize

14  Mr. Finney as a bully, did you not?

15  A.      I did characterize Mr. Finney as someone who was

16  not nice and no one that was to be approached.  I don't

17  remember using the exact words as a bully.

18          MR. WEISBROD:  May I approach again, Your

19  Honor?

20          THE COURT:  You may.

21  BY MR. WEISBROD:

22  Q.      Again, you had a meeting with law enforcement

23  agents in April.

24  A.      Okay.

25  Q.      Directing your attention to this sentence.

1   A.      Uh-huh.

2   Q.      Does that refresh your recollection that you in

3   fact directly referred to Mr. Finney as a bully, your

4   words?

5   A.      Again, I don't recall using the exact word as a

6   bully.

7   Q.      But he wasn't nice?

8   A.      He was not nice.

9   Q.      So when you leave Head Start in the fall of 2010

10  you have issues about monies missing from the dental

11  budget, about a not nice director, about kids being in

12  class when they're not supposed to be and about this

13  book, right?

14  A.      No.  My issue for leaving was that the kids are

15  being entered into the program and I felt like my license

16  was being put in jeopardy.

17  Q.      Which never happened.  The license issue never

18  came up?

19  A.      I didn't give it an opportunity.

20  Q.      All right.  Now, the book that's in evidence as

21  Government's Exhibit No. 10, you at some point approached

22  Ron Knight with this book, did you not?

23  A.      Correct.

24  Q.      Okay.  You actually brought the book to him?

25  A.      No, I didn't bring the book to him at that time.

1    Q.    All right.  So at some point you bring your

2    concerns to Mr. Knight, who's your most immediate

3    supervisor, about that book; right?

4    A.    Correct.

5    Q.    But you don't bring the book with you?

6    A.    I didn't have the book at the time.  It wasn't

7    ordered.  I talked to him about it prior to the ordering.

8    Q.    Well, you had reviewed the book or at least you

9    had looked at the pictures in the book; right?

10   A.    Yes, sir.

11   Q.    Did you tell Mr. Knight when you were having

12   issues about the book that you hadn't actually read it

13   but had looked at the pictures and deemed it

14   inappropriate?

15   A.    I believe I didn't tell him that part.  That

16   wasn't my concern.

17   Q.    So you didn't tell him what the scope of your

18   review had been, just that you didn't like this book that

19   you didn't even bring him to look at; right?

20   A.    I told him the book was brought to me by Marie

21   and Michael, and that I was asked to review it.  I felt

22   like it was inappropriate.  And I was told to go ahead

23   and order the book.

24   Q.    By Mr. Knight?

25   A.    No.  Mr. Knight did not tell me to order the

1   book.

2   Q.      Okay.  But he heard your issues.  But you didn't

3   bring him the book, and then he did nothing regarding the

4   issue; right?

5   A.      I don't know what he did about the issue, sir.

6   Q.      And then even though in the past we know that you

7   can complain about issues or bring issues to people's

8   attention all the way up the ladder, you stopped at

9   Mr. Knight in this case, did you not?

10  A.      No.  That was prior to.

11  Q.      Okay.  Prior to the book being purchased?

12  A.      No.  I never brought my issues to anyone until

13  just before I decided to resign.  The book was way prior

14  to that.

15  Q.      At the time the book was being purchased --

16  A.      Uh-huh.

17  Q.      -- you didn't bring it to anyone else's attention

18  other than Mr. Knight, your issues?

19  A.      My issues in regards to how I felt about the

20  book?

21  Q.      Yes, ma'am.

22  A.      Yes.  I let Miss Mason know that I felt like the

23  book was inappropriate.  And I didn't have another

24  conversation.  She was the supervisor.

25  Q.      And then after Miss Mason -- you didn't get

1    relief from Miss Mason, you told Mr. Knight?

2    A.      I told Mr. Knight first.  After I responded to

3    her, I went to my immediate supervisor when I was told it

4    could be trouble if this book is ordered and the reason

5    why.  That's why I went to my supervisor.

6    Q.      And you got nothing from him.  The book was

7    ordered and actually delivered; right?

8    A.      The book was ordered and it was delivered.

9    Q.      Now, you said something yesterday I didn't quite

10   understand about assisting in the receipt of the books or

11   you helped somebody or somebody helped you.  I didn't

12   understand what you said.  Were you physically there when

13   the books came in?

14   A.      I was physically there when the books came in.

15   Q.      Okay.  And they were brought by Miss Melendez

16   Santiago, were they not?

17   A.      I don't remember who she was.  That was my first

18   time ever seeing her, and I wouldn't be able to identify

19   her again.

20   Q.      And who else was present?

21   A.      It was a young man that was present, a male, and

22   it was Idalin who called for me to help her get the

23   books.

24   Q.      And you helped unload these books into the Head

25   Start center?

1    A.      Yes, I did, sir.

2    Q.      Okay.  And then, in fact, the books got

3    distributed out, did they not?

4    A.      They got distributed out to the schools.

5    Q.      Okay.  And you were part of that distribution?

6    A.      I did not distribute any books to the school, but

7    I was part of the books being distributed, yes, sir.

8    Q.      Well, you didn't physically bring them to the

9    individual schools?

10   A.      Correct, sir.

11   Q.      But you did know that they were being sent out to

12   the schools?

13   A.      Yes, I did.

14   Q.      And for ultimate distribution to the families and

15   the children; right?

16   A.      Correct.

17   Q.      And that happened with those 750 books?

18   A.      I don't remember how many books it was, but that

19   happened with the books.

20   Q.      Right.

21           There's not a bunch books that were delivered

22   that are still sitting in the Head Start center?

23   A.      I don't know.

24   Q.      Well, as of the time you were there -- the books

25   were delivered in June of 2010; right?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   A.     I don't recall when the books were delivered.

2   Q.     But they were delivered, let's say, months before

3   you left in November of 2010; right?

4   A.     They were.

5   Q.     Okay.  And during that period of time they didn't

6   just sit in the Head Start center.  They got sent out to

7   where they could be used by the people that were intended

8   to look at them; right?

9   A.     I guess they got delivered where they needed to

10   go.

11   Q.     And they weren't returned back to you, were they?

12   A.     They weren't returned to me.

13   Q.     As far as you know, none of them have been

14   returned back, have they?

15   A.     I can't answer that question.

16   Q.     As far as you know, the books are being used by

17   their intended recipients?

18   A.     I cannot answer that question.

19   Q.     Do you have any indication, any evidence, any

20   suggest to believe they're not being used?

21   A.     I don't know.  I can't answer that question.

22          MR. WEISBROD:  Thank you, Your Honor.

23          THE COURT:  All right.  Mr. Brown, any

24   questions?

25          MR. BROWN:  Yes, Your Honor.

## CROSS-EXAMINATION

BY MR. BROWN:

Q.     Good morning, ma'am.

A.     Good morning, sir.

Q.     We've never met, have we?

A.     No, sir.

Q.     Okay.  Are you familiar with the Plant City -- I guess I'll call it a classroom for Head Start?  Have you been there?

A.     Yes, uh-huh.

       MR. BROWN:  May I approach, Your Honor?

       THE COURT:  You may.

BY MR. BROWN:

Q.     I'm showing you a document.  It's not into evidence yet so we really won't comment about it.  But it's marked as Defendants' Exhibit 14.  Okay?

A.     Uh-huh.

Q.     And I'm going to show you two pictures in this, this picture and then another one next to it.

A.     Uh-huh.

Q.     Now, are you familiar with the inside of the Plant City classroom?

A.     I wouldn't say completely familiar.  When you say Plant City, you mean Plant City Head Start or do you mean like Strawberry Hills?

1    Q.      No.  Plant City Head Start.

2    A.      I'm familiar with some areas in Plant City, yes.

3    Q.      Okay.  Now, these two pictures that appear to

4    show a classroom, does that look like it's a fair and

5    accurate representation of the Plant City classroom?

6    A.      No, it doesn't look like the two classrooms up

7    front.

8    Q.      Do they look familiar to you at all?

9    A.      No.

10   Q.      Okay.  In the photos though without describing it

11   do you see that there appears to be maybe books or

12   something like a book?

13   A.      Yes, sir.

14   Q.      Okay.  Were you aware that in 2008 being used,

15   for instance, at the Plant City Head Start or other Plant

16   City Head Start or other Head Start classrooms that there

17   was a precursor to this book being actually used and

18   taught to the students?

19   A.      No, sir, I wasn't aware of that.

20   Q.      You're unaware of whether or not -- let me strike

21   that.

22          Were you aware that Miss Melendez Santiago had

23   students that were at -- or teaching at different

24   classrooms for Head Start that were also teaching about

25   germs and using this book with the very pictures in here?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Were you aware of that?

2    A.      No, sir, I was unaware.

3    Q.      Have you ever -- well, let me ask you this:  Do

4    you know who one of the Head Start teachers is by the

5    name of Tammy Childs?  She's at Plant City.

6    A.      I don't too much know first names.  I do know a

7    Miss Childs.

8    Q.      Are you familiar with the Bellsville Head Start?

9    A.      Yes.  Beesville, I'm familiar with Beesville,

10   uh-huh.

11   Q.      But you're not sure if you remember there being a

12   teacher by the name of Tammy Childs?

13   A.      I remember Miss Childs.  If I saw a face or

14   picture I probably could put a face with a name.

15   Q.      Okay.  Now, at some of these Head Start

16   classrooms there are teachers, are there not?  Can I call

17   them a teacher?

18   A.      Yes, sir.

19   Q.      Okay.  There are teachers that are actually

20   interacting with the children, are they not?

21   A.      Yes.

22   Q.      Okay.  Did you ever have that job?

23   A.      No.

24   Q.      Do you know who another teacher is by the name of

25   Maria -- and I'll spell her last name.

```
 1    D-R-A-G-U-S-T-I-N-O-V-I-S, Dragustinovis?

 2    A.      No, I'm not familiar with that name.

 3    Q.      Are you familiar with an RCMA, Plant City?

 4    A.      No.

 5    Q.      How about the -- a lady -- a teacher by the name

 6    of Mary Dunson?

 7    A.      I know a Miss Dunson from Mango.

 8    Q.      Okay?

 9    A.      Centerport native.

10    Q.      She's a teacher; right?

11    A.      She's a center coordinator.

12    Q.      Was she ever a teacher at the Plant City Head

13    Start?

14    A.      I'm not sure.

15    Q.      What about Karen Mercer, do you know a

16    Miss Mercer?

17    A.      I know Miss Mercer.  Center coordinator.

18    Q.      All right.  And how about a Miss Delago Miller?

19    A.      I'm not really familiar.  What center?

20    Q.      Plant City I believe.

21    A.      No.

22    Q.      Would you agree with me that perhaps the teachers

23    that are there and maybe watching the presentations and

24    watching the students interact with Miss Santiago's class

25    or watching or listening to the book being read to them,
```

1    would you agree with me that they're probably in a better

2    position to determine whether or not this book was

3    appropriate for the children than you?

4    A.      I agree.

5    Q.      Okay.  And have you ever seen any of the

6    evaluations done by these teachers about this

7    presentation and about how well the book was received?

8    Has anybody ever showed you?

9    A.      I was unaware of any evaluations.

10   Q.      If I was to show those to you, would that matter

11   to you or do you --

12   A.      It wouldn't matter to me because it doesn't have

13   any bearing on me.

14   Q.      Well, I guess the only bearing would be if these

15   photos are being shown to the children --

16   A.      Uh-huh.

17   Q.      -- and perhaps there's photographs of the

18   children paying attention to the book and seem to be

19   interested in it, that that might change your opinion as

20   to whether the photographs are appropriate -- or the

21   drawings are appropriate?

22   A.      I guess if I was asked to do that, like take the

23   books to the classroom and see what the teachers thought

24   and see how the kids would react.  But I wasn't.  I was

25   given the book and asked to give my own perspective on

1    the book.

2    Q.      Okay.  And I know that everybody has talked about

3    this yesterday and today, but I want to make sure that

4    you're not determining whether this book is appropriate

5    on an educational level; correct?  I mean, in other

6    words, you don't have the educational background as a

7    teacher and the tools to determine whether something is

8    going to stimulate the curiosity of a child or encourage

9    a child to begin reading.  You were strictly looking at

10   this from a health perspective; is that right?

11   A.      I was looking at it from a health perspective as

12   well as an education perspective for the children of that

13   age group.

14   Q.      What's your background then as an educator, as a

15   teacher?

16   A.      I educate all the time.

17   Q.      No.  No.

18           What's your educational background?  In other

19   words, I --

20   A.      Not as a teacher.  I mean I don't have an

21   educational background as a teacher; just as a nurse.  We

22   just educate and teach our families about their

23   medications and whatever skills they need to do at home

24   to take care of their children and take care of their

25   families.  That's the only part that I have.

1    Q.      All right.  Well, you would agree with me then

2    that part of educating is probably to stimulate a child

3    to want to learn; right?

4    A.      I would agree, sir.

5    Q.      And part of that also is to encourage kids to

6    learn to want to read if they're having trouble reading

7    or not reading yet; right?

8    A.      I agree, sir.

9    Q.      You might also want to stimulate an interest in a

10   child in science, hoping that by you getting a child

11   interested at a young age in science that might lead them

12   to one day become a scientist?

13   A.      I agree, sir.

14   Q.      Okay.  And you might also want to stimulate a

15   child's curiosity; right?

16   A.      Correct.

17   Q.      All of those are valuable teaching tools?

18   A.      I would say they're valuable, yes, sir.

19   Q.      And I would hope that at Head Start that they are

20   using these tools to encourage the children to begin to

21   learn.  They're somewhere between six weeks and five

22   years old, are they not?

23   A.      Between six weeks and five years old, correct.

24   Q.      And it's -- I guess it's fundamentally important

25   that when you teach a child you encourage a child maybe

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  to even grasp something that they're having trouble with

2  now but to encourage them to want to do that; right?

3  A.    Okay.

4  Q.    And you don't know whether this book was

5  accomplishing that at that level because, one, you were

6  never there for any of these sessions; right?

7  A.    I wasn't there for those sessions.

8  Q.    And you never asked the teachers who were

9  actually at the ground level what's going on?

10  A.    I was never asked to ask the teachers.  That's

11  not my position.

12  Q.    Okay.  Let me move onto another topic with you if

13  I can.  You stated I believe on cross -- on direct

14  examination that there was a conversation with my client

15  when she was dropping off the books.  Do you remember

16  that?

17  A.    There was a few words exchanged, yes, sir.

18  Q.    And you began the -- you began the direct

19  testimony saying that you couldn't remember everything.

20  It had something to do with a book to go with the book is

21  what I had -- I had you write down.  Are you sure it was

22  a book about a book?  I mean are you sure that she's

23  talking about another book?

24  A.    She mentioned the word "workbook," and that's

25  all -- I mean that was my thing.  I don't know about

1    another book, but it was like a workbook is what was

2    stated.

3    Q.    Could -- could she actually have talked about an

4    activity sheet and some coloring pages?

5    A.    I'm not sure.

6    Q.    Okay.  It could be then; is that right?

7    A.    I'm not sure.

8    Q.    Not sure meaning it --

9    A.    I can't answer that.  I don't know what she

10   meant.

11   Q.    Okay.  All right.  Well, no, I don't -- I'm not

12   asking what she meant.  I'm saying could she have used

13   those words, an activity --

14   A.    She used workbook, workbook.

15   Q.    Were you aware of any of the e-mails that went on

16   prior to you -- prior to this alleged conversation

17   between her and Miss Navejar about what was being bought

18   and what was available?

19   A.    Can you be more specific about e-mails.

20   Q.    Yep.

21              MR. BROWN:  May I approach, Your Honor?

22              THE COURT:  You may.

23   BY MR. BROWN:

24   Q.    Ma'am, I'm showing you what's marked as

25   Defendants' Exhibit 20.  It's an e-mail.  Go ahead and

1   read that so we can decide whether you're familiar with

2   it.  Okay?

3   A.    I can tell you now I'm not familiar with it.

4   Q.    So you're not familiar with what e-mails may have

5   preexisted this alleged conversation about a book or

6   activity sheets and things like that --

7   A.    No.

8   Q.    -- is that correct?

9   A.    No.

10           MR. BROWN:  May I approach again?

11   BY MR. BROWN:

12   Q.    I'm showing you a Government's Exhibit No. 7,

13   which is another e-mail, Miss Navejar from Miss Santiago,

14   and it has an attachment with it.  Take a minute just to

15   look at those and I'll ask some questions.

16   A.    Okay.

17   Q.    Now, are you familiar with whether or not there

18   was an activity sheet that was to accompany the book?

19   A.    I'm not familiar with that.

20   Q.    And are you familiar with whether there were

21   coloring pages to accompany the book?

22   A.    I'm not familiar with that.

23   Q.    All right.  Are you familiar with any documents,

24   including any that I've shown you, that would in any way

25   suggest that there was anything else to purchase besides

1   the book that was purchased?

2   A.      No, sir, I'm not aware of anything else.

3   Q.      Okay.  Are you aware of any e-mails or anything

4   that would suggest that the activity sheets and the

5   coloring pages were to be purchased?  In other words,

6   that they weren't being freely provided?

7   A.      I'm not aware of that.

8           MR. BROWN:  Nothing further, Your Honor.

9           THE COURT:  Mr. O'Neill, redirect.

10          MR. O'NEILL:  Thank you, Your Honor.

11                      REDIRECT EXAMINATION

12  BY MR. O'NEILL:

13  Q.      Good morning, Miss Bell.

14  A.      Good morning, sir.

15  Q.      Miss Bell, I have a series of questions that were

16  brought up during cross-examination.  You were asked a

17  number of questions during cross-examination about the

18  children and their ages being approximately six weeks to

19  five years.  Do you remember those questions about the

20  children?  Principally a lot occurred yesterday, those

21  questions.

22  A.      Yes, sir.

23  Q.      How many -- at the time that you were employed at

24  Head Start, 2002, how many children were in the Head

25  Start program?

1    A.    It was over a thousand.  I don't remember exactly

2    how many, but it was over a thousand.

3    Q.    Okay.  Uhm, you were asked questions on

4    cross-examination about Mr. Louis' business.

5    A.    Uh-huh.

6    Q.    And I believe -- and I don't want to put words in

7    your mouth.  You will tell us that you said you're aware

8    of things from conversations.

9    A.    Uh-huh.

10   Q.    Do you have any independent knowledge of

11   Mr. Louis' business?

12   A.    I don't have any independent knowledge as far as

13   that is concerned, no.

14   Q.    Now, starting this morning I believe it was with

15   Mr. Farmer during cross-examination you were asked

16   questions about a report submitted by some FBI agents.

17   Do you still have that in front of you?

18   A.    Yes, sir.

19   Q.    Ma'am, I'd ask you to look at it.  Prior to this

20   morning had you ever seen that report?

21   A.    No, sir.

22   Q.    Now, was there an occasion where you were

23   interviewed by some agents?

24   A.    Yes, sir.

25   Q.    And did you -- were you asked questions by them?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   A.      Yes, sir.

2   Q.      Did you see whether they were taking notes?

3   A.      I saw them taking some notes, but most of the

4   time we were talking.

5   Q.      And at any point did they ever show you the

6   documents that they created?

7   A.      I don't remember this document.  I was shown some

8   information, but I didn't pay close attention to exactly

9   what it was.

10  Q.      Now, Miss Bell, you were also asked questions

11  about Dawn Dasher.  Remember this morning you were asked

12  whether you knew her?

13  A.      Yes.

14  Q.      Did you work directly with Miss Dasher?

15  A.      Not directly.

16  Q.      And why is that?

17  A.      She was a deputy director.  She was on a

18  supervisory level and I was a subordinate.

19  Q.      Was she in the same section as you in Head Start?

20  A.      She was in the education section and I was in the

21  health section.

22  Q.      And the final area I'd like to ask about, Miss

23  Bell, is Mr. Brown had asked you would you agree that

24  teachers would be in a better position to judge the

25  appropriateness of the books.  And you agreed with that;

1    correct?

2    A.      I totally agree.

3    Q.      Okay.  Were you surprised then that you were

4    given the book to review?

5    A.      Afterwards I was surprised that I was given the

6    book to review.

7    Q.      Had you have been given a book before?

8    A.      Never.

9    Q.      Had you ever been given a book after that to

10   review?

11   A.      No.

12   Q.      Was this the only book you'd ever been given to

13   review?

14   A.      This was the only book.

15             MR. O'NEILL:  Nothing further, Your Honor.

16             THE COURT:  Thank you, Miss Bell.  You may

17   step down.

18             THE WITNESS:  Yes, ma'am.

19             THE COURT:  We have something up on the

20   witness stand and I'm not sure whether it came from the

21   defense or Mr. Farmer maybe.  I don't know what it is.

22   All right.

23             Mr. O'Neill, you may call your next witness.

24             MR. O'NEILL:  Yes, Your Honor.  The

25   government would call Idalin Navejar.

1          THE COURT:  If you'll come forward, please,

2     to be sworn.

3          Miss Vizza, would you swear her in.

4          COURTROOM DEPUTY CLERK:  Yes, ma'am.

5          Please raise your right hand.

6          Do you solemnly swear or affirm under the

7     penalty of perjury that the testimony you shall give in

8     this cause shall be the truth, the whole truth, and

9     nothing but the truth, so help you God?

10          THE WITNESS:  Yes.

11                    **IDALIN NAVEJAR,**

12     a witness, having been duly sworn to tell the truth, the

13     whole truth and nothing but the truth, was examined and

14     testified as follows:

15          COURTROOM DEPUTY CLERK:  Please be seated.

16          State your full name and spell the last for

17     the record.

18          THE WITNESS:  Idalin Rios Navejar.

19          COURTROOM DEPUTY CLERK:  Spell your last

20     name.

21          THE WITNESS:  N-A-V-E-J-A-R.

22          COURTROOM DEPUTY CLERK:  Thank you.

23          MR. O'NEIL:  May I inquire, Your Honor?

24          THE COURT:  Mr. O'Neill.

25                    <u>DIRECT EXAMINATION</u>

BY MR. O'NEILL:

Q.     Good morning, Miss Navejar.

A.     Good morning.

Q.     Miss Navejar, I'm going to be asking you a series
of questions on behalf of the United States.  I'd ask you
to speak in a loud and clear voice so that everyone in
the courtroom can hear you.

A.     Okay.

Q.     Ma'am, by whom are you employed?

A.     By Hillsborough County Board of County
Commissioners, Head Start.

Q.     And you're assigned to Head Start?

A.     Yes.

Q.     How long have you been a county employee?

A.     Since 1988.

Q.     And how long have you been with Head Start?

A.     Since 1994.

Q.     Can you give us a brief history of your
employment with the county, when you started and where
you went to.

A.     I volunteered before I was hired.  Then I was
doing two years like temporary summer work.  And then I
was hired with Share Van.  And then from there I went to
work for social services, and from social services to
Head Start.

1   Q.      Okay.  Miss Navejar, I'd ask you to pull the

2   microphone just a little closer to you.  Okay?  It moves.

3   A.      Okay.

4   Q.      Thank you.

5           As an employee of Head Start where are you

6   currently assigned?

7   A.      Uhm, I work at 3639 West Waters Avenue.

8   Q.      Okay.  That was a bad question.

9           What type of work do you do there?  What section

10  within Head Start are you assigned?

11  A.      I work for the health section.

12  Q.      And what do you do within the health section?

13  What are your duties and responsibilities?

14  A.      I'm the family information systems specialist.  I

15  oversee the health and dental, PIR, the first aid CPR

16  trainer.

17  Q.      Did you say PAR?

18  A.      CPR and first aid trainer.

19  Q.      Okay.  And approximately -- now, you've been in

20  the program for how many years now?

21  A.      Since 1994.

22  Q.      Okay.  And are you familiar with various aspects

23  of the program?

24  A.      Yes.

25  Q.      How many children does Hillsborough County Head

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Start program service?

2    A.    Uhm, altogether over 3,000 including the school

3    districts.

4    Q.    When you say "including the school districts,"

5    could you explain for us what that means.

6    A.    We're the granted program, so the grant comes

7    straight to the Board of County Commissioners and we

8    delegate some of our responsibilities to the school

9    districts, to the YMCA and to Lutheran services.

10    Q.    Is there a way to know how many children go to

11    the school districts as opposed to right at Head Start?

12    A.    Yes.

13    Q.    How many go to Head Start for various service?

14    A.    Ours has a 1,179.  And then we got the ARA money,

15    which is the American Recovery Act.  So we gain some more

16    children with that.

17         We also have early Head Start which has over 115.

18    And that also got an expansion of I believe maybe 40, 50

19    kids plus 12 additional pregnant moms.

20    Q.    Okay.  When you talked about some additional

21    monies, were you talking about the stimulus package?

22    A.    Yes.

23    Q.    And when did that occur?

24    A.    Uhm, over a year ago.

25    Q.    Sometime in 2010?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    A.    Yes.  I believe so.

2    Q.    Now, you also made a distinction -- and just for

3    all of our edification -- between Head Start and Early

4    Head Start?

5    A.    Uh-huh.

6    Q.    Is Early Head Start part of the Head Start

7    program?

8    A.    They're funded separately so the Head Start is

9    the three to five years old -- if they turn five after

10   September 1st.  And Early Head Start is six weeks until

11   they turn three.

12   Q.    And what is -- and Early Head Start is six weeks

13   to three?

14   A.    Yes.

15   Q.    Okay.  Miss Navejar, with the Court's permission

16   I would show you -- I'll put it on the screen.  Might

17   make it easier.  I'll show you what's been marked as

18   Government's Exhibit 10.  Has been placed into evidence.

19   The book called Travel Boy Helps Sebastian.  Do you see

20   this?

21   A.    Yes.

22   Q.    Can you relate to the ladies and gentlemen of the

23   jury when you saw this for the first time.

24   A.    Uhm, I saw it in Miss Marecia Bell's office.

25   Q.    I'm sorry?

1    A.      In Miss Marecia Bell's office.  Are you looking

2    for a time line or --

3    Q.      No.  I'm sorry.  I'm just having trouble

4    understanding you.  Can you just move that a little

5    closer.  If you need help -- okay.

6            Whose office?

7    A.      Marecia Bell.

8    Q.      Okay.  Marecia Bell's office.

9            And that was the first time you saw it?

10   A.      Yes.

11   Q.      Okay.  Did -- at some point -- now, there's

12   certain rules in court that we can't say.  Did you have a

13   conversation with Marecia Bell about this book?

14   A.      Yes.

15   Q.      Without telling what she said, what, if anything,

16   did you say to her?

17   A.      Uhm, I'm not sure what you're asking.

18   Q.      Okay.  Did you have any conversation with Miss

19   Bell where you said something about the author?

20   A.      Yes.

21   Q.      Did you notice the back page of this book?

22           MR. WEISBROD:  Object to leading.

23           THE WITNESS:  Yes.

24           THE COURT:  Sustained.

25   BY MR. O'NEILL:

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  Q.      In looking at the back page, what, if anything,

2  did you notice?

3  A.      Uhm, I looked at the book.  And at first I didn't

4  realize who it was, and then later on I realized it was

5  Mr. Jimenez' wife.

6  Q.      Had you ever met her before?

7  A.      I had seen her twice before.

8  Q.      Where had you seen her on those two occasions?

9  A.      At an employee recognition event.

10  Q.      An employee recognition event?

11  A.      Yes.

12  Q.      Can you describe -- a lot of these terms we've

13  not heard.  So if you could describe that.

14  A.      It's where we -- as a program we're required to

15  have training on a yearly basis.  So they do first the

16  training and then we have employee recognition where, you

17  know, we recognize employees for their outstanding job.

18  Q.      And do you recall why Miss Melendez Santiago was

19  at the employee recognition?

20  A.      Yes.  She was providing training.

21  Q.      And do you recall what type of training she was

22  providing?

23  A.      I think it had to do with universal precautions.

24  Not a hundred percent recall, but I believe that's what

25  it was.

1    Q.     And do you see Miss Melendez Santiago in the
2    courtroom today?
3    A.     Yes.
4    Q.     And would you please point her out and just
5    describe what she's wearing.
6    A.     Uhm, she's wearing glasses and she's got a white
7    shirt and a blue outfit.
8          MR. O'NEIL:  Indicating the defendant,
9    Melendez Santiago, Your Honor.
10         THE COURT:  Record will so reflect that.
11   BY MR. O'NEILL:
12   Q.     After you noticed that you knew the author of
13   this book, what did you do next?
14   A.     Uhm, I told Marecia that we should not pursue
15   purchasing the book because it's a conflict of interest.
16   Q.     At some point in time did you learn that the book
17   was going to be ordered?
18   A.     Yes.
19   Q.     Were you involved in a series of e-mails with
20   Miss Melendez Santiago concerning the book?
21   A.     Yes.
22   Q.     With the permission of the Court I would approach
23   you to show you what has been marked for identification
24   purposes only as Government's Exhibit 2.  It is not in
25   evidence, ma'am, so you can't speak about it right now.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    But I'd ask you to look at that and read it to yourself.

2    And have you had a chance to look at that?

3    A.    Yes.

4    Q.    And did you ever receive this e-mail, ma'am?

5    A.    Uhm, I believe so.

6    Q.    Okay.  Does it indicate that you did receive it

7    on the top -- on the distribution list?

8    A.    Yes.

9    Q.    And did you receive that from whom?

10   A.    From Mr. Jimenez.

11   Q.    And this came off of your computer at work?

12   A.    I believe so.

13   Q.    And you've seen this e-mail before; correct,

14   ma'am?

15   A.    Yes.

16         MR. O'NEILL:  Your Honor, at this time I'd

17   move into evidence Government's Exhibit 2.

18         MR. WEISBROD:  No objection.

19         THE COURT:  Received into evidence

20   Government's Exhibit 2.

21         (EXHIBIT 2 ADMITTED INTO EVIDENCE.)

22   BY MR. O'NEILL:

23   Q.    Miss Navejar, I'd ask you to keep that in front

24   of you.  I have a duplicate copy here.  I'm just going to

25   try to zoom in it a little further for the jury.

1          Now, Miss Navejar, does Government's Exhibit 2

2   indicate that there's an e-mail from Johana Melendez to

3   Michael Jimenez on Thursday, April 15, 2010, at

4   5:35 p.m.?

5   A.      Yes.

6   Q.      What is the subject?

7   A.      Book order.

8   Q.      Can you read the body of that e-mail.

9   A.      Where it says, "Here's the letter"?

10  Q.      Yes.

11  A.      "Here's a letter of presentation of my book in

12  case they need justification.  Also you can tell them

13  that I am a product of the Head Start system.  Johana."

14  Q.      And then is there another e-mail attached from

15  Michael D. Jimenez to Idalin Navejar?

16  A.      Yes.

17  Q.      Is there a CC on that as well?

18  A.      Yes.

19  Q.      Who is that to?

20  A.      Johana Melendez.

21  Q.      What is the date and time of that e-mail to you?

22  A.      April 21st, 2010, at 4:46 p.m.

23  Q.      And would you read that very short e-mail.

24  A.      "Here's the presentation.  I'll have the quote

25  sent immediately."

1    Q.    And I'll turn -- I'd ask you to turn the page.

2    Attachment.  It's a little longer.

3          MR. O'NEIL:  I think I will spare you from

4    reading the whole thing and ask the Court's permission to

5    read it out loud.

6          THE COURT:  Yes.

7          MR. O'NEIL:  Dated April 1st, 2010.  "Dear

8    Sir or Madam, I would like to introduce my newly

9    published bilingual book.  It's written both in English

10   and Spanish and it's suitable for children between the

11   ages of five to ten years old.

12          "It's a fiction picture book based on

13   scientific facts that can be used by many different

14   disciplines.  The book can be used in Spanish/English

15   classes, reading comprehension, writing, science and

16   health education.  It can be used by teachers, daycare

17   providers, parents, nurses, scientists and healthcare

18   personnel who wish to teach kids about germs and their

19   relationship to disease.  It can also be used by teachers

20   and librarians who wish to encourage kids to read.

21          "The purpose of the book is to provide

22   children with fun learning while helping them understand

23   complicated science related topics and nurturing their

24   curiosity.  I believe it is very important to motivate

25   children from a young age to study science.  By writing

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  children books I can help achieve this goal.

2      "I hope you'd consider the book for your

3  educational program.  I've also created coloring pages

4  and other activity sheets to help kids integrate the

5  learning after the reading of the story.  The book has a

6  glossary to help teachers and parents with some of the

7  vocabulary and key scientific terms described in the

8  book.

9      "If you would like to order copies you can

10 go to the publisher's website,

11 https://www2.xlibris.com/bookstore/booksdisplayaspxbookid

12 65943, or order directly from me.  I look forward to

13 hearing from you.  Best regards, Johana Melendez

14 Santiago, M.S."

15     And then it's imprinted Johana Melendez,

16 M.S., Reading For Little Scientists.  And again it has an

17 e-mail address, 6212 Soaring Avenue, Tampa, Florida

18 33617.  Phone (813) 727-5297.

19 BY MR. O'NEIL:

20 Q.    Miss Navejar, after receiving this e-mail, what,

21 if anything did you do?

22 A.    We had proceeded to getting quotes.

23 Q.    Proceeded on getting quotes?

24 A.    Uh-huh.

25 Q.    Now, previously you said you thought it was not

1 appropriate to order the book because it was a conflict

2 of interest.

3 A.     Yes.

4 Q.     Why did you proceed to get quotes then?

5 A.     Because I had talked to Marecia.

6 Q.     And you can't tell us what she said, but tell us

7 what you said or did.

8 A.     Okay.  What I said was we would get some quotes

9 and just put the book away in the back burner and hope

10 that nobody would ask about the book so that we wouldn't

11 have to order it.

12 Q.     And why is that, ma'am?

13 A.     Because I just didn't feel comfortable.

14 Q.     Did you bring your concerns to anyone's attention

15 besides Miss Bell?

16 A.     Uhm, we had also talked to our supervisor, Ronald

17 Knight.

18 Q.     And did you bring it past Mr. Knight to anybody

19 else?

20 A.     No, not that I can recall.

21 Q.     Let me show you at this time, Miss Navejar, a

22 document which has been marked as Government's Exhibit 3.

23 Again, since it's not in evidence I would ask you just to

24 review it and read it to yourself.

25        And does Government's Exhibit 3, Miss Navejar,

1    show two additional e-mails that went one from

2    Miss Melendez to you and then one from you to Miss Bell?

3    A.    Yes.

4    Q.    And you've seen these before.  And these come off

5    your computer?

6    A.    Yes.

7          MR. O'NEILL:  Your Honor, at this time I'd

8    move into evidence Government's Exhibit 3.

9          THE COURT:  Any objections?

10         MR. WEISBROD:  No objection.

11         THE COURT:  Receive into evidence 3.

12         (EXHIBIT 3 ADMITTED INTO EVIDENCE.)

13         MR. O'NEILL:  With the permission of the

14   Court I will now publish it.

15   BY MR. O'NEIL:

16   Q.    It'll put it on this machine, Miss Navejar.  And

17   there's a series of e-mails that you can see.  The bottom

18   two -- three are the ones we've just previously looked

19   at.  Is that fair to say?

20   A.    Yes.

21   Q.    Now, directing your attention to the first new

22   one, which is in the middle of the page, it is from --

23   well, who is it from?

24   A.    Uhm, the one from April 21st?

25   Q.    Yes, ma'am.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   A.      From Miss Johana Melendez.

2   Q.      Who's it to?

3   A.      To myself.

4   Q.      And what is the date and time?

5   A.      April 21st, 2010, at 10:23 p.m.

6   Q.      And would you please read that e-mail.

7   A.      "Hello.  Miss Navejar.  In order to send you a

8   quote I need to know the number of books you need.  I can

9   have the quote ready for you by Thursday afternoon.

10  Please let me know and the company name and address to

11  whom the order will be shipped to.  Thanks, Johana

12  Melendez."

13  Q.      And did you a couple days later send an e-mail to

14  Marecia Bell?

15  A.      Yes.

16  Q.      And is there an attached e-mail to that one that

17  you sent to Marecia Bell dated April 27th?

18  A.      Yes.

19  Q.      Can you read that out loud.

20  A.      "Hello, Miss Navejar.  Just following up with the

21  book order.  I wanted to know if you decided on a book

22  amount.  Let me know.  If there's anything else I can

23  provide to help with the decision don't hesitate to

24  contact me.  Thanks, Johana."

25  Q.      And what is the date and time of that e-mail?

1    A.      Tuesday, April 27, 2010, at 12:55 p.m.

2    Q.      Now, it appears that you then forwarded that

3    e-mail the following day to Marecia Bell; right?

4    A.      Yes.

5    Q.      What was your reason for doing that?

6    A.      There was just a lot of back and forth in regards

7    to the order of the book, so I had forwarded it to

8    Marecia for her to take over.

9    Q.      And again without telling us what was said, there

10   were conversations between the two of you about the book.

11   Is that fair to say?

12   A.      Could you repeat that again.

13   Q.      Sure.

14           Without again telling us what she said, you did

15   have conversations with Miss Bell during this period of

16   time?

17   A.      Yes.

18   Q.      Again, with the permission of the Court,

19   Miss Navejar, I will show you Government's Exhibit 4 for

20   identification purposes only.  So please read it to

21   yourself.  Have you read that to yourself, ma'am?

22   A.      Yes.

23   Q.      And is Government's Exhibit 4 an e-mail from you

24   to Miss Melendez?

25   A.      Yes.

1    Q.    And is that off your computer?

2    A.    Yes.

3    Q.    And there's also an e-mail from Miss Melendez to

4    you?

5    A.    Yes.

6          MR. O'NEIL:  At this time I'd move into

7    evidence, Your Honor, Government's Exhibit 4.

8          MR. WEISBROD:  No objection.

9          THE COURT:  Received in evidence 4.

10         (EXHIBIT 4 ADMITTED INTO EVIDENCE.)

11   BY MR. O'NEILL:

12   Q.    Now, in evidence, Miss Navejar.  Let me direct

13   you to the first of the two e-mails on that page.  What

14   is the date of the first one?

15   A.    Monday, May 3rd, 2010, at 9:26 a.m.

16   Q.    I apologize.  Again, bad question.  I should have

17   asked the first in time, not the first on the page.

18   A.    The one April 22nd -- Thursday, April 22nd, 2010,

19   at 5:15 p.m.

20   Q.    And what is the subject line?

21   A.    Book quotes.

22   Q.    Who's it from and who's it to?

23   A.    It's from Miss Melendez to myself.

24   Q.    And could you please read it.

25   A.    "Hello, Miss Navejar.  Here are the quotes for

1    800, 1,000 and 1,300 copies of the soft cover of the

2    book.  You can get the highest discount, 30 percent off,

3    if you get 1,300 copies.  Let me know if I can help with

4    anything else.  Thanks, Johana."

5    Q.    Now, did you have discussions with Miss Melendez

6    Santiago about this time about the number of books to be

7    ordered?

8    A.    I believe that we had had a conversation in

9    regards to the amount of books, yes.

10   Q.    I'm sorry?  At the end I didn't hear that.

11   A.    Yes, we had had phone conversations about the

12   book and the different amounts.

13   Q.    And were there different amounts of books being

14   contemplated?

15   A.    Yes.

16   Q.    And would that entail different pricing?

17   A.    Yes.

18   Q.    Do you know off the top of your head how much the

19   variations in the pricing was?

20   A.    Uhm, I know that when we started with the 1,300

21   the quote was somewhere, uhm, over $20,000.

22   Q.    And why do you remember that?

23   A.    Because it was a high amount of money.

24   Q.    Now, had you ever ordered a book before?

25   A.    No.

1   Q.      Have you ever ordered a book since?

2   A.      No.

3   Q.      Is this the first book you've been involved in

4   ordering -- first and only book I should say?

5   A.      Yes.  Other than, uhm, then like resource medical

6   book for the nurse that she uses for medication and

7   things like that.

8   Q.      Is there a separate division within Head Start

9   called the educational section?

10  A.      Yes.

11  Q.      What are their duties?

12  A.      They have teachers.  Uhm, they teach the

13  children.  They buy the materials in the classroom, also

14  the books that go in the classroom.

15  Q.      Do you also buy materials from time to time?

16  A.      Yes.

17  Q.      What type of materials do you generally buy?

18  A.      Diapers, baby wipes, first aid, CPR, dental stuff

19  like toothbrushes, toothpaste, and the racks that they

20  hold the toothbrushes.

21  Q.      Is there an amount that you're allowed -- what is

22  the general amount of money that you spend on these

23  purchases?

24  A.      They're usually under $5,000.

25  Q.      So let me then take you to the next e-mail on

1    that page, ma'am.  And from whom is it and to whom is it?

2    A.      Uhm, from myself.  You talking about the top one?

3    Q.      The one on the top of the page.

4    A.      Yes, it's from me.

5    Q.      It's to whom?

6    A.      It's to Miss Bell and Sheila Felipe.

7    Q.      We've not heard the name Sheila Felipe.  Who is

8    that?

9    A.      She was another RN that was employed at our

10   program.

11   Q.      And what is the date and time of this e-mail?

12   A.      It's Monday, May 3rd, 2010, at 9:26 a.m.

13   Q.      And can you please read the body of that e-mail.

14   A.      "Good morning, Miss Melendez.  We will be placing

15   the orders for the book today.  However, the quotes have

16   expired.  I was informed today that we need the quotes

17   amount to be under $10,000.  Could you please supply the

18   three quotes again.  Thank you for your cooperation,

19   Idalin Navejar."

20   Q.      You state in the body of that that you were

21   informed that the quote needs to be under 10,000.

22   A.      Yes.

23   Q.      Who told you that?

24   A.      I don't quite remember exactly who it was.

25   Either Miss Mason or Mr. Jimenez, but I don't know

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    exactly which of the two.

2    Q.    Miss Mason or who?

3    A.    Or Mr. Jimenez.

4    Q.    Was it one of those two that told you that?

5    A.    Yes.

6    Q.    At this time with the permission of the Court I

7    would approach the witness again and show you what's been

8    marked Government's Exhibit 5 for purposes of

9    identification only and I'd ask you to read that to

10   yourself, please.  Do you see that, ma'am?

11   A.    Yes.

12   Q.    Let me ask you, are there two e-mails on this

13   page?

14   A.    Yes.

15   Q.    And are they -- one is to you and one is from

16   you?

17   A.    Yes.

18   Q.    And are they both from your computer?

19   A.    Yes.

20        MR. O'NEIL:  Your Honor, at this time I'd

21   move into evidence Government's Exhibit 5.

22        MR. WEISBROD:  No objection.

23        THE COURT:  Received in evidence 5.

24        (EXHIBIT 5 ADMITTED INTO EVIDENCE.)

25   BY MR. O'NEILL:


SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.      Miss Navejar, since now it's in evidence we can

2    publish it to the jury.  And the earlier of the two

3    e-mails is dated when and what time?

4    A.      Friday, June 11, 2010, at 10:44 p.m.

5    Q.      Okay.  From whom is this e-mail and to whom does

6    it go?

7    A.      It's from Miss Melendez and it's sent to me.

8    Q.      What is the subject?

9    A.      Children's book arrived.

10   Q.      And let me just read it out loud to save time.

11           "Hello, Miss Navejar.  I have the books all

12   ready.  I can deliver to you as early as Monday morning.

13   Let me know if that's a good day and if the times between

14   8:00 a.m. and 12:00 p.m. be good for you.  If Monday is

15   not a good day I can also bring them Tuesday.  Regards,

16   Johana."

17           And again it's Johana Melendez, M.S., 6212

18   Soaring Avenue, Tampa, Florida with the zip, telephone

19   number and website for Reading For Little Scientists;

20   correct?

21   A.      Yes.

22   Q.      Now, at the top of the page it appears that you

23   then forward an e-mail to Miss Bell.  Is that fair to

24   say?

25   A.      Yes.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    And what was your purpose of forwarding that to

2    Miss Bell?

3    A.    Because I had talked to Miss Bell and I had asked

4    her if she could please proceed with the rest of what was

5    going on with the book.

6    Q.    What would be that for us that don't work at Head

7    Start?  What would be the next step for the book?

8    A.    The next step would be for the books to be

9    delivered to the office.

10   Q.    And what do you write in this e-mail?

11   A.    "I'm not sure what the plan is for the books.

12   Please advise so we can proceed in the delivery.  Thanks,

13   Ida."

14   Q.    And the date and time of that e-mail?

15   A.    June 14, 2010, at 8:34 a.m.

16         MR. O'NEIL:  Once again if I may approach

17   the witness, Your Honor?

18         THE COURT:  You may.

19   BY MR. O'NEILL:

20   Q.    Miss Navejar, I now show you Government's

21   Exhibit 6 for identification only and I'd ask you to look

22   at that and read it to yourself.  Again, are you familiar

23   with these e-mails?

24   A.    Yes.

25   Q.    And did they come from -- to and from your

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   computer?

2   A.      Yes.

3           MR. O'NEILL:  Your Honor, at this time I'd

4   move into evidence Government's Exhibit 6.

5           MR. WEISBROD:  No objection.

6           THE COURT:  Received into evidence 6.

7           (EXHIBIT 6 ADMITTED INTO EVIDENCE.)

8           MR. O'NEILL:  I can now publish the e-mail

9   to the jury?

10          THE COURT:  You may.

11  BY MR. O'NEILL:

12  Q.      Miss Navejar --

13  A.      Yes.

14  Q.      -- what is the date and time of the earlier of

15  the two e-mails?

16  A.      Uhm, Tuesday, June 15, 2010, at 12:01 p.m.

17  Q.      And could you read the body of the e-mail.

18  A.      "Hello, Miss Navejar.  I have the books ready to

19  be delivered.  Can I just bring them to the Head Start

20  center even if you are not there to receive them?

21  Regards, Johana."

22  Q.      And you then response to that e-mail?

23  A.      Yes.

24  Q.      And when do you respond to that?

25  A.      Tuesday, June 15, 2010, at 12:17 p.m.

1    Q.      Who do you write to?

2    A.      To Miss Melendez.

3    Q.      And what do you write?  Can you read that,

4    please.

5    A.      "Yes, bring the books.  They will be going into

6    Room No. 35.  Thank you."

7            MR. O'NEIL:  May I approach the witness?

8            THE COURT:  You may.

9    BY MR. O'NEILL:

10   Q.      Miss Navejar, I now show you Government's

11   Exhibit 7 for identification purposes.  Please read it to

12   yourself.  Have you read that?

13   A.      Yes.

14   Q.      And is this an e-mail that came off your

15   computer?

16   A.      Yes.

17           MR. O'NEIL:  Your Honor, at this time I'd

18   move in Government's Exhibit 7.

19           MR. WEISBROD:  No objection.

20           THE COURT:  Receive into evidence 7.

21           (EXHIBIT 7 ADMITTED INTO EVIDENCE.)

22   BY MR. O'NEILL:

23   Q.      Miss Navejar, what is the date and time of this

24   e-mail?

25   A.      June 22nd, 2010, at 8:41 p.m.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.     Who's the e-mail from?

2    A.     Miss Melendez.

3    Q.     And who is it to?

4    A.     To myself and Miss Mason.

5    Q.     Miss Mason is CC'd on the e-mail?

6    A.     Yes.

7    Q.     Do you notice that Michael Jimenez' name is on

8 the top left-hand corner?

9    A.     I don't see it.

10    Q.     You don't see that in the top left-hand corner,

11 ma'am?

12    A.     Okay.  Yes, I do.

13    Q.     And what does that indicate to you?

14    A.     That it looks like the e-mail is from his

15 computer.

16    Q.     Now, Miss Navejar, let me read the body of the

17 e-mail again with the permission of the Court.

18       "Hello, Miss Navejar.  I hope the books have been

19 well accepted by the parents, and will teachers receive

20 copies of the books too?  I'm attaching activity sheets

21 to go with the book.  One of the attachments is an actual

22 curricular activity that meets a benchmark for science

23 according to Next Generation Sunshine State standards

24 (SCKT 91).

25       "Although it is a kindergarten activity I'm sure

1   teachers can use it in preK with three to four-year olds.

2   As I prepare more activities to do with children I will

3   be e-mailing them to you and you can pass them along to

4   teachers if they can get a copy of the book.

5        "Let me know if I can help you in anything else.

6   Remember I'm available for any demonstration activities

7   that can help teachers can use the book and get the most

8   out of it (encouraging health and science education).

9   Hope you like it.  Best regards, Johana."

10       Is that right?

11  A.    Yes.

12  Q.    Did you take any steps to order any additional

13  activity sheets or the like?

14  A.    No.

15  Q.    And why is that?

16  A.    The books went to the parents.  They didn't go to

17  the teachers.

18  Q.    With the permission of the Court I would approach

19  again and show you Government's Exhibit 8 for the

20  purposes of identification.  Please read it to yourself.

21  Have you seen it, ma'am?

22  A.    Yes.

23  Q.    Does Government's Exhibit 8 contain two new

24  e-mails and the one we just saw previously?

25  A.    Yes.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    And they're to and from your computer?

2    A.    Yes.

3          MR. O'NEIL:  I now move into evidence, Your

4    Honor, Government's Exhibit 8.

5          MR. WEISBROD:  No objection.

6          THE COURT:  Receive into evidence 8.

7          (EXHIBIT 8 ADMITTED INTO EVIDENCE.)

8    BY MR. O'NEILL:

9    Q.    I'll now publish it, Miss Navejar.  The bottom

10   e-mail, fair to say that's the one we just read?

11   A.    Yes.

12   Q.    So there is the first of the two new e-mails on

13   the middle of the page.  And that is from you, ma'am?

14   A.    Yes.

15   Q.    To whom is it addressed?

16   A.    It's addressed to Miss Johana Melendez.

17   Q.    And is there a CC?

18   A.    Yes.

19   Q.    To whom?

20   A.    To Marecia Bell.

21   Q.    Would you read that, please.

22   A.    "I'm no longer the contact person.  I am

23   forwarding this information to Miss Bell, health and

24   nutrition coordinator.  She can be reached at 272-5140,

25   extension 317.  Mrs. Navejar."

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   Q.      And what happened that you were no longer the

2   contact person?

3   A.      There was a lot of phone calls with regards to

4   the book and I was just very uncomfortable, so I had to

5   ask Marecia if she could take from that point forward.

6   Q.      Now, when you say "uncomfortable," what do you

7   mean by that?

8   A.      There was just -- I just didn't feel right about

9   the book and also the fact that I just got numerous,

10  numerous phone calls about the book.

11  Q.      And what made you feel uncomfortable about the

12  book?

13  A.      The person who was the author and being purchased

14  from was the spouse of an employee.

15  Q.      Miss Navejar, just to be clear there's an

16  additional e-mail on this page at the top.  And who is

17  that from?

18  A.      From Miss Melendez.

19  Q.      And to whom is it addressed?

20  A.      To myself.

21  Q.      Is there a CC again?

22  A.      Yes, to Miss Marecia Bell.

23  Q.      And could you just read that short e-mail.

24  A.      "Okay.  Thanks for the information, Johana."

25  Q.      Now, the jury's heard a number of questions

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    concerning a merchandise request form or MRF.  Are you

2    familiar with that form?

3    A.    Yes.

4    Q.    And can you just tell us in layman's terms what's

5    the purpose of something like that?

6    A.    Any time that we are going to make any purchase,

7    we do it with a merchandise request.  We fill out the

8    information and then we give it to whoever is the

9    assigned manager or supervisor to give us the

10   authorization to purchase the -- whatever the supply is.

11            MR. O'NEIL:  May I approach the witness,

12   Your Honor?

13            THE COURT:  You may.

14   BY MR. O'NEILL:

15   Q.    Miss Mason -- excuse me.  Miss Navejar, this is

16   just for purpose of identification so please read it to

17   yourself.

18   A.    Okay.

19   Q.    Have you had an opportunity to look at it, ma'am?

20   A.    Yes.

21   Q.    And are you familiar with this MRF?

22   A.    Yes.

23   Q.    And is this the one for the book in question,

24   Travel Boy Helps Sebastian?

25   A.    Yes.

          MR. O'NEILL:  Your Honor, at this time I'd
move into evidence Government's Exhibit 1.

          MR. WEISBROD:  No objection.

          THE COURT:  Receive into evidence
Government's Exhibit 1.

          (EXHIBIT 1 ADMITTED INTO EVIDENCE.)

BY MR. O'NEILL:

Q.    Miss Mason, it's now in evidence.  We can publish
it.  I'm sorry.  I'm looking at the name and saying the
name.  Miss Navejar, since it's now in evidence we can
publish it to the jury.  Is this the face page of the
MRF?

A.    Yes.

Q.    And what is the date on the top?

A.    Monday, May 3, 2010.

Q.    Does it say who it's requested by?

A.    Marie Mason.

Q.    And who does -- who is it ordered from?

A.    Reading For Little Scientists.

Q.    Through those series of e-mails were you familiar
at that time whose company Reading For Little Scientists
was?

A.    No, I wasn't sure whose company that was.

Q.    How about the address 6212 Soaring Avenue?  From
those series of e-mails that you had been involved in do

1   you know whose address that was?

2   A.      At the time I didn't know that that was their --

3   her address.

4   Q.      Now, on the right-hand side -- let me go back for

5   a second.  Excuse me.

6           On the left it shows ordered from; is that

7   correct?

8   A.      Yes.

9   Q.      And on the right-hand side it shows delivered to?

10  A.      Yes.

11  Q.      And where were the books to be delivered?

12  A.      To Hillsborough County Head Start, Head Start

13  division at 3639 West Waters Avenue, Suite 500.

14  Q.      And, now, a third of the way down the page

15  there's a sign here arrow.  There's approval signature.

16  Do you see that?

17  A.      Yes.

18  Q.      And it appears that there's a signature on top of

19  the line and then one below the line.

20  A.      Yes.

21  Q.      Do you recognize the signature above the line?

22  A.      Yes.

23  Q.      Whose signature is that?

24  A.      Marie Mason.

25  Q.      Do you recognize the signature below the line?

1    A.      Yes.

2    Q.      Whose signature is that?

3    A.      Mr. Louis Finney.

4    Q.      What is the date on this merchandise request?

5    A.      May 3rd, 2010.

6    Q.      Does it give a total cost to Head Start at the

7 bottom of this?

8    A.      Yes.

9    Q.      What is the total cost?

10    A.      $9,000.

11    Q.      Now, is that in keeping with making sure it was

12 under the $10,000 limit?

13    A.      Yes.

14    Q.      Miss Navejar, let me show you and direct your

15 attention to the next page.  Again, this is entitled

16 Quote.  Can you explain what that is.

17    A.      It's a quote.

18    Q.      What would that mean to us?

19    A.      The quote is required in order to make the

20 purchase.

21    Q.      And what is the amount on this quote?

22    A.      It's for $9,000.

23    Q.      And does it say for what -- how many items and

24 what items are being quoted?

25    A.      Yes.  It says 750 books and purchasing the

1  bilingual children book for Travel Boy Helps Sebastian.

2  Q.     Does it give the unit price per book?

3  A.     Yes, $12 per book.

4  Q.     And at the top of the page it lists your name

5  twice, both as on a to line and then to ship to.  Can you

6  explain to us why your name is both the to and ship to.

7  A.     Because I requested the quote.

8  Q.     Next page has a picture of Travel Boy.

9  A.     Yes.

10  Q.     And what is that?  Are you familiar with that?

11  A.     Yes, I am.

12  Q.     What is it?

13  A.     I believe we got this off the Internet.

14  Q.     Comes off the Internet?

15  A.     I believe so.

16  Q.     For what company?  I'll direct your attention

17  near the bottom.

18  A.     From Amazon.

19  Q.     Okay.  Were you responsible for getting this or

20  was this connected to the MRF?

21  A.     We were responsible for looking where we --

22  because we're required to have three quotes, so I was

23  trying to find quotes.  So this is what I found on the

24  Internet.

25  Q.     You're required to make sure there were three

1  quotes?

2  A.    Uh-huh.

3  Q.    The next page then shows a page with a publisher

4  being Xlibris.  Do you see that?

5  A.    Yes.

6  Q.    What is the purpose of this page?

7  A.    When I printed this off the Internet, all of this

8  printed out and it just gave product detail.

9  Q.    Okay.  Then are there a series of e-mails

10  attached, including one from a Nolan Estes from Xlibris,

11  book consultant?

12  A.    Yes.

13  Q.    Bloomington, Indiana?

14  A.    Yes.

15  Q.    Again, to whom is this e-mail addressed?

16  A.    From whom?

17  Q.    To whom.

18  A.    Oh, it's addressed to me.

19  Q.    And what is the date and time of that e-mail?

20  A.    Tuesday, April 27, 2010, at 4:10 p.m.

21  Q.    If you could please read aloud that short e-mail.

22  A.    "Dear Idalin, I'm writing on behalf of the

23  publisher, Johana Melendez, in order to make myself

24  available to help complete a book order under the quotes

25  provided recently for 800, 1,000 and 1,300 paperback

1    copies of Travel Boy Helps Sebastian (speaking Spanish),

2    Book ID 65943.  Please let me know if I can be of any

3    assistance in any way.  Sincerely, Nolan Estes."

4    Q.    And on the following page again is there an

5    e-mail from Mr. Estes that provides various amounts for

6    different numbers of books?

7    A.    Yes.

8    Q.    And to save time you put here that the 750

9    paperbacks would be a total of $9,390.  800 would be

10   9,512.  1,000 would be 11,840.  And then for 1,300

11   15,307.

12   A.    Yes.

13   Q.    And to be complete, there's a different number

14   for the books depending on price.  Larger number, 1,300

15   at 11.39 per copy.  750, 9,390.00, and would be $12 a

16   copy?

17   A.    Yes.

18   Q.    And the following page, is that also off the

19   Internet for Xlibris?

20   A.    Yes.

21   Q.    Thank you, Miss Navejar.

22         And prior to this particular matter with the book

23   had you ever met Mr. Estes?

24   A.    No.

25   Q.    Or spoke to him?

1    A.       I spoke to him on the phone.

2    Q.       Okay.  Did he reach out to you or did you reach

3    out to him?

4    A.       Uhm, I believe I called him first to ask him for

5    the quotes.

6    Q.       Okay.  And he did in turn then provide the quotes

7    to you?

8    A.       Yes.

9    Q.       Thank you, ma'am.

10             MR. O'NEIL:  With the permission of the

11   Court, I'll retrieve the exhibits.  I have no further

12   questions, Your Honor.

13             THE COURT:  All right.  This is a good time

14   to take the morning recess, so why don't we do that.

15   It's 20 minutes of 11:00.  We'll be in recess till five

16   minutes of 11:00.  That's 15 minutes.

17             You're welcome to walk around.  Please don't

18   discuss the case.  And leave your pads face down in your

19   chairs.  We'll start at five minutes of 11:00.

20             COURT SECURITY OFFICER:  All rise for the

21   jury.

22      (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

23             THE COURT:  Who will be starting the

24   cross-examination?

25             MR. WEISBROD:  I think I will.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          THE COURT:  Okay.  Thank you.  All right.

2   We're in recess.

3   (THEREUPON, A RECESS WAS TAKEN, AND THEN THE PROCEEDINGS

4               CONTINUED AS FOLLOWS:)

5          COURT SECURITY OFFICER:  All rise, please,

6   for the Court.  Please be seated, come to order.

7          THE COURT:  Mr. Adkins, would you get the

8   jury.

9          COURT SECURITY OFFICER:  Yes, Your Honor.

10              (PAUSE IN PROCEEDING.)

11         COURT SECURITY OFFICER:  All rise, please,

12  for the jury.

13      (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

14         COURT SECURITY OFFICER:  Thank you, ladies

15  and gentlemen.  Please be seated.

16         THE COURT:  Mr. Weisbrod.

17         MR. WEISBROD:  Thank you, Your Honor.

18              CROSS-EXAMINATION

19  BY MR. WEISBROD:

20  Q.     Good morning.

21  A.     Good morning.

22  Q.     Let me show you what's in evidence as

23  Government's Exhibit 2.  First e-mail is from Johana

24  Melendez to her husband, Mike Jimenez, on April 15th;

25  right?

1    A.    Yes.

2    Q.    And then Michael doesn't act on that for six

3    days.  He doesn't send it to you and actually let his

4    wife know in a CC for six days; correct?

5    A.    Yes.

6    Q.    So whatever else was going on, does not appear

7    judging by the dates in those two e-mails that this was a

8    priority for Mr. Jimenez, does it?

9    A.    No.

10    Q.    Because you would think that if it was something

11    that was being pushed that his wife really wanted him to

12    do and do immediately he'd have done it immediately;

13    right?

14    A.    I would think so.

15    Q.    I mean she attached to her e-mail to him the

16    letter of presentation.  All he had to do was forward it

17    to you; right?

18    A.    Yes.

19    Q.    And yet it took six days; correct?

20    A.    Yes.

21    Q.    Now, you've known Michael Jimenez since he worked

22    at Head Start beginning in 2007; correct?

23    A.    Yes.

24    Q.    As a matter of fact, you got to know him well

25    enough that you retained him to do tax returns for you;

1   correct?

2   A.      Correct.

3   Q.      And you know, for instance, that when you file

4   tax returns with the United States you're certifying that

5   the information on there is true and correct; right?

6   A.      Correct.

7   Q.      And you trusted Mr. Jimenez to do that on your

8   behalf to ensure that the returns that were being sent to

9   the IRS in your name were accurate; right?

10  A.      Yes.

11  Q.      And you allowed him to do that -- or asked him to

12  do that for you on more than one occasion.  Is that fair

13  to say?

14  A.      Yes.

15  Q.      Okay.  Now, shortly after -- or sometime after

16  Mr. Jimenez begins working at Head Start in 2007 there is

17  this preservice event sort of in the summer of 2007;

18  right?

19  A.      Yes.

20  Q.      Now, the preservice occurs before the new

21  enrollment of children in roughly August of the year;

22  right?

23  A.      Yes.

24  Q.      There is going to be in August an influx of new

25  children into the program; right?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    A.      Yes.

2    Q.      It sort of matches the school year, but there's a

3    discernable time in August where there's lots of new

4    kids, new families getting involved with Head Start?

5    A.      Yes.

6    Q.      And everyone knows that; right?

7    A.      Yes.

8    Q.      You can't really work at Head Start and not know

9    that August is a big time?

10   A.      Yes.

11   Q.      And so in this particular case in July at the

12   preservice one of the things that this relatively new

13   employee at Head Start, Mr. Jimenez, did was get his wife

14   involved in that preservice program; right?

15   A.      Yes.

16   Q.      Now, tell me who at Head Start attends a

17   preservice in July?

18   A.      All employees.

19   Q.      How many employees are we talking about?

20   A.      Over 215 employees.

21   Q.      Where is this event held?

22   A.      It was held at the Crown Plaza Hotel in Brandon.

23   Q.      Is it a mandatory event, meaning do all the

24   employees have to attend?

25   A.      Yes, unless there's some type of an emergency or

1    something of that sort.

2    Q.      Okay.  And you attended that preservice?

3    A.      Yes, I did.

4    Q.      All right.  And, in fact, at that preservice in

5    2007, which is Mr. Jimenez' first as an employee of Head

6    Start, he has the pleasure of introducing his wife to

7    these more than 200 people in attendance?

8    A.      Yes.

9    Q.      And even though she has a different last name

10   than him, all 200 members of Head Start who are present

11   at that preservice are now informed that Johana Melendez

12   Santiago is the wife of Michael Jimenez; right?

13   A.      Yes.

14   Q.      No secret?

15   A.      No.

16   Q.      You were paying attention?

17   A.      Yes.

18   Q.      Did you actually meet her personally?

19   A.      Not that I can remember.

20   Q.      Okay.  I thought you might have since Mr. Jimenez

21   was doing your taxes for you at that point.  You might

22   have had more of a relationship, but no?

23   A.      No.

24   Q.      When do you first recall meeting her?

25   A.      At the preservice.

1    Q.      In 2007?

2    A.      Yes.

3    Q.      Okay.  Now, there was subsequently in 2009

4    another similar type of preservice; right?

5    A.      Yes.

6    Q.      And once again, Mr. Jimenez ensures that his wife

7    is available to share her expertise with the Head Start

8    group; right?

9    A.      Yes.

10   Q.      And that's again a mandatory session where more

11   than 200 employees of Head Start have to attend; right?

12   A.      Yes.

13   Q.      Now, in between those two preservice events in

14   2007 and 2009 are you aware of Miss Melendez Santiago

15   continuing to contribute to Head Start?

16   A.      You mean in between those two times?

17   Q.      Yes, ma'am.

18   A.      No.

19   Q.      Okay.  And in connection with 2007 preservice and

20   2009 preservice you weren't uncomfortable with

21   Miss Melendez Santiago sharing her knowledge with the

22   Head Start staff and administrators, were you?

23           MR. O'NEILL:  Objection, Your Honor, lack of

24   basis of knowledge on that question.

25           THE COURT:  All right.  I'll sustain.  I

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    think it's irrelevant anyway.

2    BY MR. WEISBROD:

3    Q.     You're aware that Miss Melendez Santiago

4    performed or shared -- let me start over.

5           Miss Melendez Santiago made a presentation in

6    2007 preservice; right?

7    A.     Yes.

8    Q.     Scientific educational presentation?

9    A.     Yes.

10   Q.     And she did so again on a similar topic or a

11   different topic in 2009?

12   A.     I don't quite remember what the topic was, but

13   usually it's about the same thing.

14   Q.     And you know that she's his wife?

15   A.     Uh-huh, yes.

16   Q.     And that sort of voluntary participation at Head

17   Start did not make you uncomfortable, did it?

18   A.     No.

19   Q.     Now, in the 2009 preservice presentation

20   Miss Melendez actually had some slides to show the group,

21   sort of a Power Point presentation; is that correct?

22   A.     I believe so.

23   Q.     And one of the slides actually had a copy of the

24   book, did it not?

25   A.     Not that I can recall.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.      Now, you at some point had these concerns about

2    Head Start buying a book authored by a Head Start

3    employee's spouse; right?

4    A.      Yes.

5    Q.      And you jointly brought those concerns to Mr. Ron

6    Knight; is that correct?

7    A.      Yes.

8    Q.      And I say "jointly," you and Marecia Bell

9    together?

10   A.      Yes.

11   Q.      All right.

12              MR. WEISBROD:  May I approach?

13              THE COURT:  You may.

14   BY MR. WEISBROD:

15   Q.      You've seen the book that's in evidence as

16   Government's Exhibit 10; correct?

17   A.      Yes.

18   Q.      Did you bring this book to Mr. Knight when you

19   went to see him?

20   A.      I'm not a hundred percent sure, but I believe we

21   did bring it to him.

22   Q.      Well, let's not say "we."  Let's focus on

23   yourself.

24   A.      Yes.

25   Q.      This is before the book is purchased; correct?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    A.      Yes.

2    Q.      Is this around the time you've been asked to do

3    the merchandise request form?

4    A.      Yes.

5    Q.      But before you actually do the form you want to

6    check one level higher; is that what you're saying?

7    A.      Yes.

8    Q.      And so you -- would you bring the book to

9    Mr. Knight that you're going to actually be ordering, the

10   same book that you're complaining about?

11   A.      I believe Miss Bell brought it with her, but I

12   didn't have it in my hand.

13   Q.      Did you ensure that Miss Bell brought it with

14   her?

15   A.      No.  She usually just would bring whatever she

16   had in her hand.

17   Q.      I mean it just kind of makes sense that if you

18   have an issue about a particular item and you're going to

19   bring that issue up to a supervisor you'd want to have

20   the item with you; right?

21   A.      Yes.

22   Q.      So there really shouldn't be any question as to

23   whether or not the book was with you or wasn't with you?

24   A.      No.

25   Q.      And did you have a full and fair opportunity to

1    disclose to Mr. Knight what you considered to be your

2    issues?

3    A.      Yes.

4    Q.      And the issue solely is a spouse selling

5    something -- a spouse of a Head Start employee selling to

6    Head Start; right?

7    A.      Yes.

8    Q.      And in this particular instance the spouse has on

9    at least two occasions been introduced to every single

10   employee at Head Start; right?

11   A.      Yes.

12   Q.      So everybody at Head Start knows that this book

13   that is about to be purchased is written by the spouse of

14   Mr. Jimenez?

15   A.      I wouldn't know that.

16   Q.      Well, they know that she's his spouse; right?

17   A.      If they were there at that -- if they were an

18   employee there at that time, yes.

19   Q.      Okay.  Well, we've established that every

20   employee has to attend the preservice.

21   A.      Yes.

22   Q.      And there were two different preservices where

23   she was introduced as his spouse?

24   A.      Yes.

25   Q.      And you were certainly present at both.  And

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  anyone that worked there from 2007 through 2010 would

2  have been at at least two preservices; right?

3  A.      Yes, yes.

4  Q.      So again everybody that met those criteria would

5  know that the author of this book was the spouse of an

6  employee; right?

7  A.      I guess.

8  Q.      Not really any guessing.  I don't mean to parse

9  words with you, but it's a known fact?

10  A.      Well, I didn't see the book when they did the

11  presentation, so I can't speak to that.

12  Q.      But we're not talking about a time when the book

13  is put in the presentation now.  We're talking about your

14  objection is when you're asked to do a merchandise

15  request form that your concern is the author of the book

16  is an employee's spouse; right?

17  A.      Yes.

18  Q.      Okay.  And what my simple point is is that

19  everybody at Head Start, yourself included, who had

20  attended two mandatory preservices knew who that author

21  was?

22  A.      Yes.

23          MR. O'NEILL:  Objection.  Without the

24  proviso that they were there for three years.

25  BY MR. WEISBROD:

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    With the proviso that they were there for three

2    years, knew the wife?

3    A.    Yes.

4    Q.    And that included you?

5    A.    Yes.

6    Q.    So where's the conflict of interest?

7    A.    The money.

8    Q.    So it's all about the money for you?

9    A.    Well, it's not about the money.  It's about the

10   county has policies.

11   Q.    Well, in that case your superior, Mr. Knight,

12   ought to have jumped all over this; right?

13   A.    Well, it was explained to him that that was tried

14   before.

15   Q.    You explained to Mr. Knight that --

16   A.    Miss -- not me.  Miss Bell.

17   Q.    Okay.  So you -- you didn't voice this to

18   Mr. Knight?

19   A.    No.  I just voiced to Mr. Knight that I was

20   uncomfortable with the purchase of the book.

21   Q.    Now, you're uncomfortable with the purchase of

22   the book and you're telling Mr. Knight, but the one

23   person you didn't tell was the man who had done your tax

24   returns for three years, Mr. Jimenez; right?

25   A.    Correct.

1    Q.    And he's not even in your department, is he?

2    A.    No.

3    Q.    He doesn't have any authority over you?

4    A.    No.  But we do go to him for advice and guidance.

5    Q.    Sure.

6          And one of the things you went to advice and

7    guidance about was the $10,000 rule; right?

8    A.    Yes.

9    Q.    That was one of the fiscal rules.  Not his rule,

10   but a county rule about who can purchase items for under

11   $10,000; right?

12   A.    Yes.

13   Q.    And as a matter of fact, he told you that even if

14   it's under 10,000 but over 5,000, you're responsible to

15   get three quotes; right?

16   A.    Yes.  It's a county rule.

17   Q.    Okay.  So this is a man that you have trusted on

18   a personal level; right?

19   A.    Uh-huh, yes.

20   Q.    And this is a man who you have trusted on a

21   business level or working level to instruct you about the

22   workings of the county; right?

23   A.    Yes.

24   Q.    You've known him for three years; right?

25   A.    Yes.

1  Q.     You've met his wife?

2  A.     Yes.

3  Q.     And yet you're uncomfortable about this purchase,

4  but don't talk to him about it?

5  A.     No, I do not.

6  Q.     Even though he sent you an e-mail arguably

7  starting the whole process on April 21st came from Mike

8  Jimenez to Idalin Navejar, here's the presentation;

9  right?

10 A.     Yes.

11 Q.     So you had every opportunity from April 21st to

12 whenever to voice your concerns to Mr. Jimenez, your

13 personal friend, a coworker and someone you trusted, and

14 you never did it?

15 A.     No.  Because I was uncomfortable with that.

16 Q.     Now, would you agree with me that things that are

17 hidden are a little worse than things that are out in the

18 open?

19 A.     Could you repeat that again.

20 Q.     Well, when you do something out in the open for

21 everybody to see --

22 A.     Yes.

23 Q.     -- isn't it fair to conclude you're not trying to

24 hid it from everybody?

25 A.     Yeah.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    Okay.  As a matter of fact, on the very first
2    e-mail, Government's Exhibit 2, where the letter of
3    presentation is referenced, at the bottom Miss Melendez
4    makes it very clear what the name of her company is;
5    right?
6    A.    I didn't know that that was the name of her
7    company.
8    Q.    Well, it's in the letter of presentation to you
9    about the book; right?
10   A.    Yes.  But I still didn't connect that.
11   Q.    Well, there's a difference between you making the
12   connection and the exposure being done; right?
13   A.    Yes.
14   Q.    Okay.  And you can at least agree with me that on
15   the very first e-mail you're receiving there's a
16   connection between Johana Melendez and Reading For Little
17   Scientists?
18   A.    Yes.
19   Q.    And a connection through them to Michael Jimenez?
20   A.    Yes.
21   Q.    The light of day is shining all over this
22   transaction; right?
23   A.    I guess.
24   Q.    Now, you got reprimanded for this transaction,
25   didn't you?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    A.    Yes, I did.

2    Q.    And that's part of the reason why you're here

3    today; right?

4    A.    Because I got reprimanded?  No.  Because I got

5    subpoenaed.

6    Q.    You got accused by the county of facilitating a

7    violation of county policy; right?

8    A.    Yes.

9    Q.    That's what we're talking about here is a

10   violation of county policy, not an attempt to defraud;

11   right?

12   A.    Yes, it's a violation.

13         MR. WEISBROD:  Thank you, Your Honor.  No

14   further questions.

15         THE COURT:  Mr. Brown.

16              CROSS-EXAMINATION

17   BY MR. BROWN:

18   Q.    Good morning, ma'am.

19   A.    Good morning.

20         THE COURT:  Give me a minute.  Let me just

21   instruct the witness.  If you know an answer, answer the

22   question.  If you don't know the answer, say you don't

23   know the answer.  But try not to guess.

24         THE WITNESS:  Okay.

25         THE COURT:  Okay.  Thank you.

```
 1                    THE WITNESS:  Thank you.

 2                    THE COURT:  Mr. Brown.

 3                    MR. BROWN:  Thank you, Your Honor.

 4    BY MR. BROWN:

 5    Q.      Ma'am, we've never met, have we?

 6    A.      No.

 7    Q.      Okay.  We've never talked about this case or had

 8    any opportunity to ask you questions about what you may

 9    know; is that right?

10    A.      No.

11    Q.      You speak Spanish?

12    A.      Yes.

13    Q.      Fluently?

14    A.      Yes.

15    Q.      Where were you born?

16    A.      In New York.

17    Q.      Your parents from --

18    A.      Puerto Rico.

19    Q.      Puerto Rico?

20    A.      Uh-huh.

21    Q.      All right.  Brought up speaking Spanish?

22    A.      Yes.

23    Q.      All right.  You're familiar with the custom in

24    some South America countries or Spanish speaking

25    countries regarding last names?
```

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    A.       Yes.

2    Q.       All right.  You know I represent Johana Melendez

3    Santiago?

4    A.       Okay.

5    Q.       You understand that sometimes that she goes by

6    Johana Melendez?

7    A.       I didn't -- I didn't know she was going by her --

8    Melendez, no.

9    Q.       Okay.  Explain maybe to the jury why it is that

10   somebody can have two it seems last names.

11   A.       Well, in our -- in our culture -- and I have

12   lived in Puerto Rico also -- the wife usually uses the

13   husband and they -- one of her maiden last names usually.

14   Q.       And when you say "one of her maiden last names,"

15   for instance, Johana Melendez, Melendez would signify her

16   father's family, would it not?

17   A.       Yes.

18   Q.       And Santiago would be her mother's family?

19   A.       Yes.

20   Q.       All right.  So somebody will sometimes go by

21   their father's name, Johana Melendez, or sometimes

22   they'll add the other part, the mother's family's name as

23   well, Melendez Santiago?

24   A.       Yes, sometimes that's done.

25   Q.       That's common, is it not?

1    A.      In Puerto Rico, yes.

2    Q.      Now, we talked about this preservice in 2007.

3    And you were there, were you not?

4    A.      Yes.

5            MR. BROWN:  May I approach, Your Honor?

6            THE COURT:  You may.

7    BY MR. BROWN:

8    Q.      I'm showing you what's marked as Defendants'

9    Exhibit No. 8; right?  And see if you recognize this to

10   be a fair and accurate representation or copy of the

11   preservice agenda for 2007.  Do you recognize it?

12   A.      Yes.

13   Q.      And does this appear to be the agenda for the

14   preservice in 2007 for Hillsborough County Head Start

15   that you attended?

16   A.      Yes.

17           MR. BROWN:  Your Honor, at this time I'd

18   offer into evidence -- I know it's not my case, but

19   Exhibit NO. 8.

20           MR. O'NEIL:  No objection.

21           THE COURT:  Received into evidence Defendant

22   Melendez Santiago 8.

23           (EXHIBIT 8 ADMITTED INTO EVIDENCE.)

24           MR. BROWN:  Thank you, Your Honor.  May I

25   publish?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1                    THE COURT:  You may.

2    BY MR. BROWN:

3    Q.      All right.  This says Hillsborough County Head

4    Start; correct?

5    A.      Yes.

6    Q.      Preservice for 2007?

7    A.      Yes.

8    Q.      And when we talked about attending this, this was

9    the presentation that you attended?

10   A.      Yes.

11   Q.      Now, do you see at 8:45 a topic called

12   Introduction of Guest Trainer?

13   A.      Yes.

14   Q.      And who is that presenter?

15   A.      Mr. Michael Jimenez.

16   Q.      And below that that do you see five minutes later

17   a presentation that begins with bloodborne pathogens that

18   went from 8:50 to 9:20?

19   A.      Yes.

20   Q.      Who was that presenter?

21   A.      Johana Melendez.

22   Q.      And that's what you remember listening to, did

23   you not?

24   A.      I don't recall.  I would say no, I don't know.

25   Q.      You were there?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   A.      I was there, yes.

2   Q.      Do you remember when he introduced Johana

3   Melendez, do you remember him introducing her as his

4   wife?

5   A.      Yes.

6   Q.      Now, there was another preservice for 2009;

7   right?

8   A.      Yes.

9   Q.      All right.  Now, you remember that there was also

10  a slide show at that presentation?

11  A.      I believe there was a slide show, yes.

12  Q.      And I think it's your testimony you don't recall

13  one way or another -- and I understand it's 2009 --

14  whether there was a slide that had the cover of Travel

15  Boy Meets Sebastian?

16  A.      No, I don't recall.

17  Q.      Okay.  Have you ever been to the Plant City

18  classroom, the Head Start classroom in Plant City?

19  A.      I've been to the center.

20          MR. BROWN:  May I approach, Your Honor?

21          THE COURT:  You may.

22  BY MR. BROWN:

23  Q.      I'm showing you what's been marked Defendants'

24  Exhibit 14.  And I'm going to show you two photographs,

25  and tell me if you recognize these classrooms -- or the

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    same classroom.

2    A.      It's kind of looks, yeah, like the center.

3    Q.      All right.  It kind of looks like the center at

4    Plant City?

5    A.      Yes.

6    Q.      All right.  And do you see students in the

7    photographs?

8    A.      Yes.

9    Q.      The children?

10   A.      Yes, I see children.

11   Q.      And teachers?

12   A.      I don't recall who she is, but someone there,

13   yes.

14   Q.      All right.  Is it fair to say that they appear to

15   be holding up a book of some sort?

16   A.      Yes.

17   Q.      Were you aware -- is there a date on these

18   photographs?

19   A.      Yes.

20   Q.      Assuming that date is accurate, 2008, were you

21   aware that there was a prepublished format of this very

22   book that was being used to teach the children at Head

23   Start classes specifically at Plant City?

24   A.      No.

25   Q.      All right.  We know that the government has

1    introduced what's called Government's Exhibit No. 2;

2    right?

3    A.     Yes.

4    Q.     And this was what Mr. O'Neill went over with you

5    regarding an e-mail from Johana on April 15th that said

6    here's a letter of presentation for my book in case they

7    need justification.  Also you can tell them that I'm a

8    product of the Head Start system; right?  And this was

9    forwarded to you on April 21st?

10   A.     Yes.

11   Q.     You know what that means when it says in there

12   that I'm a product of the Head Start system?  Are you

13   aware of her background and affiliation with Head Start?

14   A.     No.

15   Q.     When it says though here's a letter of

16   presentation of my book, that presentation is forwarded

17   in the attachment to you, is it not?

18   A.     That's what it states on here.

19   Q.     Now, prior to you getting this e-mail did you not

20   have a conversation with Miss Melendez about the book?

21   A.     I don't recall if I had a conversation with her

22   before this e-mail.

23   Q.     But it's no question that in this presentation

24   that I think Mr. O'Neill read to you --

25   A.     Yes.

1   Q.      -- she's talking about the use of the book;

2   right?

3   A.      Yes.

4   Q.      We don't need to read it again.  But it says if

5   you would like to order copies you can go to the

6   publisher's Web site.  Do you see that?

7   A.      Yes.

8   Q.      Then on Government's Exhibit 3 there's an e-mail

9   which she says to you on April 21st, so roughly six days

10  later; right?

11  A.      Yes.

12  Q.      In order to send you a quote I need to know the

13  number of books you need.  That would lead someone to

14  believe that there is some discussion about quotes

15  wanted; is that right?

16  A.      Yes.

17  Q.      And when she says that, it appears that she's not

18  suggesting the number of books you need; right?  She's

19  not saying I'm going to send you a quote for 10,000

20  books.  She said, I need to know the number of books you

21  need?

22  A.      Yes.

23  Q.      Then she says to you -- apparently there isn't a

24  conversation between the two of you because on April 27th

25  she says just following up with the book order.  I wanted

1  to know if you decided on a book amount; right?

2  A.    Yes.

3  Q.    She's not telling you how many books need to be

4  ordered?

5  A.    No.  She's wanting to know the amount.

6  Q.    And at some point there's a quote that's sent

7  from 800 to 1,000 or 1,300 copies; is that right?

8  A.    Yes.

9  Q.    So there was apparently some oral conversation

10  between you and Miss Melendez about a quote number;

11  right?

12  A.    I don't recall if it was about a quote number

13  with her.

14  Q.    There doesn't seem to be any e-mails in between

15  her asking you how many books may you want -- or do you

16  want and then this e-mail that says here are the quotes

17  for 800, 1,000 and 1,300?

18  A.    Exactly.

19  Q.    So if we're filing in these pieces, do you recall

20  the conversation where you may have said to her send me

21  quotes for 800, 1,000 or 1,300?

22  A.    No, I don't recall the conversation.

23  Q.    So that means it could have been happened.  You

24  just don't remember one way or another?

25  A.    Exactly.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    All right.  And as far as the quotes that were
2  received, you were the one that got those quotes; right?
3    A.    Yes, I did.
4    Q.    Now, one of the quotes was for Amazon?
5    A.    Yes.
6    Q.    And it look as if that quote price was 2,532 and
7  this item ships for free; right?
8    A.    Yes.
9    Q.    And another one was from the actual publisher of
10  the book who offered a lower price; is that right?
11    A.    Yes.
12    Q.    750, 800, 1,000, 1,300?
13    A.    Yes.
14    Q.    Now, after the books are purchased, there is an
15  e-mail, Government's Exhibit No. 7.  Now, do you know why
16  Michael Jimenez' name is up here?
17    A.    Because it's printed from his computer.
18    Q.    Do you know who printed it from his computer and
19  how that search was done?
20    A.    No.
21    Q.    Are you familiar with the ability that they
22  have -- or people have to go in through a person's name
23  or user name to be able to access data that exists or
24  e-mails that may not even be in their name but throughout
25  the system?

1   A.      No, I don't know about that.

2   Q.      This -- you're not saying that because his name

3   is up here it was actually received as an e-mail to him

4   or sent from him?

5   A.      Well, usually when you print an e-mail from your

6   computer, whoever prints it, their name shows up on the

7   top.

8   Q.      But you don't see his name in any of the headings

9   here.  It's not from him, it's not sent to him and it's

10  not CC'd to him; correct?

11  A.      No.

12  Q.      Now, she says I hope the books have been well

13  accepted by the parents; correct?

14  A.      Yes.

15  Q.      No question that she's indicating that at least

16  in her mind these books were for parents?

17  A.      Yes.

18  Q.      And that they were supposed to be sent to the

19  parents?

20  A.      Yes.

21  Q.      Her question is, will teachers receive copies of

22  the books too?

23  A.      Yes.

24  Q.      And then she says I'm attaching activity sheets

25  to go with the book.

1    A.    Yes.

2    Q.    Now, this leads me to a question Mr. O'Neill

3    asked on direct.  And he said did you take any additional

4    steps to order any activity sheets.  Do you remember that

5    question?

6    A.    Yes.

7    Q.    Did you think that when he used the word "order"

8    he was meaning to buy?

9    A.    No.  I think he just meant to get the worksheets.

10   Q.    Okay.  Let's be clear about this.  There's

11   nothing in this letter that would suggest that

12   Miss Santiago --  Miss Melendez Santiago is selling

13   anything besides the book?

14   A.    Yes, you're correct.

15   Q.    Okay.  She's not saying buy the book and then you

16   can also buy other things?

17   A.    No, no.

18   Q.    In fact, she's pretty clear about this, isn't

19   she?

20   A.    Yes.

21   Q.    After the book she's saying I've attached

22   activity sheets to go with the book?

23   A.    Yes.

24   Q.    Does it say anywhere in here that you have to buy

25   these activity sheets?

```
 1    A.      No.

 2    Q.      And it says one of the attachments is an actual

 3    curricular activity that meets a benchmark for science.

 4    Do you know what that means?

 5    A.      Not exactly, no.

 6    Q.      And then she says as I prepare more activities to

 7    do with the children I will be e-mailing them to you and

 8    you can pass them along to teachers if they get a copy of

 9    the book; right?

10    A.      Yes.

11    Q.      Does it say anywhere in there that you have to

12    pay a price for that?

13    A.      No.

14    Q.      No.

15            It's pretty clear that that's something she's

16    offering for free, isn't it?

17    A.      Yes.

18    Q.      And also it says in here let me know if I can

19    help you with anything else.

20    A.      Yes.

21    Q.      You're aware that she's helped Head Start; right?

22    A.      I know that she's done the two trainings, yes.

23    Q.      You know of one in 2007?

24    A.      Yes.

25    Q.      And another one in 2009 where she was helping to
```

1    educate people at Head Start?

2    A.      Yes.

3    Q.      Are you aware that her students had appeared at

4    numerous times to also educate students and teachers

5    about germs?

6    A.      No.

7    Q.      But she's not offering to do this at a price?

8    A.      No.

9    Q.      And she says remember, I'm available for any

10   demonstration activities that can help teachers can use

11   the book to get the most out of it; right?

12   A.      Yes.

13   Q.      Remember would indicate that she's trying to

14   suggest to you that she's willing to do this like she's

15   done it before?

16   A.      Yes.

17   Q.      Is there any question in your mind that she's

18   passionate about teaching and helping?

19   A.      No.

20   Q.      Now, there was an attachment to this, wasn't

21   there?  It even says it up here.

22   A.      Yes.

23   Q.      Let me show you --

24           MR BROWN:  May I approach?

25           THE COURT:  You may.


SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

BY MR. BROWN:

Q.    I'm showing you what's marked as Defendants'
Exhibit 11.  Do you recognize is this as the attachment
that is in reference to that?

A.    No.  Because I didn't look at the attachment.

Q.    You didn't open the attachment?

A.    No.

Q.    So when she's referring to an attachment in
here --

A.    Yes.

Q.    -- you never opened it, so you don't know what
was in it and the purpose of it?

A.    No.

Q.    Okay.  Fair enough.  Thank you, ma'am.

        MR. BROWN:  No further questions, Your
Honor.

        THE COURT:  Any other cross-examination?

        MR. FARMER:  Yes, Your Honor.

                    CROSS-EXAMINATION

BY MR. FARMER:

Q.    Good afternoon.

A.    Good morning.

Q.    Let me have you take another look at Government
Exhibit No. 1 that's in evidence, first page.  Now, this
signature by Marie Mason and signature by Mr. Finney,

1    that was required on every merchandise request form since

2    you've been at Head Start; isn't that right?

3    A.    Well, it depends.  Some of them are just signed

4    by Miss Mason.  Depends on the amount.

5    Q.    All right.  So the fact that Miss Mason signed

6    this particular merchandise request form was not unusual

7    in any way?

8    A.    No.

9    Q.    In other words, every merchandise request form

10   that you've ever seen bears Marie Mason's signature;

11   isn't that right?

12   A.    It's -- yeah, if you're under her department,

13   yes.

14   Q.    And that's the case for you.  You're under her

15   department?

16   A.    Yes, I was.

17   Q.    And the total number of employees in that

18   department is about 60 to 65?

19   A.    I don't know the exact number, but it kind of

20   sounds like it's correct.

21   Q.    Let me ask you about the same exhibit, Government

22   Exhibit No. 1.  About six pages in or so do you see

23   quotes from the person who works for Xlibris

24   Publishers --

25   A.    Yes.

1  Q.      -- Nolan Estes?

2  A.      Yes.

3  Q.      He provides a quote for 750 paperbacks of 9,390

4  and then a quote of 800 paperbacks for 9,512; is that

5  right?

6  A.      Yes.

7  Q.      Now, you'd agree with me that if someone wanted

8  to buy as many books as possible but still stay below

9  $10,000 they would choose the 800 quote?

10 A.      I don't make that decision, so --

11 Q.      Well, just mathematically would you agree with me

12 if someone wanted to buy as many paperback as possible

13 yet still stay below the --

14 A.      The 10,000, yes.

15 Q.      In fact, they could probably get -- I'm not going

16 to try to do the math, but if a book is $12 each or 11.39

17 each, they could have gotten over 800 books if that was

18 their intent?

19 A.      Yes.

20 Q.      If their intent was to maximize profit yet still

21 stay below 10,000 they wouldn't have stopped with 750

22 paperbacks; right?

23 A.      Yes.

24 Q.      And isn't it true that every fall about 750 new

25 families -- Head Start families join the organization?

1  A.      Roughly around that number.

2  Q.      Okay.  So that would -- that would be a logical

3  reason for someone to choose 750 and stay right there at

4  750; isn't that right?

5  A.      Yes.

6  Q.      And isn't it true that all of these books, the

7  750 copies of Travel Boy Helps Sebastian went out to the

8  new families?

9  A.      I don't know because I wasn't part of that

10  process.

11  Q.      Okay.  Your understanding though was that the --

12  these books went to parents?

13  A.      Yes.

14          MR. FARMER:  Now, Your Honor, may I approach

15  with what's been marked as Defense Exhibits 2 through 27?

16          THE COURT:  You may.  And if you'll be more

17  specific since I have two defendant exhibit lists.  Would

18  this be Mason's?

19          MR. FARMER:  Yes, Your Honor.  Thank you.

20          THE COURT:  All right.  Thank you.

21  BY MR. FARMER:

22  Q.      Ma'am, if you would just look at the very top

23  headers of each of those documents.  I won't ask you to

24  read anything beyond there, but just look at the top

25  headers and confirm that your name is either on the to

1    line or the from line or on the CC line on all those

2    documents.  If you would, don't bother reading the

3    document yet, just confirm that your name is affiliated

4    with those documents and if you could just quickly page

5    through and just confirm that your name is on every one

6    at the top.

7    A.      The first one at the bottom I don't see my name.

8    Q.      Look at the top.

9    A.      Okay.  Yeah, at the top I see it, yes.

10   Q.      Okay.  Look at the top of every one of those

11   documents, 2 through 27, Marie Mason's exhibits.  Have

12   you had a chance to do that?

13   A.      Yes.

14   Q.      On each of those exhibits does your name appear

15   in some form either the to or the from?

16   A.      Yes.

17   Q.      All right.

18           MR. FARMER:  Your Honor, at this time

19   Defendant Mason would offer Exhibits 2 through 27.

20           MR. O'NEILL:  No objection, Your Honor.

21           THE COURT:  Okay.  Aren't a lot of these

22   duplications from what are already in evidence?

23           MR. WEISBROD:  Some are.  There are about

24   five there that are duplicates, but I thought I'd just do

25   it as a set.

  1          THE COURT:  All right.  I'll receive into

  2     evidence Defendant Mason's Exhibits 1 (sic) through 27.

  3          (EXHIBITS 2 THROUGH 27 ADMITTED INTO

  4     EVIDENCE.)

  5          MR. FARMER:  May I approach the witness,

  6     Your Honor?

  7          THE COURT:  You may.

  8     BY MR. FARMER:

  9     Q.     Miss Navejar, I'm not going to ask you to read I

 10     don't believe any of these -- maybe one or two.  I'd just

 11     like you to take a look at the very top lines and tell me

 12     who the individuals are who are either sending the e-mail

 13     or referring the e-mail.  And if I could I might just ask

 14     you -- to speed is this up a little bit just ask you to

 15     confirm the persons on these e-mails and the date and

 16     time of the e-mails.  Okay?

 17     A.     Okay.

 18     Q.     Now, this one is from Miss Melendez to you on

 19     April 21st, 2010; is that right?

 20     A.     Yes, correct.

 21     Q.     And this one as it describes Defense Exhibit

 22     No. 3 is from Mr. Jimenez to you with a CC to

 23     Miss Melendez; is that right?

 24     A.     Yes.

 25     Q.     And this one -- actually, this is the one that's

1    out of order.  That one was 4:47 on April 21st; right?

2    A.      Correct.

3    Q.      Now, the rest of these I believe are all

4    chronological.  April -- I apologize.  4 and 2 are the

5    same.  5 is later that -- I'm sorry, the next day from

6    Miss Melendez to you; is that right?

7    A.      Correct.

8    Q.      Exhibit 6, April 22nd, 4:48 p.m. from Mr. Estes

9    to you?

10   A.      Correct.

11   Q.      Same day, slightly later from Miss Melendez to

12   you; is that right?

13   A.      Correct.

14   Q.      With the quotes of the numbers of books?

15   A.      Yes.

16           THE COURT:  Mr. Farmer, would you be sure

17   and read the exhibit number.

18           MR. FARMER:  Yes.

19   BY MR. FARMER:

20   Q.      That would be Exhibit No. 7; correct?

21   A.      Correct.

22   Q.      And defense Exhibit 8 would be Miss Melendez to

23   you April 22nd at 5:15 p.m.; is that right?

24   A.      Correct.

25   Q.      And Defense Exhibit 9, Miss Melendez to you 5:15.

1    This is slightly different than the preceding one because

2    it includes an attachment.  There's an attachment on that

3    one.  This one has no attachment; is that correct?

4    A.    Can I see the first one.

5    Q.    Sure.

6    A.    Correct.

7    Q.    9 has the attachment, 8 does not?

8    A.    Correct.

9    Q.    And the next one chronologically would be

10   April 22nd at 5:17 p.m.  That's from -- Exhibit No. 10

11   from Miss Melendez to -- I'm sorry, Miss Melendez to

12   herself with you CC'd?

13   A.    Correct.  I'm sorry?  What was the question?

14   Q.    That was incorrect.

15         It's an e-mail from Miss Melendez to herself and

16   you; is that right?

17   A.    Correct.

18   Q.    Chronologically the next one is Defense

19   Exhibit 11, an April 27th e-mail at 12:55 from

20   Miss Melendez again to you?

21   A.    Correct.

22   Q.    And Exhibit No. 12 is Mr. Estes from Xlibris

23   Publishers to you?

24   A.    Correct.

25   Q.    Defense Exhibit 13 would be April 28th, 8:39 a.m.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    from you to Miss Bell?

2    A.      From me to Miss Bell, yes.

3    Q.      About the book order?

4    A.      Yes.

5    Q.      And Defense Exhibit 14 is an e-mail ten minutes

6    later from you to Miss Bell?

7    A.      Correct.

8    Q.      That's No. 14 is 8:49 and 13 is 8:39?

9    A.      Correct.

10   Q.      Chronologically the next one is May 3rd, and

11   that's Defense Exhibit 15, e-mail from you to

12   Miss Melendez with a CC to Miss Bell and Nurse Felipe?

13   A.      Correct.

14   Q.      Which, as I recall, is Government Exhibit 2 as

15   well?

16   A.      Correct.

17   Q.      The next one chronologically is e-mail, Defense

18   Exhibit 16, an e-mail from Miss Melendez to you?

19   A.      Yes.

20   Q.      That's at May 3rd at 1:21 p.m.; is that right?

21   A.      Yes.

22   Q.      And Defense Exhibit 17 is an e-mail from

23   Miss Melendez to you the same day at 1:37 p.m.?

24   A.      Correct.

25   Q.      And the next one, Defendants' 18, is an e-mail at

1    1:46 p.m. on May 3rd from Mr. Estes to you?

2    A.    Yes.

3    Q.    And May 3rd, 2010, was the day that you decided

4    to proceed with the purchase of the books and develop a

5    merchandise request form?

6    A.    Yes.

7    Q.    Same date, Defense Exhibit 19 is an e-mail from

8    Miss Bell to you --

9    A.    Yes.

10   Q.    -- at 3:02 p.m.?

11   A.    Yes.

12   Q.    And let me ask you to stop there just for a

13   moment.

14         There was an attachment to this e-mail; is that

15   right?

16   A.    I believe so.

17   Q.    From the header could you tell if there's a

18   reference to an attachment?

19   A.    Yes.

20   Q.    That's a merchandise request form for Xlibris

21   Corporation?

22   A.    Correct.

23   Q.    If you go to the second page of that document,

24   would you look at the bottom.  This is a document that

25   you -- that you developed; is that right?  If you look

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    here above the pen.

2    A.    Yes.

3    Q.    Do you have these merchandise request forms on

4    file so that you can access them and put in the necessary

5    information each time?

6    A.    What I have is the merchandise request is on the

7    computer, so we just fill in the information.

8    Q.    Okay.  But do you have this -- do you have this

9    form easily accessible so if you are going to initiate a

10   merchandise request form you just pull up the form and

11   then input the specific data, whatever the item might be?

12   A.    Yes.  I pull it up on the computer.

13   Q.    Okay.  Now, this one -- this merchandise request

14   form regarded 1,300 copies of this book; is that right?

15   A.    Yes.

16   Q.    Is that the same book, the bilingual children's

17   book, Travel Boy Helps Sebastian?

18   A.    Yes.

19   Q.    And that would have been -- at unit price 13.29,

20   that would have been $17,277; right?

21   A.    Yes.

22   Q.    Now, you filled out this form on Friday,

23   April 23rd, 2010 --

24   A.    Yes.

25   Q.    -- is that right?

1    A.      Yes.

2    Q.      But as we saw on Government Exhibit 10, the

3    merchandise request form that was ultimately used was

4    dated on May 3rd, 2010; is that right?

5    A.      Correct.

6    Q.      And that was a Monday?

7    A.      Yes.

8    Q.      About ten days later -- exactly ten days later?

9    A.      Could I see the other one.

10   Q.      Sure.

11           And the one I'm showing now is Government

12   Exhibit 1.

13   A.      Okay.

14   Q.      And the second page to Defense Exhibit 19 is what

15   day and date, Friday, April 23rd?

16   A.      Uh-huh, yes.

17   Q.      Now, at this point -- up to this point, meaning

18   the May 3rd date, you had absolutely no communication

19   with Miss Mason about the purchase of these books you

20   personally; isn't that right?

21   A.      I don't -- I don't know.

22   Q.      Do you recall today having any communications

23   with Miss Mason about the book at any point prior to

24   May 3rd, 2010?

25   A.      Yes, we had conversations about the book.

1    Q.    With Miss Mason?

2    A.    Yes.

3    Q.    You and Miss Mason?

4    A.    Yes.

5    Q.    Okay.  And tell me when you had those

6    conversations and what did you say.

7    A.    She just came to ask us when we were going to

8    purchase the book because she hadn't seen the merchandise

9    request or the quotes that happened before this.

10    Q.    And what did you tell her?

11    A.    That we were working on it.

12    Q.    Did you express any concerns that you had to

13    Miss Mason when you had --

14    A.    I expressed the concern that we couldn't find the

15    one quote at the time when we first began.

16    Q.    Okay.  Any -- any concerns -- was that the only

17    concern that you expressed to her, that you could find

18    only one quote?

19    A.    Yes.

20    Q.    And going back to Government Exhibit 1, did you

21    ultimately obtain three quotes?

22    A.    No.

23    Q.    Well, let's see.  Again this is Exhibit No. 1 --

24    A.    I should say I ultimately got from two different

25    sources.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.      Okay.  Well, let's -- let's go through Exhibit 1
2    -- Government Exhibit 1.  Your job was to -- as part of
3    the county policies was to get three quotes for each
4    item --
5    A.      Yes.
6    Q.      -- right?
7            And the purpose of that is to comparison shop,
8    get the best price; is that right?
9    A.      Yes, correct.
10   Q.      So you had to get three and you had to choose the
11   less expensive one for the county --
12   A.      Correct.
13   Q.      -- is that right?
14   A.      Uh-huh.
15   Q.      So on May 3rd, 2010, we talked a little bit just
16   a moment ago about getting the quote from Amazon.
17   A.      Yes.
18   Q.      And that's --
19   A.      Which was from Xlibris.
20   Q.      I didn't hear you?
21           THE COURT:  Which was what?
22           THE WITNESS:  I believe that's the same --
23   the one that.
24           THE COURT:  We're having a hard time hearing
25   you.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          THE WITNESS:  Oh, I'm sorry.

2          THE COURT:  Talk into the mic.

3          THE WITNESS:  When we got this from Amazon I

4    believe it was like Xlibris was the -- the company behind

5    it.

6    Q.    Xlibris --

7    A.    Yes.

8    Q.    -- was the publisher?

9    A.    Yes.

10   Q.    But the quote you got from Amazon was per book

11   25.32; is that right?

12   A.    That's -- yes, that's what it says.

13   Q.    And if you purchase 750 of those, it would have

14   been about double the price of what you ultimately paid?

15   A.    Yes.

16   Q.    So Amazon was not the least expensive source?

17   A.    No, no.

18   Q.    All right.  Was that the first quote you got

19   then, the Amazon?

20   A.    I believe so, yes.

21   Q.    All right.  Then the second quote -- this is part

22   of Government Exhibit No. 1 -- would be the quote

23   directly from Nolan Estes at Xlibris?

24   A.    Yes.

25   Q.    And that was a lot better.  That was $12 a book?

1   A.      Yes, sir.

2   Q.      For a total of 9,390?

3   A.      Yes.

4   Q.      And the third quote you got on May 3rd, 2010, was

5   from Reading For Little Scientists; is that right?

6   A.      Correct.

7   Q.      And Reading For Little Scientists quoted not

8   9,390, but 9,000 even; is that right?

9   A.      Correct.

10   Q.      In other words, the quote from Xlibris was --

11   included shipping and handling.  And Reading For Little

12   Scientists did not include that $390?

13   A.      Correct.

14   Q.      So the lowest of the three bids -- or three

15   quotes I should say is -- was $9,000?

16   A.      Correct.

17   Q.      And that was your job is to get three and choose

18   the least expensive one?

19   A.      Correct.

20   Q.      And isn't that what Miss Mason's job is when she

21   signs these merchandise request forms to just make sure

22   that you or someone in your office is getting the three

23   quotes and choosing the least expensive?

24   A.      Yes, correct.

25   Q.      And we see this is the bid from Reading For

1     Little Scientists.  That was the winning bid --

2     A.     Yes.

3     Q.     -- is that right?

4     A.     Yes.

5     Q.     And the less expensive price?

6     A.     Yes.

7     Q.     So Miss Mason did her job because you did your

8     job.  You made her look good; right?

9     A.     Correct.

10    Q.     Let's go back to the chronological e-mails.

11    Defense Exhibit No. 20 is an e-mail later that same day,

12    May 3rd, 2010, at 3:47 p.m. from Miss Melendez to you; is

13    that right?

14    A.     Yes.

15    Q.     With the new quotes?

16    A.     Yes.

17    Q.     And the next one chronologically is -- a good

18    amount of time goes by from May 3rd to June 11th; is that

19    right?

20    A.     Yes.

21    Q.     And that's Defense Exhibit No. 21.  And that's an

22    e-mail from Miss Melendez to you; is that right?

23    A.     Correct.

24    Q.     Now, at this point Miss Mason's name does not

25    appear on any e-mails, all the ones we've gone through,

1    Defense Exhibits 2 through 21 --

2    A.      Correct.

3    Q.      -- is that right?

4    A.      Correct.

5    Q.      So she's not part of this conversation that

6    you're having with Miss Melendez or Miss Bell?

7    A.      No.

8    Q.      And Defense Exhibit No. 22 is an e-mail from you

9    to Miss Bell with Ron Knight CC'd June 14, 8:34, a.m.; is

10   that right?

11   A.      Correct.

12   Q.      Chronologically the next one we have in the

13   series is Defense Exhibit 23, Tuesday, June 15th from

14   Miss Melendez to you again dealing with the delivery of

15   the books?

16   A.      Correct.

17   Q.      Defense Exhibit 24 is the next one

18   chronologically.  It's June 15th at 12:17.  Again you

19   and -- e-mail from you to Miss Melendez with Miss Bell

20   CC'd?

21   A.      Correct.

22   Q.      And Room 35, that's Miss Bell's room?

23   A.      No.  Room 35 is a room where we keep supplies.

24   Q.      It's a supply room?

25   A.      Yes.

1  Q.     Okay.  And Defense Exhibit 25 is a government

2  exhibit as well.  It's an e-mail from Miss Melendez to

3  you with a CC to Marie Mason --

4  A.     Correct.

5  Q.     -- is that right?

6  A.     Correct.

7  Q.     And that's June 22nd, 8:41 p.m.; is that right?

8  A.     Correct.

9  Q.     And of the e-mails we have, this is the first

10 time that Miss Mason's name appears on any of the e-mails

11 dealing with the book --

12 A.     Yes.

13 Q.     -- purchase?

14        And Defense Exhibit No. 26, that's June 23rd at

15 9:30 a.m.  It's the e-mail from you to Miss Melendez;

16 correct?

17 A.     Correct.

18 Q.     Finally the last one in the series is Defense

19 Exhibit 27, an e-mail from Miss Melendez to you with a CC

20 to Miss Bell; is that right?

21 A.     Correct.

22        MR. FARMER:  Your Honor, may we approach

23 with a legal issue?

24        THE COURT:  Yes.

25        (AT WHICH TIME THE FOLLOWING SIDEBAR

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1      DISCUSSION WAS HELD:)

2                  THE COURT:  Before we do that, Mr. Farmer, I

3      think I might had misspoke.  You did not offer into

4      evidence your Exhibit 1, only 2 through 27; is that

5      correct?

6                  MR. FARMER:  That's correct.  I misspoke and

7      Mr. Weisbrod corrected me.  It was Government Exhibit 1.

8                  THE COURT:  All right.  So I should have

9      received into evidence -- and I will correct that -- 2

10     through 27, Defendant Mason's.

11                 MR. FARMER:  Yes, Your Honor.

12                 MR. WEISBROD:  What is your Exhibit 1?

13                 MR. FARMER:  It's an e-mail, but it's a --

14     it's a duplicate or out of order or something.

15                 Your Honor, I approached because there's a

16     hearsay issue on something I want to elicit from the

17     witness.  And essentially --

18                 THE COURT:  Is this regarding the exhibit?

19                 MR. FARMER:  No, no.

20                 THE COURT:  Okay.

21                 MR. FARMER:  This is a whole new -- a whole

22     new issue.  Miss Navejar gave a briefing to the agents

23     and in it she recounts what Miss Bell told her about a

24     conversation that Miss Bell had with Miss Mason.

25                 And essentially when Miss Bell goes back to

1    Miss Navejar and talks about conversations she had with

2    Marie Mason she says that Marie Mason clarified to

3    Miss Bell that these books were not for the children but

4    they were for the parents, which, of course, conflicts

5    with Miss Bell's testimony where she claims that these

6    books were simply for the children.

7            Now, it's a hearsay statement and I would

8    offer it not for the truth asserted but just for the fact

9    that Miss Bell said it to -- to Miss Navejar.  And I

10   would -- I would ask for a cautionary instruction.  But

11   that's --

12           THE COURT:  Okay.  Let me make sure I

13   understand it.  This is a statement that this witness

14   made recounting something that Miss Bell told her about

15   something Miss Mason said?

16           MR. FARMER:  Well, it's -- I wouldn't

17   want -- there is one less layer of hearsay just because

18   she may agree that -- that, uhm -- rather than recount

19   what she told the agents she may agree with me that

20   Miss Bell said it and she heard Miss Bell say it.  And I

21   don't have to get into her statement with the agents.

22   Here's the 302.

23           THE COURT:  Okay.  I'm sorry.  Where do you

24   want me to look?

25           MR. FARMER:  I'm sorry.  Right here with the

1    double stars.

2                    THE COURT:  All right.

3                    MR. O'NEILL:  Judge, government's -- it's

4    classic hearsay.  If the argument is that it's somehow

5    not offered for the truth of the matter asserted therein

6    but as an inconsistent statement there should have been

7    proper cross-examination of Miss Bell.

8                    THE COURT:  I agree.  I'll sustain the

9    objection.

10                   Mr. Farmer, I'm going to recess for lunch at

11   some point in time.  Do you have any idea how much more

12   you have?

13                   MR. FARMER:  Oh, I'm finished.

14                   THE COURT:  Okay.  Then.  I'll let

15   Mr. O'Neill redirect.  Okay.  Thank you.

16                   (AT WHICH TIME THE SIDEBAR DISCUSSION WAS

17   CONCLUDED AND THE PROCEEDING RESUMED AS FOLLOWS:)

18                   MR. FARMER:  Thank you, ma'am.

19                   No further questions.

20                   THE COURT:  Mr. O'Neill, redirect.

21                   MR. O'NEILL:  Yes, Your Honor, thank you.

22                   REDIRECT EXAMINATION

23   BY MR. O'NEILL:

24   Q.    Miss Navejar, you were asked a number of

25   questions on cross-examination about a mandatory

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    preservice meeting in 2007 at which the defendant,

2    Melendez Santiago, spoke.  Do you recall those questions?

3    A.    Yes.

4    Q.    Was Marecia Bell there?

5    A.    I don't know.

6    Q.    Was she working at Head Start in 2007?

7    A.    No.

8    Q.    You were also asked questions about whether --

9    Mr. Weisbrod in questions had mentioned that the

10   defendant, Michael Jimenez, is a personal friend of

11   yours.  Do you recall him saying that?

12   A.    Yes.

13   Q.    Is he a personal friend of yours?

14   A.    No, not personal.

15   Q.    Is he a colleague at work?

16   A.    Yes.

17   Q.    Mr. Weisbrod also asked that you trusted --

18   stated that you trusted Mr. Jimenez on a personal level

19   but you did not bring your concerns about the book to

20   him.  Do you recall those questions?

21   A.    Yes.

22   Q.    Why did you not bring your concerns to the

23   attention of Mr. Jimenez personally?

24   A.    Because I didn't feel comfortable.  I felt like I

25   had no recourse.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    What do you mean you had no recourse?

2    A.    Like I didn't have someone that I could really go

3    to to say what was going on and how I felt.

4    Q.    Miss Navejar, during Mr. Weisbrod's

5    cross-examination he asked you whether you were

6    reprimanded for not taking action in this case.  Do you

7    recall that?

8    A.    Yes.

9    Q.    What form of reprimand did you receive?

10   A.    It was a paper stating that I would not let this

11   happen again.

12   Q.    Now, you mentioned I believe in questioning by

13   Mr. Weisbrod it was a violation of county policy.

14   A.    Correct.

15   Q.    Were you told you violated county policy?

16         MR. WEISBROD:  Object to the hearsay, Your

17   Honor.

18         THE COURT:  I'll sustain.

19   BY MR. O'NEILL:

20   Q.    What was your letter of reprimand based on?

21         MR. WEISBROD:  Objection, Your Honor, that's

22   hearsay.

23         THE COURT:  Yeah.  Overruled.

24         You may answer the question.

25         THE WITNESS:  It said that I needed to let

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    them -- you know, that if something was a conflict of

2    interest that I would let superiors know.

3    BY MR. O'NEILL:

4    Q.      Now, there's some questions about the quotes.

5            MR. O'NEIL:  And if I may approach the

6    witness, Your Honor?

7            THE COURT:  You may.

8    BY MR. O'NEILL:

9    Q.      That you received.  If I may, I put Government's

10   Exhibit 1 in evidence in front of you and that's the

11   merchandise request form.  And did you tell us that you

12   were required to get three quotes?

13   A.      Yes.

14   Q.      And what were the three quotes?

15   A.      Reading For Little Scientists, Amazon and from

16   Mr. Nolan Estes.

17   Q.      Let me start with the Reading For Little

18   Scientists.  At that time did you know that was the

19   company of Miss Melendez Santiago?

20   A.      No.

21   Q.      Let me turn to Amazon.  How did you know to

22   contact Amazon to get a quote for this book?

23   A.      I just Googled it on the Internet.

24   Q.      Googled the company or the book?

25   A.      The book.

1  Q.      Okay.  And by Googling the book, that led you to

2  Amazon?

3  A.      Yes.

4  Q.      Did you ever contact anybody at Amazon?

5  A.      No.

6  Q.      And then the third one is the Xlibris book

7  company.

8  A.      Yes.

9  Q.      And how did you know to contact them?

10  A.      When I was looking through Amazon I saw something

11  about Xlibris and then I looked them up.

12  Q.      And do you know what type of company that is?

13  A.      No.

14  Q.      Thank you, ma'am.

15          MR. O'NEIL:  I'll retrieve the document,

16  Your Honor.

17  BY MR. O'NEILL:

18  Q.      During cross-examination again, Miss Navejar, you

19  were asked about new students coming every year and

20  counsel threw out the number 750.  Do you know how many

21  students come every year -- new students?

22  A.      Usually it's between 650 to 700.

23  Q.      So it's a little less than the 750?

24  A.      It's around the ballpark.

25  Q.      And these books, to your knowledge, who were they

1    going to go to?

2    A.      To the parents.

3    Q.      The parents?

4    A.      Yes.

5    Q.      The parents of who?

6    A.      Of the children in the program.

7    Q.      Was it directed to new students or just any

8    students, do you know?

9    A.      I wasn't part of the process, but I believe -- I

10   don't know.

11   Q.      You were also shown by Mr. Farmer a series of

12   e-mails.  I don't want to go into too much, but

13   one included Government's Exhibit 4.  I'll refer to

14   Government's Exhibit No. -- do you recall Mr. Weisbrod

15   asking you on cross-examination since there was a delay

16   between two e-mails that it must not have been very

17   important to Mr. Jimenez?

18   A.      Yes.

19   Q.      Do you see on Government's Exhibit 4, which is an

20   e-mail from Defendant Melendez Santiago to you and it is

21   the April 22nd, 2010, 5:15 e-mail in which

22   Miss Melendez Santiago states the importance of the

23   message is high?

24   A.      Yes.

25   Q.      And you were also asked by Mr. Farmer if you had

1    conversation with Miss Mason about the books and you

2    recounted a conversation you had with her.

3    A.    Yes.

4    Q.    How many conversations did you have with

5    Miss Mason about the books?

6    A.    Several.

7    Q.    And what was the nature of those conversations?

8    A.    About getting the quotes.  Where was the

9    merchandise request for the books.

10   Q.    I'm sorry.  Anything else?

11   A.    Not that I can recall right now.

12   Q.    Did she ever mention why she was interested in

13   these books?

14   A.    I don't remember.

15   Q.    Now, you mentioned you expressed concerns to

16   Miss Mason about obtaining only one quote when Mr. Farmer

17   was asking you questions.  Do you remember that?

18   A.    Yes.

19   Q.    Why did you not express your concerns about the

20   conflict of interest to Miss Mason?

21   A.    Because I didn't feel comfortable.

22   Q.    Why not?

23   A.    Because of the information that was shared with

24   me prior to me knowing about the book.

25          MR. O'NEILL:  Nothing further, Your Honor,

1    thank you.

2           THE COURT:  All right.  Thank you, ma'am.

3    You may step down.  You're free to go.

4           Ladies and gentlemen, we're going to recess

5    for lunch.  It is ten minutes after 12:00.  We'll take an

6    hour and 15 minutes and we'll start again at 1:25.

7           I will ask again that you not discuss the

8    case with anyone -- among yourselves or anyone else.

9    Please leave your pads and your papers face down on your

10   chairs and we'll start promptly at 1:25.  Thank you.

11          COURT SECURITY OFFICER:  All rise, please,

12   for the jurors.

13      (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

14          THE COURT:  You may be seated.  I just had

15   one follow-up question about Mr. Finney.  In order to --

16   Mr. Allen is here.  I did call the Federal Public

17   Defender's Office and said that we may have a problem.  I

18   wasn't quite sure when the witness was going to testify.

19          Mr. O'Neill, you have any better idea when

20   you expect Mr. Finney to testify now?

21          MR. O'NEILL:  Your Honor, he might be one of

22   those bubble witnesses either, you know, late today,

23   early tomorrow depending on the cross-examination and

24   length of these witnesses.

25          THE COURT:  Okay.  And -- and you brought

1   that to my attention earlier because you indicated to me

2   that Mr. Finney had taken the Fifth in front of the grand

3   jury.

4           MR. O'NEILL:  Yes, Your Honor.

5           THE COURT:  Okay.  And --

6           MR. O'NEIL:  As I told counsel, according to

7   Mr. Finney he was represented by counsel at the grand

8   jury stage.  He was subsequently -- another attorney

9   contacted me after the grand jury stage to say she then

10  represented him.  I have not heard back from her.

11          The agent has been in touch with Mr. Finney

12  to schedule his appearance and he has not mentioned an

13  attorney.  I have not spoken to him.

14          THE COURT:  Okay.  So he may or may not have

15  an attorney?

16          MR. O'NEILL:  Correct, Judge.  I just

17  thought that might help.

18          THE COURT:  But you don't expect him to take

19  the Fifth here?

20          MR. O'NEILL:  Based on his questions to the

21  agent, no.  But I think in an abundance of caution we

22  need to do that outside the presence of the jury, Your

23  Honor.

24          THE COURT:  Okay.  And, uhm, the government

25  hadn't given him any kind of immunity or anything of

1  that --

2          MR. O'NEILL:  No, Your Honor.

3          THE COURT:  Okay.

4          MR. O'NEIL:  I don't believe it's a valid

5  invocation of the privilege for the questions asked.

6          THE COURT:  All right.  Okay.

7          MR. ALLEN:  Your Honor, would the Court just

8  like me to be here by say 3:30, 3 o'clock?

9          THE COURT:  I'm sorry?  I couldn't hear you.

10          MR. ALLEN:  Would the Court like me just to

11  be present -- my afternoon is free probably after 3:00 --

12  to just come back to Court around 3:30 and be here?

13          MR. O'NEILL:  I believe we have three or

14  four witnesses before Mr. Finney.

15          THE COURT:  Would you -- we can always call,

16  Mr. Allen.  Perhaps that will save you a trip.  And if

17  you would like because if he's not going to testify this

18  afternoon then it would be a wasted trip.

19          MR. ALLEN:  That's fine, Your Honor.  I

20  should be at the office the rest of the afternoon.

21          THE COURT:  Okay.  Thank you.

22          Anything else?

23          MR. O'NEILL:  Not from the government, Your

24  Honor.

25          THE COURT:  All right.  We're in recess then

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    till 1:25.

2    (THEREUPON, THE LUNCHEON RECESS WAS TAKEN, AND THEN THE

3         PROCEEDINGS CONTINUED AS FOLLOWS:)

4         COURT SECURITY OFFICER:  All rise, please,

5    for the Court.  This Honorable Court is again in session.

6    Please be seated.

7         THE COURT:  All right.  You said the jurors

8    are back?

9         COURT SECURITY OFFICER:  Yes, ma'am.

10         THE COURT:  Did you have an opportunity to

11    listen to the tape -- or the CD -- or the DVD?

12         MR. WEISBROD:  No.

13         THE COURT:  Okay.  All right.

14         MR. O'NEILL:  Judge, we won't -- with the

15    witnesses we won't get to that today.  So --

16         THE COURT:  Okay.  I did -- I did listen to

17    it.

18         MR. WEISBROD:  I do have one different

19    matter that relates to the Motion in Limine we did last

20    week with the -- we've not been objecting this morning to

21    the conflict of interest testimony because it's our

22    understanding that the Court is allowing that into

23    evidence through intent to defraud.

24         THE COURT:  Well, as I said, I think we're

25    all in agreement what the Scoing (phonetic) case said as

SANDRA K. LEE, RPR   OFFICIAL UNITED STATES COURT REPORTER

1    far as honest services that it cannot rest solely on

2    conflict of interest.  There's got to be a kickback or

3    bribery.  I just felt that it could be evidence of that.

4                    MR. WEISBROD:  And that -- so that's why

5    we've not been objecting because of the Court's prior

6    ruling.

7                    THE COURT:  All right.  Okay.  Would you

8    bring the jury in.

9                    COURT SECURITY OFFICER:  Yes, Your Honor.

10                   THE COURT:  Who's your next witness?

11                   MR. O'NEILL:  Nolan Estes, Your Honor.

12                   THE COURT:  Thank you.

13                   COURT SECURITY OFFICER:  All rise, please,

14    for the jury.

15        (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

16                   COURT SECURITY OFFICER:  Thank you, ladies

17    and gentlemen.  Please be seated.

18                   THE COURT:  Mr. O'Neill, you may call your

19    next witness.

20                   MR. O'NEILL:  Your Honor, the government

21    calls Nolan Estes.

22                   THE COURT:  Sir, if you'll come forward to

23    be sworn.

24                   And, Miss Vizza, would you swear Mr. Estes

25    in.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          COURTROOM DEPUTY CLERK:  Please raise your

2     right hand.

3          Do you solemnly swear or affirm under

4     penalty of perjury that the testimony you shall give in

5     this cause shall be the truth, the whole truth, and

6     nothing but the truth, so help you God?

7          THE WITNESS:  I do.

8                         **NOLAN ESTES,**

9     a witness, having been duly sworn to tell the truth, the

10    whole truth and nothing but the truth, was examined and

11    testified as follows:

12         COURTROOM DEPUTY CLERK:  Please be seated.

13         Please state your full name for the record

14    and spell the last for the record.

15         THE WITNESS:  Nolan Thomas Estes, N-O-L-A-N,

16    T-H-O-M-A-S, E-S-T-E-S.

17         MR. O'NEILL:  May I inquire, Your Honor?

18         THE COURT:  Mr. O'Neill.

19                    <u>DIRECT EXAMINATION</u>

20    BY MR. O'NEILL:

21    Q.    Mr. Estes, I'm going to ask you a series of

22    questions.  I'd ask you to speak into the microphone so

23    that everyone in the courtroom can hear you, sir.

24    A.    Okay.

25    Q.    Are you currently employed?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    A.      Yes, I am.

2    Q.      How are you employed?

3    A.      With Office Solutions, Incorporated.

4    Q.      What is Office Solutions, Incorporated?

5    A.      It's a self publishing company that is located in

6    Bloomington, Indiana.

7    Q.      When you say "a self publishing company," could

8    you describe that concept to us that do not understand.

9    A.      Yeah.  Anybody who would like to put material, a

10   manuscript together to turn it into a book and have it

11   published and distributed can do so.

12   Q.      Physically how does that work?

13   A.      We get a digital manuscript and turn that into

14   print file, and that print file is sent to the printer

15   and then the prisoner can then print the book when it is

16   ordered, so it's called print on demand technology.

17   Q.      How long have you been with your current company?

18   A.      About three years.

19   Q.      And prior to that for whom did you work?

20   A.      Prior to that I was at Indiana University.

21   Q.      Okay.  So that was your first job after

22   graduating from college?

23   A.      Yes.  I went back to school, but yes.

24   Q.      Okay.  Now, Mr. Estes, we've heard during the

25   course of this case testimony concerning Xlibris.  What

1    is that?

2    A.      That is an imprint with Office Solutions.  It

3    also prints books and distributes them.  Office Solutions

4    is the parent company and Xlibris is the sister company.

5    Q.      And what is your relationship to Xlibris?

6    A.      I was a book consultant.  So when an author would

7    want to buy their book and have it for resale they would

8    call me.

9    Q.      Are you familiar with an author by the name of

10   Johana Melendez Santiago?

11   A.      Yes.

12   Q.      Did you ever physically meet Miss Melendez

13   Santiago?

14   A.      No, I did not.

15   Q.      How did you first come upon being introduced to

16   or speaking with Miss Melendez Santiago?

17   A.      She would have called in or I would have called

18   her to introduce myself as her book consultant.  But she

19   had a previous book consultant before me.

20   Q.      Who was also employed by Xlibris and Office

21   Solutions?

22   A.      Correct.

23   Q.      Is Xlibris also a self publishing company?

24   A.      Yeah, it is, yeah.  Office Solutions purchased

25   Xlibris along with the other sister companies they

1    already owned.

2    Q.    To your knowledge, did Miss Johana Melendez

3    Santiago have a -- a -- for lack of better words, a

4    contract with Xlibris where she was selling her book?

5    A.    That's correct.

6    Q.    When -- did there come a point in time when you

7    became involved in a sale of one of her books called

8    Travel Boy Helps Sebastian?

9    A.    Yes.

10   Q.    And was there an order placed for a certain

11   quantity of books?

12   A.    Yes, there was.

13   Q.    And do you recall when approximately that was?

14   A.    It's been about a year.

15   Q.    Okay.  A year ago?

16   A.    Uh-huh.

17   Q.    And do you recall approximately how many books

18   were ordered?

19   A.    Yeah, I'm familiar now.  It's 750.

20   Q.    Let me show you with the permission of the Court

21   a document that has been marked as Government's Exhibit 9

22   for purposes of identification only so I'd ask you not to

23   read it out loud at this time.  Just look at it, and I'd

24   ask you are you familiar with that document?

25   A.    Yes.  It is a typical invoice.

1  Q.    Okay.  And is that a typical invoice produced by

2  Xlibris while you were employed there?

3  A.    Yes.

4        MR. O'NEILL:  Your Honor, at this time I'd

5  move into evidence Government's Exhibit 9.

6        THE COURT:  Any objections?

7        MR. WEISBROD:  No objection.

8        THE COURT:  Receive into evidence 9.

9        (EXHIBIT 9 ADMITTED INTO EVIDENCE.)

10  BY MR. O'NEILL:

11  Q.    Mr. Estes, now that it's in evidence we can

12  publish it to the jury.  And you mentioned this is an

13  invoice and it's stated that, isn't it?

14  A.    Uh-huh.

15  Q.    And it mentions that the bill will go to whom?

16  A.    Johana Melendez.

17  Q.    And the books will be shipped to whom?

18  A.    Johana Melendez.

19  Q.    And does it give a corresponding address for her?

20  A.    Yes.

21  Q.    And what is the total amount of this invoice?

22  A.    $6,270.

23  Q.    And what is the price per book?

24  A.    $8.36.

25  Q.    Now, would this be the actual invoice that would

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   be sent to Miss Johana Melendez Santiago?

2   A.      Typically, yeah -- yes, uh-huh.  After it's --

3   the order is placed an e-mail is sent out for

4   confirmation directly to the author.

5   Q.      Mr. Estes, prior to that invoice had you sold any

6   other books on behalf of Miss Melendez Santiago?

7   A.      Yes.  There was another author discount order for

8   I believe about 150 books.

9   Q.      And do you recall when that was?

10  A.      About six months before.

11  Q.      Six months earlier?

12  A.      (Nods.)

13  Q.      Now, let me show you what has previously been

14  entered into evidence as Government's Exhibit 10.

15          MR. O'NEILL:  And just so it's clear if I

16  may approach the witness, Your Honor?

17  BY MR. O'NEILL:

18  Q.      Is that the book that was produced by Xlibris?

19  A.      Yes.

20  Q.      Okay.  I would also now show you what's been

21  marked and placed into evidence as Government's

22  Exhibit 1.  It's already in evidence so we can refer to

23  it.  You may not be familiar with it.  It's a merchandise

24  request form from Hillsborough County.  But attached --

25  if you turn it over, there is a quote from Reading For

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Little Scientists.  Do you see that?

2    A.    Yes.

3    Q.    Are you familiar with that company?

4    A.    No.

5    Q.    Do you see the address 6212 Soaring Avenue?

6    A.    Yes, I do.

7    Q.    Are you familiar with that address?

8    A.    Yes.

9    Q.    Okay.  And what address is that?

10   A.    The one from the other invoice.

11   Q.    The one on the invoice from Xlibris.

12   A.    Johana Melendez, yeah.

13   Q.    If you would turn over one page again.  And let

14   me show it to the jury.  I apologize.  There is also a

15   Xerox copy of what appears to be a computer printout

16   concerning Amazon.  Do you see that, sir?

17   A.    Yes, I do.

18   Q.    What -- can you explain for us what is the

19   relationship between a company like Xlibris and Amazon.

20   A.    We provide distribution and that distribution is

21   partnered with two companies, Baker and Taylor and

22   Ingram.  And those distribution channels connect to

23   Amazon and then our books are available on Amazon through

24   these resellers.

25   Q.    You said you provide distribution.  Was that fair

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   to say?

2   A.      (Nods.)

3   Q.      Are you the exclusive distributor for this book?

4   A.      Again, we're partnered with two distribution

5   channels and they have the best access to national,

6   international distribution.

7   Q.      I guess what I'm trying to ask is, would someone

8   else be producing this book other than Xlibris?

9   A.      No.  That is, it's through our files.  It always

10  gets our stamp.

11  Q.      Okay.  I'm going to ask you again to pull that

12  microphone just a little --

13  A.      Sorry.

14  Q.      That's all right.

15          So there is a -- and correct me with a -- is it

16  called a master file for the book?

17  A.      Yes, it's a master file, yeah.

18  Q.      And who has physical possession of that?

19  A.      The printers that we are partnered with have this

20  file.

21  Q.      Are there contractual relationships --

22  A.      Yes, there are.

23  Q.      -- between Xlibris and those companies?

24  A.      Yes.

25  Q.      So again not putting words in your mouth, but

1    would Xlibris then be the primary or only -- not

2    distributor.  That's a bad word again.  Publisher?

3    A.      Originator, yes.

4    Q.      Originator for the book?

5    A.      Yeah.

6    Q.      Okay.  Well, then the reason why I'm asking those

7    preliminary questions, on this Xerox there's a price of

8    25.32 per book.  Do you see that?

9    A.      Yes.

10   Q.      And the invoice that we entered into evidence

11   showed a price of $8.36 per book?

12   A.      Correct.

13   Q.      And it's the same book, is it not?

14   A.      That's correct, yeah.

15   Q.      Would you be able to again explain to us what's

16   the difference in the cost.

17   A.      Sure.  So an author discount is determined based

18   on how many books an author is ordering at one time.  So

19   the more that they order, the less the cost of the book

20   is.  And they ordered 750, so they had a percentage

21   discount that was greatly increased from this.  This is a

22   retailer price after the retailer is getting paid a

23   percentage, the author gets a percentage of royalty and

24   the production costs that goes back to Xlibris.

25   Q.      So this is still an Xlibris book, but it goes --

1    this is being marketed by the retailer now?

2    A.       Correct.

3    Q.       Okay.  And then if I could direct your attention

4    to several more pages down in that document, it's an

5    e-mail, and at the top would be Navejar, Idalin.  And

6    there's one from you to her, an e-mail.  Do you see that,

7    sir?

8    A.       I do.

9    Q.       And is that dated May 3rd, 2010, at 1:46 p.m.?

10   A.       Yes.

11   Q.       Can you explain -- in this e-mail you're writing

12   to Idalin Navejar.  Could you just read it quickly.

13   A.       Yes.  "For the book by Johana Melendez Santiago,

14   Travel Boy Helps Sebastian (speaking Spanish), book ID

15   65943 --

16            COURT REPORTER:  I'm sorry?

17   A.       Oh, the following reseller quotes are good for

18   seven working days, May 3rd being the first day.  750

19   paperbacks, $12 per copy, $390 shipping and handling

20   totalling 9,390.

21            800 paperbacks, 11.39 per copy, 400 shipping and

22   handling, totalling $9,512.

23            1,000 paperbacks, 11.39 per copy.  $450 shipping

24   and handling, totalling $11,840.

25            1,300 paperbacks, 11.39 per copy.  $500 shipping

1    and handling, totalling $15,307.

2    Q.      And this e-mail comes from you.  And your

3    signature block is at the bottom of that.  Is that fair

4    to say?

5    A.      That's correct.

6    Q.      Okay.  Mr. Estes, how did this e-mail come about?

7    How was it that you knew to send this to Idalin Navejar?

8    A.      I was given Idalin Navejar's phone by the author.

9    Q.      Is that Johana Melendez Santiago?

10   A.      Yes.

11   Q.      And were you given a range of -- I mean how did

12   it come about with these numbers?  Could you explain that

13   to us.

14   A.      Yes.  These are discounts offered to the Head

15   Start program as an organization.  And this is something

16   our management will do to allow an organization to save

17   some money from the retail price.

18   Q.      And is it fair to say that as you buy more books,

19   the price goes down?

20   A.      Yes.

21   Q.      Why did you give four different amounts with four

22   different prices as opposed to the amount that ultimately

23   comes on the invoice?

24   A.      We would have discussed that and given what might

25   be of interest to the author.

1    Q.    And when you say "we would have discussed that,"

2    with whom would you have discussed that?

3    A.    With the author.

4    Q.    Miss Melendez Santiago?

5    A.    Yes.

6          MR. O'NEILL:  If I may approach the witness,

7    Your Honor.

8          Your Honor, I have no further questions.

9          THE COURT:  All right.  Mr. Weisbrod.

10         MR. WEISBROD:  Yes, thank you, Your Honor.

11         THE COURT:  If the noise interferes with

12   your hearing let us know and we'll send somebody out and

13   tell them to stop.

14                    CROSS-EXAMINATION

15   BY MR. WEISBROD:

16   Q.    Good afternoon, sir.

17   A.    Good afternoon.

18   Q.    I confess I got lost in the discussion of

19   publishing houses.

20         If an author contracts with your company to be

21   their publisher is that generally an exclusive contract?

22   A.    It is.  Once they submit the manuscript and it's

23   been completed, we call that live.  Then what they've

24   submitted to us is exclusive, and their original

25   manuscript they retain the rights to that.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    And would you say that that's standard in the
2    publishing industry?
3    A.    For self publishing it's standard.  There are
4    variations.
5    Q.    All right.  Now, so with Xlibris publishing this
6    book, as I understand your testimony, there is going to
7    be a direct purchase from Xlibris as one method of buying
8    a book; correct?
9    A.    Correct.
10   Q.    You could purchase directly from the author if
11   the author purchased from Xlibris; correct?
12   A.    Correct.
13   Q.    And depending upon how much the author marked up
14   or -- or depending on how much they marked up their price
15   that might be the cheapest one out there; right?
16   A.    I'm not sure.
17   Q.    Well, the price that Xlibris sells the book --
18   the printing of the book to the author is going to be the
19   lowest number out there; right?
20   A.    Yes.
21   Q.    On a per book basis?
22   A.    Yeah, traditionally, yes.
23   Q.    And then the agreement you have with these two
24   distribution channels, they're going to sell the book at
25   a higher price; is that correct?

1   A.      That's right.

2   Q.      And then another level further, Amazon, they're

3   going to mark it up yet again?

4   A.      That's right.

5   Q.      And given the exclusivity that you demand in

6   connection with manuscripts that's all that's out there

7   for this book; correct?

8   A.      That's correct.

9   Q.      And so the author selling at a discount lower

10  than the price you quoted to Head Start would be the best

11  possible price out there; correct?

12  A.      Could you say that one more time.

13  Q.      Yeah.  That really wasn't clear.

14          Let me show you an Exhibit 1 -- Government's

15  Exhibit 1 in evidence.  The lowest price there is 9,390;

16  correct?

17  A.      Correct.

18  Q.      And that's the -- for at least 750 paperbacks

19  that's the lowest that Xlibris could give it to -- or

20  sell it to Head Start for; right?

21  A.      Correct.

22  Q.      All right.  And as it turned out, that

23  transaction didn't occur because the author discounted

24  the shipping cost and it was bought for less money?

25  A.      It didn't occur.  But it was a whole different

1    price structure, an author discount price structure

2    instead.

3    Q.    Right.

4          But in -- in Government's Exhibit No. 9 you don't

5    charge the author for shipping; correct?

6    A.    That is correct, yeah.

7    Q.    All right.  So if the author wishes to pass that

8    benefit on to the ultimate purchaser, she may?

9    A.    Correct.

10   Q.    No contractual limitation?

11   A.    She can resell her book.

12   Q.    Now, no one ever told you that your quotes had to

13   be under $10,000, did they?

14   A.    No.

15   Q.    Because you've got two quotes on there that are

16   above $10,000; right?

17   A.    That's correct.

18   Q.    And that quote came on Monday, May 3rd, at

19   1:46 p.m.?

20   A.    Correct.

21   Q.    I'm going to show you now what's in evidence as

22   Government's Exhibit No. 4.  And that's an e-mail on

23   May 3rd of 9:26 a.m.; is that correct?

24   A.    Correct.

25   Q.    And the body of that e-mail talks about needing

1   quotes under $10,000.  Do you see that?

2   A.      Correct, yeah, I see that.

3   Q.      And that was an e-mail from the Idalin Navejar

4   person to Johana Melendez; right?

5   A.      Right.

6   Q.      So that e-mail goes out roughly four hours before

7   you send an e-mail back to Miss Navejar with two quotes

8   above $10,000 and two below $10,000; right?

9   A.      Correct.

10  Q.      Okay.

11          MR. WEISBROD:  I have nothing further.

12  Thank you, Your Honor.

13          THE COURT:  All right.  Mr. Brown.

14          MR. BROWN:  Thank you, Your Honor.

15                  CROSS-EXAMINATION

16  BY MR. BROWN:

17  Q.      Good afternoon.

18  A.      Good afternoon.

19  Q.      How do you determine the price for a book?

20  A.      It's based on the production cost, which is page

21  count, format, color, black and white, dimensions.

22  Q.      And you actually have a catalog, do you not, of

23  your books?

24  A.      Yes, we do.

25          MR. BROWN:  Approach the witness, Your

 1    Honor?

 2                THE COURT:  You may.

 3    BY MR. BROWN:

 4    Q.     I'm showing you what's marked as Defendant's

 5    Exhibit 37.  Do you recognize this book?

 6    A.     Yeah.  It's similar to the books I've seen that

 7    we have.  This exact one I haven't seen.

 8    Q.     Is it published by your --  is it a book by your

 9    company?

10    A.     Yes, it is.

11    Q.     Okay.  And is it a book -- an annual book catalog

12    for 2010?

13    A.     Yeah.  It's for an exhibition so not all books

14    are in here.

15    Q.     Some of the books are?

16    A.     Yes.

17    Q.     All right.  And would you say this is a fair and

18    accurate -- or the same or substantially the same

19    condition as one of your other catalog books?

20    A.     Yes, for the exhibitions, yeah.

21    Q.     In other words, it's a book by your company?

22    A.     It's different.  It's not a book.  It's not an

23    actual book, but --

24    Q.     Catalog?

25    A.     -- yes, it's a catalog from our company.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          MR. BROWN:  Your Honor, at this time I move

2     into evidence what is marked Exhibit Defendants' 37.

3          MR. O'NEILL:  No objection, Your Honor.

4          THE COURT:  Receive into evidence Defendant

5     Santiago Melendez' 37.

6          (EXHIBIT 37 ADMITTED INTO EVIDENCE.)

7          MR. BROWN:  May I publish, Your Honor?

8          THE COURT:  Or Melendez Santiago.  Yes.

9     BY MR. BROWN:

10    Q.     This is what we were just looking at, you and I;

11    correct?

12    A.     Correct.

13    Q.     And if you turn into -- on to Page 133 in this

14    catalog you actually will see this book, Travel Boy helps

15    Sebastian, do you not?

16    A.     Yes, you do.

17    Q.     And it lists a soft cover price of 18.99 and a

18    hard cover price of 24.99, does it not?

19    A.     Yes, it does.

20    Q.     And then it has a little synopsis about what the

21    book is about, learning and fun awaits readers with the

22    release of Johana Melendez Santiago's latest bilingual

23    picture book; right?

24    A.     Correct.

25    Q.     Now, if somebody wanted to purchase this book

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    from this catalog they would contact you, correct, or

2    somebody at --

3    A.    Not myself, no.

4    Q.    Somebody at the company?

5    A.    Someone at the company, yeah.

6    Q.    And you would sell them this if they wanted soft

7    covers for 18.99?

8    A.    Yes.

9    Q.    Now, would you offer a discount on that?

10   A.    No.

11   Q.    All right.  Now, you had made a statement that

12   you said that your management I believe had agreed to

13   give a discount on this book on the quote to Head Start.

14   A.    Correct.

15   Q.    What did you mean by that?

16   A.    An organizational discount that at their

17   discretion they can give on a potential order for an

18   organization.

19   Q.    Okay.  So in this case, for instance, you found

20   out that Head Start was interested in purchasing the book

21   and you were able to offer them a discount because they

22   are Head Start?

23   A.    Yes.

24   Q.    And that's why the price that they were

25   offered -- or quoted wasn't 18.99?

1    A.    Correct.

2    Q.    Now, obviously the author can offer to sell the

3    books to whoever the author wants; correct?

4    A.    Correct.

5    Q.    And can the author also give a discount?

6    A.    They can sell for whatever they want, yes.

7    Q.    All right.  Well, they can sell it for whatever

8    they want as long as they pay your production costs?

9    A.    Yes.

10    Q.    Okay.  In other words, they can't just turn

11    around -- well, I guess they could sell it for $2 if they

12    wanted, but they're still paying you to print the books?

13    A.    Yes, they're still paying us with a minimum

14    author discount.

15    Q.    Okay.  And when we saw Government's Exhibit

16    No. 9, this price of 6,270 that's your cost to the

17    author; correct?

18    A.    Right, that's the cost to the author.

19    Q.    Right.

20          And the author can turn around and sell the books

21    for whatever they want, but they still have to pay this

22    cost for 750 of these?

23    A.    Correct.

24    Q.    So any profit that they're making would have to

25    be obviously on top of this?

1    A.    Correct.

2    Q.    Well, and I guess if we know that they have sold

3    the book to Head Start for $9,000, it's safe to say that

4    the author would then have a cost of 6,270 towards that;

5    right?

6    A.    Correct.

7    Q.    And when you put the quote in for 750 books I

8    think at the price of $12 per copy was that about

9    63 percent off the retail price?

10   A.    $12 a copy off of -- was it 24.99 or --

11   Q.    I think it was 18.99.

12   A.    1899.  I'm going to guess 40 percent.  I don't

13   have a calculator.

14   Q.    Okay.  It's not unusual though that an author may

15   discount the book; right?  I don't want to leave this

16   jury with an impression that that's something that never

17   happens.  Authors can discount books?

18   A.    Yes.  They can sell them for as much or as little

19   as they want.

20   Q.    That's not unusual; right?

21   A.    No, it's not.

22            MR. BROWN:  Nothing further, Your Honor.

23            THE COURT:  Mr. Farmer.

24            MR. FARMER:  No questions, thank you.

25            THE COURT:  Mr. O'Neill.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          MR. O'NEILL:  Briefly Your Honor.

2         REDIRECT EXAMINATION

3  BY MR. O'NEILL:

4  Q.    Mr. Estes, during the course of examination of

5  Mr. Weisbrod you mentioned an author discount price

6  structure.  Could you just explain that term for us.

7  A.    Yes.  If they order one to nine copies it's a

8  30 percent discount.  10 to 24, 35 percent discount.  So

9  it's a five percent increment on 25, 50, 100, 250, 500

10  copies.

11  Q.    Now, Mr. Brown during cross-examination asked you

12  about the soft cover books that were in the catalog I

13  belief for 18.99.  And then there were the hard cover

14  ones again I believe for 24.99.  Do you remember those

15  questions?

16  A.    Yes, I do.

17  Q.    Did -- has Xlibris ever sold any of the soft

18  cover for 18.95 on behalf of Miss Johana Melendez

19  Santiago?

20  A.    I don't know.  I don't have the records.

21  Q.    Okay.  And how about the hard covers?

22  A.    I don't know.

23  Q.    You mentioned during your direct examination that

24  150 books were sold previously.

25  A.    Yes.  I sold with the author.  She bought 150

1    books with the author discount.

2    Q.      Okay.  So she had bought those books?

3    A.      Uh-huh.

4    Q.      Okay.  Other than that, did you ever sell any

5    other books on her behalf?

6    A.      I do know in the files there are other orders in

7    the past with other book consultants.

8    Q.      Do you know the amounts?

9    A.      I don't recall exactly.  Nothing over 150 I

10   think.

11              MR. O'NEILL:  Thank you, sir.

12              THE COURT:  All right.  Thank you,

13   Mr. Estes.  You may step down.

14              THE WITNESS:  Okay.  Thank you.

15              THE COURT:  You may call your next witness.

16              MR. O'NEILL:  Your Honor, government calls

17   Linda Edman.

18              THE COURT:  Miss Edman, if you'll come

19   forward, please, to be sworn.

20              And, Miss Vizza, would you swear her in.

21              COURTROOM DEPUTY CLERK:  Yes, Your Honor.

22              Please raise your right hand.

23              Do you solemnly swear or affirm under the

24   penalty of perjury that the testimony you shall give in

25   this cause shall be the truth, the whole truth, and

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    nothing but the truth, so help you God?

2              THE WITNESS:  I do.

3                      **LINDA EDMAN,**

4    a witness, having been duly sworn to tell the truth, the

5    whole truth and nothing but the truth, was examined and

6    testified as follows:

7              COURTROOM DEPUTY CLERK:  Please be seated.

8              Please state your full name and spell the

9    last for the record.

10             THE WITNESS:  Linda Williams Edman,

11   E-D-M-A-N.

12             THE COURT:  Mr. O'Neill.

13             MR. O'NEILL:  Thank you, Your Honor.

14                   <u>DIRECT EXAMINATION</u>

15   BY MR. O'NEILL:

16   Q.    Good afternoon, Miss Edman.

17   A.    Good afternoon.

18   Q.    Miss Edman, I'm going to ask you a series of

19   questions.  We really need to you speak into the

20   microphone which is in front of you.  And it's moveable

21   if you need it so that everyone can hear you.

22             Ma'am, are you currently employed?

23   A.    No, sir.

24   Q.    Are you retired?

25   A.    I'm retired.

1   Q.      And how long have you been retired?

2   A.      I retired June 30th, 2011.

3   Q.      2009?

4   A.      '11.

5   Q.      '11.  I'm sorry.

6           And, Miss Edman, prior to your retirement where

7   did you work?

8   A.      I worked for the Family and Aging Services,

9   Hillsborough County Head Start.

10  Q.      And how long did you work for Head Start with the

11  county?

12  A.      It was ten years.

13  Q.      And prior to that were you a county employee in

14  other divisions?

15  A.      Yes, sir.

16  Q.      Approximately how many years did you work for the

17  county, ma'am?

18  A.      Less than 40.

19  Q.      Now, when you worked for Head Start what was your

20  job title?

21  A.      Accounting clerk three.

22  Q.      Okay.  Now, as an accounting clerk three what

23  were your duties and responsibilities.  Could you relate

24  that to the ladies and gentlemen of the jury.

25  A.      I processed payments and -- for the services

1    rendered or the merchandise we bought for the program.

2    Q.    And when you say processing it, how did you do

3    that?

4    A.    Well, first we get a merchandise request form for

5    the services and then we would provide the services.

6    That was our agreement to pay for the services or the --

7    I'm sorry.

8         The services or goods that we were purchasing

9    through a vendor we would have to do a purchase order,

10   which is our agreement.  And when the service was

11   fulfilled we would do -- get the invoice and process it

12   and send it to the Board of County Commissioners

13   accounting for a check to be processed for payment.

14             MR. O'NEILL:  Permission to approach?

15   BY MR. O'NEILL:

16   Q.    Miss Edman, I will show you what's already been

17   marked into evidence -- admitted into evidence as

18   Government's Exhibit 1.  And you see the teleprompter in

19   front of you?

20   A.    Yes, sir.

21   Q.    Is that a merchandise request form?

22   A.    It's a merchandise request form.

23   Q.    And are you familiar with this one for 750

24   bilingual children books in the amount of $9,000?

25   A.    Yes, sir.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  Q.      And do you see signatures on the approval line

2  dated May 3rd, 2010?

3  A.      Yes, sir.

4  Q.      And do you recognize the signature above the

5  line?

6  A.      Marie Mason.

7  Q.      And do you recognize the signature below the

8  line?

9  A.      Louis Finney.

10  Q.      And, Miss Edman, what was -- what would be your

11  role as an accounting clerk three in this merchandise

12  request form?

13  A.      My role would be to generate a purchase order

14  following the procurement manual as far as making sure we

15  have the approval -- well, actually if it's over a

16  thousand dollars we had to get at least three quotes and

17  to process it as a purchase order, which is that

18  agreement I told you about.

19  Q.      Ma'am, I just want to put up on the screen --

20  there is the book here and this was a subject of that

21  MRF.  And have you seen this book before?

22  A.      Not the actual book.

23  Q.      Okay.  And so you never saw this actual book?

24  A.      No, sir.

25  Q.      Now, Miss Edman, I'm going to start -- you just

spoke about a purchase record.  And with the permission
of the Court I will show you what's been marked as
Government's Exhibit 11 first.  Since it is not in
evidence I'd ask that you not read from it now but just
look at it and read it to yourself.

A.      Uh-huh.

Q.      Is this the purchase order for the book that we
were just talking about?

A.      Yes, it is.

Q.      And did you play a role in producing this
document?

A.      I did.

        MR. O'NEILL:  Your Honor, at this time I'd
move into evidence Government's Exhibit 11.

        THE COURT:  Any objections?

        MR. WEISBROD:  If I could have just a
moment.

        May I voir dire?

        THE COURT:  Yes, sir.

                VOIR DIRE EXAMINATION

BY MR. WEISBROD:

Q.      Miss Edman, the document you have --  let me
start over.

        There are departmental purchase orders and
purchase orders; correct?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
 1    A.      Yes, sir.

 2    Q.      And when it's -- a purchase is under $10,000,

 3    that's actually a departmental purchase order; correct?

 4    A.      It is.

 5    Q.      And there's a form that says purchase order on

 6    it, right, preprinted?

 7    A.      Yes, sir.

 8    Q.      Now, there's no preprinted purchase order on that

 9    document, is there?

10    A.      No.  This is a copy.

11            MR. WEISBROD:  May I approach the witness,

12    Your Honor?

13            THE COURT:  You may.

14    BY MR. WEISBROD:

15    Q.      There's four total pages there; is that correct?

16    A.      Yes, sir.

17    Q.      And the front page is a computer printout showing

18    the actual processing of the purchase order; right?

19    A.      Yes, sir.

20    Q.      It's not the actual purchase order?

21    A.      No, it's not.

22    Q.      And the following documents are some computer

23    generated documents that again show the flow of the

24    purchase order but are not themselves the purchase order.

25    Is that fair to say?
```

1     A.      Yes, sir.

2             MR. WEISBROD:  Your Honor, I don't object to

3     the admission of the documents but they're not a purchase

4     order.

5             THE COURT:  All right.  With that

6     clarification I will receive it into evidence.  And

7     that's Government's Exhibit 11.

8             MR. O'NEILL:  Thank you, Your Honor.

9                       DIRECT EXAMINATION

10    BY MR. O'NEILL:

11    Q.      Miss Edman, since Her Honor has now put it into

12    evidence we can publish it to the jury and refer to it.

13            Do you see the handwriting on the top right-hand

14    corner?

15    A.      Yes, sir.

16    Q.      Do you recognize that handwriting?

17    A.      No, sir.

18    Q.      Let's go down to the body of this document.  What

19    I'd ask you to do is to explain -- excuse me.  Sorry.

20            I would ask you to explain the different

21    notations that we have.  And before you do, Linda Edman

22    is, of course, you, ma'am?

23    A.      Yes, sir.

24    Q.      Who is Carol Tedder?

25    A.      She's my immediate supervisor.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.      Okay.  So if we could start with the first

2    notation, May 26, 2010, at 10:45 a.m.   Under department

3    it says CS25.  Do you see that, ma'am?

4    A.      Yes, I do.

5    Q.      What does that mean?

6    A.      It's the level of approvement for the actual

7    payment to be posted.

8    Q.      And then it says user Linda Edman.

9    A.      Yes, sir.

10   Q.      What does that mean?

11   A.      That I'm the one who initiated it.

12   Q.      Okay.  And then it goes to the right of your

13   name.  It says level 100.

14   A.      Yes, sir.

15   Q.      And what is that referring to?

16   A.      That's the actual entry for the person that

17   entered it into the system.

18   Q.      And then there's approval status and it says

19   INIT.

20   A.      Initiator.

21   Q.      Okay.  And that's you again?

22   A.      Yes, sir.

23   Q.      Okay.  And not to go over this too much, but the

24   next line shows that a couple hours later the user was

25   Carol Tedder.

1    A.    Yes.

2    Q.    And now it says level 300.  What does that mean?

3    A.    Actually that's the supervisor under that

4    department area that usually signs off on it.

5    Q.    And next to that is the approval status.  It says

6    a different letter now, RJCT.

7    A.    Yes.  And that's the rejection.

8    Q.    Okay.  So at this point this was rejected?

9    A.    Yes, sir.

10   Q.    Now, it looks like after that at 4 o'clock that

11   day again we have you as the user at level 100 indicating

12   initiator again.

13   A.    Yes, sir.

14   Q.    Do you recall why it needed to be initiated

15   twice?

16   A.    From my recollection the sub object which is on

17   another page says 5401 had been changed, so I had put the

18   previous sub object on it, and she realized that and she

19   rejected it back so it could be changed.

20   Q.    Okay.  I'd ask you again to scoot a little closer

21   to that microphone.  I'm having a little difficultly.

22         On a previous page.  Could you point us to that.

23   A.    It's on the third page.

24   Q.    Okay.  And you mentioned a number, 5401, ma'am;

25   is that correct?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    A.      Yes, sir.

2    Q.      Okay.  I see that here.  And what does that

3    signify to you?

4    A.      That you're purchasing a book.

5    Q.      Now, was there a problem with putting that

6    number?

7    A.      It was only a problem because the previous year I

8    think it was 5501 and the new fiscal year they had

9    changed it.

10   Q.      So then did you -- after it was rejected did you

11   do something to make it comport with the current county

12   policy?

13   A.      I did.

14   Q.      What did you do?

15   A.      I changed it to the sub object that you show

16   there, 5401.

17   Q.      Okay.  Now, if we go back to the first page if we

18   could, then after you initiated the second time at

19   4:02 p.m. it shows Carol Tedder at level 300 AUTH.

20   A.      Yes, sir.

21   Q.      What does that mean?

22   A.      Actually that's the rate manager that's over the

23   area.  That's where they usually sign off if they're in

24   the office.

25   Q.      So is it required that a manager sign off on

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    this?

2    A.      Yes, sir.

3    Q.      And at that time who was your direct supervisor?

4    A.      Miss Carol Tedder.

5    Q.      The very next line shows a couple minutes later,

6    Miss Tedder, again.  There's an entry and it says CS10

7    this time.  Do you see that, ma'am?

8    A.      Yes, sir.

9    Q.      What does that mean?

10    A.      Actually that's her level.  It's the manager

11    level for the fiscal area.

12    Q.      And across now for level it has 400 for

13    Miss Tedder when in the previous instance it was 300.

14    A.      If I may, when she signed off at the 300 level

15    that was someone else level who was either not in the

16    office so she would have to sign off at a lower level.

17    Q.      Would it be fair to say a form like this required

18    both someone from the 300 and 400 level to sign off?

19    A.      Yes, sir.

20    Q.      Now, if we could go to the second page, does it

21    show that this document refers to the sale of the books

22    on behalf of the vendor, Johana Melendez Santiago?

23    A.      Yes, it does.

24    Q.      And again on Page 3 does it indicate the full

25    amounts here, which total $9,000?

1  A.      Yes, sir.

2  Q.      Now, Miss Edman, why is it that the $9,000 are

3  broken down into 8,190 in one instance and $810 in the

4  other?

5  A.      The index codes which are listed under index

6  reflects the funding source that we -- the monies come

7  from.

8  Q.      Okay.  And when you say "the funding source,"

9  what are you talking about?

10 A.      We have different codes that shows like this is

11 the R money or we have Head Start or Early Head Start

12 funds.

13 Q.      Now, you said this is the R money?

14 A.      Yes, sir.

15 Q.      And what do you mean by the R money?

16 A.      I don't -- it's a grant that we have gotten in

17 order to pay it.

18 Q.      You got a federal grant?

19 A.      A federal grant, yes.

20 Q.      And then on the last page what is the

21 significance, Miss Edman, of this page where it says

22 quotes?

23 A.      These are the quotes from the different vendors

24 that we got in order to show we did try to get the most

25 economical price for the material that we purchased.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.      So three quotes are one, Reading For Little

2    Scientists; two, Amazon.com and three, Xlibris Book

3    Consultant?

4    A.      Yes, sir.

5    Q.      With the permission of the Court I will approach

6    the witness with Government's Exhibit 12 for purposes of

7    identification.  Miss Edman, again since it's not in

8    evidence I'd ask you to just look at that before I ask

9    you questions.  Have you had a chance to look at that,

10   ma'am?

11   A.      Yes, sir.

12   Q.      Are you familiar with this form?

13   A.      I am.

14   Q.      And did you fill this form out?

15   A.      I did.

16           MR. O'NEILL:  Your Honor, at this time I'd

17   move into evidence Government's Exhibit 12.

18           THE COURT:  Any objections?

19           MR. WEISBROD:  No objection.

20           THE COURT:  Received into evidence 12 --

21   Government's 12.

22           (EXHIBIT 12 ADMITTED INTO EVIDENCE.)

23   BY MR. O'NEILL:

24   Q.      Miss Edman, with the permission of the Court we

25   will now publish it to the jury.  And who is the vendor

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    for which this form was filled out?

2    A.      Johana Melendez Santiago.

3    Q.      And how did it come about that you were involved

4    in filling out this form?  Please tell the ladies and

5    gentlemen of the jury how this came about.

6    A.      Any vendor who has not been set up previously or

7    we not done business with previously in our vendor

8    request form has to fill out one of this -- this form and

9    attach their W9 -- a signed W9 I should say.

10   Q.      And did you contact Miss Melendez Santiago?

11   A.      I did.

12   Q.      How did you know to contact her?

13   A.      The original merchandise request form would have

14   her contact information in order for us to get a signed

15   W9.

16   Q.      And did anybody put you in touch with her?

17   A.      I was told -- well, I did call the number that

18   was listed and she faxed it to me.

19   Q.      So she faxed you this form?

20   A.      Yes, sir.

21   Q.      The W9 that is attached on Page 2?

22   A.      Yes, sir.

23   Q.      And just briefly what is a W9 form?

24   A.      A W9 is a request for a taxpayer's identification

25   number.

1    Q.    And does it note Miss Melendez's name?

2    A.    It does.

3    Q.    And her business, Reading For Little Scientists?

4    A.    It does.

5    Q.    And the address, 6212 Soaring Avenue?

6    A.    Yes, sir.

7    Q.    Miss Edman, do you know if that's her home

8    address?

9    A.    It does appear to be, yes.

10   Q.    And does it appear to have the signature of

11   Miss Johana Melendez Santiago?

12   A.    Yes, sir.

13   Q.    Is that the date, May 20th, 2010, on the W9 form?

14   A.    Yes, sir.

15   Q.    And again on the front page, Miss Edman, does it

16   bear your signature and your phone number and extension.

17   A.    Yes, sir.

18   Q.    With the permission of the Court again I will

19   approach, Miss Edman.  I show you what's been marked

20   Government's Exhibit 13 for identification.  And I'd ask

21   you to look at that, ma'am.

22   A.    Yes, sir.  Okay.

23   Q.    Are you familiar with this document, ma'am?

24   A.    Yes, sir.

25   Q.    Okay.  And what is it?

1    A.    It's an invoice for reimbursement for the items

2    that we purchased through the purchase order.

3              MR. O'NEILL:  At this time I'd move into

4    evidence Government's Exhibit 13, Your Honor.

5              MR. WEISBROD:  No objections.

6              THE COURT:  Received into evidence

7    Government's 13.

8              (EXHIBIT 13 ADMITTED INTO EVIDENCE.)

9    BY MR. O'NEILL:

10   Q.    And just very briefly, Miss Edman, is this an

11   invoice?

12   A.    Yes, sir.

13   Q.    All right.  Is it dated June 14th, 2010?

14   A.    It is.

15   Q.    And over here on the top left-hand corner it says

16   Reading For Little Scientists and it gives the 6212

17   Soaring Avenue with the phone number.  Why is that

18   information included here?

19   A.    That's her doing business as.  That's the

20   company.

21   Q.    Again, with the permission of the Court,

22   Miss Edman, I'm going to show you Government's Exhibit 15

23   for identification purposes only.  I'd ask you to please

24   look at that and not say anything aloud yet.

25   A.    Okay.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   Q.      And, ma'am, are you familiar with this document?

2   A.      Yes, I am.

3   Q.      And what is it?

4   A.      It's a receiving report that we have received

5   goods that we have previously ordered on a merchandise

6   request form.

7              MR. O'NEILL:  At this time I'd move into

8   evidence Government's Exhibit 15, Your Honor.

9              MR. WEISBROD:  May I voir dire again

10  briefly?

11             THE COURT:  Sure.

12             MR. WEISBROD:  May I approach?

13             THE COURT:  You may.

14                VOIR DIRE EXAMINATION

15  BY MR. WEISBROD:

16  Q.      The first page of that exhibit is the actual

17  receiving report; correct?

18  A.      Yes, sir.

19  Q.      That's the document that we didn't have on the

20  departmental purchase order, right, the equivalent

21  document?

22  A.      Yes.

23  Q.      That's the form that you use to acknowledge

24  receiving the articles?

25  A.      Yes, sir.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    And in this case there's an attachment on the

2  second page which lists the actual number of boxes and

3  the total books being 750?

4  A.    Yes, sir.

5  Q.    All the documents past that are not what you

6  usually have in connection with a receiving report, are

7  they?

8  A.    The only other -- no, sir.

9  Q.    Those other documents are some computer generated

10  reports that you don't have any knowledge how they were

11  created, do you?

12  A.    Well, yes, yes.

13  Q.    Okay.  Well, tell me then about the third page.

14  A.    Okay.  The third page is the approval path that

15  the receiver goes through for posting.

16  Q.    Do you create the approval path?

17  A.    I don't create the approval path but I do do the

18  receiver.

19  Q.    You note -- let me just make sure I understand.

20  You note the receiving of the items on this third page

21  document?

22  A.    It's part of the receiver, yes, sir.

23  Q.    Okay.  All right.  What about the next page, Page

24  4?

25  A.    It's part of the receiver too.

1    Q.     Now, are the remaining documents part of the

2    receiving report that you generate?

3    A.     No, sir.

4           MR. O'NEILL:  Well, I would ask that those

5    documents not be included in the exhibit, Your Honor.  So

6    no objection to the first -- to the first three pages --

7    first four pages was it?

8           THE COURT:  I'm confused.

9    BY MR. WEISBROD:

10   Q.     The first four pages are part of the receiving

11   report; is that correct, Miss Edman?

12   A.     Yes, sir.

13   Q.     Okay.  And after that they're not --

14   A.     Not the actual receiver, no.  The path.

15   Q.     Right.

16          But these other documents from Page 5 on are they

17   part of what you create with the receiving report or

18   approval path?

19   A.     No, sir.

20          MR. WEISBROD:  I would object to those other

21   documents but not to the first four pages of the exhibit.

22          THE COURT:  All right.  Mr. O'Neill.

23          MR. O'NEILL:  No problem with that, Your

24   Honor.

25          THE COURT:  All right.  I'll receive into

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    evidence then Government's Exhibit No. 15, the first four

2    pages.

3                   (EXHIBIT 15 ADMITTED INTO EVIDENCE.)

4                   MR. O'NEILL:  Your Honor may I approach the

5    witness and just remove those?

6                   THE COURT:  You may.

7                         DIRECT EXAMINATION

8    BY MR. O'NEILL:

9    Q.      Miss Edman, since it is now in evidence, I think

10   you called this a purchasing report.

11   A.      Receiver, yes, receiver report.

12   Q.      Okay.  And, again, this is for the books that

13   we've been speaking about; correct?

14   A.      Yes, sir.

15   Q.      Mr. Weisbrod during his voir dire mentioned on

16   Page 2 it lists the boxes and the number of books

17   received.

18   A.      Yes, sir.

19   Q.      Okay.  Then on Page 3 there's handwritten

20   notation on the top saying receiver.  Do you see that?

21   A.      Yes, sir.

22   Q.      Do you recognize that handwriting?

23   A.      No.

24   Q.      And then when you come down to the body of that,

25   Miss Edman --

1    A.      Yes.

2    Q.      -- there appears to be two notations, one June

3    15th, 2010, at 3:16 p.m., CS25.  Is that your department?

4    A.      Yes, sir.

5    Q.      It has your name, and it says level 100 and again

6    initiation.

7    A.      Yes, sir.

8    Q.      And what does that mean to you?

9    A.      That I initiated the receiver after receiving an

10   invoice for payment.

11   Q.      What does the receiver do?  When you initiate the

12   receiver, what does that mean?

13   A.      It means that I received -- someone in the

14   department has received the goods and the invoice and our

15   method of paying is a three way match.

16   Q.      Okay.  So payment is going to be coming down the

17   road?

18   A.      Yes, sir.

19   Q.      Now, the next notation has the following day at

20   11:59 a.m., ES10 department.  Which department is that?

21   A.      It is the program management department.  It's

22   the same department.

23            THE COURT:  It's the what?  I'm sorry?  It's

24   the program -- I'm sorry.  We --

25            THE WITNESS:  It's the same department but

1    it's program management.  Different area.

2              THE COURT:  Thank you.

3    BY MR. O'NEILL:

4    Q.     Miss Edman, the next is Jimenez, Michael?

5    A.     Yes, sir.

6    Q.     And at that point what is his relationship to

7    you?

8    A.     He was the manager of the fiscal area, the

9    manager.

10   Q.     And we have along to the right now level 400.

11   What does that indicate?

12   A.     That indicates that he is at the level for a

13   certain amount of authorization for payment.

14   Q.     And what would that level be?  Do you know the

15   amounts of money for level 400?

16   A.     It's up to 5,000 I believe -- I'm sorry.  On a

17   receiver it can be up to the -- not exceeding the 10,000.

18   Q.     Up to $10,000?

19   A.     Yes.

20   Q.     And then it says for approval status auth -- or

21   authorizing I guess.  Is that --

22   A.     Yes, sir.

23   Q.     Okay.  And then there's days out one.  Is that

24   just a function for the office?

25   A.     I initiated one day and it took another day

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    before he actually processed it or signed off on it.

2    Q.    Thank you, ma'am.

3            MR. O'NEILL:  Your Honor, I have no further

4    questions of the witness.  May I retrieve the exhibits?

5            THE COURT:  Yes.

6            Mr. Weisbrod.

7            MR. WEISBROD:  Thank you, Your Honor.

8            THE COURT:  14 is not in.

9                    DIRECT EXAMINATION

10   BY MR. WEISBROD:

11   Q.    Good afternoon.

12   A.    Good afternoon.

13   Q.    Let's look again at Government's Exhibit 15 in

14   evidence shall we, please.

15   A.    Yes, sir.

16   Q.    Now, this receiving report is done after the

17   county has received goods or services that they've

18   ordered; right?

19   A.    Yes, sir.

20   Q.    And have agreed to pay a certain amount for those

21   goods or services?

22   A.    Yes, sir.

23   Q.    But they're not going to pay -- the county is not

24   going to pay until there's an acknowledgment that the

25   county has received those goods or services?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    A.      Yes, sir.

2    Q.      That's what the receiving report does?

3    A.      Actually the invoice that -- we get the invoice

4    and it's signed.  They're agreed that they have received

5    it, then we create the receiver.

6    Q.      There's an invoice from the vendor --

7    A.      Yes, sir.

8    Q.      -- demanding payment for goods or services

9    delivered to the county?

10   A.      Yes, sir.

11   Q.      And then the county through its internal

12   accounting procedures is going to require this receiver

13   record be completed to verify that they received the

14   goods or services they're about to pay for?

15   A.      Yes, sir.

16   Q.      And the goods and services that have been billed

17   in that invoice?

18   A.      Yes, sir.

19   Q.      All right.  And your role initially was to note

20   that the books were received by Marecia Bell; correct?

21   A.      Yes, sir.

22   Q.      And then it says accepted by yourself.

23   A.      Yes.

24   Q.      Did you personally verify with Marecia Bell that

25   she received 750 copies of this book?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   A.      Yes, sir.

2   Q.      How did you do that?  Did you call her up or did

3   you physically go see the books?

4   A.      I didn't see the books.  It's a matter of

5   their -- most of the time they sign off on -- or the word

6   of mouth they did tell me they received all the books.

7   Q.      Have you ever had an instance in your almost --

8   well, you did ten years at Head Start; right?

9   A.      Yes, sir.

10   Q.      Did you ever have an instance where you

11   acknowledged receipt of services or goods and in fact

12   that had not occurred?

13   A.      Not as I can remember, no.

14   Q.      All right.  Now, we move to this next document

15   which is part of the county's requirement that two

16   separate levels of employee acknowledge receipt of the

17   goods and services; right?

18   A.      Yes, sir.

19   Q.      And ordinarily this CS10 in your department would

20   be Carol Tedder, would it not?

21   A.      Not necessarily.  It's Carol Tedder or any of the

22   other managers.

23   Q.      Well --

24   A.      I'm sorry.

25   Q.      I just mention Carol Tedder because from Exhibit

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    No. 11 --

2    A.      Right.

3    Q.      Exhibit 11 in evidence on this transaction

4    CS10 --

5    A.      Is Carol Tedder.

6    Q.      -- is Carol Tedder?

7    A.      Yes, sir.  Sorry.

8    Q.      But it doesn't really matter which 400 level

9    person is signing off on this at this point.  You just

10   need a 400 level person to authorize it?

11   A.      To authorize, yes.

12   Q.      Okay.  And you would have sent that to Mr.

13   Jimenez?

14   A.      It appears in either Mr. Jimenez' or Carol

15   Tedder's box.

16   Q.      Well, if it went to one box, how does it go to

17   the other box or are they together?  I'm sort of lost on

18   that.

19   A.      The way it's sets up is either -- they both are

20   qualified to see the same box level on CS10 level 400.

21   Q.      Do you know or have any idea whether on June 16,

22   2010, whether Miss Tedder was in the office?

23   A.      I believe she was out on vacation.  I'm not

24   positive, but I believe she was on vacation.

25   Q.      Well, if she's out on vacation on June 16th,

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   2010, then any receiving report that you have initiated

2   that is then going to be authorized by a 400 level person

3   would be authorized by Mr. Jimenez; right?

4   A.      Yes.

5   Q.      Okay.  And, again, that's just acknowledging that

6   the county has gotten the items it bargained for;

7   correct?

8   A.      Yes, sir.

9   Q.      Now, back to Government's Exhibit 11 in evidence.

10  Once you correct the coding issue for the proper grant --

11  or the grant numbering issue, Carol Tedder then signs off

12  at the 300 level; is that correct?

13  A.      Yes.

14  Q.      But that's actually not her level, is it?

15  A.      Normally no.

16  Q.      So she's doing that for somebody else; right?

17  A.      In their absence, yes.

18  Q.      And that would be in this instance Marie Mason,

19  would it not?

20  A.      Yes, sir.

21  Q.      Okay.  So Miss Mason was not available to

22  actually authorize the purchase of the books on May 26th;

23  is that correct?

24  A.      Yes.

25  Q.      And instead Carol Tedder did that; right?

1    A.      Yes.

2    Q.      Because Carol Tedder is at the 400 level she may

3    also sign off for an absent person on the 300 level?

4    A.      Yes, sir.

5    Q.      And Carol Tedder apparently did exactly that in

6    Government's Exhibit No. 11?

7    A.      Yes, sir.

8    Q.      Let me now also review with you briefly

9    Government's Exhibit No. 13 in evidence which is an

10   invoice; correct?

11   A.      Yes, sir.

12   Q.      Who put this information up here in the

13   right-hand corner, PO number, invoice and the date?

14   A.      That would be by the vendor.

15   Q.      And where would they get this PO number from?

16   A.      It would be sent to them on the original request

17   form for our agreement to reimburse them for the

18   services.

19   Q.      And would that be a number that you would then

20   have provided to them in this case?

21   A.      I would, yes.

22   Q.      And the DP in this order stands for departmental

23   purchase; correct?

24   A.      Yes, it does.

25   Q.      And the CS is for children's services?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    A.    Yes, sir.

2    Q.    And the DP is important because in your internal

3    accounting matters that again stands for departmental

4    purchase?

5    A.    It does.

6    Q.    And that's again this under $10,000 purchase;

7    right?

8    A.    Not -- not totally.  They do have DPs that are

9    not -- that are over that amount.

10   Q.    For DPs that are under 10,000 what's the highest

11   level of needed authorization?

12   A.    I'm sorry?

13   Q.    In other words, could someone at Marie Mason's

14   level of 300 make out a purchase order for under $10,000

15   without seeking additional approval?

16   A.    Yes, yes.

17   Q.    Okay.  So any approvals above and beyond Marie

18   Mason's signature in this case that she went and got on a

19   merchandise request form actually wasn't necessary for an

20   under $10,000 purchase; correct?

21   A.    On the merchandise -- no -- yes, that is correct.

22   I'm sorry.

23   Q.    Okay.  Well, maybe I confused the two.  You

24   have -- someone in Miss Mason's position has authority to

25   order items up to $10,000 in value?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    A.      Yes, sir.

2    Q.      And that's based upon their judgment; right?

3    A.      Well, actually it's based on the department

4    division manager whether he wants to sign off on them or

5    not.

6    Q.      You're saying a division manager has to sign off

7    on every purchase, even those under 10000?

8    A.      No, I'm not.  Really I'm saying it's up to him

9    whether he wants to sign off on it or not.

10   Q.      And when we say "sign off," we're talking now the

11   merchandise request form?

12   A.      The request form, the original merchandise --

13   Q.      So even for an under $10,000 purchase it's your

14   understanding that the division manager has to sign off

15   on that?

16   A.      If that's what he decides.

17   Q.      If he doesn't sign off on it can the purchase

18   proceed?

19   A.      Yes, it can.

20   Q.      So it's not necessary to obtain the division

21   manager's signature on a purchase less than $10,000?

22   A.      It's been both ways.  That's why I'm saying it

23   the way I am.

24   Q.      Well if it's both ways, then it's not necessary.

25   Does that make sense?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1     A.     Okay.

2     Q.     If I'm missing something I need for you to tell

3     me.

4            But my understanding is that even if the division

5     manager chooses not to sign a merchandise request form

6     for a purchase under $10,000, that purchase can still be

7     made by the county; is that correct?

8     A.     Yes, sir.

9     Q.     Does the county maintain a Web site available for

10    county employees to access for that type of purchasing

11    information?

12    A.     Yes, sir.

13    Q.     In other words, what we would call the

14    procurement manual is online, is it not?

15    A.     Yes, sir, it is.

16    Q.     And it's online within the county's own Intranet

17    site; right?

18    A.     Yes, it is.

19    Q.     And so anyone that wants to look up the

20    procurement rules is free to do so; correct?

21    A.     Yes, sir.

22    Q.     All right.

23           MR. WEISBROD:  Thank you, Your Honor.  No

24    further questions.

25           THE COURT:  Mr. Brown.

1          MR. BROWN:  No questions, Your Honor.

2          THE COURT:  Mr. Farmer.

3          MR. FARMER:  Yes, Your Honor.  Could I have

4    a moment with Mr. O'Neill, Your Honor?

5          Thank you, Your Honor.

6                    CROSS-EXAMINATION

7    BY MR. FARMER:

8    Q.    Good afternoon.

9    A.    Hi.

10   Q.    I'm going to show you a document that's been

11   admitted into evidence as Defendant Mason's Exhibit

12   No. 32.  And what does this appear to be?

13   A.    It's a receiving report for services.

14   Q.    And do you know Marecia Bell?

15   A.    Yes, sir.

16   Q.    And who is Marecia Bell?

17   A.    She was -- she was a nurse at our department for

18   Head Start.

19   Q.    And let me go to the fourth page of this document

20   and ask you about a sticky note that appears on this.

21   Have you seen this document before?

22   A.    Yes, sir.

23   Q.    And what is A Bouncing Good Times?

24   A.    It's a child's entertainment for parties, bounce

25   house and different activities.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    And do you know if there's any connection between

2    and Mr. Gregory Louis and/or A Bouncing Good Times and

3    Marecia Bell?

4    A.    Yes, sir.

5    Q.    What is the connection?

6    A.    It's his -- or her ex-husband.

7    Q.    And is this an accurate copy of an original

8    sticky note that appeared on the fourth page of this

9    document when it was -- when you received it?

10   A.    I don't remember having that sticky on there at

11   the time.

12   Q.    Have you ever seen that sticky before?

13   A.    I did see it later, yes.

14         THE COURT:  I'm sorry?  We couldn't

15   understand that.

16         THE WITNESS:  I did see it later, yes.

17   BY MR. FARMER:

18   Q.    When did you see it?

19   A.    I couldn't give you an exact date.

20   Q.    Did you see it on this document though?

21   A.    That I'm not positive.

22   Q.    Do you know where you saw it if not this

23   document?

24   A.    It might have been on the packet itself.

25         THE COURT:  Please don't guess.  If you

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    know, you can answer.

2              THE WITNESS:  No, I don't.

3    BY MR. FARMER:

4    Q.     Did you see it anywhere other than a place

5    associated with this receiver report?

6    A.     No.  I don't know.  I don't remember that at all.

7    Q.     So in other words, whenever you saw it it was

8    always associated with this document?

9              MR. O'NEILL:  Objection, Your Honor.  She

10   did not say that.

11             THE COURT:  Sustained.

12             THE WITNESS:  I don't know.

13   BY MR. FARMER:

14   Q.     What does this sticky note say?

15   A.     Thank you, Miss Linda, and a smile and

16   Nurse Bell.

17   Q.     And what's the date on that?

18   A.     4/9/10.

19   Q.     And what's the date of the merchandise request

20   form?

21   A.     4/10/2010.

22   Q.     And would Nurse Bell thank you for any

23   merchandise request forms that you processed?  Is that

24   something that she did before?

25   A.     No.  Because this is the first -- no, no.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.      Well, let me ask you, has she ever put a sticky

2    note on any documents, to your knowledge, other than what

3    we see here?

4    A.      Not that I remember, no.

5    Q.      And is that her phone number?

6    A.      That I'm not sure.

7    Q.      And if I understand your testimony, you cannot

8    say whether the original document that you see here had

9    this sticky note on it?

10   A.      No.  That's right.

11   Q.      And when was the last time that you saw this

12   sticky note, the original?

13   A.      I couldn't be sure.  I'm sorry.

14   Q.      Was it -- have you seen it since April of 2010?

15   A.      Yes.

16   Q.      And can you estimate how long ago you saw it

17   after April of 2010.

18   A.      I'm not sure on that exactly.

19   Q.      Was it within -- was it in the year 2011?

20   A.      I'm not sure.

21   Q.      Now, let me ask you about Government Exhibit

22   No. 1.  Talk a little bit about Marie Mason's and

23   Mr. Finney's signatures.  Do you have that in front of

24   you?

25   A.      Yes, I do.

1   Q.      Now, would you process a lot of merchandise

2   request forms that had Marie Mason's and Mr. Finney's

3   signature on them?

4   A.      Yes, sir.

5   Q.      And would their signatures be present on every

6   merchandise request form that came through Marie Mason's

7   side of Head Start?

8   A.      No.

9   Q.      How often would you process a merchandise request

10  form per week on average in let's say the year 2010?

11  A.      A week I'd say maybe 10, 15.

12  Q.      And would -- if it went through Marie Mason's

13  side of Head Start, would she be the one signing the

14  approval initially above the line?

15  A.      Yes.

16  Q.      Would there be anyone else who would sign other

17  than Marie Mason and then below her Louis Finney?

18  A.      No, no.

19  Q.      That would be her responsibility?

20  A.      It would be her responsibility depending on

21  whether the director decides he needs to approve it too.

22  Q.      And would Marie Mason be responsible for signing

23  the merchandise request forms that were initiated by all

24  of the workers in her division?

25  A.      Yes, sir.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   Q.      And is that about 60 to 65 people, in your
2   recollection?
3   A.      I have no idea of the exact amount.
4   Q.      Well, not exactly, but how much would you say --
5   how many persons would Miss Marie Mason supervise in the
6   year 2010?
7   A.      I don't know.
8   Q.      Is it more than 50?
9   A.      I'm not sure.  Sorry.
10  Q.      Okay.  Would it be more than a hundred or could
11  you give me any -- any idea of how many persons worked in
12  Marie Mason's part of Head Start?
13  A.      That I wouldn't know.
14  Q.      No idea?
15  A.      No, sir.
16  Q.      So it could be 2 or it could be 200, and you --
17          THE COURT:  All right.  Ask another
18  question.
19          MR. FARMER:  Yes, Your Honor.
20  BY MR. FARMER:
21  Q.      But in any event, whatever number that was Marie
22  Mason would be the person signing this document?
23  A.      She would be the primary person, yes.
24  Q.      And Mr. Finney would sign off on that?
25  A.      Yes.

1    Q.      And we talked about Government Exhibit No. 11 in

2    which Carol Tedder signed off for Marie Mason --

3    A.      Yes.

4    Q.      -- at the 300 level; is that right?

5    A.      Yes.

6    Q.      Now, essentially the 300 level and in this case

7    100 and 400, that describes the authority that certain

8    personnel have within fiscal?

9    A.      Yes, yes.

10   Q.      And it would not be out of the ordinary for Carol

11   Tedder, for instance, to have the authority to -- to

12   approve this document on behalf of Miss Mason; is that

13   right?

14   A.      Yes, sir.

15   Q.      That's completely pursuant to policy, isn't it?

16   A.      Yes, sir.

17            MR. FARMER:  Thank you, Your Honor.  That's

18   all I have.

19            THE COURT:  All right.  Mr. O'Neill,

20   redirect.

21            MR. O'NEILL:  Yes, Your Honor.

22                  REDIRECT EXAMINATION

23   BY MR. O'NEILL:

24   Q.      Miss Edman, you were asked by Mr. Weisbrod on

25   cross-examination some questions about Government's

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Exhibit 15, specifically the notations affecting Michael

2    Jimenez.  Do you see that in front of you on the monitor,

3    ma'am?

4    A.      Yes, I do.

5    Q.      Now, is that the final step for the approval of

6    payment?

7    A.      For a receiver, yes.

8    Q.      Is there any step after this?

9    A.      No, sir, not an approval path, no.

10    Q.      When you submitted this to Mr. Jimenez, by that

11    time did you know --

12              MR. WEISBROD:  Objection, Your Honor.  That

13    wasn't the testimony.

14              THE COURT:  Sustained.

15              MR. O'NEILL:  Let me change it.

16    BY MR. O'NEILL:

17    Q.      When you electronically transmitted this, by that

18    time did you know that Mr. Jimenez was married to Johana

19    Melendez Santiago?

20    A.      No, sir.

21    Q.      Did not know?

22    A.      No, sir.

23    Q.      Did you know Johana Melendez Santiago?

24              MR. WEISBROD:  Your Honor, objection.

25    Beyond the scope.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          THE COURT:  Mr. O'Neill?

2          MR. O'NEILL:  I'll move on, Your Honor.

3   BY MR. O'NEILL:

4   Q.     Mr. Weisbrod on cross-examination asked you about

5   the $10,000 amount.  There were several questions about

6   that.  What is the rule within the county as to the

7   $10,000 limit?

8   A.     Any merchandise or goods purchased for over

9   10,000 would have to go to the procurement office for

10  bid -- to go out to bid.

11  Q.     Is the procurement outside Head Start or can you

12  tell us where that is.

13  A.     It's located at the county center downtown.

14  Q.     Is that a separate division from Head Start?

15  A.     Yes, sir.

16  Q.     And then what would happen at the procurement

17  division?

18  A.     The procurement division either they would have a

19  sole source for the item if they're the only one who

20  processed the item or if it has to go out to bid for the

21  lowest bidder.

22  Q.     Are you saying there's different rules when it's

23  over $10,000?

24  A.     Yes, sir.

25  Q.     Now, I want to show you again this sticky note on

1   this MRF which is Defendant Mason's Exhibit 32.  Do you

2   remember Mr. Farmer asking you questions about that

3   sticky note?

4   A.      Yes, sir.

5   Q.      Was that sticky note on that form when you first

6   saw it?

7   A.      No, sir.

8   Q.      Do you know when that sticky note got on that

9   form?

10  A.      I do not.

11          MR. O'NEILL:  Thank you, Your Honor.

12  Nothing further.

13          MR. WEISBROD:  Your Honor, may I have a

14  little bit of additional cross on this bid issue that

15  just came up on procurement and the bidding process?

16          THE COURT:  All right.  Briefly.

17          <u>RECROSS-EXAMINATION</u>

18  BY MR. WEISBROD:

19  Q.      When procurement sends out a bid on a more than

20  $10,000 item, describe for the jury what they're doing.

21  A.      Actually they're sending out like bids for like

22  items.

23  Q.      So it doesn't have to be an identical item from

24  Company A, Company B and Company C.  They just have to

25  meet some overall specifications?

```
1    A.      It should be identical items.

2    Q.      Okay.  And then asking those companies to give

3    their best price?

4    A.      Yes, sir.

5    Q.      But you mentioned sole source.  If an item is

6    made by only one company, if one company has exclusive

7    rights to an item, that's when you do sole source?

8    A.      Yes, sir.

9    Q.      And you can do that for more than $10,000?

10   A.      Yes, sir.

11           MR. WEISBROD:  Thank you.

12           THE COURT:  Thank you.  You may step down.

13           Mr. O'Neill, you may call your next witness.

14           MR. O'NEILL:  Thank you, Your Honor.

15   Government will call Carol Tedder.

16           THE COURT:  Miss Tedder, if you'll come

17   forward to be sworn, please.

18           COURTROOM DEPUTY CLERK:  Please raise your

19   right hand.

20           Do you solemnly swear or affirm under

21   penalty of perjury that the testimony you shall give in

22   this cause shall be the truth, the whole truth, and

23   nothing but the truth, so help you God?

24           THE WITNESS:  I do.

25                   CAROL TEDDER,
```

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    a witness, having been duly sworn to tell the truth, the

2    whole truth and nothing but the truth, was examined and

3    testified as follows:

4                    COURTROOM DEPUTY CLERK:  Please be seated.

5                    State your full name and spell the last for

6    the record.

7                    THE WITNESS:  Miss Carol D. Tedder,

8    T-E-D-D-E-R.

9                    THE COURT:  Mr. O'Neill.

10                   MR. O'NEILL:  Thank you, Your Honor.

11                        DIRECT EXAMINATION

12   BY MR. O'NEILL:

13   Q.    Good afternoon, Miss Tedder.

14   A.    Good afternoon.

15   Q.    Miss Tedder, I'm going to be asking you a series

16   of questions.  Please speak into the microphone so

17   everyone can hear you.

18         Ma'am, are you currently employed?

19   A.    Yes.

20   Q.    And how are you employed?

21   A.    I'm employed as an accountant three at the

22   Hillsborough County Board of County Commissioners, Head

23   Start program.

24   Q.    And how long have you been in the county's Head

25   Start program?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    A.    Thirteen years.

2    Q.    Miss Tedder, you mentioned you're an accountant

3    three.  What does that term mean to us?

4    A.    It's an advanced accountant position.  Uhm, I'm

5    in charge of most of the budget -- or the people

6    processing the payments, the budget.

7    Q.    Are there accountants one and two within the Head

8    Start system?  Does it work that way?

9    A.    There's a one and there's accounting clerks under

10    them.

11    Q.    Now, the jury just heard from a Linda Edman.

12    A.    Yes.

13    Q.    Who is Linda Edman?

14    A.    She retired on the 30th, but she was one of my

15    accounting clerk threes.

16    Q.    And what was her number or designation as an

17    accounting clerk?

18    A.    She was a title accounting clerk three.

19    Q.    Nevertheless, she worked for you at that time?

20    A.    Right.

21    Q.    Now, when you say you're responsible for budget

22    issues and stuff, please tell us what your duties and

23    responsibilities are as an accounting three clerk within

24    the Head Start program.

25    A.    Well, at different times there's -- it's a key

1    point.  Sometimes I've worked under intermediate

2    supervisors, sometimes I work directly for the director.

3    It handles all part -- we have to apply for funding both

4    from the federal government and from the county.

5          And it would go through cycles of doing budgets,

6    doing your everyday appropriations and procurements for

7    materials for the program, helping people all through the

8    payment process with that, doing financials, watching as

9    money's spent and doing analysis on it.

10    Q.     Did there come a point in time in 2010,

11    Miss Tedder, where you learned that the county's Head

12    Start program was seeking to buy a children's book

13    authored by Johana Melendez Santiago?

14    A.     Yes.

15    Q.     And when did you first learn of that?

16    A.     Uhm, probably sometime in the spring -- late

17    spring last year.

18    Q.     And what did that cause you to learn about it?

19    A.     Well, I first learned that Miss Melendez was

20    authoring a book because she had come to a pre -- what we

21    call a preservice training in between the ends of a

22    school cycle and beginning of another one.  And she had

23    volunteered to teach a class on how to handle blood and

24    contaminated materials from bloodborne pathogens.

25    Q.     And when was that?

1    A.      Huh?  Pardon me?

2    Q.      Give us a time frame for that.

3    A.      That normally happens the last week of July or on

4    August.  I'm not sure if that was in '09.  She came

5    several times.  So one of those times she had mentioned

6    that she was -- had worked on a curriculum and she was

7    probably going to be doing a book.  And then the next

8    time was the spring last year when there was some talk

9    that --

10   Q.      Let me interrupt you for a second.  We can't talk

11   about talk.

12           But as a result of -- well, let me change -- let

13   me show you what's been placed into evidence as

14   Government's Exhibit 11.  Let me show you what's already

15   been marked and placed into evidence as Government's

16   Exhibit 11 and ask you if you recognize this, ma'am.

17   A.      Yes, I do.

18   Q.      And what would that signify to you?

19   A.      That would be an electronic purchase order.  And

20   what we're looking at is the approval path where Linda

21   had initiated a purchase order and then it came to me at

22   different levels.  It looked like it had a problem that

23   it was rejected so dd t could be lots of things, you

24   know, wrong date, wrong code, something.

25   Q.      And was it ultimately authorized then by you?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    A.      Yes, it was.  So she had originally brought that

2    to me as a merchandise request which is a prelude to

3    this.

4    Q.      Okay.  And when you say a merchandise request

5    form, let me show you Government's Exhibit 1 in evidence.

6    Is this the merchandise request form?

7    A.      Yes, yes, it is.

8    Q.      Now, at the time that you were asked to authorize

9    this did you know that the author was Melinda -- excuse

10   me, Johana Melendez Santiago?

11   A.      Uhm, I did after looking at the documents, yes.

12   Q.      Did that cause you any concern, ma'am?

13   A.      Uhm, it did because I thought it was probably a

14   gray area, just like a conflict of interest or something.

15   Q.      And what do you mean gray area?

16   A.      Well, we're in the public eye.  And a lot of

17   times people -- you know, something like that it's you

18   have what -- you have an arm's length transaction.  So

19   even though it could be the best item in the world a lot

20   of times it brings questions about motive or something.

21   So I -- and I didn't think it was -- it was potentially

22   something that could be an issue is what I thought.

23   Q.      Did anyone bring it to your attention?

24           MR. WEISBROD:  Objection to hearsay.

25           THE COURT:  He hasn't asked contents yet.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          You can answer that question.

2          THE WITNESS:  Not really.  When Linda

3    approached --

4    BY MR. O'NEILL:

5    Q.     Well, don't -- not what she said.

6          But did -- your answer was not really anybody

7    brought it to your attention?

8    A.     No.  When she brought it to me it was just here,

9    look at it.

10   Q.     Did you bring it to anyone's attention?

11   A.     No, I did not.

12   Q.     Why not?

13   A.     It had already had an original signature from the

14   section manager, Miss Mason, and it had original

15   signature from the director of the department, Louis

16   Finney.

17   Q.     And what did that signify to you?

18   A.     It signified to me they had -- the item had been

19   discussed and approved by both of those persons to be

20   something that they had agreed that it would be a viable

21   purchase.

22   Q.     Is that why you did not bring it to anyone's

23   attention?

24   A.     Yes, it is.

25   Q.     Now, subsequently the county looked into this.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Did you -- were you ever reprimanded as a result of this?

2    A.    Yes, I was.

3    Q.    And what does that reprimand entail, ma'am?

4    A.    It was something put in my file, which I work for

5    the county.  I also work for the road department and the

6    Clerk of the Court.  And I've never had anything put in

7    my file.  So I had a reprimand that I was, you know, not

8    following procedures.  I should have brought it to

9    someone's attention, you know, any of the above.

10         If I had a thought that it was questionable I

11    should have -- irregardless of the signatures I should

12    have stepped over people's head and gone to somebody else

13    to discuss it.

14    Q.    Do you receive training on your responsibility as

15    a county worker in the areas ethics and conflicts of

16    interest?

17    A.    We probably have twice since I've been here in

18    23 years, yes.

19    Q.    Do you have to fill out any form, you personally?

20    A.    Yes, you do.

21    Q.    Do you do that on a yearly basis?

22    A.    No, I'm going to say not, no.  Probably once or

23    twice since I've been here.

24    Q.    So in 23 years you've had to fill it out once or

25    twice?

1    A.      Yes.

2    Q.      Does that -- does that form -- is that

3    requirement based on a person' position, to your

4    knowledge, within the county or does every county

5    employee have to fill one out?

6    A.      I'm really not sure.  I think it's -- I mean I

7    filled the last one out I believe when we went to class.

8    When you're hired you're given a packet, so -- and that

9    was a long time ago, so I don't really remember

10   everything that's in there.

11   Q.      Miss Tedder, after the request was completed and

12   after the books were delivered did you ever have a

13   conversation with Michael Jimenez about the books?

14   A.      Yes, I did.

15   Q.      What, if anything, did he say to you?

16   A.      Well, the investigation had been -- had started

17   and Michael had gone to the professional responsibility

18   department for the county and been interviewed by

19   Mr. Sheehan.

20           And, you know, came in -- what you would be, you

21   know, concerned and said that he had never had a -- he

22   had been a non player in this whole thing.  That he

23   didn't have any participation in it.  That people had

24   approached his wife and, you know, it was nothing to do

25   with him.  That Miss Marecia bell and Idalin Navejar had

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    initiated the purchase and he didn't have anything to do

2    with it.

3    Q.      You said Marecia Bell is one of those two people?

4    A.      Uh-huh.

5    Q.      How about Miss Mason?  Did you have any

6    conversations with Marie Mason about the book at the same

7    period of time?

8    A.      Well, after the investigation started.  I didn't

9    have anything with her before.

10   Q.      After the investigation what, if anything, did

11   she say to you?

12   A.      She didn't -- well, she was shocked by the whole

13   thing because she thought that we had gone through the

14   procurement process.  It had been recommended by her

15   nursing staff.  She had -- her words to me, that she had

16   referred it to them to make recommendation.  She didn't

17   have any buy in one way or another, and they had

18   recommended the book.

19           And it fit within the health -- you know, she --

20   part of her responsibilities is running the health

21   section of the department.  So, you know, they liked it.

22   It was -- you know, she thought it was a good -- they

23   recommended it as a good purchase and she signed it.

24   Q.      Miss Tedder, I would show you with permission of

25   the Court Government's Exhibit 21 for purposes of

1    identification.  It's not in evidence, ma'am, so please

2    just read it to yourself.  Ma'am, are you familiar with

3    that document?

4    A.    Yes, I am.

5    Q.    In fact, did you create the memorandum?

6    A.    I didn't create the memorandum.  It's coming to

7    me.  But I created a lot of it, the budget part and some

8    of the forms in there.  But it's either done the agenda

9    item or coauthored it.  It was presented to the board for

10   the grant.

11   Q.    I apologize, ma'am.

12         The memorandum is directed to you; correct?

13   A.    Right.

14   Q.    And there's a number of figures with budget and

15   the like.  And you created a number of those numbers?

16   A.    Yes.

17         MR. O'NEILL:  Your Honor, at this time I'd

18   move into evidence Government's Exhibit 21.

19         MR. WEISBROD:  No objection.

20         THE COURT:  Received into evidence 21.

21         (EXHIBIT 21 ADMITTED INTO EVIDENCE.)

22   BY MR. O'NEILL:

23   Q.    Miss Tedder, since it's now in evidence we can

24   publish it to the jury.  And is this the memorandum we

25   mentioned on Page 1?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

A. Yes. This document is coming from the Clerk of the Court's record department which means it's actually been approved by the board and they've taken it and recorded it as an official record, and then she's submitting it back to the originating department.

Q. And, ma'am, who is Gail Lettsring (phonetic)?

A. She's part of the Board of County Commissioners records department. That's a branch of the Clerk of the Circuit Court.

Q. Now, the subject line states Grant Application with the United States Department of Health and human Services FY '09 Head Start/Early Head Start Cost of Living and Quality Improvement Increases, Federal Identifier and then it gives a number.

A. All right.

Q. Can you please explain to us how the process works between the United States Department of Health and Human Services, the county and Head Start.

A. Okay. The Department of Health and Human Service is the federal grantor. And it goes through you a subdepartment, the Department of Children and Families down the next step to the Head Start/Early Head Start program.

To apply for money -- this is like a one time. What they call a one time money. But all of our funding

1    has to be applied for every year.  And this is a

2    supplemental and they would normally announce a

3    particular need.  In this case they're saying it's a cost

4    of living and a quality improvement.  And a lot of times

5    they have specific needs they want you to apply for with

6    this funding.

7          The cost of living they want -- they give you

8    specific parameters to increase payroll on a long --

9    they actually want you to increase the rate of pay.

10         And -- but in circumstances where an agency has

11   already granted at least that much cost of living to

12   their employees either in payroll or benefits they will

13   let you use the money for other specific things, but you

14   have to include documentation that you've already met the

15   cost of living increase to the salaries.  And in this

16   case this is what we did -- what we used the COLA money

17   for.

18   Q.      And this was a -- as you said, a one time request

19   then; is that right?

20   A.      Yes.

21   Q.      Directing your attention to the second page that

22   I have on the machine it looks like the request is for

23   how much money?

24   A.      Uhm, it's 2 million -- the federal amount is the

25   2,116,031.  It's broken out.  It's a little lengthy, but

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    it's broken out into different parts.  There was a

2    permanent cost of living which is going to -- it's going

3    to go -- like you got a permanent raise.  So every

4    October we're going to get this three point six percent.

5         Part B kind of in the middle says it was a one

6    time and that's just strictly what it mean, just for

7    certain things.  The same thing with that cost of living.

8    It was a one time and it wouldn't be regranted.

9    Q.    And this was pursuant to the America Recovery and

10   Reinvestment --

11   A.    Yes.  Most of all of this was actually to do with

12   that.

13   Q.    With the permission of the Court I would now show

14   you Government's Exhibit 22.  Again, since it's not in

15   evidence please just read it to yourself.

16   A.    Okay.

17   Q.    Are you familiar with this, Miss Tedder?

18   A.    Yes, I am.  This has to do with some of the same

19   documents that were in the other package.  But what I had

20   mentioned previously is since we had already met our

21   requirement to give the permanent increase for particular

22   salaries we had originally requested some of the funds be

23   used for supplies, which is all type of teaching

24   supplies.

25        And what the feds sometimes do after that, they

1    don't reject the whole application but they will have a

2    phone conference with the director and some key people.

3    That's what they did in this case.

4         And, uhm, they had a phone conversation with

5    Mr. Finney and Michael Jimenez to say we're not going to

6    let you use it for supplies but we want you to have the

7    money.  What other kind of need can you -- can these

8    funds be used for that makes some kind of real impact.

9         And Mr. Finney had suggested that we use it

10   for health, which was a variety of things in this case,

11   increase the dental contracts -- increase the health and

12   dental contracts was the general title that they put on

13   there but it was for all types of health related

14   services.

15   Q.    And these are matters that you deal with on a

16   day-to-day basis?

17   A.    Yes.

18         MR. O'NEILL:  Your Honor, at this time I'd

19   move into evidence Government Exhibit 22.

20         MR. WEISBROD:  No objection.

21         THE COURT:  Receive into evidence

22   Government's Exhibit 22?

23         MR. O'NEILL:  Yes, Your Honor.

24         THE COURT:  All right.

25         (EXHIBIT 22 ADMITTED INTO EVIDENCE.)

1    BY MR. O'NEILL:

2    Q.    And just very briefly, Miss Tedder, on the front

3    page appears towards the bottom in the left-hand corner

4    that there is a total amount tabulated for the request

5    being made by Hillsborough County for federal assistance;

6    is that right?

7    A.    Yes.  Two million six forty-five.  The -- it

8    details the federal portion of the two million one, and

9    we're required to present matching requirements of 20

10   percent, and that would be the applicants, the 529,000.

11   Q.    And where do these matching funds come from?

12   A.    They come from the county general fund, which is

13   mostly property taxes.

14   Q.    And then in the right-hand -- towards the

15   right-hand corner does it not state which organizational

16   unit is requesting these funds?

17   A.    Yes, at the time we were part of the

18   children's -- under the umbrella of Children's Services

19   Department, and we were known as the division of Head

20   Start/Early Head Start.

21   Q.    Thank you, ma'am.

22         MR. O'NEILL:  I have no further questions,

23   Your Honor.

24         THE COURT:  All right.  Why don't we take an

25   afternoon recess at this time.  It is 3:20.  We'll be in

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    recess until 3:35.  You're welcome to walk around.  Leave

2    your pads on your chairs.  Please don't discuss the case.

3              COURT SECURITY OFFICER:  All rise, please,

4    for the jury.

5         (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

6              THE COURT:  Miss Tedder, you can step down.

7    We'll start again at 3:35.  Please don't discuss your

8    testimony with anyone over the recess.

9              All right.  Mr. O'Neill, I'll ask Mr. Allen

10   to come over perhaps at the end of the day.  Is

11   Mr. Finney going to be here or not?

12             MR. O'NEILL:  Mr. Finney is here, Your

13   Honor.  And so, yes, I would think before the end of the

14   day it's very possible.  Again, just cross-examination of

15   individuals.  We could take him out of order, Your Honor.

16   That won't be a problem.

17             THE COURT:  Well, that's all right.  I

18   thought you were going to call Mr. Finney after this

19   witness; is that not right?

20             MR. O'NEILL:  Yes, yes, Judge.  Yeah, we'll

21   do that.

22             THE COURT:  All right.  Okay.  Thank you.

23   We're in recess.

24             COURT SECURITY OFFICER:  All rise.

25   (THEREUPON, A RECESS WAS TAKEN, AND THEN THE PROCEEDINGS

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          CONTINUED AS FOLLOWS:)

2          COURT SECURITY OFFICER:  All rise, please,

3   for the Court.

4          THE COURT:  All right.  Mr. O'Neill, we did

5   call Mr. Allen and Mr. Allen informed us that

6   Miss Palmieri was representing Mr. Jimenez -- not

7   Mr. Jimenez.  What's his name?

8          MR. O'NEILL:  Finney.

9          THE COURT:  Finney.  Sorry.  Mr. Finney.

10  And that she would like to be present during his

11  testimony.  And she asked -- and I'm just passing this

12  on -- if he could be called tomorrow morning first thing

13  -- or tomorrow morning.

14         MR. O'NEILL:  If possible, Your Honor.

15  We'll do our best.

16         THE COURT:  Okay.  She said if he was going

17  to be called this afternoon would we please call her.

18  What do you think?  We ought to call her?

19         MR. O'NEILL:  Do we want to just wait to see

20  how long the cross is of Miss Tedder?  Because we do have

21  other witnesses.  If it's ten minutes then we would

22  probably call her.  If it's going to be 40 minutes or

23  so then we could fill in the rest of the day, Judge.

24         MR. WEISBROD:  I haven't done 40 minutes

25  yet.  So if you have other witnesses --

1          MR. O'NEILL:  We can fill the day.  We have

2     another witness.

3          THE COURT:  I'll just tell her to be here

4     tomorrow morning at 9:30.  That's when we're going to

5     start.

6          MR. O'NEILL:  That would be great, Your

7     Honor.

8          THE COURT:  All right.  Thank you.

9          Would you bring the jury in.

10          COURT SECURITY OFFICER:  Yes, Your Honor.

11               (PAUSE IN PROCEEDING.)

12          COURT SECURITY OFFICER:  All rise, please,

13     for the jury.

14     (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

15          COURT SECURITY OFFICER:  Thank you, ladies

16     and gentlemen.  Please be seated.

17          THE COURT:  Mr. Weisbrod.

18          MR. WEISBROD:  Thank you, Your Honor.

19                    CROSS-EXAMINATION

20     BY MR. WEISBROD:

21     Q.    Good afternoon.

22     A.    Good afternoon.

23     Q.    I noticed on one of the documents it just said

24     fiscal year '09.  And can you tell us what months are

25     encompassed by that.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    A.      The county's fiscal year actually starts

2    October 1 and ends September 30th and these grants run

3    concurrently with that.  So when it just says one digit

4    it's the period ending.  So that would start like

5    October 1, '08, and end September 30th, '09.

6    Q.      So this Government Exhibit 1 in evidence that

7    reflects FY '09 Head Start/Early Head Start, that would

8    be October 1, 2008, through September 30th, 2009?

9    A.      That would be the --  I'm speaking of a regular

10   grant.  These did have some kind of odd times so that one

11   I think actually part of it started in July and it ended

12   like September 29th, if I recall.

13   Q.      July of '08 to July of '09 or --

14   A.      I'm actually working on '12 so I'm trying to

15   think here.  I actually do think those started in '09 so

16   that's kind of not the norm.  '09 is the -- I assume we

17   probably put that on there because it started in '09, but

18   the norm is that's the period it's ending.

19   Q.      Okay.  So for just the Recovery Act funds, the

20   two million one that's reflected here in Government's

21   Exhibit 22 in evidence --

22   A.      This should say on there.  See over here --

23   Q.      I'm sorry.

24   A.      -- about middle ways on the extreme left.  If you

25   raise it up just a little bit more.  Just a little bit

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    below what's showing.  Says start date 10/1/08 to

2    9/30/09.

3    Q.      Okay.  So 10/1/08 to 9/30/09.

4            Oh, and the entire Head Start budget at least

5    insofar as this portion of it is going to be this two

6    million six forty-five number; right?

7    A.      Right.

8    Q.      And the county is contributing 529 to the overall

9    budget?

10   A.      Right.

11   Q.      And that's not federal money.  That's county

12   money; right?

13   A.      County money.

14   Q.      And the Clerk of the Circuit Court actually

15   issues checks for payment of Head Start activities;

16   right?

17   A.      More in the form of like an inter fund transfer.

18   Q.      All right.  Old fashioned people say checks, new

19   fangled people say transfers.  Okay.

20           And then as I understand the procedure, at some

21   point in the future you would ask the federal government

22   to reimburse the county for expenses paid?

23   A.      Right.  We normally do it concurrently.  Have a

24   spreadsheet that we go in and analyze expenditures and

25   figure out how much federal money was spent and ask for

1    the 20 percent match to also be transferred so that no

2    time -- that we're always on the 80/20 funding, that the

3    federal is not funding everything nor is the county.

4    That they're funding it concurrently.

5    Q.    So is that done on a weekly basis, monthly?

6    What's the reimbursement request?

7    A.    The goal is on a normal grant monthly.  But we've

8    been inundated with the R [sic], so it's less frequent.

9    So it's basically when you have time and when the -- or

10   when the funds reach a certain point that the cash flow

11   we need to draw it down.

12   Q.    Are the federal funds in a segregated account?

13   A.    Yeah.  You actually ask for them online.  And

14   they'll -- part of that identifier that was in the cover

15   letter and numerous places, they're identified by those

16   grants, an alphanumeric grant number.  And you might ask

17   for 2 million for this one, 500,000 for that one, 300 for

18   the other and do a combined request from the federal

19   government.

20   Q.    When the county receives those monies from the

21   feds in connection with Head Start do those monies go

22   into a separate account or into county general funds?

23   A.    No.  They go into a separate account.  We set

24   every grant up with a unique number and unique tracking

25   system and it has its own revenue code for each of them.

1    Q.      Now, let's talk a little bit about the book

2    purchase in particular.  I believe your testimony was you

3    thought the purchase was in a gray area.  Your words;

4    correct?

5    A.      Right.

6    Q.      Now, may I assume then that because you think

7    it's a gray area that there was no absolute rule

8    prohibiting an employee's spouse to sell items to

9    Hillsborough County Head Start?

10   A.      This was my 20 -- 30 second or a minute is what I

11   like to refer to it now decision on an extremely busy day

12   when Miss Linda came -- Edman came and asked -- presented

13   this merchandise request that I knew about them and I --

14   yes, I thought it was a gray area.  I did not think it

15   was illegal.  I just thought it could be controversial.

16   Q.      I understand that.

17           But had there been in existence, to your

18   knowledge, a rule specifically prohibiting a spouse from

19   selling items to Hillsborough County Head Start, you

20   would never have approved this; correct?

21   A.      Correct.

22   Q.      So there's no such rule; right?

23   A.      Well, they have lots of rules so I --  you know,

24   I don't know there's anything that says point, point,

25   point just like you pointed it out, no.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    Well, you have 23 years' worth of experience

2    making 22 million judgments; right?  Fair?  Correct?

3    A.    Right.

4    Q.    And at least insofar as you knew on this date no

5    such prohibition existed because you wouldn't knowingly

6    break a rule?

7    A.    That's right.

8    Q.    You haven't been there working this hard putting

9    in this amount of time to break a rule for Michael

10   Jimenez' wife to make $9,000?

11   A.    Exactly.

12            THE COURT:  Okay.  That's a two-part

13   question.  Is the question she wouldn't knowingly break

14   the rules or is the question regarding the prohibition by

15   the county?  So I don't know what she answered.

16            THE WITNESS:  I wouldn't do either one.

17            THE COURT:  Well, no.  Let him rephrase the

18   question.

19   BY MR. WEISBROD:

20   Q.    Would you knowingly break a rule to approve a

21   purchase in this case involving Michael Jimenez' wife?

22   A.    No.

23   Q.    Do you know whether or not such a rule exists?

24   A.    At the time I didn't.  I can put it that way.

25   Q.    All right.  Now, you said that you received a

1    reprimand for not reporting this matter; right?

2    A.      Exactly.

3    Q.      Okay.  And when you say not reporting this

4    matter, for not bringing the transaction to someone's

5    attention?

6    A.      Yes.

7    Q.      Because of this potential or apparent conflict of

8    interest involving an employee's spouse; right?

9    A.      Yes.

10   Q.      And you know that just because it was a potential

11   or apparent conflict is not an actual conflict; right?

12   A.      Right.

13   Q.      And you know that you could -- if you had brought

14   it to someone's attention, someone might have approved

15   it?

16   A.      Exactly.  That's actually what I thought.

17   Q.      And conflicts are waived periodically, are they

18   not?

19   A.      Certainly sometimes.  It's like you say, it's a

20   matter of perception or is there a hard and fast rule or

21   is it something dealing with different circumstances.

22   Q.      Now, sometimes the county has to deal with a

23   specific vendor, is that correct, because of the unique

24   nature of the item that that vendor may have to offer?

25   A.      Yes.

1  Q.     That's called sole source procurement?

2  A.     Yes.

3  Q.     And in a sole source procurement because of the

4  individual nature of the item or the services that the

5  vendor is providing special rules go into affect in the

6  county; right?

7  A.     Yes, they do.

8  Q.     Okay.  And that's not altogether different than

9  what we're talking about in approving or waiving a

10  conflict of interest, is it?

11  A.     Possibly not.

12  Q.     And so in your unfortunate instance what they're

13  really mad about is not the transaction but the

14  opportunity to have reviewed it?

15          MR. O'NEILL:  Objection, Judge, as to who

16  is --

17          THE COURT:  Sustained as to who "they" is.

18  And I'm not sure how she would know they anyway.

19  BY MR. WEISBROD:

20  Q.     Well, you got a written reprimand from whom?

21  A.     I got one from the director of family and aging,

22  which after this -- after this purchase was made the

23  county reorganized.  And instead of just Head Start being

24  in the Division of Children's Services it's now part of

25  what they call a mega department.  So --

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.      And, again, the nature of the reprimand is your

2    failure to report it to somebody; right?

3    A.      Yes.  They thought at my level I should have

4    reported it if I felt it -- had a feeling about it I

5    should have discussed it with some of the participants.

6    And if I didn't feel comfortable I should have gone over

7    their head to Mike Merrill, to Bob Sheehan, to Channel 8.

8    I don't know.

9    Q.      Even though in your mind at the time you thought

10   it would be approved?

11   A.      Would you repeat that.

12   Q.      Didn't you just tell us a little while ago that

13   even if you had reported it you thought it would have

14   been approved anyway?

15   A.      No.  You said something about it may have been

16   approved.  I don't know if it would be approved or not.

17          I said when I saw those signatures I made the

18   wrong assumption apparently that people had already

19   discussed this.  That I took it in my haste and on a busy

20   day that with those signatures you can look at it two

21   ways.  I didn't think it was illegal and my boss is

22   approving it, so am I going to go into him and say is

23   this really right?  Are you sure you wanted to make that

24   decision today?

25          I didn't feel uneasy about it when he signed it.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1      That's not something normal.  A lot of times he would

2      have signed something like that.  So I felt he had -- it

3      had already been discussed and he had agreed to buy it.

4      Q.      Well, you also knew the people involved in the --

5      in the book?

6      A.      Yes.

7      Q.      You knew Miss Melendez Santiago; correct?

8      A.      Vaguely.

9      Q.      Well, I wasn't clear.

10             You knew that she had provided services to Head

11     Start --

12     A.      Yes.

13     Q.      -- correct?

14             And had provided services specifically along the

15     line of what this book covered; correct?

16     A.      Yes.

17     Q.      And you certainly knew Mr. Jimenez from having

18     worked with him --

19     A.      Right.

20     Q.      -- during the period of time when he was at Head

21     Start; right?

22     A.      Yes.

23     Q.      You had a working relationship with him; right?

24     A.      Yeah.  He was my boss actually.

25     Q.      All right.  You also had a bit of a social

1    relationship with him?

2    A.      Not really.

3    Q.      Did you have a --

4    A.      I mean go to lunch or something, but we weren't

5    friends away from the office.

6    Q.      Okay.  Did he ever rent your cabin from you?

7    A.      Yes, he did one time.

8    Q.      Okay.  So there's at least if not what you want

9    to call a friendship, there's a certain trust level, is

10   there not?

11   A.      Yes.

12   Q.      And certainly from both your personal experiences

13   with him and your work experiences with him you had

14   reason to trust him, did you not?

15   A.      Well, at the time I didn't think he was -- I mean

16   he wasn't involved in it.

17   Q.      Yeah.

18           But you -- but you think it's a gray area, the

19   book, because it's his wife who's selling the book to the

20   county; right?

21   A.      Yeah.  It has the potential for someone to

22   make -- you know, make something out of it.  Is the only

23   reason he's buying it's because it's her or is it

24   legitimately the book is a legitimate book.

25   Q.      Well, you know he's not buying; right?

1    A.      No -- well --

2    Q.      Well, you knew from the paperwork he didn't buy;

3    right?

4    A.      His name's not on the paperwork.

5            MR. O'NEILL:  Objection, Your Honor, assumes

6    facts not in evidence.

7            THE COURT:  Sustained.

8            MR. WEISBROD:  May I approach?

9    BY MR. WEISBROD:

10   Q.      Let me show you what's in evidence as Government

11   Exhibit 1.  You're familiar with a merchandise request

12   form; right?

13   A.      Yes, I am.

14   Q.      Okay.  And obviously these are the signatures you

15   referenced in your approval of the purchase in the

16   paperwork; right?

17   A.      Correct.

18   Q.      Okay.  And so when I said Mr. Jimenez is not

19   buying, it's because you know the paperwork doesn't have

20   his name on it; correct?

21   A.      That's correct.

22   Q.      Now, all I was trying to say is that in your view

23   of the gray area you knew pretty well the two people

24   involved; right?

25   A.      Yes.

1    Q.    Well, you knew Miss Melendez Santiago had made

2  these presentations at preservices?

3    A.    Yes.

4    Q.    You knew she had told everybody at the preservice

5  that she was writing a book; right?

6    A.    Right.

7    Q.    You knew him from your time at work; correct?

8    A.    Correct.

9    Q.    You had -- you saw these signatures by other

10  people; right?

11    A.    Yes.

12    Q.    So even though you thought it was a gray area,

13  you really didn't think in your mind that he was trying

14  to defraud the county, did you?

15  A.    No.

16          MR. O'NEILL:  Objection, Your Honor.

17          THE COURT:  What's the basis of the

18  objection?

19          MR. O'NEILL:  Speculation, Your Honor.

20          THE COURT:  All right.  No.  I'm going to

21  overrule the objection.

22          You may answer the question -- she did.  The

23  question stands and the answer stands.

24          THE WITNESS:  Well, I'll just be frank.  It

25  didn't enter my mind at the time, you know.  I didn't

1    question that, you know, the people that had reviewed the

2    book and their intentions was to buy a book that was a

3    relevant subject matter for the children and families.

4             MR. WEISBROD:  Thank you, Your Honor.  No

5    further questions.

6             THE COURT:  All right.  Mr. Brown.

7             MR. BROWN:  No questions, Your Honor.

8             THE COURT:  Mr. Farmer.

9             MR. FARMER:  Yes, Your Honor.

10                    CROSS-EXAMINATION

11   BY MR. FARMER:

12   Q.    Good afternoon, Miss Tedder.

13   A.    Hi.

14   Q.    Hi.

15         Let me show you Exhibit 1 -- Government Exhibit 1

16   again and -- with reference to the sign here and Marie

17   Mason signature.  Now, are you familiar with the basic

18   number of merchandise request forms that are processed by

19   Marie Mason and then by Louis Finney say in a week?

20   A.    In the middle of the year it could be quite a

21   few.

22   Q.    About how many would you estimate on average?

23   A.    A lot of them I don't even see.  So I normally

24   see the end of the electronic thing.  I'd just be

25   speculating but probably 25, 30, something like that, you

1  know.  Between 10 or 30.  Depends on the period.  They

2  kind of run in a flux sometimes.  Beginning of the year's

3  slow.  Middle's really hot and -- you know, hot and

4  heavy.

5       And if you get something particular that you know

6  your time frame because you have to have it ordered, it

7  has to go through the process, you have to have it

8  shipped, you have to have it delivered and be able to pay

9  for it in a timely manner.

10  Q.     And is there a rule that prohibits Marie Mason --

11  if she initiated a merchandise request is there a rule

12  that she cannot be the person who signs off on it?

13  A.     I didn't catch that.  But it's not something we

14  normally do.  In fact, I don't ever know Miss Mason to

15  initiate one herself.  Her staff, especially a secretary

16  or a subordinate staff would do this and she would just

17  be on the approving end.

18  Q.     And then Louis Finney above her?

19  A.     Yes.  Mr. Finney takes -- different times he

20  approves different levels of things.  But in this case he

21  was wanting to approve stuff I believe over $5,000.

22  Q.     And are you familiar with the basic number of

23  personnel who are supervised by Miss Mason let's say in

24  the year 2010 in her department?

25  A.     Quite a few.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   Q.      Do you know if it's more than 50?

2   A.      I'd say it probably was at that time.  I'm not

3   sure if she had the -- we've had several reorgs.  I'm not

4   sure if education was under, but she has like 25 or 30

5   social workers, probably at least 10 health workers and

6   just assorted others, so between probably 40 to 50 maybe.

7   Q.      And would she be responsible for signing the

8   merchandise request forms for all requests coming from

9   those number of people?

10  A.      She would except in her -- her absence.

11  Q.      Go ahead.  What were you going to say?

12  A.      Well, I was going to say I actually think when

13  this was presented to me maybe there was something on top

14  of it like you have the little sticky because I -- I'm

15  not sure though.  I'm just --

16  Q.      Okay.

17  A.      Because I've never seen one that actually has her

18  name on it.  And I -- when it was presented to me

19  Miss Edman told me that Idalin Navejar had initiated

20  this.  So --

21  Q.      When this particular merchandise request form was

22  presented to you?

23  A.      Yes.

24  Q.      Who said what?

25  A.      Linda Edman, my accounting clerk, she -- this was

1    part of -- the ladies have different functions.  And

2    general merchandise like this is something that she would

3    have taken as an initiated purchase order on it.  And she

4    said Idalin Navejar had initiated this and brought it to

5    her.

6    Q.      And you supervised Linda Edman; right?

7    A.      I did until the 30th when she retired.

8    Q.      Now, let me ask you a little bit about your

9    discipline.  You were reprimanded for whatever you did or

10   do not do in terms of this book purchase; is that right?

11   A.      Yes.

12   Q.      Now, are you aware of whether or not Miss Mason

13   was reprimand or disciplined in any way?

14   A.      I don't think she was given a written reprimand.

15   We were verbally, you know, reprimanded by Mr. Finney.

16   Q.      And approximately when did your reprimand occur?

17   A.      The written one?

18   Q.      Yes.

19   A.      It was pretty short term.  I think all this

20   started in November sometime.  I really don't know the

21   date.  I want to say probably between five and six weeks,

22   something like that.

23   Q.      And that was November of 2010?

24   A.      Yes.

25   Q.      And after November of 2010 did Miss Mason

1    continue to work as a deputy director at Head Start?

2    A.    I believe she worked until some time in mid

3    December.  Seemed like the 13th or something like that.

4         It was at one of our policy counsel meetings that

5    basically Mr. Rogoff, who issued the reprimand to me,

6    came to our policy committee which was parent governing

7    group -- parent and community rep governing group.  And

8    that's normally held on the third Thursday of the month.

9    But I believe they may have had a special one a week

10   early and announced that --

11             MR. O'NEILL:  Objection, Your Honor.

12             THE COURT:  Sustained.

13   BY MR. FARMER:

14   Q.    Let me ask if at some point after December of

15   2010 Miss Mason came back to work as a deputy director of

16   Head Start, that is in the year 2011.

17   A.    That's correct.

18   Q.    And she continued as the deputy director -- one

19   of the deputy directors?

20   A.    Yes.

21   Q.    And you recounted a statement that Miss Mason had

22   said to you about allegations made against her for this

23   incident.  You said she was shocked.

24   A.    Yeah, she was shocked that it was being perceived

25   and it was being investigated -- it was being perceived

1      because she was I guess shocked about some of the backup

2      didn't really have Miss Santiago's name on it.  And she

3      was under the impression that all three of the quotes

4      were independent quotes from different vendors.

5      Q.      Did you get to know Miss Mason pretty well?

6      A.      My office is right between hers and Mr. Jimenez',

7      so, yes.

8      Q.      What was her demeanor when she told you that she

9      was shocked about this allegation?

10     A.      She was very -- she was upset.  I mean Miss Mason

11     doesn't get -- you know, she's pretty controlled.  But

12     she was upset.

13     Q.      And did you have occasion to know whether or not

14     Miss Mason is the kind of person who would knowingly do

15     anything wrong to violate county policy?

16             MR. O'NEILL:  Objection, Your Honor.

17             THE COURT:  Sustained.  That would be

18     speculation on her part.

19     BY MR. FARMER:

20     Q.      And do you know Marecia Bell?

21     A.      Vaguely.  Just she works on the other side of the

22     building.  Hi, how are you.

23     Q.      And do you know whether or not Miss Bell had a

24     family member or a former family member who did business

25     with the county?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    A.    I didn't at the time but I've, you know, learned

2    it from Miss Edman that she does.  She had an ex-husband

3    and some of her children.

4          MR. O'NEILL:  The hearsay nature of the

5    learning this.

6          THE COURT:  I'll sustain.

7          Ask the jury disregard it.  It's hearsay.

8    BY MR. FARMER:

9    Q.    Did you learn that without Miss Edman telling you

10   anything about it, saying anything to you or was it all

11   from Miss Edman's words?

12   A.    I first learned it from an another supervisor in

13   the office.

14         THE COURT:  Still would be hearsay.

15         MR. FARMER:  Yeah.

16   BY MR. FARMER:

17   Q.    Let's not repeat --

18   A.    I've not had a conversation with Miss Bell about

19   it.

20   Q.    Okay.

21         MR. FARMER:  That's all I have, Your Honor.

22         Thank you, Miss Tedder.

23         THE COURT:  Mr. O'Neill.

24         MR. O'NEILL:  Yes, Your Honor, thank you.

25                    REDIRECT EXAMINATION

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    BY MR. O'NEILL:

2    Q.      Miss Tedder, Mr. Farmer just asked you several

3    questions about your conversation with Miss Mason in

4    which she appeared shocked.  Do you recall that?

5    A.      Yes.

6    Q.      And you took that from her statement that she was

7    shocked?

8    A.      Yes.

9    Q.      What exactly did she say?

10   A.      That she was being investigated and -- for being

11   in some kind of collusion with Michael for buying these

12   books from his wife.  And what she told me is that she

13   left it to her health section.  That, yes, someone had

14   presented it and it's totally up to them to review the

15   book for content and was it appropriate for the children

16   and would it be a good purchase for some of these health

17   funds.

18           And in the end then Mr. Sheehan called her to the

19   office and said -- you know, I guess accused her of

20   being, you know, in some kind of collusion with Michael.

21   Q.      Did she mention whether the individual that

22   worked for her had recommended the book?

23   A.      She said Miss Bell had recommended it, who was

24   the RN, the registered nurse.  And Idalin Navejar was

25   working and Ida was the one that had presented -- like I

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1     said before, Miss Edman told me Ida had brought the --

2     had prepared the merchandise request form and brought it

3     to Linda after she had presented it to -- for being for

4     signature.

5     Q.     Now, Miss Tedder, you were asked by Mr. Weisbrod

6     about whether you knew of any rule in -- which prohibited

7     a spouse from personally benefiting from the sale of a

8     book by another spouse and you said there are many rules.

9     Do you know of any specific rule affecting spouses like

10    that, as you said, point for point?

11    A.     Well, I know many years ago there was a conflict

12    of interest.  And I only know because I haven't signed

13    one in years.  But as this case came up that apparently

14    they've added clauses to the disclosure about whether

15    you're -- not only do you have a business, but does

16    anyone living in your household have a business.

17    Q.     But my question was do you know of any such rule

18    that's in place that prohibits a spouse -- as explicit as

19    Mr. Weisbrod said prohibiting a spouse from personally

20    benefitting from the sale of a book by another spouse?

21    A.     I don't know that it mentions spouses, but I

22    think it's -- you know, I'm sure somewhere in the ethics.

23    I can't say something I don't know every single rule

24    there is.  And, believe me, after what I've been through

25    they've got a rule -- you know, there's hundreds of rules

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    that, you know, are laying out there in a book somewhere.

2    Q.    And had you ever a encountered a situation like

3    that before while working for the county in the Head

4    Start program?

5    A.    No, I haven't.

6    Q.    Have you encountered any situation like that

7    since?

8    A.    No.

9    Q.    Mr. Weisbrod asked you about the sole source

10   procurement.

11   A.    Yes.

12   Q.    When does that apply?

13   A.    It's pretty unique, especially having to do with

14   software or something.  Or if you've got -- like we have

15   several softwares that deal with measuring vital data on

16   the children or their families.  Once you get your

17   research and got your bids and your quote and you start

18   using that vendor it's counterproductive next year to

19   change to a totally different program.  It's very cost

20   prohibitive.  And that would be a case when you would

21   have a sole source.

22        Of course, the people can't -- you know, you

23   still have to do your due diligence.  Is it still in the

24   ballpark of something reasonable to some other program

25   that's out there.  But particular things like that.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          Or once you have -- well, they call it

2     proprietary.  You have this material and only these

3     diaper liners fit with it, then that might be a -- not

4     something normal.  But there's --

5     Q.     In this particular case did the sole source

6     procurement have anything to do with this book?

7     A.     No, it didn't.  It was presented with three

8     quotes.

9     Q.     And then finally, Mr. Weisbrod asked questions

10    about Mr. Jimenez' intent to defraud.  Do you recall

11    that?

12    A.     Yes.

13    Q.     Do you have any legal training?

14    A.     No -- I have one course in business, business

15    law.

16    Q.     In business law?

17    A.     Yeah.

18              MR. O'NEILL:  Thank you.

19              THE WITNESS:  No, I don't.

20              THE COURT:  Thank you, ma'am.  You may step

21    down.

22              THE WITNESS:  Thank you.

23              THE COURT:  Mr. O'Neill, do you want to call

24    another witness or what do you --

25              THE WITNESS:  Whatever the Court would like.

1          THE COURT:  If you have another witness you

2     can call them now.

3          MR. O'NEILL:  Yes, ma'am.  Government would

4     call Dawn Dasher.

5          THE COURT:  Miss Dasher, if you'll come

6     forward to be sworn, please.

7          COURTROOM DEPUTY CLERK:  Please raise your

8     right hand.

9          Do you solemnly swear or affirm under

10    penalty of perjury that the testimony you shall give in

11    this cause shall be the truth, the whole truth, and

12    nothing but the truth, so help you God?

13         THE WITNESS:  I do.

14                    **DAWN DASHER,**

15    a witness, having been duly sworn to tell the truth, the

16    whole truth and nothing but the truth, was examined and

17    testified as follows:

18         COURTROOM DEPUTY CLERK:  Please be seated.

19         State your full name and spell the last for

20    the record.

21         THE WITNESS:  Dawn Romell Dasher,

22    D-A-S-H-E-R.

23         MR. O'NEILL:  Thank you, Your Honor.

24                   <u>DIRECT EXAMINATION</u>

25    BY MR. O'NEILL:

1    Q.      Good afternoon, Miss Dasher.

2    A.      Good afternoon.

3    Q.      Miss Dasher, I'm going to be asking you

4    questions.  Please speak into the microphone so that

5    everyone can hear you.

6            Ma'am, would you please give us your educational

7    background.

8    A.      Yes.  I have a Bachelor's in Business

9    Administration from the University of Miami and a

10   Master's in education from National Louis University.

11   Q.      And are you currently employed?

12   A.      Yes.  I currently work with the Head Start

13   program.

14   Q.      Is that here in Hillsborough County?

15   A.      Yes, sir.

16   Q.      Are you a county employee?

17   A.      Yes.

18   Q.      How long have you worked for the Head Start

19   program here in Hillsborough County?

20   A.      Since 1992.

21   Q.      Have there been any breaks in your service?

22   A.      No, not technically.

23   Q.      And what do you mean by that?

24   A.      I was put on administrative leave with pay in

25   October of 2010.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    Can you explain how that came about.

2    A.    Yes.  The children that left the program in 2008

3    received a new test administered by the state in

4    kindergarten.  And some of their scores were low and

5    suddenly in October of 2010 I was to blame.

6    Q.    And did you have a chance to contest that?

7    A.    Not technically.  When the issue came before the

8    policy counsel they voted not to terminate.

9    Q.    And as a result of that did you go back to the --

10   well, excuse me.  Let me -- let me ask you.  During that

11   period of time were you on paid leave?

12   A.    Yes.

13   Q.    After that period ran out, what, if anything,

14   happened?

15   A.    I was returned to work.

16   Q.    To what position?

17   A.    Manager of education and health services.

18   Q.    Had you been that before --

19   A.    No.

20   Q.    -- this period?

21   A.    No, I had not.

22   Q.    Had you been promoted?

23   A.    It's lateral.

24   Q.    Lateral.  Okay.

25         Now, are you still the manager of the educational

1    department?

2    A.    And health.  It's a different position.  I used

3    to be manager of center operations which was over all

4    education services.

5    Q.    So as the manager in -- when you came back, what

6    date was that?

7    A.    Approximately March 25th.

8    Q.    Of 2010?

9    A.    '11.

10   Q.    Of '11?

11   A.    Correct.

12   Q.    Okay.  In the year 2010 what was your position?

13   A.    Manager of -- well, it was called deputy director

14   of center operations.

15   Q.    And what would that entail?

16   A.    It was -- I was responsible for all the teachers,

17   all the classrooms, transportation, things along that

18   nature that revolved around the education area.

19   Q.    And in the education area what type of matters

20   would you do on a day-to-day basis?

21   A.    I was responsible for approving all purchases

22   under the area, for managing discipline, for approving

23   hires and taking -- moving forward terminations.

24   Q.    In 2010 were you ever approached by Marie Mason

25   or Michael Jimenez about buying a book written by Johana

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Melendez Santiago?

2    A.    No, sir, I was not.

3    Q.    Were you familiar at that time with a book that

4    was authored by Miss Melendez Santiago?

5    A.    Somewhat, yes.

6    Q.    Let me go around a different way.  You stated

7    that you were not involved in -- nobody -- neither one of

8    those individuals approached you about purchasing such a

9    book.

10   A.    Correct.

11   Q.    Was it your job to purchase books at that time,

12   educational books?

13   A.    Yes, it was.

14   Q.    When you purchase educational books, what is --

15   is there a normal procedure?

16   A.    Yes.  The supervisory staff meet with the center

17   staff and determine what the needs are, and then we place

18   a purchase against a blanket purchase order that we've

19   already preestablished with a number of early childhood

20   catalogs.

21   Q.    And could you give that to us in a little better

22   detail, please.

23   A.    Well, if -- Lake Shore is an early childhood

24   provider of supplies and books.  So we would determine

25   what the needs were at the sites and fill out a

1    merchandise request form for those items and then

2    purchase them off of a preapproved -- I don't how else to

3    say blanket purchase order that was already set up with

4    discounts applied, things like that.

5    Q.    And who would authorize those purchases at that

6    time?

7    A.    Once they were accumulated then I would sign off

8    on them and forward them up the chain.

9    Q.    Do you know Michael Jimenez?

10   A.    Yes.

11   Q.    Was he a coworker?

12   A.    Yes, he was considered a peer.

13   Q.    Did you know his wife, Johana Melendez Santiago?

14   A.    Yes.

15   Q.    And how do you know her?

16   A.    She provided reservice straining for our

17   organization on bloodborne pathogens in the past.

18   Q.    Did she ever approach you about selling a book to

19   the county that she had authored?

20   A.    No, no.

21   Q.    Now, without tell us what you learned, did there

22   come a point in time when you learned the county had

23   purchased a book written by Johana Melendez Santiago?

24   A.    Yes.

25   Q.    As a result of that knowledge what, if anything,

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   did you do?

2   A.      During an internal investigation that the county

3   was conducting I shared that that purchase had been made.

4   Q.      And to who's attention did you bring that, do you

5   recall?

6   A.      Bob Sheehan.  He's the internal investigator.

7   Q.      And he is the internal investigator for what, do

8   you know?

9   A.      Professional responsibility section of

10  Hillsborough County.

11  Q.      Now, did you have any occasion to do anything --

12  well, withdrawn.

13          Did there come a point in time when you learned

14  the county actually did purchase these books?

15  A.      Yes.

16  Q.      Have you had any involvement with those books --

17  A.      No.

18  Q.      -- at any time?

19  A.      Just recently when we discovered some at the

20  office.

21  Q.      And when you say "discovered some at the office,"

22  what did you discover?

23  A.      The new RN was moving from one area to the next

24  and underneath some articles of materials was a large box

25  of the books.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   Q.      When you say a large box of books, did you see

2   it?

3   A.      Yes.

4   Q.      And do you know how many books were in there?

5   A.      No.  I wouldn't be able to make a guesstimate.

6   But the book was -- I mean the box was approximately that

7   tall and about that wide.

8   Q.      Okay.  Indicating --

9   A.      About that tall.

10  Q.      Approximately two and a half feet --

11  A.      Yes.

12  Q.      -- in height.

13          And how about in width?

14  A.      Maybe about the same.  I'm assuming about the

15  same.

16  Q.      Two and a half.

17          So -- and it was a square box?

18  A.      Correct.

19  Q.      So just for the record about two and a half feet

20  high and two and a half feet wide?

21  A.      Yes.

22  Q.      And that contained the books -- let me just so

23  it's clear for the record, was it this book here, Travel

24  Boy Helps Sebastian?

25  A.      Yes.

1    Q.      Now, when you purchase books is there -- is there

2    a ceiling on what you can authorize or do you have

3    unlimited discretion?

4    A.      No.  There is a ceiling.  But based on the

5    blanket purchase order because you're following

6    procurement rules it increases.  So where I could only

7    maybe sign offer on 10,000 on something that hadn't gone

8    through normal procurement, I can initial off to move

9    this up the chain on a much larger amount.

10   Q.      Under this blanket --

11   A.      Correct.

12   Q.      Okay.  And I apologize.  Can you explain it one

13   more time.

14   A.      The blanket?

15   Q.      Yes.

16   A.      The blanket is when you go out and get items that

17   you would typically use and get bids on them.  And the

18   county procurement system handles that.  So you get the

19   bid, there's a bid conference that's conducted by

20   procurement again and then those items are placed on a

21   list of things you can order from without having to go

22   back out every time and get bids.

23   Q.      So would this be used in the companies that are

24   common?

25   A.      Correct.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.      Working with you?

2    A.      Right.  Like Kaplan, Early Learning.  Like I

3    said, Lake Shore, School Specialty.

4    Q.      Would that or would that not apply to a vendor

5    who was trying to sell to the county for the first time?

6    A.      It would be better to have them established so

7    that we know we're getting a good deal.

8    Q.      Thank you, ma'am.

9            MR. O'NEILL:  Nothing further, Your Honor.

10           THE COURT:  All right.  Mr. Weisbrod.

11           MR. WEISBROD:  Thank you, Your Honor.

12                    CROSS-EXAMINATION

13   BY MR. WEISBROD:

14   Q.      Blanket purchase orders and departmental purchase

15   orders are two separate and distinct items; correct?

16   A.      Correct.

17   Q.      All right.  The department purchase order is the

18   figure up to $10,000 that at a certain level managers

19   have discretion to purchase; correct?

20   A.      Correct.

21   Q.      All right.  On a blanket purchase order a lot

22   more work goes in up front to establish a sum of money

23   that managers and others may then work from for repeating

24   purchases; right?

25   A.      Correct.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  Q.     So in your area of education, for example, for

2  classroom toys and classroom supplies and that sort of

3  thing there might be an established BPO that you can go

4  to to make purchases on a regular or periodic basis;

5  right?

6  A.     Correct.

7  Q.     Okay.  The two are completely distinct, are they

8  not?

9  A.     Yes.

10  Q.     The procurement manual, which is a pretty long

11  document, has separate discreet sections depending upon

12  the purchase that's involved; right?

13  A.     The amount of the purchase, correct.

14  Q.     They specifically have a thing called a small

15  purchase; right?

16  A.     Correct.

17  Q.     And that's a department purchase order under

18  $10,000?

19  A.     Correct.

20  Q.     And if they wanted that to be part of a blanket

21  purchase order it wouldn't exist as a separate item,

22  would it?

23  A.     It's based on the total amount that you're going

24  to order.  So in your example you could not use the BPO

25  in order to split a purchase.  So if we needed a hundred

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1     books you couldn't split it.  So it's hard to answer.

2     Q.      You can't use multiple department purchase orders

3     under 10,000 to circumvent the $10,000 limit, can you?

4     A.      Correct.

5     Q.      If you're going to need more than $10,000 then

6     you're going to have to follow those 10 -- more than

7     $10,000 rules; right?

8     A.      Yes, sir.

9     Q.      But those are not all blanket purchase orders,

10     are they?

11     A.      No.

12     Q.      Of course not.

13           They're a separate little unit that's allowed by

14     the county?

15     A.      Yes.

16     Q.      Okay.  Now, let me show you, please, what's in

17     evidence as Government's Exhibit 15.  The second page has

18     a listening of boxes with number of books inside.  Now,

19     you say that you recently saw one box; is that correct?

20     A.      Yes.

21     Q.      Was it open or unopened?

22     A.      I believe it was open.

23     Q.      All right.  So judging by this list, which is the

24     box list for Travel Boy Helps Sebastian, the most number

25     of books that there could have been if it was the largest

1    box would have been 88; right?

2    A.      Correct.

3    Q.      And that would assume that none of the books had

4    been taken out of the box.  But some obviously were,

5    according to what you just told us; correct?

6    A.      I'm not sure.  But it could have been.

7    Q.      Well, did you -- I'm sorry.  I didn't mean to

8    interrupt.

9    A.      No.  I'm saying I didn't count them or really go

10   into the box at all.  I was just -- the box was just

11   there and they said we found it and they locked it up, so

12   I didn't --

13   Q.      Well, did you actually see it?

14   A.      Yes.

15   Q.      And now you locked the books up?

16   A.      Well, I didn't -- yeah, the staff that had them

17   put them in a storage closet.

18   Q.      They're not using them?

19   A.      No.

20   Q.      That's your decision as the director or someone

21   else's decision?

22   A.      I mean what -- I'm not clear what we would use

23   them for.

24   Q.      Okay.  Well, there's apparently eight other boxes

25   of 80 books each that are being used somewhere out in

1    Head Start; right?

2    A.      No, sir, not to my knowledge.

3    Q.      Okay.  Now, you say that in was it October of

4    2010 that you went on this technical hiatus?

5    A.      Yes, sir.

6    Q.      And then it was shortly after that when you were

7    on your technical break that you disclosed to Mr. Sheehan

8    with compliance services information about the book that

9    you had; is that correct?

10   A.      Part of it.  I think you're confused -- I'm

11   confused with -- you're saying the book that I had.

12   Q.      Well, you testified that you shared information

13   with Mr. Sheehan about the book.

14   A.      Yes.

15   Q.      And you did that after you were forced to take

16   this break?

17   A.      Yes.

18   Q.      Okay.  And the break had to do with the

19   underperformance of the voluntary prekindergarten

20   program; is that correct?

21   A.      Yes.

22   Q.      That's known in the lingo as VPK?

23   A.      Yes.

24   Q.      So these are the children that are underneath the

25   age of five that are attending classes in various Head

1    Start centers to get ready for kindergarten?

2    A.     Correct.

3    Q.     And there were 16 of those centers; is that

4    correct?

5    A.     Correct.

6    Q.     And in 9 of the 16 they were underperforming by

7    the measurement performed by the State of Florida

8    Department of Education?

9    A.     In the year 2008, correct.

10    Q.     Right.

11    And that's what the -- well, it was in 2008.  But

12    the survey wasn't done till the kids were in kindergarten

13    the following year.  It takes a little while for the

14    results to get figured and then action taken; right?

15    A.     Right.

16    Q.     And the action taken was to suspend you?

17    A.     Ten months later, yes.

18    Q.     For what you said was taking the blame for the

19    kids not doing well in kindergarten?

20    A.     Correct.

21    Q.     Okay.  So it was the kids' fault?

22          MR. O'NEILL:  Objection, Your Honor.

23          THE WITNESS:  I don't teach.

24          THE COURT:  I'll sustain it.

25    BY MR. WEISBROD:

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    You supervise the teachers?

2    A.    Yes.

3    Q.    You're responsible to make sure the teachers

4    teach; right?

5    A.    Make modifications to the program with support,

6    yes.

7    Q.    You told us you have a Bachelor's degree from the

8    University of Miami; right?

9    A.    Correct.

10   Q.    And a Master's -- I'm sorry.  I did not catch the

11   school.

12   A.    National Louis University.

13   Q.    Okay.  Is that a physical school that you attend?

14   A.    Yes.

15   Q.    Okay.  It's not -- is it local here?

16   A.    Yes.  It's a teaching school.

17   Q.    Were you working as -- I'm sorry.  It's a

18   teaching school?

19   A.    It's an education based teaching school, yes.

20   Q.    Were you working for Head Start at the time you

21   went to school?

22   A.    Yes.

23   Q.    Did Head Start pay for you to go to school?

24   A.    No.  The county through tuition reimbursement.

25   Q.    So not Head Start itself, but the county overall

1  paid for you to attend a local school to get this

2  Master's degree?

3  A.    Correct.

4  Q.    Okay.  And then you were in the education

5  section; correct?

6  A.    Correct.

7  Q.    You weren't in the health section, were you?

8  A.    No.

9  Q.    So a book that's being purchased in connection

10  with health issues is not necessarily one that you as

11  someone in the education section would have to approve;

12  correct?

13  A.    Depends on its use.  I wouldn't have to approve

14  it.  But if it's being used with the teachers we would

15  need to be connected.

16  Q.    Well, for someone else who's in charge of health

17  if they thought the book was important enough to buy

18  that's their decision, is it not?

19  A.    I don't know if I can agree with that

20  necessarily.

21  Q.    They don't have to clear their purchases with

22  you, do they?

23  A.    Technically, no.

24  Q.    Okay.  You might think it's the better practice,

25  but they're free to exercise their judgment as a manager

1    and within the county buying rules up to $10,000 to

2    further the interests of what they're responsible for, in

3    this case health; isn't that correct?

4    A.    If that's how you feel, yeah.

5    Q.    But it wasn't how you felt when you were trying

6    to get your job back, and that's why after you had been

7    suspended you told everybody that you weren't included in

8    this book purchase; right?

9    A.    No.

10   Q.    Well, sure it was.

11         You told Mr. Sheehan about -- you didn't raise a

12   word about it until after you got suspended; right?

13   A.    I didn't know about it.

14   Q.    Yeah.

15         And then you shared it with him to try and get

16   your job back; right?

17   A.    No.

18   Q.    The same job you lost because you blame the kids

19   for underperformance; right?

20   A.    No, sir.

21         MR. WEISBROD:  Thank you, Your Honor.  No

22   further questions.

23         THE COURT:  Mr. Brown, any questions?

24                    CROSS-EXAMINATION

25   BY MR. BROWN:

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1 Q. Good afternoon.

2 A. Good afternoon.

3 Q. It's common knowledge that everybody at Head

4 Start knew that Johana was Michael's wife; is that right?

5 A. Yes. I'm assuming. I knew.

6    THE COURT: Well, look. If you know the

7 answer, answer the question. If you don't know, say you

8 don't know. But don't assume.

9    THE WITNESS: Okay. Thank you. I knew.

10 BY MR. BROWN:

11 Q. Well, the reason I'm saying that is did you ever

12 have an interview with an FBI agent?

13 A. Yes.

14 Q. Recently -- or I guess in April of 2011?

15 A. Yeah.

16 Q. This agent right here?

17 A. Yes.

18 Q. Do you remember actually telling him -- I guess

19 I'm quoting -- everyone knew that it was Michael's wife?

20    MR. O'NEILL: Objection, Your Honor, to the

21 quoting from a --

22    THE COURT: It's sustained. Can you --

23    MR. BROWN: I'll rephrase it.

24 BY MR. BROWN:

25 Q. Did you use those exact words or tell the agent

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1      those exact words, quote -- excuse me, no quote.

2      Everyone knew it was Michael's wife?

3      A.      Maybe.  I mean -- I don't mean to be vague.  I

4      mean a lot of people knew.

5      Q.      Okay.  I'm just trying to be accurate using what

6      I thought was words that you used.

7              But regardless, you knew it?

8      A.      Correct.

9      Q.      All right.  And you knew it because you had been

10     to the preservice presentation; correct?

11     A.      Correct.

12     Q.      Were you at the one in 2007?

13     A.      Yes.

14     Q.      All right.  She spoke; right?

15     A.      Yes.

16     Q.      She was actually introduced by Michael as his

17     wife?

18     A.      Yes.

19     Q.      And she gave I guess can we call it a passionate

20     discussion about bloodborne pathogens?

21     A.      I don't know about passion.

22     Q.      Okay.  Did she seem as if she scared about the

23     topic?

24     A.      She seemed knowledgeable about the topic.

25     Q.      I'll take that.

1          Did she speak again in 2009?

2     A.    Yes.

3     Q.    Seem knowledgeable in 2009?

4     A.    Yes.

5     Q.    Did she give a slideshow in 2009?

6     A.    Yes.

7     Q.    Did she have as one of the slides a picture of

8     the book?

9     A.    Yes.

10    Q.    And was she available to anybody that wanted to

11    discuss either the topic or the book?

12    A.    I don't know that.

13    Q.    Are you familiar with the Plant City Head Start

14    center?

15    A.    Yes.

16    Q.    Have you been there?

17    A.    Yes.

18          MR. BROWN:  May I approach, Your Honor?

19          THE COURT:  You may.

20    BY MR. BROWN:

21    Q.    I'm showing you what's marked as Defendant's

22    Exhibit 14.  I'm going to show you two photographs in

23    there.  Are you familiar with the inside of the Plant

24    City classroom?

25    A.    Yes.

1    Q.    Is that a fair and accurate representation -- or

2    a picture of what that classroom looked like in 2008?

3    A.    Yes.

4    Q.    Do you see what they're doing in there?

5    A.    Yes.  They're reading.

6          MR. BROWN:  Your Honor, at this time I'd

7    offer into evidence what's been marked as Defendant's

8    Exhibit 14 as to the two photos.

9          MR. O'NEILL:  No objection, Your Honor.

10         THE COURT:  All right.  I'll receive into

11   evidence Melendez Santiago's 14.

12         (EXHIBIT 14 ADMITTED INTO EVIDENCE.)

13   BY MR. BROWN:

14   Q.    This is one of the two photographs.  Do you see

15   in there a teacher or somebody?

16   A.    Yes.

17   Q.    They seem to have a book, do they not?

18   A.    Yes.

19   Q.    And you can also make out what looks to be a

20   picture in there; is that correct?

21   A.    In the book?

22   Q.    Yes.

23   A.    Yes.

24   Q.    Now, are you familiar with whether or not there

25   was an earlier edition of Travel Boy Helps Sebastian in

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   2008?

2   A.     No, I'm not.

3   Q.     I'm showing you -- do you see the photograph in

4   there?

5   A.     Yes.

6   Q.     All right.  Does that photograph look similar to

7   this photograph -- this drawing -- excuse me, this

8   cartoon drawing, can you tell?  I can show you --

9   A.     Looks similar.

10   Q.     Okay.  And this one here again looks like

11   somebody is reading a book to the students; is that

12   right?

13   A.     Yes.

14   Q.     All right.  And you'd agree with me that at least

15   from the photograph it looks like the students are paying

16   attention; correct?

17   A.     Somewhat, yeah.

18   Q.     Well, the girl in the pink dress or the lavender

19   dress looks like she's clearly paying attention and

20   interested in what's going on; right?

21   A.     Yes, that one girl, yes.

22   Q.     Okay.  And can you tell whether or not the

23   cartoon or the drawing that's in that book looks similar

24   to the one that's in the book that I have here, the 2010

25   edition of Travel Boy Meets Sebastian?  Does it look

1    similar to you?

2    A.      I can't tell on that one.

3    Q.      Do you know who Mary Dunson is?

4    A.      Yes.

5    Q.      She's a teacher; right?

6    A.      Center coordinator, yes.

7    Q.      Have you ever talked to her to see about how when

8    Miss Melendez Santiago's student went to teach at the

9    Plant City Head Start how well their presentation was

10    received?  Did you ever talk to her about that?

11            MR. O'NEILL:  Hearsay grounds, Your Honor.

12            THE COURT:  I'm sorry?  Say it again.

13            MR. O'NEILL:  Hearsay.

14            THE COURT:  Any -- anything that she might

15    have said about the presentation is hearsay.  I will

16    sustain and ask the jury to disregard it.

17    BY MR. BROWN:

18    Q.      Did you ever talk to Karen Mercer?  Do you know

19    who Karen Mercer is?

20    A.      Yes.

21    Q.      Did you ever talk to her about whether or not the

22    book was well received or not?

23            MR. O'NEILL:  Objection, same grounds.

24            MR. BROWN:  Just asked whether it was --

25    whether she talked to her, Your Honor.

1           MR. O'NEILL:  Same grounds.

2           THE COURT:  All right.  I'm going to allow

3    her to ask the question.

4           Did you talk to her.

5           THE WITNESS:  Not about that, no.

6    BY MR. BROWN:

7    Q.     How about -- did you talk to any of the teachers

8    there --

9    A.     In Plant City?

10   Q.     -- about the book or about whether the book was

11   well received or not?

12   A.     No, sir.

13          MR. BROWN:  Nothing further.

14          THE COURT:  Mr. Farmer.

15          MR. FARMER:  Yes, Your Honor.  Thank you.

16                    CROSS-EXAMINATION

17   BY MR. FARMER:

18   Q.     Good afternoon, Miss Dasher.

19   A.     Good afternoon.

20   Q.     Now, you described how a box of these books was

21   discovered when staff members were moving items out of

22   the RN's office.

23   A.     From one side of the office, not -- I'm sorry.

24   Not a specific office but, you know, we have cubicles.

25   Q.     And but what's the connection between the

1   location that the books were found and the RN?

2   A.      Many of the health staff are on that side of the

3   office.

4   Q.      So the books were found in the common area where

5   cubicles are located or in someone's office?

6   A.      To my knowledge, in the common area.

7   Q.      Did you see where they were discovered, that is

8   the box of books?

9   A.      No.  They were -- they brought the box in my

10  direction.

11  Q.      I see.

12          And this was -- there was an area next to the

13  RN's office?

14  A.      Adjacent, like this open area.

15  Q.      And who was the RN at that time?

16  A.      Marecia Bell.  You mean currently that found

17  them?

18  Q.      No.  At the time the books were discovered.

19  A.      Oh, at the time the books were discovered it was

20  Amy Rocha.

21  Q.      And who was the RN right before Miss Rocha?

22  A.      Marecia Bell.

23  Q.      And you described that books that are distributed

24  to the teachers of Head Start are within your area of

25  supervision; is that right?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   A.      Yes, the teachers, yes, it was.

2   Q.      All right.  So if a book order is made that

3   ultimately was for books that go to teachers it goes

4   through you; is that right?

5   A.      It's supposed to.

6   Q.      And books that go to parents, that would not go

7   through you; is that correct?

8   A.      Correct.

9   Q.      And you have no medical personnel on your staff;

10  is that right?

11  A.      Correct.

12  Q.      All of the medical personnel, including the

13  registered nurses and the assistant nurses, the LPNs,

14  that's within Miss Mason's area of supervision at least

15  in 2010; is that right?

16  A.      Correct.

17          MR. FARMER:  That's all I have.  Thank you,

18  Your Honor.

19          THE COURT:  All right.  Mr. O'Neill.

20          MR. O'NEILL:  Thank you, Your Honor.

21                  REDIRECT EXAMINATION

22  BY MR. O'NEILL:

23  Q.      Miss Dasher, Mr. Weisbrod asked you questions

24  about you overseeing the education department and that

25  you stated -- and I don't want to put words in your

1    mouth.  You can change it -- that you felt you needed to

2    be connected to any purchase of any book like this.

3    A.    Correct, yes, I did.

4    Q.    Are you aware of any book like this being

5    purchased outside of the education department during

6    2010?

7    A.    No, sir.  We received from St. Joseph's Hospital

8    free Germane the Germ, and from the health department we

9    received free services where they come into the

10   classrooms and give materials to the children and give us

11   posters and things on handwashing.  So we always got

12   those kind of services gratus from our community

13   partners.

14   Q.    So you received books about germs for free?

15   A.    And other materials, yes.

16   Q.    And how is it that Head Start gets these books

17   for free?

18   A.    We're actually a partner with St. Joseph's

19   Hospital.  And when they applied for a grant to get such

20   services specifically for our children.

21   Q.    These are particularly children's books?

22   A.    They're children's materials.  I wouldn't specify

23   books as much as a variety of materials that support good

24   handwashing and germ management.

25   Q.    You mentioned handwashing and germ management.

1    Any other topics that you can think of?

2    A.    For the children?

3    Q.    Yes, ma'am.

4    A.    I mean that's the number one thing with little

5    kids.  It's really washing hands and covering your mouth

6    when you cough or sneeze.  So it's good hygiene.

7    Q.    Let me show you what has been marked as

8    Government's 2.  It's already been placed in evidence.

9    Have you seen this, Miss Dasher?  It's an e-mail from

10    Miss Melendez Santiago to Mr. Jimenez and then one from

11    Mr. Jimenez to Miss Navejar.

12        There's an attached sheet from Miss Melendez

13    Santiago which states that -- I'll read it with the

14    permission of the Court.  "This book can be used for

15    Spanish, English classes, reading comprehension, writing,

16    science and health education.  It can be used by

17    teachers, daycare providers, parents, nurses, scientists

18    and healthcare personnel that wish to teach kids about

19    germs and relationship to disease."

20        Are you familiar with that, ma'am?

21        MR. WEISBROD:  Your Honor, I'm going to

22    object.  Beyond the scope.

23        THE COURT:  Overruled.

24        You may answer the question.

25        THE WITNESS:  I've seen this.  Yes, I have

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    seen this.

2    BY MR. O'NEILL:

3    Q.    To your knowledge, was this book directed to

4    teachers as well as parents?

5    A.    I'm sorry?  I couldn't hear the last part.

6    Q.    To your knowledge, was this book directed to

7    teachers as well as parents?

8    A.    No.  I mean not -- well, older -- I think for

9    older -- teachers who teach older children maybe.

10   Q.    Have you reviewed this book?

11   A.    Yes.

12   Q.    Do you have an opinion as to whether it is

13   relevant for children from six weeks to five years?

14   A.    In my opinion, no, it isn't.

15   Q.    And why is that, ma'am?

16   A.    It's very wordy.  The pictures are -- I mean some

17   of the pictures look inappropriate and it's a little

18   long.  It's long.  And the words you would need to really

19   introduce just -- it's a higher level vocabulary.

20   Q.    How would you describe the books you get from

21   St. Joseph's for free concerning germs?

22         MR. WEISBROD:  Objection, Your Honor.

23   They're not books from St. Joseph's.  That's another --

24   that's a misstatement of the evidence.  She very clearly

25   said materials.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          THE COURT:  I'll sustain.  She said

2  materials I believe.

3          MR. O'NEILL:  Let me redraft it.

4  BY MR. O'NEILL:

5  Q.      How would you describe the booklets, materials,

6  training materials that you receive for free from

7  St. Joseph's that involve germ management?

8  A.      Well, the booklets are specifically designed --

9  they're like pamphlets to give the teachers specific

10  strategies to implement in the classroom.  And then some

11  of the posters and other materials have simple words and

12  simple messages to guide the children as they're

13  handwashing.  So they're more appropriate for the level.

14  Q.      Thank you, ma'am.

15          MR. O'NEILL:  Nothing further.

16          THE COURT:  All right.  Thank you.  You may

17  step down.

18          We're going to go ahead and recess.  It's

19  ten minutes of 5:00.

20          Ladies and gentlemen, we're going to recess

21  for the evening.  Please leave your pads on your chairs.

22          And let me remind you again please don't

23  discuss the case with anyone in any manner.  Also, should

24  there be any articles in the news media please don't

25  listen to them or read them.  And I will see you in the

1    morning.

2           Now, a slight change.  Instead of 9:00 we're

3    going to start at 9:30 because I have two hearings in the

4    morning before the trial.  So we will start at 9:30

5    tomorrow morning.  Any questions?  Okay.  Have a good

6    evening.

7           COURT SECURITY OFFICER:  All rise, please,

8    for the jury.

9       (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

10          THE COURT:  Okay.  You may have a seat.

11          Mr. O'Neill, can you tell me about the day

12   tomorrow.

13          MR. O'NEILL:  Yes, Your Honor.  Judge, I

14   would expect that because we finished with this witness

15   we could start with Mr. Finney first thing if that would

16   help Miss Palmieri.

17          THE COURT:  Good.  All right.

18          MR. O'NEILL:  And then I also think we would

19   get to Miss Galloway, Miss Fowler, Miss Bayard

20   Mr. Sheehan.  And just because of the nature of the --

21   of the second tape, it's rather lengthy, that might take

22   a while.  And I think we could probably finish all the

23   witnesses by tomorrow even with those tapes.  I see no

24   problem with doing that, Judge.

25          THE COURT:  Okay.  Now, you -- neither you

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  nor Mr. Weisbrod have had an opportunity to listen to the

2  redacted tape?

3          MR. O'NEILL:  No, Your Honor.  I gave

4  Mr. Weisbrod just a little while ago a copy that was done

5  and I was hoping to stay a couple minutes with Anaida and

6  see if --

7          THE COURT:  It plays?

8          MR. O'NEILL:  -- the equipment here plays.

9  And if not, then we'll do something with that tomorrow

10  morning.

11          THE COURT:  All right.  Then we'll talk

12  about that tomorrow.

13          Anything else you think we need to discuss

14  tonight?

15          MR. WEISBROD:  Air-conditioning.

16          THE COURT:  Air conditioning?

17          MR. WEISBROD:  It's hot in here.  I mean I

18  appreciate you trying to help me slim down some, but it's

19  warm in here.

20          THE COURT:  Is it?

21          MR. O'NEILL:  Yeah, it's very hot.

22          THE COURT:  Okay.  Well, we have reported it

23  apparently three times.

24          MR. WEISBROD:  I know.  I've bugged Anaida a

25  whole bunch of that.  I figured maybe I'd go up the chain

1   a little bit.

2          THE COURT:  Well, this is somewhat

3   surprising because everybody says Judge Kovachevich keeps

4   the courtroom freezing cold.

5          MR. WEISBROD:  Absolutely.

6          THE COURT:  I don't know what's happened.

7   All right.  See you in the morning at 9:30.

8          And I do have two sentencings so you're

9   probably going to have to -- the defense will need to put

10   their stuff on the back table.

11          And, Mr. O'Neill, I would just suggest that

12   you either put your stuff on the floor or --

13          MR. O'NEILL:  Yes, Your Honor.

14          THE COURT:  -- any way to clear the table.

15          MR. O'NEILL:  Thank you for letting us know

16   that.

17          (PROCEEDING ADJOURNED.)

18          I CERTIFY that the foregoing is a true and

19   accurate transcription of my stenographic notes.

20   Dated:  11/04/2011.

21

22          ___s/ Sandra K. Provenzano_____
                SANDRA K. PROVENZANO, RPR
23              Official Court Reporter

24

25


SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER