IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
CASE No. 8:11 CR 197 T 24 MAP


UNITED STATES OF AMERICA


       Plaintiff,

v.                        July 13, 2011
                            9:00 a.m.

MICHAEL JIMENEZ, JOHANA
MELENDEZ SANTIAGO, and
MARIE MASON


       Defendant.
_____/


TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:     ROBERT O'NEILL
                       Assistant U.S. Attorney
                       U.S. Attorney's Office
                       400 North Tampa Street
                       Suite 3200
                       Tampa, FL 33602


For the Defendant:     DAVID WEISBROD
Michael Jimenez        Law Office of David T. Weisbrod
                       Suite 1111, 412 E Madison St
                       Tampa, FL 33602

```
For the Defendant:        JEFFREY G. BROWN
Johana Melendez           Brown & Doherty, PA
Santiago                  Suite 120, 450 Carillon Pkwy
                          St. Petersburg, FL 33716


For the Defendant:        MATTHEW P. FARMER
Marie Mason               Farmer & Fitzgerald, PA
                          708 E Jackson St.
                          Tampa, FL 33602



Reported By:              Sandra K. Provenzano, RPR
                          Official Court Reporter
                          U.S. District Court
                          801 North Florida Avenue
                          Tampa, FL 33602
                          (813) 301-5699

STENOGRAPHICALLY REPORTED
COMPUTER-AIDED TRANSCRIPTION
```

INDEX

WITNESS:                                              PAGE:

**LOUIS FINNEY, JR.**                                      8
        DIRECT EXAMINATION                                9
BY MR. O'NEILL
        CROSS-EXAMINATION                                18
BY MR. WEISBROD
        CROSS-EXAMINATION                                37
BY MR. FARMER:
        REDIRECT EXAMINATION                             42
BY MR. O'NEILL
**JANET FOWLER**                                          48
        DIRECT EXAMINATION                               49
BY MR. O'NEILL
        CROSS-EXAMINATION                                55
BY MR. WEISBROD
**MERRIE BAYARD**                                         56
        DIRECT EXAMINATION                               57
BY MR. O'NEILL:
        CROSS-EXAMINATION                                63
BY MR. WEISBROD
**TERESA GALLOWAY**                                       65
        DIRECT EXAMINATION.                              66
BY MR. O'NEILL
        CROSS-EXAMINATION                                71
BY MR. BROWN:
        REDIRECT EXAMINATION                             74
BY MR. O'NEILL
**ROBERT SHEEHAN**                                        78
        DIRECT EXAMINATION                               78
BY MR. O'NEILL
        CROSS-EXAMINATION                               138
BY MR. WEISBROD
        CROSS-EXAMINATION                               144
BY MR. FARMER
        REDIRECT EXAMINATION                            154
BY MR. O'NEILL
**JOHANA MELENDEZ SANTIAGO**                             191
        DIRECT EXAMINATION                              191
BY MR. BROWN:
        CROSS-EXAMINATION                               232
BY MR. FARMER:
        CROSS-EXAMINATION                               233
BY MR. O'NEILL
        REDIRECT EXAMINATION                            242
BY MR. BROWN:

* * * * *

EXHIBITS:                    IDENTIFIED:

EXHIBITS:                    RECEIVED:

 24                          54
 16                          59
  29                         81
 30                          89
 17 THROUGH 20               133
 7                           196
 3 THROUGH 6                 201
 35                          206
 15 THROUGH 19               212
 9                           219
 11                          224

```
 1              P R O C E E D I N G
 2         THE COURT:  Okay.  Are Mr. Weisbrod and
 3    Mr. Brown not here, or are they --
 4              MR. FARMER:  No.  They're both here.
 5              THE COURT:  Would you ask them to come in.
 6              Mr. Brown, is Mr. Weisbrod here?
 7              MR. BROWN:  Yes.  He's in the restroom, Your
 8    Honor.
 9              THE COURT:  I just started a little early
10    since I wanted to find out if there was going to be any
11    problem with the next witness before -- as early as I
12    could.
13              Mr. O'Neill.
14              MR. O'NEILL:  There's not any problem, Your
15    Honor --
16              THE COURT:  Okay.
17              MR. O'NEILL:  -- by Miss Palmieri, who's in
18    the courtroom.
19              THE COURT:  Miss Palmieri?
20              MISS PALMIERI:  Yes, Your Honor.  No
21    problems.
22              THE COURT:  Okay.  All right.
23              MR. WEISBROD:  And just so the Court knows I
24    listened to the redacted disk last night, and it's fine
25    as is in its new form.
```

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          THE COURT:  Good grief.  Things are just

2    really working out this morning.

3          The women's restroom apparently is closed on

4    the 17th floor and you'll have to go to what floor?

5          COURTROOM DEPUTY CLERK:  Fifteen.

6          THE COURT:  Fifteen if you need to use the

7    restroom.  Now, doesn't seem quite fair because the men's

8    restroom is open but that's the way it is.  And I'm told

9    that it's closed because there is an effort to do

10   something about the temperature in the courtroom.  And in

11   order to do that they have to do something in the

12   bathroom -- the women's bathroom.

13         MR. WEISBROD:  Of course.

14         THE COURT:  There was an article in the

15   St. Petersburg Times.  I did not see one in The Tribune,

16   but there was one in the Times so I will be asking the

17   jurors about trial publicity, if they're here.

18         Okay.  We're apparently missing a juror.  I

19   knew things were too good to be true.

20              (PAUSE IN PROCEEDING.)

21         THE COURT:  The juror is present so I'm

22   going to ask Mr. Adkins to bring them in.

23         COURT SECURITY OFFICER:  Yes, Your Honor.

24              (PAUSE IN PROCEEDING.)

25         COURT SECURITY OFFICER:  All rise, please,

1  for the jury.

2      (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

3          COURT SECURITY OFFICER:  Thank you, ladies

4  and gentlemen.  Please be seated.

5          THE COURT:  Good morning.

6          MEMBERS OF THE JURY:  Good morning.

7          THE COURT:  Ladies and gentlemen, as I did

8  yesterday I'm going to ask the same few questions.  First

9  let me ask if anything might have happened over the

10 evening hours that might affect anybody's ability to

11 serve fairly on this jury.  Okay.

12         It's been brought to my attention again that

13 there was a news story or may have been a news story in

14 the paper or television or radio or in some -- perhaps in

15 some form.  Let me verify, have any of you read anything

16 or heard anything in the news media over the evening

17 hours about the trial?  Okay.

18         Again, it's important that the case be tried

19 based on what's heard in the courtroom rather than what

20 you hear or may hear outside of the courtroom.  So I

21 would again tell you not to read anything or listen to

22 anything should there be anything in the news media.  Any

23 questions or any concerns before we begin?

24         I know the attorneys brought to my attention

25 yesterday and we may have even discussed it, it was warm

1  in the courtroom and we have been trying to do something

2  about that.  As a result, I'm not sure what the

3  connection is, but the women's 17th floor restroom, not

4  the one in -- the ones in the jury room but the one out

5  here is closed because somehow they're working on that in

6  order to work on the problem with the courtroom

7  temperature.

8            So I just tell you that so you will know

9  that that's closed and the one that's open is the one on

10 the 15th floor.  But we are working on it.

11            All right.  Mr. O'Neill, you may call your

12 next witness.

13            MR. O'NEILL:  Thank you, Your Honor.  The

14 government calls Louis Finney.

15            THE COURT:  Mr. Finney, if you'll come

16 forward, please, sir, to be sworn.

17            And, Miss Vizza, would you swear him in.

18            COURTROOM DEPUTY CLERK:  Yes, Your Honor.

19            Please raise your right hand.

20            Do you solemnly swear or affirm under

21 penalty of perjury that the testimony you shall give in

22 this cause shall be the truth, the whole truth, and

23 nothing but the truth, so help you God?

24            THE WITNESS:  Yes, I do.

25            **LOUIS FINNEY, JR.,**

a witness, having been duly sworn to tell the truth, the
whole truth and nothing but the truth, was examined and
testified as follows:

COURTROOM DEPUTY:  Please be seated.

State your full name and spell the last for
if record.

THE WITNESS:  Louis Adrian Finney, Junior,
F, as in Frank, I-N-N-E-Y.

THE COURT:  Mr. O'Neill.

MR. O'NEILL:  Thank you.

DIRECT EXAMINATION

BY MR. O'NEILL:

Q.    Good morning, Mr. Finney.

A.    Good morning.

Q.    Mr. Finney, I'm going to be asking you a series
of questions.  I'd ask you to speak in a loud and clear
voice so that everyone can hear you, particularly the
jury.

A.    Yes.

Q.    Sir, let me begin by asking you could you relate
to the ladies and gentlemen of the jury your educational
background.

A.    Have a Bachelor's degree in criminal justice, a
Master's degree in public administration as well as
completed some doctoral study towards a PhD in human

```
 1   services.
 2   Q.      Okay.  If we could slow down just a little.
 3           Your Bachelor of Arts degree is from what
 4   institution?
 5   A.      University of Maryland.
 6   Q.      And your Master's degree is from what
 7   institution?
 8   A.      Wilmington University.
 9   Q.      Okay.  And where is that located?
10   A.      That's in Delaware.
11   Q.      Now, Mr. Finney, are you currently employed?
12   A.      Yes, I am.
13   Q.      And how are you employed?
14   A.      I'm employed by the Hillsborough County Board of
15   County Commissioners.
16   Q.      In what capacity?
17   A.      As the division director for Head Start and Early
18   Head Start.
19   Q.      Let me first -- the jury's heard some testimony
20   about it.  What is Head Start and Early Head Start?
21   A.      Okay.  Head Start is antipoverty program for low
22   income at risk families that also serves children with
23   disabilities.  Out of Hillsborough County we serve
24   approximately 3,452 children.  The county operates one
25   program but we also contract out services to nonprofits
```

1    in the school district.

2    Q.    And how are you funded, the program in

3    Hillsborough County?

4    A.    The funding is multiple.  It's federal funding,

5    state funding as well as county funding.

6    Q.    You receive in excess of $10,000 a year from the

7    federal government?

8    A.    Excuse me.

9    Q.    Do you receive, the institution, in excess of

10   $10,000 a year from the federal government?

11   A.    Yes, we do.

12   Q.    And where does that come from within the federal

13   government?

14   A.    U.S. Department of Health and Human Services, the

15   Office of Head Start.

16   Q.    Now, so the Department of Health and Human

17   Services also has a division of Head Start?

18   A.    Yes, they do.

19   Q.    Okay.  Now, Mr. Finney, within Head Start/Early

20   Head Start how many employees do you supervise?

21   A.    Approximately 289.

22   Q.    And how many children are in the program?

23   A.    In the program that we operate it's approximately

24   1,500 children.

25   Q.    Now, does that include just children within the

1    Head Start/Early Head Start as opposed to ones that are

2    supervised through the school system?

3    A.      No.  That is just the Board of County

4    Commissioners program.

5    Q.      Okay.  Are there other children sort of

6    ancillarily related to the program?

7    A.      Yes, there are.

8    Q.      And how many of those?

9    A.      That's roughly close to about 1,900.

10   Q.      And could you briefly explain how that works that

11   some are directly within the program and others

12   associated with the school system.

13   A.      Okay.  Hillsborough County is actually the

14   grantee for the organization, and what we do is operate a

15   full day, full year program for working parents.  And

16   then we also contract out through three delegates as the

17   recipients.  One is Lutheran services, the YMCA and

18   Hillsborough County Public Schools, and we also contract

19   out with nonprofits as well as churches to manage Head

20   Start.

21   Q.      With the permission of the Court I approach the

22   desk in front of the --

23           MR. O'NEILL:  Sorry.  I don't know what it's

24   called, Your Honor.

25   BY MR. O'NEILL:

Q.      Mr. Finney, some documents have already been

placed in evidence.  And I would like to show you at this

time starting with Government's Exhibit 10 which is

placed in evidence.  And it's a book called Travel Boy

Helps Sebastian.

        And then I want to show you what has been marked

as Government's Exhibit 1 in evidence and that is a

merchandise request form.  And specifically turning to

Government Exhibit 1 then, sir, are you familiar with

that form?

A.      Yes, I am.

Q.      And is that a standard form used to order

merchandise within Head Start?

A.      Yes, it is.

Q.      Mr. Finney, I would direct your attention to the

right-hand side where my finger is pointing and ask you

if you recognize that signature.

A.      Yes, I do.

Q.      And whose signature is that?

A.      That is my signature.

Q.      And so by that signature did you approve this

expenditure of $9,000 for 750 copies of Government's

Exhibit 10?

A.      Yes, I did.

Q.      Okay.  At the time that you did so, Mr. Finney,

1   did you have any knowledge that the author of Travel Boy

2   Helps Sebastian was the wife of Michael Jimenez?

3   A.      No, I did not.

4   Q.      Now, sir, I mentioned Michael Jimenez.  Who is

5   Michael Jimenez?

6   A.      Michael Jimenez is the former deputy director of

7   administrative services.

8   Q.      And as deputy director of administrative services

9   he works under you.  Is that fair to say?

10  A.      Yes, he does.

11  Q.      What would be his duties and responsibilities as

12  a deputy administrator?

13  A.      He's primarily the CFO for the organization

14  responsible for fiscal at that time, also quality

15  assurance as well as managing some of the contracts and

16  the delegate operations.

17  Q.      Now, had you ever met his wife, Johana Melendez

18  Santiago, prior to signing that merchandise request form?

19  A.      Yes.  I recall meeting her once or twice about

20  four or five years ago at a training.  And that was

21  primarily it.  Each year we have preservices, and I do

22  recall at some point meeting her at that time.

23  Q.      Did anything about meeting her years before

24  trigger something when you signed this merchandise

25  request form?

1    A.    No, because I don't recall her name.

2    Q.    Would you have expected someone to tell you that

3    the author was the wife of Michael Jimenez?

4    A.    Yes, I would.

5    Q.    Now, Government's Exhibit 1, which is the

6    merchandise request form, also bears the signature of

7    Marie Mason.  Do you recall that or would you like me to

8    put it on the screen again?

9    A.    You can put it on the screen again.

10   Q.    Sure.

11         MR. O'NEILL:  If I may approach, Your Honor?

12         THE COURT:  Yes.

13   BY MR. O'NEILL:

14   Q.    Sir, I'm putting up on the screen Government's

15   Exhibit 1.  And we previously directed your attention to

16   your signature.  Do you see another signature on top of

17   the approval?

18   A.    Yes, I do.

19   Q.    And whose signature is that?

20   A.    Marie Mason.

21   Q.    Now, when you signed off on that, did Marie Mason

22   mention to you that Johana Melendez Santiago was the wife

23   of Michael Jimenez?

24   A.    No, she didn't.

25   Q.    If you had known that, would you have signed that

1    document?

2    A.    No, I would not.

3    Q.    And why not, sir?

4    A.    Because for me in my opinion I thought it might

5    have been a conflict of interest.

6    Q.    Were you concerned by the -- would you have been

7    concerned by the fact that the wife of one of your

8    employees was the author of this book and making money on

9    behalf of the county?

10   A.    Yes, I would have been concerned.

11   Q.    Now, Mr. Finney, when did you learn for the first

12   time that Johana Melendez Santiago was the wife of

13   Michael Jimenez?

14   A.    From an investigator who came to my office and

15   questioned me about it.

16   Q.    And what is that investigator's name?

17   A.    Bob Sheehan.

18   Q.    After you learned from Bob Sheehan that there was

19   an investigation going on, what, if anything, did you do

20   in relation to this book?

21   A.    First, I immediately contacted my supervisor at

22   HR.  I don't recall if it was either through e-mail or

23   phone call.  Also talked to the staff as well expressing

24   my concern.

25   Q.    And when you spoke to the staff, who did you

1  speak to?

2  A.      As far as I recall, I recall speaking to

3  Miss Mason, I recall speaking to Miss Tedder.  And there

4  were a few other staff.  I don't recall exactly.

5  Q.      Did you have a conversation with Miss Mason about

6  the book?

7  A.      Yes, I did.

8  Q.      And what, if anything, did she say to you?

9  A.      Pretty much as far as I can recall she addressed

10  the concern that I had.  She was very frank, you know,

11  that, no, she didn't tell me.  She didn't see a major

12  problem with it, et cetera.  And I just told her this

13  could be a potential issue and that was primarily it.

14  Q.      And you said as far as you could recall.  Did you

15  request that Miss Mason author an e-mail to you

16  explaining the fact that she had never told you about

17  this?

18  A.      Yes, I requested her to write exactly what

19  happened in that situation.

20  Q.      And did you likewise do the same with

21  Miss Tedder?

22  A.      Yes, I did.

23  Q.      And as a result of those e-mails, did you then

24  author a memorandum to David Rogoff, who was then the

25  director?

```
1    A.      Yes, I did.

2    Q.      And did that explain that you had no knowledge of

3    the fact that Miss Melendez Santiago was the author of

4    this book when you signed off on the merchandise request

5    form?

6    A.      Yes.

7                MR. O'NEILL:  Nothing further, Your Honor.

8                THE COURT:  All right.  Mr. Weisbrod.

9                MR. WEISBROD:  Thank you, Your Honor.

10                        CROSS-EXAMINATION

11   BY MR. WEISBROD:

12   Q.      Good morning, sir.

13   A.      Good morning.

14   Q.      You say some doctoral studies; correct?

15   A.      Yes.

16   Q.      And that was at -- or in connection with a

17   Capella University; is that accurate?

18   A.      Yes, it is.

19   Q.      Okay.  And that's relatively recent, is it not?

20   A.      No.  It's not finished.  I haven't been there in

21   quite some time.

22   Q.      Okay.  And that cost some money, did it not?

23   A.      Yes.  It's not finished.

24   Q.      All right.  Cost thousands of dollars to take

25   those classes?
```

1    A.    I don't recall the exact amount it cost.

2    Q.    Well, you're the one that approved payment for

3    that, did you not?

4    A.    No.  That's false.

5    Q.    Well, you had something called a P card at your

6    disposal; correct?

7    A.    No.  That's incorrect.

8    Q.    Well, let's see.  You were interviewed by

9    Mr. Sheehan --

10   A.    Uh-huh.

11   Q.    -- in regard to this matter in November of 2010;

12   right?

13   A.    Yes.

14   Q.    Now, you're familiar with Mr. Sheehan because he

15   had interviewed you regarding several matters before

16   November of 2010; right?

17   A.    Yes.

18   Q.    And one of the matters that he had interviewed

19   you about concerned the payment of your doctoral studies

20   at Capella University?

21   A.    Yes.

22   Q.    And one of the things that he had talked to you

23   about and you had talked to him about was the payment of

24   those credit hours through the use of the P card;

25   correct?

A.     Yes.

Q.     And the person that had authorized the use of the
P card for those credit hours was yourself?

A.     That's inaccurate.  First of all, the way that
process was, there was an employee who actually had the
credit card.  My role as a division director is to
approve all credit card expenses.

       My supervisor, Tom Pappan (phonetic), signed off
on me going to school, so the department director was
well aware that I was in school.

Q.     You had a supervisor above you?

A.     Absolutely.

Q.     But you also directed the employee below you to
pay those expenses; right?

A.     I don't do any direction.  I do approval.

Q.     You approved that?

A.     Yes.  And then my boss approved me going to
school and is aware of the purchases.

Q.     That was an instance where you were benefiting
with Head Start funds for personal professional
development; right?

A.     Well, let me restate that.  No.  That's a
situation where every employee is eligible to go to
school for Head Start, including the Head Start director.

Q.     Right.

```
 1           And you benefited from those funds; right?
 2    A.      Yes.
 3    Q.      Okay.  So there's nothing inherently wrong with
 4    an employee of Head Start benefiting from Head Start
 5    funds; right?
 6    A.      Well, Head Start funds pay for benefits, they pay
 7    for training, they pay employee salaries.
 8    Q.      Well, beyond salaries, attending classes is not a
 9    salary; it's something beyond that?
10    A.      It's a benefit, yes, it is.
11    Q.      Okay.  And that's a benefit that you were able to
12    personally have --
13    A.      Uh-huh.
14    Q.      -- through the use of Head Start funds?
15    A.      Yes.
16    Q.      And you told Mr. Sheehan in your interview that
17    there was an appearance of impropriety with that, did you
18    not.
19    A.      I don't recall because I don't have that in front
20    of me.
21              MR. WEISBROD:  May I approach the witness,
22    Your Honor?
23              THE COURT:  You may.
24    BY MR. WEISBROD:
25    Q.      I'm going to ask you to read this to yourself.
```

1    A.     Sure.  Yeah, that's comprised from my statement.

2    That's not my entire statement.

3    Q.     The summary was, as you now recall, that you told

4    Mr. Sheehan there was an appearance of impropriety for

5    you approving your own expenses?

6    A.     No.  They were not my exact words.  That's

7    Mr. Sheehan's summary of what my conversation was.

8    Q.     And you told him that you had benefited from

9    getting these classes at Cappella paid for by Head Start;

10   right?

11   A.     Yes, me as well as several employees.

12   Q.     So, again, there is no prohibition against Head

13   Start employees personally benefiting from Head Start

14   funds?

15   A.     No, there is no prohibition.

16   Q.     Now, there is a distinct difference between

17   filing a disclosure form and there being an actual

18   conflict of interest; correct?

19   A.     I'm not sure.  I'm not the human resources person

20   so I can't give you an answer on that one.

21   Q.     Well, when a disclosure form is filed, doesn't it

22   first go to you as the division director?

23   A.     Yes.  But I don't make the decision.  The

24   decision is actually made by the department director.  It

25   goes to a supervisor, a manager, myself.  But the

1    department director actually makes the decision on

2    disclosure forms.

3    Q.    Okay.  So you're the -- you're at the first level

4    of review; is that correct?

5    A.    No.  It's from the manager or supervisor.

6    Q.    So above -- oh, those are people below you?

7    A.    Yes.

8    Q.    Okay.  And then after that's done, there's

9    another level of review at your level?

10   A.    Yes.

11   Q.    And then there is a decision made by the

12   department director --

13   A.    Yes, it is.

14   Q.    -- to allow or not allow a particular situation

15   to proceed?

16   A.    Yes.

17   Q.    But even past that then there is a committee that

18   can review whether or not an actual conflict exists;

19   correct?

20   A.    As far as I can recall.  Again, that's an HR

21   policy that I'm not -- I don't specialize in that

22   particular form and I've never been involved in a

23   committee.

24   Q.    I'm not asking you to specialize in it.

25         But you know from the HR policy that there is

1    this committee that can approve so-called conflicts;

2    right?

3    A.      Yes, there is some form of committee.

4    Q.      Or waive a conflict?

5    A.      Yes.

6    Q.      And then beyond that there's even something

7    called an ad hoc committee that can review yet again;

8    right?

9    A.      As far as I recall, I think there is.

10   Q.      And, now, in your case there was another

11   disclosure situation involving your time as an instructor

12   at a local college; right?

13   A.      Yes.

14   Q.      I don't know if it's a local college or a branch

15   of another college, but it was here locally; right?

16   A.      Uh-huh.

17   Q.      I'm sorry.  You have to say "yes" or "no."

18   A.      Yes.

19   Q.      And because you were going to teach there and

20   Head Start personnel were going to attend classes there

21   and get that paid for by Head Start, you filed some sort

22   of notice; is that correct?

23   A.      No.  I filed that notice prior to that.  Head

24   Start students have been going to Springfield for the

25   past 10 to 15 years.

Q.      Right.

But when you went to work there, when you went
and accepted a position or were going to accept a
position as an instructor --

A.      Uh-huh.

Q.      -- that was something that then you wanted
somebody at Head Start to sign off on?

A.      Yes.  My department director signed off on that.

Q.      And because your department director signed off
on it -- who is that by the way?

A.      That was Tom Pappan at the time.

Q.      Because Mr. Pappan signed off on it, that was the
end of that particular issue?

A.      Yes, it is.

Q.      Okay.  So even though you're benefitting from the
fact that Head Start people are going to the school that
you're teaching at, that was allowed?

A.      Well, actually I was not benefitting.  I taught
graduate school and social services.  The Head Start
people were actually taking classes in early childhood,
so I taught none of those students.  And most of them
were already registered.  I only taught for two -- two or
three semester, so there really wasn't any benefit.

Q.      Well, we're talking about appearances; right?

A.      Yes -- well, I thought we were talking about

1    facts.

2    Q.    You're -- you're working at this college?

3    A.    Yes.

4    Q.    You're being paid to work there?

5    A.    Uh-huh.

6    Q.    Is that a "yes"?

7    A.    Yes, I was being paid.

8    Q.    The court reporter just can't take down the

9    sounds.  And we all do it, but you need to verbalize

10   "yes" or "no."

11   A.    Okay.

12   Q.    So you are at that time the director of Head

13   Start; correct?

14   A.    Yes.

15   Q.    And you have -- or there are monies available for

16   Head Start employees to get professional development

17   through higher education; right?

18   A.    Yes, there are.

19   Q.    And some of your Head Start employees are going

20   to attend classes at this college; correct?

21   A.    Yes.

22   Q.    And that college is going to earn money from Head

23   Start, your division; right?

24   A.    Yes.

25   Q.    And you're the same person that's teaching at

1  this college.  And presumably they're going to make more

2  money from all these Head Start students than what

3  they're paying you; right?

4  A.     Yes.  But, again, I'm teaching social services.

5  And most of these people were taking early childhood.

6  And there were 15 colleges that were actually -- we were

7  involved with.  That was actually one of the smallest

8  colleges.

9  Q.     My apologies for interrupting.

10  A.     Okay.

11  Q.     We're just talking about the one you're working

12  at and the number of students going there.  There's an

13  appearance that the college is going to make some money

14  and you're going to earn some money from the Head Start

15  students.  It's just an appearance; right?

16  A.     Yes, that could be an appearance.

17  Q.     Theres's going to be a benefit to these Head

18  Start employees being able to further their professional

19  development by having these courses under their belt;

20  right?

21  A.     Yes.

22  Q.     And you're teaching something different; right?

23  A.     Yes.

24  Q.     And so your pay is unrelated; right?

25  A.     Yes.

Q.      But there's still the appearance.  And so that's
why you asked for somebody to sign off on that; right?

A.      Yes.

Q.      So that's an example again -- there's no rule
prohibiting you working here and sending the Head Start
people there, but you wanted it to be approved; right?

A.      Yes, I did.

Q.      Okay.  Now, let's get back to Mr. Sheehan.  When
he comes to talk to you it's November of 2010.

A.      I don't recall the exact date, but it was in the
month of November.

Q.      All right.  It is in the month of November.  And
it is not the first time in 2010 that you have had to
deal with Mr. Sheehan coming to talk to you, is it?

A.      No, it's not.

Q.      When I say "coming to talk to you," whether he
came to your office or you went to him.  He's been
speaking to you multiple times in 2010 about compliance
issues; right?

A.      Yes, he has.

Q.      Okay.  And those have ranged from matters under
your control at Head Start to matters that pertain
directly and particularly to you personally; right?

A.      Yes.

Q.      Okay.  So, for instance, he questioned you in

1  June of 2010 about $1,800 going to a fraternity that you

2  were associated with; right?

3  A.     Yes.

4  Q.     And it turned out that that was $1,800 from the

5  Head Start policy council and not Head Start funds

6  itself; right?

7  A.     Yes, it was funds that were fundraised for

8  parents.

9  Q.     But you had to go through that interview process

10  and investigation, for lack of a better term, because

11  someone brought that issue up?

12  A.     Yes.

13  Q.     Okay.  Now, were you connected in any way with

14  the people on the policy council?

15  A.     No.  They are actually citizens.

16  Q.     Do you know any of them personally?

17  A.     No.  They're all parents who are elected

18  throughout the community, so it could be -- each October.

19  It could be anyone who wants to be on the policy council.

20  Q.     Have you ever had a personal friend serve on the

21  policy council?

22  A.     No, there's no personal friends.  They're based

23  off of people who are community people.  And I don't have

24  any authority to put people on there.  The authority is

25  all from the parents.

Q.      And yet there was another investigation the same
year because a citizen made a complaint that you were
somehow controlling the policy council; right?

A.      Yes.

Q.      And so you had to endure another Sheehan
investigation regarding that issue in 2010; correct?

A.      Yes.

Q.      And then there was another investigation that
pertained to your driver's license status; right?

A.      Yes.

Q.      Now, you've worked at Head Start for how long?

A.      A little over five years.

Q.      And do you have a county vehicle at your
disposal?

A.      No, I do not.

Q.      Did you use to have a county vehicle at your
disposal?

A.      No.  I never had a county vehicle.

Q.      Have you ever driven a county vehicle?

A.      Just recently within the past couple months.

Q.      After your license situation got straightened
out?

A.      No.  The license was never invalid.  I had an
out-of-state license.

Q.      Well, there was a question.  Again, this was

1    being investigated by Mr. Sheehan in your office or you

2    in his office that you did not at the time have a valid

3    Florida driver's license; right?

4    A.    I didn't have a Florida.  I had a valid Virginia

5    license.

6    Q.    And at one point you told him I've got to go to

7    New Jersey to take care of something, and I'll straighten

8    out the license situation; right?

9    A.    I told him it needed to be corrected.  I

10   corrected it probably a couple days afterwards.  But my

11   supervisor at that time was well aware each year that I

12   had an out-of-state license.

13   Q.    Well, and then you were informed, of course, that

14   once you live in Florida you're supposed to get a Florida

15   driver's license; right?  So that was technically a

16   violation for you to be driving around with an

17   out-of-state license when you should have had a Florida

18   driver's license; right?

19   A.    Yes.

20   Q.    And the county office of risk management was

21   upset that you didn't have a valid Florida driver's

22   license; right?

23   A.    Yes.

24   Q.    And these concerns were expressed to you during

25   yet another one of these investigations in 2010; right?

A.     Yes.

Q.     The whole spring -- the whole college instructor issue was also investigated by Mr. Sheehan and compliance services in 2010; right?

A.     Yes.

Q.     Okay.  And that was another instance where either he came to you or you went to him and it all had to be straightened out because you were the target of this investigation; right?

A.     Yes.

Q.     Okay.  And the same thing with Capella that we talked about initially.  That was yet another investigation that you had undergone that you had dealt with Mr. Sheehan and compliance services; right?

A.     Yes.

Q.     Then there was also an issue in 2010 with the underperforming voluntary prekindergarten program; right?

A.     Yes.

Q.     Now, as the director of Head Start this -- it's called VPK; right?

A.     Yes.

Q.     The underperforming of the VPK program was going to be laid at your doorstep; right?

A.     Yes.

Q.     You -- because of your overall responsibility for

1    the program, when you have 9 of 16 centers

2    underperforming by a state measurement that's going to be

3    a problem; right?

4    A.    Yes.

5    Q.    And because of that problem there was going to be

6    yet another investigation as to why these centers were

7    underperforming; correct?

8    A.    Yes.

9    Q.    And as a result of that investigation in 2010

10   Dawn Dasher was suspended from her duties; is that

11   correct?

12   A.    She was suspended with pay pending termination by

13   the policy council.

14   Q.    And this was in October of 2010, right?  Pretty

15   much right before Mr. Sheehan came to see you about this

16   matter?

17   A.    Yes.  I don't recall the exact date, but, yes, it

18   was around that time.

19   Q.    And Miss Dasher responded to her being

20   investigated for the underperformance of the VPK program

21   by listing a whole host of concerns she had with her

22   operation at Head Start; right?

23   A.    Yes.

24   Q.    Including, as it turned out, this issue

25   concerning the book?

1  A.    I'm not sure who actually initiated this because

2  I was not involved in the process of it in my meeting

3  with Bob Sheehan.

4  Q.    Now, you also had in 2010 yet another opportunity

5  to become familiar with Mr. Sheehan over a proposal to

6  lease Head Start space to a nonprofit organization or

7  maybe a for profit organization called Educate Today;

8  right?

9  A.    Yes, that was the allegation.

10  Q.    And that was -- it was your plan to initially

11  lease this space for $1; right?

12  A.    No, that's false.

13  Q.    And the principal in Educate Today was a Glenton

14  Gilzene (phonetic); is that correct?

15  A.    Yes.

16  Q.    And how do you know Mr. Gilzene?

17  A.    He was a volunteer who volunteered on our policy

18  council to help the parents.

19  Q.    Do you know him from my other association?

20  A.    No.

21  Q.    Okay.  And so this proposal ultimately it didn't

22  occur; right?  There was -- the lease never got executed;

23  right?

24  A.    It was never executed.  And it was initiated

25  actually from the parents, not me.

Q.     But yet Mr. Sheehan was in your office asking you
about your involvement with the Educate Today potential
lease; right?

A.     Yes.

Q.     And asking you all sorts of questions about the
initial proposal in front of the board and why it was
later withdrawn; right?

A.     Well, it never went in front of the board so it
could not have been withdrawn.

Q.     So all of these issues and maybe more -- were
there other investigations in 2010 that I missed?

A.     No.  Nothing happened until after my former
supervisor resigned.

Q.     So all of these investigations have occurred in
2010 when then you are called in to talk about the
merchandise request form that we saw on Exhibit 1; right?

A.     Can you restate your question.

Q.     All of the investigations we talked about
occurred before you were asked to speak with Mr. Sheehan
about the merchandise request form that's in evidence as
Exhibit 1?

A.     Yes.

Q.     And at that point you knew that you were the
subject of yet another investigation and you were going
to find your way out; right?

A.      It's not a matter of finding my way out.  I
was subject -- at the time that I met with Bob Sheehan I
wasn't under the direct impression that I'm the subject.
It was just that it was an issue going on within my
program and he needed to get the facts.

Q.      And what you immediately did after that as far as
getting the facts was to get facts that establish you
knew nothing about the transaction?

A.      No.  It was to get facts about what happened.

Q.      Well, the facts that you obtained went directly
to your knowledge; right?

A.      To my knowledge they did.

Q.      Yeah.

        Because you wanted to send a memo saying I don't
know anything about this; right?

A.      No.  What I wanted to do was clarify the facts.

Q.      Which included, in your mind, telling everybody
the fact that I, Louis Finney, didn't know anything about
this transaction?

A.      No, I did not know anything about the
transaction.

Q.      Okay.  And you wanted Rogoff and others to know
that?

A.      Yes.

Q.      Because the last thing you needed was another

1    investigation?

2    A.    (Nods.)

3    Q.    You nodded your head.  Was that a "yes"?

4    A.    Yes.

5    Q.    As far as you know, during the time Mr. --

6    Mr. Jimenez isn't with Head Start anymore; right?

7    A.    No, he is not.

8    Q.    He was terminated as a result of this?

9    A.    Yes.

10   Q.    As far as you know, during his time at Head Start

11   did he have the best interests of Head Start in mind?

12   A.    I believe he did.

13              MR. WEISBROD:  Thank you.

14              THE COURT:  Mr. Brown.

15              MR. BROWN:  No questions, Your Honor.

16              THE COURT:  All right.  Mr. Farmer.

17              MR. FARMER:  Yes, Your Honor.

18                   CROSS-EXAMINATION

19   BY MR. FARMER:

20   Q.    Good morning, sir.

21   A.    Good morning.

22   Q.    I represent Marie Mason.

23   A.    Okay.

24   Q.    Now, Miss Mason was not terminated over this

25   incident regarding this merchandise request form; is that

correct?

A.    That is correct.

Q.    Let me see if I could show you Government Exhibit No. 1 again.  And we see your signature underneath Miss Mason's signature?

A.    Yes.

Q.    And is signing merchandise request forms something that you did regularly?

A.    Yes, it is.

Q.    And about how many a week would you say you sign?

A.    Referring to me?

Q.    Yes.

A.    Per week depending on the time period it could be a hundred.

Q.    And would most of those also bear Miss Mason's signature?

A.    There will be a large majority because of what she does.

Q.    And what was her title?

A.    Deputy director of program services.

Q.    And isn't it true that when you receive these documents for your signature, Miss Mason's signature has already appeared?

A.    Yes.

Q.    And does Miss Mason typically -- or ever

1   personally bring you the merchandise request form after

2   she signs it and have a discussion about it before you

3   sign it?

4   A.    No.  The normal process is it initiates from

5   staff, then a supervisor, then a deputy director, then it

6   will go through clerical staff, my administrative

7   specialist and then it will go to me.

8   Q.    So after Miss Mason's signs it, the next time you

9   see it is there's an intermediary, your clerical staff?

10  A.    Yes.

11  Q.    Your secretary hands it to you?

12  A.    Yes.

13  Q.    And so when you were asked a few moments ago

14  about not having a conversation with Miss Mason about

15  this merchandise request form, that is not at all unusual

16  is it?

17  A.    No.  Because the process is pretty much it's put

18  it an in and out box.

19  Q.    Now, you said that you would not have approved

20  the payment of these $9,000 to the wife of Michael

21  Jimenez had you known about it.

22  A.    Yes.

23  Q.    Now, you understand though that Rule 6.06 -- are

24  you familiar with Rule 6.06 --

25  A.    No.

Q.      -- of human relations?  No?  You're not familiar

with that?

A.      I'm not familiar with Rule 6.06.

Q.      Are you familiar with the rules about

disclosing -- as an employee of Head Start or the county

disclosing the businesses that your spouse has an

interest in?

A.      I'm somewhat familiar with it, but --

Q.      Now, when you came to the conclusion that you

would not have approved this transaction, you had no

awareness of whether or not Mr. Jimenez -- Mr. Jimenez

had disclosed that his wife had another business?

A.      No, I wouldn't know because I didn't know the

book was a relative.  So when I'm getting the merchandise

request I'm assuming that due diligence was done from the

management under me, so I wouldn't ask those kind of

questions when I'm looking at a merchandise request.

Q.      Isn't it true that if disclosure had been made,

that is there was disclosure of the business, that this

transaction would have been appropriate?

A.      I can't say that because I don't approve the

disclosures that's something that a department director

would make that decision on.

Q.      Well, isn't the whole point though that a spouse

of an employee could receive Head Start funds as long as

1   there's a disclosure?

2   A.      I can honestly say.  I don't know the answer to

3   that because I don't know the disclosure policy or rule.

4   That's something that human resources and our department

5   director and ad hoc committee come up with, so I can't

6   really say yes or no.  I'm not sure.

7   Q.      So you're not familiar at all with the disclosure

8   --

9   A.      I'm familiar with the form, but I'm not the

10  expert to be able to answer your question because I'm not

11  sure.

12  Q.      And are you familiar with any other employees at

13  Head Start having family members, ex-husbands, et cetera,

14  receive Head Start funds?

15  A.      Off the top of my head I know there was an

16  original allegation that was made and reported, and that

17  was with Miss Marecia Bell at one time.  I'm not sure

18  what happened with that.  And I don't know if there's any

19  other off the top of my head.

20  Q.      You don't know the result of that investigation?

21  A.      I have no idea.

22  Q.      Do you know if Miss Marecia Bell disclosed the

23  fact that her ex-husband was receiving Head Start funds?

24  A.      No, there was no disclosure because I would have

25  saw the form.

1  Q.    Now, you disclosed the fact that you received

2  funds from, for instance, Springfield College; is that

3  right?

4  A.    Yeah.  I no longer do that.  That was over a year

5  ago.  Yes, that was disclosed.

6  Q.    But there's a requirement for you to disclose the

7  fact that you're receiving -- or have business or receive

8  a salary from an outside organization; is that right?

9  A.    Yes, there is.

10  Q.    And your obligation as an employee of Head

11  Start -- or actually the director is to disclose that

12  fact; is that correct?

13  A.    Yes.

14  Q.    And as long as you disclose that fact, there is

15  no potential conflict of interest?

16  A.    No, there isn't.

17  Q.    Thank you.

18        MR. FARMER:  That's all I have.

19        THE COURT:  All right.  Redirect,

20  Mr. O'Neill.

21        MR. O'NEILL:  Thank you, Your Honor.

22                REDIRECT EXAMINATION

23  BY MR. O'NEILL:

24  Q.    Mr. Finney, you were asked on cross-examination

25  by Mr. Weisbrod, Mr. Jimenez' attorney, a number of

1   questions about going and getting tuition reimbursement

2   for training.  Do you recall that?

3   A.      Yes.

4   Q.      What is the policy of Head Start for tuition

5   reimbursement?

6   A.      For Head Start it's different from all other

7   county employees.  What happens is our -- we're required

8   by federal law by September 2011 to have all of our

9   teachers with a Bachelor's degree or an Associate degree.

10          So when we wrote the grant we specifically wrote

11  the grant to allow all employees to actually get tuition

12  assistance and reimbursement.  The process is every

13  employee will fill out a form.  And because we were given

14  these dollars within a one-year period the department of

15  procurement decided to give a special credit card to our

16  training coordinator that can only be used for school

17  tuition.

18          And at the time she, as well as our county

19  attorney, certified that including Mr. Finney is eligible

20  to get this as a benefit for school.  So that coordinator

21  is actually the person who is responsible.  And then it

22  goes to a supervisor who signs off to say you're eligible

23  to go to school.

24          So an example for me, in order for me to go to

25  school and get it paid, my supervisor, Tom Pappan, the

1    director of the department, he signed and approved to

2    allow me to go to school as well as approved the cost for

3    me to go to school.

4    Q.    So it was for all employees?

5    A.    All employees.

6    Q.    Now, Mr. Finney, to your knowledge, did

7    Miss Mason take advantage of that opportunity?

8    A.    Yes, she did.

9    Q.    Now, since you're her supervisor and Mr. Pappan I

10   believe was --

11   A.    Tom Pappan is my supervisor.

12   Q.    Would you have to sign off on Miss Mason's

13   schooling or would he do that?

14   A.    I would sign off on her schooling.

15   Q.    Okay.  Because you're her immediate supervisor?

16   A.    Yes.

17   Q.    Okay, sir.  Now, is this one of the

18   investigations that Bob Sheehan was looking into?

19   A.    Yes.

20   Q.    And is it fair to say as the director you're the

21   boss, so you're involved in all these investigations?

22   A.    Yes.

23   Q.    And I believe you said in answer to one of

24   Mr. Weisbrod's questions that you were there to answer

25   the facts.

A.      Absolutely.

Q.      And did you do that in these cases?

A.      Yes, I did.

Q.      Now, you mentioned that you put together a
conflict of interest form.

A.      Yes.

Q.      Okay.  And what was the reason for doing that?

A.      You said a conflict of interest form?

Q.      Yes.  You filled one out as part of your --

A.      Yes.  A disclosure form.

Q.      Disclosure.  I'm sorry.

A.      Okay.  That's because I was teaching at the
school.  I knew that we had staff who were rushing to get
their education.  I knew there some that actually
participated at that school so I filled out the form and
gave it to my supervisor.

Q.      Was that to ensure that there'd be no
improprieties?

A.      Yes.

Q.      Now, sir, Mr. Weisbrod asked you, the very last
question, whether, to your knowledge, Mr. Jimenez had the
best interests of Head Start in mind when he worked
there.

A.      Yes.

Q.      And you said you believed he did.

1   A.      I believe he did up until this situation.

2   Q.      Okay.  In this particular instance did he fail

3   you?

4   A.      Yes, he did.

5   Q.      And did he fail the program?

6   A.      Yes, he did.

7   Q.      Mr. Weisbrod mentioned Dawn Dasher, sir.  And I

8   believe your testimony was she was suspended with pay

9   pending termination by policy council.

10  A.      Yes.

11  Q.      Was she terminated by policy council?

12  A.      No.

13  Q.      And is she back working at Head Start?

14  A.      Yes, she is.

15  Q.      What is her current title?

16  A.      Manager of education and health.

17  Q.      Sir, Mr. Farmer asked you whether -- let me

18  withdraw that.

19          When you signed Government's Exhibit 1, the

20  merchandise request form --

21  A.      Yes.

22  Q.      -- whether there was any conversation with

23  Miss Mason.

24  A.      Yes.

25  Q.      And you mentioned I believe in your testimony --

1    correct me if I'm wrong -- that you actually get it from

2    clerical.

3    A.    Yes, I do.

4    Q.    Okay.  If there was an issue with a merchandise

5    request form, would you have expected Miss Mason to bring

6    that to your attention?

7              MR. FARMER:  Objection to form, Your Honor,

8    speculative.

9              THE COURT:  No.  I think he can answer the

10   question.  Overruled.

11             THE WITNESS:  Yes.

12   BY MR. O'NEILL:

13   Q.    And why is that, sir?

14   A.    Because for me it appeared as something that I

15   think with good judgment it should have appeared as a

16   potential conflict of interest, so it's something I

17   should have been brought aware of.

18   Q.    Did she tell you she knew that Johana Melendez

19   Santiago was Mr. Jimenez' wife?

20   A.    After the fact during that conversation, yes.

21   Q.    But not before you signed the request?

22   A.    No.

23   Q.    Did she fail the program too?

24   A.    I think she failed in that instance because of

25   that decision and that judgment.

1              MR. O'NEILL:  Thank you, sir.

2              THE COURT:  Thank you, sir.  You may step

3    down.

4              Call your next witness.

5              MR. O'NEILL:  Your Honor, government calls

6    Janet Fowler.

7              THE COURT:  Miss Fowler, if you'll come

8    forward to be sworn.

9              And, Miss Vizza, would you swear her in.

10              COURTROOM DEPUTY CLERK:  Yes, Your Honor.

11              Please raise your right hand.

12              Do you solemnly swear or affirm under

13    penalty of perjury that the testimony you shall give in

14    this cause shall be the truth, the whole truth, and

15    nothing but the truth, so help you God?

16              THE WITNESS:  I do.

17                        **JANET FOWLER,**

18    a witness, having been duly sworn to tell the truth, the

19    whole truth and nothing but the truth, was examined and

20    testified as follows:

21              COURTROOM DEPUTY CLERK:  Please be seated.

22    Please state your full name and spell the last for the

23    record.

24              THE WITNESS:  Janet Morgan Fowler.

25              COURTROOM DEPUTY CLERK:  Spell your last

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
 1    name, please.
 2                 THE WITNESS:  F-O-W-L-E-R.
 3                 THE COURT:  Mr. O'Neill.
 4                 MR. O'NEILL:  Thank you, Your Honor.
 5                      DIRECT EXAMINATION
 6    BY MR. O'NEILL:
 7    Q.    Good morning, Miss Fowler.
 8    A.    Good morning.
 9    Q.    Miss Fowler, I'm going to ask you a series of
10    questions.  And I'd ask you to speak in a loud voice so
11    that everyone can hear you.
12    A.    Yes, sir.
13    Q.    Ma'am, by whom are you employed?
14    A.    The U.S. Department of Health and Human Services.
15    Q.    How long have you been employed by HHS?
16    A.    I've been employed for six years and four months.
17    Q.    And what is your current assignment within HHS?
18    A.    I am an accountant and team leader with the
19    division of payment management under the governmental and
20    travel payments branch.
21    Q.    And to us what does that mean?  Could you
22    simplify that.
23    A.    Sure.
24    Q.    Thank you.
25    A.    I'm an accountant who approves and confirms
```

1    payments for any state, county or local government.

2    Q.    Would you please let us know about your

3    educational experience.

4    A.    Sure.  I have obtained a four-year accounting

5    degree at Hampton University.  I am currently studying a

6    Master's in taxation at the University of Baltimore in

7    Baltimore, Maryland.  And I've obtained at least 18

8    experience -- 18 years of experience in the accounting

9    sector.

10   Q.    Miss Fowler, could you -- now, you mentioned you

11   were involved with the monies going to local government.

12   A.    Yes, sir.

13   Q.    Could you explain for all of us how that works

14   between the federal government and local governments in

15   general.

16   A.    Yes, sir.  In the division of payment management

17   we work in tandem with several operating divisions

18   throughout HHS.  How that works is the awarding agency

19   hosts grant awards in our system, which is Internet

20   based.  The Internet based system is called the payment

21   management system.

22         Once the awarded funds are posted they are

23   available to be extracted by any organization who has

24   designated a user so that the payments may be extracted

25   by this user using a user name and password for the

1    payment management system.

2    Q.      Now, do you have any involvement with

3    Hillsborough County?

4    A.      Yes, sir.

5    Q.      And how -- what is your involvement with

6    Hillsborough County?

7    A.      I confirm the payments that are requested through

8    the payment management system before they are transmitted

9    to treasury and then to the specific bank account for

10   that organization.

11   Q.      And specifically are you familiar with the Head

12   Start program in Hillsborough County?

13   A.      Yes, sir.

14   Q.      Is that funded by the federal government,

15   particularly the United States Department of Health and

16   Human Services?

17   A.      Yes, it is it is funded through the

18   Administration for Children and Families.

19   Q.      And, Miss Fowler, in calendar year 2010 did

20   Hillsborough County and Hillsborough County Head

21   Start/Early Head Start program receive in excess of

22   $10,000 from HHS?

23   A.      Yes, sir.

24   Q.      Now, let me show you with the Court's permission

25   what's been previously marked as Government's Exhibit 24.

1          MR. O'NEILL:  May I approach the witness,

2   Your Honor?

3          THE COURT:  You may.

4          THE WITNESS:  Thank you.

5   BY MR. O'NEILL:

6   Q.    Miss Fowler, it's not in evidence at this time so

7   just look at it and don't read it aloud.

8   A.    Yes, sir.

9   Q.    And are you familiar with that document, ma'am?

10  A.    Yes.

11  Q.    What is it?

12  A.    It simply summarizes the payments received by

13  Hillsborough County Board of Commissioners -- County

14  Commissioners.

15  Q.    And is that a type of document that you use in

16  your business?

17  A.    Yes, sir.

18  Q.    And is it your business to produce such

19  documents?

20  A.    Yes, sir.

21          MR. O'NEILL:  Your Honor, at this time I'd

22  move into evidence Government's Exhibit 24.

23          MR. WEISBROD:  May I just look for a second,

24  Your Honor?

25          THE COURT:  Sure.

1          MR. O'NEILL:  I got copies.

2          THE COURT:  Any objection?

3          MR. WEISBROD:  No.  I'm sorry, Your Honor.

4     I talked to Mr. O'Neill and he was going to ask some

5     further questions about the exhibit before offering it.

6          THE COURT:  Okay.

7          MR. O'NEILL:  Thank you, Your Honor.

8     BY MR. O'NEILL:

9     Q.     Miss Fowler, I'd ask you to page through this

10    document.  And as you can see, there's a number of pages.

11    A.     Yes.

12    Q.     And do they all pertain to disbursement of

13    federal money from HHS to Hillsborough County Board of

14    County Commissioners?

15    A.     Yes, they do.

16    Q.     And are you familiar with all these documents?

17    A.     This document in particular, yes, sir.

18    Q.     I'm sorry.  All the pages within the document?

19    A.     Yes, sir.

20          MR. O'NEILL:  Your Honor, I'd renew the

21    motion.

22          THE COURT:  All right.  Any objections?

23          MR. WEISBROD:  No objection.

24          THE COURT:  Receive into evidence

25    Government's Exhibit 24.

1          (EXHIBIT 24 ADMITTED INTO EVIDENCE.)

2     BY MR. O'NEILL:

3     Q.     Miss Fowler, since it is now in evidence we can

4     publish it so that the jury can see.  Is it fair to say

5     this is a data compilation of funds sent to Hillsborough

6     County?

7     A.     Yes, it is.

8     Q.     In calendar year 2010 does it show several

9     amounts that were send down from HHS to Hillsborough

10    County?

11    A.     Yes, it does.

12    Q.     And can you just name a couple of the bigger

13    ones?

14    A.     Sure.  In calendar year 2010 the bigger payments

15    are in excess of $4 million, and the second being 3.5 --

16    over 3.5 million.

17    Q.     And those funds went here to Hillsborough County

18    for the Head Start program?

19    A.     There is another account --

20    Q.     Okay.

21    A.     -- that shows specific amounts that have gone for

22    the Head Start program.

23    Q.     And I want to get to that, Miss Fowler.

24           Have you in anticipation of your testimony

25    figured out how much money in calendar year 2010 went

1    specifically to the Head Start program here in

2    Hillsborough County?

3    A.    Yes, sir, I have.

4    Q.    And how much money went there?

5    A.    $5.3 million.

6    Q.    Thank you.

7          MR. O'NEILL:  I have no further questions,

8    Your Honor.

9          THE COURT:  Mr. Weisbrod.

10         MR. WEISBROD:  Just briefly, Your Honor,

11   thank you.

12                     CROSS-EXAMINATION

13   BY MR. WEISBROD:

14   Q.    Good morning, Miss Fowler?

15   A.    Good morning, sir.

16   Q.    The funding of Head Start is a joint enterprise

17   between the feds and county, local authorities; right?

18   A.    That I can't be sure of.  I only know that they

19   are awarded by the Administration for Children and

20   Families, which is an operating division of HHS.

21   Q.    So you're unaware of how much Hillsborough County

22   contributes to Head Start?

23   A.    That is correct.

24   Q.    Thank you.

25         MR. WEISBROD:  Nothing further.

1          THE COURT:  All right.  Mr. Brown.

2          MR. BROWN:  No questions, Your Honor.

3          THE COURT:  Mr. Farmer.

4          MR. FARMER:  No questions.

5          THE COURT:  Any --

6          MR. O'NEILL:  No, Your Honor.

7          THE COURT:  You may step down.  Thank you.

8          THE WITNESS:  Thank you, ma'am.

9          THE COURT:  You may call your next witness.

10         MR. O'NEILL:  Your Honor, government calls

11  Merrie Bayard.

12         THE COURT:  Miss Bayard, if you'll come

13  forward to be sworn.

14         And, Miss Vizza, would you swear her in.

15         COURTROOM DEPUTY:  Yes, Your Honor.

16         Please raise your right hand.

17         Do you solemnly swear or affirm under

18  penalty of perjury that the testimony you shall give in

19  this cause shall be the truth, the whole truth, and

20  nothing but the truth, so help you God?

21         THE WITNESS:  I do.

22                    **MERRIE BAYARD,**

23  a witness, having been duly sworn to tell the truth, the

24  whole truth and nothing but the truth, was examined and

25  testified as follows:

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
 1              COURTROOM DEPUTY CLERK:  Please be seated.
 2              Please state your full name and spell the
 3      last for the record.
 4              THE WITNESS:  Merrie A. Bayard.  Last name's
 5      spelled B-A-Y-A-R-D.
 6              THE COURT:  Mr. O'Neill.
 7                      DIRECT EXAMINATION
 8      BY MR. O'NEILL:
 9      Q.     Good morning, Miss Bayard.
10      A.     Good morning.
11      Q.     Miss Bayard, I just want to note for the record
12      since your first name has a different spelling too would
13      you spell that for the record.
14      A.     Yes.  It's M-E-R-R-I-E.
15      Q.     Miss Bayard, I'm going to ask you a series of
16      questions.  I'd ask you to speak in a loud voice so
17      everyone can hear you, ma'am.
18      A.     Okay.
19      Q.     Are you currently employed?
20      A.     Yes, sir.
21      Q.     And how are you so employed?
22      A.     I am the payment processing manager for county
23      finance for the Clerk of the Circuit Court.
24      Q.     And as such you're a county employee, ma'am?
25      A.     Yes, sir.
```

Q.    How long have you been doing that kind of work?

A.    Uhm, nine years.

Q.    And has that always been with the county?

A.    Yes, sir.

Q.    And what are your duties and responsibilities with the county, ma'am?

A.    I currently oversee the entire payment processing for all the departments that submit payment requests -- departments that fall under the Board of County Commissioners and independent agencies.

Q.    And does that include Head Start/Early Head Start?

A.    Yes, sir.

Q.    With the permission of the Court, Miss Bayard, I would show you a document which has been marked as Government's Exhibit 16 for identification purposes only. Ma'am, since it's not in evidence we can't talk about it. Read from it right now.  But let me ask you a few questions.  Do you recognize Government's Exhibit 16?

A.    Yes, sir.

Q.    And is this a record kept in the ordinary course of Hillsborough County's business?

A.    Yes, sir.

Q.    And is it the business of Hillsborough County to keep such records?

1   A.      Yes, sir.

2               MR. O'NEILL:  Your Honor at this time I move

3   into evidence Government's Exhibit 16.

4               MR. WEISBROD:  No objection.

5               THE COURT:  Receive into evidence

6   Government's Exhibit 16.

7               (EXHIBIT 16 ADMITTED INTO EVIDENCE.)

8   BY MR. O'NEILL:

9   Q.      Miss Bayard, I can now put on it on the screen so

10  that everyone can see it.  And would you please describe

11  it, ma'am.

12  A.      This is a disbursement by the way of check for a

13  payment request that was submitted and audited, and this

14  is the end result that we disbursed.

15  Q.      And what's the amount on the check?

16  A.      $9,000.

17  Q.      And on what account is it drawn?

18  A.      Wachovia.

19  Q.      And who is the payee?

20  A.      Johana Melendez Santiago doing business as

21  Reading For Little Scientists.

22  Q.      And in the bottom right-hand corner, ma'am, there

23  are two signatures?

24  A.      Yes, sir.

25  Q.      And whose signatures are those?

1    A.    That is Ken Hagen (phonetic), who's the chairman

2    of the board, and Pat Frank, Clerk of the Circuit Court.

3    Q.    Now, Miss Bayard, how does the county -- what

4    happens when the county generates a check such as this

5    and how does the check then go to the payee?

6    A.    Uhm, starting from the inception of like the

7    submitted payment request?

8    Q.    Yes, ma'am.

9    A.    When a department submits a payment request it

10    goes through our audit process, one of our clerks, and

11    they do their audit just to make sure that, you know,

12    everything seems legit, the payee, the amount.  And then

13    once it's audited, they'll enter it into our financial

14    system which then creates a voucher for payment.

15          After that the vouchers are batched together

16    electronically.  We have an offsite printing facility.

17    These checks are then printed at an offsite facility.

18    They're delivered back to us the next day.

19          And then from there we would do what we call a

20    post audit on the check just to make sure that it was

21    written for -- our post audit section will review all the

22    documentation that belongs to that particular check.  And

23    then once everything is couture or signed off on the

24    check is then mailed -- or processed for distribution.

25    Q.    It's processed for distribution and then mailed?

A.      It's processed for distribution and then it's
picked up by a courier, a county employee, and it's taken
to our -- the county's postal service center for
metering.

Q.      Okay.  And what happens after it's metered?

A.      There's a company that picks those documents --
those mailings up once they've been metered and they take
it to a facility in Clearwater.  And then from there in
Clearwater they take it to the post office.

Q.      And it is mailed at that time?

A.      Yes, sir.

Q.      Is that the way all checks from the county are
processed?

A.      That is the way that most checks from the county
are processed.

Q.      And did you check on this particular check?

A.      Yes, sir.

Q.      And how was this check processed?

A.      According to our records it was processed in that
manner.

Q.      Now, the date on the check is June 24th.  Did you
have occasion to check when this check was actually
mailed?

A.      This check would have been mailed -- what day was
the 24th on day of the week?  I'm not sure.  The 24th --

1    it's mailed five days later from the date of the check.

2    Q.    Okay.  And is that because of this process?

3    A.    It's because of the process.  From the time the

4    voucher is created the check comes back to us two days

5    later.  Say, for instance, this voucher would have been

6    created on the 23rd, so it comes back with a check dated

7    the 24th.  There's a day waiting period in there for

8    auditing and then it's mailed out the next day -- or

9    leaves our office the next day.

10   Q.    Miss Bayard, with the assistance of counsel I

11   would note that June the 24th of 2010, was a Thursday.

12   A.    Okay.  So that's a Thursday.  We would have

13   received those checks back on that Monday.  It would have

14   been audited and it would have left our office on that

15   Tuesday -- the following Tuesday --

16   Q.    So that is --

17   A.    -- for the courier.  The courier would have

18   picked that up on Tuesday, which would have been --

19   Q.    Tuesday would be the 29th.

20   A.    Correct.

21   Q.    Thank you, ma'am?

22         MR. O'NEILL:  I have no further questions,

23   Your Honor, thank you.

24         THE COURT:  All right.  Mr. Weisbrod.

25         MR. WEISBROD:  Thank you.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

CROSS-EXAMINATION

BY MR. WEISBROD:

Q.    Good morning.

A.    Good morning.

Q.    I'm just a little confused.  The county doesn't mail its own checks out?  There's an intervening company?

A.    That's correct.

Q.    Is this a company that contracts with the county to perform the service of mailing these checks?

A.    I'm not sure the details if they're under contract -- or I'm not privy to the specifics for that part of it.

Q.    When the checks leave your payment division are they in envelopes ready to mail?

A.    They are batched in a stack.  They go to our postal -- the county's postal area for stuffing and metering.

Q.    And then a separate company under contract with the county for an amount of money that you don't know picks these checks up that are ready to be mailed and holds them for five days?

A.    No, they don't hold them for five days.

Q.    They -- they actually do the process of mailing?

A.    They take it to the post office to be mailed.

Q.    The county pays a separate company to do that?

A.      I don't know, sir.  I don't know what the

payment -- that's the whole mailing side of it.  I just

deal with the payment processing.  Once it really

leaves --

Q.      I just want to -- I just want to be clear.  Is it

a county employee that's performing the function of

mailing or is it somebody that's under contract with the

county to do it?

A.      It is someone other than the county who performs

the mailing -- the actual delivery to the post office.

Q.      And that's for all of the checks sent out by the

payment department throughout the entire year?

A.      Can you repeat that, please.

Q.      That's for every check you issue?

A.      No, sir, it's not for every check we issue.  It's

for most checks we issue.

Q.      How many?

A.      I don't know the postal count.  We process

206,000 invoices a year.  I don't know what that equates

to in actual mailings.

Q.      But most of those are physically mailed by this

contracted company?

A.      As far as I know, yes.

            MR. WEISBROD:  Thank you, Your Honor.

            THE COURT:  Mr. Brown.

1          MR. BROWN:  No questions, Your Honor.

2          THE COURT:  Mr. Farmer.

3          MR. FARMER:  No, Your Honor.

4          MR. O'NEILL:  No redirect, Your Honor.

5          THE COURT:  You may step down.  Thank you.

6     You may call your next witness.

7          MR. O'NEILL:  Yes, Your Honor.  Government

8     calls Teresa Galloway.

9          THE COURT:  Miss Galloway, if you'll come

10    forward to be sworn.

11         COURTROOM DEPUTY CLERK:  Please raise your

12    right hand.

13         Do you solemnly swear or affirm under

14    penalty of perjury that the testimony you shall give in

15    this cause shall be the truth, the whole truth, and

16    nothing but the truth, so help you God?

17         THE WITNESS:  I do.

18                    **TERESA GALLOWAY,**

19    a witness, having been duly sworn to tell the truth, the

20    whole truth and nothing but the truth, was examined and

21    testified as follows:

22         COURTROOM DEPUTY CLERK:  Please be seated.

23         State your full name and spell the last for

24    the record.

25         THE WITNESS:  I'm Teresa Galloway,

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    G-A-L-L-O-W-A-Y.

2              THE COURT:  Mr. O'Neill.

3              MR. O'NEILL:  Thank you, Your Honor.

4                   DIRECT EXAMINATION.

5    BY MR. O'NEILL:

6    Q.    Good morning, Miss Galloway.

7    A.    Good morning.

8    Q.    Miss Galloway, I'm going to ask you a series of

9    questions.  I'd ask you to speak loudly into the

10   microphone so that everyone in this room can hear you.

11   A.    Yes, sir.

12   Q.    Ma'am, are you currently employed?

13   A.    Yes, sir, at Hillsborough Community College.

14   Q.    In what capacity?

15   A.    I'm an English faculty.

16   Q.    When you say "an English faculty," what does that

17   mean?

18   A.    I teach a range of classes from developmental

19   English 1 and 2, English Composition 1 and 2, Intro to

20   Film, College Success, and I think that's all.

21   Q.    And how long have you been teaching at

22   Hillsborough Community --

23   A.    I was hired in May of 2006.

24   Q.    Are you tenured there?

25   A.    Yes, sir, I am.

Q.    What does that mean?

A.    Tenured means that you have met the teaching
requirements for a certain level.  For instance, college
means that you have reached educational mastery, uhm,
performance standards.  Some of us perform volunteer work
as part of our commitment to the college.  Do you want to
know my volunteer work or you just want that general --

Q.    Yes.  What type of volunteer work?

A.    Okay.  Well, for instance, it's not mandatory but
it is suggested that a well rounded instructor is one who
is not just in the classroom.  It's an instructor who is
a model for the college.

      Uhm, I have collected children's books and
pencils and pens and paid for an airline ticket to Haiti
and brought books and all kinds of instructional material
to a mission in Haiti in 2008.

      I am the advisor for Phi Theta Kappa
International Honor Society.  We mentor students who are
in the upper level, but we also seek to draw in other
students.

      It hasn't been presented yet, but Officer Jeffrey
Kocab who was killed last year in Tampa, our Phi Theta
Kappa, we raised $986.41 because we're going to buy a K-9
bulletproof vest for the Plant City Police Department in
his honor, and that will be presented in the fall when we

1    get back to school.  So besides the classroom, we --

2    we're involved.  We're involved.

3    Q.      Did Officer Kocab have some connection to

4    Hillsborough Community --

5    A.      Officer Kocab needed an AA degree to transfer

6    from Plant City Police Department to qualify to be a

7    Tampa PD, and he was my student for two of my English

8    classes and I developed a great rapport and friendship

9    with him.  And he was also Phi Theta Kappa International

10   Honor Society.

11   Q.      Miss Galloway, what is your educational

12   background?

13   A.      I have a BA and an MA in English education,

14   secondary 6 through 12.  I have a graduate certificate,

15   18 credit hours in teaching college English Composition.

16   I have a graduate certificate in -- in teaching

17   developmental reading K through college and I also have

18   additional courses such as film and ESOL certification

19   and teaching College Success, which is student success.

20   Q.      Now, Miss Galloway, do you know an individual by

21   the name of Johana Melendez Santiago?

22   A.      Yeah, sir.  We're colleagues at the same campus.

23   Q.      When you say "colleagues," what does that mean to

24   you?

25   A.      She teaches one discipline and I teach another.

Q.    At some point did you have a conversation with
her concerning a children's book?
A.    Yes, sir.  Sometime in 2009 I think I was coming
down a hallway from the restroom and she said, hey, I
need you to edit something.  I'm working on a project.
And I was on the way to the classroom and I said, sure.
You know, whatever.  Put it in my mailbox and I'll get
with you later.

        And I don't think I saw her the rest of the day
because our classes are such that sometimes I only have
15 minutes between classes.

        So a few days later I see her again and she said,
do you have a minute?  And I said, yes.  And she -- she
goes, I need you to edit something for punctuation and
grammar.  And I said, sure.  What are you working on?

        And she said I'm writing a book for Head Start.
It's about germs and for the little kids and, you know,
keeping -- keeping their hands clean.  And I said, oh,
that's a great idea.  And I didn't think anything of it.
Q.    And what year did this conversation take place?
A.    Well, it was sometime in 2009 in the summer --
late spring and summer.  And I honestly couldn't tell you
the time because, again, I was just asked to put in
whether a quotation mark -- whether the punctuation goes
inside the quotation mark or outside the quotation mark.

1  It is a period at the end or -- again, it was all grammar

2  and punctuation.

3  Q.     And you are an English professor; correct?

4  A.     I'm an exceptional grammarian.

5  Q.     Now, Miss Galloway, did you do that for Miss

6  Johana Melendez Santiago?

7  A.     I certainly did.  I had rough drafts.  In other

8  words, I just got a piece of paper with words on it and I

9  put in red that in this case if it's an internal

10  quotation and the internal quotation is the exclamation,

11  that the exclamation must go inside the internal

12  quotation.  And then a period would be at the end of the

13  sentence.  And I just gave it back with all the little

14  red dots on it.

15  Q.     Were you compensated for your time?

16  A.     No, sir.

17  Q.     Did you have any subsequent conversations with

18  Miss Melendez Santiago about that?

19  A.     No, not really.  Because I just put the

20  punctuation in.  And then as time went by there was

21  another time that she said, would you go over it again

22  and I went over it again because evidently it had gone to

23  print or partial print.  And went I back in -- I think in

24  an e-mail conversation it said that when it went to print

25  that the printers messed up some of the punctuation and

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
1    for me -- if I'd go back over it again.  So again on the
2    rough draft paper I put the periods and the exclamation
3    points back in it again.
4    Q.      Thank you very much, Miss Galloway?
5            MR. O'NEILL:  No further questions, Your
6    Honor.
7            THE COURT:  Mr. Weisbrod.
8            MR. WEISBROD:  No questions, Your Honor.
9            THE COURT:  Mr. Brown.
10                   CROSS-EXAMINATION
11   BY MR. BROWN:
12   Q.      Good morning, Miss Galloway.
13   A.      Good morning.
14   Q.      This is -- have you seen the book, the final
15   version?
16   A.      I have a copy that was signed of it.
17   Q.      And on the back of the book -- well, near the
18   back does she in fact give you credit --
19   A.      Yes, she did.
20   Q.      -- and thanks --
21   A.      Yes.
22   Q.      -- for your --
23   A.      Editing -- editing the book.
24   Q.      You said it went to print.  Do you know whether
25   or not there was a rough draft used in 2008 at Head Start
```

1    that was never -- had never gone to print yet?

2    A.      No.  The only mention to Head Start was the

3    initial I'm writing a book for Head Start.  And I never

4    thought anything of it because I have a 32-year old son.

5    Head Start is not something that even -- I don't have any

6    children.  I didn't pay any attention to it at all.  So

7    it never -- that was the original --  the original was

8    I'm writing a book for Head Start and I never asked

9    another question.

10   Q.      So you don't know what was used prior to the

11   conversation with you by her at Head Start?  You don't

12   have any knowledge?

13   A.      I don't know.

14   Q.      It's not a trick question.

15   A.      I don't know.  Again --

16   Q.      What you did was to help her get a book ready for

17   print?

18   A.      I just put the punctuation in.

19   Q.      Okay.  Let's talk about the -- there was a

20   printed version of the book, about a hundred copies, that

21   you found out had some grammatical errors in it; is that

22   right?  Did you know that?

23   A.      Well, I don't know how many copies.  I just know

24   that -- that at some point she said that she -- when -- I

25   have it on an e-mail.  I honestly didn't pay much

1    attention to it because it really wasn't my issue.  It

2    was her -- she was writing the book.  That -- that the

3    printers had put some exclamation points and some -- I

4    understand in Spanish the question mark is upside down.

5    And would I go over it again.  And I said, sure.  Put it

6    in my box or I'll see you tomorrow.

7    Q.    And these books that were printed incorrectly,

8    didn't they -- didn't she give them to you?

9    A.    No.

10   Q.    Okay.  What did you take with you to Haiti?

11   A.    I didn't take any of those to Haiti.  I have been

12   on trips to Haiti myself where we collected children's

13   books, pencils, pens and whatever and donated them to a

14   mission.  I never had possession of that book.  You're

15   misunderstanding that.

16   Q.    You didn't had any of the books that -- the

17   hundred copies of the book that were printed incorrectly,

18   she didn't give those to you?

19   A.    No, sir.  No, sir.  No, I wasn't -- if there were

20   books that went to Haiti, it wasn't under me.

21   Q.    Okay.

22          MR. BROWN:  Nothing further, Your Honor.

23   Thank you.

24          THE COURT:  Mr. Farmer.

25          MR. FARMER:  No, Your Honor.

                    THE COURT:  Any redirect?

                    MR. O'NEILL:  Very briefly, Your Honor.

                    REDIRECT EXAMINATION

BY MR. O'NEILL:

Q.     Miss Galloway, on these trips to Haiti and the
like are you compensated for your voluntary work?
A.     No, sir.  I paid for my own ticket.  I paid for
lodging in a -- this little place that had no
air-conditioning.  We bought our own food.  I don't know
exactly how much, but I brought three of my own -- three
suitcases full of pencils, papers, children's books.  And
it's just a little mission in Mantra, Haiti, and it was
part of one of our PTK collection fundraisers.

       We collected pencils, pens and whatever and I
went with Dr. Craig Hardesty, mathematics instructor.
And that was in March of 2008.  That was before.
Q.     Thank you, ma'am.

                    MR. O'NEILL:  Nothing further, Your Honor.

                    THE COURT:  You may step down.  Thank you.

                    Why don't we take a morning recess at this
time.  We'll be in recess until ten minutes after 11:00.
You're welcome to walk around.  Please don't discuss the
case.  Leave your pads on your chairs.

                    COURT SECURITY OFFICER:  All rise, please,
for the jury.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

2              THE COURT:  Is Sheehan your next witness?

3              MR. O'NEILL:  Yes, Your Honor.

4              THE COURT:  And is he your last witness?

5              MR. O'NEILL:  I'm not sure yet, Judge.

6    We're getting very close.  And, again, his direct is

7    going to be longer because the one, as you know, is now

8    probably 50 minutes.  The other one is seven minutes.

9    And just for scheduling that's an hour right there.

10             THE COURT:  Yeah.  Okay.  I was just

11   wondering.  So you'll finish up probably some time

12   midafternoon you think?

13             MR. O'NEILL:  Yes, Your Honor.

14             THE COURT:  Okay.  Thank you.

15             MR. WEISBROD:  Your Honor?

16             THE COURT:  Yes.

17             MR. WEISBROD:  I did have a question.  In

18   your former career did you ever self describe yourself as

19   an excellent grammarian?

20             THE COURT:  No, I didn't.  But I'm sure I

21   was an excellent grammarian.

22   (THEREUPON, A RECESS WAS TAKEN, AND THEN THE PROCEEDINGS

23             CONTINUED AS FOLLOWS:)

24             COURT SECURITY OFFICER:  All rise.  This

25   Honorable Court is again in session.  Please be seated.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  Come to order.

2          THE COURT:  Mr. O'Neill?

3          MR. O'NEILL:  Your Honor, yes.  Just one

4  quick administerial matter.  As you know, Mr. Weisbrod

5  had asked on Government's Exhibit 30 that we redact

6  certain portions.  And I just wanted to know for

7  housekeeping how Your Honor would like to that.  Would

8  you like us to put -- I mean obviously for the jury it

9  would only be the redacted one.  There's no issue.  Would

10  you like the unredacted as well as the redacted?

11          THE COURT:  You mean admitted into evidence?

12          MR. O'NEILL:  For the record, yes, Your

13  Honor.

14          THE COURT:  Yeah.  I don't think so.  Just

15  the redacted.  Whatever the jury hears.

16          MR. O'NEILL:  Yes, Your Honor.

17          THE COURT:  Okay.

18          MR. BROWN:  Judge, one other housekeeping

19  matter.  Government's Exhibit No. 20 --

20          THE COURT:  All right.

21          MR. BROWN:  -- is the Hillsborough County

22  Department of Human Resources policy and procedures

23  manual.

24          THE COURT:  Okay.

25          MR. BROWN:  I just wanted to say that if the

1  government introduces that -- Mr. O'Neill is not quite

2  sure.  But if he does, I will be placing an objection.  I

3  don't know if the other attorneys are joining in on that,

4  but I would be objecting that it's hearsay.  And that if

5  he's going to introduce it he needs to call a records

6  custodian.  There is a witness, an investigator, that he

7  may try to introduce it through.  So I just wanted to

8  give the Court a heads up.  But I'll be placing an

9  objection.

10              THE COURT:  All right.  Thank you.

11              Bring the jury in.

12              COURT SECURITY OFFICER:  Yes, Your Honor.

13                  (PAUSE IN PROCEEDING.)

14              COURT SECURITY OFFICER:  All rise, please,

15  for the jury.

16      (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

17              COURT SECURITY OFFICER:  Thank you, ladies

18  and gentlemen.  Please be seated.

19              THE COURT:  Mr. O'Neill, you may call your

20  next witness.

21              MR. O'NEILL:  Yes, Your Honor.  The

22  government calls Robert Sheehan.

23              THE COURT:  Sir, if you'll come forward to

24  be sworn.

25              And, Miss Vizza, would you swear him in.

```
 1                  COURTROOM DEPUTY CLERK:  Yes, Your Honor.

 2                  Please raise your right hand.

 3                  Do you solemnly swear or affirm under

 4        penalty of perjury that the testimony you shall give in

 5        this cause shall be the truth, the whole truth, and

 6        nothing but the truth, so help you God?

 7                  THE WITNESS:  I do.

 8                          ROBERT SHEEHAN,

 9        a witness, having been duly sworn to tell the truth, the

10        whole truth and nothing but the truth, was examined and

11        testified as follows:

12                  COURTROOM DEPUTY CLERK:  Please be seated.

13                  State your full name and spell the last for

14        the record.

15                  THE WITNESS:  Robert J. Sheehan,

16        S-H-E-E-H-A-N.

17                  THE COURT:  Mr. O'Neill.

18                  MR. O'NEILL:  Thank you, Your Honor.

19                          DIRECT EXAMINATION

20        BY MR. O'NEILL:

21        Q.    Good morning, Mr. Sheehan.

22        A.    Good morning.

23        Q.    Mr. Sheehan, I'm going to ask you a series of

24        questions.  I'd ask you to speak in a loud and clear

25        voice so that everyone can hear you.
```

```
 1              Are you currently employed, sir.
 2    A.      Yes.
 3    Q.      How are you employed?
 4    A.      I'm a chief investigator for the Office of the
 5    County Administrator of Hillsborough County.
 6    Q.      And as a chief investigator what are your duties
 7    and responsibilities?
 8    A.      I investigate allegations of misconduct on the
 9    part of employees of the county administrator's office.
10    Q.      How long have you been the chief investigator
11    there?
12    A.      Since November 2004.
13    Q.      And is that your whole time with the county?
14    A.      Yes, sir.
15    Q.      Prior to becoming the chief investigator for
16    Hillsborough County, what, if anything, was your
17    employment?
18    A.      I was employment by the Tampa Police Department
19    from 1978 to 2004.
20    Q.      And during that period of time what were your
21    duties and responsibilities?  What assignment did you
22    have?
23    A.      I started out in uniform patrol for approximately
24    18 months.  And then I was a training officer.  And then
25    for my final 23 years I was a detective.
```

Q.      And did you specialize in any types of cases?

A.      I worked in homicide, auto theft, fraud, checks
and vice.

Q.      That was vice, not ICE; right?

A.      Correct.

Q.      Okay.  Mr. Sheehan, did there come a point in
time when you conducted an investigation at the county
into an event that surrounded the purchase of a book
called Travel Boy Helps Sebastian?

A.      Yes, sir.

Q.      And were you the primary investigator in that?

A.      Yes.

Q.      As part of your investigation did you make taped
statements of some of the individuals involved?

A.      Yes.

Q.      Now, does that apply both to witnesses and
targets?

A.      It applies to everybody.

Q.      Prior to testifying today were you shown what's
been marked as Government's Exhibit 29, which is a
tape -- a CD actually which is a statement of the
defendant, Marie Mason?

A.      Yes.

Q.      And had you had the opportunity prior to
testifying to listen to that tape?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
1   A.      Yes.

2   Q.      Does that CD or tape fairly and accurately depict

3   the conversation between yourself and Miss Mason?

4   A.      Yes.

5              MR. O'NEILL:  Your Honor, at this time I

6   move into evidence Government's Exhibit 29.

7              MR. FARMER:  No objection.

8              THE COURT:  Receive into evidence

9   Government's Exhibit 29.

10             (EXHIBIT 29 ADMITTED INTO EVIDENCE.)

11             MR. O'NEILL:  With the permission of the

12  Court I would now seek to play that.

13             THE COURT:  Okay.  Miss Vizza, would you

14  step down and help.

15             COURTROOM DEPUTY CLERK:  Yes, Your Honor.

16             MR. O'NEILL:  Thank you, Your Honor.

17             THE COURT:  Did we fix it so it comes

18  through the system?

19             COURTROOM DEPUTY CLERK:  Yes, Your Honor.

20             THE COURT:  Good.  Okay.

21             (AUDIOTAPE PLAYING, EXHIBIT 29):

22             "MR. SHEEHAN:  You're being placed on tape

23  on November 9, 2010, under Head Start business interview

24  with Marie Mason.

25             You understand I'm going to ask you only
```

82

about your job.  You have an obligation to be truthful

and cooperative, and you understand I'm tape recording

the interview.

        MS. MASON:  Yes.

        MR. SHEEHAN:  Thank you.  So you'll speak

up -- "

        MR. WEISBROD:  Your Honor --

        THE COURT:  Can't hear?

        (AUDIO RESUMES).

        "MR. SHEEHAN:  Do you remember that book.

        MS. MASON:  Yes.

        MR. SHEEHAN:  That box was referred to you

by who?

        MS. MASON:  This is a book where there was a

flyer and we looked at it in terms of the information.

So when I got it I just gave it to the nurse and

Miss Navejar to look at and asked them their opinion if

this is something that our families could use because the

individual who published this book, she had been out in

our organization before and done trainings at our

preservice on germs and things.  So it was a way for us

to get the information out to our families and such.

        MR. SHEEHAN:  Did you ever talk to the

author?

        MS. MASON:  No.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          MR. SHEEHAN:  Had you ever met her?

2          MS. MASON:  Yeah, I met her at preservice.

3    I know who she is.

4          MR. SHEEHAN:  Is she related to anybody at

5    Head Start?

6          MS. MASON:  Yeah, she's related to

7    Mr. Michael Jimenez.

8          MR. SHEEHAN:  Okay.  Did you know that at

9    the time that you referred the book to Miss Navejar?

10         MS. MASON:  That this book was written by

11    her?

12         MR. SHEEHAN:  Yes.

13         MS. MASON:  Yes, uh-huh.

14         MR. SHEEHAN:  Did you discuss it with

15    Mr. Jimenez?

16         MS. MASON:  I discussed it with him to the

17    length of where did he get the book from and how it could

18    be ordered and those types of things.

19         MR. SHEEHAN:  Did you think it might be a

20    conflict of interest for Head Start to order books from

21    his wife?

22         MS. MASON:  No, I didn't because we had had

23    her out here before doing training.  And when I looked at

24    the book I thought it was just a good book.  But I

25    didn't -- I gave the book to the nurse and them to have

1    them look at it to give me their opinion on it.

2         MR. SHEEHAN:  So who would be responsible

3    for determining if there was a conflict of interest if

4    not you?  Did you discuss it with Mr. Finney?

5         MS. MASON:  No, I didn't.

6         MR. SHEEHAN:  Okay.  Well, Idalin sent an

7    e-mail that says I was informed today that we need the

8    quotes amount to be under $10,000.

9         MS. MASON:  Uh-huh.

10         MR. SHEEHAN:  Why would that be?

11         MS. MASON:  Because anything over 10,000 I

12    guess has to go to procurement.

13         MR. SHEEHAN:  Okay.

14         MS. MASON:  That's how I understand it.

15         MR. SHEEHAN:  And why would there be a

16    problem with this going to procurement?

17         MS. MASON:  Well, the problem would be

18    because if it goes, then it would have to -- my

19    understanding, it would have to go out for a bid.

20         MR. SHEEHAN:  Okay.

21         MS. MASON:  And, uhm -- and so it was trying

22    to alleviate that process.

23         MR. SHEEHAN:  So were you the person that

24    instructed her about the $10,000?

25         MS. MASON:  No.  I instructed her about --

1  what I remember telling her -- and not for sure.  But

2  what I remember telling her was that -- I did authorize

3  her to try to keep it under $10,000.

4           MR. SHEEHAN:  Okay.  Did anybody suggest

5  that to you?

6           MS. MASON:  No.

7           MR. SHEEHAN:  Did you -- you had -- did you

8  have any discussion about the $10,000 limit with Michael

9  Jimenez?

10          MS. MASON:  No, other than I know that the

11 rule is we need to keep it under ten.  Because when we do

12 other events, like when we do big events, we make sure

13 that we try to keep it under 10,000 or we will have to,

14 you know, go out to bid.

15          MR. SHEEHAN:  Okay.  Here's the thing I

16 don't understand.  When she got the bill for the books

17 who would she give it to?  Who would approve it?

18          MS. MASON:  Well, we put it through a

19 purchase order, so it would get approved by me first.

20          MR. SHEEHAN:  Okay.

21          MS. MASON:  And so we would do like a

22 merchandise request form and then Idalin would put the

23 package together and they would -- she would have gotten

24 some other bids behind the packet, and then I would

25 initial off for the approval of the purchase.

1          MR. SHEEHAN:  Okay.  So do you remember

2     specifically approving this one?

3          MS. MASON:  Yeah, I did approve that.

4          MR. SHEEHAN:  Okay.  And then --

5          MS. MASON:  In order for us to purchase the

6     book I would have had to initial off on it.

7          MR. SHEEHAN:  And who does that package go

8     to?

9          MS. MASON:  Then it goes to either

10    Miss Linda, the clerk person.  It would go to her.

11         MR. SHEEHAN:  And she works for who?

12         MS. MASON:  She works for Mr. Paritelli

13    (phonetic), her direct supervisor.  But she works under

14    Michael Jimenez' section.

15         MR. SHEEHAN:  Okay.  So as a fiscal manager

16    does he actually approve the expenditure of money here?

17         MS. MASON:  I'm not for sure.  I would -- I

18    know he oversees it, so I would assume he would have

19    that --

20         MR. SHEEHAN:  Well, what is your

21    understanding of what he does?

22         MS. MASON:  My understanding is that he

23    oversees the budget in terms of the -- he's the fiscal

24    officer, so I assume he's responsible for the oversight

25    of the transactions that are processed through fiscal.

```
 1                    MR. SHEEHAN:  Okay.

 2                    MS. MASON:  That's the whole mystery.  I'm

 3        not --

 4                    MR. SHEEHAN:  In this case -- well, in this

 5        case it wouldn't matter because he knew that Head Start

 6        was buying books from his wife.

 7                    MS. MASON:  Yeah.

 8                    MR. SHEEHAN:  Because you discussed that

 9        with him?

10                    MS. MASON:  No.  I had the conversation

11        about the book, yes.  So, yeah, I would have had -- I had

12        conversation with him about the book and the purchase of

13        the book.  And then I authorized Idalin and Miss Bell to

14        look at the book.

15                    MR. SHEEHAN:  Okay.

16                    MS. MASON:  So she -- yeah.

17                    MR. SHEEHAN:  And when you met the author

18        during the training when she was doing the training you

19        knew she was Michael Jimenez' wife; right?

20                    MS. MASON:  Uh-huh.

21                    MR. SHEEHAN:  I mean did it come up in -- I

22        mean she doesn't hide it or anything?

23                    MS. MASON:  No.  We knew that because when

24        we've hired her for trainings to do trainings here

25        because she's a professor at HCC so she deals in that
```

1    biochemical and germ stuff.  So I'm not for sure if we

2    paid her, but I know we have used her for trainings with

3    the agency.  I was not a part of the -- of the piece

4    where you hire her and bring her in.  That was not mine.

5              MR. SHEEHAN:  Okay.

6              MS. MASON:  I don't know --

7              MR. SHEEHAN:  Anything that I didn't ask you

8    that you want to add?

9              MS. MASON:  No.

10             MR. SHEEHAN:  Okay.  We'll conclude the

11   interview."

12   BY MR. O'NEILL:

13   Q.    Mr. Sheehan, is it fair to say that was a fairly

14   short interview of approximately seven minutes?

15   A.    Yes.

16   Q.    Did you likewise take a taped statement from the

17   defendant, Michael Jimenez?

18   A.    Yes.

19   Q.    And is that a much longer statement,

20   approximately 50 minutes?

21   A.    It's much longer.  I remember that.

22             MR. O'NEILL:  At this time, Your Honor --

23   BY MR. O'NEILL:

24   Q.    And was that taped, that interview with

25   Mr. Jimenez?

1    A.      Yes.

2    Q.      And prior to testifying today did you have an

3    occasion to review that disk?

4    A.      Yes.

5    Q.      And does that disk fairly and accurately depict

6    the statement that was given to you by Mr. Jimenez?

7    A.      Yes.

8                    MR. O'NEILL:  Your Honor, at this time I'd

9    move into evidence Government's Exhibit 30.

10                   MR. WEISBROD:  No objection.

11                   THE COURT:  Receive into evidence

12   Government's Exhibit 30.

13                   (EXHIBIT 30 ADMITTED INTO EVIDENCE.)

14                   MR. O'NEILL:  And, again, with the

15   permission of the Court I'd like to publish it at this

16   time.

17                   THE COURT:  All right.

18                   (AUDIOTAPE PLAYING, EXHIBIT 30):

19                   "MR. SHEEHAN:  Being placed on tape on

20   November 10th, 2010.  This is an interview of Michael

21   Jimenez, fiscal manager at Head Start.  We're at the

22   compliance services office.  Also present Jack Carlisle

23   from compliance services.

24                   Michael, this is going to be an interview

25   about employment.  And you know that you have an

1    obligation to be truthful and cooperative?

2              MR. JIMENEZ:  Yes.

3              MR. SHEEHAN:  You understand that I'm

4    recording the interview for the purposes of the report.

5    See the tape recorder right here.  So you speak up when

6    you respond.

7              MR. JIMENEZ:  Okay.

8              MR. SHEEHAN:  What my interview today is

9    about is about two things.  First of all let me talk to

10   you about Dawn Dasher.  Do you know anything about Dawn

11   Dasher's employment status?

12             MR. JIMENEZ:  I believe that she -- she's on

13   a leave of absence, but there's no -- there's no final

14   determination as to whether -- you know, what the outcome

15   of that will be.  That's about all I know.

16             MR. SHEEHAN:  Do you know if she did

17   something wrong?

18             MR. JIMENEZ:  I don't know.  I know that

19   there was some discrepancies with the VPK program that

20   seems to be serious enough to I guess enable her to be --

21   or allow her to be on that leave of absence.  I don't --

22   beyond that I don't know.

23             MR. SHEEHAN:  Do you know if anybody's

24   proposed terminating her?

25             MR. JIMENEZ:  I believe there's a motion

1    going before the policy council --

2    MR. SHEEHAN:  Uh-huh.

3    MR. JIMENEZ:  -- to my knowledge but I'm not

4    100 percent sure whether it's a motion to request

5    termination or not.  But I'm aware that there are events

6    occurring that involve Miss Dasher.

7    MR. SHEEHAN:  Have you been involved in any

8    interviews conducted by Louis Finney with Dawn Dasher?

9    MR. JIMENEZ:  I was involved in a meeting

10   surrounding VPK, the program that -- it related the --

11   we received some I guess notification from VPK that some

12   of the classrooms or the delivery -- the curriculum was

13   deficient in some respect.

14   MR. SHEEHAN:  Does that happen once in

15   awhile in a Head Start program?

16   MR. JIMENEZ:  Well, there's always an

17   opportunity for a mistake or things to not run

18   100 percent.  Whether corrective action was taken in a

19   timely manner or not, I can't answer to that.  But I

20   would say in Head Start or any workplace, for that

21   matter, you know, there are issues that occur and then

22   action needs to be taken in a timely manner to correct

23   whatever the issue is.

24   MR. SHEEHAN:  Have you had any discussions

25   with Louis Finney about -- about Dawn Dasher's proposed

1    termination?

2            MR. JIMENEZ:  Not -- not really discussions,

3    no.  Because the -- the only thing I've been made aware

4    of is that there is -- I guess that she's on a leave of

5    absence --

6            MR. SHEEHAN:  Uh-huh.

7            MR. JIMENEZ:  -- and that whatever --

8    whatever is proposed has to be brought before the policy

9    council.

10           MR. SHEEHAN:  Okay.  So your understanding

11   is Dawn Dasher can only be fired by the policy council?

12           MR. JIMENEZ:  Well, the policy council has

13   the power -- well, I don't know if they have the power,

14   but the -- has involvement in whether something to that

15   effect would occur.

16           MR. SHEEHAN:  Okay.  Do you remember the

17   ordering of this book?

18           MR. JIMENEZ:  Yes.

19           MR. SHEEHAN:  Who's the author of that book?

20           MR. JIMENEZ:  The author of that book is

21   Johana Melendez.  She is my wife.

22           MR. SHEEHAN:  Okay.  How much were the --

23   how much were the books?

24           MR. JIMENEZ:  I believe there were 750 books

25   purchased at a cost of $9,000, which was about 2 to

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   $3,000 less than the publisher's cost and the cost of

2   Amazon.com and Barnes & Noble.

3           MR. SHEEHAN:  Okay.  Who approved the

4   purchase order?

5           MR. JIMENEZ:  Marie Mason.

6           MR. SHEEHAN:  And who approved the payment?

7           MR. JIMENEZ:  The payment I believe went

8   through the ANTIKS [sic] system.  We have a system

9   whereby I approve items of $20,000 or higher and my

10  accountant three approves purchases that are lower

11  threshold than that.

12          MR. SHEEHAN:  So your recollection is you

13  didn't approve this?

14          MR. JIMENEZ:  No -- well I can go back to

15  the documentation to review to determine if I did.

16          MR. SHEEHAN:  I think we can do that here.

17  I have the documentation.

18          MR. JIMENEZ:  Okay.  But --

19          MR. SHEEHAN:  Do you recall approving it?

20          MR. JIMENEZ:  No, I don't.

21          MR. SHEEHAN:  Okay.  Do you recall -- excuse

22  me.  Do you recall disclosing to Louis Finney that Head

23  Start was doing business with your wife?

24          MR. JIMENEZ:  Let me bring out the history

25  of my wife working with Head Start.  My wife has been

1   working with Head Start since 2007 I believe providing

2   actually preservice to our inservice events.  She

3   provided service on bloodborne pathogens training.

4           And she involved here students -- she's a

5   professor at HCC -- where she worked with -- for Head

6   Start centers 230 children to have her students who are

7   in the service learning program for which they earn the

8   presidential award for service learning to deliver health

9   and safety training to the teachers to provide them to

10  the students.

11          And there's been reading and other events

12  occurring where either my wife directly or indirectly

13  through her service training students provided to the --

14  there's different classrooms in the Plant City area -- or

15  from Plant City through Magnet.

16          When she provided her second inservice event

17  she mentioned her book because at the time prior to that

18  inservice the book was not in published format, yet the

19  service learning students would teach the material or

20  convey the message that was -- are east related to I

21  guess I want to say the prepublished book itself.

22          It's more than a book.  It's a program of

23  hygiene.  It has learning.  It's in Spanish and English

24  so it allows children to learn -- children of both

25  English and Spanish languages to learn about hygiene and

other materials.

So to the extent that Mr. Finney knows about the actual purchase of the book, to my knowledge, no, he doesn't. But the services that were delivered prior to the purchase of the book and the services that were -- that are delivered will be delivered in conjunction with the purchase of the book because there's more than just the purchase of the book. There's a purchase of the curriculum. He -- he will be involved in that. However, the purchase of the book itself I believe that he is not aware of that.

MR. SHEEHAN: Did your wife ever get paid for association with Head Start before this particular transaction?

MR. JIMENEZ: No.

MR. SHEEHAN: It was volunteer work?

MR. JIMENEZ: Yes.

MR. SHEEHAN: Okay. So there's a distinction between the volunteer work and this book transaction?

MR. JIMENEZ: There is a distinction -- well, I wouldn't say a distinction because it's all along the same -- same lines. It's teaching the children about -- about health, cleanliness.

It's actually a method also -- by the way,

she was going to teach the teachers how to teach the
children.  And that's where the curriculum gets involved
because it's -- it's a Florida -- it's the National
Science Association curriculum approved by the National
Science Association and it's also approved by the
Florida -- and I may be getting the institutions wrong.
But Florida --

MR. SHEEHAN:  Well, you understand I have no
questions about the content of the book.

MR. JIMENEZ:  Okay.  I'm just -- my -- what
I'm trying to emphasize here is that this is more than
just a purchase of a book.  This is a purchase of a
curriculum that is to be delivered in conjunction with
the purchase of the book for which there is no profit
involved in the purchase of the book.

MR. SHEEHAN:  Do you recognize this?

MR. JIMENEZ:  Yes.

MR. SHEEHAN:  What is it?

MR. JIMENEZ:  It's a disclosure statement
that I made from my business.

MR. SHEEHAN:  And why did you fill it out?

MR. JIMENEZ:  I filled it out because I
received it from the -- I believe it's the supervisor of
elections.

MR. SHEEHAN:  And what's your rationale for

1    filling that out?  What's the purpose of that form you

2    think?

3              MR. JIMENEZ:  Well, the purpose of the form

4    is to disclose any financial involvement that I have with

5    an organization outside of my employment with the county.

6              MR. SHEEHAN:  Where would I find a similar

7    form for this for your wife's company?

8              MR. JIMENEZ:  Now, the form -- and after I

9    signed that form, part of the rationale by not submitting

10   an additional form or form to renew I guess an annual --

11   do an annual renewal was because I received that form I

12   began to read through the Florida statute based on

13   conflict of interest and the form itself whether the

14   definition of employee applies to me or not.

15             And there were specific levels -- or

16   specific titles of employees that are listed within the

17   statute.  And part of that is the rationale behind the

18   fact that it wasn't disclosed.

19             Now, I know there's a renewal that's due

20   every --

21             MR. SHEEHAN:  Well, let's go back to this

22   rationale.  What's the rationale of not disclosing?

23             MR. JIMENEZ:  The definition behind whether

24   my involvement with the county or my employment with the

25   county fits the definition of an employee per the Florida

1    statutes.

2         MR. SHEEHAN:  Okay.  So your legal opinion

3    is you're not in violation of Florida statute?

4         MR. JIMENEZ:  My opinion is that.  However,

5    the fact of whether I am or not I can't attest to that

6    because I'm not a lawyer.

7         MR. SHEEHAN:  Did you seek a legal opinion

8    about your interpretation of the Florida statute?

9         MR. JIMENEZ:  No, I did not.

10        MR. SHEEHAN:  Okay.  Have you ever read HR

11   Policy 6.06 during your research of conflict of interest?

12        MR. JIMENEZ:  No.  I went directly to the

13   Florida statute.

14        MR. SHEEHAN:  And why would that be?

15        MR. JIMENEZ:  Well, because I was -- I

16   myself and another colleague who received that form,

17   first of all we were wondering where the form came from.

18   And then it was public -- an e-mail went out from the

19   county --

20        MR. SHEEHAN:  Let's stop there.  You

21   wondered where this form came from, the one that says

22   Hillsborough County Administrator on the top?

23        MR. JIMENEZ:  Well, that form -- I may be

24   talking about an another form because we received a form

25   from the supervisor of elections.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

          MR. SHEEHAN:  Okay.  Well, I handed you this

form in particular with your signature on it and asked

you to identify it.  You said you didn't know where this

came from.  So I'm giving you an opportunity to correct

your statement.  It says Hillsborough County

Administrator right on top of it.

          MR. JIMENEZ:  Well, if that's the case,

then, yes.  But what I'm trying to convey here --

          MR. SHEEHAN:  Well, it's not if it's the

case.  Could you look at the form for me and identify

that you signed that and that you know where it came

from.

          MR. JIMENEZ:  I did sign it.  And -- yes.

          MR. SHEEHAN:  Okay.  That's all I was

trying to -- I don't want to put words in your mouth.

I'm trying to --

          MR. JIMENEZ:  No.

          MR. SHEEHAN:  -- clarify that we're talking

about the same document.

          MR. JIMENEZ:  Okay.  Because I have another

document that is from the supervisor of elections that I

did fill in.

          MR. SHEEHAN:  I don't have that document.

Don't care about it.

          MR. JIMENEZ:  Okay.  I just wanted to make

1    that distinction.

2              MR. SHEEHAN:  So you've not read Human

3    Resource Policy 6.06?

4              MR. JIMENEZ:  I may have.  If you can --

5              MR. SHEEHAN:  It's entitled Employee

6    Disclosure, Conflict of Interest.

7              MR. JIMENEZ:  I probably did at one point in

8    time.  However, I don't recall reading it, no.

9              MR. SHEEHAN:  In your research on employment

10   statute do you recall the term "self dealing"?

11             MR. JIMENEZ:  No.

12             MR. SHEEHAN:  Have you ever seen this form

13   before?

14             MR. JIMENEZ:  I don't recall receiving --

15   seeing this in -- no.

16             MR. SHEEHAN:  So what's your recollection of

17   the conflict of interest policy for Hillsborough County,

18   your employer?

19             MR. JIMENEZ:  Well, from what I find and

20   what I've reviewed from the other document that I

21   received from the supervisor of elections, you know,

22   which has no bearing to this case, but --

23             MR. SHEEHAN:  Well, since it has no bearing

24   in this case let's stop referring to it.  Let's refer to

25   the Hillsborough County document that you signed.

1          MR. JIMENEZ:  Okay.  Because the only reason

2     I refer to it is because that's confusing between the two

3     documents.

4          The fact that, you know, there is an

5     appearance of a conflict of interest I would say yes.

6     But that -- that second document that you showed me I've

7     never seen that document before.

8          MR. SHEEHAN:  So you don't think you ever

9     filled one of those out?

10          MR. JIMENEZ:  Not the second document.  I

11     did fill in --

12          MR. SHEEHAN:  That's a definitive answer,

13     you've never filled that document out?

14          MR. JIMENEZ:  Well, from my recollection I

15     didn't.  Because in looking at the document now I don't

16     recall it.  And I do have a file in my office where I

17     keep all the documentation that I sign or that I have to

18     submit.

19          MR. SHEEHAN:  So if you had a question about

20     there being a conflict of interest in doing business with

21     your wife and that caused you to check the state

22     statutes, wouldn't it be reasonable to expect that you

23     would have discussed it with your boss as a source of

24     resolving any potential conflict?

25          MR. JIMENEZ:  Well, part of the issue

1    came -- I wasn't -- I wasn't materially involved in the

2    situation.  There was -- my wife participated in the

3    inservice.  We had a new nurse on board who I guess saw

4    that the material would help.  And --

5           MR. SHEEHAN:  Who -- who is that you're

6    talking about?

7           MR. JIMENEZ:  I believe it's Marecia Bell --

8           MR. SHEEHAN:  Okay.

9           MR. JIMENEZ:  -- who would -- who thought

10   that the material was adequate for teaching the

11   students -- the Head Start students and actually the

12   teachers themselves the material.

13          Now, I did introduce her to my wife.  But at

14   that time whether the sale of a book or not was going to

15   happen, I didn't know.  Now, I need to clarify that.

16   It's more than just a sale of this book.

17          MR. SHEEHAN:  You already explained that.

18          MR. JIMENEZ:  Okay.  And that's what was

19   being --

20          MR. SHEEHAN:  So you understand that that

21   doesn't make it better; it makes it worse?

22          MR. JIMENEZ:  No, it doesn't make it better.

23   But I just need to clarify that because the purchase of a

24   book had basically no -- had no profit motive.  It just

25   goes and -- and I guess follows the intent that my wife

1  had to continue providing services to Head Start at

2  little or no cost.

3          MR. SHEEHAN:  Okay.  Let me be clear.  I'm

4  not concerned with your wife's intent.

5          MR. JIMENEZ:  Okay.

6          MR. SHEEHAN:  She's not a Hillsborough

7  County employee.

8          Let me go back to the statement that you

9  made about you weren't -- you weren't directly involved.

10  Did you handle the presentation of the materials?  Did

11  you act as a go-between your wife and Idalin Navejar?

12          MR. JIMENEZ:  The book was provided to me.

13  Idalin was delegated from the nurse.  The nurse was her

14  supervisor at the time.  Was delegated the -- I guess

15  the -- she was delegated the task of looking into the

16  matter.

17          My wife provided her a sample of the book to

18  determine whether -- so that the nurse could determine

19  whether it was adequate or not or --

20          MR. SHEEHAN:  Provided her or provided you

21  to provide her?

22          MR. JIMENEZ:  I think she -- I delivered the

23  book to her.

24          MR. SHEEHAN:  Okay.  Here's an e-mail on

25  April 21st from you that says, "Here's the presentation.

```
 1    I'll have the quote sent immediately."
 2              MR. JIMENEZ:  Right.
 3              MR. SHEEHAN:  Is that you acting as a
 4    go-between between your wife and Mrs. Navejar?
 5              MR. JIMENEZ:  Yes.  Simply because my wife
 6    at that point in time didn't have the contact
 7    information.
 8              MR. SHEEHAN:  Okay.  And what is -- I asked
 9    Louis Finney about is this, but I think being a fiscal
10    manager you understand it better.  What was the
11    instructions about keeping the bid under $10,000?  What's
12    the purpose of that?
13              MR. JIMENEZ:  Well, if you keep -- see, part
14    of it was that for -- I don't know the reasons about the
15    number of -- the quantity of books that they wanted --
16              MR. SHEEHAN:  I didn't ask about the
17    quantity of books.  I asked about there was instructions
18    to keep the quotes under $10,000.  I'm asking you what is
19    the purpose of those instructions?
20              MR. JIMENEZ:  Where did the instructions
21    come from?
22              MR. SHEEHAN:  Are you the fiscal manager of
23    Head Start?
24              MR. JIMENEZ:  Yes, I am.
25              MR. SHEEHAN:  Okay.  So I'm asking you what
```

1    is the purpose of those instructions?

2            MR. JIMENEZ:  Well, in order to keep a

3    purchase under $10,000 is that it doesn't have to go out

4    for bid.

5            MR. SHEEHAN:  Okay.

6            MR. JIMENEZ:  Okay.  In regards to the

7    instruction I'm -- I'm not sure.

8            MR. SHEEHAN:  Okay.  Would you like an

9    opportunity to deny that you've ever given anybody

10   instructions to do something for less than 10,000 to

11   avoid a bid?

12           MR. JIMENEZ:  No.  I mean I would -- I would

13   need to see documentation, but I don't recall mentioning

14   it anyone or indicating that, okay, if you keep it under

15   $10,000 this would be -- this is the scenario.

16           MR. SHEEHAN:  I don't understand that

17   answer.  You need to explain that to me so I understand

18   it.  Because I don't understand what you just said.

19           I asked you do you want an opportunity to

20   deny that you ever discussed with anybody keeping the

21   quote under $10,000 so that it would not have to go to

22   bid.  Do you want an opportunity to deny that or do you

23   want to not deny it or what -- the response that you gave

24   I don't understand, so clarify it for me.

25           MR. JIMENEZ:  I can't give an answer either

1    way.  Because when information -- or I guess a

2    recommendation is -- or information is requested of me,

3    someone can ask me, okay, what's the threshold for bids.

4    I can answer that question.  I answer that question

5    almost every day.  Now, whether it happened in this

6    particular situation I don't recall.

7              MR. SHEEHAN:  Did this transaction raise any

8    red flags to you at all?

9              MR. JIMENEZ:  At the time I was just

10   connecting the need from the health section of Head Start

11   based off of a presentation that was provided at the

12   inservice.

13             MR. SHEEHAN:  Okay.  I understand all that.

14   I'm not questioning the content of the book.

15             MR. JIMENEZ:  Okay.

16             MR. SHEEHAN:  I' asking you the specific

17   transaction where your wife gets a check approved by you,

18   not an arm's length transaction, does any of that raise a

19   red flag to you?

20             MR. JIMENEZ:  It does raise a red flag.

21             MR. SHEEHAN:  Okay.  What did you do to

22   resolve any concerns you have about that red flag?

23             MR. JIMENEZ:  Well, what I did was I

24   requested from -- and my wife was also requested from the

25   health section to deliver the -- I guess the second half

1  of the -- of what was purchased because it wasn't just a

2  book.  What was purchased was curriculum to be taught.

3        MR. SHEEHAN:  What did you do to address the

4  red flag that was raised in the county doing business

5  with your wife and you approving a $9,000 payment, a

6  check made out to your wife?  What did you do to address

7  your concerns about that transaction?

8        MR. JIMENEZ:  Well, in part the transaction

9  occurred and it was approved -- actually the transaction

10  was initiated by a section other than mine.  The -- when

11  the red flag was raised because understand from the

12  standpoint of, you know, working in my business for -- in

13  this field for 13 years that that, yes, would be a red

14  flag.  Did I raise it at a higher level, no?  But I

15  addressed it at the level of the section manager who did

16  approve the transaction.

17        MR. SHEEHAN:  Who's that?

18        MR. JIMENEZ:  Marie Mason.

19        MR. SHEEHAN:  And what did you address with

20  her specifically?

21        MR. JIMENEZ:  Well, I addressed with her

22  number one, that, okay, we -- my wife had contacted Head

23  Start several times -- the contact person was basically

24  Idalin Navejar -- several times to deliver the

25  curriculum.  That has not happened or she was unable to

1   coordinate that, and that -- the coordination of that

2   service continues.

3           MR. SHEEHAN:  Did you go to Marie Mason and

4   say, Marie, I think we're engaged in an illegal

5   transaction here.  What are your thoughts?

6           MR. JIMENEZ:  I did not express it like

7   that, no.

8           MR. SHEEHAN:  Okay.  So your conversations

9   with Marie Mason were about delivery of the curriculum,

10  delivery of books, logistics?

11          MR. JIMENEZ:  Logistics.

12          MR. SHEEHAN:  Okay.  And let me go back to

13  my prior question.  What did you do as an employee of

14  Hillsborough County to address your concerns -- you said

15  you had concerns.  I'm not putting words in your mouth.

16  You said a red flag was raised based on your experience.

17          What did you do to address that red flag not

18  from a logistical point of view but from a conflict of

19  interest point of view?  The red flag is up.  Michael,

20  you're engaging in a conflict of interest here.  What did

21  you do to resolve that either practically or in your mind

22  before proceeding to approve a $9,000 check payment to

23  your wife?  What specific things did you do to address

24  that concern?

25          MR. JIMENEZ:  Well, I can tell you I failed

to exercise judgment by not making my boss, Mr. Finney,

aware of the transaction.

            MR. SHEEHAN:  And why did your judgment lead

you to not inform Mr. Finney?

            MR. JIMENEZ:  Well, in part I -- I can't

really answer that question because the --

            MR. SHEEHAN:  Were you trying to protect

him?

            MR. JIMENEZ:  Mr. Finney?

            MR. SHEEHAN:  Uh-huh.

            MR. JIMENEZ:  I don't believe that was the

real intent.

            MR. SHEEHAN:  Was it part of the intent?

            MR. JIMENEZ:  To be honest with you, I don't

recall.

            MR. SHEEHAN:  Okay.  So you didn't inform

Mr. Finney, but you don't remember why?

            MR. JIMENEZ:  I didn't inform him.  However,

I should have informed him.

            MR. SHEEHAN:  Okay.  You didn't inform Marie

Mason, who approved the purchase order.  Do you remember

why you didn't inform her about the conflict of interest?

            MR. JIMENEZ:  We spoke about, you know, the

delivery of the services and everything.  And then that

time it seems like the transaction that was done that

that was more of a benefit to the program than anything.
And then after that is when the --

        MR. SHEEHAN:  Okay.  What is your education
level, Michael?

        MR. JIMENEZ:  I have a Bachelor's degree in
accounting.

        MR. SHEEHAN:  Okay.  And you've been to
training during your time here?

        MR. JIMENEZ:  For?

        MR. SHEEHAN:  Accounting, fiscal management.

        MR. JIMENEZ:  Yes.

        MR. SHEEHAN:  Okay.  So you're up to date?

        MR. JIMENEZ:  Pretty much.  I have to -- I'm
required to I guess attend or acquire 120 of continuing
professional education every three years.

        MR. SHEEHAN:  Okay.  Let me pose the
question this way and you tell me based on your
experience.  Listening to your explanation I'm trying to
conclude whether you embarked in this transaction not
recognizing there was a problem or you embarked on this
transaction knowing that there was a problem and
proceeded anyway.  Can you help me down one path or the
other because that's sort of where I need to bring this
to a conclusion.

        MR. JIMENEZ:  Okay.  The transaction itself

1    there was a point in time when I didn't even think that

2    the transaction was going to occur.  I did bring together

3    two people who were interested in delivering the

4    services.  Now, the intent was not to take county funding

5    to the benefit of me or my wife.

6              MR. SHEEHAN:  But that was the practical

7    outcome?

8              MR. JIMENEZ:  Correct.

9              MR. SHEEHAN:  So let's stop talking about

10   all this stuff before and let's get to when you approved

11   a $9,000 check, county funds to be paid to your wife, did

12   you do that not even realizing it was a problem or did

13   you realize it was a problem and you did it anyway?

14             MR. JIMENEZ:  I realized that there was a

15   potential for conflict of interest.  I realized that I

16   had exercised poor judgment in that by doing that.

17   However, at the same time in prior conversations as to

18   what the delivery and service was going to be, at that

19   time I thought it was more a benefit to the program than

20   it was not a benefit to the program.

21             MR. SHEEHAN:  So the end justified the means

22   was kind of the rationale you used?  Is that how you

23   rationalized it to yourself?

24             MR. JIMENEZ:  Well, if you want to call it

25   rationalization.  But it wasn't -- the rationalization

1  wasn't a means to convince myself that what I was doing

2  was correct.

3          MR. SHEEHAN:  Well, let me use your words

4  because I'm not putting words in your mouth.  That's why

5  these are tape recorded.  You said you realized there was

6  a problem.

7          MR. JIMENEZ:  Right.

8          MR. SHEEHAN:  A conflict of interest.

9          MR. JIMENEZ:  An apparent conflict, yes,

10  yes, yes.

11          MR. SHEEHAN:  But you thought the benefit to

12  the program to Head Start with this book --

13          MR. JIMENEZ:  Yes.

14          MR. SHEEHAN:  -- and curriculum --

15          MR. JIMENEZ:  And curriculum, yes.

16          MR. SHEEHAN:  -- outweighed the potential

17  problem?

18          MR. JIMENEZ:  Correct.

19          MR. SHEEHAN:  How is that different from the

20  end justifies the means?

21          MR. JIMENEZ:  I guess I'm not understanding

22  the end justifies the means.  But that's -- what you just

23  mentioned there is -- was the rationale.

24          MR. SHEEHAN:  Okay.  So it wasn't a case

25  though that you didn't realize you were doing something

1  wrong?

2          MR. JIMENEZ:  Correct.

3          MR. SHEEHAN:  You knew you were doing wrong.

4          MR. JIMENEZ:  Well, my judgment at the time

5  I believed I was doing something that was beneficial to

6  the program.  However, at the same time I knew that there

7  could be an apparent conflict of interest.  So, yes,

8  there was --

9          MR. SHEEHAN:  Sorry.  Go ahead.

10          MR. JIMENEZ:  I guess, yes, there was a --

11  I'd say a feeling or -- or -- or something similar to

12  that that, yes, there was an apparent conflict of

13  interest.  However, my understanding at the time was also

14  that it was more of a benefit to the program.

15          MR. SHEEHAN:  Did you review the conflict of

16  interest policy before you came here today?

17          MR. JIMENEZ:  I have reviewed it, yes.

18          MR. SHEEHAN:  You have reviewed it?

19          MR. JIMENEZ:  Yes.

20          MR. SHEEHAN:  Did you come to a conclusion

21  as to whether this transaction violated it or not?

22          MR. JIMENEZ:  I came to the conclusion that

23  there is an apparent conflict of interest, yes.

24          MR. SHEEHAN:  Okay.  Did you come to a

25  conclusion as to whether you violated the policy or not?

1          MR. JIMENEZ:  Whether I violated what I read

2     and understood, yes.

3          MR. SHEEHAN:  Okay.  Help me out here.  You

4     did or did not violate the HR policy regarding conflict

5     of interest?

6          MR. JIMENEZ:  What you've showed me, I don't

7     recall seeing.  Now, however, I can read it.

8          MR. SHEEHAN:  What you reviewed of the HR

9     policy -- you told me you reviewed it; right?

10          MR. JIMENEZ:  I reviewed the Florida

11     statute.

12          MR. SHEEHAN:  You have not reviewed -- have

13     you reviewed the HR policy?

14          MR. JIMENEZ:  To my recollection, no.

15          MR. SHEEHAN:  Okay.  That's different from

16     what you just told me 30 seconds ago.  You said yes.

17     Were you confused?

18          MR. JIMENEZ:  Well, I am sort of confused

19     because I did review the Florida statute.

20          MR. SHEEHAN:  Okay.  Let -- let's do this

21     before we go any further because I want to alleviate any

22     confusion that you might have.  Starting here on the

23     first Page 1 through 8 HR Policy Section 6.06.

24          MR. JIMENEZ:  Do you want me to read it out

25     loud or --

1           MR. SHEEHAN:  No, no.  This isn't video.

2    You were not clear whether you reviewed it, so review

3    it --

4           MR. JIMENEZ:  Okay.

5           MR. SHEEHAN:  -- and then I'll -- I'll

6    re-ask my question.

7           MR. JIMENEZ:  What's in here is similar to

8    what I've read in the Florida statute.  I don't recall

9    reading this employee conflict of interest, but it's a;

10   language that's similar to what I've heard.

11          MR. SHEEHAN:  Okay.  So do you want me to

12   re-ask the question?

13          MR. JIMENEZ:  If you're looking for an

14   affirmative answer yes or no, my recollection is no.

15   However, the language is very similar to what I've read.

16          MR. SHEEHAN:  So you just read this policy.

17          MR. JIMENEZ:  Yes.

18          MR. SHEEHAN:  And you don't see anything in

19   here that addresses the transaction that we've been

20   talking about?

21          MR. JIMENEZ:  No.  I can see that it does

22   address the transaction, but the question was whether I

23   read it or not.

24          MR. SHEEHAN:  No.  The question is now that

25   you've read it, do you have a conclusion as to whether

1    you have violated this policy or not?

2           MR. JIMENEZ:  The definition of employee

3    according to Florida statute -- it could be apparent that

4    I did.  However, the definition of employee per the

5    Florida statute I can't tell you right now if I

6    violated --

7           MR. SHEEHAN:  Okay.  Well.

8           MR. JIMENEZ:  But there is an apparent

9    conflict of interest.  That I know.  I can attest to

10    that.

11           MR. SHEEHAN:  This says, "County policy

12    prohibits employees from engaging in any business

13    transactions or professional activity or incur any

14    obligation of any nature that is in substantial conflict

15    with the proper discharge of their public duties."

16           Do you believe that this transaction fits

17    that?

18           MR. JIMENEZ:  I believe that the -- the

19    transaction would fit any conflict of interest policy.

20           MR. SHEEHAN:  Okay.  Would you agree that

21    this policy calls for you to disclose any financial

22    interest in an outside business?

23           MR. JIMENEZ:  I would say yes.

24           MR. SHEEHAN:  Can you direct me to where you

25    disclosed that your family received $9,000 in county

1   money.

2          MR. JIMENEZ:  I can't disclose -- there is

3   no disclosure where the county received -- or whether she

4   received $9,000 of county money.  However, a disclosure

5   of whether she had a business or not and was -- was not

6   written to disclose it, no, at that time.

7          MR. SHEEHAN:  So would that be a violation

8   of this policy?

9          MR. JIMENEZ:  As read, yes.

10         MR. SHEEHAN:  Okay.  And you would agree

11  that the form that I showed you is attached to this

12  policy?  The employment disclosure form that we discussed

13  before is attached right here?

14         MR. JIMENEZ:  That form itself, the one that

15  I signed and filled in?

16         MR. SHEEHAN:  No.  This form right here, the

17  employee disclosure statement.  That's attached to this

18  policy, right?

19         MR. JIMENEZ:  Right.

20         MR. SHEEHAN:  Okay.

21         MR. JIMENEZ:  Now, whether the one I

22  assigned was attached to the policy at the time I don't

23  believe so because I would have had that in my file and I

24  don't have that document in my file.

25         MR. SHEEHAN:  You have access to COIN [sic]?

1          MR. JIMENEZ:  Yes, I do.

2          MR. SHEEHAN:  You use COIN pretty regularly?

3          MR. JIMENEZ:  I would say on and off I'd use

4    it.  I don't know as to what period --

5          MR. SHEEHAN:  So you know there's a little

6    thing on there that says policies and procedures?

7          MR. JIMENEZ:  Yes.

8          MR. SHEEHAN:  And you know that under that

9    tab there's HR policies?

10          MR. JIMENEZ:  Yes.

11          MR. SHEEHAN:  So you know that any time

12    eight hours a day you're at work you can go to them and

13    you could see those pages as they exist yesterday, today,

14    tomorrow?

15          MR. JIMENEZ:  Well, I can review many

16    policies.

17          MR. SHEEHAN:  Okay.

18          MR. JIMENEZ:  I know that it exists.

19          MR. SHEEHAN:  Okay.

20          MR. JIMENEZ:  I just -- I just want to make

21    clear that I know it exists whether when I signed the

22    document or not I don't recall reading that.  But --

23          MR. SHEEHAN:  Well, the document I'm

24    referring to you never saw it.  In fact, you never filled

25    it out.

1           MR. JIMENEZ:  The one with my signature on

2     it?

3           MR. SHEEHAN:  No.

4           MR. JIMENEZ:  Because that's where -- that's

5     where the confusion was.

6           MR. SHEEHAN:  Okay.  You're talking about

7     two documents, one you never signed and one with your

8     signature on it, and your referring to them as the same

9     document.  That's confusing to me.

10          MR. JIMENEZ:  Okay.

11          MR. SHEEHAN:  I showed you a blank document

12    and asked you if you had ever filled it out and you said

13    no.

14          MR. JIMENEZ:  You're referring to the one --

15    I don't know what the title is right now.

16          MR. SHEEHAN:  That's why I'm trying to help

17    you to make sure you don't confuse yourself.

18          MR. JIMENEZ:  Okay.  I --

19          MR. SHEEHAN:  I gave you this form before --

20    I gave you this form before --

21          MR. JIMENEZ:  Right.

22          MR. SHEEHAN:  -- and I asked you had you

23    have seen that form and you said no.

24          MR. JIMENEZ:  I don't recall filling in the

25    form.

1          MR. SHEEHAN:  Okay.  Now I asked you is that

2    form not an attachment to HR 6.06 that you just reviewed?

3          MR. JIMENEZ:  Oh, when I looked under HR

4    6.06 I did see this form, yes.

5          MR. SHEEHAN:  Okay.

6          MR. JIMENEZ:  And this is -- it states HR

7    Policy 6.06.

8          MR. SHEEHAN:  So you read in the policy that

9    in order to do -- have outside employment, in order to

10   have financial interest in a company, in order for a

11   company that you have financial interest in, to do

12   business with the county, this policy requires that you

13   fill out this form.

14         MR. JIMENEZ:  Correct.

15         MR. SHEEHAN:  And you did not fill out this

16   form?

17         MR. JIMENEZ:  I filled in another form

18   delivered by the supervisor of elections, which did

19   provide for a disclosure of interest, which I did fill

20   in.

21         MR. SHEEHAN:  Okay.  So the answer to my

22   question -- correct me if I'm wrong -- is no, you did not

23   fill out this form?

24         MR. JIMENEZ:  This one in particular I do

25   not recall filling out.

1              MR. SHEEHAN:  Okay.

2              MR. JIMENEZ:  I do have a file in my office

3    which I can provide those forms that I did fill out.

4              MR. SHEEHAN:  Okay.  Good.  That's -- that's

5    fine.  If you want to include it in there, I'll include

6    it in there.  But that's not my question.

7              MR. JIMENEZ:  I just want to answer your

8    question to the best of my --

9              MR. SHEEHAN:  Okay.  This policy requires

10   that you fill out this form.

11             MR. JIMENEZ:  Correct.

12             MR. SHEEHAN:  You did not fill out this

13   form --

14             MR. JIMENEZ:  Correct.

15             MR. SHEEHAN:  -- is that what you just told

16   me?

17             MR. JIMENEZ:  I don't recall filling out

18   that form, but I do recall filling out a disclosure

19   conflict of interest form.

20             MR. SHEEHAN:  Okay.  So you may have filled

21   out this form now, but you don't remember?

22             MR. JIMENEZ:  I don't recall filling out

23   this one in particular, but I did fill in a disclosure

24   conflict of interest.

25             MR. SHEEHAN:  And this policy requires that

1    you fill out this form?

2              MR. JIMENEZ:  That policy does, yes.

3              MR. SHEEHAN:  Let me go back to my initial

4    question.  Having reviewed this policy, do you now agree

5    that you have violated HR Policy 6.06?

6              MR. JIMENEZ:  In regards to the business of

7    my wife?  Yes.

8              MR. SHEEHAN:  Okay.  Well --

9              MR. JIMENEZ:  I was just confused about the

10   fact that I did sign a --  I did fill in a disclosure of

11   conflict of interest for myself and my business.  Whether

12   it was this form in particular or not I don't recall.

13             I do have a file in my office with the forms

14   that I did fill out.  But that's the point I'm trying to

15   drive home here is that I'm not denying the fact that I

16   filled in a conflict of interest form myself for my own

17   business.  I did not fill in a conflict of interest form

18   for my wife.

19             MR. SHEEHAN:  Why not?

20             MR. JIMENEZ:  It just didn't cross my mind

21   at the time.

22             MR. SHEEHAN:  This happened as a result of

23   you being ignorant of the policy or did this happen, you

24   knew about the policy and you went and did it anyway?

25             MR. JIMENEZ:  I wouldn't say ignorant of the

1   policy.  But at the time of the transaction and the way

2   it occurred, it didn't appear to me -- it did come up

3   after the fact -- or as the transaction progressed that

4   there was a possible conflict of interest.  However, I

5   did not think about filling in the form because it didn't

6   cross my mind at the time.

7           MR. SHEEHAN:  Okay.  And once the conflict

8   of interest became apparent to you, this was -- once the

9   conflict of interest became apparent to you, what steps

10  did you take to expose it or resolve it?

11          MR. JIMENEZ:  Well, I addressed the issue

12  with the manager.  The --

13          MR. SHEEHAN:  Who is that?

14          MR. JIMENEZ:  Marie Mason.  However, I did

15  not elevate it to the level of my --

16          MR. SHEEHAN:  What did you address with

17  Marie Mason, that you had engaged in a conflict of

18  interest and you needed to resolve it or the shipment of

19  the books?

20          MR. JIMENEZ:  No.  It didn't -- it didn't

21  involve, you know, direct --

22          MR. SHEEHAN:  Then what does Marie Mason

23  have to do with an answer to my question?

24          What did Michael Jimenez do when he realized

25  he engaged in a conflict of interest to resolve or expose

1    the conflict of interest?

2           MR. JIMENEZ:  I had a lapse in judgment and

3    I did not fill in the form the way that it's prescribed.

4    So to answer your question, I didn't -- I didn't follow

5    the procedure.

6           MR. SHEEHAN:  Right.  But that wasn't my

7    question.

8           MR. JIMENEZ:  So I did nothing.

9           MR. SHEEHAN:  After you realized that there

10   was a conflict, you did nothing to resolve it?

11          MR. JIMENEZ:  Correct.  My -- my --

12          MR. SHEEHAN:  You didn't speak to

13   Mr. Finney?

14          MR. JIMENEZ:  No, I did not.

15          MR. SHEEHAN:  You didn't speak to Marie

16   Mason?

17          MR. JIMENEZ:  I spoke to her, not in this --

18   not in no --

19          MR. SHEEHAN:  About logistics of the

20   curriculum?

21          MR. JIMENEZ:  Correct, exactly.

22          MR. SHEEHAN:  But you didn't talk to her

23   about the ethics violation?

24          MR. JIMENEZ:  To my recollection, no.

25          MR. SHEEHAN:  Okay.  You didn't hire a

1  lawyer?

2          MR. JIMENEZ:  No.

3          MR. SHEEHAN:  You didn't call the compliance

4  services hotline to report an ethics violation?

5          MR. JIMENEZ:  No.

6          MR. SHEEHAN:  You did not appear here in my

7  office of your own accord.  You're here because I invited

8  you here.

9          MR. JIMENEZ:  Correct.

10          MR. SHEEHAN:  Okay.  So you didn't show up

11  here uninvited to say I think I screwed up.  Let me

12  explain to you what I did.

13          MR. JIMENEZ:  Correct.

14          MR. SHEEHAN:  Is there anything I didn't ask

15  you that you want to add to this?

16          MR. JIMENEZ:  Well, in part.  The county

17  policy on conflict of interest, in regard to that I know

18  that, you know, the policy exists and disclosure has to

19  be made.  It wasn't made in regards to my wife's

20  business.  Time went by and, you know, I didn't -- uhm, I

21  don't want to say I forgot, but basically it just -- I

22  just didn't fill in the form.

23          MR. SHEEHAN:  Okay.  You classified or

24  unclassified?

25          MR. JIMENEZ:  Unclassified.

            MR. SHEEHAN:  As a -- I just want to ask
your opinion as a manager.  Don't you think it would be
in the best interest of the county to have its
unclassified managers maybe a little more focused on
conflicts of interest and ethics violations so that it
wouldn't just be forgotten?

            MR. JIMENEZ:  No.  I understand that, yes, I
do.  I understand that law for employees.  But, yes, of
my -- it's my duty to.  Yes, I understand.

            MR. SHEEHAN:  Okay.  I -- I just want to
tell you that so that's why I'm kind of explaining why I
had to repeat some of these questions --

            MR. JIMENEZ:  Right.

            MR. SHEEHAN:  -- was to make sure that you
understood what I was asking.  Because the worst thing
that would happen is -- well, I don't know if it would be
the worst thing that happened, but it would be bad if you
got caught not telling the truth.

            MR. JIMENEZ:  Well, I have no intention of
not telling the truth.

            MR. SHEEHAN:  Okay.  Well, I just want to
make sure you had every opportunity to address --

            MR. JIMENEZ:  And I just want to make clear
that I intend to cooperate 100 percent.

            MR. SHEEHAN:  Okay.  Is there any particular

1   reason that your wife's name doesn't appear on any county

2   records, like in your personnel file?

3           MR. JIMENEZ:  It should.  I mean she's in

4   HRS and she's in the -- what it is, the employee

5   disaster.

6           MR. SHEEHAN:  Where in HRS would she be?

7           MR. JIMENEZ:  In the contact information.

8           MR. SHEEHAN:  Just give me one minute here.

9           MR. JIMENEZ:  She'd also be in the employee

10  disaster plan.

11          MR. SHEEHAN:  Okay.  You just -- you

12  mentioned the disaster plan.  Okay.  Here's the disaster

13  plan form that you filled out.  Show me what I'm missing

14  there if your wife's name appears on there anywhere.

15          MR. JIMENEZ:  She should appear as an

16  alternative contact.

17          MR. SHEEHAN:  Okay.  Well, there's the form.

18  Now, you said it would appear on it.  I want to make sure

19  I'm not missing it.  Do you see it on there anywhere?

20          MR. JIMENEZ:  No, I don't.  The form is more

21  than two pages long.

22          MR. SHEEHAN:  Okay.  I will check on it.

23  Anything else you want to add?

24          MR. JIMENEZ:  No.  I mean I can almost -- I

25  could be almost 100 percent certain that she's listed in

1   HRS as a family member.

2               MR. SHEEHAN:  Okay.  If she is, she is.

3   Maybe I just didn't notice it.  I just wanted to ask you

4   about that form that I did get.

5               MR. JIMENEZ:  Right.

6               MR. SHEEHAN:  And for some reason her name

7   doesn't appear anywhere.  And I went through all the

8   screens at HRS yesterday and didn't find her name

9   appearing anywhere.  It was just strange when I was

10  looking, so I -- I wanted to ask you that before we were

11  done.

12              MR. JIMENEZ:  If neither I can provide -- I

13  can look in myself and provide that information for you.

14  Now, the Pages 1 and 2 I believe she should be on -- she

15  should be somewhere.

16              MR. SHEEHAN:  Okay.  Okay.  Okay.  Anything

17  I didn't ask you about that you want to add?

18              MR. JIMENEZ:  No.

19              MR. SHEEHAN:  Okay.  Then we'll conclude the

20  interview at 9:30."

21              (Conclusion of audiotape.)

22              THE COURT:  Mr. O'Neill, we need to turn it

23  off.  Thank you.

24              All right.  We're going to recess for lunch

25  at this time.  Ladies and gentlemen, it's 12:20.  We'll

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    be in recess for an hour and 15 minutes or until 1:35.

2    We'll start again at 1:35.  Please don't discuss the

3    case.  Leave your pads on your chairs.

4              COURT SECURITY OFFICER:  All rise for the

5    jury.

6         (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

7              THE COURT:  Mr. Sheehan, we're going to be

8    in recess till 1:35.  You may step down.  Please don't

9    discuss your testimony with anyone over the recess.

10   Thank you.

11   (THEREUPON, A RECESS WAS TAKEN, AND THEN THE PROCEEDINGS

12                  CONTINUED AS FOLLOWS:)

13             COURT SECURITY OFFICER:  All rise.  This

14   Honorable Court is now in session.  Please be seated.

15   Come to order.

16             THE COURT:  Jurors all back?

17             COURT SECURITY OFFICER:  Yes.

18             THE COURT:  Would you bring the jury in.

19             COURT SECURITY OFFICER:  Yes, Your Honor.

20             All rise, please, for the jury.

21        (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

22             COURT SECURITY OFFICER:  Thank you, ladies

23   and gentlemen.  Please be seated.

24             THE COURT:  Mr. O'Neill.

25             MR. O'NEILL:  Yes.  Thank you, Your Honor.

BY MR. O'NEILL:

Q.     Mr. Sheehan, when we broke for lunch we had just finished playing Government's Exhibit 30.  Do you recall that, sir?

A.     Yes.

Q.     During the course of that statement and -- between yourself and the defendant, Michael Jimenez, there were a number of references to disclosure statements, forms and the like.  Do you recall that?

A.     Yes.

Q.     Are you familiar with the employee disclosure statements filed by Hillsborough County employees?

A.     Yes.

Q.     First, can you tell us what is an employee disclosure statement.

A.     In the Human Resource Policy 6.06 there's a list of things that trigger an employee filing a disclosure form.  Among those are having secondary employment, owning rental property, family ownership of businesses, and owning of business by Hillsborough County employees.

Q.     And what would an employee have to do if one of those instances were applicable to that employee?

A.     If any of those --

       MR. WEISBROD:  Excuse me.  I'm going to object.  Foundation, lack of knowledge, 602.  He's in

1   investigations.  He's not in human resources.

2              MR. O'NEILL:  I'll lay a predicate, Your

3   Honor.

4              THE COURT:  All right.

5   BY MR. O'NEILL:

6   Q.     Mr. Sheehan, how long have you been the chief

7   investigator for the county?

8   A.     Since 2004.

9   Q.     Do many of your investigations involve

10  investigations of county employees?

11  A.     Yes.

12  Q.     When they do, what, if any, documents do you rely

13  upon?

14  A.     Many times -- most times the documents that are

15  contained in their personnel files.

16  Q.     And what would that be?

17  A.     They would be their applications, their payroll

18  records, their conflict of interest disclosure forms,

19  evaluations, accommodations, things such as that.

20  Q.     As an investigator why would you be concerned

21  with something such as an employee disclosure statement?

22  A.     Well, for one thing, filing the disclosure

23  statement tells me whether the employer has been notified

24  of a potential conflict of interest, which is the purpose

25  of that policy.

Q.    In general in your investigations is that -- of
county employees is that important?

A.    Yes.

Q.    Now, have you had the opportunity to examine
employee disclosure statements in your capacity as the
chief investigator?

A.    Yes.

Q.    And have you done so on more than one occasion?

A.    I've done so on more than a hundred occasions.

Q.    So you're familiar with that form?

A.    Yes.

Q.    Is that a form that maintained by the county?

A.    Yes.

Q.    And is it a record compiled in the normal course
of events by that county?

A.    Yes.

Q.    And is that -- is that required of these
employees who have one of those instances that you've
mentioned previously in your testimony?

A.    It would be required for them to file a
disclosure form if they meet the instances listed in the
policy.

Q.    And you are familiar with those policies?

A.    Yes.

              MR. O'NEILL:  Your Honor, at this time I

1    move into evidence Government's Exhibit 17.

2              THE COURT:  Any objection?

3              MR. WEISBROD:  Yes, Your Honor.  I think

4    he's going to move into a group of forms together.

5              MR. O'NEILL:  Mr. Weisbrod asked me would I

6    do them all, Your Honor, so government would be moving

7    for 17, 18, 19 and 20.

8              MR. WEISBROD:  No objection.

9              THE COURT:  Thank you.  I'll receive into

10   evidence 17, 18, 19 and 20.

11             (EXHIBITS 17 THROUGH 20 ADMITTED INTO

12   EVIDENCE.)

13             MR. O'NEILL:  May I approach the witness,

14   Your Honor?

15             THE COURT:  Yes.

16   BY MR. O'NEILL:

17   Q.    Mr. Sheehan, I've handed you what's been entered

18   into evidence as Government's Exhibits 17, 18, 19 and 20.

19   And I would just like to bring your attention to them

20   starting with Government's Exhibit 17.

21   A.    Yes.

22   Q.    And I put them in front of you, but you can also

23   look at the screen, whichever you want out of efficiency.

24   What is Government's Exhibit 17?

25   A.    That is an employee disclosure statement filed by

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Michael Jimenez.

2    Q.    Does it give his address?

3    A.    6212 Soaring Avenue, Temple Terrace.

4    Q.    And does it give his position?

5    A.    Manager fiscal and administrative services.

6    Q.    Now, in the next box there's a name of a business

7    entity.  Do you see that, sir?

8    A.    Yes, sir.

9    Q.    And what does that denote?

10   A.    Well, in the context of this form Mr. Jimenez

11   appears to have been reporting ownership of United Tax

12   and Accounting, Incorporated.

13   Q.    And at the bottom does there appear to be a

14   signature and a date?

15   A.    There's a signature and it's dated 8/28/08.

16   Q.    And is that what we've been calling the employee

17   disclosure statement?

18   A.    Yes.

19   Q.    Now, on the back page of that -- it's a two-page

20   form -- could you tell the ladies and gentlemen of the

21   jury what this back page denotes to you.

22   A.    Well, because the purpose of the form is to

23   notify the employer of potential conflicts there's

24   various spaces on the back of the form to be signed by

25   the department director and then subsequently by human

1    resources.  And the purpose is for both to review them to

2    determine if in their opinion there is or is not a

3    conflict of interest.

4    Q.    And do you see that there are two signatures on

5    that page?

6    A.    Yes.

7    Q.    Do you recognize those signatures?

8    A.    I recognize the signature from human resources.

9    I do not recognize the signature of the department

10   director.

11   Q.    Just for the record, the one you do not recognize

12   is this first one that's hard to read?

13   A.    Correct.

14   Q.    And the second one you do recognize?

15   A.    Yes.

16   Q.    And who is that individual?

17   A.    That is Bobbie Aggers.  She's a personnel analyst

18   in human resources.

19   Q.    Mr. Sheehan, I now direct your attention to

20   Government's Exhibit 18 and I'd ask you please describe

21   the form for the ladies and gentlemen of the jury.

22   A.    This form is not a Hillsborough County form.

23   This is a form that's distributed by the supervisor of

24   elections.

25   Q.    And why is that?

A.      The purpose of this form as -- well, first let me

say I'm not as familiar with this form as I am with the

previous form because it's not a Hillsborough County

form.  But during the course of my investigation I

learned that the purpose of this form is to have

procurement officers defined under the state statute to

make financial disclosures through the supervisor of

elections.

Q.      And turning several pages into this form, did

Mr. Jimenez in fact fill out this form?

A.      Yes.  It appears to be dated May 27, 2009.

Q.      And that's on this signature block over here on

the screen right now?

A.      Yes.

Q.      Mr. Sheehan, I now direct your attention to

Government's Exhibit 19 and ask you to please describe

this form for the ladies and gentlemen of the jury.

A.      This is a statement of ethics that was prepared

to provide guidance to employees working for the

Hillsborough County administrator.

Q.      And who receives this?

A.      There is mandatory training on the statement of

ethics for all employees.  It's maintained on the

employee Web site where it's accessible to all employees.

Q.      Finally, Mr. Sheehan, I would direct your

1   attention to Government's Exhibit 20 that's been entered

2   into evidence.  And during your statement with the

3   defendant, Michael Jimenez, you mentioned several times

4   HR 6.06.  Is this what you were referring to?

5   A.      Yes.

6   Q.      Please explain to us what this form is.

7   A.      This form provides direction to employees about

8   their obligation to report potential conflicts of

9   interest or disclosure of business interests and explains

10  the purpose for those disclosures and how those

11  disclosures would be handed by the employee and the

12  employer.

13  Q.      Why is it important to Hillsborough County that

14  someone disclose potential conflicts of interest?

15  A.      Uhm, well, in my experience dealing with the

16  policy, for example, secondary employment hours can

17  sometimes interfere with scheduled county hours.  So, for

18  example, somebody -- an employee could be getting paid

19  from two employers at the same time.  It would be in the

20  interest of the Hillsborough County government to know

21  that an employee was engaging in that kind of behavior.

22          The reason for disclosure of rental properties as

23  another example is because Hillsborough County code

24  enforcement, which is under the county administrator's

25  office, regulates code violations on rental properties so

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    it would be in their interest to know whether a rental

2    property was owned by an employee.

3         And then probably most important is the

4    disclosure of business ownership because the county would

5    be concerned about business entities owned by

6    Hillsborough County employees doing business with

7    Hillsborough County.

8    Q.   And why would that with be?

9    A.   Well, for one thing it would be a violation of

10   the ethics code.  It wouldn't be -- it wouldn't be -- it

11   would not instill confidence in the mind of the public if

12   public employees were engaging in that kind of behavior.

13   So it's -- the purpose of -- of precluding it is to

14   maintain that public trust.

15        MR. O'NEILL:  Your Honor, I have no further

16   questions.

17        THE COURT:  Mr. Weisbrod.

18        MR. WEISBROD:  Thank you, Your Honor.

19             CROSS-EXAMINATION

20   BY MR. WEISBROD:

21   Q.   Good afternoon.

22   A.   Good afternoon.

23   Q.   Let's start at the end of the statement real

24   briefly.  There was a discussion with Mr. Jimenez about

25   whether his wife's name, Mrs. Melendez, appeared in his

1    file at Hillsborough County.  Do you remember that?

2    A.    Yes.

3    Q.    Okay.  And you had apparently showed him a couple

4    pages of a disaster form but not the entire form?

5    A.    Correct.

6    Q.    And after the interview with Mr. Jimenez you had

7    a member of your staff go to his office and retrieve the

8    full form; right?

9    A.    We retrieved the -- we retrieved the missing page

10   from human resources.

11   Q.    And it had his wife's name as a contact?

12   A.    Yes.

13   Q.    And he was also -- Mr. Jimenez also was able to

14   get a screen shot for you of the HRIS system; is that

15   correct?

16   A.    I believe so.

17   Q.    That's the human resources information system?

18   A.    Correct.

19   Q.    And that also had his wife's name as a contact

20   along with his children; right?

21   A.    Yes.

22   Q.    Okay.  So he was able to provide that to you

23   literally within minutes of the interview?

24   A.    I -- I don't recall the time frame.  The

25   information came to light.  I don't recall the time

1    frame.

2    Q.    He was able to provide it to you.  You were --

3    had not been able to find for yourself at least as of the

4    time of interviewing him?

5    A.    Yes.

6    Q.    Okay.  Now, Government's Exhibit 17 in evidence,

7    this is a Hillsborough County form; correct?

8    A.    Yes.

9    Q.    And this is, for lack of a better term, the old

10   employee disclosure statement; right?

11   A.    Yes.

12   Q.    Okay.  And so in 2008 Mr. Jimenez filled it out

13   and it was on file; right?

14   A.    Yes.

15   Q.    Okay.  And he told you during the interview if I

16   remember correctly that he had a file in his office with

17   all the disclosure statements that he had filed with the

18   county; right?

19   A.    Yes.

20   Q.    Okay.  And did you ever find any other statements

21   other than the ones we have here?

22   A.    No.

23   Q.    Then we also have Exhibit 18 -- Government's

24   Exhibit 18 in evidence.  And this was the form that

25   Mr. Jimenez was relating to during the course of the

1   interview on multiple occasions; right?

2   A.     Yes.

3   Q.     This was the one that was sent to him by the

4   supervisor of elections in 2009?

5   A.     Yes.

6   Q.     So he had one form from the county, the old

7   county form in '08 and then the supervisor of elections

8   form in '09; right?

9   A.     Correct.

10  Q.     And then on this face page the very top of it it

11  has definitions for state officers, local

12  officers/employees and specified state employees, does it

13  not?

14  A.     Yes.

15  Q.     And that comes underneath the heading of who must

16  file Form 1?

17  A.     That's what it says.

18  Q.     And when you were having the discussion with

19  Mr. Jimenez on the tape, what he was telling you is he

20  looked at these definitions and didn't think he really

21  needed to file this form; right?

22  A.     I'm not sure that's what he was telling me, no.

23  Q.     Okay.  And despite that he went ahead and he

24  filed it -- filled it out and filed it shortly after the

25  supervisor of elections sent it to him, right?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

A. Yes.
Q. And that's the form you told him during the course of interview you didn't care about. Put it aside; right?
A. Correct.
Q. Now, then in October of 2009 we have Government's Exhibit No. 20. We're back to Hillsborough County forms; right?
A. Yes.
Q. And this is a new form effective October 22, 2009; right?
A. Yes.
Q. And it supercedes the old form, which is Exhibit 18, which Mr. Jimenez had filed in '08 when he had to with the county 'right?
A. Correct.
Q. And, in fact, we know from this form -- well, I'll just ask you. You probably know this from your work. It used to be that you had to file your disclosure forms every five years; right?
A. There was a time when it -- well, I don't -- I don't recall the time frame, but I recall that that may have been the policy at one time.
Q. Then the policy was changed here. I found it. Within Government's Exhibit No. 20 on Page -- Page 9 says

1  modified change from five years to annually; correct?

2  A.    That's what that says.

3  Q.    All right.  Well, you're familiar with the HR

4  forms.  And we've introduced this into evidence based on

5  your familiarity with them; right?

6  A.    Well, I was only confused because your second

7  statement is not about the same thing as your first

8  statement.

9  Q.    Well, this disclosure form changes the old rules

10  where you had to file them every five years?

11  A.    That is not accurate.

12  Q.    Okay.  That's what -- that's what this says,

13  doesn't it?

14  A.    No, sir, that's not what it says.

15  Q.    What's changing from five years to annually?

16  A.    On the top of each HR form there's a review date

17  to tell management when they are obligated to go back and

18  review that policy to see if they want to make any

19  changes.  Prior to this change they reviewed the conflict

20  of interest policy every five years.  As a result of this

21  change senior management is now required to review this

22  policy every year.

23  Q.    So if Mr. Jimenez had gotten this form and he had

24  reviewed it, he would have read that section as providing

25  that the change is from five years to annual for senior

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    management to review the policy, not for the actual

2    filing of the forms?

3    A.    I'm not sure I understood.

4    Q.    Well, you say that the change from five years to

5    annual is for review by top management of the human

6    resources policies; correct?

7    A.    Correct.

8    Q.    And so if Mr. Jimenez had actually received that

9    human resources 6.06 form, that's how he should have

10   interpreted what we had up on the screen; right?

11   A.    Correct.

12   Q.    Okay.

13          MR. WEISBROD:  I have nothing further.

14   Thank you, Your Honor.

15          MR. BROWN:  No questions, Your Honor.

16          THE COURT:  Mr. Farmer.

17          MR. FARMER:  Yes, just briefly.

18                  CROSS-EXAMINATION

19   BY MR. FARMER:

20   Q.    Afternoon, sir.

21   A.    Good afternoon.

22   Q.    Now, it's true that Policy 6.06 does not as a per

23   se rule ban a county employee's spouse from having county

24   business?

25   A.    That's correct.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

Q.     All right.  The -- the only -- the only violation
that you found in this case was the nondisclosure of a
spouse's business on the new form that went into effect
in 2009; correct?

A.     No, I don't agree with that statement.  That was
not my only finding.  That was one of my findings.

Q.     Well, the -- the investigation involved the
failure to fill out for a spouse's business, this here --
if you look on the screen, I've got it there.  Business
ownership self, spouse, child.

A.     Correct.

Q.     That was the -- the only rule violation that you
found; is that right?

A.     You mean related to this form or generally?

Q.     Well, related to this form.

A.     Yes, related to this form my finding was the form
should have been filed and was not.

Q.     And if it was filed, you would have found that no
one was in violation of Policy 6.06; correct?

A.     I don't -- I don't know.  I would have to make a
presumption to -- to answer that.

Q.     Well, did you find a rule violated during your
investigation?

A.     Yes.

Q.     A policy was violated?

1    A.    Yes.

2    Q.    And that policy was 6.06?

3    A.    That policy was violated.

4    Q.    And specifically the portion of the policy that

5    you found violated was the nondisclosure of a spouse's

6    business; isn't that right?  That is Question No. 2 here.

7    A.    That is one of my findings.

8    Q.    That was your only finding in terms of a

9    violation of this policy; isn't that right?

10   A.    No.  I don't agree with that.

11   Q.    Well, if there was disclosure of the spouse's

12   business there would have been no violation of 6.06;

13   correct?

14   A.    No.  I don't agree with that either.

15   Q.    Well, you found no other rule violation during

16   your investigation for anyone; correct?

17   A.    No, that's not correct.

18   Q.    What other rule did you find in violation during

19   your investigation?

20   A.    The -- the purpose of the policy --

21   Q.    What other rule did you find in violation?

22   A.    I found ethical violations under the Hillsborough

23   County statement of ethics.  I found a violation of HR

24   6.06.

25   Q.    That's the one we're just talking about; correct?

A.      Correct.  It was -- it was my conclusion that
people did not appropriately report conflicts of
interest.

Q.      Is there anything in Rule 6.06 that requires
reporting of a violation of Rule 6.06?

A.      No.  What I think is encompassed is 6.06 is an
obligation of an employee not to engage in conflicts of
interest.

Q.      All right.  My question was there was no
violation of 6.06 regarding reporting by an employee of
another employee violation; correct?

A.      I think that would be correct, yes.

Q.      And the purpose of this disclosure form -- and
I'll show you the new form -- part of the exhibit here --
let's see.  The employee disclosure statement, that was
the form that went into effect October 2009; correct?

A.      Correct.  That's attached to the updated 2009
policy.

Q.      And that's a -- that's a form that beginning
October of 2009 all Hillsborough County employees should
fill out; right?

A.      If they fit the criteria of having to report a
potential conflict.

Q.      Well, doesn't -- well, what you're referring to
is the employee disclosure questionnaire?

1    A.      That's an attachment to the policy.

2    Q.      Right.

3            So as we see here about halfway down on the

4    questionnaire if the answer to any of these questions is

5    yes, then we go to the form; is that right?

6    A.      Correct.

7    Q.      And was that what you were referring to just a

8    moment ago when you referred to criteria?

9    A.      Yes, sir.

10   Q.      Okay.  So any yes answer to any of these

11   questions required the employee to go ahead and fill out

12   the next page that is the employee disclosure statement;

13   is that right?

14   A.      Correct.

15   Q.      And the one change that went into effect in

16   October of 2009 that was not -- or one of the changes

17   that was not in effect before that date was dealing with

18   business ownerships by spouses; is that correct?

19   A.      That requirement was there before 2009.

20   Q.      Well, we saw -- we saw a form that Mr. Jimenez

21   filled out prior to 2009.  I think he testified that that

22   was the one effect for that point; is that right?

23   A.      It appears to be.

24   Q.      And is there anything on that form, the one

25   before October 2009, that requires disclosure that a wife

1   or a husband that is the non Hillsborough County employee

2   spouse had a business?

3   A.    I believe the questionnaire that triggers the

4   form was exactly the same.

5   Q.    Are you sure of that?

6   A.    Yes.  I'll review the policy that you're

7   referring to if you would like me to.  The reason I'm

8   answering yes is because prior to 2009 there was

9   investigations of employees who did not disclose their

10  wife's business.  So based on that experience I'm saying

11  that I know that the trigger was the same.  If you'd like

12  me to comment on the old policy I'll be glad to read it

13  and answer your question more specifically.

14  Q.    I don't think I have a policy that predates

15  October 22nd, 2009.  That's the only one I have

16  available.  But your recollection is they were exactly

17  the same in terms of spouse's businesses?

18  A.    My recollection is that the trigger was exactly

19  the same.

20  Q.    That is if an employee has a spouse works out --

21  you know, different business, that has to be disclosed to

22  the county?

23  A.    Yes.

24  Q.    Are you familiar with any discipline that was

25  administered to Marie Mason as a result of your

1  investigation?

2  A.     I'm not aware.

3  Q.     It's true that Miss Mason was not disciplined in

4  any way as a result of your investigation.  Isn't that

5  true?

6  A.     If I'm not aware I can't agree or disagree with

7  that statement.  I'm not aware.  I don't know what

8  discipline was involved.

9  Q.     Isn't that a part of your investigation, that is,

10  determining what the discipline would be?

11  A.     No.

12  Q.     What you find in the investigation?

13  A.     No.  That's not part of my job at all.

14  Q.     Were you involved in decisions determining the

15  discipline that was administered to any employees that

16  were subject to your investigation?

17  A.     No.

18  Q.     What happens once you find a violation?

19  A.     I write a report.  It's reviewed by an executive

20  staff member.  Then it's sent to the county attorney for

21  legal review.  And then it is sent to the department

22  director for administration of whatever they decide or

23  decided not to do.  And I'm not party to any of those

24  conversations.

25  Q.     You have no involvement after you administer your

1   investigation; is that right?

2   A.      That's correct.

3   Q.      Now, does this policy prohibit absolutely

4   Hillsborough County employees having spouses outside of

5   the county to run businesses who receive county funds?

6   A.      I didn't get that.

7   Q.      Okay.  Too long?

8   A.      It was confusing.

9   Q.      This policy and no policy in the county prevents

10  as a black and white rule an employee's spouse from

11  receiving county funds; isn't that correct?

12  A.      I don't recall any black letter statement like

13  that in a policy.  The policy is to provide review by

14  management.  It does not prejudge what the outcome of

15  that preview would be.  So theoretically what you

16  proposed could be perfectly appropriate.

17  Q.      As long as there's disclosure; isn't that right?

18  A.      Correct.  The key is disclosure.

19  Q.      And let's talk just a moment about the timing of

20  the disclosure.  We'll go to the second page of this

21  policy.  We see here that the employee disclosure

22  questionnaire must be completed within 45 days of certain

23  employment actions; isn't that right?

24  A.      Correct.

25  Q.      So that requires if there's a change in your


1  employment status, within 45 days the employee has to

2  fill out the employee disclosure questionnaire?

3  A.      Correct.

4  Q.      Including if a spouse has a business outside of

5  the county government, disclosing that fact?

6  A.      Correct.

7  Q.      And in addition to that timing of the

8  disclosure -- of the disclosure, the -- the other

9  requirement is the disclosure questionnaire must be

10  filled out when various other events occur; isn't that

11  right?

12  A.      Correct.

13  Q.      And at that time the disclosure must be filled

14  out by the county employee; isn't that right?

15  A.      Correct.

16  Q.      And as long as the county employee fills out that

17  disclosure form; correct?  With me so far?

18  A.      I'm with you so far.

19  Q.      Okay.  And as long as that form is submitted in

20  the proper channels?

21  A.      Correct.

22  Q.      And as long as no conflict is determined?

23  A.      Correct.

24  Q.      As long as -- there's a finding that if there's a

25  conflict, it's acceptable to the county.  With me so far?

1    A.    Correct.

2    Q.    Then there would be nothing barring the spouse's

3    business from receiving county funds; isn't that correct?

4    A.    There would be no violation of this policy in the

5    hypothetical that you just proposed to me.  That does not

6    preclude violations of other policies, but this policy

7    would not be violated with an appropriate disclosure.

8    Q.    Isn't it true that you found no violations of

9    policy other than HR 6.06 in your investigation?

10   A.    Well, I have to clarify my answer to that because

11   I am not familiar with the details of any criminal

12   charges.  I am not familiar with any details of

13   disciplinary charges.  What I know is what I reported as

14   my observations and findings to executive management.

15   Q.    That was my question to you.

16         Isn't it true that you found violation of no

17   other provisions other than 6.06?

18   A.    I do not agree with that.

19   Q.    Which other ones did you find, sir?

20   A.    I found that employees acted not in the best

21   interest of Hillsborough County, which is a violation

22   of -- of both the civil service rule which may or may not

23   apply depending what the classification of employee is,

24   and violations of the statement of ethics and I found --

25   I observed potential violations of administrative rules

1    related to expenditure of county funds.

2    Q.    Now, it's true that your report did not -- your

3    written report did not address any of those findings;

4    isn't that right?

5    A.    No.  In my opinion I addressed all those findings

6    and more.

7    Q.    In your written findings of a violation of Rule

8    6.06?

9    A.    I apologize if I'm misunderstanding your

10   question.  Are you limiting the issue to this one policy?

11   Q.    Yes.  I'm limiting my questions to 6.06.

12   A.    What I found in this policy was a potential

13   conflict of interest was not disclosed in accordance with

14   this policy.

15   Q.    And it was a factor of -- a fact of nondisclosure

16   that led to you that conclusion?

17   A.    Correct.

18            MR. FARMER:  That's all I have.  Thank you.

19            THE COURT:  Mr. O'Neill.

20            MR. O'NEILL:  Thank you, Your Honor.

21                    REDIRECT EXAMINATION

22   BY MR. O'NEILL:

23   Q.    Mr. Sheehan, Mr. Farmer had asked you whether

24   discipline was part of your job.  And not testifying for

25   you, but I believe you said you were not involved in the

1    discipline side of the investigation.  Is that your

2    testimony?

3    A.    Yes.

4    Q.    What exactly is your job as a chief investigator

5    in a matter such as this?

6    A.    My job is to gather any available information and

7    match that information against the workplace policies

8    that are in place at the time I do the investigation, and

9    report my observations, my gathering of information and

10   my findings to those that will eventually make decisions

11   about whether discipline will be imposed or not.

12   Q.    And as for this criminal case, other than as a

13   witness did you have any other involvement?

14   A.    No.

15   Q.    Mr. Sheehan, Mr. Farmer also asked you about

16   Government's Exhibit 28, which is the employee disclosure

17   conflict of interest.  Specifically Page 2 you brought

18   out the fact that an employee is required to fill this

19   out within 45 days of a job change, such as hire,

20   promotion, et cetera.  Do you recall those questions?

21   A.    Yes.

22   Q.    Right below that un Subsection 2 would the

23   employee also be required to fill this out within 45 days

24   if there was any change -- and it states here -- let me

25   read -- in the employee's conflict of interest status?

A.     Correct.

Q.     Let me direct your attention to the second bullet

point there.  What does that state:

A.     "The employee or the employee's spouse or child

owning a business in whole or in part directly or

indirectly."

Q.     How about -- skip one and go to the next bullet.

A.     "The employee or the employee's spouse or child

owning more than five percent of the total stock of any

business and the employee or the employee's spouse or

child entering into a contractual relationship that may

create conflict between the employee's private interests

and the performance of the employee's official public

duties or that may impede the full and faithful discharge

of said official public duties."

Q.     And if those instances occurred, what would be

true?

A.     The purpose of the policy is to inform an

employee that if any of those conditions exist they must

disclose that instance to Hillsborough County so that

management can evaluate whether it's a conflict that can

be tolerated or not tolerated and the employee can be

advised accordingly, whatever that decision is.  If there

is no disclosure, there is no management review.  And

that's the purpose of the disclosure.

1    Q.      Thank you, sir.

2            MR. O'NEILL:  Your Honor, I have no further

3    questions.

4            THE COURT:  Thank you, sir.  You may step

5    down.

6            Mr. O'Neill, you may call your next witness.

7            MR. O'NEILL:  Your Honor, at this time the

8    government rests.

9            THE COURT:  All right.  Ladies and gentlemen

10   the government has rested its case and we have a matter

11   to take up outside of your presence so we're going to

12   take a recess at this time.  This will probably be the

13   only afternoon recess we take so it's going to be a

14   longer recess.  We're going to be in recess till about

15   2:40 or 2:45, somewhere in that time frame.  You're

16   welcome to walk around if you'd like to walk around.  I

17   would ask that you be back in the jury room by 2:45.

18           Leave your pads on your chairs.  And please

19   don't discuss the case.  We're in recess till 2:45.

20           COURT SECURITY OFFICER:  All rise, please,

21   for the jury.

22      (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

23           COURT SECURITY OFFICER:  Thank you, ladies

24   and gentlemen.  Please be seated.

25           THE COURT:  All right.  The government has

1    now rested its case.

2              And let me ask counsel for the defendants do

3    any of you or all of you have a motion for judgment of

4    acquittal as to any or all of the counts?

5              Mr. Weisbrod?

6              MR. WEISBROD:  Yes, Your Honor.

7              THE COURT:  Okay.  Mr. Weisbrod, is your

8    motion -- are you making the motion for everyone or just

9    for your client?

10             MR. WEISBROD:  Just for Mr. Jimenez.

11             THE COURT:  Okay.  Thank you.

12             MR. WEISBROD:  Your Honor, pursuant to Rule

13   29 I would move for judgment of acquittal as to each and

14   every count against Mr. Jimenez.  Let's start with Count

15   III because this implicates the discussion we had last

16   week regarding the <u>Skilling</u> case in which I think we were

17   all in agreement that honor services fraud as charged in

18   Count III cannot be based upon undisclosed self

19   dealing/conflict of interest.

20             That the government has the burden of

21   proving as part of its mail fraud scheme that there was a

22   bribe or a kickback involved.  And that is completely and

23   totally absent from the government's proof in this case.

24   Quite frankly, the only possible evidence of a quid pro

25   quo, which is the essence of a bribe or kickback, is the

1  fact that there's a $9,000 check in evidence to

2  Miss Melendez.  But the government offered the Court

3  absolutely no proof whatsoever where that money went.

4          The check in evidence -- the exhibit number

5  is --

6          THE COURT:  Well, don't you think we can

7  assume that it went to Miss Melendez?  Are you talking

8  about physically who it went to?

9          MR. WEISBROD:  It was made out to her.  And

10  the back of it shows her signature and a blacked out area

11  which -- well, I don't even want to guess what the

12  blacked out area is.  It may be an account number but

13  honestly I just don't know.  It's Exhibit No. 16.

14          But what the government did not do

15  subsequent to that is in any way trace those funds as to

16  where they went.  Were they deposited in a joint account,

17  in a business account, was it cash, how did any of those

18  funds ends up with Mr. Jimenez.  And that's the quid pro

19  quo.

20          It's not a bribery case where a public

21  employee is paid a certain amount of money to do an act.

22  We know there's absolutely nothing in the evidence to

23  demonstrate that.

24          As to the kickback an act occurs and then

25  later on the public employee receives some sort of

1    payment.  And there's just no evidence to show that.

2         And the government can't just rely upon this

3    undisclosed self dealing, this conflict of evidence.

4    That doesn't prove a material fact in this case.  And

5    beyond that physically showing -- or actually

6    demonstrating, rather, that he -- that Mr. Jimenez

7    benefited from this transaction.  There's nothing in

8    the -- in the proof that's been presented to the Court up

9    to this point in time.

10        THE COURT:  Well, the Skilling case says

11   indirectly.  Why couldn't the jury find that Mr. Jimenez

12   indirectly -- even if the check was made out to and

13   obviously sent to Miss Melendez doing business as, why

14   couldn't the jury find that he indirectly benefitted?

15        MR. WEISBROD:  Well, first of all, are you

16   talking about in the context of a kickback?

17        THE COURT:  A kickback, yeah.

18        MR. WEISBROD:  Because they're making --

19   because you're basing that whole thing on an assumption

20   that because they're married automatically he received

21   the benefit.  We know that the check was made out to

22   Johana Melendez DBA Reading For Little Scientists.

23        There's nothing in the record tying

24   Mr. Jimenez in any way to that entity or that corporate

25   name.  There is nothing -- there's just absolutely no

1    evidence showing that she shared the $9,000 or what was

2    left after paying for the books that she shared any of

3    that with him.

4              THE COURT:  I can't -- and I shouldn't say I

5    can't assume that.  The jury can't assume that because

6    they're married they shared that credit?

7              MR. WEISBROD:  No.  How can you assume any

8    material fact that's not -- not proven?  You know, some

9    families might, some families don't.  There are certainly

10   families out there where there are separate checking

11   accounts for husbands and wives, yet alone another step

12   beyond that where a wife has a separate business.

13             There is a W9 form in evidence that

14   Miss Melendez filed but in no way, shape or form is that

15   tied to Mr. Jimenez.

16             So when it comes to having some modicum of

17   proof to demonstrate the benefit, the quid pro quo, I

18   don't think the jury is allowed to rely on assumption.  I

19   don't think the Court is at this juncture either.

20             THE COURT:  All right.  You know, here's

21   what I would like to do simply because I think we should

22   allow everyone if they wish to join or make an additional

23   argument and then let me get Mr. O'Neill to address them

24   all.  So let's just take them one count at a time.

25             Mr. Brown, as far as the -- as far as the

1  mail fraud, depriving another of intangible right to

2  honor services do you have anything to add?

3          MR. BROWN:  I do, Your Honor.  We would also

4  join in the Rule 29 motion.  When the Court heard the

5  evidence about conflict of interest it's a little

6  misleading to say that it is a conflict of interest.

7  It's our position that that's something that had never

8  actually been reached yet.

9          The first step would have been the

10  disclosure form.  While there is evidence that the

11  disclosure form was not filled out, but that just begins

12  the process for a committee to decide whether there is a

13  conflict or not a conflict.

14          So we don't know whether there's a conflict

15  and we don't know whether if there was a conflict it was

16  a conflict that the committee could have waived.  What we

17  do know is that obviously the committee didn't get to

18  decide that issue because the disclosure form wasn't

19  filed.

20          But there's no evidence that my client knew

21  whether or not that disclosure form had been filled out.

22  There's no evidence that my client knew if it was filled

23  out whether the committee had decided there was a

24  conflict or waived that conflict.  There's no testimony

25  that Mr. Jimenez ever discussed any of this with my

1    client.

2            So there's no evidence that my client

3    entered into an illegal agreement or an agreement to do

4    something illegal.  There's no evidence offered by the

5    government in any shape or form to suggest that.  And

6    there's no evidence that she was a part of a kickback or

7    bribery specifically to the count that she gave some of

8    the money back to her husband or that she shared that

9    money with her husband.  There's been no evidence that

10   she's actually done anything illegal.

11           And as Mr. Sheehan said, he wasn't concerned

12   with my client.  My client wasn't a member of

13   Hillsborough County as far as the school board or an

14   employee of Hillsborough County.  There's no evidence

15   that she's done anything wrong.

16           The insinuation here is that she should have

17   known or maybe she knew about the conflict but there's no

18   evidence to that.  And there's no evidence that she know

19   that there was anything improper or what was going on at

20   the Head Start.

21           The only evidence here is that she sold a

22   book and that she received $9,000 for it.  If she had

23   been the -- if she had been the next door neighbor to

24   Mr. Jimenez I don't think we're here.  I don't think that

25   we're suggesting there's anything fraudulent that

1    occurred.  If she lived next door he would not have to

2    disclose it.

3            And this whole transaction was completely

4    proper.  Miss Mason had every right to sign and buy that

5    took.  She had every right to offer that book for sale

6    and she had every right to receive the $9,000 for the

7    business.  So I don't see anything illegal or a bribery

8    or a kickback that she's done in Count III.

9            I think the government had to prove at some

10   point in time that she knew that he had not filled out a

11   disclosure form or that there was a conflict of interest.

12   But they haven't shown that.  They haven't proven

13   anything on her part other than she sold a book to the

14   county and she received $9,000.

15           There's no money going to Miss Mason,

16   there's no money going to -- back to Mr. Jimenez.

17   There's no bribes, there's no kickback, there's no fraud

18   on her part.  And she's never entered into an agreement

19   to do anything fraudulent.

20           Whether her husband filled that disclosure

21   form out or not, there's been no evidence that they ever

22   knew that.  I think the only insinuation here is that

23   because they're married, therefore she -- I guess it's an

24   inference that you could make that she shared the money

25   with her husband.  But there's no evidence to that.

1          And clearly I know from my prior marriage

2     separate bank accounts are -- separate bank accounts do

3     occur.  And I don't think this Court can infer that

4     because they're married they commingled their money or

5     because they're married she shares her money with him or

6     spends the money on him.  I think that is -- some

7     evidence had to be suggested to prove that and that's

8     lacking.

9          THE COURT:  Mr. Farmer, Count III.

10          MR. FARMER:  Yes, Your Honor.  We also move

11     for a judgment of acquittal on Count III.  I think the

12     government's best theory on Count III is an aiding and

13     abetting theory based on the kickback theory of honor

14     services fraud, that is we don't have a conflict of

15     interest theory that is legal anymore on honor services

16     fraud.

17          Bribery doesn't fit the facts either, not

18     even remotely.  I think bribery and kickback are just

19     sort of timing issues.  I think if there's a criminal

20     intent to pay money to a government employee for a favor

21     and the money is up front, that's a bribe.  If it's paid

22     on the back end, as the term implies, it's a kickback.

23          In this case I think the government's theory

24     is that somehow under the aiding and abetting standards

25     of the 11th Circuit that Miss Mason deliberately entered

1    into this criminal kickback scheme, and that is she knew

2    there was going to be a kickback, she knew that there

3    would be a benefit back to Mr. Jimenez from Mrs. Melendez

4    and that she knowing that criminal intent and that

5    criminal scheme joined it intentionally and without

6    receiving any of the kickback herself.

7         There is absolutely no evidence that -- even

8    remote possibility that she received money from

9    Miss Melendez after Miss Melendez received the check from

10   the county.  And there really in general is no evidence

11   of an intentional agreement to enter a fraudulent scheme

12   whether it's a kickback or more fraud in general.

13        And particular with Count III, which is

14   limited to kickbacks it doesn't seem like in the best

15   light the government's evidence establishes aiding and

16   abetting in this case.

17        THE COURT:  Well, and if in fact the -- I

18   agree that there's a kickback -- let's take it there for

19   just a moment.  The aiding and abetting -- and I'm am

20   assuming you're right.  I'm going to ask Mr. O'Neill in a

21   minute.  But I'm assuming that Miss Mason, she signed off

22   on Government's Exhibit 1.  Wouldn't that be sufficient

23   for aiding and abetting?

24        MR. FARMER:  I don't think so.  Mr. Finney

25   signed off as well.  And --

          1          THE COURT:  Well, maybe they could have

          2   charged him, but they didn't.

          3          MR. FARMER:  Oh, understood.  Understood.

          4   But that just seems to be --

          5          THE COURT:  He didn't know the relationship

          6   apparently.

          7          MR. BROWN:  Right.  But what does that

          8   administrative act do?  What does it prove?  That is an

          9   administrative act that's done with every merchandise

         10   request form that goes across Marie Mason's desk.  And

         11   there was no -- by signing that form that doesn't

         12   establish that she knew there was anything criminal afoot

         13   by Mr. Jimenez or Miss Melendez.

         14          And, again, it seems like if there is a

         15   crime here -- if there is a crime here, the theory that

         16   we're hearing is that it's a, quote, unquote conflict of

         17   interest.  If there was a fraud here, it's having a

         18   conflict of interest.

         19          And there is no requirement that Marie Mason

         20   assume that this disclosure form wasn't signed.  It's not

         21   illegal.  It's not even against the rules

         22   administratively in Hillsborough County to have a wife or

         23   a husband who doesn't work for the county benefit for

         24   county business.

         25          The only time there becomes a rule violation

1     is if there's nondisclosure.  And that nondisclosure

2     concept is really similar to the theory in Skilling that

3     was disavowed, undisclosed conflicts of interest.  That's

4     the whole point is not having a conflict of interest,

5     it's not disclosing the potential conflict.

6             To have criminal liability here there would

7     have to be a duty from Miss Mason to know that this

8     administrative form wasn't filled out.  That seems to be

9     the only alleged theory of criminal wrongdoing in this

10    case, that is not filling out this form and doing

11    business with the county.  She can't have a duty to

12    assume the worst about her fellow worker.

13            So that's -- that's all.

14            THE COURT:  All right.  Mr. O'Neill -- and

15    I'm going to take these one at a time.  I think we did

16    but maybe I should start there.  We did agree that after

17    the Skilling case that in order for a defendant to be

18    found guilty of honor services fraud there has to be

19    evidence of kickback or bribery?

20            MR. O'NEILL:  Yes, Your Honor, absolutely.

21            THE COURT:  Okay.  And you had told me in

22    the beginning -- or prior to trial that the government

23    was alleging that this was a kickback.

24            MR. O'NEILL:  Yes, Your Honor.

25            THE COURT:  And I'm also assuming that

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Mr. Farmer is right that Miss Mason comes in based on the

2    aiding and abetting.

3              THE WITNESS:  No, Judge.  She's a co-schemer

4    as we look at Count III.

5              THE COURT:  Okay.  Well, then -- then go

6    ahead.

7              MR. O'NEILL:  What the government would

8    argue, Judge, taking the evidence in the light most

9    favorable to the government as we have to at this stage

10   is that Miss Mason specifically was the person who

11   Mr. Jimenez, we have testimony, went to and said -- acted

12   as a go-between for the purchase of this took.

13             Miss Mason knew that Johana Melendez

14   Santiago was his wife.  When she signed this document

15   that gave the $9,000 kickback to them she signed off on

16   this document knowing full well that the money was going

17   to Johana Santiago and in turn the natural and reasonable

18   inference to be drawn to her husband, who lives at the

19   same address.

20             THE COURT:  Well, that it -- okay.  There's

21   no doubt that based on what she said in her interview she

22   knew the relationship?

23             MR. O'NEILL:  That's correct, Your Honor.

24   So she knew this money was going back so she's adding and

25   abetting under one theory.  She's a co-schemer within --

again, I'd like to look at the elements of the offense as

opposed to different things like conflict of interest.

There are three elements to that.  The first

is that the defendant knowingly devised or participated

in a scheme to fraudulently deprive the public of

intangible rights of honor services.

We've ascertained that Miss Mason knew they

were married, yet they give the book to Marecia Bell.

Marecia Bell says it's inappropriate.  She says order it

anyway.  She then keeps her boss out of it, giving the

whole impetus that she's hiding this.

They kept it under $10,000 even though

initially it was over $10,000 because it would have gone

outside their department.  So the government feels

there's more than sufficient evidence for the first

element.

The second one is with intent to defraud.

And as it's related in the pattern instruction it means

to act knowingly and with the specific intent to deceive

someone, usually for personal financial gain or to cause

financial loss to someone else.

That's what happened here.  The deception is

Mr. Finney, it's to Hillsborough County, and she took an

active role in that by being a post schemer.

Then if you go to the third element, Your

1  Honor, the use of the postal service, I think we've

2  ascertained that element.  So I believe the government

3  has put forth, again, judging the evidence in the light

4  most favorable to the government, which he have to at

5  this stage, more than sufficient evidence on each

6  Count -- on each element of Count III.

7              THE COURT:  All right.  Let me ask you a

8  question.

9              MR. O'NEILL:  Yes, ma'am.

10             THE COURT:  And I'm still bothered by the

11  kickback.  I was bothered prior to the trial.  I'm still

12  bothered by the kickback.  I can take the <u>Skilling</u>

13  definition or take the definition in the 11th Circuit

14  pattern jury instructions.  Let's start with that one

15  right now since that's what Mr. Weisbrod or whoever -- I

16  guess it was Mr. Weisbrod prepared the jury instructions.

17  And this is, I think, standard.

18             Here it is.  A kickback is a kind of secret

19  payment or reward a person gives to an employee who has

20  been dealing in the course of employment with that person

21  so that the employee's personal financial interest

22  interferes with the employee's obligation to get the best

23  deal for the employer.

24             Now, if I'm trying to put this in the -- so

25  that I have a name behind this, a kickback is a kind of

1   secret payment or reward a person -- in this case it

2   would be Miss Melendez gives to an employee, Mr. Jimenez,

3   who has been dealing in the course of employment with

4   that person so that the employee's, Mr. Jimenez',

5   personal financial interest interferes with the employee,

6   Mr. Jimenez; obligation to get the best deal for Head

7   Start/Early Head Start.

8           MR. O'NEILL:  Yes, Your Honor.

9           THE COURT:  What about Mr. Brown's argument

10  and Mr. Weisbrod's argument?  I mean I realize Skilling

11  says indirectly.  But how can we assume that just simply

12  because that Miss Melendez is married to Mr. Jimenez that

13  he is -- I mean she is offering something and he is

14  getting some sort of kickback?  How can we assume that he

15  profits from that?

16          MR. O'NEILL:  I don't think we're assuming,

17  Your Honor.  I think the rational and natural inference

18  is they are husband and wife.  They live together.  The

19  Reading For Little Scientists is a DBA at the same

20  address at which they live.  She is benefitting

21  financially from this transaction.  He is depriving the

22  county of the honest services of his employment by

23  benefiting her in the kickback.  And the money comes back

24  to him as an employee through them.

25          There is no evidence on the record

1    whatsoever to indicate that they're divorced or that

2    they're not living in one household.  I think it strange

3    credulity to even argue that this is not a kickback

4    because we could not take the proceeds of this $9,000 and

5    somehow put them into Mr. Jimenez' pocket.  I don't know

6    how the government would ever prove that, Your Honor.

7    I've never seen that in a corruption case.  I mean that

8    would be great but it doesn't work that way.

9         THE COURT:  Mr. Brown argues that there's

10   been no evidence in the record that Miss Melendez had any

11   intend to defraud.  That she didn't know anything about

12   the failure to fill out a form or disclose the conflict

13   or anything of that sort.

14        MR. O'NEILL:  Judge, Miss Melendez Santiago

15   clearly doesn't know whether -- we have no proof that she

16   knows whether Mr. Jimenez has filed a form or not.  I

17   think the form is diminimous.

18        Again, in keeping with the Court's pretrial

19   rulings, which the government agrees with a hundred

20   percent, conflict of interest was just part of the

21   evidentiary matter to bring forth.  It is not illegal

22   anymore -- and Mr. Brown made a salient point although I

23   think it's irrelevant here.  There was no conflict of

24   interest because it didn't get to that level.

25        I think Mr. Sheehan's testimony is clear.

1    The forms were not filled out.  He just showed that

2    Mr. Jimenez has this knowledge of this.  He'd been given

3    this information, hasn't done it.  So the forms

4    themselves, the conflict of interest, whether

5    Miss Melendez Santiago knows about them I find pretty

6    irrelevant.

7            What is important is she knows he is an

8    employee of Hillsborough County.  She knows that.  She's

9    married to him.  She then markets this book through him

10   at Hillsborough County.  That's why the e-mail traffic is

11   so essential in the government's view.

12           And even Mr. Jimenez in his taped interview

13   says, well, I acted as the go-between.  So she utilizes

14   her husband to hawk this book or booklet at Hillsborough

15   County.  It puts her right in -- she's the one who

16   initiated the whole thing.

17           THE COURT:  Okay.  All right.  I'm going

18   to -- pursuant to Rule 29, which allows me to do this,

19   I'm going to reserve ruling on this and go ahead and send

20   the case to the jury and reserve ruling as to each of the

21   defendants on the matter of Count III, which is the

22   honest services fraud.

23           All right.  Do you want to take the next one

24   or first one?

25           MR. BROWN:  I'll start, Your Honor.  As to

1    Count I, Count I is a conspiracy amongst the

2    coconspirators to agree to do something illegal.  And as

3    I've indicated before, there's -- there's no evidence

4    that she ever agreed to do anything illegal.  If I hear

5    Mr. O'Neill correctly, he's conceding the fact she may

6    not have known whether or not Mr. Jimenez, her husband,

7    failed to fill out a disclosure form and whether or not

8    there was a conflict.

9         Let's assume then that that is true.  And I

10   think that we can do that here.  There's no crime.  If

11   Mr. Jimenez had filled out a disclosure form and the

12   county had ruled that there was no conflict or chose to

13   waive the conflict there is absolutely no crime.  She

14   could have sold the book as she did.  Miss Mason has

15   every right to sign that purchase agreement to keep it

16   under 10,000 if they chose.  There's absolutely no crime.

17        So I don't see how she can be found to have

18   agreed to do something illegal.  What is it that she

19   agreed to do that was illegal?  She has to know that it's

20   illegal for her to sell this book to the county because

21   her husband hasn't filled out a disclosure form and that

22   it's a conflict.  There's no evidence that she ever knew

23   that.  And Mr. O'Neill has conceded that.  So if she

24   doesn't know that then how could she possibly be doing

25   anything criminal?

          THE COURT:  Just hold it a minute.  Let me
go back to Mr. O'Neill.

          Mr. O'Neill -- and I'm now just asking just
as to Miss Melendez.  Under the general conspiracy charge
the defendant knew the unlawful purpose of the plan and
willfully joined in it.  How is it that Miss Melendez --
and I realize intent is normally an issue for the jury,
but how is it that Miss Melendez knew the unlawful
purpose of the plan in this particular instance?  What
evidence is there of that?

          MR. O'NEILL:  Her husband is an employee of
Hillsborough County.  He works for Hillsborough County.
As such, he is responsible for giving them his best
efforts.  She contacted him about selling this book.

          Miss Galloway's testimony I think is quite
important to this and germane.  In 2009, a year earlier,
she said before this book went to print while it was just
handwriting -- not handwriting.  I shouldn't say that,
Your Honor -- just print she made the changes.  That was
a year earlier.  And she said at that time I'm selling
this to Head Start.

          Our evidence doesn't show that until well
into 2010 she's contacting Head Start after the book is
printed where it's already at Xlibris.  She gets the
three quotes for the book.

1    As you said, Your Honor, the intent is

2  always something that -- in a conspiracy case that has to

3  be inferred from the circumstances.  It's a secret nature

4  of the charge.  And all the case law is clear on that.

5    And by looking at the outside factors, which

6  is that she contacted her husband at work, a Hillsborough

7  County employee, to start this whole thing going.  And

8  she's the one who then ultimately benefits unjustly, the

9  government feels, from this conspiracy.

10    THE COURT:  Mr. Weisbrod or Mr. Farmer, you

11  want to make an argument on behalf of your clients?

12    MR. FARMER:  Yes, Your Honor.  Again, on

13  Count I there's no evidence here in which a reasonable

14  jury could infer an intent to join a criminal scheme.

15    Only wrongdoing that's been asserted here,

16  the only deception even remotely possible is an

17  undisclosed conflict of interest.  There's no evidence

18  that Miss Mason would have known that there was no

19  disclosure of this conflict.  There's no overt act by

20  anyone knowingly that furthered a scheme that was known

21  to Miss Mason.

22    I think factually the only potential

23  evidence we have here is Miss Bell -- Nurse Bell saying

24  that she told Miss Mason that this book was

25  inappropriate.  But, again, that does not establish a

crime.

If the only crime here is an undisclosed conflict of interest, how does -- how does that element -- factual element further the scheme in any way? There's got to be some just scintilla of evidence that shows that Miss Mason had a criminal intent to join this conspiracy if there was one. And we don't have any deception whatsoever that Miss Mason knew about.

THE COURT: Well, let me ask you a question --

MR. FARMER: Yes.

THE COURT: -- as far as Miss Mason is concerned. Miss Mason was not entirely candid. And, again, I'm taking everything in the best light of the government. And I'm sure you'll say that Miss Bell wasn't telling the truth. But right now let's assume for the purposes of this argument that Miss Bell said as she said she said to Miss Mason that this was inappropriate for the Early Head Start group of children.

Uhm, she was not -- Miss Mason wasn't truthful about that when she was interviewed. And said, I think as I recall, that Miss -- she turned it over to Miss Bell and Miss Bell had said it was appropriate and so therefore, you know, she said she didn't see a problem or something. And I'm paraphrasing to that extent.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
1              But doesn't that -- isn't that some evidence
2     that she knew there was something -- well, something
3     wrong, perhaps maybe not unlawful.  Is that your
4     argument?
5              MR. FARMER:  Well, Your Honor, I think at
6     this point you are permitted as the Court to make a
7     finding that testimony is unworthy of credence.  And what
8     I'm talking about is Nurse Bell's testimony.
9              THE COURT:  No.  I'm not going to do that.
10    I think that's a jury issue.  And I didn't think her
11    testimony was so outrageous or whacko or crazy that I
12    could make such a finding.  So that would be something
13    that the jury would have to determine.
14             MR. FARMER:  Yes, Your Honor.
15             THE COURT:  Mr. O'Neill, what evidence is
16    there that Miss Mason knew the unlawful purpose of the
17    plan?
18             MR. O'NEILL:  One, Judge, she brought it to
19    the attention of Marecia Bell.  The testimony is
20    Miss Bell was a nurse in the health department.  The
21    testimony is she never received a book before to approve,
22    never saw one afterwards.
23             Idalin Navejar said she'd never gotten a
24    book before or afterwards to authorize.
25             Dawn Dasher, who is in the education
```

1    department, said the books go through there and that the

2    books were many times given for free.  I'm covering

3    books, booklets.  Mr. Weisbrod objected before, so I

4    apologize I'm just saying books.

5          So once she brings it to them, Nurse Bell

6    and Idalin Navejar say it's not appropriate.  She said

7    she brought it to them for their opinion.  They said it's

8    not appropriate.  She said order it anyway.  She's

9    admitted that she knew Mr. Jimenez' wife was the author

10   of the book.

11         She fails to tell Mr. Finney, her

12   supervisor, about that, which goes to one's state of mind

13   and one's intent.  She keeps it under 10,000.  She admits

14   in this taped statement to Mr. Sheehan that she's the one

15   who advocated for it being under 10,000, and the reason

16   was so it wouldn't have to go out for a bid.  By keeping

17   it under 10,000 she was able to control the situation.

18         She then signs off on the merchandise

19   request form knowing that that money is going to

20   Mr. Jimenez and Miss Melendez.  So I think all those

21   elements again in the light most favorable to the

22   government is more than enough to sustain any conviction

23   for a conspiracy if that's the way the jury would go.

24         THE COURT:  Mr. Weisbrod, what about

25   Mr. Jimenez?

1              MR. WEISBROD:  Your Honor, in regard to

2     Counts I and II because they're tied together, the

3     conspiracy to commit the fraud and the fraud itself we'd

4     also move for judgment of acquittal pursuant to Rule 29.

5              Your Honor, I go back to the government's

6     argument that they say the disclosure statement is

7     diminimous.  But that's all we have is that the only

8     possible deceit or trickery to defraud the government

9     here is to claim that if only the government had known

10    that the money would be going to an employee's spouse it

11    might not have occurred.  Not that it wouldn't have

12    occurred, it might not have occurred.

13             So the claim that that's a diminimous issue

14    is absolutely incorrect.  It's the heart of their case.

15    And we're suggesting to the Court that failure to follow

16    a county -- a new county human resource policy is not

17    evidence of intent to defraud or deceive or to steal from

18    the government.

19             All the other circumstances surrounding the

20    relationship between this man and Head Start doesn't

21    demonstrate any intent to defraud the government.  He

22    gets his wife involved in Head Start, does all the

23    preservices, does all the other training.  The Court's

24    heard all that evidence.

25             There's nothing about his performance with

1    Head Start that suggested he's trying to cheat the

2    government out of anything.  And on the tape he makes

3    that clear time and time and time again.  He must say it

4    at least five different times I thought this would be a

5    benefit to the program.  All in all it was a benefit to

6    the program.

7              So with all of that in mind we don't believe

8    that the government has crossed that threshold to show

9    that there's fraud just because a disclosure statement

10   wasn't filed consistent with administrative policy within

11   the county.  There's no other evidence of fraud.

12             THE COURT:  Well, Count II can also be

13   proven by intentionally misapplying property.

14             MR. WEISBROD:  But it -- well --

15             THE COURT:  That defendants obtained by

16   fraud or intentionally misapplied property that is valued

17   at $5,000 or more.  And Mr. Jimenez certainly I don't

18   think there's any question about the value.  So --

19             MR. WEISBROD:  The intentional

20   misapplication is even weaker, especially when you

21   consider again that all that he believes the book and the

22   curricular and the subsequent -- and all the attendant

23   activities are doing for the children in the program, the

24   personal belief he has at to what his wife can add to the

25   Head Start program which is why he involved her with it

1  the whole time.  To suggest that he's intentionally

2  misapplying the property of the program in light of all

3  that evidence is totally inconsistent with the evidence

4  the government presented.

5          THE COURT:  Mr. O'Neill.

6          MR. O'NEILL:  Judge, again, the conflict of

7  interest matter is so little in this case it is -- it is

8  diminimous.  It was showing that there was a

9  responsibility on the part of Mr. Jimenez to alert his

10  bosses.  And what the government was bringing out was his

11  failure to alert his bosses, which is indicative of a

12  conspiracy -- of a scheme to defraud.

13          The government would go back to once again,

14  Judge, what we have with Mr. Jimenez is he's an employee

15  of Hillsborough County so we've gone through all of that.

16  He knows he's supposed to serve the interests of the

17  public.  He's being paid by the public to do that.

18          He then acts as a go -- between -- his own

19  words -- with his wife in order to unjustly enrich

20  themselves of $9,000 by going through this process.

21          If you look at the elements of both Counts I

22  and Count II the government meets each of the elements

23  beyond a reasonable doubt in the light most favorable to

24  the government.

25          If we zero in on Count II, both Miss Mason

1  and Mr. Jimenez are agents of Hillsborough County.  On or

2  about June 24th they obtained by fraud or intentionally

3  misapplied property of $5,000 or more.

4          We went through all the elements of the

5  fraud, Your Honor, giving the book to Nurse Bell and Miss

6  Navejar asking them for their opinions.  They say it's

7  inappropriate.  They're told to order it anyway keeping

8  it under $10,000, formulating three quotes when in fact

9  it's really only one quote.  All of the quotes come from

10 Miss Melendez Santiago.

11         And the property was owned by -- I think II

12 and IV are clearly met and there's no sense even

13 discussing them.  So it really comes down to what Your

14 Honor was just saying.  The government thinks that the

15 evidence is more than sufficient there.

16         THE COURT:  Mr. O'Neill, I would agree it

17 says the defendants Michael Jimenez and Marie Mason were

18 agents of Hillsborough County Head Start.  The

19 defendants -- and I'm assuming defendants in Count II

20 would be whom, all of them?

21         MR. O'NEILL:  All three.  And in aiding

22 abetting, Your Honor.

23         THE COURT:  That's my next question.

24         MR. O'NEILL:  I'm sorry, Your Honor.  I was

25 speaking over you.  Then the kickback scheme is going to

1   be the county official or the public official, any

2   individual, and both are tied under aiding and abetting

3   theory.

4                THE COURT:  All right.  Anybody have

5   anything else?

6                MR. BROWN:  Just for the record I don't know

7   if I was clear.  I'm also joining in obviously on the JOA

8   to Count II.  The argument being that there's no

9   allegations that she committed any fraud or misapplied

10  any property.  And under aiding and abetting I'm still

11  not quite clear of how the government thinks they've

12  proved that she aided and abetted that.

13               Again, she would have to know that her

14  husband hadn't filled out a disclosure form and that

15  there was a conflict for her to be guilty of anything.

16  There's been no evidence that she knew that.  If it's --

17  if we can assume one thing, then why can't we assume that

18  she thought that the form was filled out and there was no

19  conflict.  If we assume that, there's no crime.

20               THE COURT:  Are you talking about Count II?

21               MR. BROWN:  Count II.  He's arguing that she

22  was aiding and abetting.  There's no -- there's no

23  evidence that she aided and abetted any scheme to defraud

24  or misapplied -- or misapplication of any money, so I

25  would argue it would be appropriate for judgment of

1    acquittal as to Count II.

2              THE COURT:  All right.

3              MR. FARMER:  Your Honor, I should for the

4    record move for JOA on Count II as well.

5              THE COURT:  All right.  I'm going to deny

6    the motions as to Count I and II as to all of the

7    defendants and we'll proceed with the trial.

8              You all can raise the issue again if you

9    would like after the -- well, I guess at the close of all

10   the evidence but after the jury returns a verdict as

11   well.

12             Let me summarize I'll deny the motion as to

13   all defendants as to Counts I and II.  On Count III as to

14   all of the defendants I'm reserving decision until such

15   time as the case is considered by the jury.

16             What is going to happen?

17             MR. WEISBROD:  Your Honor, is it possible we

18   could take our afternoon break so we could --

19             THE COURT:  We are on our afternoon break.

20   Now, can you tell me do you know at this time are the

21   defendants -- well, I'll just ask about your defendant --

22   your client.  Is Mr. Jimenez going to testify?

23             MR. WEISBROD:  Your Honor, I've been leaning

24   toward no.  But based upon some recent information I got

25   I'd like to have a chance based upon what I found out

just as we started the afternoon session.  So that's why

I'm asking for perhaps just 15 minutes of the Court's

time.

THE COURT:  Okay.  And that's fine.  I was

just joking.  But I'm trying to figure out what's going

to happen this afternoon.

What about your client?

MR. BROWN:  Judge, I believe she is and I

believe that would be our only witness.  However, as to

the -- because of the Court's ruling on Count III I want

to discuss that a little more with her.  But we're

leaning towards putting her on.

THE COURT:  All right.  And, Mr. Farmer,

what about Miss Mason?

MR. FARMER:  Your Honor, she would be the

only witness.  And we're leaning toward not calling her.

THE COURT:  Okay.  We will take a 15-minute

recess.

COURT SECURITY OFFICER:  All rise.

THE COURT:  Mr. Adkins, would you tell the

jury we're going to be a little bit longer.

COURT SECURITY OFFICER:  Yes, Your Honor.

I'd be happy to.

(THEREUPON, A RECESS WAS TAKEN, AND THEN THE PROCEEDINGS

CONTINUED AS FOLLOWS:)

1          COURT SECURITY OFFICER:  All rise, please,

2     for the Court.  This Honorable Court is again in session.

3     Please be seated.  Come to order.

4          THE COURT:  Mr. Weisbrod.

5          MR. WEISBROD:  Your Honor, the defendant is

6     going to rest -- Defendant Michael Jimenez is going to

7     rest.

8          THE COURT:  All right.  Let me speak with

9     him then for just a moment.

10          Mr. Jimenez, if you'd stand up.  You

11     understand you have the right to testify if you wish to

12     do that?

13          DEFENDANT JIMENEZ:  Yes, Your Honor.

14          THE COURT:  Okay.  And is it your decision

15     after speaking with your attorney that you do not wish to

16     testify?

17          DEFENDANT JIMENEZ:  Yes.

18          THE COURT:  Okay.  All right.  And,

19     Mr. Brown, is your client still going to testify?

20          MR. BROWN:  Yes, she is, Your Honor.

21          THE COURT:  Okay.  And I'm sorry.  I should

22     have asked.  No more witnesses?  Mr. Weisbrod, you're not

23     calling any other witnesses?

24          MR. WEISBROD:  No, Your Honor.

25          THE COURT:  Okay.  Let me go back to

1    Mr. Farmer.  What's your client going to do?

2                 MR. FARMER:  Not testify.

3                 THE COURT:  Okay.  Are you calling any other

4    witnesses?

5                 MR. FARMER:  No, Your Honor.

6                 THE COURT:  Miss Mason, would you stand up,

7    please.  Miss Mason, let me ask you the same question.

8    Do you understand that you certainly have the right to

9    get on the stand and testify, tell your story if that's

10   what you wish to do?

11                DEFENDANT MASON:  Yes, ma'am.

12                THE COURT:  Okay.  And have you talked about

13   that with your attorney, Mr. Farmer?

14                DEFENDANT MASON:  Yes, Your Honor.

15                THE COURT:  And have you decided that you do

16   not wish to testify in this matter?

17                DEFENDANT MASON:  Yes.

18                THE COURT:  Okay.  All right.

19                Then I think we're ready to bring the jury

20   in.

21                Mr. Brown, then you'll be up in just a few

22   minutes.  Is Miss Melendez Santiago ready?

23                MR. BROWN:  Yes, she is, Your Honor.

24                THE COURT:  Okay.  I'm sorry.  Mr. O'Neill,

25   are you ready, sir?

```
 1              MR. O'NEILL:  Yes, Your Honor.

 2              THE COURT:  I'll call on you, Mr. Weisbrod,

 3     anyway and let you tell me that that you're going to

 4     rest.

 5              MR. WEISBROD:  Yes, Your Honor.

 6                   (PAUSE IN PROCEEDING.)

 7              COURT SECURITY OFFICER:  All rise, please,

 8     for the jury.

 9        (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

10              COURT SECURITY OFFICER:  Thank you, ladies

11     and gentlemen.  Please be seated.

12              THE COURT:  Okay.  You recall when we

13     recessed the government had rested their case.  I'm sorry

14     incidentally it took us a little longer than we

15     anticipated -- or I anticipated.

16              All right.  Mr. Weisbrod.

17              MR. WEISBROD:  Yes, Your Honor.  Michael

18     Jimenez rests.

19              THE COURT:  All right.  Thank you.

20              Mr. Brown.

21              MR. BROWN:  Your Honor, I would call to the

22     stand Johana Melendez Santiago.

23              THE COURT:  Okay.  Miss Melendez Santiago,

24     if you'll come forward to be sworn, please, ma'am.

25              COURTROOM DEPUTY CLERK:  Please raise your
```

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    right hand.

2          Do you solemnly swear or affirm under

3    penalty of perjury that the testimony you shall give in

4    this cause shall be the truth, the whole truth, and

5    nothing but the truth, so help you God?

6          THE WITNESS:  I do.

7          **JOHANA MELENDEZ SANTIAGO,**

8    a witness, having been duly sworn to tell the truth, the

9    whole truth and nothing but the truth, was examined and

10   testified as follows:

11         COURTROOM DEPUTY CLERK:  Please state your

12   name and spell the last for the record.

13         THE WITNESS:  My name is Johana Melendez

14   Santiago.

15         THE COURT:  Would you spell the last --

16   well, spell the last two names.

17         THE WITNESS:  Melendez, M-E-L-E-N-D-E-Z.

18   And Santiago, S-A-N-T-I-A-G-O.

19         THE COURT:  Mr. Brown.

20         MR. BROWN:  Thank you, Your Honor.

21                 DIRECT EXAMINATION

22   BY MR. BROWN:

23   Q.    Good afternoon.

24   A.    Good afternoon.

25   Q.    You've introduced yourself to the jury, but why

don't you tell the jury a little bit about your
background.  And make sure you speak up into the mic and
speak slowly.  Okay?

A.     My name is Johana Melendez Santiago.  And I moved
to Florida from Puerto Rico to Tampa to work at the H.
Lee Moffitt Cancer Center in 2001.  They hired me there.
And I've been teaching in Puerto Rico and doing
scientific research in Puerto Rico as well.

Q.     Why don't you tell them what your educational
background is.

A.     I have a Master's degree in microbiology and
medical zoology from the University of Puerto Rico, the
medical science campus, and I have a Bachelor's degree in
general sciences.

Q.     And your native language, is it Spanish or
English?

A.     My first language is Spanish.  So I apologize if
I say something wrong.  But that's my native language.

Q.     And your maiden name?

A.     My maiden name is Melendez Santiago.  It's a
custom in Puerto Rico that we don't change the last names
when we get married, only when you move to the United
States.  But I didn't want to do that because it's a
custom, and I respect my father and my mother.  They gave
me birth.

1    Q.    Do you sometimes just use the father's name,

2    Melendez?

3    A.    Yes, I do sometimes use my father's name only

4    instead of Melendez Santiago.  It's just a shortcut I

5    guess.

6    Q.    Is that customary?  Is that --

7    A.    It is customary.  And only on official documents

8    we use both last names.

9    Q.    Now, you're married?

10   A.    Yes, I'm married to Michael Jimenez.

11   Q.    And this is Michael seated here next to

12   Mr. Weisbrod?

13   A.    We've been married for 15 years.  And we have

14   three boys.  Michael, who's 15.  Gabriel Sebastian, who I

15   named the book for, he's ten.  And Alec, who's nine.

16   Q.    So when I interrupted you -- sorry about that.

17   But you said you had done some teaching at MOSI or for

18   MOSI?

19   A.    Well, when I moved to Florida I worked at the

20   H. Lee Moffitt Cancer Center, and I've been working there

21   since 2001.  And in 2005 I went to teach at San Miguel

22   (phonetic) University for one semester teaching general

23   biology.

24         After that I got the opportunity to get a

25   full-time position at Hillsborough Community College

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    teaching microbiology, which is my passion.  And I took

2    the job, but at Moffitt Cancer Center they did not want

3    to let me move so they kept me as a consultant PRN

4    status.

5          So I get to go and work on Fridays or whenever I

6    have time because they didn't want to let go of me.

7    Takes a lot of training to do what I do at Moffitt.  And

8    to hire someone and train them again, it's a long

9    process.  Which I'm very grateful for that because I love

10   science and I love teaching.  So I have -- my life could

11   not be better.

12   Q.    How long have you been at HCC, Hillsborough

13   Community College?

14   A.    I've been at HCC since January 2006.  And when I

15   started working at HCC the first semester they -- Barbara

16   Reader, who is the service learning coordinator

17   introduced me to the -- Barbara Reader, she's the service

18   learning coordinator at Hillsborough Community College.

19   She introduced me to the concept of service learning.

20         Service learning is when you take your students

21   to the community to serve the community using concepts

22   that they learn in your class.  And I thought, wow,

23   that's great.  That's for me.

24         So the -- I started in January, and the next

25   semester I was already doing community projects.  My

1   first community project was with Migrant Ministries.

2   They help migrant families.

3       And it was in November of 2006 where I had my

4   first service learning community project in which I took

5   my students -- we had an event at the Plant City campus,

6   and my students that spoke Spanish were teaching the

7   parents about germs and how to avoid foodborne illnesses.

8       Other group of student were teaching the younger

9   kids about how to avoid, you know, foodborne diseases at

10  the time and handwashing.

11      And for that matter The Courier from Plant City,

12  the newspaper, came in and interviewed my students.  And

13  we came up in the newspaper for that, you know, local

14  newspaper.

15                  MR. BROWN:  May I approach the witness, Your

16  Honor?

17                  THE COURT:  You may.

18  BY MR. BROWN:  Showing you a copy of what's marked as

19  Defendant's Exhibit 7.  Do you recognize this?

20  A.      Yes.

21  Q.      And is this The Courier newspaper?

22  A.      Yes, this is the newspaper where the article came

23  off.

24  Q.      Is it dated on the newspaper as far as the date?

25  A.      Yes, it is November 23rd, 2006.

Q.     And if you turn into the -- open the first page
of the newspaper is there an article about your help with
the migrant workers?

A.     Yes.  Students' ministry help migrant service
learning project at HCC.

        MR. BROWN:  Your Honor, at this time I'd
offer into evidence what's been marked Defendant's
Exhibit No. 7.

        THE COURT:  Mr. O'Neill.

        MR. O'NEILL:  No objection, Your Honor.

        THE COURT:  Receive into evidence Defendant
Melendez Santiago 7.

        (EXHIBIT 7 ADMITTED INTO EVIDENCE.)

BY MR. BROWN:

Q.     And that's the article, students' ministry helps
migrants?

A.     Yes, that's the article.

Q.     Did you do any other work or involvement in the
community regarding your passion?

A.     Yes.  Ever since 2006 I've been hooked to service
learning activities and I don't hesitate to go out to the
community.  So I help the Humane Society.  Me and my
students we got a grant.  We receive funding and we use
the money to -- I'm sorry --

        THE COURT:  There's some water up there too

1   if you'd like.

2           THE WITNESS:  Sorry if I get emotional.  I

3   take it very personal.  My students went to the Humane

4   Society, and we tested more than 150 dogs for parasites.

5   Ever since I started at HCC -- I'm sorry.  I apologize

6   for that.

7           I have several events where I partner with

8   the health department.  And they came to the Plant City

9   campus -- the Hillsborough County Health Department, they

10  came to the Plant City campus and they tested -- every

11  time they came they tested more than 75 people for HIV

12  and syphilis for free because of my coordination with the

13  health department and my students through doing service

14  learning.

15          And I also partner with MOSI on the science

16  and industry.  I've helped them with their National

17  Hispanic Scientist of the Year event.

18          I also mentor a group of students that are

19  called Latin American Student Association.  I'm the

20  mentor for that group.  And I've taken them on many trips

21  and help them get opportunities to serve the community.

22          And one of the events that I've taken them

23  is to help at the MOSI -- for the National Hispanic

24  Scientist of the Year event.  They've helped during that

25  event because I've brought them there to help.  And that

1    program every year serves more than a thousand children

2    from Hispanic background or minorities or groups that are

3    at risk of falling into, you know, drugs or something

4    like that.

5            And I've also brought my students to help

6    H. Lee Moffitt Cancer Center, which I have a lot of

7    passion for this cancer center as well because I just

8    love what I do there.  And they've been very gracious to

9    me and my husband.

10           He was in the military.  And when he got

11   activated to go to the Iraq -- the Operation Freedom in

12   Iraq, they -- they were great support for me.  So I --

13   every time they need me, I'm there.

14   BY MR. BROWN:

15   Q.     Okay.  Now, have you also helped author some

16   research articles that have been published?

17   A.     Yes, I have.

18           MR. BROWN:  May I approach the witness, Your

19   Honor?

20           THE COURT:  You may.

21   BY MR. BROWN:

22   Q.     I'll show you what's been marked Defendant's

23   Exhibit No. 3.  Do you recognize that?

24   A.     Yes, I recognize that.  That's one of my

25   scientific publications that I've done with H Lee Moffitt

1    investigators.

2    Q.    And the name of that article is what?

3    A.    Johana -- J. Melendez.

4    Q.    And when was it published?

5    A.    This was accepted in 2009.

6    Q.    And the name of the paper?

7    A.    Three Color Internucleur Staining For Measuring

8    Mitosis --

9    Q.    You're going to have to slow down.

10   A.    Sorry for that.  I speak very fast.

11         Three-Color Intranuclear Staining For Measuring

12   Mitosis And Apoptosis In Cells Transfected With A

13   GFP-Tagged Histone.

14   Q.    And I'm showing you what's marked as Defendant's

15   Exhibit 4.  Do you recognize that?

16   A.    Yes, I do.

17   Q.    And is that also a research paper?

18   A.    Yes.  That's the most recent publication that I

19   have corroborated at Moffitt Cancer Center.

20   Q.    And where was it published?

21   A.    This was published in Leukemia & Lymphoma 2011.

22   Q.    And the name of the article?

23   A.    Telomere Length In Myelodysplastic Syndromes.

24   Q.    I'm showing you what's marked as Defendant's

25   Exhibit 5 for identification.  Do you recognize that?

A.    Yes, I do.

Q.    And what is that paper?

A.    This is another scientific paper that I helped
collaborate with at the H. Lee Moffitt Cancer Center.

Q.    And in what journal was that published?

A.    Cancer Biology and Therapy.

Q.    And the name of the paper?

A.    Ectopic Expression Of Histone H2AX Mutants
Reveals A Role For Its Post-Translational Modifications.

Q.    I'm showing you what's marked as Defendant's
Exhibit No. 6 for identification.  Do you recognize that?

A.    Yes.  This is actually my first publication for
my Master's degree thesis.  I did this at the University
of Puerto Rico.

Q.    And the name of the article?

A.    Is Decreased HIV Infectivity of Placental
Microphages Caused by High Levels of Beta-Chemicons.

Q.    And in what journal was that published.

A.    Cellular and Molecular Biology.

        MR. BROWN:  At this time I'd move into
evidence what's been marked as Defendants Exhibits 3, 4,
5 and 6.

        MR. O'NEILL:  No objection, Your Honor.

        THE COURT:  Receive into evidence 3, 4, 5
and 6.

1          (EXHIBITS 3 THROUGH 6 ADMITTED INTO

2    EVIDENCE.)

3    BY MR. BROWN:

4    Q.     All right.  Let's make a transition here and

5    start talking about Head Start.  We have I believe heard

6    or read in an e-mail that you said you were a product of

7    Head Start.

8    A.     Yes.

9    Q.     What do you mean by that -- or what did you mean

10   by that?

11   A.     I -- I went to Head Start in Puerto Rico.  That

12   was my first time in school.  I was five years old.

13   Q.     Did that have an impact on you?

14   A.     Oh, yes, definitely.  I remember the first

15   time -- like I told you, the first time I went to the

16   dentist was kind of a field trip.  You know, we didn't

17   have a car.  So for me to go in a car somewhere was a

18   field trip.  And that was the dentist.  And that was the

19   first time, and was through Head Start.

20   Q.     And when was it that you first got involved with

21   Head Start?

22   A.     I first got involved with Head Start when my

23   husband started working at Head Start in 2007.  He

24   invited me to give a talk about bloodborne pathogens --

25   or he told me if I wanted to do that because they needed

1     someone to do that presentation and he thought that I

2     would be a good candidate for that.

3     Q.      Already introduced as Defendant's Exhibit 8 was

4     this the preservice presentation that you -- that you're

5     referring to right now?

6     A.      Yes, it is.

7     Q.      And where was this held, do you remember?

8     A.      The Crown Plaza, Brandon.

9     Q.      And is that you that's listed as a speaker at

10     8:50?

11     A.      Yes, that's me.

12     Q.      Do you remember giving this speech?

13     A.      Yes, I do.

14     Q.      Do you remember whether or not you were

15     introduced by anybody in particular?

16     A.      By my husband, Michael.

17     Q.      And did he introduce you as his wife?

18     A.      Yes.

19     Q.      And who was the audience?  Who were you speaking

20     to?

21     A.      All the employees from Head Start from teachers,

22     administrative staff and the director.  That I

23     understood, everyone from Head Start was there.

24     Q.      And did you charge them for that?

25     A.      No, it didn't cost me to talk.

Q.    Were you glad to be able to give this lecture?

A.    Yes, I was.

Q.    Why?

A.    First of all, anything that has to do with science is like a hobby for me. It's something that I really enjoy doing. And why not do it at my husband's place of work where they needed it. So I -- you know, it helps me to prepare better because when I give presentations I have to prepare so I learn too. I just love teaching about science or anything related to that matter.

Q.    Okay. Now, I want to talk to you about your students at HCC.

A.    Uh-huh.

Q.    When they go to Head Start --

A.    Yes.

Q.    -- is it in fact true that your students have taught at different Head Start -- I guess the word is classrooms?

A.    Yes. When I -- when I first started with the service learning program I had to look for partners so that my students could go and do the serve part of the service learning component of my class. So I started at Plant City. I did Plant City High School, Migrant Ministries. And then little by little I kept spreading

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    to places where I met people or where I knew people.

2         And I loved the idea of Head Start because I was

3    already doing some schools in the area and I know that

4    there were some Head Start centers nearby the Plant City

5    campus so I thought this was -- be good because I could

6    get in contact with Laura Rice from Head Start.  She's

7    the community coordinator.  And she could help me to find

8    other centers besides the public schools because I always

9    give my students the opportunity to choose the place.

10        But there were always a few that didn't know

11   where to go, so for those I had to provide a place where

12   they could go to do their service learning.  And it could

13   have been Head Start, it could have been a public school,

14   it could have been a day care center, it could have

15   been -- you know, some of my students went to the planary

16   (phonetic) offices.  It doesn't matter where as long as

17   they can expand under learning that I taught them in my

18   class about microbiology.

19   Q.    All right.  And let's talk generally though.

20   What years did your students appear at any Head Start

21   classroom?

22   A.    They started in 2008 I believe.  And then they

23   keep doing it every time after that.

24   Q.    All right.  Now, prior to 2008, did your -- one

25   of your sons write a children's book?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    A.    Yes, he did.  He wrote it --

2    Q.    And which -- which child?

3    A.    Michael, my son -- my oldest son.

4              MR. BROWN:  Approach the witness, Your

5    Honor?

6              THE COURT:  You may.

7    BY MR. BROWN:

8    Q.    I'm showing you what's marked as Defendant's

9    Exhibit 35.  Do you recognize this?

10   A.    Yes, I do.

11   Q.    And what is it?

12   A.    That's a book that my son had to write for his

13   science class when he was in sixth grade attending Temple

14   Terrace Middle School.

15   Q.    And do you know when that was?

16   A.    It was -- this was December 14, 2007.

17   Q.    And is his writing on the back?

18   A.    Yes, it is.

19   Q.    All right.  And was this created by him?

20   A.    It was created by him.

21   Q.    You were aware of this as he was writing it?

22   A.    Yes, I was aware.

23   Q.    Did you help?

24   A.    I helped him put some of the pictures together

25   and I gave him ideas as well, but he did most of it.

Q.      And what's the name of this book that he put
together?

A.      It's called Travel Boy Goes to Hawaii.

        MR. BROWN:  Your Honor, at this time I'd
offer into evidence what's marked as Defendant's
Exhibit 35.

        MR. O'NEILL:  No objection.

        THE COURT:  Receive into evidence 35.

        (EXHIBIT 35 ADMITTED INTO EVIDENCE.)

BY MR. BROWN:

Q.      Explain to the jury why it is we're talking about
this.  What was -- what's the importance of this?

A.      We're talking about that because when I started
at HCC in 2006 and I started doing service learning I
realized that I needed tools to help the children -- or
my students convey some of the messages that they're
trying to teach the community about germs.  And a lot of
the times they went to schools, little kids.

        And I thought, wow, this is a great idea because
this is a project where my son had to write a story at
the same time learning about volcanoes.  So I thought,
wow, this is a great idea.  I never thought of that.  You
have a concept and you write a book, you make a story and
then you can use the story to lead the students'
discussions to the topic that you want to teach.

1    Q.    So did you create a book?

2    A.    I did.

3    Q.    And when did you first create this book?

4    A.    I used my son's idea of the name Travel Boy, and

5    in December of 2007 I decided I'm going to write a book

6    so that I can use it for my service learning classes and

7    my students can use it if they want to because I never

8    make my students use it.  But if they want to, they can

9    use it to teach some of the concepts of microbiology that

10   are kind of hard to teach and germs and hand wash and all

11   of that.

12   Q.    There's been some question about when this book

13   was created, so let me do this.  If I could approach,

14   give you a copy.

15         MR. BROWN:  If I could ask, Your Honor, that

16   the jury be published again the copies of the book.

17         THE COURT:  They have them.

18   BY MR. BROWN:

19   Q.    I'd like to give you the Travel Boy Helps

20   Sebastian book, and I want to put on -- show the jury two

21   photographs that's already been introduced as Defendant's

22   Exhibit 14.  Okay.  First of all, what is this a picture

23   of?

24   A.    That picture that you're showing there, this is

25   the precursor of this published book.  That book I wrote

1    early 2007 and then I illustrated it.  I had a girl who

2    was about 14 or 15 at the time, she illustrated it during

3    the spring of 2008 so my students could use it.  That is

4    Page No. 27 of the published book.

5    Q.    All right.  So if we turn to Page -- what is

6    that, Page 27?

7    A.    Page 27.

8    Q.    If we turn to Page 27, that is basically the same

9    picture that this student of yours is reading to the

10   class?

11   A.    Yes, it is because it is the same illustration.

12   Q.    Now, was it this book that she's showing to the

13   class in 2008 in Spanish and English?  Is it bilingual?

14   A.    No.  At that time it was only in English.

15   Q.    And had you sent that book to get it to a

16   publisher to have them produce it?

17   A.    Not the same one.  I had Theresa Galloway, the

18   lady that came in here before, she edited the English to

19   make it perfect because I didn't want it with any errors

20   since it's going for kids.

21   Q.    All right.  Now, the other photograph, also part

22   of Exhibit 14, again it's dated on the bottom, is it not?

23   A.    Yes.

24   Q.    And what is she -- what is she doing there?

25   A.    She was reading -- or showing the pictures of my

book to the kids because they were talking about hand

wash and they had to -- they had to practice some of the

concepts of the class.

Q.     And you can see it better in the picture than

it's blown up.  And the jury can look at that.  But what

page would be that be in the new travel book?

A.     That is Page 9 I believe.  I think, yeah.

Q.     The picture of a submarine?

A.     Yeah, Page 9.

Q.     And can you determine whether or not these

children seem interested in what's being taught them?

A.     Yes, they look interested.

Q.     All right.  Explain a little bit about what your

students were instructed to do as far as your teaching

method.

A.     Well, my teaching method instructs my students

that if they're going to a classroom to do service

learning they have to teach something valuable to them

like maybe handwashing.  But at the same time they have

to try to gear them into thinking about science and maybe

careers about science and microbiology.

Q.     Was this book intended for children at four or

five years old for them to actually read the book?

A.     No, not for the kids to read the book; for the

teacher or a parent to read it, for the kids to look at

1    the pictures and ask questions.

2    Q.    Why is asking questions important?

3    A.    Because that's how you nurture the kids'

4    curiosity and ability to learn.

5    Q.    You've heard some criticism of your book in this

6    trial.

7    A.    Yes, I did.

8    Q.    And that it is inappropriate for at least

9    five-year olds or younger.

10    A.    Yes.  And I have to say that I cannot find the

11    words to express that.  But I have a nephew who's five

12    years old who goes to Head Start and read this book

13    entirely, did not get up until he finished it.  And he

14    made some comments about Sebastian.  He feels sorry for

15    him.

16    Q.    What's your opinion about whether this book is

17    appropriate for five years old?  Why do you think it is?

18    A.    I think it is appropriate because I've seen it

19    and how it works.  And it also depends on who's directing

20    the children.  It's not all in the children.  It's the

21    parents, it's the teachers.  You cannot just give a book

22    to a child and pretend that it is appropriate to him

23    unless you lead him.

24              MR. BROWN:  May I approach, Your Honor?

25              THE COURT:  You may.

BY MR. BROWN:

Q.     Have you ever gotten feedback from teachers, and specifically teachers at the Plant City Head Start as to whether or not your students that are appearing here with the book, whether that was well received?

A.     Yes.

Q.     I'm showing you Defendant's Exhibit No. 15.  What is that?

A.     This is a sign-in sheet for service learning activities that my students did at the Plant City, Beesville Head Start in 2008.  And the ages of the participants were from three to five years old.

Q.     And does it indicate there how did the teacher feel the presentation went?  Did she rate it?

A.     Yes.  She wrote that it was excellent.

Q.     I'm showing you what's marked as Defendant's Exhibit 16.  What is that?

A.     This is a sign-in sheet for my students for service learning.  This was actually at the RCMI Plant City CBC center I don't believe -- well --

Q.     What were the ages of these children?

A.     This is three to five years old too.  There were 32 kids in there.  And the teacher rated it as an outstanding presentation and she wrote the presentation --

1    Q.      Don't read it.  It's not in yet so don't read it.

2            I'm showing you what's marked as Defendant's 17.

3    Do you recognize that?

4    A.      Yes.  This is another sign-in sheet for the

5    service learning activities.

6    Q.      And where is that?

7    A.      Plant City Head Start -- HCC Plant City Head

8    Start.

9    Q.      Do you remember what the ages were for that?

10   A.      Three to five years old.

11   Q.      And I'm showing you what's marked as Defendant's

12   Exhibit 18.  What is that?

13   A.      This is Plant City Head Start ages three to

14   five years old, another sign-in sheet.

15   Q.      And Defendant's Exhibit 19?

16   A.      This is another sign-in sheet, three to

17   five years old.

18           MR. BROWN:  Your Honor, at this time I'd

19   move into evidence what's marked as Defendant's

20   Exhibit 15, 16, 17, 18 and 19.

21           MR. O'NEILL:  No objection.

22           THE COURT:  Received into evidence 15, 16,

23   17, 18 and 19.

24           (EXHIBITS 15 THROUGH 19 ADMITTED INTO

25   EVIDENCE.)

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

BY MR. BROWN:

Q.    Do you remember who this teacher was -- or student of yours was?

A.    Yes.  Her name is Linda Sassy.  She's one of my microbiology students from Plant City area.  She's a nursing student.  She just graduated.

Q.    Okay.  What's her name again?

A.    Linda Sassy.

Q.    And do you know who that student is?

A.    She's Brittany.  I forgot her last name, but she's another one of my microbiology students from that spring of 2008.

Q.    Brittany Berg sound familiar?

A.    Brittany Berg, yes.

Q.    And I'm showing you what's been introduced Defendant's Exhibit 18.  This is one of those teacher evaluation forms?

A.    Yes.

Q.    And it's for three to five-year olds at Plant City Head Start?

A.    Yes.

Q.    And it's rated as the presentation was outstanding?

A.    Yes.

Q.    Do you see whether or not Brittany Berg was

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    there?

2    A.     Yes, she was there.  She signed.

3    Q.     And the date of that?

4    A.     That's April 14, 2008.

5    Q.     And then this photograph is also dated

6    April 14th, 2008?

7    A.     Yes.

8    Q.     And this photograph is April 14th, 2008?

9    A.     Yes.

10   Q.     Who is that again?

11   A.     That's Brittany Berg.

12   Q.     Now, to stay on this book for a minute, we saw

13   here that it's a -- I guess a pre edition of what

14   everybody in the courtroom has now.  Explain -- take us

15   through the process then of creating this book to this

16   format.

17   A.     Well, when I did that one, I wanted to do it in a

18   more professional way.  I didn't know, so I went to

19   Staples, I got that copy that you see on the picture.

20   However I have a student, her name is Laura Lash, and she

21   had published -- had self published a book that she wrote

22   and she was talking to me about why don't I publish the

23   book, that that's a great idea --

24              MR. O'NEILL:  Your Honor.

25   BY MR. BROWN:

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   Q.      You can't say what somebody told you.

2   A.      Okay.  Well, I got encouraged to publish the

3   book.  She sent me some information about a self publish

4   agent.  I contacted them.  They said that they don't do

5   children's books, so then I went over -- online and I

6   found Xlibris, which is a publisher that I found.  But up

7   until then I didn't think about publishing the book, but

8   through her encouragement I did.

9   Q.      Okay.  And who published your book?

10  A.      Xlibris.

11  Q.      And did you have somebody edit the Spanish

12  portion of the book?

13  A.      Yes.

14  Q.      Who is that?

15  A.      Her name is Antolino Prado.

16  Q.      And do you give her credit in the book too?

17  A.      Yes, I do.

18  Q.      So she's listed under the acknowledgment there?

19  A.      Yes, she is.

20  Q.      Was there an early edition of this book that had

21  some errors?

22  A.      Yes.

23  Q.      Explain that.

24  A.      In October 2009 on the day I was serving on a

25  jury here, criminal trial, my book got published.  And I

1    don't know, with the rush of that week had some errors on

2    the Spanish version.

3           I was excited that it got published.  I went home

4    and I ordered a hundred copies because I was getting

5    ready to promote it and try to sell it at the Temple

6    Terrace Arts Festival which is in November.

7           And when I noticed the errors, that was

8    unacceptable to me.  So cost me about a thousand

9    something dollars.  I decided I'm not using these books,

10    no way.

11           So I also volunteer at cancer center doing some

12    community events, and I know Antolino Prado.  She's the

13    translation -- the person that translates everything at

14    the cancer center.  She's the translator there.  And I

15    told her about my book and I told her could you please

16    look at the Spanish.

17           Because even though I speak Spanish, when you see

18    the stuff and you don't realize the mistakes.  Could you

19    please take a look at it, and that way you can make it

20    more professional.

21           And she said, yes, sure.  That's a great idea.

22    So she offered to help me.  And I said, do you need me to

23    pay you, just like I offered Teresa.  But none of them

24    wanted any payment.  The did it because they thought it

25    was a great idea, so they helped me for free.

Q.    What happened to those hundred books?

A.    Those hundred books I donated then to Teresa Galloway.  She was here on the stand before.  Actually, I didn't donate it directly to her.  But she goes to Haiti for some missions for teaching some schools in Haiti.

      And I told her, Teresa, you helped me with the edition of the -- the English edition of the book.  I'm so thankful for that.  I never paid you.  I know you wouldn't take any payment.  But if you want I can give you these hundred copies.  I'm not going to sell them. And she said -- she said, sure, I'd love to take them to Haiti.  You can bring them to me.  I'll give them to the organization that deals with that.

Q.    Do you know whether the books ended up in Haiti?

A.    My understanding is that they did.

Q.    Do you ever recall receiving a letter from a mission thanking you for the hundred books called Travel Book Helps Sebastian Trapping the Germs?

A.    Yes.

          MR. BROWN:  May I approach the witness, Your Honor?

BY MR. BROWN:

Q.    I'm showing you what's marked as Defendant's Exhibit 46.  Do you recognize that?

A.    Yes, I do.

Q.    And is this something you received from a mission

called Life Connection?

A.    Yes.

Q.    All right.  We covered 2008.  In 2009 did you

have an opportunity to do another preservice guest

lecture?

A.    Yes, I did.

Q.    And when you were there did you -- did you use a

slideshow to help educate the Head Start employees?

A.    Yes, I did.

Q.    And do you remember whether in your slideshow

there was a slide talking about the book Travel Boy Helps

Sebastian?

A.    Yes, the last slide.

Q.    The last slide?

A.    Uh-huh.

        MR. BROWN:  May I approach again?

        THE COURT:  You may.

BY MR. BROWN:

Q.    I'm showing you what's marked Defendant's Exhibit

No. 9.  Do you recognize this?

A.    Yes.

Q.    What is it?

A.    This is the presentation that I gave to the Head

Start program in 2009.

1    Q.    And is there a picture of Travel Boy Helps

2    Sebastian?

3    A.    Yes.

4              MR. BROWN:  Your Honor, at this time I'd

5    offer into evidence what's marked Defendant's Exhibit No.

6    9.

7              MR. O'NEILL:  No objection, Your Honor.

8              THE COURT:  Receive into evidence 9.

9              (EXHIBIT 9 ADMITTED INTO EVIDENCE.)

10   BY MR. BROWN:

11   Q.    And the presentation was for bloodborne

12   pathogens?

13   A.    Yes.

14   Q.    And what we're looking for here in Defendant's

15   Exhibit 9 is I guess a copy of each of the slides that

16   they would have seen in the slide presentation.

17   A.    Yes.

18   Q.    And the last slide in here was a picture of the

19   book?

20   A.    Yes.

21   Q.    We've already seen -- the jury has seen because

22   it's been admitted Defendant's Exhibit 37.  Is this the

23   company that published your book eventually?

24   A.    Yes.

25   Q.    Now, the cover of the book that we see in here,

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
1    Travel Boy Helps Sebastian, has the cover always stayed
2    the same?
3    A.     It was in a greenish format, you know, prior to
4    the publication.  And then I changed it to the orange
5    background.
6    Q.     All right.  So let's pick up then 2010, all
7    right?
8    A.     Yeah.
9    Q.     How is it that you decide -- or hear that Head
10   Start wants to buy your book?
11   A.     My husband, he came to my house one day and he
12   said --
13          MR. O'NEILL:  Objection, Your Honor --
14   BY MR. BROWN:
15   Q.     Okay.  What your husband told you is hearsay.
16   A.     Okay.
17   Q.     But did you have a -- did you believe that Head
18   Start was interested in potentially buying your book?
19   A.     Yes.
20   Q.     All right.  And did you eventually contact -- or
21   were you put in contact with somebody at Head Start?
22   A.     Yes.
23   Q.     Who was that?
24   A.     Idalin Navejar.
25   Q.     And I think the government has introduced a
```

1    series of e-mails --

2    A.      Yes.

3    Q.      -- between you and Miss Navejar.

4    A.      Yes.

5    Q.      Do you recall those?

6    A.      Yes.

7    Q.      And one of those e-mails, Government's Exhibit 2,

8    refers to a presentation.

9    A.      Yes.

10   Q.      I think the e-mail was, here's the presentation

11   of my book in case they need justification.  Also you can

12   tell them that I'm a product of the Head Start system.

13   A.      Yes.

14   Q.      When you used the term "justification," are you

15   suggesting there's something wrong about this?

16   A.      No, not at all.

17   Q.      When you say there's a letter of presentation,

18   what are you referring to?

19   A.      That's the letter that I did to promote my book

20   which lists all the reasons -- or not reasons -- well, in

21   a way reasons, but also different people that would

22   benefit from the book, different organizations that would

23   benefit from the book and ideas that people could use to

24   not -- sorry.  Different ways that the book could be used

25   for teaching, for learning, for reading, science, all the

1    different topics that you could elaborate from using the

2    book.

3    Q.    You refer here where it says, "I hope you

4    consider the book for your educational program.  I have

5    also created coloring pages and other activity sheets to

6    help kids integrate the learning after the reading of the

7    story."

8    A.    Yes.

9    Q.    Had you actually created those?

10   A.    Yes.

11            MR. BROWN:  Approach?

12   BY MR. BROWN:

13   Q.    I'm showing you what's marked Defendant's No. 11.

14   Do you recognize that?

15   A.    Yes.

16   Q.    What is that?

17   A.    This is a kindergarten activity using clay to

18   build the bacteria, creating and recognizing shapes.

19   Q.    When you talk about activity sheets in the

20   presentation letter that's been introduced as

21   Government's Exhibit 2 are you referring to this or

22   something else?

23   A.    Activity sheets could be the coloring books.  But

24   the curricular activity is also a summary of an activity

25   that the teachers could use or parents could use if they

1    want to, uh-huh.

2    Q.    Now, when you say, I hope you consider the books

3    for your educational program were you under any

4    understanding that they had committed to buy your book?

5    A.    No.

6    Q.    When the government introduced some of the

7    exhibits -- or some of the e-mails that suggested you

8    were asking about how many books do they want, why were

9    you asking that?

10   A.    I'm sorry?  Can you repeat the question.

11   Q.    Government's Exhibit No. 3.  You say -- in an

12   e-mail to Miss Navejar you say, in order to send you a

13   quote I need to know the number of books you need.

14   A.    Uh-huh.

15   Q.    Why are you saying that?

16   A.    Because I don't know how many books they need.

17   Q.    So it could have been one?

18   A.    It could have been one, two, three.  I don't

19   know.

20   Q.    It says -- in your next e-mail on April 27th you

21   say, just following up with the book order.  I wanted to

22   know if you decided on a book amount.  Do you see that?

23   A.    Yes.

24   Q.    So was -- the decision as to how many books that

25   Head Start was buying, was that your decision?

```
1    A.      No, it was not my decision.  And I was not sure
2    that they were going to buy it.
3    Q.      Ever send an e-mail that said you have to be
4    buying a thousand of my books?
5    A.      No, not at all.
6    Q.      Government's Exhibit 7 is an e-mail from you to
7    Miss Navejar.
8    A.      Yes.
9    Q.      And it references an attachment, does it not?
10   A.      Yes.
11   Q.      I'm attaching activity sheets to go with the
12   book.
13   A.      Yes.
14   Q.      When I just showed you Defendant's Exhibit No. 11
15   for identification, is that the activity sheet that was
16   included with that e-mail?
17   A.      That along with coloring pages I believe I
18   attached as well.
19            MR. BROWN:  Your Honor, at this time I'd
20   offer into evidence what's marked as Defendant's Exhibit
21   No. 11.
22            MR. O'NEILL:  No objection, Your Honor.
23            THE COURT:  Received into evidence 11.
24            (EXHIBIT 11 ADMITTED INTO EVIDENCE.)
25   BY MR. BROWN:
```

Q.    Let's go through this though because you're

sending this on June 27th; is that right?

A.    Yes.

Q.    The books have already been delivered?

A.    Yes.

Q.    Has anyone told you that you or your husband are

under an investigation at this time?

A.    No.

Q.    So why are you writing this e-mail?

A.    Because I promised them that I would help them

with the activities.  Or if it was going to go to the

parents, you know, doing some talk with the parents on

things to help them to educate their children.  Or if it

was the teachers, to help the teachers.  And since I

wasn't sure why they hadn't contacted me, that's why I

wrote the letter.  Plus, it's something that I promised

them to send them, so I had to follow up with my promise.

Q.    Did you ever suggest they had to buy more from

you?

A.    Not at all.

Q.    You heard the word "purchase" was used.  Did you

ever say that they needed to purchase more from you?

A.    No, not at all.

Q.    When this e-mail refers to activity sheets to go

with the book, one of the statements is an actual

1    curricular activity that meets a benchmark for science

2    according to the Next Generation Sunshine State

3    standards.  What are you referring to?

4    A.      This is punished in the Hillsborough County

5    School District Web site.  And if you go there you can

6    pull out the Sunshine State standards for K to 12.  And

7    since my goal is to get the children interested in

8    science I want to do it right.  So I'm going to go there

9    and I'm going to get their -- the benchmarks and try to

10   do my activities according to that.

11   Q.      All right.  The next paragraph says, "As I

12   prepare more activities to do with children I will be

13   e-mailing them to you and you can pass them along to

14   teachers if they get a copy of the book."  Is that

15   accurate?

16   A.      Yes.

17   Q.      Did you ever suggest that they had to buy this

18   from you?

19   A.      No.  Those are free.

20   Q.      And you state, "Let me know if I can help you in

21   anything else."  Were you sincere about that?

22   A.      Definitely.

23   Q.      And it says, "Remember, I'm available for any

24   demonstration activities that can help teachers use the

25   book to get the most out of it."  What did you mean by

1    that?

2    A.    If they're not sure how they can use the book I

3    can teach them different activities where they can use

4    the book just like I've done with my students.

5    Q.    And so with Government's Exhibit 7 -- actually,

6    Defendant's Exhibit 11 is the activity sheet that

7    Government Exhibit 7 refers to; is that right?

8    A.    I'm sorry?  Can you repeat the question.

9    Q.    Government's Exhibit 7 references an attachment.

10   A.    Oh, yes.

11   Q.    Activity sheets?

12   A.    Yes.

13   Q.    Am I correct that Defendant's Exhibit 11 is that

14   attachment?

15   A.    Yes, that's one of the attachments.

16   Q.    In this activity sheet talks about using clay to

17   build a bacteria, creating and recognizing shapes.

18   A.    Yes.

19   Q.    And it talks about the benchmark again in science

20   for kindergarten students.

21   A.    Yes.

22   Q.    What are the learning objectives?

23   A.    Well, by doing this you will help the students

24   learn about microorganisms in humans and shapes and

25   change of matter, which are some of the benchmarks of

1    kindergarten according to the Sunshine State standards.

2    Q.      You talk about the National Science Education

3    Program Standard D.

4    A.      Yes.  Because I am associated with the American

5    Society for Microbiology K to 12 Educational Growth, and

6    they have a Web site where you can publish curricular

7    activities so that teachers from all over the nation can

8    use for free.  And if I ever wanted to publish this there

9    I have to do it to their standards.  And they want me to

10   make sure that I address some of the national science

11   education standards on my curricular activities, not just

12   the local standards, but also the national standards that

13   meet the science education standards.

14   Q.      And when it says materials, what are the

15   materials?

16   A.      The materials are clay.  And the book, in this

17   case I'm referring to my book so it is suggested but it

18   is not necessary.  Chalkboard or large paper to use as

19   writing board.

20   Q.      And what's the purpose of clay?  What did you

21   expect them to be able to do with the clay?

22   A.      The clay, if they use the book I have everything

23   step by step in there.  You're supposed to read the book.

24   Or if not -- if the book is not available, you can talk a

25   little bit about what bacterias are and you are supposed

1    to discuss the topic of the microorganisms with the kids.

2    You should ask them what happened to Sebastian.  That's

3    only if you read the book.

4         But you could -- you know, you can -- this is a

5    suggested activity.  If they don't have the book they can

6    do it differently, what made him sick.  It's just a way

7    to get the kids engaged in an activity.  And then from

8    there you can get to the point of handwashing and

9    anything you want to teach them.  But that's just a way

10   to grab their attention.

11   Q.    So if it's suggested that this photograph of a

12   thermometer at 102 degrees is inappropriate for a child,

13   what is your response as to how this could be used

14   instrumental?

15   A.    This would be to show the kids that when they get

16   sick, they get fever.  And fever can be measured by an

17   instrument.  They get hot.  And that's a way for your

18   body to tell you that you're sick.

19   Q.    And is that not exactly what your book explains?

20   A.    Yes, it is.

21   Q.    So a child may not understand what a thermometer

22   is or 102, but hopefully by a teacher explaining this a

23   child can learn it, is that what you're saying?

24   A.    Yes, exactly.

25   Q.    We heard -- the government's introduced that you

1    were paid $9,000 for the books.

2    A.      Yes.

3    Q.      And the government's introduced Exhibit No. 9

4    showing an invoice for these books in the amount of

5    $6,270.

6    A.      Yes.

7    Q.      So how much money did you make off the sale of

8    these books?

9    A.      The difference between the 9,000 and the 6,270

10   minus 270 that I paid to the illustrator.  That's part of

11   one agreement I had with her.  So I'm not good in math,

12   but --

13   Q.      About 2,700?

14   A.      Roughly, yeah.

15   Q.      And where was that -- that money was sent to who?

16   To you?

17   A.      To me.

18   Q.      And did you have a business?

19   A.      I have a business account.

20   Q.      What's the name -- first of all, what's the name

21   of the business?

22   A.      Reading For Little Scientists.

23   Q.      And do you also have an account for that

24   business?

25   A.      Yes.

Q.     What kind of an account is it?

A.     It's a business account.

Q.     And what type of an account?  Is it a Visa
account?

A.     It is a checking and Visa business account with
Grow Financial.

Q.     And who is named in that account?  Are you named
in that account?

A.     Just me.

Q.     And is that -- and what did you do with the
check?

A.     I deposited it there.  I used some for
promotional material for another activity that I was
doing.  It's called Temple Terrace reads.  It's in
October 2010.  And I'm not supposed to sell the book
there, but I could promote it.  And I went there and I
bought all the material that I needed so the kids could
build the raw bacteria.  You see like the hard paper
that's colored.  And I use some of the money for the Web
site and pretty much back into the business.

Q.     Did you ever intend to commit a crime?

A.     No, not at all.

Q.     Did you ever join a conspiracy with other people
to commit a crime?

A.     No, not at all.

1    Q.    Did you ever intend to defraud the United States

2    Government?

3    A.    No, not at all.

4    Q.    Did you ever receive a kickback?

5    A.    No, not at all.  But I -- I understand what a

6    kickback is, but for a moment it took my brain -- sorry

7    for that.

8    Q.    Did you ever pay a bribe to anyone?

9    A.    No, not at all.

10          MR. BROWN:  Your Honor, I have no further

11   questions.

12          THE COURT:  All right.  Mr. O'Neill -- I'm

13   sorry.  Any questions --

14          MR. WEISBROD:  No questions, Your Honor.

15          THE COURT:  -- Mr. Weisbrod?

16          Mr. Farmer.

17                    CROSS-EXAMINATION

18   BY MR. FARMER:

19   Q.    Good afternoon.

20   A.    Good afternoon.

21   Q.    Did any of the money that you received from the

22   county -- of that money did you send any of it or give

23   any of it to Marie Mason?

24   A.    Not at all.

25          MR. FARMER:  That's all I have.  Thank you.

1          THE COURT:  Mr. O'Neill.

2          MR. O'NEILL:  Thank you, Your Honor.

3                    CROSS-EXAMINATION

4   BY MR. O'NEILL:

5   Q.     Good afternoon, Miss Melendez Santiago.

6   A.     Good afternoon.

7   Q.     Ma'am, Mr. Brown brought out on cross -- on

8   direct examination that you are married to Michael

9   Jimenez; is that correct?

10  A.     Yes, that is correct.

11  Q.     And where do you reside with Mr. Jimenez?

12  A.     In 6212 Soaring Avenue, Temple Terrace.

13  Q.     What's the address again?

14  A.     6212 Soaring Avenue, Temple Terrace, Florida.

15  Q.     And how long have you lived at that address?

16  A.     Since 2007 I believe.  Since 2007 I think.

17  Q.     2007.

18         And do you have a mortgage on that home?

19  A.     Yes, we do.

20  Q.     Is it fair to say it's in both of your names?

21  A.     Yes, it is.

22  Q.     So you own that home jointly?

23  A.     Yes.

24  Q.     And have you ever run the property appraiser's

25  report on your home?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

A.      Property appraisal?

Q.      Yes, ma'am.

A.      I don't know if I have done that.

Q.      Well, do you know whether the county has both of your names listed as the owners of that home?

A.      Yes.

Q.      Now, ma'am, do you have a savings account jointly with your husband?

A.      A savings account?

Q.      Yes, ma'am.

A.      Yes.

Q.      And do you have a checking account jointly with him?

A.      Yes.

Q.      And how about cars?  Whose names are the cars in?

A.      They're both on my husband's name.

Q.      And this is both the Acura and the Cavalier?

A.      Yes.

Q.      Now, Miss Melendez Santiago, you are paid for your work on behalf of Hillsborough Community College, are you not?

A.      Yes.

Q.      And what was your approximate salary in the year 2010?

A.      I can't remember.  Probably 60,000.  I'm not

1    sure.  55, somewhere.

2    Q.    It was $53,474 --

3    A.    Yes, somewhere around there.

4    Q.    -- 28.  Okay.

5          Now, you mentioned your work at Moffitt and you

6    have a passion for working at Moffitt.

7    A.    Yes, I do.

8    Q.    Fair to say they paid you as well; right?

9    A.    Yes.

10   Q.    And last year you made approximately $12,032.90

11   at Moffitt?

12   A.    Yes.

13   Q.    And your husband works on behalf of Hillsborough

14   County; correct?

15   A.    Yes.

16   Q.    And you've heard a lot of testimony about that.

17   A.    Yes.

18   Q.    And are you aware that he gets paid in 2002

19   approximately $68,469.12?

20   A.    Yes.

21   Q.    And he's a public employee; correct?

22   A.    Yes.

23   Q.    As are you?

24   A.    Yes.

25   Q.    And as such he gets paid by the public to work on

1  their behalf?

2  A.    Yes.

3  Q.    And so do you --

4  A.    Yes.

5  Q.    -- is that correct?

6       Now, do you file a joint tax return with your

7  husband?

8  A.    Yes.

9  Q.    Now, the jury's heard testimony that

10 Miss Galloway was told by you in 2009 you were creating

11 this book to sell it to the head Start program.

12 A.    I recall that, but that's not true.

13 Q.    And, well, let me ask you a couple other things

14 then while we're on Miss Galloway.  You also heard that

15 she denied receiving those hundred copies of that book;

16 correct?

17 A.    I recall that, but that's not true.

18 Q.    Okay.  And you also said that you offered her

19 money, but she did not take it.  And she said you did not

20 pay her; correct?

21 A.    Yes, that's true.

22 Q.    That's true.

23      But at no time did anybody cross-examine her

24 about being offered money; correct?

25 A.    No.

Q.    Now, how about -- you also mentioned that
Miss Antolino you likewise offered to pay.

A.    Yes.

Q.    And she likewise declined payment.

A.    Yes.

Q.    The only person we've heard of that you paid for
the production of this book was the illustrator.

A.    Yes.

Q.    Now, how much did it cost you to produce this
book?

A.    It cost me probably around $3,000.

Q.    And where'd you get those funds from?

A.    From my work that I do at Moffitt.

Q.    And did you take your paycheck and send it to the
people or did you pull it out of a bank account?

A.    I probably put it in my bank account and then I
paid.

Q.    So that money came out of the joint account?

A.    At the time probably.

Q.    And would that be a saving account you believe or
a checking?

A.    I am not sure now which account it came.  I also
have accounts where I'm the sole person on the account,
so I could not remember which one that the money came
from.

1    Q.    You mentioned that during direct examination --

2    A.    I'm sorry?

3    Q.    -- you have a separate account?

4    A.    I'm sorry?  I do have separate accounts too, yes.

5    Q.    Yes.

6          You mentioned that during direct examination that

7    you have a separate account.

8    A.    He didn't ask me if I had -- I don't remember

9    now.

10   Q.    Now, Miss Melendez Santiago, you said the book --

11   the expenses cost you about $3,000.

12   A.    Yes.

13   Q.    And did you bring those receipts with you today?

14   A.    No.

15   Q.    Did you bring anything indicating how much you

16   paid in all those documents Mr. Brown to the attention of

17   the jury?  Did you bring any documents indicating how

18   much you paid for this book?

19   A.    No.

20   Q.    Or to whom you paid money?

21   A.    No.

22   Q.    Or how you paid the money?

23   A.    No.

24   Q.    Now, is it fair to say the only person who's --

25   well, the only entity that's ever bought your book in

1    bulk is Hillsborough County?

2    A.      Yes.

3    Q.      Nobody else has ever bought your book in bulk,

4    have they?

5    A.      Not in bulk.  But some other places bought it

6    too.

7    Q.      Now, the 150 or so books that Mr. Nolan Estes

8    mentioned had been purchased previously were purchased by

9    you; correct, ma'am?

10   A.      Yes.

11   Q.      And you had to pay for those books?

12   A.      Yes.

13   Q.      Now, if Hillsborough County hadn't bought those

14   books, you would have been stuck with paying a few

15   thousand dollars for this book, would you not?

16   A.      Can you repeat the question.

17   Q.      Sure.

18           If Hillsborough County hadn't bought those books,

19   you would just be left with having paid several thousand

20   dollars to produce this book or booklet?

21   A.      Yes.

22   Q.      And there came a point in time when you were able

23   to sell these books to Hillsborough County?

24   A.      Yes, I guess, uh-huh.

25   Q.      And you contacted your husband; correct?

A.      I don't remember contacting him.

Q.      Well, the e-mail indicates you contacted him.

A.      That was after we had the conversation that he
told me that the nurse wanted to evaluate the book.

Q.      Sorry, ma'am?  I didn't hear any of that.

A.      That was after he had already approached me that
the nurse wanted to evaluate the book.

Q.      So it's your understanding the nurse wanted to
evaluate the book?

A.      Yes, that was my understanding.

Q.      And that precipitated your e-mail to your
husband?

A.      Yes.

Q.      So you e-mailed your husband.  And you -- you
knew he was an employee for Hillsborough County, did you
not, ma'am?

A.      Yes, I do.

Q.      Again, you knew he was a public official, did you
not?

A.      Yes.

Q.      A public employee; correct?

A.      Yes.

Q.      And that he owed honest services to Hillsborough
County?

A.      Yes.

1    Q.      And yet he was going to be involved in a book

2    deal in which you were the author; correct?

3    A.      Yes.

4    Q.      Now, it was your husband who introduced you to

5    Miss Idalin Navejar; correct, ma'am?

6    A.      Yes.

7    Q.      He was the one that put the two of you together?

8    A.      I believe so.

9    Q.      Now, are you a tenured professor at Hillsborough

10   Community College?

11   A.      Yes, I am.

12   Q.      And as Miss Galloway said, Hillsborough Community

13   College recommends this sort of service to the community?

14   A.      Yes.

15   Q.      And that's highly recommended there?

16   A.      Yes.  You don't have to do too much.

17   Q.      But many of the teachers do do community service,

18   do they not?

19   A.      Yes.

20   Q.      And they do that on their own time?

21   A.      Yes.

22   Q.      And it's volunteer, is it not?

23   A.      Yes.

24   Q.      And that means you do not get paid for that?

25   A.      Yes.

Q.    Now, Miss Melendez Santiago, why did you not

donate this book to Hillsborough County Head Start?

A.    Because I would have had to spend all that money

to donate to them.

          MR. O'NEILL:  No further questions.

          THE COURT:  Mr. Brown.

                    REDIRECT EXAMINATION

BY MR. BROWN:

Q.    The publisher that you use for the books --

A.    Uh-huh.

Q.    -- are those books already there?  In other

words, are those books already printed?

A.    No.

Q.    Okay.  Explain how that happens.  I mean there's

an insinuation here that the books are already published

and they're sitting there.  That's not accurate?

A.    No, that's not accurate.

          MR. O'NEILL:  Objection, Your Honor.

There's no such insinuation.

          THE COURT:  I'll sustain.

BY MR. BROWN:

Q.    How does that work with the publisher?

A.    They only print them if you buy them and that's

called print on demand.  If I don't have any purchases, I

don't print.  I don't lose any money because I'm not

1    printing books unless I am going to sell them.

2    Q.    And once you ordered 750 books, who was

3    responsible for that?

4    A.    Xlibris prints them.

5    Q.    And who has to pay that?

6    A.    I have to pay for that.

7    Q.    Did you pay that?

8    A.    Yes.

9            MR. BROWN:  Nothing further.

10           THE COURT:  Anything else?

11           MR. O'NEILL:  No, Your Honor.

12           THE COURT:  All right.  Anything else?

13           MR. FARMER:  No, Your Honor, thank you.

14           THE COURT:  Thank you, ma'am.  You may step

15   down.

16           THE WITNESS:  Thank you.

17           THE COURT:  Mr. Farmer.

18           MR. BROWN:  Your Honor, on behalf of Johana

19   Melendez Santiago we rest.

20           THE COURT:  I'm sorry.

21           All right.  Now, Mr. Farmer.

22           MR. FARMER:  Thank you, Your Honor.  Marie

23   Mason rests.

24           THE COURT:  All right.  Any rebuttal

25   evidence, Mr. O'Neill?

1          MR. O'NEILL:  No, Your Honor.

2          THE COURT:  Okay.  Ladies and gentlemen,

3    both sides have rested their case so you have heard all

4    of the evidence in this case or seen all of the evidence

5    in the case.

6          And there are two matters remaining.  I need

7    to instruct you in the law that applies to the case and

8    the attorneys will be making a closing or final argument

9    in the case.  Then you will get the case to decide.

10          We're going to go ahead and recess.  It's

11    4:25.  It's a little late to start any closing arguments

12    this evening so we will come back tomorrow morning.  And

13    I'll ask that you be back at 9:30.

14          And I'm not sure whether we'll do closing

15    arguments first and then instructions in the law or

16    instructions in the law and then closing arguments, but

17    we will do both of these things and you'll go back to the

18    jury room to begin your deliberations in the matter.  So

19    I anticipate you will probably get this case sometime

20    maybe around lunchtime or shortly thereafter.

21          Do any of you have any questions?  All

22    right.

23          I'm still going to ask you to leave your

24    pads face down on your chairs and please don't discuss

25    the case with anyone.  Please don't read anything should

1   there be anything in the news media.  Please don't listen

2   to anything should there be anything on the television or

3   radio or any other news source.  And I will see you in

4   the morning at 9:30.  Thank you.

5           COURT SECURITY OFFICER:  All rise, please,

6   for the jurors.

7       (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

8           COURT SECURITY OFFICER:  Please be seated.

9           THE COURT:  All right.  Mr. Weisbrod, do you

10  wish to renew your Rule 29 motion now that you have

11  rested your case?

12          MR. WEISBROD:  I do, Your Honor.  And would

13  incorporate everything that was said previously.  And

14  would further to the argument note the testimony now that

15  you've heard in the defense case regarding the funds in

16  no way going from -- once the funds went to Miss Melendez

17  Santiago they didn't go any further, so there's no money

18  going to Mr. Jimenez.  The kickback is dead frankly.

19          THE COURT:  All right.

20          MR. BROWN:  And, Your Honor, we would renew

21  all of our motions for judgment of acquittal.  Obviously,

22  it's no longer in the light that's most favorable to the

23  non moving party.

24          And, again, I would reiterate what

25  Mr. Weisbrod has said too, is the evidence now has

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    conclusively shown that the check was deposited into her

2    account.  She was the only name on that account.  And

3    that that money went just towards her.

4         There's been no evidence that in any way

5    that money went towards the mortgage, that that money

6    went towards a car payment, that that money went towards

7    anything that Mr. Jimenez was involved in.  In fact, the

8    money was strictly in that account.

9         The government had an opportunity to

10   cross-examine on that point to try to suggest that the

11   funds had been shared between the two of them and there

12   was no evidence introduced to that, so I would ask the

13   Court renew -- grant our motions for JOA, specifically

14   the one on Count III that the Court is reserving.

15             THE COURT:  Mr. Farmer.

16             MR. FARMER:  Yes, Your Honor, we renew our

17   JOA motion on all three counts, particularly on Count III

18   for the same reasons expressed by co-counsel.

19             THE COURT:  Mr. O'Neill, any response?

20             MR. O'NEILL:  No, Your Honor.

21             THE COURT:  All right.  My ruling will at

22   this stage be the same.  I'm going to defer on Count III

23   and I will deny the motions as to all defendants as to

24   Counts I and II.

25             We've prepared a set of jury instructions

1    and here's what I would propose.  I'll hand those out

2    this evening, the verdict forms and the jury

3    instructions.  And this evening you can take them home

4    and look at them and decide -- have a chance to read them

5    and see if there's anything that you think that there is

6    a problem with.

7              I'll ask you if you could come back tomorrow

8    morning at 9 o'clock and then we'll have a charge

9    conference.  You can talk about the jury instructions and

10   we'll make changes if changes are necessary.

11             I would think that maybe in this case the

12   best thing to do is for me to give the jury instructions

13   first and then you do closing arguments.  But you can

14   think about that over the evening hours as well.

15             So would you give each of the attorneys a

16   copy of the jury instructions and the verdict form.  I

17   want to tell you a couple of things about them so that

18   you'll be aware of it and just make things easier year.

19   Okay.

20             On Page 5 the defendants did not suggest

21   that I give a -- it's probably an oversight -- a

22   credibility of the witnesses instruction.  It was in the

23   packet that the government gave me and I did include it

24   in this packet.

25             The defendant suggested that it's

1  appropriate that I give an impeachment, inconsistent

2  statements.  I think there was some impeachment as I

3  recall based on statements that some of the witnesses had

4  given to law enforcement.  This was an instruction.  And

5  it's on Page 6.  It was included by the defendant but not

6  the government.  I have included that.

7       Let me ask you to look at Page 7 if you

8  will.  This was given to me by the defendants.  This is

9  confession or statement of multiple defendants.  It's a

10  little different in that the standard special instruction

11  doesn't quite apply because nobody was arrested or

12  detained.

13       What I did -- normally I wouldn't give this

14  instruction if somebody wasn't arrested or detained.  But

15  we'll talk about that tomorrow.  But I will tell you what

16  I did.  I included it in the packet.  I took out after

17  being arrested or detained and I took out the last

18  sentence in the standard instruction.  So you will note

19  that it's there but it's a little different.  And this

20  was one that the defendant gave me but the government did

21  not.

22       Introduction to offense instruction.  You

23  can read through it.  I have summarized what I think the

24  Indictment charges and you can take a look at it.

25       Then there's the general conspiracy charge

1    which is the standard instruction.  I think you all

2    agreed to it.

3          Mr. O'Neill, you gave me a -- a multiple

4    objects instruction and a multiple conspiracy

5    instruction.  The multiple objects -- and so the

6    defendant gave me a multiple objects instruction too.  I

7    think would be appropriate.  I wasn't quite sure why the

8    multiple conspiracies was included.

9          MR. O'NEILL:  I'd have to look at that

10   again, Your Honor.  That may have been an oversight.

11   You're right.  It doesn't make sense to have multiple

12   conspiracies.

13         THE COURT:  Okay.  Well, I didn't include it

14   in this packet.  But I wanted to tell you I didn't

15   include it.  And you need to read this to see if you have

16   any problem with the language on the multiple objects of

17   the conspiracy.

18         The conspiracy to defraud the United States

19   I think is one everyone agreed to.

20         Page 14 is one that was a little -- you both

21   gave me different instruction -- a little bit of a

22   different instruction so you need to look at this one.

23   This is primarily the government's instruction.  It's a

24   little different, but primarily.

25         And 50.2 on Page 16 I think pretty much you

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

 1   agreed except for the defendants included a definition of

 2   kickback.  The government didn't put that in their

 3   instruction.  I put it in the instruction.  It's what the

 4   defendants suggested.  So that's on Page 17.

 5              The aiding and abetting instruction.

 6              The defendant suggested that a good faith

 7   instruction would be appropriate in this case.  I've

 8   included it so you'll see that on Page 19.

 9              The conjunctive instruction, although not

10   a -- not a standard instruction is one that I commonly

11   give and I think most judges in the District give.  So I

12   think it's appropriate and I did include it.

13              9.1A, this is the -- there's a 9.1, as you

14   know, B and a 9.1A.  The defendant suggested 9.1B.  The

15   government suggested 9.1A.  I thought 9.1A was

16   appropriate.  You can make your argument if you'd like

17   tomorrow.  I just wanted to tell you that's what I've

18   included.

19              The rest I think is fairly standard.  I

20   think that's it.  And then the -- you also should have

21   copies of the verdict forms.  So take a look at the jury

22   instructions and we'll have a charge conference at

23   9 o'clock.

24              Mr. O'Neill, how long would you anticipate

25   your closing arguments lasting?

```
 1              MR. O'NEILL:  Judge, I'd request maybe a
 2    half hour at the front end and ten minutes rebuttal.
 3              THE COURT:  Okay.  That's fine.
 4              Mr. Weisbrod, what about you, sir?
 5              MR. WEISBROD:  Maybe 45 minutes, Your Honor.
 6              THE COURT:  Okay.  Mr. Brown?
 7              MR. BROWN:  I'd ask for the same, but I
 8    doubt I'll take it.
 9              THE COURT:  Okay.  Mr. Farmer?
10              MR. FARMER:  I would say more 35 minutes.
11              THE COURT:  Okay.  So, well, then I would
12    ask that everybody not go over 45 minutes.  How's that?
13    Is that fair enough?  And as long as you don't do that I
14    won't stop you.
15              Any thoughts about whether you would like
16    the jury instructed prior to closing arguments or after
17    closing arguments?
18              MR. BROWN:  I'd like it before.
19              MR. O'NEILL:  I'd like it before.
20              THE COURT:  That was easy.  I'd like it
21    before too.
22              MR. WEISBROD:  I'm a traditionalist.  I'd
23    like it after.  It's not a make it or break it thing.
24    And since you like it before I think we're going before.
25              THE COURT:  Well, not necessarily.  If
```

1   everyone would have wanted it afterwards I probably would

2   have given it afterwards.

3         Okay.  Anything else we need to talk about

4   before we recess for the evening?

5         MR. O'NEILL:  Not from the government, Your

6   Honor.  Thank you.

7         THE COURT:  Okay.  I have a violation of

8   supervised release at 8:30 in the morning, but it should

9   be quick.  And I just tell you that so that you can move

10  your things.  And we're in recess till 9 o'clock tomorrow

11  morning.

12        COURT SECURITY OFFICER:  All rise.

13        (PROCEEDING ADJOURNED.)

14        I CERTIFY that the foregoing is a true and

15  accurate transcription of my stenographic notes.

16  Dated:  11/04/2011.

17

18        ___s/ Sandra K. Provenzano_____
              SANDRA K. PROVENZANO, RPR
19            Official Court Reporter

20

21

22

23

24

25

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER