IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
CASE No. 8:11 CR 197 T 24 MAP


UNITED STATES OF AMERICA


   Plaintiff,
v.         July 14, 2011
          9:00 a.m.

MICHAEL JIMENEZ, JOHANA
MELENDEZ SANTIAGO, and
MARIE MASON


   Defendant.
_____/


TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:  ROBERT O'NEILL
        Assistant U.S. Attorney
        U.S. Attorney's Office
        400 North Tampa Street
        Suite 3200
        Tampa, FL 33602


For the Defendant:  DAVID WEISBROD
Michael Jimenez   Law Office of David T. Weisbrod
        Suite 1111, 412 E Madison St
        Tampa, FL 33602

```
   For the Defendant:      JEFFREY G. BROWN
   Johana Melendez         Brown & Doherty, PA
   Santiago                Suite 120, 450 Carillon Pkwy
                           St. Petersburg, FL 33716


   For the Defendant:      MATTHEW P. FARMER
   Marie Mason             Farmer & Fitzgerald, PA
                           708 E Jackson St.
                           Tampa, FL 33602



   Reported By:            Sandra K. Provenzano, RPR
                           Official Court Reporter
                           U.S. District Court
                           801 North Florida Avenue
                           Tampa, FL 33602
                           (813) 301-5699

STENOGRAPHICALLY REPORTED
COMPUTER-AIDED TRANSCRIPTION
```

P R O C E E D I N G

THE COURT:  All right.  Unless everyone agrees to all of the proposed instructions, it would be my intent just to run through them one at a time quickly and ask if anybody has any objections and then just ask whatever objections those are.

So, Mr. O'Neill, let me just confirm.  Does the government have some objections to some of the instructions?

MR. O'NEILL:  Not objections, Your Honor, no.  A real technical -- just a word.

THE COURT:  Oh, okay.  Well, let's do that first.

MR. O'NEILL:  Okay.  On Page 11, Your Honor, which would be Instruction 13.2 --

THE COURT:  Yes.

MR. O'NEILL: -- the last sentence of the first paragraph --

THE COURT:  Yes.

MR. O'NEILL: -- where it says in other words, the defendants are charged with conspiring to commit two separative substantive crimes.  Technically the conspiracy to defraud is not a substantive crime.  It doesn't matter to me, Your Honor.  It just hit me when I was reading it.

1          THE COURT:  Okay.  We probably just pulled

2    that out of the standard instruction.  Hold on just a

3    minute.  Let me look.  That's what I'm assuming we did.

4    Yeah, we pulled it out of the standard instruction.  I

5    don't know if it was in your instruction or not.  So what

6    would you suggest, that we just drop the substantive?

7          MR. O'NEILL:  Yes, Your Honor.

8          THE COURT:  All right.  Mr. Weisbrod,

9    Mr. Brown or Mr. Farmer, any objections to that?

10          MR. WEISBROD:  No, Your Honor.

11          MR. BROWN:  No, Your Honor.

12          THE COURT:  I'll pull it out.

13          MR. O'NEILL:  Nothing further, Your Honor.

14          THE COURT:  Well, that was easy.  All right.

15    Then maybe since that's the case the easiest thing to do

16    would be then to go to the defense and ask about

17    objections or corrections or suggestions, however you

18    would like to frame it.

19          MR. WEISBROD:  Your Honor, on Special 2.2

20    modified, the only thing that --

21          THE COURT:  What instruction is that and

22    what page.

23          MR. WEISBROD:  Page 7, Special 2.2.

24          THE COURT:  Got you.

25          MR. WEISBROD:  We would just prefer that the

1    Court take out confession and just the words "confession

2    or."

3                THE COURT:  You're talking about in the

4    heading?

5                MR. WEISBROD:  Yes.

6                THE COURT:  I was going to pull all the

7    headings off.

8                MR. WEISBROD:  Okay.

9                THE COURT:  So don't worry about what it

10   says.  That's just for your benefit and my benefit to be

11   able to go to that instruction.  So, yeah, I'm going to

12   pull all the headings off.

13                MR. WEISBROD:  Uhm, you had also mentioned

14   yesterday selecting I believe it's 9.1A --

15                THE COURT:  Yes.

16                MR. WEISBROD:  -- instead of 9.1B.  That's

17   Page 21.

18                THE COURT:  Yes.

19                MR. WEISBROD:  When I went back and looked

20   at the pattern instructions on the 11th Circuit Web site

21   it seems to me that the differences as they describe it

22   in A and B is that B is for more specific intent crimes.

23                And I think given the definitions that we

24   have and the essential elements for Counts II and III, I

25   think this is more of a specific intent crime and

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    therefore 9.1B would be more applicable.

2          THE COURT:  Okay.  I tell you -- and I don't

3    disagree with what you've said about specific intent

4    crimes.  But I'll tell you why I chose 9.1A and I know

5    you suggested B, the government suggested A.  But I went

6    back and looked through the annotations and the comments.

7    And under 9.1A it says, among other things, for crimes

8    requiring a particularized knowledge of the law being

9    violated, such as the tax and currency structuring

10   statutes use 9.1B's definition of willfulness.

11          And then it -- it goes on to talk about the

12   committee recommends that the definition of willfully in

13   9.1B be given for offenses that include currency

14   structuring statutes, certain tax laws which tend to

15   involve highly technical statutes.  And then it goes onto

16   talk about the complexity of the tax laws and that sort

17   of thing.

18          And since I didn't think that the defrauding

19   the United States, for example, falls into that category

20   and also because of the fact that you asked for the good

21   faith defense -- and I suppose if I were -- you know,

22   when you give 9.1 B -- and the only time I think I've

23   ever given that is maybe with a tax case.  Normally you

24   go through and give that good faith defense as it relates

25   to tax cases and that sort of thing.  So it -- it to me

1    just didn't seem to fit.

2            But let me see what Mr. O'Neill says.

3            MR. O'NEILL:  Your Honor, the government's

4    contention is this is not a specific intent crime such as

5    tax, such as an Arms Export Control Act violation where

6    the government must specifically know that the defendant

7    is aware of the regulatories or criminal scheme.  That is

8    not the case here.

9            THE COURT:  All right.  And I agree.  So I

10   will -- I'll note the objection to my giving 9.1A instead

11   of 9.1B, but that's what I'm going to give.

12           MR. WEISBROD:  Your Honor, can I just take

13   30 seconds to highlight --

14           THE COURT:  Sure.

15           MR. WEISBROD:  In the mail fraud

16   instruction, 50.2, you specifically tell the jury -- and

17   I don't think anyone --

18           THE COURT:  All right.  Hold on.  What page?

19           MR. WEISBROD:  I'm sorry.  Page 16.  To act

20   with intent to defraud means to act knowingly and with

21   the specific intent to deceive someone, usually for

22   personal financial gain or to cause financial loss to

23   someone else.

24           So I understand the distinction between the

25   highly technical offenses and the generalized willfulness

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    that's contained within 9.1A.  But, again, given the

2    specificity with which the jury is being told the intent

3    must be found in this case that's why I think the B

4    version's got --

5            THE COURT:  Okay.  I note the objection.

6    I'm still going to give 9.1A.

7            MR. WEISBROD:  Your Honor, while we're on

8    Page 16 --

9            THE COURT:  Yes.

10           MR. WEISBROD:  -- at the bottom the sentence

11   that starts with so if an official does something or

12   makes a decision that serves the official's personal

13   interest by, for example, taking a bribe or kickback, I

14   would suggest the Court that you take "for example" out.

15   That it has to be by bribe or kickback.

16           THE COURT:  All right.  So your suggestion

17   is to pull -- so it would read public officials and

18   public employees must act in the public's interest.  In

19   other words, they have a duty to the public to do what's

20   best and what's right for the public.

21           So if an official does something or makes a

22   decision that serves the official's personal interest by

23   taking a bribe or a kickback, the official employee

24   defrauds.  Is that the way you would suggest?

25           MR. WEISBROD:  Yes, ma'am.

1          THE COURT:  Mr. O'Neill, any problem with
2     that?
3          MR. O'NEILL:  No, Your Honor.
4          THE COURT:  I'll put it out and the commas.
5          MR. WEISBROD:  Being an excellent
6     grammarian.
7          THE COURT:  Being an excellent grammarian.
8     I pride myself on it as well.
9          MR. WEISBROD:  May I have a moment with
10    Mr. Farmer?
11         MR. FARMER:  Your Honor, I think I'd step in
12    on Page 7.  The body of that instruction I think we would
13    both request -- Mr. Weisbrod and I would request to take
14    out the word "admission:
15         THE COURT:  Okay.  Hold on just a minute.
16    Let me find 7 --
17         MR. FARMER:  Page 7.
18         THE COURT:  Mr. O'Neill.
19         MR. O'NEILL:  Your Honor, there were
20    admissions in that statement.  But I think I'd go one
21    step further.  I'm not sure it really has much relevance
22    to this particular case.  Obviously that pattern is in
23    there for an oral statement to -- made to a police
24    officer an agent after an arrest.  This is a tape.  I'm
25    not sure if it'll confuse.  I have no strong interest one

1    way or the other, Your Honor, but I'm not sure the

2    defense would want it in much more.  But there were

3    admissions.

4              THE COURT:  Do you want to pull it out or

5    you want to leave it in?

6              MR. WEISBROD:  I would want it in, Your

7    Honor.

8              THE COURT:  Okay.  Well, and I think they

9    made admissions as well so I'm going to overrule that

10   suggestion to add that word.

11             Anything else?

12             MR. FARMER:  Your Honor, I do have

13   something.

14             THE COURT:  Okay.

15             MR. FARMER:  I should step in.  I think that

16   the general conspiracy instruction and the second clause

17   conspiracy instruction might be --

18             THE COURT:  Can you tell me what page you're

19   on.

20             MR. FARMER:  Sure.

21             The general starts at Page 9 and goes

22   through 10.  And the second clause conspiracy starts at

23   12 and goes to 13.

24             THE COURT:  Okay.

25             MR. FARMER:  It look like the second clause

1    instruction on Page 12 and 13 incorporates -- and I'm

2    trying to just confirm this -- but it looks like it

3    incorporates the entirety of the general conspiracy

4    charge.  And I'm just trying to match them up.  It looks

5    like it goes a little bit further, but it does

6    incorporate everything that we see on Pages 9 and 10.

7                    THE COURT:  Okay.  So --

8                    MR. FARMER:  And I would ask that we just go

9    with the second clause instruction on Page 12 and 13.

10                   THE COURT:  All right.  Then your suggestion

11   would be to leave out 13.1 in its entirety?

12                   MR. FARMER:  Yes.

13                   THE COURT:  All right.  Mr. O'Neill?

14                   MR. O'NEILL:  Your Honor, point well taken

15   by Mr. Farmer.  There's two ways of doing that.  The

16   other way would be to just on 13.6 on Page 12 leave in

17   the first two sentences because those are different.  The

18   rest starting with a conspiracy is word for word, in my

19   estimation, on the two.

20                   Again, I would defer to the Court.  I don't

21   think it's the government's perspective that big an issue

22   either way.  I think it should be in on 13.6 just for the

23   first two sentences.  But if the Court thinks otherwise,

24   I have no objection.

25                   THE COURT:  Do we define defraud anywhere

else?

MR. O'NEILL:  No, Your Honor, not that I'm aware of because that's specifically what the prong of the 371 is is to defraud the United States.

THE COURT:  Well, then, why don't we -- well, okay.  Then, Mr. O'Neill, would you -- what if we just give 13.6 and not 13.1.

MR. O'NEILL:  Again, Your Honor, I really have no objection to that.

THE COURT:  All right.  And is that acceptable to you, Mr. Farmer?

MR. FARMER:  Yes.

THE COURT:  All right.  Then we'll take that out.

All right.  Let me reiterate what we have the changes that -- and they are minor -- that we've decided to make here.  We're taking out 13.1.  That's the instruction on Page 9 and 10.

On Page 11 we are striking in the first paragraph, last line the word "substantive."

On Page 16 we are in the last paragraph taking out "for example" and the commas in the for example and I believe that's it.

Mr. O'Neill did you get a chance to look at the verdict form?

1          MR. O'NEILL:  Yes, Your Honor.  No

2    objection.

3          THE COURT:  All right.  Mr. Weisbrod, the

4    verdict form any problems -- or forms I should say.

5    There are three separate forms.

6          MR. WEISBROD:  If I could have just

7    30 seconds.  No objection.

8          MR. BROWN:  No objection, Your Honor.

9          THE COURT:  All right.  Mr. Farmer?

10         MR. FARMER:  No objection.

11         THE COURT:  All right.  Thank you.

12         Miss Melendez, your co-teacher at

13   Hillsborough Community College, I used to at one point be

14   a teacher and they're making fun of that.  We're

15   certainly not making fun of her in any way.  It's a

16   wonderful talent to be an excellent grammarian.

17         All right.  Give us a few minutes to get

18   these instructions, these minor changes.  We'll make

19   copies for the jury and we will instruct the jury when

20   they return.

21         Mr. O'Neill, and I didn't ask you this

22   yesterday, you had indicated -- again, how do you want to

23   divide your time up?

24         MR. O'NEILL:  I was thinking a half hour and

25   15 minutes, Your Honor.

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
 1                THE COURT:  Yeah, okay.  And do you want us
 2    to tell you when you've used the 30 minutes or your agent
 3    going to tell you or you're going to be responsible or
 4    what?
 5                MR. O'NEILL:  If you could do that, Judge,
 6    that would be great.
 7                THE COURT:  Okay.
 8                MR. O'NEILL:  And I would ask a little
 9    flexibility if each of the counsel are going 45 minutes.
10                THE COURT:  I understand.
11                MR. O'NEILL:  Okay.
12                MR. WEISBROD:  Your Honor, we're going to do
13    summations if the Court allows in the same order we did
14    openings.  Mr. Brown would go first, I would go second
15    and then Mr. Farmer third.
16                THE COURT:  Okay.  Thank you.  Okay.  All
17    right.  Hopefully we can do this in about 10 minutes or
18    15 minutes.
19                COURT SECURITY OFFICER:  All rise.
20    (THEREUPON, A RECESS WAS TAKEN, AND THEN THE PROCEEDINGS
21                    CONTINUED AS FOLLOWS:)
22                COURT SECURITY OFFICER:  All rise, please,
23    for the Court.  This Honorable Court is again in session.
24    Be seated.  Come to order.
25                THE COURT:  All right.  Anything before I
```

1    bring the jury in?

2                MR. O'NEILL:  Not from the government, Your

3    Honor.

4                MR. WEISBROD:  No, Your Honor.

5                THE COURT:  Let's bring the jury in.

6                COURT SECURITY OFFICER:  Yes, Your Honor.

7                THE COURT:  We're going to order lunch for

8    the jurors about 1:00 or 1:15, something like that.  That

9    way they can start deliberating and eat at the same time.

10               MR. O'NEILL:  Thank you, Judge.

11                    (PAUSE IN PROCEEDING.)

12               COURT SECURITY OFFICER:  All rise, please,

13   for the jury.

14       (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

15               COURT SECURITY OFFICER:  Thank you, ladies

16   and gentlemen.  Please be seated.

17               THE COURT:  Good morning.  Ladies and

18   gentlemen, did anything happen over the evening hours

19   that any of you feel could affect your ability to serve

20   on this jury in any way?

21               Should there have been reports in the news

22   media, television, newspapers, did any of you read

23   anything or watch anything or listen to anything about

24   the case?

25               MEMBERS OF THE JURY:  (Shakes heads.)

1        THE COURT:  All right.  Any questions that

2   you might have of me before we begin?

3        Let me just generally outline for you what

4   we're going to do today.  Uhm, I'm going to in just a few

5   minutes pass out jury instructions to you and then we're

6   going to read through them.

7        After I have given you the instructions in

8   the law the attorneys are going to make a closing or

9   final argument.  After they have done that then I will

10  send you back to the jury room to deliberate in this

11  case.

12        I anticipate that that won't be before --

13  depending on if we break and that sort of thing 1:00 or

14  1:30.  So it'll be later on.  We -- I did ask Miss Vizza

15  and she's agreed to order lunch.  So we'll bring

16  sandwiches into the jury room and you'll have to get

17  Cokes or water or something like that.  But we'll give

18  you lunch so you won't have to go out and break apart and

19  get lunch.  And that should help you as far as your time

20  anyway in deliberating on the case.

21        Okay.  Would you please pass out the jury

22  instructions, Mr. Adkins.

23        COURT SECURITY OFFICER:  Yes, Your Honor.

24        THE COURT:  All right.  Ladies and

25  gentlemen, I'm going to ask you that you follow along.  I

am going to read the instructions aloud.  You have the

same copy that I am reading from.  These instructions

will go back with you.  You'll each be able to take back

a copy of the instructions back with you for your

deliberations.

It is my duty to instruct you on the rules

of law that you must apply and use in deciding this case.

After I have completed the instructions -- and this is a

little different -- but after I have completed the

instructions we'll have the closing argument by the

attorneys and then you will go to the jury room to begin

your discussions, your deliberations.

You must decide whether the government has

proved the specific facts necessary to find the

defendants guilty beyond a reasonable doubt.

Are your decision must be based only on the

evidence presented here in this courtroom.  You must not

be influenced in any way by either sympathy for or

prejudice against the defendants or the government.

You must follow the law as I explain it to

you even if you do not agree with the law and you must

follow all of my instructions as a whole.  You may not

single out or disregard any of the Court's instructions

on the law.

The Indictment or formal charge against the

1    defendants isn't evidence of guilt.  The law presumes

2    every defendant is innocent.

3            The defendants do not have to prove their

4    innocence or produce any evidence at all.  The government

5    must prove beyond a reasonable doubt guilt.  And if it

6    fails to do so, you must find the defendants not guilty.

7            The government's burden of proof is heavy,

8    but it doesn't have to prove a defendant's guilt beyond

9    all possible doubt.  The government's proof only has to

10   exclude any reasonable doubt concerning the defendant's

11   guilt.

12           A reasonable doubt is a real doubt based

13   upon reason and common sense after you've carefully and

14   impartially considered all of the evidence in the case.

15   Proof beyond a reasonable doubt is proof so convincing

16   that you would be willing to rely and act on it without

17   hesitation in the most significant or most important of

18   your own affairs.

19           If you are convinced that the defendants

20   have been proven guilt beyond a reasonable doubt, then

21   say so.  And if you are not convinced, then say so.

22           As I said before, you must consider only the

23   evidence that I have admitted in the case.  Evidence

24   includes the testimony of witnesses and the exhibits

25   admitted, but anything the lawyers say is not evidence

1    and is not binding upon you.

2         You shouldn't assume from anything I've said

3    that I have any opinion about any factual issue in the

4    case.  Except for my instructions to you on the law you

5    should disregard anything I may have said during the

6    trial in arriving at your own decision about the facts.

7    Your own recollection and interpretation of the evidence

8    is what matters.

9         In considering the evidence you may use

10   reasoning and common sense to make deductions and reach

11   conclusions.  You shouldn't be concerned about whether

12   the evidence is direct or circumstantial.

13        Direct evidence is the testimony of a person

14   who asserts that he or she has actual knowledge of a

15   fact, such as an eyewitness.

16        Circumstantial evidence is proof of a chain

17   of facts and circumstances that tend to prove or disprove

18   a fact.  And there's no legal significance in the weight

19   you may give to either direct or circumstantial evidence.

20        When I say you must consider all of the

21   evidence, I don't mean that you must accept all of the

22   evidence as true or accurate.  You should decide whether

23   you believe what each witness had to say and how

24   important that testimony was.  And in making that

25   decision you may believe or disbelieve any witness in

whole or in part.  The number of witnesses testifying

concerning a particular point doesn't necessarily matter.

To decide whether you believe any witness I

suggest you ask yourself a few questions.  Did the

witness impress you as one who was telling the truth?

Did the witness have any particular reason not to tell

the truth?  Did the witness have a personal interest in

the outcome of the case?  Did the witness seem to have a

good memory?

Did the witness have the opportunity and

ability to accurately observe the things he or she

testified about?  Did the witness appear to understand

the questions clearly and answer them directly?  Did the

witness' testimony differ from the other testimony or the

other evidence?

You should also ask yourself whether there

was evidence that a witness testified falsely about an

important fact.  And ask whether there was evidence that

at some other time a witness said or did something or

didn't say or do something that was different from the

testimony the witness gave during the trial.

But keep in mind that a simple mistake

doesn't mean a witness wasn't telling the truth as he or

she remembers it.  People naturally tend to forget some

things or remember them inaccurately.  So if a witness

misstated something you need to decide whether it was because of an innocent lapse of memory or an intentional deception. And the significance of your decision may depend on whether the misstatement is about an important fact or an unimportant detail.

If the government offers evidence that a defendant made a statement or admission to someone, you must consider the evidence with caution and great care. You must decide for yourself, one, whether the defendant made the statement and, two, if so, how much weight to give to it. To make these decisions you must consider all of the evidence about the statement including the circumstances under which it was made.

The Indictment charges three separate crimes. And let me just again remind you you will have a copy of the Indictment back with you in the jury room. The Indictment charges three separate crimes called counts against the defendants. Each count has a number and you'll be given a copy of the Indictment to refer to in your deliberations.

Count I charges that the defendants knowingly and willfully conspired to defraud the United States in connection with the operation of the Hillsborough County Head Start/Early Head Start program and to commit an offense against the United States by

obtaining by fraud and knowingly converting and

intentionally misapplying property that is valued at

$5,000 and more and is owned by and is under the care,

custody and control of Hillsborough County Head

Start/Early Head Start.

Counts II and III charge that the defendants

committed what are called substantive offenses.

Count II charges that the defendant obtained

by fraud and intentionally misapplied property valued at

$5,000 and more owned by and under the care, custody and

control of the Hillsborough County Head Start/Early Head

Start.

And Count III charges that the defendants

used the United States mail to carry out a scheme to

fraudulently deprive the citizens of Hillsborough County

and Hillsborough County Head Start/Early Head Start

programs of a right to honest services.

And I will explain the law governing those

substantive offenses in a moment, but first you need to

know that the defendants are not charged in Count I with

committing a substantive offense.  They are charged with

conspiring to commit that offense.  And I'm going to give

you specific instructions on conspiracy.

In this case regarding the alleged

conspiracy the Indictment charges that the defendants

knowingly and willfully conspired to defraud the United

States for the purpose of impeding, impairing,

obstructing and defeating the lawful government functions

of the Department of Health and Human Services in the

operation of the Hillsborough County Head Start/Early

Head Start program, and to commit an offense against the

United States, that is being an agent of an organization

and of a state and local government in any agency thereof

which received federal assistance in excess of $10,000 in

a one-year period to obtain by fraud and otherwise

without authority knowingly convert to the use of any

person other than the rightful owner and intentionally

misapplied property that is valued at $5,000 and more and

is owned by and is under the care, custody and control of

such organization government and agency.

In other words, the defendants are charged

with conspiring to commit two separate crimes.

The government does not have to prove that a

defendant willfully conspired to commit both crimes, but

it is sufficient if the government proves beyond a

reasonable doubt that a defendant willfully conspired to

commit one of those crimes.  But to return a verdict of

guilty you must all agree on which of the two crimes a

defendant conspired to commit.

It is a federal crime for anyone to conspire

or agree with someone else to defraud the United States
or any of its agencies.  To defraud the United States
means to cheat the government out of property or money or
to interfere with any of its lawful governmental
functions by deceit, craft or trickery.

A conspiracy is an agreement by two or more
persons to commit an unlawful act.  In other words, it's
a kind of a partnership for criminal purposes.  Every
member of the conspiracy becomes the agent or partner of
every other member.

The government does not have to prove that
all people named in the Indictment were members of the
plan or that those who were members made any type of
formal agreement.

The heart of a conspiracy is the making of
the unlawful plan itself, so the government does not have
to prove that the conspirators succeeded in carrying out
the plan.

The government does not have to prove that
the members planned together all the details of the plan
or the overt acts that the Indictment charges would be
carried out in an effort to commit the intended crime.

The defendant can be found guilty of this
crime only if the following are proved beyond a
reasonable doubt:

One, two or more persons in some way agree to try to an accomplish a shared and unlawful plan.

Two, the defendant knew the unlawful purpose of the plan and willfully joined in it.

Three, during the conspiracy one of the coconspirators knowingly engaged in at least one overt act described in the Indictment.

And, four, the overt act was knowingly committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

An overt act is any transaction or event, even one which may be entirely innocent when viewed alone, that a conspirator commits to accomplish some object of the conspiracy.

A person may be a conspirator even without knowing all the details of the unlawful plan or the names and identities of all of the other alleged coconspirators.

If the defendant played only a minor part in the plan but had a general understanding of the unlawful purpose of the plan and willfully joined in the plan on at least one occasion that's sufficient for you to find the defendant guilty. But simply being present at the scene of an event or merely associating with certain

1    people and discussing common goals and interests doesn't

2    establish proof of a conspiracy.  Also, a person who

3    doesn't know about a conspiracy but happens to act in a

4    way that advances some purpose of one does not

5    automatically become a conspirator.

6              It is a federal crime for anyone who is an

7    agent of a local government or a local governmental

8    agency receiving significant benefits under a federal

9    assistance program to obtain by fraud or intentionally

10   misapply property that is valued at $5,000 or more and is

11   owned by or is under the care, custody and control of

12   such organization, government or agency.

13             The defendant can be found guilty of this

14   crime only if all of the following facts are proven

15   beyond a reasonable doubt:

16             One, the defendants Michael Jimenez and

17   Marie Mason were agents of Hillsborough County Head

18   Start/Early Head Start.

19             Two, on or about June 24, 2010, the

20   defendants obtained by fraud or intentionally misapplied

21   property that is valued at $5,000 or more.

22             Three, the property was under -- I'm sorry.

23   The property was owned by or under the care, custody or

24   control of Hillsborough County Head Start/Early Head

25   Start.

1          And, four, during the calendar year 2010 the

2   Hillsborough County Head Start/Early Start received

3   federal assistance in excess of $10,000.

4          As used in this instruction the term "agent"

5   means a person authorized to act on behalf of

6   Hillsborough County Head Start/Early Head Start and

7   includes a servant, employee, partner, director, officer,

8   manager or representative.

9          To obtain by fraud means an act knowingly --

10  to act knowingly and with the intent to deceive or cheat,

11  usually for the purpose of causing a financial loss by

12  someone else or bringing about a financial gain to one's

13  self or another.

14         To misapply means to use the funds or

15  property of Hillsborough County Head Start/Early Head

16  Start knowing that such use is unauthorized or

17  unjustifiable or wrongful.

18         Misapplication includes the wrongful taking

19  or use of the money or property of Hillsborough County

20  Head Start/Early Head Start by its agent for his or her

21  own benefit or the use or benefit of some other person or

22  an unauthorized purpose even if such use benefitted

23  Hillsborough County Head Start/Early Head Start.

24         And I'm on Page 14.  It is a federal crime

25  to use the United States mail to carry out a scheme to

fraudulently deprive someone else of a right to honest services.

The defendant can be found guilty of this crime only if all the following facts are proven beyond a reasonable doubt:

One, the defendant knowingly devised or participated in a scheme to fraudulently deprive the public of the intangible right of honest services.

Two, the defendant did so with an intent to defraud.

And, three, the defendant used the United States Postal Service by mailing or causing to be mailed some manner or thing to carry out the scheme to defraud.

A scheme includes any plan or course of action intended to deceive or cheat someone.

To act with the intent to defraud means to act knowingly and with the specific intent to deceive someone, usually for personal financial gain or to cause financial loss to someone else.

To deprive someone else of the intangible right of honest services is to violate or to cause a public official or employee to violate a duty to provide honest services to an employer.

Public officials and public employees must act in the public's best interest.  In other words, they

have a duty to the public to do what's best and what's right for the public.

So if an official does something or makes a decision that serves the official's personal interest by taking a bribe or kickback, the official or employee defrauds the public of honest services even if the public agency suffers no monetary loss.

A kickback is any kind of secret payment or reward a person gives to an employee who has been dealing in the course of employment with that person so that the employee's personal financial interest interferes with the employee's obligation to get the best deal for the employer.

The government does not have to prove all the details alleged in the Indictment about the precise nature and purpose of the scheme.  It doesn't have to prove the material mailed was itself false or fraudulent or that the use of the mail was intended as the specific or exclusive way to carry out the alleged fraud or that the defendant actually mailed the material and it doesn't have to prove that the alleged scheme actually succeeded in defrauding anyone.

To cause the mail to be used is to do an act knowing that the use of the mail will follow in the ordinary course of business or where the use can

reasonably be expected to follow.  Each separate use of the mail as a part of the scheme to defraud is a separate crime.

It is possible to prove a defendant's guilt of a crime even without evidence that the defendant personally performed every act charged.

Ordinarily, any act a person can do may be done by directing another person or agent or may be done by acting with or under the direction of others.

A defendant aids and abets a person if the defendant joins with the person to commit a crime.  A defendant is criminally responsible for the acts of another person if the defendant aids and abets the other person.

A defendant is also responsible if a defendant willfully directs or authorizes the acts of an agent, employee or other associate.

But finding that a defendant is criminally responsible for the acts of another person requires proof that the defendant intentionally associated with or participated in the crime, not just proof that the defendant was simply present at the scene of a crime or knew about it.  In other words, you must find beyond a reasonable doubt that a defendant was a willful participant and not merely a knowing spectator.

1          I'm on Page 17.  Good faith is a complete

2   defense to a charge that requires intent to defraud.

3          A defendant isn't required to prove good

4   faith.  The government must prove intent to defraud

5   beyond a reasonable doubt.

6          An honestly held opinion or an honestly

7   formed belief cannot be fraudulent intent even if the

8   opinion or belief is mistaken.  Similarly, evidence of a

9   mistake in judgment, an error in management or

10  carelessness can't establish fraudulent intent.

11         But an honest belief that a business venture

12  would ultimately succeed doesn't constitute good faith if

13  the defendant intended to deceive others by making

14  representations the defendant knew to be false or

15  fraudulent.

16         In these charges the government has -- I'm

17  sorry, the Court has reviewed the pertinent parts of the

18  federal statutes or law which are alleged to have been

19  violated.  And where a statute specifies certain

20  alternative ways in which an offense may be committed the

21  Indictment may allege the several ways in the

22  conjunctive, that is by using the word "and."

23         Therefore, if only one of the alternatives

24  is proved beyond a reasonable doubt that's sufficient for

25  a conviction so long as the jury agrees unanimously as to

1   at least one of the alternatives.

2          You'll see that the Indictment charges that

3   the crime was committed on or about a certain date.  And

4   the government doesn't have to prove the crime occurred

5   on the exact date.  The government only has to prove

6   beyond a reasonable doubt that the crime was committed on

7   a date reasonably close to the date alleged.

8          The word "knowingly" means that an act was

9   done voluntarily and intentionally and not because of

10  mistake or accident.

11         The word "willfully" means the act was

12  committed voluntarily and purposely with the intent to do

13  something the law forbids, that is with bad purpose to

14  disobey or disregard the law.

15         While a person must have acted with the

16  intent to do something the law forbids, before you can

17  find the person acted willfully the person need not be

18  aware of the specific law or rule that his or her conduct

19  may be violating.

20         Each count of the Indictment charges a

21  separate crime against one or more of the defendants and

22  you must consider each crime and the evidence relating to

23  it separately.  And you must consider the case of each

24  defendant separately and individually.  If you find the

25  defendant guilty of one crime that must not affect your

verdict for any other crime or any other defendant.

I caution you that each defendant is on trial only for the specific crimes charged in the Indictment and you are here to determine from the evidence in the case whether each defendant is guilty or not guilty of those specific crimes.

You must never consider punishment in any way to decide whether a defendant is guilty. If you find the defendant guilty the punishment is for the judge alone to decide later.

In this case you've been told you can take notes. And we've handed out pads and many of you, maybe all of you have taken notes. You will have your notes available to you during your deliberations, but you should make use of them only as an aid to your memory. In other words, you should not give your notes any precedent over your independent recollection of evidence or the lack of evidence.

And neither should you be unduly influenced by the notes of other jurors. And, again, I emphasize that notes are not entitled to any greater weight than the memory or impression of each juror as to what the testimony may have been.

Your verdict, whether it's a guilty verdict or a not guilty verdict, must be unanimous. In other

1   words, you must all agree.  Your deliberations are secret

2   and you will never have to explain your verdict to

3   anyone.

4           Each of you must decide the case for

5   yourself, but only after fully considering the evidence

6   with the other jurors.  So you must discuss the case with

7   one another and try to reach an agreement.

8           And while you're discussing the case don't

9   hesitate to reexamine your own opinion, change your mind

10  if you become convinced you're wrong, but don't give up

11  your honest belief because the others think difficultly

12  or because you simply want to get the case over with.

13          And remember that in a real way you're the

14  judges here.  You are the judges of the facts of this

15  case.  And your only interest is to seek the truth from

16  the evidence in the case.

17          Now, I'm going to hold some of this

18  instruction on Page 23 until after the closing arguments.

19          I do want to tell you that I will send back

20  with you three verdict forms.  You don't have copies of

21  those verdict forms, but -- and the attorneys may or may

22  not refer to them in their closing arguments.

23          But I will tell you that there is a verdict

24  form for Michael Jimenez, Johana Melendez Santiago and

25  Marie Mason, three separate verdict forms.  And I'm going

to read the verdict form to you at this time.  It reads as follows:

Count I of the Indictment.  As to the conspiracy -- as to the offense of conspiracy to commit offenses against the United States, in violation of 18 United States Code, Section 371, we, the jury find the defendant -- and there's a line for you to check guilty or not guilty once you've unanimously reached a verdict.

Count II of the Indictment.  As to the offense of fraud or misapplication of funds concerning programs receiving federal funds, in violation of 18 United States Code, Sections 661(a)(1)(A)(i) and (2) and (ii), we, the jury, find the defendant -- again, a line to check guilty or not guilty.

Count III.  As to the offense of honest services mail fraud, in violation of 18 United States Code, Sections 1341, 1346 and (2), we, the jury, find the defendant -- and again there's a line to check guilty or not guilty.

So say we all this blank day of July 2011.  And there's a place for the foreperson to sign.

Now, I'm going to talk to you about the selection of a foreperson and give you one other instruction after the attorneys make their closing argument.

1          Let me tell you just a minute about closing

2     arguments.  And I think I mentioned this at the beginning

3     of the trial.  Closing arguments are an opportunity for

4     the attorneys to review with you the evidence that's been

5     presented in this case.  And I'm sure that's what they're

6     going to do.  You recall the evidence differently, I

7     encourage you to rely on your recollection of the

8     evidence.

9          Now, they may be referring to pieces of

10    evidence during the closing argument.  You're going to

11    have the evidence back with you in the jury room.  So if

12    you get concerned and think, well, I need to take a

13    better look at that, keep in mind that all of the

14    evidence that was received will go back with you to the

15    jury room and you look at it back in the jury room.

16         What the attorneys say to you in closing

17    argument is not evidence and you should not consider it

18    as such.  You should listen closely to the closing

19    arguments, but, again, they're not evidence.

20         Both sides will have -- meaning each

21    attorney will have an equal amount of total time to

22    address you in closing arguments, but it will be divided

23    up as follows, and I'll tell you the order.  Mr. O'Neill,

24    because Mr. O'Neill on behalf of the United States has

25    the burden of proof will go first.

1       After he has made an opening -- an opening

2   closing argument then Mr. Brown will present a closing

3   argument on behalf of his client, Mr. Weisbrod will be

4   presenting a closing argument on behalf of Mr. Jimenez

5   and Mr. Farmer will be presenting a closing argument on

6   behalf of Miss Mason.

7       After they have finished then Mr. O'Neill

8   will have an opportunity to present a rebuttal argument

9   to you on behalf of the United States.

10      Now, I anticipate we will take at some point

11  in time a recess during the course of closing arguments.

12  I'll try to do it so it doesn't interrupt anybody's

13  closing argument.  But if anybody needs to recess at a

14  time I'm not recessing please let me know.

15      Mr. O'Neill, you may make a closing argument

16  on behalf of the United States at this time.

17      MR. O'NEILL:  Thank you, Your Honor.

18      May it please the Court, Judge Bucklew,

19  counsel.

20      Ladies and gentlemen of the jury, good

21  morning.  Before I begin I'd like to thank you for your

22  attention you've shown through this trial.  I know it's

23  been a rather short trial but it's hard sometimes to sit

24  there -- we're very cognizant of that -- and listen to

25  people and just try to listen and sitting there the whole

time.  It's not always easy.  And we thank you because your presence is absolutely essential to the system of justice that we have in this country.

I told you in opening statement that this was a very straightforward but serious case.  And it's serious because it's affects public corruption and it affects public employees acting out of their own self interest, not for the interest of the public who they serve and who pays their salaries, many times very decent salaries.

Her Honor has stated the government has the burden of establishing guilt in this case beyond a reasonable doubt.  And that's why I'm going to show you what we've done now.  And as she stated, it's a heavy burden but not an impossible task.  That is not imposed on the government.

It's the same burden imposed in every criminal case in every courtroom in this country whether it be on the federal or state level.  In every criminal case the government has the burden of showing the defendant's guilt beyond a reasonable doubt.

I want to mention a couple concepts.  Her Honor has stated sympathy, prejudice play no role either for the government or against the government.  It's a dispassionate analysis based on the facts.

1          As her Honor has stated, you're the judges

2     of the facts.  You have to determine what they are.  I

3     can't tell you what they are, counsel cannot tell you

4     what they are.  Her Honor would not even tell you what

5     the facts are.  That is your domain.  You will take those

6     facts and apply them to the law that her Honor has just

7     given you.

8          Now, in looking at the evidence you've heard

9     use your common sense and reasoning and make the

10    deductions and inferences that naturally draw from them.

11         You know, when you look at what this case is

12    about it sort of comes down to one witness, Idalin

13    Navejar, and what she said.  When she was asked on

14    cross-examination what makes this different when

15    Miss Melendez Santiago may have done things and

16    volunteered, what makes this different, she said the

17    money.  That's why we're here.

18         There's a song now that's being played on a

19    lot of the kid's stations.  I have a rather sophomoric

20    taste in music so I do listen to things like 93.3 on

21    occasion or the new 101.5, sad to say.  But the refrain

22    in the song is it's not about the money, money, money.

23    I'm not going to sing it, trust me.

24         But it is about the money in this case.

25    That's what it's all about.  You know, you're a public

employee.  You cannot take the money.  You cannot use

your public employee status to benefit yourself

privately.

Let's go through the witnesses.  I'd like to

go through them rather briefly even though you've heard

them all to show you what the significance was from the

government's standpoint.

The first witness was Mr. Bartholomew Banks.

You might recall he was a sort of overview or lead off

witness.  The purpose of Mr. Banks testifying was to show

that the Hillsborough County Head Start/Early Head Start

program is designed to help those less fortunate in

society, those who are economically disadvantaged,

particularly children, as we heard, from the ages of six

weeks to five years.  And that's what it is.

We also heard that it's a county government

agency, but much of the financing comes through the

United States Department of Health and Human Services and

there's some matching funds from the county.

The next witness was Marecia Bell.  You

remember Miss Bell.  She was the nurse.  She had only

worked there from late 2009 to late 2010.  In fact, the

day she was interviewed by Bob Sheehan, the investigator,

was the day she had resigned because of other matters.

And she was not happy there and didn't like what was

going on.  That's irrelevant to this case because those

issues were -- were different.  But she had resigned.

Miss Bell was the nurse.  And you recall she

was in the health section.  You will also recall that she

stated Miss Mason and Mr. Jimenez came up to her and

stated we'd like you to look at this book.  We'd like you

to give an opinion whether we should purchase this book.

And you all recall what her opinion was.  She said I

didn't think it was appropriate.

At the time she didn't know who Johana

Melendez Santiago was.  Now, you've heard repeatedly that

everybody knew.  Well, that presupposed you were at the

inservice in 2007 and the inservice in 2009.  Since she

did not become an employee till late 2009 she was at

neither one.  Was it a coincidence that the book was

given to the one person there that for sure did not know

Johana Melendez Santiago?

Miss Mason and Mr. Jimenez give her the book

and ask for her opinion.  The one thing that seemed to be

passed over in the testimony was her opinion is, no, it's

not appropriate.  Now, you might agree with that opinion,

you might disagree with the opinion.  But they asked her

opinion.

I didn't ask her opinion.  Counsel didn't

ask her opinion.  The defendants Jimenez and Mason asked

her opinion and she said it was inappropriate.  We

shouldn't order it.  What was she told?  Order it anyway.

She was told to order it.

Now, she said she didn't have the authority

to order it so she passed it on Idalin Navejar.  And,

again, let's talk about Miss Navejar.  She was next.

Miss Navejar was that clerk.  And her job

was to put the package together, the merchandise request

form, package it all up to her superior, Miss Mason.  And

she did.  And you recall she was very uncomfortable about

this, but didn't feel that she could go towards Miss

Mason.

Sometimes testimony comes out in a

disjointed form in court and I think you saw that.

Because of our rules of -- federal rules of evidence,

hearsay -- you know in real life Miss Bell and

Miss Navejar are working near each other and talking all

the time, but we can't say what they talked back and

forth.

Miss Bell can only say what she said and

Miss Navejar can only say what she said.  So sometimes it

becomes a little disjointed where we have to stop

Miss Bell from saying what Miss Navejar said and

Miss Navejar from what Miss Bell said.

But when you heard both of them it came

clear that they had worked together, they had discussed

this. And Miss Navejar had explained to Miss Bell that

Miss Melendez Santiago was the wife of Michael Jimenez.

And they right away knew there was a problem.

You know, you heard this -- and we'll get

into it, the taped statement of Michael Jimenez. Well, I

did know there was a problem, I didn't know there was a

problem. There was red flags raised but I wasn't sure.

Well, they knew right away, but they didn't

feel comfortable bringing it to anybody's attention.

They were uncomfortable by the situation. And you heard

several of these people were reprimand later for simply

not doing anything.

And Miss Navejar put together the package.

And part of that package was to get three quotes. We all

heard that. She was told by Miss Mason keep it under

$10,000.

I expect you're going to hear a lot of

things about this was for the children, this was for the

good of the children and good of the program. Well, then

why keep it under 10,000? Why only buy 750 books when

there's approximately 1,500 children and other children

in the program through the school system. All the

children are not going to get these books.

Unfortunately now we find out some of the

books never even left the office.  They're still in a

box.  Were they ever needed?

But regardless, all the books were bought

for one particular reason.  It had to be under $10,000.

Why did it have to under $10,000?  So you could control

the whole situation.  If it went above 10,000 you would

have had to gone outside and you would have had to

received bids and there would have been a bidding process

and maybe the bid does not go to Johana Melendez

Santiago.

Or, as Miss Dasher said -- we'll get into

that, maybe it's not needed at all because they get these

things for free.  They get booklets for free all the

time.

And doesn't that make sense to you, ladies

and gentlemen?  When you're listening to this does it

make sense that you would order this book, only 750 of

them at a time when there are that many more kids, well

more than a thousand is the uncontroverted testimony.

They're not all going to get the books.

So Miss Navejar puts this together and she

gets the three quotes.  But we now learn all three quotes

are Miss Melendez Santiago.  The first quote is Reading

For Little Scientists.  We know that's Melendez Santiago.

The second quote is Xlibris.  It's a vanity

publishing company.  Mr. Nolan Estes, who was the next
witness, explained that.  You self publish.  So
Miss Melendez Santiago sent things there.  They make a
digital copy.  She pays for the various things you heard
her say.  She probably spent at much as $3,000 on this.
And ultimately they then send as many books as you need.
So that's the second quote.

And the third quote is Amazon.  And you
heard from Nolan Estes that that just is Xlibris' books
going to Amazon.  And because it's a retailer and it's up
one more chain in the marketing field they charge more
for the books.

So rather than go outside where there'll be
a bidding process -- a competitive bidding process it
went inside where all three quotes were from Melendez
Santiago.  They controlled the situation.  And that's
what Miss Navejar will say -- and did say, excuse me.

And she was very uncomfortable because of
the money.  It was all about the money.  You heard you
can volunteer your time.  I'm sure many people on the
jury donate their time and make contributions and the
like.  There's nothing wrong with charity.

But when you pay for it it implicates
different rules.  And when you're a public official it
clearly implicates different rules.

The next witness was Nolan Estes. And I described what he said. It was a vanity or self publishing company.

After Mr. Estes came Linda Edman. And you might remember Miss Edman. She recently retired after approximately 40 years. And she was a clerk there. And what was Miss Edman's role here? She was to put together the merchandise request form and make sure that everything was done properly so that the -- if they're going to pay money from Hillsborough County that the goods are received and that its all proper, that all the proper paperwork is there.

And she went through it. You might even remember it was just a minor thing. But when she first started it it was kicked back because there was a problem with the coding, and then it went back through. And you remember who authorized the final payment on that merchandise request form? It was Michael Jimenez, whose wife and he are getting the money.

And when you go even further on that, who signed off on the merchandise request for? Marie Mason. And we'll get into that in a little.

And I just want to -- as her Honor has stated, because of time constraints I'm not going to go over all the exhibits that were placed in evidence by the

1   government.  But they're going to go back in the jury

2   room so you'll have an opportunity to look at each and

3   every one as well as the defense exhibits and go through

4   them.

5          Miss Edman also told you she was

6   uncomfortable.  And she also ultimately was reprimanded

7   over this because she knew that Miss Santiago was the

8   wife of Michael Jimenez and yet she's processing

9   paperwork for payment to go back to that family.  And she

10  knows that's wrong.

11         And who's her direct supervisor, Carol

12  Tedder.  And she speaks to Carol Tedder about this.  And

13  what does Carol Tedder say?  Remember Carol Tedder, she

14  was the next witness, woman with sort of strawberry

15  blonde hair.

16         Miss Tedder says I too was uncomfortable but

17  I thought since Miss Mason signed off on it and

18  Mr. Finney signed off on it that it was good to go and I

19  wasn't going to confront the bosses about this.

20         Miss Tedder also told something very

21  interesting and it wasn't even cross-examined on.  After

22  the investigation began she had the opportunity to speak

23  to Mr. Jimenez and Miss Mason and she spoke to them about

24  their role in this.

25         You remember Mr. Jimenez came to her.

1      Mr. Jimenez said he had nothing to do with the book

2      purchase.  We know that's not true.  We know that's a

3      lie.  He said that was Idalin Navejar and Marecia Bell

4      went to his wife about the book.  You know that's not

5      true.  In his taped statement to Bob Sheehan he states

6      he's the go-between.  He brought them together.

7              Ask yourselves, ladies and gentlemen, why

8      would he lie to Miss Tedder?

9              You also remember Marie Mason went to

10     Miss Tedder and had a statement during this period of

11     time and she said Marecia Bell and Idalin Navejar

12     recommended the book.  We know that's not true.  We know

13     that's a lie.

14             She said she was shocked by this.  We know

15     that's not true.  She was a primary instigator in this.

16     And those statements weren't even cross-examined.

17             Now, after Carol Tedder the next witness

18     tellingly was Dawn Dasher.  And you might remember Dawn

19     Dasher was the woman who because the kindergarten system

20     had failed she was put on leave pending termination but

21     then they gave her her job back and now she's a manager

22     within Head Start in the education department.

23             And what was important about Dawn Dasher is

24     that she's in the education department where the books

25     go.  You'll recall that Miss Bell, Miss Navejar had never

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

ordered a book before in this area, never ordered one

since.  Never ordered anything for $9,000.  It was never

that much.

Miss Dasher is the one who orders books, but

it was never brought to her.  Never brought to the

education department.  Again, common sense.

If you ask Miss Bell look at this book, what

do you think, well, I think it's inappropriate.  Would

you perhaps then go to someone else or do you just then

say, no, order it.  You order it because you've already

come up with your scheme -- and we'll get into that -- to

put this together to order this book.

But now you have Miss Dasher.  Miss Dasher

also states we get these for free all the time.  We --

and she specifically said books on germs to teach

children.  And doesn't that make sense again, ladies and

gentlemen, common sense to tell you that.

And who came after Dawn Dasher?  The

director of all of Head Start, Louis Finney.  And

Mr. Finney's signature appears on Government's Exhibit 1,

the merchandise request form.  And what did he say?  I

signed that expecting that the people in front of me did

their due diligence.

I was never ever told that Mr. Jimenez and

his wife were involved in this, that the books were

authored by his wife who he had met but he didn't put two

and two together. There was just a name on a request

form. You'll see it. He expected the people under him

to do the due diligence and he said they failed him.

He said he would not have signed that if he

had known because it would have been a conflict of

interest and that is something that would have to go up

further.

After Mr. Finney there was some required

witnesses. And you might wonder at this stage why

they're in there. Maybe from Her Honor's instructions on

the law you realize Janet Fowler came in from the

Department of Health and Human Services. And Miss Fowler

stated that Hillsborough County Head Start receives more

than $10,000 in a year, in fact they receive several

millions of dollars.

The -- that is a jurisdictional

prerequisite, something that has to be proven in each of

the charges that in fact Hillsborough County in this

instance gets more than $10,000. That's why she

testified.

And then there was Merrie Bayard,

Miss Bayard who works for the county. Again, a

prerequisite jurisdictional matter is that for the mail

fraud count, Count III, there must be a mailing. That's

what makes it a federal charge, believe it or not, but
that's what makes it's a federal charge, the fact that
something was mailed.

So Miss Bayard had to come in and say all
these checks -- and you heard it -- they're bundled up
and they go to this company and then are mailed out a few
days later.

And then finally there was -- before
Mr. Sheehan there was Teresa Galloway. And Teresa
Galloway testified that she is a teacher at Plant City.
And in the summer, late spring 2009 she was contacted by
whom? Miss Melendez Santiago to make changes and do the
English. She said an excellent grammarian. To make the
changes in the grammar so that the book could be
published because Miss Melendez Santiago was writing a
book for the Head Start program.

So this scheme was hatched quite a bit
earlier, all the way back in 2009. And you heard from
Miss Galloway she did that. She was not paid for her
services. She actually does a lot of charity work,
volunteer work. And the reason is it's recommended at
the school for the teachers to get involved in the
community. You heard she did stuff with Officer Kocab's
vest. They're going to donate a vest. And she did work
in Haiti, missionary work bringing supplies down there.

1          And then finally there was -- final witness

2     for the government was Robert Sheehan, who's a chief

3     investigator for the county.  And primarily what we

4     learned from Mr. Sheehan's testimony is that both

5     Miss Mason and Mr. Jimenez gave taped statements to

6     Mr. Sheehan.

7          And you heard in Miss Mason's statement

8     again that she knew they were married.  That save the

9     book -- she gave the book to Marecia bell for her opinion

10    and she is the one who made the decision to keep it under

11    $10,000.

12         And we also heard a much longer statement

13    from Mr. Jimenez.  Why?  There was problems getting him

14    to answer the questions.  You could hear it every time

15    Mr. Sheehan asked him a question he came up with

16    something else.  It went on and on and on.  He just

17    wouldn't answer the questions.

18         But some of the things came out of there

19    aside from the evasion of answering was that he said

20    Miss Mason approved this transaction.  And he also

21    mentioned again that it's more than a book.  This wasn't

22    just a book.

23         And you're going to hear this from defense

24    counsel I anticipate.  It was a curriculum.  It was for

25    teachers to teach teachers.  Does that make it better?

1    Does that make it right that it's a book that

2    Miss Melendez Santiago somehow believes in because it

3    still is being brought by the county where her husband

4    works, where he's a public initial and he's intimately

5    involved in the purchase of this book?

6          It doesn't matter if it's a good book or bad

7    book.  We could argue all day on the appropriateness.

8    You could look at some of those pictures and think they

9    weren't very appropriate.  You could look at the language

10   and say that didn't seem appropriate.  Or you could say

11   the other side.

12         We're not here because of the

13   appropriateness of the book.  We are here because a

14   public official conspired with another public official

15   and with his wife to sell a book to Hillsborough County

16   for $9,000 when they should not have been involved in

17   this at all.

18         You heard a lot also from Mr. Sheehan about

19   conflict of interest forms.  And they're here and you'll

20   see -- the import of the forms is that Mr. Jimenez knows

21   that there's a conflict of interest form.  He has signed

22   one before this.  He has filled it out.  And he knows

23   there's an obligation from these forms to continue to do

24   that and to let the county know his wife has a business.

25         And if he wants to try to get his wife with

1    whom he lives, with him he's married, with whom he shares

2    children, would whom he shares a house, with whom he

3    shares a mortgage, with whom he files joint tax

4    returns -- if he wants her to do business with the county

5    he has to make the proper disclosures so that the county

6    can then decide whether or not to do it.

7    We will never know because the proper

8    disclosures were not made.  That's why we're here,

9    because they sought to make the money without the proper

10   disclosures and did it in a false, misrepresenting way.

11   And then final witness not from the

12   government, from Miss Johana Melendez Santiago testified

13   in her own behalf.  And you heard about her -- what she

14   said.  She talked about her background, she talked where

15   she comes from, she talked about her teaching, how

16   passionate she is about teaching.  And she talked a bit

17   about the book.

18   She also very, very tellingly stated that

19   Miss Galloway didn't tell the truth on a couple of

20   things.  And this is going to come up -- and you saw the

21   instruction where Her Honor is going to say judge the

22   credibility of the witnesses.

23   Does anyone in this jury think Miss Galloway

24   does not tell the truth?  Does anyone in this jury think

25   Miss Galloway came up here and lied when she said that

she was told in 2009 to edit this book for Head Start

when she was -- when she said I -- I took these things

down to Haiti.

And then she was asked, well, did you bring

down these hundred books from Travel Boy, and she said,

no, I was never given those books.  And how -- ask

yourselves if anyone here believes that Miss Galloway

lied for a second.

Now, ladies and gentlemen, you must take

those facts and apply them to the law.  There are three

charges.  And each defendant is charged in each, so you

have to judge each count and each defendant separately.

The first one is conspiracy.  There are four

elements.  The government has proved each beyond a

reasonable doubt.  The first is two or more people must

agree to accomplish a shared and unlawful plan.  In this

case there's three.  What is the plan?  The plan is to

unjustly enrich Mr. Jimenez and Miss Melendez Santiago.

Miss Mason joins that.  She knows of the

plan.  She brings it to Miss Bell.  She ordered that the

book be bought despite Miss Bell and his Navejar's

misgivings.  She keeps it under $10,000 so it doesn't go

out for bid.  These are all things that she's doing.

All three have this plan.  You see it from

the e-mails which are in evidence.

1          We must show that the defendants knew the

2    unlawful purpose of the plan.  That dovetails with one.

3    Of course they knew.  Miss Melendez stated -- excuse me,

4    Miss Mason stated in her tape she knew they were married.

5    She knew that this money was going back to Melendez

6    Santiago.

7          Same thing with Mr. Jimenez.  Of course he

8    knows.  He's a public initial and he knows it's his wife.

9    That's uncontroverted.

10          And Miss Melendez Santiago knows it's her

11   husband who works there who she -- initial e-mail goes

12   right to him to start the process.

13          And then -- and I want to mention this

14   briefly.  An overt act must be committed by one of the

15   coconspirators at or around the time of the alleged time

16   and further the object of the conspiracy.  You will have

17   a copy of the Indictment Her Honor has stated and you

18   will look at that.  And on Page 5 starts the overt acts.

19          And there's only several, but the first one

20   is the e-mail on April 15th from Johana Melendez to

21   Michael Jimenez that we just spoke about.  That's an

22   overt act.

23          The next one is Michael Jimenez to Idalin

24   Navejar.  Third, similar.  Fourth is another e-mail.  And

25   then it ultimately goes up to the actual check being

disbursed to the coconspirator. So those overt acts need
to be proved and have been.

I would go quickly to Count II because of my
time constraints. And Count II is a fraud concerning a
governmental program receiving federal funds. And,
again, there's four elements that must be proved beyond a
reasonable doubt. One, that the defendants Michael
Jimenez and Marie Mason were agents of Hillsborough
County Head Start/Early Head Start. Well, that's clear.
The testimony is clear they're both employees there.
They've been public officials there. They're both
agents.

Now, the fact that Miss Melendez Santiago is
not a public servant does not extricate her from this
charge. Because when Her Honor read you the law there's
also aiding and abetting. If you further the scheme, if
you help someone else, if you aid and abet the public
officials you likewise are responsible and criminally
culpable. So it is not -- her name is not left off of
No. 1 for any particular reason.

The next one is that on or about June 24,
2010, the defendants obtained by fraud or intentionally
misapplied property valued in excess of $5,000. Again, a
jurisdictional matter that we must prove. The statute
requires that what's defrauded or misapplied is in

1  section of $5,000.  Here it is $9,000.

2        Three, we must show that the property is

3  owned by or under the id control of Hillsborough County

4  Head Start.  I think that's uncontroverted.  And during

5  the calendar year 2010 Hillsborough County Head

6  Start/Early Head Start received in excess of $10,000

7  which again I believe is uncontroverted.

8        Quickly turning to Count III, that's the

9  mail fraud, depriving another of the intangible rights of

10  honest services.  And that's where Her Honor read about

11  public official and public employees acting in the

12  public's best interest, not their own to do what's best

13  for the public for us, the taxpayer, not for themselves.

14        And there's three elements that the

15  government must prove there beyond a reasonable doubt.

16  That the defendants knowingly devised or participated in

17  a scheme to fraudulently deprive the public of the

18  intangible rights of honest services.

19        And a lot of this is defined in the

20  instructions and you'll see.  And you will have no

21  trouble finding that one beyond a reasonable doubt.

22        That the defendant did so with intent to

23  defraud.  Again, it's a term of art which is described

24  and defined by Her Honor.  To act with intent to defraud

25  means to act knowingly and with the intent --  excuse me,

1    and with the specific intent to deceive someone, usually

2    for personal financial gain or to cause financial loss to

3    someone else.

4              And here it's clear.  The whole purpose, as

5    Idalin Navejar stated, was about the money.  Once you're

6    personally gaining you cannot do it.  Case closed.

7              And the third one is that the defendant used

8    the United States Postal Service, which is clear.

9              Ladies and gentlemen, I am constrained by

10   time.  And I do have another chance, as Her Honor stated,

11   to talk to you.  But as you go through these elements you

12   need to go through each element and each charge.  You

13   will find that the government proved them beyond a

14   reasonable doubt, which is required.  And if so you will

15   be able to determine the guilt of each defendant on each

16   charge appropriately.

17             Thank you.  And I appreciate your attention.

18             THE COURT:  Mr. Brown on behalf of

19   Miss Melendez Santiago.

20             MR. BROWN:  Well, good morning.  You know,

21   there is a thing called the objective truth in life.

22   Some things are just true.  Sometimes we hear politicians

23   giving opinions and seeming to change facts.  But there

24   is such a thing as the objective truth.

25             And this case has something very similar to

1    that.  Let me tell you what it is.  It's not a crime for

2    a spouse to sell a book to Head Start where her husband

3    works.  Think about that.  It's not a crime for a spouse

4    to sell a book to Head Start where her husband works.  At

5    no time will Mr. O'Neill ever come back in his rebuttal

6    and tell you that's false because it's not a crime.

7         Why isn't it a crime?  Well, let's go to

8    human resources introduced manual, 6.06 that was

9    introduced by the government.  And it states in here that

10   the purpose is to require employees to disclose potential

11   conflict of interest.  Notice the word "potential."

12        And it says -- it goes on to say including

13   outside business interests and activities, to establish

14   procedures for determining if such outside business

15   interests and activities are in conflict with the

16   employee -- employee's job.

17        Now, there's a procedure to determine that.

18   Employee must fill out what's called an employee

19   disclosure questionnaire.  He must disclosure what that

20   potential conflict may be.

21        So let's say this is a disclosure.  Okay?

22   This is the disclosure.  This has to be filled out.  But

23   does that automatically mean there's a conflict?  The

24   answer is no, it doesn't.  It's simply what we have been

25   talking about all week long as a disclosure form.  It's

1    supposed to be filled out.

2            Now, you'll hear there's some confusion

3    about this whole form itself.  You'll hear that Miss --

4    if you remember I think it was Carol Tedder that

5    indicated in 20 years she's only filed out two of these.

6    And you'll hear there was an old form and a new form

7    started in 2009.  And there's questions about whether or

8    not an employee is properly defined.

9            Regardless, as it applies to my client,

10   Miss Santiago, let's just say there is a disclosure form.

11           After this is filled out, the rules tell us

12   what happens to this.  This disclosure form goes to a

13   department director who reviews it.  And then he forwards

14   it to an employee -- he forwards it to the human

15   resources department relations section and they review

16   and approve.  If they determine that no potential

17   conflict of interest exists, it's over.  Close the file.

18   Business can be conducted.

19           If they determine a potential conflict of

20   interest exists it goes to an ad hoc committee for a

21   decision on whether a conflict of interest exists.  If

22   they determine that a conflict exists, they inform the

23   employee in writing providing the employee with a

24   reasonable period of time to resolve the conflict.

25           So, again, it's not a crime for a violation

of this policy for an employee a spouse to sell a book or
books to Head Start because her husband worked there.

Now, the government wants you to believe
that she's guilty of that and they have proven that she
has joined a conspiracy to do something illegal.  And
you're going to hear about the intent.  She has to have
the intent to defraud the government.  And they're
arguing a kickback and they're arguing a bribery.  But
all of that boils down to intent, and it's an intent they
have to prove by fact.

All right.  The law is pretty clear, as
Mr. O'Neill said, that in every courtroom in this
country, state or federal, the government has to prove
facts beyond a reasonable doubt.  That definition, that
burden means that they have to prove it of such a
convincing nature that you would rely upon it in the most
important of your own affairs.

I don't know what the most important of your
own affairs, but I'll tell you one in mine so you can
then equate it to your own.  But if I'm rock climbing and
I know that I need to make a certain reach for me to
continue to climb, and that my life depends on whether or
not that rock, that ledge my grip will hold me, I have to
have proof to my mind beyond a reasonable doubt that
that's going to hold me because that is something I have

1    to be convinced of beyond a reasonable doubt.

2            That's what reasonable doubt means.  That's

3    the level of proof you have to have before you can rely

4    on that as being a fact.

5            Government says that they have proven a fact

6    that she intended to defraud.  Well, how'd they prove

7    that?  Two ways they can prove it.  One is called direct

8    witness -- direct evidence.  Is there a witness that came

9    into this courtroom and said that she knew about this

10    policy at Head Start?  Was there a witness that came in

11    and said she knew that her husband had not filed a

12    disclosure form and that Head Start had never ruled on

13    whether it was or is a conflict?  What witness said that?

14            You see, before you can say she's guilty of

15    a criminal or a conspiracy to defraud anybody you have to

16    prove that she knew that she's not supposed to sell a

17    book to Head Start because her husband worked there.  And

18    the only way that would not be true that she couldn't do

19    that is if there was a conflict.

20            Who proved she knew that her husband had not

21    filled out that form?  Look at your notes.  Tell me the

22    witness that came into this courtroom and said that she

23    knew her husband had never filled out a disclosure form.

24            There's not a single witness that ever said

25    that.  There's not a single witness that ever said she

1    even knew the policies of Head Start.  How is she

2    supposed to know whether her husband has to fill a form

3    out or not and whether or not a committee has ruled on

4    whether it's a conflict or not?  How is she supposed to

5    know that?  What evidence tells you she knew that?

6           You know, in her world professors write

7    books and then they turn around and make their students

8    buy the books because they're using them in the classroom

9    to teach.  But how does she know that this is the policy

10   at Head Start.  What witness came in here on the stand

11   and told you that?

12          Now, if Mr. O'Neill wants to say to you,

13   well, we haven't directly proven it but we have used

14   circumstantial evidence, let me help define what

15   circumstantial evidence really means.  And I'll use this

16   story.  The farmer, Michigan, who's out in the fields,

17   he's growing corn.  And he's out there working all day.

18   And his wife knows that he loves above all else blueberry

19   pie.

20          So she begins to bake him a blueberry pie.

21   And right around noontime she sets that pie to cool on

22   the windowsill.  And he's out in the field, he can smell

23   that and he's thinking, wow, what a great wife I have.  I

24   can't wait to come home and have some of this blueberry

25   pie.

1           Well, around 2 o'clock their teenage son

2    comes home.  He comes home, as a teenager does sees the

3    pie.  He's hungry.  Says I'll just cut myself a slice of

4    this.  Cuts himself a big slice of the pies, goes on

5    upstairs, starts his homework.  Doesn't really think

6    about it because he's a teenager.

7           Comes back down, has another slice of pie.

8    Well, right around 5 o'clock he comes back down to have a

9    little bit more pie when he realizes there's barely any

10   pie left.  And just about that time he notices -- he

11   looks out that window -- that his father is coming in

12   from the field.

13          And he knows why his mom baked that pie.

14   And he also knows that his dad is going to be pretty

15   upset with him that he ate that pie.  So he's scrambling

16   trying to think how is he going to get himself out of

17   this fix when he sees Scout, the black lab that's part of

18   the family.  Brings Scout over, takes some of that

19   blueberry from the pie fill, rubs it all over Scout's

20   muzzle, blueberry everywhere.  Of course, he's a lab.

21   Loves it anyway.  Puts the rest of the pie tin down on

22   the ground right in front of Scout, bolts out of the

23   house.

24          When dad walks in and sees the pie tin, the

25   remainder of the blueberry pie and sees blueberry pie all

1   over Scout.  So he figures Scout did it.

2           That's an argument for circumstantial

3   evidence.  Okay?  Is there a witness that directly came

4   in and said Scout ate the blueberry pie?  No.  But is

5   there circumstantial evidence that Scout may have eaten

6   that blueberry pie?  Yes.  What is it?  It's facts you

7   can point to, the blueberry pie over Scout's muzzle, the

8   pie tin on the ground.  There are still facts to argue

9   circumstantial evidence.  There's no direct witness that

10  saw it, but there are facts.

11          Now, in this case that circumstantial

12  evidence would be wrong and Scout would be incorrectly or

13  innocently blamed for something Scout didn't do.

14          Do we have circumstantial evidence here?  Do

15  we have the blueberry pie over Scout's muzzle?  Do we

16  have the pie tin?

17          What's the circumstantial evidence that says

18  she knew whether or not her husband has filled out a

19  disclosure form and whether Head Start had ruled on it?

20  Where is that circumstantial evidence?

21          There isn't any.  There's no circumstantial

22  evidence that she knew.  And, members of the jury, they

23  have to prove that beyond a reasonable doubt.  They have

24  to prove that evidence of such a level that it would

25  convince you in the most important of your own affairs.

1           And the suggestion by Mr. O'Neill that

2    because they're married, therefore she's guilty, is not

3    direct evidence; it's not circumstantial evidence, and

4    it's certainly not evidence that would ever rise to the

5    level of beyond a reasonable doubt.

6           It's not enough that they live in the same

7    house, that they have a mortgage, that they may share

8    accounts or cars.  That's not enough.  That's not proof

9    by direct evidence or circumstantial evidence and it

10   clearly doesn't even get to the issue of whether it's

11   proof beyond a reasonable doubt.

12           There is no evidence to suggest that she

13   knew whether or not a form had been filled out and

14   whether or not Head Start had ever ruled on it.

15           I should technically sit down because this

16   case has clearly not been proven beyond a reasonable

17   doubt, but I still want to talk to you about intent.

18   Because I told you in opening statement I wanted to prove

19   two things to you.  I wanted to prove to you that this

20   case was about passion and I wanted to prove to you that

21   it was about education.

22           And Mr. O'Neill wants to talk about why 750

23   books, because there's 750 new accidents.  Mr. O'Neill

24   wants to say it's about the money.  Well, members of the

25   jury, either you believe that or you don't.

At this point I am clearly not eloquent enough to be able to convince you that this woman is passionate about education if I haven't already done it. If you don't think that she's passionate about education then I guess I failed in my duties to represent her.

Because if she's passionate about education then you should realize one thing, that's the reason she's selling this book to the county because she believes in it. She's not selling the book to the county because she's trying to make money. She made $2,700. This case is about $9,000 total. If she wants to make this about money, why discount the book. Why give a discount from $25 down.

Mr. O'Neill says all the quotes came from her. That's what he just told you. All the quotes came from her. Well, then if she's in control of the quotes why give a assessment discount? Why go down to $12 when the book is selling for 25? If it's about money, maximize your profit.

It's never been about money. You know, Mr. O'Neill wants you to believe that. But do you remember one of the witnesses that said there was a discussion about purchasing a book.

If it's about purchasing a book and more things to buy and it's about money, why does she send

this e-mail?  If this is about greed, she sold the books.
She's gotten away with what Mr. O'Neill believes is a
scheme to defraud, a conspiracy.  Why is she sending an
e-mail to them afterwards saying I hope the books have
been well accepted by the parents.  I'm attaching
activity sheets to go with the book.

He's suggesting to you -- and that's the
reason he asked the witness that, that she was actually
not just going to sell the book but she was going to be
selling more.  This was just the beginning.  Well, that's
just not true.  That is just not true.

Why is it that she's saying I'm attaching
activity sheets to go with the book?  She's not selling
them.  As I prepare more activities to do with the
children I will be e-mailing them to you and you can pass
them along to the teachers if they get a copy of the
book.  Let me know if I can help you with anything else.
Remember, I'm available for any demonstration activities
that can help teachers -- can use the book to get the
most out of it.

This right here is perfect evidence of what
her intent was.  Her intent was to educate.

Look at the activity sheet that describes
all the activities that she's trying to help them to be
able to better educate our children.

1           And is there any doubt that this book was

2   helpful?  Look at the teachers' reviews of this.

3   Excellent.  Presentation was very good.  The students did

4   it in English and Spanish, they asked questions and

5   presented a video -- a video and handouts.  Very good

6   interactions with children.  Presentations were on the

7   children level, HCC Plant City Head Start.  Plant City,

8   outstanding.  Outstanding.

9           This is not about the money.  Miss Santiago

10  is passionate about what she's done for her life, her

11  teaching, her education and the students.  Is there any

12  question in your minds that she's passionate?

13          When we talk about intent the Court will

14  read to you an instruction, and it's called good faith is

15  the complete defense to a charge that requires intent to

16  defraud.

17          A defendant, me -- or the attorney isn't

18  required to prove good faith.  The government must prove

19  intent to defraud beyond a reasonable doubt.

20          An honestly held opinion or an honestly

21  formed belief cannot be fraudulent intent even if the

22  opinion or belief is mistaken.  Similarly, evidence of a

23  mistake in judgment, an error in management or

24  carelessness can't establish fraudulent intent.

25          And you're going to hear throughout this

that the government has to prove willfully, which means
intentionally.  They're going to have to prove that she
voluntarily and purposely with the intent to do something
the law forbids, that is with a bad purpose to disobey or
disregard the law.

They have to prove that she had that intent
with facts, not just the fact that they're married.
There has to be something that they can point to and say
that's the fact and we've proven it beyond a reasonable
doubt.

There has never been any evidence that she
even knew what the policy was for Head Start.  And
there's never been any evidence that suggests that there
was a discussion between them, that they knew whether or
not a disclosure form had been filled out or a conflict
waived.  She simply wrote a book.

And is there any question about the book
being written and when it was written?  The photographs
are dated April 14, 2008.  And you can see the book
that's being used and compare it to the book to see --
it's the precursor for what was eventually published and
sold to Head Start.

There's another copy, another picture of the
same book and you can see the date on it.  Now, is there
any question that this book was being used and that it

1    was being well received?

2         Miss Galloway had said that she never got

3    any books to take to Haiti.  But you heard my client

4    testify on the stand that she received a letter from a

5    mission in Haiti thanking her for the books.  I don't

6    know why Miss Galloway wants to say that.

7         But I can submit to you that it would not be

8    unusual to have witnesses that want to run for cover when

9    they get called into a federal criminal trial in a

10   federal courthouse.  It's not unusual for people to want

11   to have nothing to do when they have been subpoenaed.

12   You can use your common sense and realize that people

13   sometimes they don't want to get involved.

14        Now, I don't know if I didn't ask the

15   question properly and that maybe she technically didn't

16   bring them to Haiti, but somebody else from the office

17   brought them to Haiti on her behalf so technically she

18   didn't.  I don't know.  And I really frankly at the time

19   didn't think it was a big deal.

20        I knew -- we know from what she testified

21   that the books ended up in Haiti.  Mrs. Galloway can say

22   what she wants, but really that has nothing to do with

23   this trial.

24        This trial has to do with whether that lady

25   there intended to defraud the government by selling them

a book that she passionately believed in and had always believed in.

Members of the jury, this is the only opportunity I have to talk to you. From now on Miss Santiago's defense is over and Mr. O'Neill actually has the last opportunity to talk to you. And I don't have a chance to come up after that and say I disagree, here's my argument.

But you have an important job to do. Miss Santiago is on trial by herself actually in this case. I know she's seated here with other defendants, but she's by herself. You're going to return a verdict on just her case and the facts on just her case.

Government has argued in Count I that she's guilty of a conspiracy. That she agreed with others to do something illegal. She's counting on you who have used your common sense in this trial to apply this law and let her know that you agree with her that she's not guilty of this crime.

Count II argues that joined a -- she was as a member of -- actually, Count II argues that she also defrauded the government with a scheme to defraud.

And Count III argues that she provided a kickback or I guess in this case a bribe and she was a part of that.

1          Members of the jury, the government's never

2     shown that she gave any money to Miss Mason.  There's no

3     kickback to Miss Mason.  In fact, the government wants

4     you to believe that because she got the money that

5     there's a kickback here because she's married to

6     Mr. Jimenez.

7          Where's the proof of that?  Where's the

8     proof that the money that she got for the book went to

9     him, went to pay a mortgage, went to make a car payment?

10    The only evidence, the only facts were that that money

11    got deposited in her account -- her business account.

12         Where's the kickback?  Members of the jury,

13    Miss Jimenez is counting on you to use your common sense

14    but also to apply the law, to apply what reasonable doubt

15    means and to find her not guilty of these crimes.

16         Remember, she's on trial for just her

17    actions.  She's on trial for whether or not there's

18    evidence that she intended to defraud the United States

19    Government.  And the only way they get there is if they

20    prove the facts that show you beyond all reasonable doubt

21    that she knew that her husband was not supposed to allow

22    that book to go through.  That she knew that she couldn't

23    sell the book to Head Start.

24         One last story to help make you hopefully

25    understand this.  When the government has to prove that

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

allegation, all right, they have to prove it just like if
you built a pathway of stones and the stones have to be
one in front of another.  And you have to step on one
stone to go down the pathway.

That pathway would perhaps lead to you a
guilty verdict.  It would be that she has -- she knew and
she intended to defraud the government and she knew all
along that her husband had not filed the disclosure form
and that he was prevented -- or preventing her from
selling the book.

Can't skip over stones.  You have to step on
each one.  Each of those stones are the facts to prove
what they believe to be true.

What is the fact that proves that she knew?
What's the fact -- the stone that proves she knew that
her husband had not filed a disclosure?  What's the facts
that prove she even knew what the rules were at Head
Start?  And what's the facts that prove that Head Start
had actually ruled it to be a conflict?

There has to be a witness.  There has to be
facts.

In a moment I'm going to sit down and I
think Mr. Weisbrod and Mr. Farmer will be able to make
their arguments to you.  At this point I've always
believed that juries have pretty much made their minds

1    up, that our eloquence is really not eloquent at all.

2    That's there's very few times when we can change a

3    person's believe.

4         But if you happen to be a juror that feels

5    she is guilty I hope the other jurors will say to that

6    juror, please, what are the facts that support that?

7    What are the facts that prove she knew?  You may feel she

8    knew, you may think she should have known, you may feel

9    that as a husband and wife how could she not know.  But

10   those aren't facts.

11        I hope that some juror will say to that

12   juror and say where's the proof?  Where are the facts

13   that we can rely on beyond all reasonable doubt that she

14   knew?  Because anything less than that is speculating and

15   it's not using common sense.  It's not an inference that

16   you can draw.  It's pure speculation.

17        Members of the jury, I'm asking you at the

18   end of this case to return a not guilty verdict for her

19   on all three counts.  Let her go home.  Let this ordeal

20   be finally over.

21        THE COURT:  Ladies and gentlemen, we're

22   going to take about a ten-minute break here.  And the

23   whole purpose of this break is to let you use the

24   restroom if you need to do that, get a drink of water,

25   that kind of thing.  It's very quick.

1          So we're going to start again at 11:25.

2    Leave your pads on your chairs.  Please don't discuss the

3    case.  I'd stick in the area of the jury room if I were

4    you.  11:25.

5          COURT SECURITY OFFICER:  All rise, please,

6    for the jury.

7        (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

8          THE COURT:  Quick break, 11:25.

9    (THEREUPON, A RECESS WAS TAKEN, AND THEN THE PROCEEDINGS

10                CONTINUED AS FOLLOWS:)

11          THE COURT:  Mr. Weisbrod, are you ready?

12          MR. WEISBROD:  I am ready, Your Honor.

13    Thank you.

14          Okay.  I think you can bring the jurors in.

15          COURT SECURITY OFFICER:  Yes, Your Honor.

16          All rise, please, for the jury.

17      (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

18          COURT SECURITY OFFICER:  Thank you, ladies

19    and gentlemen.  Please be seated.

20          THE COURT:  Mr. Weisbrod on behalf of

21    Michael Jimenez.

22          MR. WEISBROD:  Thank you, Your Honor.  May

23    it please the Court, counsel.

24          Good morning again, ladies and gentlemen.

25    When the government called Carol Tedder as a witness I'm

1    fairly certain that they did not believe that she would

2    offer you a very key bit of evidence to this case, but

3    she did.  Because in the midst of all the questioning

4    about how this book order should be processed through her

5    department and all the conversations that she was having

6    with the other people in the department, what did Carol

7    Tedder tell you?  She said it was a gray area.  This

8    whole thing was a gray area to her.

9          And I'm here to tell you that no individual

10   whoever performed an act in a gray area is going be found

11   guilty of doing a criminal act with proof beyond a

12   reasonable doubt.  And I'm going to go through all the

13   evidence and show you why that's true.

14         The first thing you know that you've already

15   heard and by nature of this sort of trial is going to be

16   some duplication of argument even though you're

17   considering each person individually.

18         But the first thing you know is the rule

19   that it's not illegal for a spouse of a Hillsborough

20   County employee to sell books to Hillsborough County.

21   You know that because you would have been told it was

22   illegal if that were the case.

23         Number two, you heard all these people talk,

24   Miss Navejar, Miss Tedder, maybe Linda Edman.  They all

25   talked about how they were uncomfortable.  Miss Tedder

threw in the gray area description.  Uncomfortable, gray
area, there's no bright line.  It's not a case of on the
left side or the right side.  It's in dispute.

And you're not going to be told of any
instruction and you didn't see in any instruction that a
violation of the Hillsborough County Human Resource
Policy 6.06 is the basis of an intention to defraud.

Now, this case really does revolve around
the filing of a disclosure form -- or more accurately
what Mr. Jimenez described in his interview with
Mr. Sheehan as the lapse in judgment of not filing the
form.

So we need to talk about the form because
the government's going to suggest to you that not filling
it shows his intent to deceive.  And I'm here to suggest
to you that when you consider the veritable mountain of
other evidence in this case that demonstrates what
Mr. Jimenez' intent was you will see that the form in the
long run doesn't really matter.

So let's start with what's in evidence as
Government's Exhibit 17.  This is a Hillsborough County
form that in 2008 Mr. Jimenez files with Hillsborough
County and it's signed off by various personnel.  So we
know shortly after he begins working at Hillsborough
County he's presented with this form.

1          But in 2009 something different happens.  He

2    gets this Form 1 and it's not from the county per se.

3    It's from the supervisor of elections on May 22, 2009.

4    But he fills it out and it gets filed.

5          And the interesting thing is when he's

6    having his discussion with the policy policeman,

7    Mr. Sheehan, they're going back and forth about

8    disclosure forms because Mr. Sheehan doesn't even know

9    about this form and ultimately tells him in the middle of

10   the interview despite the importance that these

11   disclosure forms supposedly have in this case I don't

12   care about that one; let's not talk about it.  So that's

13   what Mr. Jimenez hears.

14          But he tells him something even further.

15   Who must file Form 1?  Now, I know -- and I heard

16   Mr. O'Neill this morning characterize the way Mr. Jimenez

17   answered questions as evasive.  And that's for you to

18   determine whether or not you think he was evasive.

19          What there was no doubt about was he was

20   confused because Mr. Jimenez is trying to explain to the

21   policy policeman that this form that he did complete

22   really didn't apply to him.  Because if you look at all

23   the definitions of state officers, local officers and

24   specified state employees -- and I'm not going to spend

25   the time to go through it with you now.  You'll have in

1     the jury room to look at -- you'll see Mr. Jimenez

2     doesn't meet this definition, so he's really confused.

3                Now, Mr. Sheehan thinks he shouldn't be

4     confused because there's Government's Exhibit 20 which is

5     HR 6.06, the infamous 6.06.  Mr. Sheehan says, well, you

6     should have filled this one out.  And Mr. Jimenez is

7     repeatedly during that interview saying I don't think I

8     got that.  But I do have a file in my office.  Anything

9     that I filled out is in that file.

10               For instance, when Mr. Sheehan said, you

11    know, I don't see your wife anywhere in any of these

12    contact information, Mr. Jimenez went back there with one

13    of Mr. Sheehan's associates right afterward and showed

14    them where his wife was in the contact information.

15               So they had every opportunity to see whether

16    or not he had it in the file and hadn't completed it, but

17    he told them I don't have it.  And you know what?  We

18    know from Carol Tedder she didn't have it either.  So

19    it's not unusual for Mr. Jimenez to not have gotten this

20    form despite the fact that Mr. Sheehan then says, oh,

21    well, it's online.

22               Well, Mr. Jimenez says lots of things are

23    online.  We know that.  Everything that the county wants

24    people to know is online.  It doesn't mean that you know

25    you're supposed to fill out 6.06.

1          Here's another thing about 6.06.  If you

2    look into it on Page -- Page 9, it tells you a very

3    specific date apparently when it comes into being

4    October 22, 2009.  And this page is a list of what's been

5    modified or added.  And you turn the page to Page 10 --

6    this is Page 10.  And at the top, this paragraph here

7    talks about modified.  And it talks about when the

8    employees are supposed to file this and do it within

9    45 days of a specific act.

10          And then there's a little footnote here, 3.

11   And when you go down and when you look at 3, what does it

12   say?  The current policy only addresses completing this

13   form at the time of new hire initial processing.  The

14   revised process requires employees to complete the form

15   at hire, promotion, transfer, et cetera, et cetera.

16          So not only did he not get the form, which

17   seems consistent with what Miss Tedder told you, but the

18   form is new.  It replaces the one he's already filed.

19   And it says when you're supposed to do acts.  But he

20   doesn't have it.  And despite that -- and we'll talk more

21   about his statement -- he explains later to Mr. Sheehan

22   why it really doesn't matter.  And we'll talk about it in

23   a little bit.

24          The penalty for not complying with the human

25   resources policy is not a federal conviction for crime.

The penalty is what he got, which is getting fired from your job.  The penalty is what some of the other folks in this unfortunate incident got, reprimands in their file.  It's not a federal conviction.

Now, let's talk about some of the other evidence.  And I know we spent a lot of time about the preservice events, but they're important.  In 2007 shortly after being hired Michael Jimenez gets his wife involved with Head Start.  He doesn't have to.

If he's really going to cheat the program is he laying the groundwork in 2007 by having his wife perform service or is he doing it and is it more likely to believe that he's doing it because he has a genuine interest in seeing Head Start succeed and seeing the children succeed?

In 2009 -- and I'll get back to '08.  But let's talk about the preservices.  In 2009 there's another presentation, and his wife puts in a slide -- and you saw it.  It was brought up on the big screen -- that tells everybody, hey, I have a book.  I have a book to sell you.  I have a book that's going to be available.

People that commit secret frauds don't announce it to every single person that works in the department.  You don't let the sunshine in.  You keep it quiet.  Not what was done here.

1              2009 followed 2008.  Service learning.  This

2      is Defendant Melendez Santiago's Exhibit No. 14.  And

3      this really is the trite situation where a picture is

4      worth a thousand words.  When you look at this picture,

5      how do you ever say to yourself that this book, which we

6      all know was the predecessor to Travel Boy Helps

7      Sebastian, how would you ever think that that book is

8      inappropriate for children?

9              If you're Michael Jimenez and you see your

10     wife's picture of a service learning project what are you

11     going to think, that this program is helping kids or is

12     above their head?  This girl in the pink dress is so cute

13     you can't help but look at her.  But look at how involved

14     she is.

15             We know from this picture alone how helpful

16     these materials are.  I don't have to really talk about

17     it much.  You can see it with your own eyes.  It's very

18     unusual to have that.

19             But the picture tells us one thing that's

20     also very important.  Tells us Nurse Bell didn't know

21     what she was talking about assuming she ever said that

22     this book was inappropriate.  That's number one.

23             You also know Nurse Bell was wrong about

24     enrollment.  She was the only one of all the Head Start

25     people that didn't know that August sees a lot of new

kids enrolled, approximately -- or in the ballpark I

believe the testimony was from some other witnesses of

750.  Nurse Bell was wrong again.

Nurse Bell also told you that she had a

conversation with Miss Melendez Santiago when the books

were physically delivered in which Miss Melendez Santiago

was talking to her about another book to be sold.  Wrong

again.  Three times.

But that's not all.  We have more on

Nurse Bell, and it comes quite frankly from Defendant

Mason's Exhibit No. 19, the second page.  It's a

merchandise request form.

Now, let me just stop for a second because

Mr. O'Neill said something during his initial closing

which just is flat wrong where he suggests and told you

that Mr. Jimenez authorized the purchase of this book on

the merchandise request form.  Maybe it was a mistake on

his part, but it's not true.

MR. O'NEILL:  Objection.  That wasn't said.

MR. WEISBROD:  It was said.  That's why I'm

talking about it now.

THE COURT:  All right.  You know that

there -- let me just tell the jury you note that there is

a difference in recollection of what was said.  And I

just encourage you to rely on your recollection of what

1   was said.

2           MR. WEISBROD:  You can look at the

3   merchandise request form that's in evidence I believe as

4   Exhibit 1 and you'll see that Mr. Jimenez had nothing to

5   do with it.

6           But let's talk about this merchandise

7   request form.  Because look when it's dated, Friday,

8   April 23, 2010.  And down at the bottom you know it was

9   prepared -- get my finger out of the way -- by Navejar.

10  On April 23 Idalin Navejar prepared the merchandise

11  request form for 1,300 books I believe it is.

12          Now, that's kind of interesting because this

13  whole process doesn't get started until Mr. Jimenez sends

14  his wife's letter of presentation on April 21st to

15  Miss Navejar.

16          Now, let me back up just a second.  His wife

17  sends him an e-mail on April 15th.  Here's the letter of

18  presentation.  And it's a small little thing, but he

19  waits six days before sending it on.  They're really in

20  such a hurry to steal from the government, why does he

21  wait six days?

22          Beyond that, April 21 Miss Navejar knows

23  this process is under way.  Now, two days later she comes

24  up with 1,300 books but we know that's not from

25  Miss Melendez Santiago.  Because Government's Exhibit

No. 3 now, on April 21 Melendez sends an e-mail saying I
need to know the number of books you need.

And then six days later-- yeah, six days
later, following up April 27th, just following up on the
book order. I wanted to know if you decided on a book
amount. So on April 27th Miss Melendez Santiago still
doesn't know how many books are going to be ordered.

But on April 23rd Miss Navejar is preparing
a merchandise request form. Now, it doesn't get
approved. It's supposed to be sent to Marie Mason but it
doesn't get approved. But here's what it does.

Remember Nurse Bell told you that after she
got the book she wasn't really interested, according to
her. She didn't really want to make a recommendation
although she ultimately makes a recommendation. She says
without having read the book, just having looked at the
pictures. But it took some time. She didn't want to
commit to how much time. What a load of malarkey.

April 23rd we know that Nurse Bell either
didn't know how or didn't have the authority to prepare
merchandise request forms. She wanted Idalin Navejar to
do it, and Idalin Navejar did it two days later on the
23rd. That's how you know the sequence of events in this
case.

Now, why? Who knows what's going on at Head

1   Start in the fall of 2010.  The policy policeman are out

2   and about.  Everybody is getting talked to.  Everyone is

3   covering their backside.  Nurse Bell for some reason

4   thinks her license is at issue.  That makes no sense.

5   But everyone is protecting themselves, Dawn Dasher,

6   Nurse Bell, the list goes on and on.

7           Louis Finney.  Oh, Louis Finney, I'd never

8   approve this.  Louis Finney, he's not spending any days

9   without the policy policeman coming to see him.  The last

10  thing he needs is another headache.  So it's just easy

11  for him to say after the fact I wouldn't approve it.

12  We'll talk about that a little later when we get back to

13  the conflict issue.

14          The $10,000 rule, another one of these facts

15  you can look at.  Keep it under 10,000 purposefully.

16  Well, we all know that there is this small purchase rule.

17  All the accounting people acknowledge it.  Everybody is

18  aware of it.  It's not a surprise to anyone.

19          Marie Mason has authority at her managerial

20  position where she can approve it, get the three quotes

21  and away we go.

22          Michael Jimenez is the deputy director of

23  fiscal.  He knows the $10,000 rule.  And yet supposedly

24  he's in a conspiracy with his wife to get this money from

25  the government they're not entitled to and yet what

happens?  His wife sends quotes, two of which are below

10,000 and two of which are above.  And his wife is

sending an early e-mail, hey, do you want 1,300 copies,

do you want a thousand?

Is that the action of somebody who knows,

hey, I need to keep this below a certain level or

everyone is going to get involved and then we're out of

luck?  Of course not.  But you know what, even if this

went to bid it wouldn't have made a difference.

Nolan Estes from Xlibris told you they have

exclusive rights to a manuscript like this.  Of course

they do.  Think about it.  What writer is going to --

what publishing company is going to allow a writer to

have their books published by every other company?  Once

they get the publishing rights they've got it.

Now, there are distribution channels.  But

for this book you can bid it out all day long.  It

wouldn't have mattered.  The numbers wouldn't have come

back any differently than on the quotes.  Your common

sense tells you that.  You know that.

And I know there's been some talk already

about the number of books that was ultimately settled on.

And you can decide whether or not it's a coincidence to

keep it under 10,000 or whether or not it really is for

the approximate number of new kids enrolling in August.

But here's something that can help you.
When you look at the e-mail from Nolan Estes to
Miss Navejar on May 3rd, the two below $10,000. If
you're trying to maximize your take, your illegal booty
from the government, you would have sold him 800 books
and you would have gotten closer to the $10,000 level.

So you decide whether or not 750 was to keep
it under 10,000 or whether it more likely related to the
new number of kids being enrolled that summer.

What other evidence? Well, we know a little
bit about Mr. Jimenez from his coworkers. Miss Navejar
trusted him to do her taxes. That's interacting with the
government. She has to have some faith that he's not
going to do something wrong. That that's not his state
of mind to cheat on her taxes for her.

Even Louis Finney says that Mr. Jimenez had
the best interest of Head Start in mind, but Mr. Finney
has to add, well, he failed me on this occasion. But it
goes to Mr. Jimenez's state of mind. Mr. Finney doesn't
think he would do anything to deliberately cheat Head
Start. The fact that he failed Louis Finney is just of
no meaning whatsoever.

Carol Tedder -- and this one is pretty
important because Carol Tedder also told you that she
didn't believe after all the time she worked with

Mr. Jimenez directly underneath him that he had the

intent to defraud.

And on redirect the government's question to

her was, well, you don't have any legal training, do you?

She said no.

Well, neither do you.  But that doesn't mean

you can't make a determination as to whether or not

somebody has intent to defraud.  That's, as a matter of

fact, exactly what your job is.  And without legal

training you're well able to do it by looking at the

volume of evidence that's been presented.

Let's talk about the receiving report a

little bit.  This is Government's Exhibit 15.  Linda

Edman told us a little bit about this.  And I actually

talked to you about it in opening.  The county has

already ordered the books, the books have been delivered,

an invoice has been sent to the county, this receiving

report then has to be filled out before the county makes

a payment.

It's not approving payment.  The book's

already authorized.  The county's already received them.

But there is a process and properly so that before a

check gets issued the county knows that it has received

what it paid for.

And so Linda Edman verifies that.  And then

1    as she told us without any contradiction, the reason

2    Carol Tedder didn't sign on that particular instance is

3    because she was out of the office so Mr. Jimenez signed

4    it.

5              Does that make him materially involved in

6    this purchase?  No, it does not.  And that's what he told

7    Sheehan during his interview.  He wasn't a player in

8    this.  Another comment he made.  I wasn't materially

9    involved.  He's not making the decisions to purchase.

10   That's what's material.

11             He would be derelict in his duty to

12   Hillsborough County if he doesn't acknowledge the

13   obvious.  Would it have made one bit of difference if it

14   went to the lowest person in the office or highest person

15   in the office to verify that the books were there other

16   than Mr. Jimenez?  Of course not.  Completely unimportant

17   fact.

18             Now, let's talk a little more about the

19   50-minute statement.  You've heard Her Honor's

20   instructions.  You realize that you consider the

21   circumstances in which the statements are made.  And

22   that's -- that's kind of important here because I've sort

23   of euphemistically talked about the policy police being

24   out.

25             But, man, everybody at Head Start is getting

grilled. Everybody's job is on the line. Reprimands are
flying. And, yeah, because of that people are -- might
be a little guarded in what they tell the investigator.

He's not under arrest. He's simply
answering the questions that have his job on the line.
And so what does he say?

Well, at one point Mr. Sheehan says did you
ever fill out a form saying your family got $9,000 from
the county? That's kind of similar to the government
representing to you in opening that 9,000 went to the
marital household. And he says, no, I didn't do that
because it went to Johana.

And this is actually a pretty important
point. Count III requires the government to prove to you
that as a public employee Mr. Jimenez received a bribe or
a kickback. Well, a bribe is usually when they come to
you up front and say, hey, I need you to vote a
particular way and then you do an action afterward.

A kickback as defined for you in the
instructions says he gets a benefit down the line for
having done something previously.

Where's the money? I don't begrudge her for
keeping the money for the book she wrote. But the
government has an obligation to prove that the public
official -- the allegedly corrupt public official got

1  paid a kickback.

2        This is when we talk about you being a

3  barrier between the government saying something happened

4  and it being a fact.  There's not a single fact that the

5  government introduced into evidence to show that he got

6  money, he being Mr. Jimenez, from this book sale to his

7  wife.  It just didn't happen.  It wouldn't have been hard

8  I suppose if they wanted to try and prove it.  They

9  didn't even try.  Not there.

10        You know, during these interviews, you know,

11  I can't help but think that, you know, of all the Head

12  Start people that went through this interview process you

13  have Mr. Jimenez answering all these questions, these

14  allegations.  You approved this, when he didn't.  You got

15  money, when he didn't.  You didn't fill out a form.  I

16  didn't get the form.  All that.  Getting sacked in the

17  long run for it.

18        And the same time someone like Dawn Dasher

19  at the program whose voluntary preK program is failing

20  miserably in the State of Florida somehow gets to keep

21  their job.  The same person who when a box of these

22  books, 80 of these books is discovered kicks it into a

23  storage unit and doesn't distribute it.

24        You saw the picture of how the kids react to

25  that book.  We have someone who claims to be an educator

who gets her job back and acts like that.  And that's

what comes from these interviews.  That's the atmosphere

that the interviews have.

All right.  During the course of the

interview I counted five or six occasions -- you can go

back and listen to it for yourself if you'd like to --

five or six different occasions where Mr. Jimenez

attempted to explain to Mr. Sheehan that the benefit to

the program outweighed any possible apparent or potential

conflict of interest.  We know that's true.  That is an

unassailable fact.  All you have to do is look at the

picture to see it.  The only contrary evidence is from

someone who didn't even read the book who claims she made

an analysis of it.

So he is telling you at the time --

remember, he's not under arrest.  But he is telling you

from that day here's what I was thinking.  It was going

to benefit the program.

And think about it.  Let's say the form had

been filed.  Let's say that HR 6.06 had actually been

filed and they know all about the business of his wife.

And let's say Mr. Finney's still protecting himself,

doesn't sign off and it goes up to one of these

committees.

And you have then a committee where Johana

1    Melendez Santiago is here and Nurse Bell is here and they
2    are explaining the relevant merits of this book and
3    whether or not it'd benefit the county more than the fact
4    that her husband works for Head Start.  And what do you
5    reasonably think the result of that committee meeting
6    would be?  There's no doubt what the result of that would
7    be.  The book would be purchased.
8           Is that a fair -- is that a reasonable
9    belief for Michael Jimenez to have based upon his
10   knowledge of everything that's going on at Head Start,
11   with his wife's involvement, with the reception of the
12   predecessor materials?
13          Is it unreasonable to think the benefit
14   outweighed what he called the lapse in judgment in not
15   filing the form?  Does not filing the form evidence that
16   he intended to cheat or deceive the government?  Because
17   these are the words in the jury instructions, cheat,
18   deceive, trickery, craft, unauthorized, unjustifiable,
19   wrongful authorization.
20          None of those terms fit what Mr. Jimenez did
21   here, not even close.  And yet that's the government's
22   burden of proof, proof of such a convincing character
23   that you would be willing to rely and act upon it without
24   hesitation in the most important of your own affairs.
25          I know they accept the burden, but they have

1    not fulfilled it.  I ask you to return a verdict of not

2    guilty on each and every count for Mr. Jimenez.  And

3    thank you for your time and your attention.

4              Thank you, Your Honor.

5              THE COURT:  Mr. Weisbrod.

6              Mr. Farmer on behalf of Miss Mason.

7              MR. FARMER:  Your Honor, may it please the

8    Court, counsel, counsel.

9              Ladies and gentlemen, I can tell you're

10   anxious to get this case.  It's hard for us to give it to

11   you sometimes because we don't -- we don't have another

12   chance to talk to you directly or indirectly through

13   witnesses.

14             So I'm going to be a little more brief than

15   I initially planned.  I'd like you to think about some

16   very significant looming issues the government has in its

17   case and its theory of its charges against Miss Mason.

18             And that is Miss Mason never benefited

19   personally from this alleged scheme to defraud.  There's

20   no evidence she received anything of value.  Certainly no

21   money.  Nothing of value.  Not one witness indicated that

22   she received, whether you call it a kickback or reward or

23   any amount of money or benefit whatsoever.

24             Now, did she intend to help someone else in

25   alledgedly entering into this agreement to scheme, to

defraud the county?  Did she have a motivation that

Michael Jimenez would benefit?  Is there any indication

that a deputy director of an important agency in the

county who supervises five supervisors and supervises an

additional 50 to 60 people below that woke up one day and

said, I'm going to commit three crimes because I feel

like Mr. Jimenez needs a little boost here?

There's just no common sense behind that.

There's just no evidence behind that.  No gain to

herself, no intent to commit crimes to help anyone else.

It just doesn't exist here.

Now, there's also no evidence that

Miss Mason wanted to direct the profits of these books to

Miss Melendez or anyone else.  That's why I went through

the somewhat belabored process of introducing the 25 or

26 e-mails that we have in evidence in this case.

As we pointed out and as you'll see,

Miss Mason does not appear on any of these e-mails.  The

purpose of all these -- except for one she's CC'd about

six weeks after the -- the transaction.

The point is Miss Mason had no involvement

in choosing who the vendor was going to be, in deciding

whether or not Miss Melendez, who she knew was

Mr. Jimenez' wife was going to be the vendor in this

case.  She had no role in that, no care whatsoever what

1    happened there.

2          So, again, that was a -- if she wanted to

3    intervene to help someone for whatever reason and commit

4    crimes, that would have been an awfully good point to do

5    it, that is get involved in the process of picking who

6    the vendor is to ensure that Miss Melendez' company would

7    get the profits.

8          There's just no incentive here for someone

9    like Miss Mason to cross the line and commit a crime.

10   What we have here is good faith entirely throughout the

11   process, acting in good faith at all times and not any

12   effort to give up a career in social services over this

13   without any motivation or benefit.

14         And before I forget to mention this, it's

15   clear, you heard from Mr. Finney, that Miss Mason wasn't

16   even punished, wasn't terminated as a result of this

17   county investigation.

18         And we heard from Miss Tedder, we also heard

19   this morning about how Marie Mason was shocked about

20   this.  She was shocked about being investigated.  She was

21   shocked like Miss Tedder was.  That was the shock.  That

22   wasn't something that she ever expected because she knew

23   she did nothing wrong.

24         Now, another big problem that the government

25   has in this case factually is if this was a grand scheme

to defraud between Mr. Jimenez and Miss Mason, why in the

world would you even approach Nurse Bell or anyone to

become a part of this.  Was that a necessary stage in all

of this?  Was it important that Nurse Bell sign off on

this?

She didn't have to sign anything.  They

didn't need her if this was a criminal effort, a criminal

scheme.  So it wouldn't make any sense to even go to

Miss Bell unless there was no criminal scheme here.

Schemes are to keep secret, to deceive, to

trick.  That's where the fraudulent scheme is.  The

evidence showed that if Miss Mason really want to

conspire with anyone to commit a crime and fraud she

could have signed the form herself and put it in the

process, got Mr. Finney's signature on it, and it went

back to fiscal and this whole scheme could have been

pulled off.  There was no reason to bring anyone else

into it, particularly Nurse Bell.

So, again, it shows good faith is I guess my

point, good faith.  That is Miss Mason went to a nurse.

That was her first response when she got the book for the

first time.

Now, we talked a little bit about the county

policy.  I mean to spend a lot more time on it today.

I'm not going to spend a lot of time on it.  I just want

1    you if you would to think about a couple things.

2            First, if you have the time and the

3    inclination I'd urge you to read at least the first

4    couple of pages if not all of it.  That's Exhibit No. 20.

5            But the important thing to understand is

6    this is an employee disclosure form.  And what the --

7    what it does is if your spouse has a business you're

8    supposed to fill out the form and say that.

9            The second thing it does -- and I don't know

10   if it was a new change or on old change, but the second

11   requirement is if your spouse later enters into a

12   contractual relationship with the county you're supposed

13   to disclose that within 45 days.  All right?

14           So what the government is trying to assert

15   here is that Miss Mason had a duty to tell Mr. Finney

16   that there was a conflict of interest, that there was,

17   quote, unquote, a violation of the rules.

18           How does she know?  And this is something

19   Mr. Brown talked about with Miss Melendez.  How does

20   Miss Mason assume -- and why in the world would she

21   assume?  There'd be no reason to assume that another

22   deputy director, one of the five supervisors just below

23   Mr. Finney -- why would she assume that he's not doing

24   the proper disclosure form about his wife's business and

25   why would she assume that in the next 45 days Mr. Jimenez

would not fill out the proper disclosure form?  That just
makes no sense.

That's why Miss Mason wasn't terminated over
this.  She didn't do anything wrong.  Why would she say
to Mr. Finney Mr. Jimenez has a conflict of interest.
You shouldn't do it.  That's sort of ridiculous.  She
doesn't think he has a conflict of interest and she knows
that all you got to do is fill out forms.

I mean she can't be her brothers keeper.
And it's not like she supervises him.  He's another
deputy director.  She's assuming the best.

And this is sort of a technical thing
anyway, you know, as the other lawyers have pointed out.
This doesn't mean there's a conflict of interest where
people are barred from doing this.  If you disclose it
and the county finds it's okay, it's okay.

But really Miss Mason has no -- no interest
in that dispute.  She's assumes that there's going to --
there was disclosure earlier and was going to be
disclosure later.

And it's interesting about how no one,
including Mr. Finney, seems to know anything about these
disclosures.  He's not familiar with Rule 6.06.  He said
he's not familiar with what the rules are.  I mean these
went into effect October 2009 and all this happened, uhm

1  in, April, May, June, 2010.  You know, it is a gray area.

2  Uhm, but it's not -- it's not a case where Miss Mason

3  crossed the line beyond good faith.

4          Now, the government has -- and I'll get very

5  briefly into some of the nitty gritty stuff that you've

6  heard, some of the nitty gritty arguments.  And the first

7  is the government -- some of the witnesses floated the

8  idea that buying books is unusual.  That makes it all

9  suspicious.

10          Well, we know -- I'm not going to display

11  this now, but take a look at Government Exhibit 11 when

12  you have a chance back there.  This is the document where

13  it says that there was codes for books and that the wrong

14  code was placed in because there had been a change in the

15  code.  There was a new funding source the next year.  And

16  the proper code was put in and that's where we went from

17  a rejected to an approved.

18          There's codes for books.  There's codes for

19  books in help start -- I'm sorry, Head Start.  Does that

20  mean books are unusual?  There wouldn't be a code for it,

21  an established computer code if these books were unusual.

22          And then Miss Dasher floated the idea that,

23  wow, this is really suspicious because when you buy a

24  book at Head Start it would have to go through me.  By

25  the end of her testimony when we had a chance to talk to

her, everybody had a chance, what she agreed with is she has no jurisdiction over health and she's got no jurisdiction over dealing with parents.  Her domain is education and dealing with the teachers.

Health books that go to parents have nothing to do with one thing that Dawn Dasher does, and that's why Miss Mason didn't go to Dawn Dasher or someone else. She went to the RN, the most important person, the most important person there in the office who could give her some feedback about health.

Oh, uhm, again little nitty gritty stuff. Theres a suggestion that having Miss Mason sign the merchandise request form was somehow suspicious.  That she signs off on the form as part of the grand scheme to defraud.

Well, you heard from Mr. Finney.  Mr. Finney testified yesterday I think that he signs about a hundred of these.  And he said the majority -- not sure what the word was before majority, he said large or vast or significant majority, but most of these forms came from Miss Mason.

Again, 60 employees plus 5 supervisors -- maybe it's less.  Maybe it's 50 workers and 5 supervisors.  She's processing all of these.  They all come up from her.  So the fact that she signed a

merchandise request form isn't unusual or suspicious or anything. That's her job. That's what she does all time.

And, again, she signed off simply on the fact that there were three vendors, three quotes, and that the choice for the cheapest quote was selected.

And -- and, by the way, she had -- again, I mentioned this earlier, but I'll say it again. Miss Mason had no involvement over selecting the vendors, no involvement over saying let's let Miss Melendez supply the books and get the check. None of that.

In fact, we just had three quotes. All Miss Marie Mason does is figure out the cheapest quote. And she's not picking out vendors. She has got no involvement. And that's what the 25 e-mails -- what the purpose of that is all about.

Oh, and another nitty gritty issue, $10,000. It's suggested that keeping it to 10,000 was somehow part of the grand scheme to deceive; right? That was part of the thing was let's keep it from procurement.

Was there one witness -- one witness who came into court and said -- from procurement, for instance, who would have said -- maybe there was someone from procurement. But in any event, there was no testimony that if it went to my office we would have

1    stopped this transaction.

2           The process you heard was if it's over

3    10,000 it's simply another check to make sure that the

4    three best -- the three quotes are given and the best

5    price is selected.  That's not a part of a scheme to keep

6    it below 10,000 so no one would be reviewing it.  But

7    that suggestion has been made by some witnesses.  And,

8    frankly, it's not part of anyone's common sense.

9           And if you have the time play Miss Mason's

10   tape back there when you have a chance and you will see

11   that Miss Mason addresses this very issue.  She's asked

12   by Mr. Sheehan about the $10,000 issue.  And I'm not sure

13   if your equipment will have a counter back there, but pay

14   attention at the three minute and 55 second mark.

15   There's questions and answers about -- follow-up

16   questions and answers about this very issue.

17          And Miss Mason says this is not unusual to

18   keep it below ten at all.  And she refers to some events

19   that are paid for that are kept below $10,000.  And she

20   calls it a rule, a rule to keep it below $10,000.

21          But, again, this is -- this is a point

22   that -- that's important.  It's a little bit of a nitty

23   gritty point, but there's not a whole lot of suggestion

24   that Miss Mason did anything fraudulent.

25          We have these theories floated.  And when

1    you really examine them under a microscope -- or not even

2    under a microscope, but just take a little bit closer

3    look, you see that there really is no common sense behind

4    them.

5           And, again, the government has to -- has the

6    burden -- a high burden here of showing that Miss Mason

7    had a criminal intent.  Didn't act in good faith, but she

8    had a criminal bad intent, worked in bad faith to join

9    this criminal effort for inexplicably no benefit for

10   herself, but still to join this criminal effort to

11   deceive and defraud and to cheat and deceive and trick.

12          And they float these suggestions about why

13   it might have been deceptive.  And when you look at them

14   they're all -- they all don't hold together.  They don't

15   fit.  It's not beyond a reasonable doubt.  There's plenty

16   of reasonable doubt.

17          Let's talk about Nurse Bell very briefly.

18   If this were not such a serious case and serious stakes

19   her testimony would be laughable.  It's -- it was absurd.

20   A picture of kind of a cartoon drawing of a kid emerging

21   from a submarine was too mature for a five-year old and a

22   four-year old and a three-year old.  And pictures of

23   tonsils in crayon were too mature.  It's absurd.

24          If Nurse Bell told Marie Mason that was the

25   basis for her opinion that this book was inappropriate,

1   Miss Mason would have had the same response as we all

2   had, that is ridiculous.

3            If Nurse Bell said I didn't read the book.

4   I just looked at the pictures, Miss Marie, her boss'

5   boss, and came to this opinion that this book was too

6   mature and inappropriate, Marie Mason would have had the

7   same response you had.  That is totally absurd,

8   laughable.

9            That's why this transaction went forward

10  despite Nurse Bell just -- I don't have words.  Words

11  fail.

12           I'll leave you with this.  I think you if

13  you remember one thing about this case you remember

14  Mr. Finney's testimony.  There was an investigation we

15  know by Bob Sheehan, law enforcement officer 25 years,

16  detective, works for the FBI.  You know he's doing a

17  thorough investigation.  The result, Marie Mason was not

18  terminated from her job.  She did not commit a crime.

19           THE COURT:  Mr. O'Neill in rebuttal.

20           MR. O'NEILL:  Thank you, Your Honor.

21           Ladies and gentlemen, before I begin I just

22  want to state and show you both Government's Exhibits 1

23  and 15.  Mr. Weisbrod said I misspoke.  And in

24  Government's Exhibit 1, which is the merchandise request

25  form, I'll show it to you directly.  As you might have

seen many, many times in this trial this is the one

that's signed by both Defendant Marie Mason and Louis

Finney.  Nowhere on this document is Mr. Jimenez'

signature.

The government was referring to at the same

time Government's Exhibit 15, which is the final document

here which Miss Edman testified Mr. Jimenez is the final

say on the approval of the payment.  That's what -- they

did receive the books, but nobody had paid anything yet.

So you have both of these documents.  I just want to be

clear on them.

Ladies and gentlemen, you were asked is

there anything unusual about books being bought by

Hillsborough County.  Of course not.  We know that.

That's what Dawn Dasher does.  Dawn Dasher's department

buys the books.

This book was unusual.  Everything about

this particular book was unusual.  It went to the health

department that doesn't buy books.  It went to Marecia

Bell who never saw a book before.  It went to Idalin

Navejar who never saw a book before.  They were never

involved in the process of purchasing books.  They told

you that.  And they were never involved in the process of

purchasing something for this amount of money, $9,000.

So it's this particular book that's unusual.

1            The attacks on Nurse Bell appear to be

2    unwarranted.  And I'm sort of at a loss for that.  And

3    I'll dovetail it with what I'm about to say.  I guess the

4    only reason is because she didn't do what they needed her

5    to do to make this kind of work.  But, you see, it did

6    work, didn't it?  Everybody keeps saying, well, it's

7    obvious.  It's so overt everybody knows what happened.

8            It worked.  Payment was made, the books were

9    sold to the county, they were put in boxes apparently on

10   the floor.  But when did this become overt?  When it go

11   from covert to overt?  When was it discovered?

12           It wasn't till much later when Dawn Dasher

13   brought it to the attention of Bob Sheehan, who started

14   an investigation.  So this is a very, very overt matter.

15   Went all the way through.

16           And it made me think about it when I picked

17   up Government's Exhibits 15 and 11 -- and 1, excuse me,

18   because this is what we have.  We have typical vouchers,

19   invoices, documentation and it looks all very good.

20           Louis Finney thought it was a perfectly

21   acceptable deal because nobody had told him Michael

22   Jimenez was involved in it.  You need to know more.  You

23   need to know who's involved.

24           And that's why the attack on Marecia Bell

25   because she's saying, look, this wasn't right.  This

didn't make sense. And I brought it to people's
attention and nothing was done.

What we're really talking about here is --
and it makes your job a little easier -- is that this is
not a case where there's different stacks all over the
place and different sort of ideas about what happened.
This is I did it, but I didn't have any criminal intent.
I didn't intend to defraud anybody. I did this in good
faith. Okay?

And it's an interesting explanation, of
course, one always given after the fact -- after the
investigation by Bob Sheehan commences. But it goes to
the intent. And that's something you as jurors are going
to have to figure out in applying the facts to the law.

But, you know, when we look at what happened
in this case we look at what people do, not what they
think. Mr. Farmer a couple of times said Miss Mason
assumed. We don't know what Miss Mason assumed. We have
no idea what anybody assumed. You don't know I'm
assuming, I don't know what you're assuming.

That goes to the operation of the mind.
And, again, with my different ideas -- even in literature
I think differently sometimes. And there's a famous poem
by Edward Arlington Robinson called Richard Cory. And I
hope I have it right. But it begins whenever Richard

1    Cory went downtown we people on the pavement looked at

2    him.  He was a gentleman from sole to crown, clean

3    favored and imperially slim.

4              And he was always quietly arrayed, humble as

5    he talked.  Still he fluttered pulses when he said good

6    morning and he glittered as he walked.

7              And he was rich, yes, richer than a king.

8    And admirably schooled in every grace.  In fine we

9    thought that he was everything to make us wish we were in

10   his place.

11             And so on we worked and waited for the

12   light.  Went without the meat and cursed the bread.  And

13   Richard Cory one calm summer night went home and put a

14   bullet in his head.

15             We don't know why Richard Cory killed

16   himself, but we know when he took the gun, had a bullet

17   in it, put it to his head his intent was to kill himself.

18             So going back to this case, the government

19   must show that the defendants acted knowingly and

20   willfully.  That's the requirement.

21             And you'll hear as Her Honor has instructed

22   you, and you'll have the jury instructions, knowingly

23   means that an act was done voluntarily and intentionally

24   and not because of mistake or accident.

25             You've gone through the evidence.  And

1    you'll have an opportunity.  Was there an accident when

2    Miss Melendez Santiago sends an e-mail to her husband,

3    start the ball rolling?  He sends it over to Marecia Bell

4    and Idalin Navejar when both he and Marie Mason meet with

5    these individuals, these gals that work there and tell

6    them, look, we'd like you to look at this.

7              Is it an accident when they come back and

8    say we don't think it's appropriate where they said order

9    it anyway?  Is it an accident when both Mr. Jimenez and

10   Miss Mason tell stories and make things up, tell

11   misrepresentations to Carol Tedder when they're under

12   investigation?

13             So when you have those -- and by that what

14   I'm referring to is the time when Miss Tedder spoke to

15   each of them and Mr. Jimenez said Marecia Bell and Idalin

16   Navejar, it was their idea to purchase the book, you may

17   recall.  And they brought it to my wife.

18             And Miss Mason said I had no idea that

19   Melendez Santiago -- excuse me, Melendez Santiago was

20   going to get the book but that it might have gone to a

21   vendor and she was shocked.  Those are the statements I'm

22   referring to there.

23             But we have no idea why Defendant Mason

24   risked her job and her career to get involved in this

25   conspiracy.  We don't know what operated in her head.

1    What we do know is what she did.  Okay?

2         We don't know why Mr. Jimenez thought it was

3    acceptable as a public official to unjustly enrich

4    himself and his wife.  We know what he did, not what was

5    in his head.

6         We don't know what was in Melendez

7    Santiago's head when she started this ball rolling and

8    wanted to sell a book to her husband, a public official,

9    with his interaction with him being the go-between.  We

10   don't know what's in their head, but we know what they

11   did.  And we know that it was purposeful and that it was

12   voluntarily and intentionally done.

13        And you'll see and you'll have this in front

14   of you.  We can only go and the law only requires that

15   you prove what people did, not what they think, not what

16   their motivation might have been.

17        Often you hear about what a motive is and

18   what was the person's motive.  You see it on TV shows.

19   We don't have to prove motive.  That would be impossible.

20   We have to show intent.  We have to show that someone

21   purposefully did what they did, intentionally did it,

22   knowingly did it.  Okay?

23        The defense will say then that this was just

24   good faith, that they didn't do it with any criminal

25   purpose.  And good faith is an honestly held opinion or

1    formed belief.  Cannot be a fraudulent intent.  And,

2    again, you'll have this in front of you.  And you will

3    also have but it is not good faith if a defendant

4    intended to deceive others by making representations the

5    defendant knew to be false or fraudulent.  And I just

6    catalogued some of them.

7              And think about Mr. Finney when he's signing

8    this document on behalf of Head Start, on behalf of

9    Hillsborough County.  And he has no idea that when

10   Miss Mason signed it she knew that the prime person

11   behind this is Melinda -- excuse me once again, Melendez

12   Santiago, who is the wife of Michael Jimenez, that one of

13   his supervisors is benefiting from this because $9,000 is

14   going to his household where he lives with his wife,

15   where he lives with their children, where they have a

16   house together, a mortgage together and file joint taxes

17   together.

18             That is the kickback, ladies and gentlemen.

19   That is the $9,000 going back to the Jimenez household to

20   Michael Jimenez and Melendez Santiago.  They're receiving

21   this money.

22             Is there anything unusual about books going

23   to Hillsborough County?  No.  It happens all the time

24   through the education department, through Dawn Dasher.

25   But is there something unusual about this book?  Oh,

1    yeah, a lot.  When the author is married to a public

2    official who's benefiting financially from this

3    transaction it's called a crime.

4          I finally want to talk about the conflict of

5    interest forms for a second.  You'll note they're not

6    charged with conflict of interest.  We've not spent a lot

7    of time on conflict of interest.  That merely goes to

8    knowledge on the part of Michael Jimenez that he knew he

9    needed to fill these things out because he had filled one

10   out before.  That it's a requirement.

11         This is not a conflict of interest case.  It

12   is conspiracy of fraud against government programs and

13   mail fraud -- wire fraud case -- excuse me, mail fraud

14   case.  Those are the three counts, not conflict of

15   interest.

16         So, ladies and gentlemen, on behalf of the

17   United States, the government -- when you go through each

18   and every element you will find the government has proven

19   those beyond a reasonable doubt, which is required, and

20   I'd ask you on behalf of United States to find each of

21   the defendants guilty as charged.  Thank you.

22         THE COURT:  All right.  Ladies and

23   gentlemen, in just a few minutes you will be able to go

24   back to the jury room and deliberate in this matter.

25         Just sort of what I would call housekeeping

1    things.  First of all, you can take whatever time you

2    need in order to reach a verdict.  There's no time

3    constraint here.  You can come back tomorrow if you need

4    to come back.  So from this point forward my only

5    instruction to you is regarding time.  Take whatever time

6    you need in an effort to reach a verdict if you can do

7    so.

8         Secondly, I mentioned that lunch would be

9    brought in.  And I'm not sure exactly when it's going to

10   be here, but we'll have it brought up.  And I'm sure it

11   will probably be sometime between 12:30 and 1 o'clock

12   when it's brought up to your jury room.

13        You are welcome during your deliberations to

14   take a break.  If you need to walk around, you're

15   certainly welcome to walk around.  However, if you do

16   break apart for any reason, such as to go get a Coke or

17   just because you need to get out the jury room, walk

18   around, stop discussing the case.  All of you, meaning

19   the 12 jurors, must be in that jury room to have

20   discussions about the case.  So fine, take a break if you

21   need to get out.

22        Mr. Adkins will be outside of the room and

23   I'm sure he'll tell me the jury's taking a break.  If you

24   do that though wait till all of you are back together

25   again before you begin discussing the case again.

Finally, the housekeeping matter that I probably should have mentioned earlier, I told you the evidence was going back. We had two audio recordings -- two DVDs, CDs that were played. Those will go back and we're going to send back a computer.

Miss Vizza will show you where it starts so that if you wish to replay those and listen to them, you certainly will be able to do that as well. And there's nothing really else on there on the computer other than we're sending it back so that you can play those audio recordings.

Now, the first thing that you need to do when you get back to that jury room in just a few minutes is to select one of your number to be the foreperson of this jury. And the foreperson of the jury will act for you when you come back to court. The foreperson will sign and date the verdict form. The foreperson will preside over the jury's deliberations much like a chairman presides over a meeting.

If you need to communicate with me in any way you will have your legal pads back there. You can write out a question, sign it, give it to Mr. Adkins who will be outside of your room. Miss Vizza will bring it to me. I'll look at it.

If I need to reconvene court, I'll reconvene

court.  If it's a question about an instruction or a question about something in the case, I will reconvene court, bring you into the courtroom with everybody present and attempt to answer the question.  Should you need to write out a question, please don't tell me a numerical division if there is a numerical division among the jurors.

Also, again, if you recess you don't need to write that out and say, oh, we're going to recess for 15 minutes.  It's fine.  Take a recess.  You don't need to tell me about that.  But if you do have a question about the case then you'll need to write it down and sign it and Mr. Adkins will bring it to me.

Now, two of your number are alternate jurors.  And you will recall that when we were selecting the jury we selected 12 jurors and 2 alternate jurors. The law allows only 12 jurors to deliberate in a criminal case, so only 12 of you will go back to make a decision in the case.  Two of you are alternate jurors.  And as I normally do, I haven't announced the names of the alternate jurors until now.

But Miss Clos and Mr. Moore, you are the alternate jurors in this case.  Because all of the 12 jurors have remained, you will not be going back to the jury room to deliberate in this case and in just a few

1    minutes I'm going to excuse you.

2            I would like to thank you, however, before I

3    do that for your services in this case.  You've all paid

4    close attention -- you've paid close attention.  You've

5    been with us now for four days.  I hope it was a good

6    experience.  I would ask you not to discuss the case

7    until such time as the jury returns a verdict in this

8    case, which I'm not sure whether that'll be this

9    afternoon or tomorrow or when it will be.  But I would

10   ask that you not discuss the case.

11           Miss Vizza will be happy -- and I think you

12   have her number.  And if not, she'll give it to you again

13   if you will call to tell you what the verdict is or to

14   tell you if necessary when the jury has reached a

15   verdict.  If you want to remain in the courtroom, as long

16   as you don't discuss the case with anyone you're welcome

17   to do that as well.  Just simply can't go back and

18   deliberate in the case.

19           If you have something in the jury room,

20   you're welcome to go back and get what you have in the

21   jury room.  But you will have to leave during the jurors'

22   deliberations.  As far as your notes are concerned I

23   would ask that you leave your notes here face down on

24   your chairs, the jury instructions and the seating chart

25   as well.

1          All right.  For the remainder of the jurors,

2    you have heard all of the case, you have your

3    instructions, you have your notes to take back with you.

4    We will send the exhibits back in just a few minutes.

5          And, Mr. Adkins, you can conduct the jury to

6    the jury room.

7          COURT SECURITY OFFICER:  Yes, Your Honor.

8          All rise, please, for the jury.

9    (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

10          THE COURT:  Okay.  Could you all have a seat

11    for just a minute.  Couple of things.  I would appreciate

12    it if you would get with Miss Vizza to make sure that

13    both the government and the defendants are satisfied with

14    the exhibits going back so that no exhibit is

15    inadvertently sent back or not sent back.

16          We've also -- and I'm not sure you discussed

17    this with them, the exhibit list that you prepared we're

18    going to -- at least I would like to send back those

19    exhibit lists.  It allows the jurors to look at the

20    exhibits I think easier.  We have whited out those that

21    did not come in and Miss Vizza will show you that.  And

22    if there's a problem you can let me know.  But I would

23    like to do that if it's not a problem to send back

24    exhibit lists.

25          And, number two, I want you to check with

1    her regarding the exhibits before we send those exhibits

2    back.  And I believe that's it.

3                 Mr. O'Neill.

4                 MR. O'NEILL:  You want us to start that

5    right now, Judge?

6                 THE COURT:  Yes, I do.

7                 MR. O'NEILL:  Thank you.

8                 THE COURT:  And otherwise we'll be in recess

9    pending a verdict.  The defendants -- I anticipate you're

10   going to have at least an hour and 15 minutes.  If you

11   want to go eat lunch, whatever you would like to do.  I

12   can't imagine we're going to get a verdict any quicker

13   than that.

14                For the attorneys, if you'll leave Miss

15   Vizza your cell phone numbers so that we can get in touch

16   with you.  We'll be happy to call you if you have cell

17   phones.  If you don't, you'll have to come back.

18                MR. WEISBROD:  Do you want us to hang around

19   for any bit of time?

20                THE COURT:  No.  I think you're fine.  I

21   don't think you're going to get a verdict anytime soon.

22                I'm just going to sit up here and tell you

23   check and make sure your exhibits are good.

24                Listen, I should all of you what a well

25   tried case this was.  This was an absolute pleasure for a

judge.  I mean so professionally tried.  This was just
unusually nice.  What can I tell you.

MR. FARMER:  I feel bad for requiring the
only sidebar.

THE COURT:  Mr. Farmer, I still think you
have a good hour and 15 minutes or hour and a half.
Nobody is going to do anything.  They're going to eat and
all that kind of thing.

MR. FARMER:  Thank you.

(THEREUPON, THE LUNCHEON RECESS WAS TAKEN, AND THEN THE
PROCEEDINGS CONTINUED AS FOLLOWS:)

COURTROOM DEPUTY CLERK:  All rise.  Please
be seated.

THE COURT:  All right.  Well, as you
probably know, the jury has sent us a message which says,
"We have reached a verdict."  It's signed by Adele Geyer
who apparently is the foreperson of this jury.

So what time did I send the jury out?

MR. O'NEILL:  12:35.

THE COURT:  12:35.  Well, whatever verdict
it is it did not seem a lot of question in their minds
about what the verdict should be.

Let me talk to the defendants for just a
moment.  And Your attorneys may have told you this, but
I'm going to go through it again.  I'm going to ask

1    Mr. Adkins to bring the jury in.  And the first thing I

2    will do is ask them if they've selected a foreperson.

3    Now, I already know they have and I know who it is, but

4    I'm going to ask them that anyway.

5         Then I will ask her if the jury has reached

6    a unanimous verdict as to each of you and to as to each

7    of the counts.  I'm assuming the answer to that is yes.

8    If that is the case I will ask her to hand the verdict

9    form to the security officer and he will hand it to me.

10        I'm going to look at it to just make sure

11   it's all filled out and signed.  If it is, I will then

12   hand it to Miss Vizza and I will ask you to stand and she

13   will be the person that reads the verdict.

14        Okay.  Bring the jury in.

15        COURT SECURITY OFFICER:  All rise, please,

16   for the jury.

17     (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

18        COURT SECURITY OFFICER:  Thank you, ladies

19   and gentlemen.  Please be seated.  Come to order.

20        THE COURT:  Ladies and gentlemen, you've

21   sent a note indicating that you have reached a verdict

22   but I'm going to still ask a couple of questions.  First

23   if you will tell me if you've selected a foreperson and,

24   if so, who that foreperson is.  Who's the foreperson?

25        THE JUROR:  I am.

1          THE COURT:  All right.  Miss Geyer, you are

2     the foreperson of the jury?

3          THE JUROR:  I am.

4          THE COURT:  All right.  Without telling me

5     what the verdict is, has this jury reached a unanimous

6     verdict as to each of the defendants and each of the

7     counts?

8          THE JUROR:  Yes.

9          THE COURT:  Okay.  Could you hand the

10    verdict form to Mr. Adkins, please.

11          All right.  Miss Vizza, I'm going to ask you

12    to publish or read the verdicts.

13          And we will start with Mr. Jimenez.

14    Mr. Jimenez, if you would stand.

15          And, Miss Vizza, would you publish the

16    verdict for Mr. Jimenez.

17          COURTROOM DEPUTY CLERK:  Yes, Your Honor.

18          In the matter of the United States of

19    America versus Michael Jimenez, verdict.  Count I of the

20    Indictment.  As to the offense of conspiracy to commit

21    offenses against the United States, in violation of Title

22    18 United States Code, Section 371, we, the jury, find

23    the defendant, Michael Jimenez, not guilty.

24          Count II of the Indictment.  As to the

25    offense of fraud or misapplication of funds concerning

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   programs receiving federal funds, in violation of Title

2   18 United States Code, Sections 666(a)(1)(A)(i) and 2 and

3   (ii), we, the jury, find the defendant, Michael Jimenez,

4   guilty.

5           Count III of the Indictment.  As to the

6   offense of honest services mail fraud, in violation of

7   Title 18 United States Code, Sections 1341, 1346 and (2),

8   we, the jury, find the defendant, Michael Jimenez,

9   guilty.

10          So say we all this 14th day of July.  Signed

11   by Adele Geyer, foreperson.

12          THE COURT:  Thank you.

13          Mr. Jimenez, you may have a seat, sir.  And

14   I'm just going to go down the row.

15          Miss Melendez Santiago, if you would stand.

16          And would you publish the verdict for

17   Miss Melendez Santiago.

18          COURTROOM DEPUTY CLERK:  Yes, Your Honor.

19          United States of America versus Johana

20   Melendez Santiago, verdict.  Count I of the Indictment.

21   As to the offense of conspiracy to commit offenses

22   against the United States, in violation of Title 18

23   United States Code, Section 371, we, the jury, find the

24   defendant, Johana Melendez Santiago, not guilty.

25          Count II of the Indictment.  As to the

offense of fraud or misapplication of funds concerning

programs receiving federal funds, in violation of Title

18 United States Code, Sections 666(a)(1)(A)(i) and 2 and

(ii), we, the jury, find the defendant, Johana Melendez

Santiago, not guilty.

Count III of the Indictment.  As to the

offense of honest services mail fraud, in violation of

Title 18 United States Code, Sections 1341, 1346 and (2),

we, the jury, find the defendant, Johana Melendez

Santiago, not guilty.

So say we all this 14th day of July.  Signed

by Adele Geyer, foreperson.

THE COURT:  If you would have a seat,

please.

And, Mr. Farmer, I'm going to ask if you and

your client, Miss Mason, will stand.  Thank you.

COURTROOM DEPUTY CLERK:  In the matter of

the United States of America versus Marie Mason, Verdict.

Count I of the Indictment.  As to the offense of

conspiracy to commit offenses against the United States,

in violation of Title 18 United States Code, Section 371,

we, the jury, find the defendant, Marie Mason, not

guilty.

Count II of the Indictment.  As to the

offense of fraud or misapplication of funds concerning

programs receiving federal funds, in violation of Title

18 United States Code, Sections 666(a)(1)(A)(i) and 2 and

(ii), we, the jury, find the defendant, Marie Mason, not

guilty.

Count III of the Indictment. As to the

offense of honest services mail fraud, in violation of

Title 18 United States Code, Sections 1341, 1346 and (2),

we, the jury, find the defendant, Marie Mason, not

guilty.

So say we all this 14th day of July. Signed

by Adele Geyer, foreperson.

THE COURT: All right. Thank you,

Miss Vizza. You may have a seat.

Mr. Weisbrod, would you like this jury

polled?

MR. WEISBROD: Yes, please.

THE COURT: All right. Ladies and

gentlemen, you recall I said that it needed to be a

unanimous verdict. That means it must be the verdict of

each one of you as well as the jury as a whole. So I'm

going to ask Miss Vizza to poll you. And all that means

is she's going to ask each of you individually about your

verdicts.

So, Miss Vizza, if you would poll the jury.

COURTROOM DEPUTY CLERK: Sherill Stone, is

1   this your verdict as to each of the counts and as to each

2   of the defendants?

3               THE JUROR:  Yes.

4               COURTROOM DEPUTY CLERK:  Austin Baker, is

5   this your verdict as to each of the counts and as to each

6   of the defendants?

7               THE JUROR:  Yes.

8               COURTROOM DEPUTY CLERK:  Wendy James, is

9   this your verdict as to each of the counts and as to each

10  of the defendants?

11              THE JUROR:  Yes.

12              THE COURT:  I'm sorry?

13              THE WITNESS:  Yes.

14              THE COURT:  Thank you.

15              COURTROOM DEPUTY CLERK:  Aimee Kessler, is

16  this your verdict as to each of the counts and as to each

17  of the defendants?

18              THE JUROR:  Yes.

19              THE COURT:  Each of the defendants, yes?

20              THE JUROR:  Yes.

21              COURTROOM DEPUTY CLERK:  Constance Kinnick,

22  is this your verdict as to each of the counts and as to

23  each of the defendants?

24              THE JUROR:  Yes, it is.

25              COURTROOM DEPUTY CLERK:  Jennifer Pavluk, is

1  this your verdict as to each of the counts and as to each

2  of the defendants?

3            THE JUROR:  Yes.

4            COURTROOM DEPUTY CLERK:  Michelle Kindle, is

5  this your verdict as to each of the counts and as to each

6  of the defendants?

7            THE JUROR:  Yes.

8            COURTROOM DEPUTY CLERK:  Tamra Gorsuch, is

9  this your verdict as to each of the counts and as to each

10  of the defendants?

11            THE JUROR:  Yes.

12            THE COURT:  Each of the defendants?  Is that

13  your verdict as to each of the defendants as well?

14            THE JUROR:  Yes.

15            THE COURT:  Okay.  Thank you.

16            COURTROOM DEPUTY CLERK:  Jane Giffen, is

17  this your verdict as to each of the counts and as to each

18  of the defendants?

19            THE JUROR:  Yes.

20            COURTROOM DEPUTY CLERK:  Bethany Leavitt, is

21  this your verdict as to each of the counts and as to each

22  of the defendants?

23            THE JUROR:  Yes, it is.

24            COURTROOM DEPUTY CLERK:  Adele Geyer, is

25  this your verdict as to each of the counts and as to each

1       of the defendants?

2                   THE JUROR:  Yes.

3                   COURTROOM DEPUTY CLERK:  Sheila Evans, is

4       this your verdict as to each of the counts and as to each

5       of the defendants?

6                   THE JUROR:  Yes.

7                   THE COURT:  All right.  Thank you,

8       Miss Vizza.

9                   Ladies and gentlemen, I would like to thank

10      each of you for the time and the service on this case.  I

11      think the attorneys were pretty good.  They told me at

12      the beginning it was going to be about four days and it

13      is indeed four days.  So we tried to be very conscious of

14      your time and tried to start timely.  I think we might

15      have slipped a couple of times.

16                  But we hope that this jury service has not

17      been an unpleasant experience for you.  Hope if you're

18      called again you'll come.

19                  I would also like to thank you because we

20      know that each of you, as we said in the beginning, have

21      something else you could be doing whether it's a job,

22      whether you're here because you're not getting paid your

23      commissions that you would normally get paid, whether,

24      you know, you had a trip or something else that you

25      wanted to do.  We understand that.

1         And, again, it is an extremely important

2  service you perform.  We rely on jurors to make difficult

3  discussions.  Without you we couldn't have the system

4  that we have.  And we are all appreciative.  So thank

5  you.

6         Mr. Adkins, would you conduct the jury back

7  to the jury room.

8         COURT SECURITY OFFICER:  Yes, Your Honor.

9         All rise, please, for the jury.

10     (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

11        THE COURT:  I'm going to work backwards here

12  for just a moment.

13        Miss Mason, this jury has found that you

14  were not guilty as to Counts I, Count II and Count III of

15  the Indictment.  Those were all of the counts that you

16  were charged on.  I'm going to adjudicate you not guilty

17  and you're essentially free to go.

18        DEFENDANT MASON:  Thank you.

19        THE COURT:  That doesn't mean you have to

20  get up and leave right now but I'm just telling you that.

21        Mr. Farmer, you had a question?

22        MR. FARMER:  Miss Mason would like to have

23  her passport returned as soon as possible, do I need an

24  order for that?

25        THE COURT:  You do.

1          MR. FARMER:  And can we do an order?

2          THE COURT:  Do you know where it is?

3          MR. FARMER:  It's pretrial.

4          THE COURT:  Okay.  We'll do an order.

5          MR. FARMER:  Thank you.

6          THE COURT:  All right.

7    Miss Melendez Santiago, this jury has found you not

8    guilty on Count I, Count II, and Count III of the

9    Indictment.  Those were all of the counts that you were

10   charged with.  I'm going to adjudicate you not guilty

11   and you too are free to go.

12         MR. BROWN:  Same issue we've got on the

13   passport, Your Honor.  I assume the same order.

14         THE COURT:  Yes.  We will do that.  We

15   wouldn't do it unless you asked us, but we'll do it

16   because we wouldn't know it was there.  But pretrial?

17         MR. BROWN:  Pretrial services has her

18   passport.

19         THE COURT:  All right.  Thank you.

20         Mr. Jimenez, this jury has found you not

21   guilty on Count I.  The jury has found you guilty as to

22   Count II, which is the offense of fraud or misapplication

23   of funds concerning programs receiving federal funds.

24   The jury has also found you guilty of Count III of the

25   Indictment, which is the honest services mail fraud

1   count.

2          As to Count II of the Indictment, I'm going

3   to adjudicate you guilty of that count.

4          As to Count III I had deferred ruling on the

5   motion for judgment of acquittal.  And normally what I do

6   if you would like -- so I'm asking you if you would

7   like -- is to give you an opportunity to file any

8   motions -- I'm sorry, any memorandum or briefs that you

9   would like to file on this issue.  This is the kickback

10   issue.  And the concern -- at least a concern I have is

11   to whether the government had presented evidence of a

12   kickback.

13          So, Mr. O'Neill, would you like any

14   additional time to brief or file any kind of memorandum

15   on this issue?

16          MR. O'NEILL:  Before there's a motion, Your

17   Honor?

18          THE COURT:  Well, I deferred ruling on it on

19   the motion for judgment of acquittal until after the

20   verdict.

21          MR. O'NEILL:  Respectfully, Judge, I thought

22   you only did that as to Defendant Melendez Santiago.

23          THE COURT:  No.  I did it all of them.

24          MR. O'NEILL:  Okay.  My mistake, Judge.  I

25   misheard.  I'd be glad to.  Whatever is convenient for

1    the Court, but I would need a little time to file a

2    brief.

3              THE COURT:  Well, it's up to you if you want

4    to or you don't want to.

5              MR. O'NEILL:  Oh, I would like to, Your

6    Honor.

7              THE COURT:  Mr. Weisbrod.

8              MR. WEISBROD:  I would, Your Honor.  I can

9    only tell you because of travel plans if I'm going to get

10   it to you it would either be by Friday of next week or

11   30 days.

12             THE COURT:  Okay.  It doesn't have to be

13   lengthy.  I think I pretty much know the issue.  I'm just

14   giving you an opportunity to do this if you want to do

15   it.

16             MR. O'NEILL:  Yes, Judge.  Friday of next

17   week will be fine with the government.

18             THE COURT:  All right.  Friday of next week

19   would be what?

20             COURTROOM DEPUTY CLERK:  July 22nd.

21             THE COURT:  July 22nd.  All right.  If you

22   would file any brief or memorandum you wish to file on

23   the issue, and that's the issue only as to Count III, if

24   you would file it by that date.

25             Now, as far as Mr. Jimenez is concerned, I'm

1   going to order a presentence investigation report and set

2   a sentencing date.

3            And, Miss Vizza, if you could give us a

4   date, please.

5            COURTROOM DEPUTY CLERK:  Yes, Your Honor.

6   October the 11th at 8:30.

7            THE COURT:  All right.  Does anyone have

8   anything else to come before the Court at this time?

9            MR. O'NEILL:  Not from the government.

10  Thank you.

11           THE COURT:  Okay.  Thank you.  We're

12  adjourned.

13           MR. O'NEILL:  Thank you, Your Honor.

14           COURT SECURITY OFFICER:  All rise.

15              (Proceeding adjourned.)

16           I CERTIFY that the foregoing is a true and

17  accurate transcription of my stenographic notes.

18  Dated:  11/04/2011.

19

20                ___s/ Sandra K. Provenzano_____
                       SANDRA K. PROVENZANO, RPR
21                     Official Court Reporter

22

23

24

25

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER