```
1                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
2                     TAMPA DIVISION

3     UNITED STATES OF AMERICA,

4         Plaintiff,

5           vs.            CASE NO. 8:11-CR-197-T-24TGW
                           20 OCTOBER 2011
6                          TAMPA, FLORIDA
                           8:32 - 9:39 AM
7                          PAGES 1 - 54

8     MICHAEL JIMENEZ,

9         Defendant.

10    _____/

11          TRANSCRIPT OF SENTENCING PROCEEDINGS
            BEFORE THE HONORABLE SUSAN C. BUCKLEW
12              UNITED STATES DISTRICT JUDGE

13    APPEARANCES:

14    For the Plaintiff:   Robert O'Neill
                           United States Attorney
15                         Middle District of Florida
                           400 N. Tampa Street
16                         Suite 3200
                           Tampa, Florida 33602
17
      For the Defendant:   David T. Weisbrod
18                         Law Office of David T. Weisbrod
                           Suite 1111
19                         412 E Madison Street
                           Tampa, Florida 33602
20
      Court Reporter:      Linda Starr, RPR
21                         Official Court Reporter
                           801 N. Florida Avenue
22                         Suite 13B
                           Tampa, Florida 33602
23

24     Proceedings recorded and transcribed by
      computer-aided stenography.
25
```

1          Call to order of the Court:

2                    **P R O C E E D I N G S**

3          THE COURT:  Good morning.  The matter that is

4     set this morning for sentencing is the United States

5     of America versus Michael Jimenez.  This is criminal

6     case 11-197.

7          If I can get counsel to state their

8     appearances, starting with counsel for the United

9     States.

10          MR. O'NEILL:  Good morning, Your Honor.

11     Robert O'Neill for the United States.  With me is

12     Deven Williams from the FBI.

13          THE COURT:  Good morning.

14          MR. WEISBROD:  Good morning, Your Honor.

15     David Weisbrod for Mr. Jimenez, who is present in

16     court.

17          THE COURT:  Mr. Weisbrod.

18          Mr. Jimenez, if you would stand, please, sir.

19     And, Ms. Vizza, would you swear him in.

20          COURTROOM DEPUTY CLERK:  Yes, Your Honor.

21     Please raise your right hand.

22          (Defendant complied.)

23          COURTROOM DEPUTY CLERK:  Do you solemnly swear

24     or affirm under penalty of perjury that the answers

25     you shall give to questions propounded by the Court

1    will be the truth, the whole truth and nothing but

2    the truth?

3              THE DEFENDANT:  Yes.

4              COURTROOM DEPUTY CLERK:  Thank you.

5              THE COURT:  Mr. Jimenez, if you'll remain

6    standing.

7              In the past 24 hours, have you had any drugs,

8    any alcohol or any medications?

9              THE DEFENDANT:  Medication, what is prescribed

10   to me.

11             THE COURT:  Okay.  And I'll come back to that

12   in a minute.  But there are no other drugs or

13   alcohol?

14             THE DEFENDANT:  No.

15             THE COURT:  All right.  What is the medication

16   that you are taking?

17             THE DEFENDANT:  Depakote.

18             THE COURT:  Okay.  And when did you last have

19   that?

20             THE DEFENDANT:  This morning.

21             THE COURT:  Okay.  Anything else?

22             THE DEFENDANT:  Lomentol (phonetically) and

23   Xanax.

24             THE COURT:  And what?

25             THE DEFENDANT:  Xanax.

1          THE COURT:  Okay.  You've had all of those

2    within the past 24 hours?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Is your mind clear this morning?

5          THE DEFENDANT:  Yes, it is.

6          THE COURT:  All right.  Have you had an

7    opportunity to read through the presentence

8    investigation report that was prepared by probation?

9          THE DEFENDANT:  Yes, I did.

10          THE COURT:  Have you had an opportunity to

11    discuss it with Mr. Weisbrod?

12          THE DEFENDANT:  Yes, I did.

13          THE COURT:  Do you need any more time to talk

14    about the presentence report with him or to talk

15    about anything else before we begin this morning?

16          THE DEFENDANT:  No, I do not.

17          THE COURT:  Thank you, sir.  You may have a

18    seat.

19          Okay.  Mr. O'Neill, let me ask you a question

20    and I'll then ask Mr. Weisbrod the same question.

21          But you filed an interlocutory -- I'm not sure

22    I have it up here, but an interlocutory notice of

23    appeal as to the judgment of acquittal on Count

24    Three.  Well, let me start again.

25          The jury came back with a verdict of guilty as

1    to Mr. Jimenez as to Counts Two and Three, not

2    guilty as to Count One.  I subsequently granted the

3    motion for judgment of acquittal as to Count Three.

4          You then filed an interlocutory notice of

5    appeal.  I am assuming, but let me just get --

6    verify this with you -- I am assuming that you agree

7    that I have jurisdiction to go ahead and sentence on

8    Count Two.

9          MR. O'NEILL:  Yes, Your Honor.

10          THE COURT:  Okay.  Mr. Weisbrod, you do, too?

11          MR. WEISBROD:  Yes, Your Honor.

12          THE COURT:  Okay.  And I think that's right,

13    too.  I just wanted to make sure we were all on the

14    same page.

15          Mr. Weisbrod, I know that you have filed a

16    motion to appoint counsel for purposes of appeal.

17    And it was my intent to take this up after

18    sentencing, if that's all right.

19          MR. WEISBROD:  Yes, Your Honor.

20          THE COURT:  Okay.  Mr. O'Neill, Mr. Weisbrod

21    filed a sentencing memorandum.  I believe it was

22    filed on 10/14/2011.  Have you had an opportunity to

23    see that?

24          MR. O'NEILL:  Yes, Your Honor.

25          THE COURT:  Okay.  Thank you.  Okay.  Let me

1    go through a few things in the presentence

2    investigation report.

3         As I said earlier, the jury in this matter on

4    July 14th, 2011 found Michael Jimenez guilty as to

5    Count Two and Three, not guilty as to Count One.  I

6    granted a JOA as to Count Three.  So we are here to

7    the offense of fraud or misapplication of funds

8    concerning programs receiving federal funds, or

9    Count Two.

10        The probation office has done an advisory

11   guideline calculation and my presentence report is

12   dated October the 3rd.  And the advisory guideline

13   calculation that the probation office has prepared

14   has suggested the following.  And I know there are

15   some objections which we will talk about in a

16   minute.

17        But the base offense level for that count

18   under 2B1.1(a)(2), actually, is a six.  They have

19   suggested it appropriate that there be a two-level

20   increase because the loss exceeded $5,000 but was

21   less than $10,000.

22        They have suggested that there be an

23   additional two-level increase based on the abuse of

24   a position of trust which would make the adjusted

25   offense level a 10.  He receives nothing off for

1    acceptance of responsibility, so it would be a 10.

2    He has no criminal history, so it would be a 10,

3    criminal history category of one.

4         The range of imprisonment is anywhere from six

5    to twelve months under the advisory guidelines.  And

6    I believe that the statutory provision is up to 10

7    years.

8         Now, Mr. O'Neill, according to the addendum

9    from the probation office, you have no unresolved

10   objections to those advisory guidelines.  Is that

11   correct?

12        MR. O'NEILL:  Correct, Your Honor.

13        THE COURT:  Or anything else in the

14   presentence report?

15        MR. O'NEILL:  Correct, Your Honor.

16        THE COURT:  Okay.  Mr. Weisbrod, both in the

17   addendum that I have and also in the sentencing

18   memorandum that you have filed, you do have two

19   objections, and I'm going to let you address them

20   both at the same time and then ask Mr. O'Neill to

21   respond.

22        The first is the two-level increase for the

23   loss amount.  The probation office has determined

24   that it's $9,000.  And I believe your argument is

25   that he should get credit on that for the amount of

1    the books, essentially, and the amount of the loss

2    is really $2,730.

3        The other objection is as to the adjustment

4    for the role in the offense.  And you believe that

5    there should not be a two-level increase for abuse

6    of a position of trust.  And I think you base that

7    on several things, among them the *Williams* case

8    which the -- I have read, as well.  So I'll let you

9    proceed.

10        MR. WEISBROD:  That's a pretty concise

11    summary, Your Honor.

12        THE COURT:  Okay.  It's not so concise, but a

13    summary.

14        MR. WEISBROD:  Probably more concise than I'm

15    about to be.

16        There are two parts to the loss argument.  The

17    first is what the Court recited and, that is,

18    whether or not there should be a credit against the

19    9,000 -- I'm calling it a credit because that's sort

20    of the language of the guidelines -- a credit

21    against the 9,000 for the actual cost of the books.

22        If you subtract that from the 9,000, then the

23    loss figure would be, as the Court mentioned, under

24    5,000, and then there would be no enhancement for

25    that specific offense characteristic.

1          The application note, Your Honor, is 3E2(i).

2          THE COURT:  I'm sorry.  Ms. Vizza, my

3   sentencing book -- and I've got this all marked on

4   my desk.  Would you bring that to me.

5          COURTROOM DEPUTY CLERK:  Yes, Your Honor.

6          THE COURT:  Go ahead.  I went through this

7   yesterday and marked it.  So go ahead.  I'm

8   listening.

9          MR. WEISBROD:  So what the application note

10  says is the loss shall be reduced by the following,

11  and then (ii) is, in a case involving collateral

12  pledge or otherwise provided by the defendant, the

13  amount the victim has recovered at the time of the

14  sentencing from disposition of the collateral or if

15  the collateral has not been disposed of by that

16  time, the fair market value of collateral at the

17  time of sentencing.

18         So what we have is the county paid a certain

19  amount of money -- well, actually, not the county,

20  the United States government, and received in

21  exchange these books of value.  And they used the

22  books of value.

23         They're -- if the Court recalls, there was

24  testimony regarding one carton which may not have

25  been distributed, but all the other cartons were

1    distributed.  There's no evidence to suggest that

2    the books were returned by the families or not used

3    by Head Start.

4         So they've taken advantage of the purchase.

5    They've used the purchase to further the program

6    goals.  Program participants have received the books

7    and presumably used them.  I mean, there's no other

8    testimony that that hasn't been the case.  And I

9    think that's a fair inference from the evidence

10   presented.

11        So given that, it is not just that $9,000 was

12   spent and nothing was received.  It wasn't like

13   $9,000 was embezzled and the program is out that

14   money without having received the benefit.

15        Because there was a benefit received, it's

16   only fair to suggest that that value be subtracted

17   from the overall cost paid by the county and so --

18   were paid by the government.  And so that's the

19   essence of the credit against loss calculation that

20   we've made.

21        THE COURT:  Okay.  I have two questions for

22   you.  The first one is the jury came back with a

23   guilty verdict as to this count.  And when I

24   instructed the jury, I said that they had to find

25   four things.  Number one, that Michael Jimenez was

1    an agent of Hillsborough County Head Start, that he

2    obtained by fraud or intentionally misapplied

3    property that is valued at $5,000 or more.  Had the

4    jury already made the determination that it's $5,000

5    or more?

6        MR. WEISBROD:  I don't think so, Your Honor.

7    My -- I thought my understanding was, and I don't

8    have -- hold on just a second, if the Court would.

9        THE COURT:  Okay.  What I said -- I'm sorry.

10    I probably have you at a disadvantage.  I'll read

11    the whole jury instruction.  It says, it is a

12    federal crime for anyone who is an agent of a local

13    government or local governmental agency receiving

14    significant benefits under a federal assistance

15    program to obtain by fraud or intentionally misapply

16    property that's valued at $5,000 or more and is

17    owned by or is under the care, custody or control of

18    such organization, government or agency.

19        The defendant can be found guilty only if all

20    of the following facts are proven beyond a

21    reasonable doubt.  Number one.  As I said, that he

22    was an agent of Head Start; number two, that the --

23    on or about June 24, 2010, he obtained by fraud or

24    intentionally misapplied property valued at $5,000

25    or more, the property was owned or under the care of

1    Head Start.  And then during the calendar year, Head

2    Start received assistance, federal assistance in

3    excess of $10,000.  I don't think there are any

4    definitions that affect the $5,000.

5         So my question to you is hasn't the jury

6    already made this determination.

7         MR. WEISBROD:  The value of the property is

8    not the same as loss.  If that were the case, there

9    would never be credits to be given and there

10   wouldn't be certain amounts that are never included

11   in a loss calculation.  For instance, in the

12   application note right above 3E, in 3E, there are

13   exclusions from loss, finance charges, late fees and

14   penalties and that sort of thing.

15        So you can have value of property greater than

16   $5,000, obviously.  The book cost was $9,000, but

17   that doesn't equate the loss.

18        THE COURT:  Okay.  Here's my other question.

19   The probation office suggested that what we need to

20   be looking at is application note 3F5, little 5.

21   Certain other unlawful misrepresentations, schemes

22   in a case involving a scheme in which services were

23   fraudulently rendered to the victim by persons, and

24   then it would go on to number three, goods for --

25   goods -- I'm sorry, let me find my -- goods for

1    which regulatory approval by a governmental agency

2    was required but not obtained or was obtained by

3    fraud, the loss shall include the amount paid for

4    the property services or goods.  Why wouldn't this

5    apply?

6         MR. WEISBROD:  Because this isn't obtaining

7    goods by regulatory approval.  The regulatory

8    approval in this case, Your Honor, is Head Start

9    awarding a block grant to Hillsborough County for

10   the purposes of operating Head Start.  There's no

11   regulatory approval when you're talking about Head

12   Start internally managing their operations and

13   spending their money consistent with the terms and

14   conditions of that block grant.

15        So -- and quite frankly, there's almost no

16   case law, none that I could find that defines what

17   that regulatory approval in that section of the

18   application note is referring to.

19        But in this case, I don't think the regulatory

20   approval is the internal operating mechanism of

21   Hillsborough County.  I believe it's more likely

22   what I just mentioned, which is getting the money

23   from the government in the first place.

24        So it would be -- I guess a better example

25   might be along the lines of somebody attempting,

1    say, to get FDA approval of a drug and making

2    misrepresentations as to what the drug is, getting

3    the regulatory approval and then putting it out on

4    the market.  That's the sort of thing where it's

5    the -- the loss is directly attributed to the

6    governmental action in approving, in that case, the

7    licensing of a particular drug.  There's no

8    regulatory approval related to the purchase of these

9    books by Head Start.

10       THE COURT:  All right.  I want to go back just

11   a minute to your reliance on E1.  And I'm assuming

12   that what you're relying on is there was no property

13   returned but services rendered?

14       MR. WEISBROD:  Well, actually, Your Honor, we

15   had done more E2 --

16       THE COURT:  Oh, E2.  Okay.

17       MR. WEISBROD:  Collateral pledge or otherwise

18   provided.

19       THE COURT:  All right.  I'm sorry.  All right.

20   In a case involving collateral pledge or otherwise

21   provided, collateral provided, the books, by the

22   defendant, the amount the victim has recovered at

23   the time of sentencing from the disposition of the

24   collateral or if the collateral has not been

25   disposed of by the -- that time, the fair market

1     value of the collateral at the time of sentencing.

2         It seems to me that there's something wrong

3     with saying that they should get -- if, in fact, the

4     books were obtained by fraud, it seems there's

5     something wrong with then saying, okay, the jury has

6     found that the books were obtained by fraud,

7     however, we're going to give them credit for those

8     books, irregardless.

9     MR. WEISBROD:  Well, maybe it was my error to

10    not request the more specialized verdict fraud or

11    intentionally misapplied.  Because quite frankly,

12    the way I rationally look at the jury verdict is

13    perhaps what they focused on was Mr. Jimenez not

14    filing the appropriate notices with human resources

15    and, therefore, the money was dispensed when it

16    shouldn't have been to his wife, and that's an

17    intentional misapplication of the funds.

18        That to me is different than what the Court

19    usually sees in fraud where there's some sort of

20    material misrepresentation regarding the product

21    itself and the money received for it.  There really

22    wasn't in this case.

23        I mean, there wasn't any misrepresentation

24    regarding the author of the book or the book itself

25    and the subject covered or the pricing.  I mean, all

1    of that was very straightforward and up front, I

2    think.

3         So in looking at intentional misapplication,

4    it seems to me it's more along the lines of you

5    didn't follow the internal county rules to -- for

6    purchasing purposes, even though it's not illegal to

7    sell your spouse.  There are mechanisms in place you

8    ought to have followed, you didn't follow them,

9    therefore, you intentionally misapplied government

10   funds.

11        And I think if you look at it in that context,

12   the county is still receiving a benefit.  I mean, I

13   think it's uncontroverted that the county, as I

14   mentioned before, and I don't want to be repetitive,

15   they used these books, distributed them, etcetera.

16        Why does the county get it both ways?  Why do

17   they get the benefit of the item and yet the full

18   compensation, the full cost, at least for purposes

19   of this calculation?  You may still order $9,000 in

20   restitution because that's not the same as loss.

21        THE COURT:  No, and I agree with that.  I

22   guess my problem with it is it's not really a

23   decision that they fairly made because if, in fact,

24   they obtained or they misapplied the property, I

25   mean, it just seems to me there's something wrong

1    with that because they -- I mean, maybe they did

2    distribute the books.  But on the front end they

3    didn't have the -- they didn't have the ability to

4    determine and -- and at least what the jury has

5    found, that the whole -- the whole obtaining the

6    books was by fraud or by misapplication.

7         So it just seems there's something wrong with

8    me -- to me to then say, okay, even though that

9    happened, he ought to get credit for the fact that

10   they used those books.  I agree, there was evidence

11   that the books -- at least some of the books were

12   distributed and used.

13        Anyway, I don't know.  Let me hear from

14   Mr. O'Neill.

15        MR. O'NEILL:  Your Honor, I think that's the

16   essence of the crime.  Mr. Jimenez was in a position

17   to order or not to order.  And he was to do that for

18   the benefit of the Head Start Program on behalf of

19   HHS.  What he did here was he obtained by fraud

20   going through his wife ordering these books.

21        To say that these books were then dropped in

22   the lap of Head Start, were used, even though we

23   heard uncontroverted evidence, not a lot of it, I

24   mean, they're just there now.

25        There was also uncontroverted testimony that

1   these kind of books are given to them for free all

2   the time.  There was no need for these books.  There

3   was never any testimony that these books were

4   needed.  It was a plot by the defendant and his wife

5   to order these books.  So now Head Start has them.

6        To say that they're dolled out as a result of

7   that, which what he paid in upfront costs of

8   production of these books, the government thinks the

9   probation officer hit it right on the head with the

10  application note that in a case like this where

11  they're obtained by fraud, the loss shall include

12  the entire amount of the property.  We would not

13  have --

14       THE COURT:  I do, too.  I agree.

15       MR. WEISBROD:  Just briefly.  Mr. Jimenez

16  didn't order these books.  Marie Mason ordered these

17  books.  And the jury, since we're focusing on the

18  jury's findings, did not find that Ms. Mason

19  committed any sort of crime.  And it was not

20  uncontroverted testimony that these books were

21  available for free.

22       What was ultimately testified by that witness,

23  who I believe was Ms. Dasher, was that they get

24  pamphlets from St. Joseph's Hospital.  They don't

25  get books.  Nobody testified that books are

1    available to the program.

2         So that was -- that's not supported by the

3    evidence.  But if the jury didn't find that the

4    acquisition by Ms. Mason was fraudulent and that her

5    role did not lead to a conviction for her, then it

6    is not proper to say that Mr. Jimenez fraudulently

7    obtained books, because he didn't.

8         I mean, that much is clear from the evidence

9    that we'll get to that in discussion of 3B1.3 what

10    his role was.  But he did not order the books and he

11    did not authorize them.

12         THE COURT:  All right.  I do agree with you

13    that -- when I asked the first question, that the

14    value of the property is not necessarily the same as

15    the loss.  I think that's accurate.  But I do think

16    the probation office has properly scored it.  And I

17    think that -- you know, I don't -- I don't believe

18    that E2 applies as much as F5 applies as far as the

19    application notes are concerned.

20         I don't disagree there was some evidence that

21    some of the books were used.  We have no idea how

22    many of the books were used.  So I would have no

23    idea when you -- when you suggest that the amount of

24    the loss was 2,000 and something, I would have no

25    idea if that gives him credit for using all of the

1    books, and I don't even know that -- that -- I mean,

2    we have no idea how many books were actually used.

3         But at any rate, irregardless, that's

4    irregardless.  I still think the amount of the loss

5    should be the amount that was obtained by fraud, and

6    I think the jury convicted Mr. Jimenez of the fraud

7    and so I think it is the $9,000.  So I will overrule

8    the objection as to that.

9         The next one I think is abuse of a position of

10   trust.  And, Mr. Weisbrod, why don't you -- I did --

11   I read your sentencing memorandum.  I did read the

12   case, but go ahead.

13        MR. WEISBROD:  Well, first, Your Honor, the

14   language of the enhancement itself requires that the

15   abuse of position significantly facilitated the

16   commission or concealment of the offense.  And we

17   started talking about this a little bit a few

18   seconds ago.

19        The evidence doesn't establish that

20   Mr. Jimenez used his position to facilitate the

21   commission of this offense.  The facts establish

22   that he introduced his wife to Head Start years

23   before this book was authored at a public meeting

24   with all Head Start personnel.  His wife made it

25   known that a book would be available.

 1          When the book was finished, she asked

 2     Mr. Jimenez to bring it to the office, and he did.

 3     He brought it to Marie Mason.  The only testimony

 4     regarding his involvement from that point forward

 5     was Nurse Bell testified that there was a meeting

 6     between her, Marie Mason, Ron Knight and Mr. Jimenez

 7     in which she expressed her concerns about the book.

 8     She didn't say Mr. Jimenez uttered anything at that

 9     meeting, it was simply Marie Mason telling her to

10     order the book.

11          Thereafter, his only role was to acknowledge

12     as the second person in the chain of command the

13     actual receipt of the books after they had been

14     ordered by Ms. Mason.  There was a lot of testimony

15     regarding the receipt.  The Court may recall that

16     Linda Edmonds was the first line.  She acknowledged

17     that, in fact, the books that the county had ordered

18     had been received.

19          The second level was usually Ms. Tedder.  She

20     was not available so Mr. Jimenez signed off on that

21     form simply acknowledging receipt of the books.  So

22     when probation at various points said he authorized

23     or he approved the purchase of these books, that's

24     just simply not an accurate reflection of what the

25     trial testimony was.

1    Simply because he worked there did not

2    facilitate the commission of the offense.  It played

3    a role in it as it would for any employee of a

4    business involved in an offense, but the enhancement

5    requires more than that.  So --

6         THE COURT:  Go ahead.

7         MR. WEISBROD:  Well, that's the first part of

8    the argument.  The second part pertains to the

9    *Williams* case which the Court has read, it was in

10   the memo, which seems to suggest that the -- or does

11   suggest that the position of trust has to be

12   vis-à-vis the victim in the case.

13        Now, the victim, paragraph 23 of the report,

14   also, I believe paragraph 90, is the Department of

15   Health and Human Services because this is their

16   money that has been improperly spent in this case.

17   And there's no interplay, certainly no evidence

18   presented whatsoever of any relationship that

19   Mr. Jimenez had as his -- considering his position

20   with Head Start with Health and Human Services.

21        So when you combine those two factors

22   together, that's why we believe the enhancement is

23   inappropriate.

24        THE COURT:  Okay.  Let me ask a couple of

25   questions.  The first one, then, you don't have any

```
 1      argument with the fact that Mr. Jimenez had some
 2      managerial discretion that he was the -- obviously
 3      was the deputy director in charge of finance or
 4      something, I hesitate to say CFO, but at any rate,
 5      that he had some managerial discretion.  Your
 6      argument was that -- is with the fact that his
 7      position contributed in a significant way to the
 8      commission of the offense.
 9              MR. WEISBROD:  Did not.
10              THE COURT:  Did not.
11              MR. WEISBROD:  Right.
12              THE COURT:  Did not, that prong.
13              MR. WEISBROD:  Right.  He was deputy director
14      of fiscal, but there was no evidence that that
15      position played a role here.  We had a lot of
16      testimony regarding the 10,000-dollar threshold, as
17      the Court probably recalls that Marie Mason who was
18      on an equal level with Mr. Jimenez, she could order
19      items for the program, and if it's under $10,000,
20      according to Hillsborough County auditing accounting
21      rules, it doesn't require review by procurement, is
22      what I believe the term was.  Instead, you get
23      competitive bidding and then you select presumably
24      the low bid and off you go.
25              So that's in essence what Ms. Mason did.
```

1    That's what occurred and was unrelated to

2    Mr. Jimenez other than the fact that it's his wife

3    and he physically handed her the book.  His position

4    as deputy director of fiscal placed no role in him

5    delivering the book to Ms. Mason other than the fact

6    that he's going to be in the same building with her.

7            THE COURT:  Well, let me ask -- and this is to

8    the *Williams* argument, primarily.  The jury

9    instruction says, again, the property was owned by

10   or under the care, custody or control of

11   Hillsborough County Head Start.  And it's clearly

12   that -- I know your argument is as to Mr. Jimenez.

13   But certainly it seems to me that someone had

14   discretion in Head Start, whether it was Ms. Mason

15   or whoever, had discretion as to make that purchase.

16           That seems to me to be a little different from

17   the *Williams* case.  Because according to the

18   *Williams* case, and I'm reading from a portion of the

19   *Williams* case, it says that there were two different

20   agencies involved in the *Williams* case, the ETA and

21   the CNCS.

22           And the court came down -- the Eleventh

23   Circuit came down on the fact that it seemed to me

24   that ETA -- maybe *Williams* had discretionary

25   authority, but not CNCS and that that -- and that

1    seems different than what we have here with the

2    Hillsborough County Head Start.

3           MR. WEISBROD:  Well, actually, I thought -- if

4    you look at footnote 13 in *Williams*, I thought it

5    was kind of the opposite --

6           THE COURT:  Okay.  Well, then, maybe --

7           MR. WEISBROD:  -- that they tried -- that the

8    -- that the probation officer had suggested that

9    perhaps there could have been conditional victims

10   other than CNCS such as ETA.  But what the court

11   said, that's not what happened here.

12          Instead in this case, the PSI reported without

13   objection by the government that the victim in this

14   case is the Corporation for National Community

15   Service, an independent federal agency.  And so

16   that's what we have here.  The victim in this case

17   is Health and Human Services, and there's just no

18   relationship shown between Mr. Jimenez's position in

19   this book purchase and Health and Human Services

20   playing a role.

21          And quite frankly, there's -- even if there

22   was more than one victim, it still was within

23   Ms. Mason's purview as a director -- deputy director

24   herself to authorize these sorts of purchases.  And,

25   clearly, the chain of documentation that was

1    introduced at trial showed that that's what happened

2    and it was without involvement of Mr. Jimenez.

3        Ms. Mason even testified that -- she didn't

4    testify, but the tape was introduced of her

5    interview with Agent Sheen, the internal

6    Hillsborough County interview.  And he even asked

7    her about whether or not it was a problem for her

8    that the author was Mr. Jimenez's wife, and she said

9    no.

10        So she didn't need his involvement, didn't

11    request his involvement, didn't use his involvement

12    to make the purchase.

13        THE COURT:  Okay.  And I think I agree with

14    the situation in *Williams*.  But in *Williams*, the

15    court in *Williams* said that because there's no

16    evidence that CNCS, who they determined I guess was

17    the victim, entrusted *Williams* with discretionary

18    authority or placed a special trust akin to that of

19    a fiduciary, then in *Williams* the district court

20    erred in applying the abuse of a position of trust

21    because the position of trust that she had, the

22    position of trust was as to ETA and not CNC,

23    right -- I mean, CNCS.

24        MR. WEISBROD:  Well, but ETA wasn't a victim.

25        THE COURT:  No.  But if there -- if she had --

1    if she had discretionary authority, it was with ETA.

2         MR. WEISBROD:  Correct.

3         THE COURT:  Okay.

4         MR. WEISBROD:  And so I guess the analogy to

5    this case would be Mr. Jimenez doesn't have any

6    authority in connection with Health and Human

7    Services, at least none that's been shown.  He

8    arguably as deputy director would have authority to

9    order purchases under $10,000 without going through

10   procurement review.

11        And had that occurred in this case, then the

12   Court could make the argument or it seems to me the

13   enhancement could be applied by the Court that he

14   used his position knowing it wouldn't need

15   procurement review to get his wife's book purchased.

16        But that's not what happened.  It was Marie

17   Mason who used her authority to authorize the

18   purchase of the books.  And there's no evidence that

19   he influenced her to do that.  As a matter of fact,

20   the evidence demonstrated that, because of the long

21   relationship that had been established between

22   Mr. Jimenez's wife and Head Start, that her

23   production of a book consistent with her programs

24   was, perhaps, a positive for Head Start, at least

25   from Marie Mason's perspective.

1          And this jury, I can only assume, accepted

2     that in finding her not guilty.  So under those

3     circumstances, how did -- how did he use his

4     position to significantly facilitate the commission

5     of the offense.

6          THE COURT:  Okay.  Mr. O'Neill, how did he use

7     his position to significantly -- in a significant

8     way to contribute to the commission of the offense?

9          MR. O'NEILL:  He initiated the offense, Your

10     Honor.  We have the e-mails in which he becomes the

11     conduit between his wife and Ms. Mason.  He then

12     goes to that meeting with Ms. Mason and Marecia Bell

13     in which they then say, hey, approve this.  And then

14     finally he signs the final approval that initiates

15     the payments.  And HHS entrusts their moneys,

16     government moneys to Head Start.

17          THE COURT:  Okay.  Wait a minute.  I want to

18     go back to something you said.  He signs the

19     approval.  He signed off -- what was the form he

20     signed off on?  Mr. Weisbrod, do --

21          MR. WEISBROD:  It's an acknowledge -- it's a

22     receipt acknowledgment.

23          MR. O'NEILL:  A receiver report is what it's

24     called.

25          THE COURT:  A what?

1            MR. O'NEILL:  A receiver report.

2            THE COURT:  Yeah.  But that was different.

3      Isn't that different in that he -- that's not quite

4      the same.  That's the receipt, isn't it?

5            MR. O'NEILL:  That is the receipt, Your Honor.

6      Without that, the payment will not be made.  That's

7      acknowledging that the books are here, that Head

8      Start got these books, the books that he knows --

9      somehow Mr. Weisbrod keeps wanting to cut off his

10     knowledge of this -- a scheme that he initiated, a

11     fraud that he set in motion, and at the tail end, he

12     signs off saying the books are here, now my wife can

13     be paid.  Even though, you know, when we hear that's

14     uncontroverted, everybody knows who his wife is.

15     The people who signed off, Marecia Bell, did not

16     know who she was.

17           THE COURT:  Okay.  So his contribution is that

18     he -- according to the government, he initiated the

19     offense by setting it in motion, making the

20     introductions, essentially.

21           MR. O'NEILL:  Yes.  Without those e-mails,

22     Judge, we would have no idea that he was involved in

23     this.  It was only through the e-mail traffic that

24     was turned over by the witnesses that we know

25     Mr. Jimenez thought of this, that he brought forth

1      this scheme to Ms. Mason on behalf of his wife.

2           THE COURT:  And he's one of two people that

3      signed off on the receipt report which allows the --

4      allows Ms. Jimenez to get paid.

5           MR. O'NEILL:  That's correct, Your Honor.

6           THE COURT:  All right.  Explain to me, goes to

7      the meeting.

8           MR. O'NEILL:  I'm sorry, Your Honor?

9           THE COURT:  You said he went to a meeting.

10     Did he --

11          MR. O'NEILL:  Yes.  Mr. Weisbrod just

12     mentioned it, the meeting in which he and Ms. Mason

13     go over and tell Ms. Bell to order the books.  He's

14     there.  The testimony is, I believe Mr. Weisbrod

15     said it correctly, he does not speak at the meeting.

16     Ms. Mason does.  He's just standing there.

17          THE COURT:  Okay.  All right.  You started to

18     say something else.

19          MR. O'NEILL:  Yes, Your Honor.  In terms of

20     the abuse of trust argument that Mr. Weisbrod is

21     making, I believe *Williams* actually speaks in favor

22     of the probation officer's decision.  In keynote

23     number 22, the court says, the abuse of trust

24     adjustment applies only where the defendant has

25     abused discretionary authority.

1          There is very little doubt here that in

2     Ms. Stafford's response to the objection that the

3     defendant was employed as the Head Start deputy

4     director of fiscal services.  His job was to make

5     sure that the money entrusted by HSS to Head Start

6     was properly utilized.

7          Here we have that this expenditure was

8     purposely done under $10,000 so that it could be

9     done inhouse.  He's the one who starts the scheme.

10    He's the one who plays a role in the payment in the

11    end by certifying receiver.  At any point, Your

12    Honor, he could have stopped this.  As Ms. Stafford

13    said, but for him, there's no offense.  And that's

14    the government's position.

15         THE COURT:  Okay.  And I don't want to

16    paraphrase Mr. Weisbrod, but I will to some extent.

17    The *Williams* case, it talks about CNCS being the

18    victim in the case and that -- not ETA and that

19    there was no evidence that *Williams* had a position

20    of trust with CNCS.

21         Mr. Weisbrod has suggested that the victim in

22    this case is the United States.  And I'm assuming

23    the argument is there's no evidence that there's a

24    position of trust with the United States.

25         MR. O'NEILL:  I think the statute speaks for

1      itself, Your Honor, in the elements of the offense.

2      The defendant has to be an agent of an organization

3      and has charged and has proven it was of the Head

4      Start Program.  The moneys flowed from the

5      Department of Health and Human Services.

6              Ultimately, the Department of Health and Human

7      Services are the victim, and as Mr. Weisbrod was

8      opining, there are two victims here because if the

9      Head Start Program is found to not properly be

10     allocating the moneys entrusted to it by the United

11     States government, they will lose all these grants

12     and the like.

13             So Head Start has to properly handle the

14     moneys that are given by the United States

15     government.  So ultimately it's taxpayer dollars,

16     but nonetheless it goes through the Head Start

17     Program.

18             THE COURT:  All right.  Mr. Weisbrod, you

19     started to respond, I think.

20             MR. WEISBROD:  Well, I just think it's wrong

21     to say that he initiated this.  His wife made an

22     announcement at a public meeting that she was

23     writing this book and it would be made available.

24     She then asked him to deliver it to a coworker.

25             I mean, that makes perfect sense to me.  It's

1    not him initiating it.  If he wrote the book, he

2    hatched the plot, hey, let's -- you know, let's set

3    you up, Johana, so that you have an in with Head

4    Start and then you'll write a book and then I'll be

5    able to bring it to them and you'll be able to sell

6    it to them, then you could say that he's somehow

7    initiating it but, otherwise, he's not.

8         He's a conduit to Ms. Mason who then,

9    according to all the evidence, made the decision as

10   to whether or not the book should be purchased or

11   not.  And there were four people at that meeting,

12   and Ms. Bell was very succinct in her testimony that

13   Mr. Jimenez didn't say anything.  It was Ms. Mason

14   that ordered it.

15        The only other thing I would add, Your Honor,

16   is that obviously Mr. Jimenez was an agent of an

17   organization, state, local government receiving

18   federal assistance.  That -- and it's the federal

19   assistance, it's the federal money that's -- that

20   makes it the federal offense here.  And, again,

21   there's no relationship between him and HHS in the

22   record.

23        THE COURT:  Okay.  Let me take the easier one

24   first, at least I think it's the easier one.

25        It seems to me that *Williams* does not apply

1    here.  And the jury did find because, you know, and

2    I don't want to go through the whole thing about

3    *Williams* again, but it's different, the factual

4    situation is, and how the money was distributed, the

5    scenario is different than we have here.

6         And the jury did find that the property was

7    owned by or under the care or custody or control of

8    Hillsborough County Head Start/Early Head Start.

9    And even though the money might have been initiated

10   from the federal government in that they received

11   federal assistance in excess of $10,000, it would

12   seem to me that it would be proper to call the

13   Hillsborough County Head Start/Early Head Start the

14   victim in this case.  And he did have a position of

15   trust with -- with that agency.

16        Number two is a little more difficult, I

17   think, because whether or not the position

18   contributed in a significant way, certainly

19   contributed, there's no doubt about it, but in a

20   significant way to the commission of the offense.

21   You know, I'm not sure.  Maybe the word initiated

22   the offense, initiate is -- maybe I wouldn't use

23   that word.

24        But certainly the e-mails set it in motion.

25   And without that happening, it -- in all

1      probability, the whole sale of the book wouldn't

2      have happened.  I'm not sure what going to the

3      meeting -- what part that plays in it there.  You

4      both said that there was no evidence that he said

5      anything or did anything other than attending the

6      meeting.

7      He did sign off on the receipt along with

8      someone else which, I suppose then in turn as a

9      result of receiving them, they paid them.  So even

10     though I think this is a closer call regarding

11     whether or not it contributed to it in a significant

12     way, I'm going to overrule the objection and find

13     that it did.

14     I think that -- I don't disagree that without

15     Mr. Jimenez, it would never have happened.  And I

16     don't disagree that the evidence is that he did sign

17     off along with someone else on the receipt of the

18     books and then the payment followed.

19     So I'm going to overrule both objections and

20     find that the probation officer has properly scored

21     the advisory guideline calculation.

22     So now, you know, I think I have some

23     discretion as far as sentencing is concerned in this

24     matter.  I think the discretion even under the

25     advisory guidelines allows me to impose -- and

1     perhaps the probation officer can correct me, but a

2     sentence that includes probation and home detention;

3     is that correct?

4          PROBATION OFFICER:  Yes, Your Honor.

5          THE COURT:  Yeah.  And I understand that

6     Mr. Weisbrod is asking for a variance.  So both of

7     those things would allow me to impose some sort of

8     sentence that does not involve incarceration.  And I

9     will tell you and I haven't heard from either of you

10    that I come into this thinking this is not a crime

11    that should result in incarceration for Mr. Jimenez

12    based on the fact that he has no prior criminal

13    record, based on the fact I don't think he is a

14    danger to the community.

15         I realize that -- that we are dealing with an

16    agency, Hillsborough County Head Start, that we

17    should all be cognizant of the fact that this is

18    money that is intended to go to children who

19    otherwise would not get the proper head start into

20    the public school system, and we should be cognizant

21    of how that money is used.

22         But it does seem that this would not be a case

23    that it would be necessary to incarcerate

24    Mr. Jimenez.  Now, I come in here feeling that way

25    having listened to the trial and having read the

1    presence investigation report.  So I haven't made

2    any final decision, but I just thought I would

3    inform you that that's the way I felt.  So

4    Mr. Weisbrod?

5         MR. WEISBROD:  Well, I guess, Your Honor, I'd

6    ask Mr. O'Neill if he objects to --

7         THE COURT:  I don't know.  Let's see what

8    Mr. O'Neill is -- are you going to be asking me to

9    incarcerate Mr. Jimenez?

10        MR. O'NEILL:  Not now, Your Honor.

11        THE COURT:  Okay.

12        MR. WEISBROD:  I think, frankly, that makes it

13   easier, Your Honor, you have the full picture,

14   having done the trial, read the memorandum obviously

15   that I submitted, much of what you just said is what

16   would have been in my presentation.

17        Obviously, I believe that the ultimate

18   conclusion from acknowledgment of all of those facts

19   would be a straight period of probation, and home

20   detention doesn't serve any particular useful

21   purpose regarding Mr. Jimenez.

22        He's going to be under the watchful eye of

23   probation.  He's going to school.  He's attempting

24   to reeducate himself in a new field.  He's

25   struggling with his family to get by.  He's got a

1       lot on his plate right now.  There's no indication

2       that he's going to be a problem for anybody.

3            So I would just ask you to impose that

4       straight period of probation which the law allows

5       you to do at this point.

6            THE COURT:  All right.  Now, let me -- I

7       should state a couple things.  And I know that the

8       government has filed a notice of interlocutory

9       appeal on Count Three.  Should the government

10      prevail in -- and should the defense not prevail in

11      their appeal, should the government prevail in the

12      interlocutory appeal and should the judgment of the

13      jury be reinstated as to Count Three and should I be

14      remanded this case for resentencing which would

15      include Counts Two and Three which may affect the

16      advisory guideline range, I don't mean to suggest by

17      saying what I did -- part of why I said what I did

18      about the need to incarcerate him and protect the

19      public is based on the fact that the guideline range

20      does give me some discretion to impose a

21      non-incarceration sentence or an incarceration

22      sentence, and I think in this case, a

23      non-incarceration is appropriate.

24           But if the guidelines -- advisory guidelines

25      were different and much higher, then I don't mean to

1    suggest that if we did get in that position that my

2    position would be the same.  So I just wanted to

3    clear that up.

4        MR. WEISBROD:  And I understand that.  The

5    only thing I would advise the Court is we did

6    initially receive from probation a report that

7    included a calculation with Count Three, and it was

8    I think just one level higher.  I think it was 11,

9    criminal history one instead of 10.

10       THE COURT:  Okay.  Well, I never got that so I

11   don't know what that --

12       MR. WEISBROD:  But there's not a significant

13   difference in the scoring, if the Court was

14   concerned about that.

15       THE COURT:  All right.  Mr. O'Neill, when I

16   say I have discretion, obviously I could vary and

17   impose a probationary sentence, I could impose a

18   probationary sentence with six months of home

19   detention which would be an advisory guideline

20   sentence.  What says the government?

21       MR. O'NEILL:  Your Honor, I agree with

22   Mr. Weisbrod that home detention is -- is sort of --

23   in the federal system, as this Court knows more than

24   anybody having been a state judge, as well, the

25   United States Probation Office does a great job of

1    overseeing these people in the federal system and

2    have the time to do it.  So I don't think home

3    detention adds anything to the mix.

4        I think what's really important in this case

5    is that Mr. Jimenez lost his job.  As a skilled

6    advocate, Mr. Weisbrod can say different things.

7    Mr. Jimenez knows what he did.  He utilized his

8    position to defraud the United States government and

9    the Head Start Program.  He did it for whatever

10   reason.  That doesn't come out at trial, whatever

11   his motives were.  It's a de minimis amount of money

12   and it was caught early.

13       And so as a result of that, the loss was

14   small.  He suffered because of his loss of a job,

15   and I think that's rightful and proper.  But the

16   government would leave it to the discretion of the

17   Court what you would put together as an appropriate

18   sentence.

19       THE COURT:  All right.  Mr. Jimenez, is there

20   anything you would like to say, sir?  And I do have

21   a couple of questions based on the presentence

22   report and pretrial services report.

23       THE DEFENDANT:  I have nothing else to say,

24   Your Honor, other than I'm sorry, Your Honor.  I

25   have nothing else to say regarding the sentence

1    except for the fact that I respect the jury's

2    verdict and I respectfully request any leniency that

3    the Court believes I deserve.

4        THE COURT:  Okay.  Let me ask you a couple of

5    questions, but I will be ordering restitution in

6    this case, so let me ask about your employment.  I

7    thought the presentence report said you were not

8    employed, and then I got something that said you

9    were earning $250 a month.  What is the status of

10   your employment?

11       THE DEFENDANT:  $250 dollars a month is on an

12   as-needed basis.  It's not consistent.  So I teach

13   corporate training courses.  And when I teach those

14   courses, it's scheduled courses on an as-needed

15   basis.  I may not have a course next month in the

16   month of November to teach, but I may have one in

17   December.  So it's not consistent.  It's not a

18   salary.

19       THE COURT:  Okay.  And when were you last

20   employed?

21       THE DEFENDANT:  The last presentation I made

22   was last month.

23       THE COURT:  And you're saying you earned $250

24   for that?

25       THE DEFENDANT:  Yes, ma'am.

1          THE COURT:  Okay.  And that was just one

2     presentation?

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  All right.  When were you last

5     employed by Head Start?  When was your last day?

6          THE DEFENDANT:  December 17th, 2010.

7          THE COURT:  Okay.  December 17th, 2010.  And

8     we are now October 20th, 2011.  So ten months or

9     so --

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  -- you've been unemployed?

12          THE DEFENDANT:  Yes.

13          THE COURT:  How come?

14          THE DEFENDANT:  I've been searching for

15     employment.  With a criminal record, it is haunting

16     me.  It follows me.  I've had several job offers,

17     hiring managers wanting to hire me but I don't get

18     past the corporate level because of the fact that I

19     have a criminal record.

20          And that's been very hurtful in my job search,

21     so I'm changing careers.

22          THE COURT:  You know, you may have to take a

23     job that perhaps pays less than what you earned

24     before, but you've got restitution to pay so you are

25     going to have to become employed.

1           THE DEFENDANT:  I am searching.

2           THE COURT:  That's not my statement to you.

3     You are going to have to become employed because you

4     have restitution to pay.  And even if it is taking a

5     job that is maybe not up to what your standards

6     were, you are going to have to become employed at

7     some sort of job that earns some sort of income so

8     that you can pay restitution.

9           THE DEFENDANT:  Yes, ma'am.

10          THE COURT:  You know, I applaud you going to

11    school.  But I repeat again, you are going to have

12    to become employed.

13          I'm looking for something else that you filed.

14    I know that I received information about your wife's

15    income.  I also received some information -- I'll

16    find it in a minute -- regarding -- regarding the

17    value, the equity that you have in your house.

18          And I'm asking all these questions right now

19    as it might relate to restitution, but it also might

20    relate to whether or not you qualify to have the

21    services of an attorney appointed.  So you are what

22    we slangily call underwater in your home; is that

23    correct?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  And the presentence report says

1       that 124 -- the difference between the value of your

2       home and the mortgage is minus $124,000,

3       approximately; right?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  And at the time the presentence

6       report was done, you had in a joint savings account

7       approximately $500.  Is that still accurate or

8       inaccurate?

9              THE DEFENDANT:  That is -- I haven't checked

10      the account lately, but it's probably accurate.

11             THE COURT:  Okay.  And you also have indicated

12      that you own a car and own it outright and that you

13      have approximately $12,500 in credit card debts.

14      Would that be about right?

15             THE DEFENDANT:  12,500 -- actually $25,000.

16             THE COURT:  I thought I said $25,000.

17             THE DEFENDANT:  $25,500.

18             THE COURT:  500, yeah.  Okay.  All right.  I

19      know it was on my chair.  Let me -- Ms. Vizza, let

20      me give you all my documents and see if you can find

21      the affidavit that he did most recently for me.

22             COURTROOM DEPUTY CLERK:  Yes, Your Honor.

23             THE COURT:  I brought it in from my chair.  If

24      not, it's still sitting there.

25             Mr. Weisbrod, when you requested that I

1    appoint counsel for purposes of appeal in this

2    matter, would it be your intent to withdraw as

3    retained counsel at the time that I or after I

4    sentence?

5         MR. WEISBROD:  Yes, Your Honor.

6         THE COURT:  Okay.  All right.  Mr. O'Neill, do

7    you have any position regarding -- I don't even know

8    if you saw it or not -- regarding the appointment of

9    counsel?

10        MR. O'NEILL:  I saw it, Your Honor, and no

11   position.

12        THE COURT:  Okay.

13        MR. O'NEILL:  Thank you.

14        THE COURT:  All right.  Mr. Jimenez, if you'll

15   come forward I'm going to impose sentence in this

16   matter.  Mr. O'Neill, would you mind joining us up

17   here.

18        Mr. Jimenez, on July 14th, the jury found you

19   guilty of Count Two of the indictment which charged

20   you with fraudulently obtaining funds in excess of

21   $5,000 from organizations receiving federal funds.

22   I adjudicated you guilty of that offense.

23        You have told me earlier that you read the

24   presentence report, and there were some objections

25   and I ruled on those objections.  There were no

1     objections to the facts other than as they related

2     to those guideline objections.

3         I will adopt the presentence report, both the

4     facts and the guideline calculations, finding the

5     total offense level is a 10, the criminal history

6     category is one.  The range of imprisonment is six

7     to twelve months, two to three years of supervised

8     release, $9,000 -- $9,000 is the restitution, $2,000

9     to $20,000 is the fine range and a 100-dollar

10     special assessment.

11         Mr. Weisbrod, is there any legal reason I

12     shouldn't proceed with sentencing at this time?

13         MR. WEISBROD:  No, Your Honor.

14         THE COURT:  Mr. O'Neill?

15         MR. O'NEILL:  No, Your Honor.

16         THE COURT:  All right.  The Court having asked

17     why judgment should not now be pronounced and no

18     cause being shown to the contrary, having considered

19     the advisory guidelines, which we have talked about

20     at length here, having considered everything that

21     was said this morning, having considered the

22     evidence that I heard at trial, having considered

23     the presentence investigation report, having

24     considered Title 18, United States Code, Section

25     3553 and all of the factors thereunder, including

1    the admonition that a sentence that's imposed should

2    be sufficient but not greater than necessary, it is

3    the judgment of this Court that you be placed on a

4    term of probation for three years.

5         While on probation, you'll have to comply with

6    the standard conditions adopted by the Middle

7    District of Florida.  In addition, you'll have to

8    comply with these special conditions.  First of all,

9    I'm going to order that you pay restitution.

10   Restitution is $9,000.  And because you have that

11   large amount of restitution, you are prohibited from

12   incurring any new credit charges, opening additional

13   lines of credit, obligating yourself to any major

14   purchases without the approval of the probation

15   office.  And you will also have to provide the

16   probation officer with access to any financial

17   information, should they request it.

18        The restitution is to be paid according to my

19   presentence report to the US Department of Health

20   and Human Services, and I won't read the address

21   into the record.  But that is who I'm told that it

22   should be paid to.

23        I am going to order that you make payments in

24   the amount of no less than $250 a month, and you'll

25   have to make that amount of payments in order to get

1    this paid off by your three years of probation.

2          If something happens and you get a great job

3    and you earn a lot more money, then I may up it.  If

4    you should become ill or something of that sort and

5    not be able to work, I may change it in that manner.

6    But just not getting a job is not sufficient.  You

7    may have to get a job that perhaps is not up to your

8    standards, but you'll have to get a job because you

9    have to pay the restitution.

10          I'm going to order that you become employed

11    within 60 days, that seems fair enough to me, in

12    some manner or way.  And that would mean a regular

13    job as opposed to, you know, one day a month or

14    something of that sort.

15          I'm going to order that you pay a 100-dollar

16    special assessment which I cannot waive in any way.

17    I will waive the fine, finding because you have a

18    large amount of restitution and based on your --

19    what you told me is your ability to pay, you have no

20    ability to pay a fine so I'll waive that.

21          I'll also order that you cooperate in the

22    collection of DNA by the probation office.  The

23    probation officer has suggested that it might be

24    appropriate for mental health counseling, and I'm

25    sure that's based on what you told me, the

1    medication you're taking and that sort of thing.

2    Mr. Weisbrod?

3         MR. WEISBROD:  He already has a regular

4    counselor, Your Honor.  I believe that information

5    was in the report.  There's actually two

6    professionals that he sees, one on a more regular

7    basis than the other.  I would just have him

8    continue doing what he's been doing because he's

9    obviously getting treatment.

10        THE COURT:  All right.  Then I'll order that

11   you continue with your mental health counseling

12   and/or the medication that you are currently taking.

13        The advisory guidelines were a 10, criminal

14   history category of one.  I actually, in order to

15   impose a probationary sentence, have varied downward

16   two guideline levels to an eight.  And I've done

17   that based on a number of things, including what

18   I've said earlier, the fact you have no criminal

19   record, the fact that I don't think it's necessary

20   to protect the public to put you on home detention,

21   and also because I think it's a sentence sufficient

22   but not greater than necessary based on the count

23   that you were convicted of, and the circumstances of

24   the conviction and the facts of the conviction.

25        The Court, having pronounced sentence,

```
1     Mr. Weisbrod, do you have any objections to the
2     sentence or the manner in which it was imposed?
3          MR. WEISBROD:  None other than those
4     previously stated, Your Honor.
5          THE COURT:  Okay.  And Mr. O'Neill, what about
6     you?
7          MR. O'NEILL:  No, Your Honor.
8          THE COURT:  All right.  Then let me tell you
9     about your appeal rights.  You have the right to
10    file an appeal.  Any notice of appeal must be filed
11    within 14 days.  And you have to file it within 14
12    days.  If you are indigent and qualify for the
13    services of either a federal public defender or a
14    court-appointed attorney, I will appoint one and
15    they will pursue the appeal.
16         If -- and I'll talk about that in just a
17    moment.  In this instance I would also waive the
18    filing fee.  But the notice of appeal, I'm sure
19    Mr. Weisbrod will file, it must be filed within 14
20    days.
21         The government also has the right to appeal
22    the sentence that I have imposed.  And as we've
23    discussed earlier, they are filing an interlocutory
24    appeal on my granting the JOA as to Count Three of
25    the indictment.
```

1          Was there a superseding indictment in this

2    case or was it just -- it was the original

3    indictment, wasn't it?

4          MR. O'NEILL:  Just the one, Your Honor.

5          THE COURT:  Okay.  That's unusual.  But do you

6    have any questions about anything that I have said

7    so far?

8          THE DEFENDANT:  No, Your Honor.

9          THE COURT:  Okay.  Ms. Vizza, did you get that

10   for me?

11         COURTROOM DEPUTY CLERK:  Yes, Your Honor.

12         THE COURT:  Could I have it.  Thank you.

13   Okay.  According to the financial affidavit that you

14   have signed, and it's dated 10/19, you have told me

15   just as you have this morning that you are earning

16   approximately $200 a month by the instruction at

17   HCC.  Your spouse is earning $4800 a month.  You

18   received $10,000 in tax return money sometime this

19   year.  Do you still have any of that?

20         THE DEFENDANT:  No.

21         THE COURT:  All right.  It says you have

22   approximately $1500 in savings in the bank and you

23   have a mortgage -- well, you're underwater in your

24   home.  So you have a mortgage of about $290,000 and

25   the value of the home is about $172,000.  You have

1    three children, and your total monthly living

2    expenses are $5,290.  It does appear to me that you

3    qualify for a court-appointed attorney to pursue

4    this appeal, so I will appoint one.

5         I would -- first I would call the Federal

6    Public Defender to see if there's any conflict in

7    their willingness to take this and pursue the

8    appeal.

9         Mr. Weisbrod, should the Federal Public

10   Defender not be able to do this or have a conflict,

11   would you consider pursuing the appeal pursuant to

12   what you're paid to be a CJA lawyer or would you

13   prefer me to appoint someone else?

14        MR. WEISBROD:  I'm not on the list, Your

15   Honor.

16        THE COURT:  You're not?

17        MS. WEISBROD:  No, I've been off of that for a

18   little bit.

19        THE COURT:  Too bad.

20        MR. WEISBROD:  That's why I suggested and I

21   proposed a name in my motion.  I've talked to that

22   individual and he's ready, willing and able.

23        THE COURT:  All right.  Well, let me first

24   contact the Federal Public Defender, which I think

25   it's incumbent upon me to do, so I'm going to do

1     that first.  If they have a conflict or are unable

2     to pursue it, then I will consider the

3     recommendation.  But I will do that immediately and

4     appoint counsel to represent you, and Mr. Weisbrod

5     will go ahead and file the notice of appeal.

6          And, obviously, counsel would need to respond

7     to Mr. O'Neill's appeal, as well.

8          THE DEFENDANT:  Okay.

9          THE COURT:  Any other questions?  You'll need

10    to report to the probation office, and the probation

11    officer is present in the courtroom at the end of

12    that table.  And she'll tell you where and when and

13    all that sort of thing.

14         THE DEFENDANT:  Yes, Your Honor.

15         THE COURT:  All right.  Thank you.

16         MR. WEISBROD:  Thank you.

17         MR. O'NEILL:  Thank you.

18         (Proceedings concluded at 9:39 AM.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3     STATE OF FLORIDA            )

4     COUNTY OF HILLSBOROUGH   )

5        I, Linda Starr, RPR, Official Court Reporter for

6     the United States District Court, Middle District,

7     Tampa Division,

8        DO HEREBY CERTIFY, that I was authorized to and

9     did, through use of Computer Aided Transcription,

10    report in machine shorthand the proceedings and

11    evidence in the above-styled cause, as stated in the

12    caption hereto, and that the foregoing pages,

13    numbered 1 through 54, inclusive, constitute a true

14    and correct transcription of my machine shorthand

15    report of said proceedings and evidence.

16       IN WITNESS WHEREOF, I have hereunto set my hand in

17    the City of Tampa, County of Hillsborough, State of

18    Florida, this 15th day of December 2011.

19

20

21          _____/s/ Linda Starr_____
                 Linda Starr, RPR, Official Court Reporter
22

23

24

25